1  JAMIE LYNN GALLIAN
   16222 Monterey Lane Unit 376
2  Huntington Beach, CA 92649
   (714) 321-3449
3  Jamiegallian@gmail.com

4  IN PRO PER

5

6

7            **UNITED STATES BANKRUPTCY COURT**

8            **CENTRAL DISTRICT OF CALIFORNIA**

9
                              **BK Case No. 8:21ap-01097-ES**
10  In Re                      **Chapter 7**
                          )
11  JAMIE LYNN GALLIAN         )
                          )    **OPPOSITION TO HOUSER BROS**
12                 Debtor.     )    **MOTION TO CONTINUE PRETRIAL**
                          )    **CONFERENCE PAST JULY 14, 2022;**
                          )    **REQUEST TO CONSOLIDATE THE DATE**
13  _____   )    **ALL THREE ADVERSARYS PRETRIAL**
                          )    **CONFERENCE TO JULY 14, 2022, ALL**
14  HOUSER BROS CO             )    **CLOSELY RELATED AND OVERLAP.**
                          )
15  vs.                        )    **DECLARATION IN SUPPORT OF**
                          )    **OPPOSITION OF JAMIE LYNN GALLIAN;**
16                             )    **Frivilous Motion only to delay and miss the**
                               **tentative appointment with Mediator Thomas**
17  JAMIE LYNN GALLIAN         **Watts 6/24/22.  Request for reconsideration of**
                               **reversing imposed sanctions of $4000 on**
18  _____   **6/2/22, because of Houser Bros Co delay**
                               **tactics.**
19      **TO THE HONORABLE ERITHE A. SMITH, UNITED STATES BANKRUPTCY JUDGE,**

20  **HOUSER BROS CO, dba RANCHO DEL REY MOBILEHOME ESTATES AND THEIR**

21  **ATTORNEY D. EDWARD HAYS:  Debor opposes this Motion filed in bad faith as frivilous,**
    **time consuming tactic in order to avoid mediator Watts, tentative date June 24, 2022.**

22          PLEASE TAKE NOTICE that debtor JAMIE LYNN GALLIAN moves this Court for

23  sanctions against Houser Bros Co and their attorney D. Edward Hays for filing a false document,

24  with this Honrorable Court on June 6, 2022, 19:08:05, with PROOF OF SERVICE DOC 22 8:21-

25  AP-01097. signed under penalty of perjury that debtor was served by [email service] on June 6

26  2022.  Ms. Gallian has never agreed to service to served by email. See POS and email attached here

27  page 3-4 dated June 7, 2022 @ 9:11 AM. Secondly,  Ms Gallian's email address is NOT

28  listed on the Proof of Service SIGNED and filed electronically by attorneys for  Houser Bros Co
    on 6/6/2022 at 19:08:05.  No reward can be offered when Officers of the Court disrespect the Court.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 870 Roosevelt, Irvine, CA 92620.

A true and correct copy of the foregoing document entitled**: NOTICE OF MOTION AND MOTION TO CONTINUE PRETRIAL CONFERENCE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 6, 2022**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **TRUSTEE JEFFREY I GOLDEN (TR):** Jeffrey I Golden (TR) lwerner@wgllp.com, jig@trustesolutions.net; kadele@wgllp.com
- **ATTORNEY FOR PLAINTIFF HOUSER BROS. CO.:** D Edward Hays ehays@marshackhays.com, ehays@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com; cmendoza@marshackhays.com; cmendoza@ecf.courtdrive.com
- **ATTORNEY FOR PLAINTIFF HOUSER BROS. CO.:** Laila Masud lmasud@marshackhays.com, lmasud@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com
- **U.S. TRUSTEE:** United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On **June 6, 2022**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**DEBTOR AND DEFENDANT**
JAMIE LYNN GALLIAN
16222 MONTEREY LANE, SP #376
HUNTINGTON BEACH, CA 92649

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 6, 2022**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**VIA EMAIL DELIVERY**: DEBTOR AND DEFENDANT – JAMIE LYNN GALLIAN

PURSUANT TO THE COURTROOM POLICIES AND PROCEDURES OF THE HONORABLE ERITHE A. SMITH, COURTROOM 5A, §VIII. JUDGES' OR COURTESY COPIES, EXCEPT FOR DOCUMENTS 200 PAGES OR OVER, INCLUDING EXHIBITS, JUDGE SMITH **DOES NOT** REQUIRE JUDGES' COPIES.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 6, 2022 | Layla Buchanan | /s/ Layla Buchanan |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

 Gmail

Jamie Gallian <jamiegallian@gmail.com>

---

## Houser adv Gallian - Motion
1 message

---

**Layla Buchanan** <LBuchanan@marshackhays.com>                    Tue, Jun 7, 2022 at 9:11 AM
To: "jamiegallian@gmail.com" <jamiegallian@gmail.com>
Cc: Ed Hays <EHays@marshackhays.com>, "Bradford N. Barnhardt" <bbarnhardt@marshackhays.com>

Please find attached an additional copy of the motion that was filed.


Thank you,


Layla B.



**Layla Buchanan**
Senior Paralegal



**MARSHACK HAYS** LLP
— **ATTORNEYS AT LAW** —
870 Roosevelt, Irvine, CA 92620
Tel 949.333.7777   Fax 949.333.7778

CONFIDENTIALITY NOTICE. The information contained in this electronic e-mail and any accompanying attachment(s) is intended only for the use
of the intended recipient and may be confidential and/or privileged. If any reader of this communication is not the intended recipient, unauthorized
use, disclosure or copying is strictly prohibited, and may be unlawful. If you have received this communication in error, please immediately notify
the sender by return e-mail, and delete the original message and all copies from your system.

 Please consider the environment before printing this email.

---

📄 **06-06-22 Houser v Gallian 01097 - Motion to Continue Pretrial Conference 4870-4312-3236 v.pdf**
5798K

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Debtor moves this Court for a reasonable continuance to coincide and track the other two adversary proceedings closely related and all three overlap 8:21-ap-01095 and 8:21-ap-01096 respectively.HOUSER BROS IS TRYING TO STEAL THE HOME OF DEBTOR WITH HOA.

On May 11, 2022, the Court continued 8:21-ap-01095 and 8:21-ap-01096, on its own motion, Pretrial Conference Set for June 30. 2022, now continued to July 14, 2022.

The Opposition to Movant's Motion, and memorandum of points and authorities in support thereof, the Declaration of Jamie Lynn Gallian, the pleadings and files in the Debtor's bankruptcy case 8:21-bk-11710-ES, and the Houser adversary proceeding, 8:21-ap-01097, and upon such further oral and documentary evidence as may be presented to the Court in support of denial of Movant's Motion or in the alternative schedule the Pretrial Conference to coincide with the other two Closely Related Adversary Proceedings 8:21-ap-01095 and 8:21-ap-01096 on July 14, 2022, 9:30 a.m. 5A.

### **MOVANT CITES NO GOOD CAUSE TO CONTINUE PRETRIAL CONFERENCE**

Movant provides no good cause to continue the pretrial conference 60-90 days out because discovery [has been] completed; debtor has provided over a thousand pages of discovery last October 2021, provided transcripts from previous hearings and related depositions have been provided to the attorney for Houser Bros. Co.

There is nothing more that debtor could add or offer for the simple reason that the State Court Unlawful Detainer Case 30-2019-01014123, filed 1/2/2019, pending for approximately 4 years and debtors affirmative defenses have not been decided on the merits. Even Thomas Watts, III, the Mediator, wondered what he was mediating because there is no final Judgment in the Unlawful Detainer State Court Case No. 30-2019-01014123, normally a quick summary proceeding usually involving possession only, and generally resolved within 30-60 days, now unprosecuted by Houser Bros Co. dba Rancho Del Rey Mobilehome Estates for nearly 4 years. It appears that Houser Bros Co has come into this court with unclean hands, and has not

accurately taken responsibility for an unprosecuted State Court Case and appears to be "THROW

AS MUCH PAPER AGAINST THE WALL AND SEE WHAT STICKS."

over other creditors in this Chapter 7, NO ASSET CASE.

**STANDING - Affirmative Defense in the State Court Case**

**Purpose of Requirement:** The purpose of the real party in interest requirement is to assure that any judgment rendered will bar the owner of the claim sued upon from relitigating. "It is to save a defendant, against whom a judgment may be obtained, from further harassment or vexation at the hands of some other claimant to the same demand." [*Giselman v. Starr* (1895) 106 C 651, 657, 40 P 8, 10; *Cloud v. Northrop Grumman Corp.* **(1998) 67 CA4th 995, 1003, 79 CR2d 544, 549, fn. 2** (citing text); *O'Flaherty v. Belgum* **(2004) 115 CA4th 1044, 1094, 9 CR3d 286, 326** (citing text) ]

**"A litigant's standing to sue is a threshold issue to be determined by the court before addressing the merits."** [*Boorstein v. CBS Interactive, Inc.* (2013) 222 CA4th 456, 465, 165 CR3d 669, 674]

    A.  **Effect of Lack of Standing to Sue:**

    When a party lacks standing to sue, the action must be dismissed, unless the complaint can be amended by substituting a party who has standing. [*Cloud v. Northrop Grumman Corp.* (1998) 67 CA4th 995, 1004-1011, 79 CR2d 544, 549-554]  Houser Bros Co is an interested party at best or an unsecured creditor and is attempting to gain an advantage over other creditors similarly situated.

    There is no controversy with possession because Debtor is the Registered Owner of a 2014 Manufactured Home under a 80 year Ground Leasehold recorded December 5, 1979, DQQM"35646."PG 499-506, against A.P.N. 178-011-010and recorded by Subdivider Robert P. Warmington Co. July 1980, Application to Department of Real Estate for a **FINAL SUBDIVISION PUBLIC REPORT File No. 46-370 LA.**

1

2  **Jamie Lynn Gallian does not qualify as an unlawful detainee under C.C.P. 798.75.**

3  **798.75 RENTAL AGREEMENT REQUIRED FOR PARK OCCUPANCY**

4          (a) An escrow, sale, or transfer agreement involving a mobilehome located in a park at

5  the time of the sale, where the mobilehome is to remain in the park, shall contain a copy of either

6  a fully executed rental agreement or a statement signed by the park's management [**and**] the

7  prospective homeowner that the parties have agreed to the terms and conditions of a rental

   agreement.

8  (b) In the event the purchaser fails to execute the rental agreement, the purchaser shall not have

9  any rights of tenancy.

10 (c) In the event that an occupant of a mobilehome has no rights of tenancy and is not otherwise

11 entitled to occupy the mobilehome pursuant to this chapter, the occupant is considered an

12 unlawful occupant if, after a demand is made for the surrender of the mobilehome park site, for a

13 period of five days, the occupant refuses to surrender the site to the mobilehome park

   management. In the event the unlawful occupant fails to comply with the demand, the unlawful
14
   occupant shall be subject to the proceedings set forth in Chapter 4 (commencing with Section
15
   1159) of Title 3 of Part 3 of the Code of Civil Procedure.

16 *(d) The occupant of the mobilehome [shall not] be considered an unlawful occupant and shall*

17 *not be subject to the provisions of subdivision (c) if all of the following conditions are present:*

18 *(1) The occupant is the registered owner of the mobilehome.*

19 *(2) The management has determined that the occupant has the financial ability to pay the rent*
   *and charges of the*
20
   *park, will comply with the rules and regulations of the park, based on the occupant's prior*
21 *tenancies, and will*

22 *comply with this article.*

23 *(3) The management failed or refused to offer the occupant a rental agreement.* (Amended by

24 Stats. 1990, Chap. 645 (SB 2340, Kopp), eff. 1/1/1991)

25

26

27

28

4

Movant has two item yet to be scheduled:

1. Debtors deposition. Debtor offered a 10 window beginning June 3, 2022.  Movant refuses to set the deposition during this timeframe.

Debtor previously took two days off from work with no pay and was present at the first deposition; a disagreement regarding a prior written request for Captioning was made two days before the deposition with the paralegal of Mr. Hays.  Mr. Hays did not return my phone call as I requested his paralegal give him the message that I needed to speak to him before the deposition. The captioning software was made due to a severe medical condition, [frontal lobe damage in the brain.]  Debtor refused to disclose to the public audience and Mr. Hays put debtor on the spot embarrassed her, and was insistent he wanted to know why debtor requested captioning software two days before and he just now was addressing the request on Zoom with interested parties present.

The second deposition tentatively set for May 6, 2022, personally scheduled by Mr. Hays and debtor telephoned Mr. Hays on May 5, 2022 at his Office and to his personal cell phone to confirm Zoom sign in information.  Debtors calls were not returned.

**Pursuant to the Court's ruling JULY 2, 2022, Defendant must appear for her deposition and participate in mediation on or before June 30, 2022.**

On June 2, 2022, Debtor confirmed by email to Mr. Hays, for 10 days, debtor would make herself available from June 3, 2022 through June 15, 2022, Movant to schedule to take depose debtor.  Mr. Hays would not consider rearranging any part of his schedule to cooperate with debtor window of opportunity.  Debtor is a manager for retail store.  Two major holidays, Father's Days and Fourth of July weekend impact debtors work schedule.  Debtor explained to

Mr. Hays she does not work Mon-Fri 8am-5pm.  Debtor availability as a store leadership is the needs of the store which is Mon-Sun, Debtor's usual work shift is 3-11:30pm.

## THE PRETRIAL STIPULATION

A pretrial stipulation identifies all disputed and undisputed issues of fact and include the language required by LBR 7016-1(b)(2)(G).  I believe we could try this case today.

## DEBTOR CONTACTS MEDIATOR  RE: MEDIATION WITH THOMAS WATTS, III

Thereafter, June 2, 2022, Ms. Gallian became very pro-active and contacted the Mediator Mr. Thomas Watts, III, by email herself and cc'd Mr. Hays.

Mr. Watts personally answered my email and indicated he does mediation appointments on Friday's and that he had June 24, 2022, available to the parties.

Mr. Watts said in his email that if June 24, 2022, was not acceptable to the parties, that the next available date in his schedule was into August 2022.

I immediately contacted Mr. Hays and asked him to contact Mr. Watts assistant Hallie, on Monday, June 6, 2022, to confirm the date.

All of my emails and emails from and to Mr. Thomas Watts and his assistant Hallie went ignored by Mr. Hays.

I believe Mr. Hays intentionally ignored the kind gesture by the Mediator, Mr. Thomas Watts and his efforts contacting both parties over the weekend trying to confirm a date and requesting the parties confirm with his assistant Hallie on Monday June 6, 2022.

Thereafter this frivolous motion was emailed to me this afternoon.

Mr. Hays refusal to contact the mediator's office to determine the Mediators availability and set a firm date since the order was first made by this Court in February 2022, is a lack of good faith showing.  Mr. Hays just got $4000.00 on June 2, 2022, from the court in sanctions.

6

Mr. Hays only interest in filing this Motion is to DELAY, DELAY, DELAY and possibly obtain more sanctions and to continue Mediation for 60-90 days without consideration of others schedules, other creditors and the most urgent matter was to get on the calendar of Mr. Watts, prior to the Courts Order June 2, 2022, to be completed by June 30.2022.

    In opposition of the Motion, and pursuant to Local Bankruptcy Rule 9013-1(m), Jamie Lynn Gallian notes the following:

1. This opposition is filed June 7, 2022, at least nine days before the scheduled June 16, 2022, pretrial conference;

2. The attached declaration of Jamie Lynn Gallian provides detailed evidence the request for a continuance and Plaintiff's continued delay tactics and then asking debtor to stipulate to such continuance is in bad faith and not in the spirit of cooperation of all parties schedules whether licensed attorney's or representing themselves;

3. I have cooperated in several continuances with Mr. Hays, however he drafts stipulation as one-sided meaning that I am not afforded the continuance to discovery and deposition against his client.  His client has not completed any discovery requested or will not agree to sit for deposition as I have requested; and

5.  Mr. Hays excuse seems to be always be "I'll check with my client" and then avoids my calls and emails for several weeks or;  It would appear a seasoned attorney would have determined with his clients ahead of time, anticipated questions and know the answers to many everyday questions that come up in this forum,

6.  Mr. Hays three paralegals (two of which have the same first name) send me strings of email conversations, attempting to confuse the real issue and then files this frivolous motion, knowing I am IN PRO PER and not entitled to ask for sanctions for all of Ms. Hays waster of my time and Mr. Watt's time over the weekend.

7

## **MEMORANDUM OF POINTS AND AUTHORITY**

Jamie Lynn Gallian, Debtor, represents the following:

1.      On July 9, 2021, Jamie Lynn Gallian, **in Pro Per**, filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code.

2.      Jeffrey I. Golden was appointed to serve as the Chapter 7 Trustee for the benefit of the estate. Between 21 and 40 days after the debtor's petition was filed, [July 9, 2021 [DOC 1], the case trustee will hold a meeting of creditors.  [August 18, 2021, First 341 meeting of Creditors]

3.      Last day for creditors to oppose discharge October 18, 2021 [DOC 5]

        a.  Three Adversary Cases were filed on October 18, 2021, each incorporating by reference, the other adversary complaints.

4.      First 341(a) meeting of creditors took place on August 18, 2021, at 9:00 a.m.

        The Section 341 meeting was scheduled 16 times each time Debtor was ordered to appear and called every day before the scheduled 341 meeting to confirm whether to attend. Debtor appeared In Pro Per at every 341 meeting,

On August 18, 2021, potential counsel appeared for Debtor and notified the Trustee potential counsel was still reviewing Debtors chapter 7 petition filed by debtor In Pro Per on 7/9/21 and has not decided to substitute in as counsel for debtor at the time of the 341meeting held.

        a. 341 meeting appearance of Debtor continued to September 22, 2021 [DOC 11]

        b. 341 meeting appearance of Debtor continued to October 06, 2021 [DOC 18]

        c. 341 meeting appearance of Debtor continued to October 14, 2021 [DOC 20]

        d. 341 meeting appearance of Debtor continued to November 10, 2021 [DOC 24]

8

**November 17, 2021 - ORDER [DOC 31]** *Honorable Erithe A. Smith –*

**Approving Stipulation submitted by and between TRUSTEE, Jeffrey I. Golden and Debtor Jamie Lynn Gallian. Debtor agreed to Extend the Time to File a Complaint Objecting to Debtor's Discharge Pursuant to 11 U.S.C Section 727 and Federal Rule of Bankruptcy Procedure 4004. The deadline for the Trustee or United States Trustee Objecting to Debtor's Discharge Pursuant to 11 U.S.C Section 727 is Extended to and Including November 17, 2021.**

e. 341 meeting appearance of Debtor continued to December 1, 2021 [DOC 34]

f. 341 meeting appearance of Debtor continued to December 15, 2021 [DOC 40]

g. 341 meeting appearance of Debtor continued to January 7, 2022 [DOC 43]

h. 341 meeting appearance of Debtor continued to January 24, 2022 [DOC 51]

i. 341 meeting appearance of Debtor continued to February 14, 2022 [DOC 54]

j. 341 meeting appearance of Debtor continued to February 28, 2022 [DOC 63]

k. 341 meeting appearance of Debtor continued to March 21, 2022 [DOC 66]

l. 341 meeting appearance of Debtor continued to April 4, 2022 [DOC 79]

m. 341 meeting appearance of Debtor continued to April 11, 2022 [DOC 81]

n. 341 meeting appearance of Debtor continued to April 22, 2022 [DOC 83]

o. 341 meeting appearance of Debtor continued to April 29, 2022 [DOC 85]

p. 341 meeting appearance of Debtor continued to May 3, 2022   [DOC  86]

Trustee Golden put the debtor under oath, and both the trustee and creditor, Houser Bros Co attorney D. Edward Hays asked debtor questions.

The debtor attended every 341 meeting and answered questions regarding the debtor's financial affairs and property. 11 U.S.C. § 343.

Within 10 days of the creditors' meeting, the U.S. trustee will report to the court whether the case should be presumed to be an abuse under the means test described in 11 U.S.C. § 704(b).

No report was filed by Trustee Golden indicating any presumed abuse under the means test as described in 11 U.S.C. § 704(b)

**DEBTOR'S AMENDED PETITION AND SCHEDULES PRIOR TO CONCLUSION OF**

**341 HEARING ON MAY 3, 2022 [DOC 86].**

5.      [DOC 15] 9/7/2021

Amended Schedule A/B Individual: Property (Official Form 106A/B or 206A/B) , Amended Schedule C: The Property You Claimed as Exempt (Official Form 106C) , Schedule G Individual: Executory Contracts and Unexpired Leases (Official Form 106G or 206G) , Schedule H Individual: Your Codebtors (Official Form 106H or 206H) , Amended Schedule I Individual: Your Income (Official Form 106I) , Statement of Financial Affairs for Individual Filing for Bankruptcy (Official Form 107 or 207) , Statement of Intention for Individuals Filing Under Chapter 7 (Official Form 108) , Chapter 7 Statement of Your Current Monthly Income (Official Form 122A-1)

6.      [DOC 16] 9/22/2021

Amended Schedule A/B Individual: Property (Official Form 106A/B or 206A/B) , FIRST AMENDMENT Amended Schedule C: The Property You Claimed as Exempt (Official Form 106C) , Amended Schedule I Individual: Your Income (Official Form 106I) , Amended Schedule G Individual: Executory Contracts and Unexpired Leases (Official Form 106G or 206G) , Amended Statement of Financial Affairs for Individual Filing for Bankruptcy (Official Form 107 or 207) ,Amended Statement of Intention for Individuals Filing Under Chapter 7 (Official Form

10

108) , Amended Statement of Related Cases (LBR Form 1015-2.1) , Amended Chapter 7

Statement of Your Current Monthly Income (Official Form 122A-1)

       7.     [DOC 17] 9/22/2021

       Amending Schedules (D) and (E/F), Amended List of Creditors (Master Mailing List of

Creditors), Amended Verification of Master Mailing List of Creditors (LBR Form F1007-1)

       8.     [DOC 22] 10/14/2021

       Amended Schedule A/B Individual: Property (Official Form 106A/B or 206A/B) ,

Amended Schedule C: The Property You Claimed as Exempt (Official Form 106C) , Amending

Schedules (D) (E/F) , Schedule G Individual: Executory Contracts and Unexpired Leases

(Official Form 106G or 206G) , Schedule H Individual: Your Codebtors (Official Form 106H or

206H) , Statement of Intention for Individuals Filing Under Chapter 7 (Official Form 108)

       9.     [DOC 38] 11/23/2021

       Amended Schedule A/B Individual: Property (Official Form 106A/B or 206A/B) ,

Amended Schedule C: The Property You Claimed as Exempt (Official Form 106C) , Schedule G

Individual: Executory Contracts and Unexpired Leases (Official Form 106G or 206G) ,

Statement of Financial Affairs for Individual Filing for Bankruptcy (Official Form 107 or 207) ,

Statement of Intention for Individuals Filing Under Chapter 7 (Official Form 108)

       10.     [DOC 39] 11/23/2021

       Amended Schedule A/B Individual: Property (Official Form 106A/B or 206A/B) ,

Amended Schedule C: The Property You Claimed as Exempt (Official Form 106C) , Schedule G

Individual: Executory Contracts and Unexpired Leases (Official Form 106G or 206G) ,

       Statement of Financial Affairs for Individual Filing for Bankruptcy (Official Form 107 or

207) , Statement of Intention for Individuals Filing Under Chapter 7 (Official Form 108)

       11.     [DOC 42] 12/2/2021

       Amending Schedules (D) (E/F)

11

12.    [DOC 72] 3/14/2022

Addendum to voluntary petition , Statement of Related Cases (LBR Form 1015-2.1) , Amended Schedule A/B Individual: Property (Official Form 106A/B or 206A/B) , Amended Schedule C: The Property You Claimed as Exempt (Official Form 106C) , Schedule G Individual: Executory Contracts and Unexpired Leases (Official Form 106G or 206G) , Schedule H Individual: Your Codebtors (Official Form 106H or 206H) , Amended Schedule I Individual: Your Income (Official Form 106I) , Declaration About an Individual Debtor's Schedules (Official Form 106Dec) , Statement of Financial Affairs for Individual Filing for Bankruptcy (Official Form 107 or 207) , Statement of Intention for Individuals Filing Under Chapter 7 (Official Form 108) , Chapter 7 Statement of Your Current Monthly Income (Official Form 122A-1) (BNC Option) , Verification of Master Mailing List of Creditors (LBR Form F1007-1), Proof of service. Verification of Declaration of Homestead filed with Orange County Clerk Recorder.

13.    [DOC 73] 3/14/2022

Addendum to voluntary petition to amend Debtor's DBA, Item #11 pg 3, Item #16b pg6.

14.    [DOC 74] 3/14/2022

Document re Verification of Declaration of Homestead. Filed by Debtor Jamie Lynn Gallian (RE: related document(s)72 Addendum to Vol Pet filed by Debtor Jamie Lynn Gallian, Statement of Related Cases (LBR Form 1015-2.1), Schedule A/B: Property (Official Form 106A/B or 206A/B), Schedule C: The Property You Claimed as Exempt (Official Form 106C), Schedule G: Executory Contracts and Unexpired Leases (Official Form 106G or 206G), Schedule H: Your Codebtors (Official Form 106H or 206H), Schedule I: Your Income (Official Form 106I), Declaration About an Individual Debtor's Schedules (Official Form 106Dec), Statement of Financial Affairs (Official Form 107 or 207) (Official Form 107 or 207), Statement

of Intention for Individuals Filing Under Chapter 7 (Official Form B8, or 108), Chapter 7

Statement of Your Current Monthly Income (Official Form 122A-1)

15.   [DOC 75] 3/15/2022

Amending Schedules (D) and (E/F)

16.   [DOC 76] 3/16/2022

Proof of service of Amended Schedules Filed by Debtor Jamie Lynn Gallian.

There is nothing atypical regarding debtor's chapter 7.

Trustee Golden told debtor numerous times "this is a no asset chapter 7 case, no need for

creditors to file any proofs of claim. "There will be no distribution."

## ATTORNEY D. ESWARD HAYS, HOUSER BROS CO AND THE COVID 19 RENT

## RELIEF CHECK AND TRUSTEE GOLDEN,

DEBTOR NOTICED BY EMAIL TO ATTORNEY D. EDWARD HAYS BEGINNING ON OR

ABOUT NOVEMBER 2, 2021 UP AND INCLUDING THE TIME OF THE NOVEMBER 10,

2021 341 MEETING, WHICH TRUSTEE NOTED IN THE RECORD ATTORNEY D.

EDWARD HAYS  REPRESENTING  INTERESTED PARTY HOUSER BROS CO. FAILED

TO APPEAR AT THE 341 MEETING. MR. HAYS WAS INFORMED HOUSER BROS CO

HAD BEEN PAID IN FULL AND BEGAN PLAYING GAMES AT THIS POINT.

DEBTOR LISTED THE COVID19 RENT RELIEF CHECK DATED NOVEMBER 7,

2021, IN THE POSSESSION OF HOUSER BROS CO.

HOUSER BROS CO AND THEIR ATTORNEYS NEGLIGENTLY IGNORED DEBTOR'S

PLEAS OF URGENCY THE CHECK NEEDED TO BE CASHED PRIOR TO FEBRUARY 4,

2022, AND DEBTORS SPACE 376 RENT LEDGER BE UPDATED TO REFLECT THE

MONIES RECEIVED AGAINST ANY SPACE RENT FOR 376.

13

HOUSER BROS CO ALSO RECEIVED FROM J-PAD, LLC. LEGAL OWNER OF THE 2014 MANUFACTURED HOME PERFECTED ON THE FACE OF THE CERTIFICATE OF TITLE 1/14/2019,  THE BALANCE APPROXIMATELY $13,500 ON OR ABOUT NOVEMBER 5, 2021. DEBTORS LEDGER FOR SPACE 376, WAS PAID IN FULL THROUGH DECEMBER 31, 2021. HOUSER BROS CO REFUSED TO ENTER ANY MONIES RECEIVED FOR SPACE 376 TO MITIGATE THEIR ALLEGED DAMAGES.

DEBTOR LISTED ON HER PETITION LINE 34, THE CHECK WAS NOT AN ASSET OF THE ESTATE AND DID NOT BELONG TO THE ESTATE, IN ALL OF HER SCHEDULES.

THE PURPOSE OF THE COVID 19 RENT RELIEF AWARD WAS TO PROVIDE COVID RELATED ASSISTANCE TO A QUALIFIED APPLICANT (DEBTOR),  FOR ASSISTANCE FROM THE GOVERNMENT PROGRAMS SO THE LANDLORD COULD BE MADE WHOLE.  BY ACCEPTING THE PAYMENTS FROM THE COVID19 RENT RELIEF PROGRAM ON BEHALF OF DEBTOR, A RESIDENT IN RANCHO DEL REY MOBILEHOME ESTATES,

HOUSER BROS CO WAS LAWFULLY REQUIRED TO DISMISS THE UNLAWFUL DETAINER CASE 30-2019-01041423.  HOUSER REFUSED TO DISMISS THE CASE AND INSTEAD LET THE COVID 19 RENT RELIEF CHECK GO STALE.

**TRUSTEE GOLDEN has possession of the Covid 19 Rent Relief Check in the amount of $24, 301.55, at the time this opposition is filed.**

In November 2021, Trustee Golden told debtor she could have the check and "hire an attorney with the funds."  Debtor contacted Trustee Charles Daff, Riverside, November 2021, confirming Trustee Goldens statement.  Trustee Charles Daff, looked up the exemption code and told me he believed I should use the funds from the Covid 19 Rent Relief Fund to also "hire a bk attorney."

Debtor believed using the funds for any other purpose other than the Government's intended purpose when awarding the Covid19 Rent Relief was against her moral compass AND UNLAWFUL.

**The individual debtor's primary concerns in a chapter 7 case are to retain exempt property and to receive a discharge that covers as many debts as possible.**

**TRUSTEE NOTICEOF INTENT TO ABANDON ESTATE'S INTEREST**

[DOC NO. 60, 70] Trustee's Notice of Proposed Abandonment of Scheduled Post Petition CA COVID19 Relief Award Check dated November 7, 2021, $24,301.55 in the possession of Trustee.

CA COVID19 Rent Relief Award Check dated November 7, 2021, became stale on February 4, 2022, (90 days after issuance).

On March 6, 2022,  Hon. Erithe A. Smith [DOC 71], ORDER on Motion to Abandon [60, 70] CA Covid19 Rent Relief Check $24,301.55 to Debtor.

15

On February 6, 2022, exactly one month before Hon, Erithe A Smith signed the Order allowing the Trustee to abandon the $25,301.55 Covid 19 Rent Relief check in the Trustee's possession, I sent a text message to Trustee Golden indicating I was not aware of any application being filed to employ **DANNING, GILL, ISRAEL & KRASNOFF, LLP.**

## CONCLUSION

JAMIE LYNN GALLIAN filed a Chapter 7 petition on July 9, 2022, Ms. Gallian did not file with the help of any attorney.  She is not educated, past high school. She filed this Chapter 7 within the intent of a "Fresh Start."

Debtor has done her absolute best to try and navigate through a complicated legal system that most professionals licensed to practice still struggle with.

## **Declaration of Jamie Lynn Gallian**

Ms. Gallian is a 60 year old middle aged woman who makes $17.00 per hour. For 20 years she traveled the world with the coveted profession as a Flight Attendant at $65.00 per hours, until a bully in the homeowner's association she lived in, attacked her from behind while working in her yard trimming the plants, a lifetime hobby, gardening and watering her lawn. Debtor suffered a crushed nerve injury to her left foot. Debtor was in the hospital two weeks, due to severe complications from the nerve injury.

Debtor telephone Trustee Golden and explained her hospitalization and she was very ill.  Debtor asked Trustee if he would appear at Houser Bros Co June 2, 2022, Motion by Houser. Trustee Golden stated he had not read the Motion but would be reading it over the weekend and would appear.  I asked Trustee Golden to support my testimony concerning Houser Bros Co and the issues I had obtaining cooperation in getting mediation date set and confirmed on the

mediators schedule.  He stated he understood my struggles and again stressed keep trying to hire an attorney.  He stated he would otherwise appear/

Little did I know that the reason I have been unsuccessful in keeping retained Counsel after paying them money on two times at the beginning of the case, both attorney's returned the money to debtor after the three adversary complaints were filed.  Both attorney's stated that each are returning the money tendered and accepted and cashed by the attorney's and that by the two attorneys refunding the money's "there is no contract and that they are under no obligatin to represent a debtor down the rabbit hole."  I have interviewed at least 25 Orange County Bankruptcy attorneys and have been told the exact same statement each time, "The Court will not relieve a Debtor's attorney from representation.  Once we sign o, we're stuck in it, "down the rabbit hole."


I declare under penalty of perjury the foregoing to be true and correct under the laws of the state of California.

Signed this 7th day of June 2022, at Huntington Beach, CA County  of Orange.


Dated:  June 7, 2022


By: *Jamie Lynn Gallian*

Jamie Lynn Gallian

Debtor, In Pro Per

17

 Gmail

**Jamie Gallian <jamiegallian@gmail.com>**

## Mediation Appointment 8:21-bk-11710-ES
10 messages

---

**OC Services** <bobwentflying@yahoo.com>                                        Sat, Jun 4, 2022 at 1:44 PM
To: Jamie Gallian <jamiegallian@gmail.com>
Cc: Jamie Gallian <jamiegallian@gmail.com>

Mr. Watts,

We would like to schedule court ordered mediation with you as soon as your schedule permits.

Do you have any time in the month of June 2022 for an appointment.

Would you forward two or three dates that work for your schedule I will then choose from your availability.

Time is of the essencse.  I appreciate your prompt reply.

Sincerely,


Jamie Gallian
714-321-3449

---

**Jamie Gallian** <jamiegallian@gmail.com>                                        Sat, Jun 4, 2022 at 1:46 PM
To: tcw@tcwatts.com, Ed Hays <EHays@marshackhays.com>, Jamie Gallian <jamiegallian@gmail.com>


Sincerely,

Jamie Gallian
714-321-3449
jamiegallian@gmail.com
[Quoted text hidden]

---

**Thomas C. Watts III** <tcw@tcwatts.com>                                        Sat, Jun 4, 2022 at 5:41 PM
To: Jamie Gallian <jamiegallian@gmail.com>, Ed Hays <EHays@marshackhays.com>
Cc: Hallie Darnell <H.Darnell@tcwatts.com>


Hi Jamie. Thanks for your note. I hear the court ordered mediations on Fridays. The 24th of June appears to be open
in the AM  ( 10:00) after that I am into August. If you need confirmation I will be in the office on Monday. If exigent,
please call me on my personal cell at 714 329 1814. Typically, you would contact my assistant Hallie Darnell who is
uber-competent at arranging this. I would also appreciate a short vignette about the case. Hopefully we will be able to
connect. I look forward to that opportunity. TCW


Very Truly Yours,

Thomas C. Watts III

---



8175 Kaiser Boulevard Suite 100

Anaheim Hills, California, 92808

Telephone 714 364 0100

*Confidentiality/Privilege Notice:*

This e-mail transmission is intended for the exclusive use of the individual or entity to which it is addressed and may be revised or redacted in whole or in part. This e-mail transmission may contain or reflect confidential and or privileged information that is covered by the Federal Electronic Communications Privacy Act, or Attorney/Client or other Privileges. No waiver of those protections is intended by the inadvertent receipt by or disclosure to individuals or entities that are not the intended recipients hereof. If you are not the intended recipient (or an employee or agent responsible for delivering this e-mail to the intended recipient), you are hereby notified that any copying, disclosure or distribution of this information is strictly prohibited. If you have received this e-mail in error, please notify me by return e-mail immediately, delete the e-mail and all attachments, and destroy all hard copies hereof. Thank you in advance for your co-operation.

[Quoted text hidden]

---

**Jamie Gallian** <jamiegallian@gmail.com>                                      Sat, Jun 4, 2022 at 6:31 PM
To: "Thomas C. Watts III" <tcw@tcwatts.com>
Cc: Ed Hays <EHays@marshackhays.com>, Hallie Darnell <H.Darnell@tcwatts.com>

Ms. Watts,

Thank you for replying to my initial email.

Are you available for mediation on June 16, 2022?

The parties are available on June 16, 2022 if that date is acceptable to you with your calendar.

Please contact me or your office assistant to firm the date of June 16, 2022 is available for mediation.
[Quoted text hidden]
[Quoted text hidden]

---

**Jamie Gallian** <jamiegallian@gmail.com>                                      Sat, Jun 4, 2022 at 6:39 PM
To: "Thomas C. Watts III" <tcw@tcwatts.com>, Ed Hays <EHays@marshackhays.com>, Hallie Darnell
<H.Darnell@tcwatts.com>

Ms. Watts,

After re-reading your initial email from earlier indicating you are available on June 24, 2022 for mediation.

I will agree to the date of mediation June 24, 2022.   Mr. Hays will confirm with his client that June 24, 2022 is also agreeable.  I don't see a problem with that date for either party.

I have included Mr. Hays in this email string so he is in the loop.

I will be in touch on Monday with your office and Mr. Hays and hopefully will be speaking with Hallie to firm up the date.
[Quoted text hidden]
[Quoted text hidden]

---

**Jamie Gallian** <jamiegallian@gmail.com>                                      Sun, Jun 5, 2022 at 1:30 PM

To: "Thomas C. Watts III" <tcw@tcwatts.com>, Ed Hays <EHays@marshackhays.com>, Hallie Darnell <H.Darnell@tcwatts.com>

Please find a PDF attached to this email of the courts Tentative Ruling June 2, 2022, Honorable Erithe A. Smith, ordering mediation.

[Quoted text hidden]

[Quoted text hidden]

---

 **8-21-BK-11710-ES_6.2.22 TENTATIVE RULING.pdf**
1053K

---

**Hallie Darnell** <H.Darnell@tcwatts.com>                                      Sun, Jun 5, 2022 at 3:14 PM
To: Jamie Gallian <jamiegallian@gmail.com>, Ed Hays <EHays@marshackhays.com>

Good afternoon,

Is this a court ordered mediation? Would you kindly provide the case name? Is this a mediation that Mr. Watts has already accepted?

Please advise.

Thank you.

Hallie Darnell

Get Outlook for iOS

---

**From:** Thomas C. Watts III <tcw@tcwatts.com>
**Sent:** Saturday, June 4, 2022 5:41:03 PM
**To:** Jamie Gallian <jamiegallian@gmail.com>; Ed Hays <EHays@marshackhays.com>
**Cc:** Hallie Darnell <H.Darnell@tcwatts.com>
**Subject:** RE: Mediation Appointment 8:21-bk-11710-ES

[Quoted text hidden]

---

**Jamie Gallian** <jamiegallian@gmail.com>                                      Mon, Jun 6, 2022 at 12:41 AM
To: Hallie Darnell <H.Darnell@tcwatts.com>

Me. Darnell,

Thank you for reaching out.
The case name is Houser Bros Co vs Jamie Gallian.  The adversary was filed October 18, 2021.  The Honorable Erithe A. Smith ordered the parties to mediation on January 6, 2022.
I encouraged Mr. Hays to contact the mediator to determine availability and to lock in a date.
I reached out to Mr. Watts myself to determine his availability and it appears Mr. Watts suggested June 24, 2022. as a potential date.  I understand after June 24, 2022, his next availability is not until August 2022.

I have included Mr. Hays on this email so we can firm up the date June 24, 2022, if that is acceptable with his client and Mr. Watts.

Jamie Gallian
Sent from my iPhone

On Jun 5, 2022, at 3:14 PM, Hallie Darnell <H.Darnell@tcwatts.com> wrote:

---

3 of 6                                                                        6/7/22, 3:56 PM

Good afternoon,

Is this a court ordered mediation? Would you kindly provide the case name? Is this a mediation that Mr. Watts has already accepted?

Please advise.

Thank you.

Hallie Darnell

Get Outlook for iOS

---

**From:** Thomas C. Watts III <tcw@tcwatts.com>
**Sent:** Saturday, June 4, 2022 5:41:03 PM
**To:** Jamie Gallian <jamiegallian@gmail.com>; Ed Hays <EHays@marshackhays.com>
**Cc:** Hallie Darnell <H.Darnell@tcwatts.com>
**Subject:** RE: Mediation Appointment 8:21-bk-11710-ES

Hi Jamie. Thanks for your note. I hear the court ordered mediations on Fridays. The 24th of June appears to be open in the AM ( 10:00) after that I am into August. If you need confirmation I will be in the office on Monday. If exigent, please call me on my personal cell at 714 329 1814. Typically, you would contact my assistant Hallie Darnell who is uber-competent at arranging this. I would also appreciate a short vignette about the case. Hopefully we will be able to connect. I look forward to that opportunity. TCW

Very Truly Yours,

Thomas C. Watts III

<image001.png>

[Quoted text hidden]

---

Jamie Gallian <jamiegallian@gmail.com>                                    Mon, Jun 6, 2022 at 12:42 AM
To: Ed Hays <ehays@marshackhays.com>, Hallie Darnell <H.Darnell@tcwatts.com>, "Thomas C. Watts III"
<tcw@tcwatts.com>, Jamie Gallian <jamiegallian@gmail.com>

Jamie Gallian
Sent from my iPhone

Begin forwarded message:

> **From:** Jamie Gallian <jamiegallian@gmail.com>
> **Date:** June 6, 2022 at 12:41:58 AM PDT
> **To:** Hallie Darnell <H.Darnell@tcwatts.com>
> **Subject: Re: Mediation Appointment 8:21-bk-11710-ES**

> Me. Darnell,
> [Quoted text hidden]

---

**Hallie Darnell** <H.Darnell@tcwatts.com>    Mon, Jun 6, 2022 at 9:47 AM
To: Jamie Gallian <jamiegallian@gmail.com>

Great, just let me know if June 24th is agreed upon and we can go from there. Please note that this mediation will take place via Zoom.

Very Truly Yours,

Hallie Darnell

Paralegal Assistant



8175 Kaiser Boulevard Suite 100

Anaheim Hills, California,  92808

Telephone 714 364 0100 – Facsimile 714 505 3661

*Confidentiality/Privilege Notice:*

This e-mail transmission is intended for the exclusive use of the individual or entity to which it is addressed and may be revised or redacted in whole or in part. This e-mail transmission may contain or reflect confidential and or privileged information that is covered by the Federal Electronic Communications Privacy Act, or Attorney/Client or other Privileges. No waiver of those protections is intended by the inadvertent receipt by or disclosure to individuals or entities that are not the intended recipients hereof. If you are not the intended recipient (or an employee or agent responsible for delivering this e-mail to the intended recipient), you are hereby notified that any copying, disclosure or distribution of

this information is strictly prohibited. If you have received this e-mail in error, please notify me by return e-mail immediately, delete the e-mail and all attachments, and destroy all hard copies hereof. Thank you in advance for your co-operation.

**From:** Jamie Gallian <jamiegallian@gmail.com>
**Sent:** Monday, June 6, 2022 12:42 AM
**To:** Hallie Darnell <H.Darnell@tcwatts.com>
**Subject:** Re: Mediation Appointment 8:21-bk-11710-ES

Me. Darnell,

[Quoted text hidden]



GROUND LEASE

THIS GROUND LEASE (herein termed the "Lease"), is made as of this 19th day of October , 199 , by and between HOUSER BROS. CO., a limited partnership organized and existing under the laws of the State of California in which Clifford C. Houser and Vernon P. Houser constitute the sole general partners (herein termed the "Landlord"), whose address is Suite 204, 610 East Seventeenth Street, Santa Ana, California 92701 and ROBERT P. WARMINGTON, a married man (herein termed the "Tenant"), whose address is 16592 Hale Avenue, Irvine, California  92714 upon the following terms and conditions:

ARTICLE I
THE LEASED LAND

For and in consideration of the payment of the rentals, taxes and other charges covenanted to be paid by Tenant and of the performance of all the covenants and conditions hereinafter covenanted and provided to be observed and performed by Tenant, the Landlord hereby leases to Tenant and Tenant hereby hires from Landlord that certain parcel of real property (herein termed the "leased land"; the term "leased land" and "leased premises" may be used interchangeably), situated in the County of Orange, State of California, described on Exhibit A attached hereto and by this reference made a part hereof for the term, at the rental, for the uses and purposes, and upon and subject to the covenants, conditions and restrictions hereinafter set forth.  The demise of the leased land is made subject to taxes and assessments for the current fiscal year, not yet delinquent and subject to covenants, conditions, reservations, restrictions, easements, rights and rights-of-way of record.

ARTICLE II
TERM

The term of this Lease shall be for a period of eighty (80) years commencing on the date first above written and continuing until the anniversary of the eightieth (80th) year thereafter, unless sooner terminated, as hereinafter provided.  Tenant shall have no option to extend the term of this Lease.  This Lease shall terminate as to any portion of the leased land which is Sold and Conveyed as hereinafter provided.  As hereinafter provided, this Lease shall terminate as to any portion of the leased land which is Sold and Conveyed unless Tenant elects to enter into an Affiliate Sublease or a Consumer Sublease.

ARTICLE III
USE AND DEVELOPMENT

3.01  Use.

At all times during the term of this Lease, Tenant shall be entitled to use the leased land, buildings and

HOU 000746

4

other improvements constructed thereon for single family
residential use and for other purposes incidental thereto,
including, without limitation, recreational facilities and
sales offices, and Tenant may subdivide the leased land in
connection with such single family residental use and
development. Tenant covenants and agrees that it will not
use or suffer or permit the leased land, buildings and other
improvements constructed thereon to be used in a manner
which would constitute waste or which would constitute a
public or private nuisance. It is expressly understood and
agreed that Tenant's construction activities upon the leased
land shall not be deemed to constitute waste. As used in
the foregoing, "single family residential use" includes
condominiums, planned unit developments and other multiple
unit developments of a similar nature.

3.02  Compliance with Laws.

    Tenant covenants that during the lease term, Tenant
will comply, at no cost or expense to Landlord, with all
laws, ordinances, orders, rules, regulations and require-
ments of all federal, state and municipal governments and
appropriate departments, commissions, boards and officers
thereof, which may be applicable to the leased land, build-
ings and other improvements constructed thereon, or the
use or manner of use of the leased land.  Tenant accepts the
leased land in the actual condition of the same as of the
date of this Lease.

3.03  Contest.

    Tenant shall have the right, after notice to Landlord,
to contest by appropriate legal proceedings, without cost or
expense to Landlord, the validity of any law, ordinance,
order, rule, regulation or requirement of the nature herein
referred to and to postpone compliance with the same,
provided such contest shall be promptly and diligently
prosecuted by and at the expense of Tenant and so long
as Landlord shall not thereby suffer any civil, or be
subject to any criminal penalties or sanctions, and Tenant
shall properly protect and save harmless Landlord against
any liability and claims for any such noncompliance or
postponement of compliance.

3.04  Development of the Leased Land; Dedications.

    3.04.01  Lessor's Cooperation; Power of Attorney.

        (a)   Landlord and Tenant (at no expense to
Landlord other than Landlord's time) shall take such actions
and shall execute such instruments, documents, applications
and/or certificates as Tenant may deem reasonably necessary
or desirable to obtain requisite governmental approvals for
the proposed development of the leased land or any portion
thereof and/or to facilitate use and development of all or
any portion of the leased land for the use permitted in
Section 3.01 above, including, but not limited to, execution
and delivery of the following:

-2-

HOU 000747

(i)  Instruments of dedication conforming with the provisions of this Section 3.04;

(ii)  Public utility conveyances;

(iii)  Applications to federal, state and local governmental agencies, together with all other instruments and documents reasonably necessary in order to obtain permits, reports, public reports, zoning, conditional use permits, variances and similar type items necessary for the proposed use and development; and

(iv)  Certificates to be affixed to subdivision maps, parcel maps, condominium plans and plans pertaining to the residential development.

(b)  Without limiting the foregoing, Landlord agrees to cooperate with Tenant in the development of the leased land in the manner of development set forth in Section 3.01 above, including, without limitation, attending a reasonable number of meetings with Tenant and/or jurisdictional government agencies.

(c)  In furtherance of paragraph (a) above, Landlord will, within three (3) days of a request from Tenant, execute, by one of its general partners who are named as signatories to this Lease, all of the documents or instruments described in paragraph (a).  If one of said named individuals has not executed such documents on behalf of Landlord within said period of time because of their unavailability or otherwise, Landlord, as provided in the Ground Lease (Short Form - Memorandum) executed by the parties concurrently herewith, hereby appoints Tenant as Landlord's attorney-in-fact to sign any and all of such documents.  Notwithstanding the execution of any of such documents by Tenant as Landlord's attorney-in-fact, Landlord agrees to execute any and all of such documents upon request therefor by Tenant.  In any event, Tenant shall promptly supply Landlord with copies of any document signed by Tenant as Landlord's attorney-in-fact.

3.04.02  Dedications.  In connection with the subdivision and development of the leased land, Tenant may cause subdivision tract maps to be filed of record which will show streets within the subdivision intended for use of the "Buyers of Lots", as such terms are defined herein, and their licensees, invitees, tenants, and servants; and, with respect to such streets, and all utility easements and rights-of-way, Tenant may, at its option, offer for dedication for public use thereof only its respective leasehold interest therein, in which event Landlord shall be required to offer for dedication for public use its respective leasehold interest therein; provided, however, that the reversionary interest of Landlord in the fee simple estate of the real property comprising the leased land therein will not be offered for dedication for public use upon the recording of any such subdivision tract maps or public

-3-

HOU 000748

utility conveyances unless required by the utility or the
City of Huntington Beach; or, provided further, Landlord
shall complete the dedications of the property of Landlord
pursuant to proceedings for Tentative Parcel Map No. 77-7
dated June 8, 1977 (subject to the undertakings of Tenant,
at no cost to Landlord to improve such areas within Edinger
Avenue required pursuant to the proceedings for Tentative
Parcel Map 77-7).

3.05  Construction.

Except as to offsite improvements which Tenant shall
construct pursuant to the proceedings under Tentative Parcel
Map No. 77-7, during the term of this Lease Tenant shall
have the right, but not the duty, to construct buildings and
improvements upon the leased land.  All buildings and
improvements now or hereafter constructed or located on the
leased premises by Tenant shall be the property of Tenant.

Landlord shall have the right to approve, for architec-
tural treatment, color and external appearance of materials
and the elevation design of the improvements which Tenant
intends to construct on the leased land prior to the com-
mencement of the construction of such improvements.  Land-
lord shall not unreasonably withhold such approval and
Landlord's sole consideration for granting or withholding
such approval shall be the preservation of the esthetics of
the leased land in reasonable harmony with the improvements
to Landlord's adjoining mobile home park.  Within thirty
(30) days of delivery to Landlord of plans showing the
foregoing, Landlord shall either approve such plans in
writing or give written notice to Tenant of Landlord's
disapproval, specifying the reasons therefor.  Failure to so
disapprove such plans within such time period shall be
deemed approval thereof.  In the event of such disapproval,
Tenant shall submit revised plans for Landlord's approval as
aforesaid, except that Landlord's time for approving or
disapproving said plans shall be shortened to ten (10)
days.  If Landlord disapproves the revised plans, all rental
payments hereunder shall abate until the revised plans are
either approved or deemed approved pursuant to the aforesaid
procedure for revised plans.  If such plans are not approved
or deemed approved within ninety (90) days of their original
submission to Landlord, Tenant may, at its option, terminate
this Lease by written notice to Landlord.  After such plans
are approved or deemed approved as aforesaid, Tenant shall
have the right, without the necessity of obtaining Land-
lord's consent, to make minor changes to such plans which
do not substantially affect the esthetic harmony of the
improvements to be built on the leased land with Landlord's
adjacent mobile home park.  However, Tenant shall promptly
deliver to Landlord copies of all such changes as they are
made.

Construction of improvements to the leased premises
shall be made in all cases subject to the following condi-
tions which Tenant covenants and agrees to observe and
perform:  (a) no construction shall be undertaken until
Tenant shall have procured and paid for, so far as the same

-4-

HOU 000749

may be required from time to time, all municipal and other governmental permits and any authorizations of the various municipal departments and government subdivisions having jurisdiction, and the Landlord agrees to join, at the expense of the Tenant, in the application for any such permits or authorizations whenever such action is necessary; and (b) all work done in connection with such construction shall be done promptly using quality materials and in a good and workmanlike manner at no cost or expense to Landlord and in compliance with the applicable municipal building and zoning laws and with all other laws, ordinances, orders, rules, regulations and requirements of federal, state and municipal governments and appropriate departments, commissions, boards and officers thereof; the cost of all construction shall be paid in cash or its equivalent, so that the leased land shall at all times be free of liens for labor and materials supplied to the leased land.

Tenant agrees to (i) indemnify Landlord against and to hold Landlord harmless from any and all damages of any nature suffered by owners of adjacent property (including Landlord) by reason of the acts or negligence of Tenant on the leased land; and (ii) protect the land and improvements of adjoining owners (including Landlord) against damage caused by said construction and improvements of the leased land as required by law.

Landlord shall have the right at any time and from time to time to post and maintain on the leased land such notices as may be necessary to protect the leased land and Landlord from mechanic's liens, materialmen's liens or liens of a similar nature. On or before ten (10) days prior to the commencement of any work of improvement by Tenant on the leased land, Tenant shall give notice thereof to Landlord and with the date expected by Tenant for the commencement of such construction.

Tenant may at any time alter, improve or remodel any building, structure or other improvement constructed or placed by Tenant on the leased land.

3.06  Residential Leases.

3.06.01  Definitions.

(a)  The term "Placed under Development" for purposes of this Lease shall mean all those portions of the leased land which shall, subsequent to the date hereof, be made the subject of a recorded subdivision map or parcel map (including all streets, easements and rights-of-way within the areas covered by any such subdivision map or parcel map), together with those portions of the leased land hereafter conveyed or dedicated by Tenant for public utility purposes.

(b)  The term "Lot" shall mean any lot into which the leased land or any portion thereof has been subdivided, and as used herein, shall include, without limitation, any condominium into which the leased land or

-5-

HOU 000750

any portion thereof has been divided pursuant to the pro-
visions of Section 1350, et seq., of the California Civil
Code.

(c)    The term "Buyer" is defined to mean any
person, firm or corporation who is a purchaser of any
structure located or to be located upon any Lot and who
executes a Residential Lease or a Consumer Sublease as
lessee.

(d)    The term "Sold and Conveyed", as used
herein, is defined to mean the execution and delivery of a
Residential Lease or a Consumer Sublease, the term of which
shall (i) commence concurrently with delivery; (ii) in the
case of a Residential Lease be equivalent with the then
remaining term of this Lease; and (iii) in the case of a
Consumer Sublease be equivalent to the then remaining term
of this Lease less one (1) day.

(e)    The term "Residential Lease", as used
herein, shall mean a lease between Landlord and any Buyer
(and the homeowners association in the case of common
facilities with appropriate modifications) in the form
attached hereto as Exhibit "B", and by this reference
incorporated herein and made a part hereof as if set forth
in full herein, with appropriate modification if the im-
provements are sold as condominiums.

(f)    The term "Consumer Sublease" shall be
defined in Section 3.08(b) below.

3.06.02    Execution of Residential Leases.

(a)    After Tenant shall have first obtained
the appropriate governmental approvals, Tenant may offer the
Lots be Sold and Conveyed to the general public together
with, at the election of Tenant, an appurtenant membership
in any homeowners association organized and incorporated
to be the lessee of a Residential Lease of the common
facilities, hereafter provided and/or to administer subdivi-
sion servitudes.  It is the intention of the parties that
Tenant shall sell the building and other improvements it
constructs on the Lots to Buyers.  All amounts received by
Tenant upon the sale of improvements shall be the sole
property of Tenant, and the Landlord shall not be entitled
to any portion thereof.

(b)    When each Lot is Sold and Conveyed
Landlord will execute, within fifteen (15) days following
the request of Tenant, individual Residential Leases with
the Buyers.  Each Residential Lease shall be subject to no
monetary encumbrances other than current taxes; however each
Lot shall, at the election of Tenant, be subject to sub-
division servitudes (if such be the case, such servitudes
shall be mutually approved in writing by Landlord, who
agrees not to unreasonably withhold its consent, and by
Tenant) and each Buyer's estate shall be subject to appro-
priate assessments for upkeep and replacement of common

-6-

HOU 000751

facilities. This Lease shall, upon the commencement of
the lease term of each Residential Lease, terminate as to
the real property covered by the Residential Lease. The
improvements on any Lot shall remain the sole property of
the Buyer. This Lease shall also terminate upon the con-
veyance or dedication of any portion of the leased land to a
public entity or public utility.

(c)   At all times the total of the basic
rental remaining payable under this Lease and the basic
rental payable under the aggregate of the Residential Leases
shall be equal to the rental payable under Article IV of
this Lease as if no Lots had been Sold and Conveyed. For
the purposes of the foregoing, each Residential Lease, which
may be terminated by Landlord, as lessor, by reason of an
event of default by the Buyer under a Residential Lease,
shall nevertheless for the purposes of this provision be
deemed to still be in effect and the rental which would have
been paid thereunder shall be accounted for with respect to
the foregoing determinations. It is anticipated by the
parties that the basic rental as provided for herein shall
be uniformly divided among the Lots. Tenant shall be
discharged and exonerated under this Lease as to each
Lot Sold and Conveyed; however, Tenant shall nevertheless
remain obligated with respect to all covenants made by
Tenant with Buyers and for all warranties and representa-
tions, express or implied, in favor of the Buyers; Tenant
shall indemnify and hold Landlord free and harmless from all
liability with respect to such covenants, warranties and
representations in favor of Buyer whether or not disclosed
to Landlord.

3.07  Common Facilities.

Tenant may choose to construct within portions of the
leased land Placed under Development recreational or other
common facilities (which shall include streets) for the use
and enjoyment of Buyers and convey such facilities to an
association organized and incorporated to acquire the same.
Upon such conveyance and upon request of Tenant, Landlord
shall execute a Residential Lease or Consumer Sublease, as
lessor, with such association, as lessee, for a term equiva-
lent to the unexpired period of this Lease, at basic rental
of ONE ($1) DOLLAR per year. The land area of such recrea-
tional or common facilities (exclusive of streets) shall not
exceed twenty-six thousand eight hundred (26,800) square
feet without Landlord's prior written approval if a multi-
phase development is elected. No Lot or Lots of the common
facilities shall be Sold and Conveyed unless and until the
following conditions shall have occurred:

(a)   Tenant shall have first obtained the govern-
mental approvals necessary to permit all Lots (or in the
case of a multi-phase development, the Lots within the
initial phase) benefited by such common facilities to be
Sold and Conveyed to Buyers.

(b)   No less than forty (40%) percent of all
buildings and other improvements to the Lots (or in the case

-7-

HOU 000752

of a multi-phase development, no less than forty (40%)
percent of the lots within the initial phase) benefited by
such common facilities shall have been substantially com-
pleted, or, in the event a condominium development is
elected, completion assured by surety arrangements approved
by the California Department of Real Estate).

(c)   The mortgagee, as that term is hereafter
defined, shall have executed and delivered a reconveyance of
any lien on the lot or Lots of the common facilities so con-
veyed to such association.

(d)   The construction of the common facilities
shall have been fully completed or completion assured by
surety arrangements approved by the California Department of
Real Estate.

### 3.08  Tenant's Right to New Leases; Consumer Subleases.

(a)   Tenant, at any time and from time to time may
at its election designate certain parcels of the leased land
to be subject to separate leases between Tenant and Land-
lord.  Without limiting the generality of the foregoing,
Tenant may obtain hereunder separate leases for some or all
of the Lots into which the leased land is divided.  These
parcels shall comply with all requirements of the Subdivi-
sion Map Act and all other applicable laws.  Upon written
request by Tenant, Landlord shall execute new leases to
parcels of the leased land as designated by Tenant and shall
amend this Lease to reflect that such parcels are no longer
subject to this Lease.  The terms and conditions of the new
leases and this Lease, as amended, shall be the same as the
terms and conditions of this Lease with the exception that
the annual rent shall be divided among the leases based on
the proportion which the square footage of the parcel
governed by any such lease bears to the total square footage
of the leased land.  Notwithstanding the foregoing, in the
event that Tenant designates a Lot for a separate lease
hereunder, the annual rent payable under the lease for such
Lot shall be equal to the annual rent payable under this
Lease multiplied by a fraction, the numerator of which is
one and the denominator of which is the total number of Lots
into which the leased land is divided.

(b)   As to such Lots for which Tenant has obtained
separate leases, and notwithstanding any other provision of
this Article III, Tenant may elect to enter into a sublease
with the Buyer of any such Lot in the form attached hereto
as Exhibit D with appropriate amendments if the Lots are
Sold and Conveyed as condominiums (referred to in this Lease
as a "Consumer Sublease") instead of causing such Lot to be
Sold and Conveyed pursuant to a Residential Lease.  This
Lease shall not terminate when any such Lot is Sold and
Conveyed pursuant to a Consumer Sublease.  Tenant, or its
permitted development sublessee, as provided in Section
6.01.03 below, may offer Lots to be Sold and Conveyed to the
public as provided in Section 3.06.02(a), but reading
"Consumer Sublease" for "Residential Lease" therein.  Tenant
may sublease common facilities Lots to a homeowners associa-

-8-

HOU 000753

May-01-02  04:17pm   From-RUTAN & TUCKER LLP,                714-546-9035         T-234   P.10/28   F-670

tion formed from among Buyers under Consumer Subleases as appropriately modified, but subject to the restrictions of Section 3.07 above. The use of Consumer Subleases shall not affect, among other things, Landlord's obligation under Section 3.04.02 or Tenant's ability to impose subdivision servitudes providing for assessments against Buyers as provided in Section 3.06.02(b).

(c)  Tenant shall be solely liable with respect to all covenants made by Tenant with Buyers and for all warranties and representations, express or implied, in favor of the Buyers under the Consumer Subleases. Tenant shall indemnify and hold Landlord free and harmless from all liability with respect to such covenants, warranties and representations in favor of Buyer whether or not disclosed to Landlord.

(d)  Landlord hereby agrees with Tenant for the benefit of all Buyers under Consumer Subleases that:

(i)  So long as such Buyer is not in default in the payment of rental or other charges due under the Consumer Sublease or in the performance of any of the other terms, covenants or conditions of the Consumer Sublease on such Buyer's part to be performed, such Buyer's possession of the Lot subject to such Consumer Sublease and such Buyer's other rights and privileges under the Consumer Sublease shall not be interfered with by the Landlord, its successors or assigns.

(ii)  Should this Lease be terminated prior to the expiration of the term hereof or any extensions of said term for any reason whatsoever, including without limitation, as a result of Tenant's breach thereof or default thereunder, the Consumer Sublease shall continue in full force and effect as a direct lease between Landlord and the Buyer under the Consumer Sublease, upon and subject to all of the terms, covenants and conditions of the Consumer Sublease for the balance of the term thereof remaining, provided that such Buyer attorns to Landlord in writing. Notwithstanding the foregoing, Landlord shall not be bound by any act or omission of Tenant as the prior sublessor under the Consumer Sublease. Landlord shall not be bound by any prepayment of rent (other than through the Payment Agreement referred to in subparagraph 3.08(d)(iv)) or other charges which such Buyer might have paid for more than three (3) months in advance to Tenant as the prior sublessor, and Landlord shall not be bound by any amendment to or modification of any Consumer Sublease or by any waiver or forbearance on the part of Tenant as the prior sublessor thereunder made or given without the written consent of Landlord.

(iii)  If, the provisions of the foregoing notwithstanding, a Consumer Sublease is terminated by reason of any termination of this Lease, it is hereby agreed that the Buyer under such Consumer Sublease and

-9-

HOU 000754

Landlord shall enter into a new lease upon the terms and conditions of the Consumer Sublease for the then remaining balance of the term of the Consumer Sublease.

(iv)  In the event that such Consumer Subleases shall call for the payment of rent less frequently than quarter annually, the provisions of subparagraph 3.08(d)(ii) shall only be applicable if Landlord and Tenant enter into a Payment Agreement under the terms of which all rental to be paid by Buyers under the terms of the Consumer Sublease will be paid to a neutral depository, such as a bank, savings and loan, trust company or escrow company.  Such neutral depository shall be instructed to remit to lessor from such sum collected the amount due under this Lease attributable to the Lot subject to the Consumer Sublease and to remit the balance to the Tenant.

## ARTICLE IV
### RENTAL

### 4.01   Basic Rental.

Tenant agrees to pay to Landlord as basic rental for the use and occupancy of the leased land, an annual sum of SEVENTY-TWO THOUSAND TWO HUNDRED TWENTY ($72,220.00) DOLLARS calculated at TEN THOUSAND ($10,000.00) DOLLARS per acre, multiplied by 7.222 acres, being the number of acres within Parcel 1 of Parcel Map recorded in Book 108, pages 47 and 48, inclusive, Official Records of Orange County, California, subject to adjustment as provided in Section 4.03 below.  Basic rental shall be payable in twelve (12) equal monthly installments of SIX THOUSAND EIGHTEEN DOLLARS AND THIRTY-THREE CENTS ($6,018.33) each, due and payable in advance on the first day of each calendar month during the term hereof, without deduction or offset, in lawful money of the United States of America at such place as Landlord from time to time shall direct in writing to Tenant.

### 4.02   Commencement of Rentals.

Rental payments shall commence on the first day of the calendar month next following the date first above written if such date be a date other than the first day of a calendar month.  In addition to the first full month's rent, Tenant shall pay at such time an additional pro rata rent representing the period between the term commencement date and the first day of the next succeeding calendar month, based on a thirty (30) day month and a three hundred sixty (360) day year.

### 4.03   Adjusted Rental.

(a)  When a Residential Lease, but not a Consumer Sublease, is Sold and Conveyed, the basic rental payable by Tenant shall be reduced by the amount of rental payable to Landlord under such Residential Lease.

-10-

HOU 000755

May-01-02  04:18pm    From-RUTAN & TUCKER LLP,                      714-546-9035              T-234  P.12/28  F-870

(b)   Upon the expiration of the twentieth (20th),
fortieth (40th) and sixtieth (60th) year of the term of this
Lease, the rental payable hereunder shall be adjusted to a
sum equal to eight (8%) percent of the unimproved fair
market value of the leased land, or any portion then re-
maining subject to this Lease, at the end of said twentieth
(20th), fortieth (40th) or sixtieth (60th) year, as the case
may be.   After any such adjustment of rental, Tenant shall
pay to Landlord such rental as so adjusted during the period
applicable thereto at the times and in the manner provided
in Section 4.01 above; provided, however, in no event shall
the rental as so adjusted be less than an annual rental at
least equal to TEN THOUSAND ($10,000.00) DOLLARS per acre
for the portion of the leased land then subject to this
Lease (calculated to exclude the area of the reserved
easement described in Exhibit A).   If, upon the expiration
of the twentieth (20th), fortieth (40th) or sixtieth (60th)
year, as the case may be, the parties hereto shall have
failed to agree upon such adjusted rental, the fair market
value of the leased land (or portion thereof then subject to
this Lease), as unimproved, and the adjusted rental, shall
be determined by arbitration pursuant to subparagraph (c) of
this Section.

(c)   Within ten (10) days of the expiration of the
twentieth (20th), fortieth (40th) or sixtieth (60th) year of
the term of this Lease, as the case may be, each of the
parties hereto shall appoint in writing an arbitrator and
give written notice thereof to the other party; or, in case
of the failure of either party so to do, the other party may
apply to the Superior Court of Orange County, California, to
appoint an arbitrator to represent the defaulting party in
the manner prescribed in the then existing statutes of the
State of California, applicable to arbitration, the pro-
visions of which statutes shall apply to and govern the
arbitration herein provided for with the same effect as
though incorporated herein.   Within ten (10) days after the
appointment of said two (2) arbitrators (in either manner),
they shall appoint, in writing, a third arbitrator and give
written notice thereto to Landlord and Tenant and, if they
shall fail to do so, then either party hereto may make
application to said Superior Court to appoint such third
arbitrator in the manner prescribed in said arbitration
statutes.

The three (3) arbitrators so appointed (in either
manner) shall promptly fix a convenient time and place in
the County of Orange for hearing the matter to be arbitrated
and shall give reasonable written notice thereof to each of
the parties hereto and with reasonable diligence shall hear
and determine the matter in accordance with the provisions
hereof and of said arbitration statutes, and shall execute
and acknowledge their award thereon in writing and cause a
copy thereof to be delivered to each of the parties hereto,
and the award of a majority of said arbitrators shall
determine the question arbitrated, and a judgment may be
rendered by said Superior Court confirming said award, or
the same may be vacated, modified or corrected by said Court

-11-

May-01-02  04:19pm  From-RUTAN & TUCKER LLP,                714-546-8035           T-234  P.13/28  F-670

at the instance of either of the parties hereto, in accordance with said arbitration statutes, and said judgment shall have the force and effect as provided in said statutes.

Each of the parties hereto shall pay for the services of its appointee, attorneys and witnesses and one-half (1/2) of all other proper costs of arbitration. Pending the final decision of such adjusted rental, Tenant shall pay to Landlord the amount of rent previously payable under Section 4.01 above as adjusted pursuant to Section 4.03(a) above. If such adjusted rental, as finally determined, shall exceed the amount of the previous rental, the excess accruing during the interim period shall be paid by Tenant to Landlord within thirty (30) days after the final determination of said adjusted rental. If such adjusted rental, as finally determined, shall be less than such previous rental, the amount of any excess paid by Tenant during said interim period shall be credited against the first rentals thereafter payable hereunder.

### ARTICLE V
### TAXES AND ASSESSMENTS

#### 5.01   Tenant to Pay Taxes and Assessments.

In addition to the basic rental, Tenant shall pay and discharge all taxes and general and special assessments which may be levied upon or assessed against the leased land (or the portion thereof being subject to this Lease at the time such taxes become payable), and all interest therein and all improvements and other property thereon, and upon all rentals payable on this Lease (in the event that county secured real property taxes be assessed in whole or in part either on an _ad valorem_ basis upon the leased land or upon rentals payable under the terms of the Lease thereof) as such taxes and assessments become due and payable during the term of this Lease. Taxes and assessments for the current fiscal year shall be prorated between Landlord and Tenant to the term commencement date. Tenant shall pay each installment of said taxes and assessments not later than the delinquency date thereof. Notwithstanding the foregoing, if Tenant shall, in good faith, contest the validity of said taxes and assessments, then Tenant, upon furnishing a sufficient surety bond to Landlord, may withhold payment pending settlement of its claim or may pay the same under protest and, in either case and at Tenant's expense, shall defend itself and Landlord against the same and shall pay and satisfy any adverse judgment that may be rendered thereon before the enforcement thereof against Landlord or the leased land.  Landlord shall remain responsible for its income tax payable on revenue derived from this Lease and all estate, inheritance, gift taxes and taxes of a similar nature.

#### 5.02   Tenant's Indemnity Re Taxes and Assessments.

Tenant agrees to protect and hold harmless Landlord and the leased land and all improvements in, on and about

-12-

HOU 000757

the leased land from all liability for any taxes and as-
sessments for which Tenant is obligated pursuant to Section
5.01 above, together with any interest, penalties or other
charges imposed and from any sale or other proceeding to
enforce payment thereof.

### 5.03  Lack of Separate Assessment.

Tenant's obligations pursuant to Section 5.01 presume
that the county tax assessor will separately assess the
leased land and will send the tax bill therefor directly to
Tenant.   If the assessor sends the tax bill to Landlord,
Tenant agrees to make the payments required under Section
5.01 within ten (10) days after Tenant's receipt from
Landlord of a copy of any tax bill received by Landlord.

### 5.04  Tenant Entitled to Refund.

It is agreed that any refund made in any taxes or as-
sessments paid by Tenant pursuant to this Article shall be
the sole property of Tenant, and if any such refund is mis-
takenly paid to Landlord, Landlord agrees to immediately,
and in no event later than three (3) days, pay the same
over to Tenant.

### 5.05  Installment Election for Assessments.

Notwithstanding any other provision of this Article,
Tenant may elect, as to any assessment levied against the
leased land during the term of this Lease, to take advan-
tage of the ability to cause such assessments to be payable
in installments instead of in a lump sum.  In such event,
Tenant shall only be responsible to pay the installments
which come due and payable during the term hereof.

### ARTICLE VI
### ASSIGNMENT AND ENCUMBRANCE

### 6.01  When Landlord's Consent Required.

6.01.01   Landlord's Consent Required.   Except as
provided in Article III and in this Article VI, Tenant shall
not encumber, assign or otherwise transfer this Lease, or
sublet the whole or any part of the leased land without the
prior written consent and approval of Landlord, which
consent shall not be unreasonably withheld.  Except as
otherwise so permitted in this Lease, no assignment or other
transfer, whether voluntary or involuntary, by operation of
law, under legal process, by receivership, in bankruptcy, or
otherwise, shall be valid or effective without the express
prior written consent and approval of Landlord.

6.01.02   Assignments For Which Landlord's Consent
Not Required.

(a)(1)  If the Tenant be Robert P. Warming-
ton, Tenant shall have the right, without obtaining Land-

-13-

HOU 000758

May-01-02  04:19pm    From-RUTAN & TUCKER LLP,                      714-546-9035              T-234  P.15/29  F-670

lord's consent, to assign its interest under this Lease
to The Robert P. Warmington Co., a California corporation
(as used herein The Robert P. Warmington Co. includes any
corporation which succeeds to the assets of such corporation
by merger, consolidation or purchase), to any other corpora-
tion in which Tenant (or The Robert P. Warmington Co.) has
greater than a fifty (50%) percent proprietary interest, to
any partnership or joint venture in which Tenant (or The
Robert P. Warmington Co.) or any such other corporation or
entity is the managing partner and to the heirs, devisees
and personal representatives of Optionee.

(a)(2)   If the Tenant be The Robert P.
Warmington Co., a California corporation (or successor as
provided in subsection (a)(1) above), Tenant shall have the
right, without obtaining Landlord's consent, to assign its
interest under this Lease to Robert P. Warmington, an
individual, to any corporation in which Tenant or said
individual has greater than a fifty (50%) percent proprie-
tary interest, to any partnership or joint venture in which
Tenant or said individual or any such corporation or
entity is the managing partner, and to any corporation
or other entity which succeeds to Tenant's interest by
merger, consolidation or by sale of all or substantially all
of Tenant's assets.

(b)   Tenant shall further have the right to
assign its interest under this Lease to any individual,
corporation or entity which, at the time of the assignment,
has a net worth of not less than THREE MILLION ($3,000,000)
DOLLARS and has experience substantially equal to that of
Tenant in building and marketing single-family residences of
the type to be built on the leased land.  Robert P. Warming-
ton and The Robert P. Warmington Co. shall each be consider-
ed as having identical experience.

(c)   In the event of any assignment which
complies with the foregoing, the assignor shall be released
of any and all liability arising under this Lease from and
after the effective date of the assignment.

(d)   Notwithstanding the foregoing, within ten
(10) days of a request therefor, Landlord shall execute an
instrument in recordable form consenting to any assignment
or other transfer made without its consent pursuant hereto.

6.02  Hypothecation.

Landlord agrees and consents that Tenant may, without
Landlord's prior consent, at any time and from time to time,
mortgage, encumber, assign and hypothecate by mortgage
or deed of trust (either of which is herein termed a "mort-
gage") all right, title and interest of Tenant in the
leasehold estate created by this Lease to a lender (herein
called "mortgagee").  Notwithstanding the foregoing, within
ten (10) days of a request therefor from Tenant, Landlord
agrees to execute an instrument in recordable form consent-
ing to any such mortgage, encumbrance, assignment or hypo-

-14-

HOU 000759

thecation.  If, notwithstanding the foregoing, Tenant's leasehold interest hereunder terminates under such fore-closure, assignment in lieu of foreclosure, the mortgagee shall be entitled to a new lease upon the same terms as this Lease and subject only to those things caused, created or consented to by Landlord to which Tenant's leasehold estate hereunder is subject as of the date of the recordation of the mortgage.

Except as hereinafter otherwise provided, the mortgage and all rights thereunder shall be subject to each and every of the covenants, conditions and restrictions of this Lease, and the same shall be subject to all rights and interest of Landlord, none of which shall be deemed waived by the foregoing consent.  Tenant agrees to furnish to Landlord copies of all instruments, indentures or agreements executed by Tenant, and to be recorded, to perfect the hypothecation of the leasehold estate to a mortgagee.

Any mortgagee shall have the right at any time during the term hereof while this Lease is in full force and effect:

(a)  To do any act required of Tenant hereunder, and all such acts done or performed shall be effective to prevent a forfeiture of Tenant's rights hereunder as if the same had been done or performed by Tenant; and

(b)  To rely on the security afforded by the leasehold estate and to acquire and to succeed to the interest of Tenant hereunder by foreclosure, whether by judicial sale, by power of sale contained in any security instrument, or by assignment given in lieu of foreclosure, and thereafter convey or assign title to the leasehold estate so acquired to any other person, firm or corporation without the consent of Landlord as to the such initial transfer.

Landlord shall give written notice to mort-gagee of any default by Tenant.  Landlord shall not termi-nate this Lease by reason of such default of Tenant if the mortgagee shall:

(i)  Cure such default within sixty (60) days after service on mortgagee of written notice from Landlord of Landlord's intention to terminate this Lease, except, however, (if the same cannot be cured by payment of rent, taxes, assessments and insurance premiums and other cash charges payable by Tenant hereunder within sixty (60) days) mortgagee shall have a reasonable time after sixty (60) days within which to cure such default so long as mortgagee is proceeding to cure such default with reasonable diligence, or

(ii)  Undertake on or before the expiration of said sixty (60) days or said reasonable time, in writing to perform all covenants of this Lease capable

-15-

HOU 000760

May-01-02  04:20pm   From-RUTAN & TUCKER LLP,                    714-546-9035              T-234   P.17/28   F-670

of performance by mortgagee.  In the event of such undertaking, or in the event such default is not susceptible of being cured by mortgagee, such default shall be deemed cured if mortgagee shall proceed in a timely and diligent manner to accomplish the foreclosure of Tenant's interest; provided, however, that if said foreclosure proceedings shall be subject to leave of any court (as in the case of a bankruptcy proceeding) and such leave shall have been applied for but not obtained by mortgagee, such default shall be deemed cured nevertheless, if mortgagee shall have attempted to obtain such leave in a timely and diligent manner. The obligation of mortgagee for the performance of the terms of this Lease shall terminate upon the sale, transfer or assignment of the right, title and interest of mortgagee in the leasehold estate to any other person, firm or corporation.

Any provisions contained in this Lease to the contrary notwithstanding, any mortgagee or its assignee may enforce such mortgage and acquire title to the leasehold estate in any lawful manner and, pending foreclosure of any such mortgage, may take possession of and rent the leased land and upon foreclosure of such mortgage may, without further consent of Landlord, sell, transfer or assign the leasehold estate or sublet the leased land.  Any purchase money, mortgage or deed of trust delivered in connection with any such assignment or transfer shall be entitled to the benefit of all of the provisions of this Lease regarding the rights of a mortgagee.  Any person acquiring the leasehold estate from mortgagee shall, as a condition precedent to the enjoyment of the leasehold estate, assume in writing the liability for the performance of the obligations imposed upon Tenant by the terms of this Lease.  Mortgagee shall furnish Landlord with an executed copy of the instrument of assignment or transfer and a copy of the undertaking made in accordance with the foregoing provisions.  Upon said assumption the assignor shall be released from all obligations for performance of the terms of this Lease.

The foregoing provisions do not give any person the right to mortgage, hypothecate or otherwise encumber or to cause any liens to be placed upon the freehold estate of Landlord, nor shall the foregoing provisions in any event be construed as resulting in a subordination in whole or in part of the freehold estate of Landlord to any indebtedness of Tenant.

Notwithstanding the foregoing provisions, until such time as the indebtedness of Tenant to mortgagee shall have been fully paid, Landlord shall not, without the prior written consent of mortgagee first had and obtained, accept any surrender of this Lease, consent to any modification hereof or consent to the assignment hereof, or of any part or portion, of the term created thereby or of any interest therein; provided, however, at the time a Lot is Sold and Conveyed by a Residential Lease, there shall be recorded a reconveyance of the lien of the mortgagee covering such Lot Sold and Conveyed by a Residential Lease.

-16-

HOU 000761

6.03  Subleases For Which Landlord's Consent Not Required.

(a)   Landlord's consent shall not be required for any Consumer Subleases or for any subsequent transfer of the subleasehold estate thereunder.

(b)   Tenant shall have the right, without Landlord's prior consent, to sublease its leasehold estate hereunder to any person or entity described in Section 6.01.02(a)(1).   Said sublease is herein referred to as an "Affiliate Sublease".

## ARTICLE VII
### LIENS

Tenant shall not suffer or permit to be enforced against the leased land, or any part thereof, any mechanics', laborers', materialmen's, contractors', subcontractors', or any other liens arising from or any claim for damages growing out of any work of construction or improvement, or any other claim or demand howsoever the same may arise, but Tenant shall pay or cause to be paid all of said liens, claims and demands before any action is brought to enforce the same against the leased land, and Tenant hereby indemnifies and agrees to hold Landlord and the leased land free and harmless from all liability for any and all such liens, claims and demands, together with all costs and expenses, including, but not limited to, attorneys' fees and court costs incurred by Landlord in connection therewith, and Landlord shall have the right, at any time and from time to time, to post and maintain on the leased land, or any part thereof, such notices of nonresponsibility as desired by Landlord or as may be provided by law.   Notwithstanding anything to the contrary contained in this paragraph, if Tenant shall, in good faith, contest the validity of any such lien, claim or demand, then Tenant shall, at its expense, defend itself and Landlord against the same and shall pay and satisfy any adverse judgment that may be rendered thereon before the enforcement thereof against Landlord or the leased land, and if Landlord shall require, Tenant shall furnish to Landlord a surety bond satisfactory to Landlord in an amount equal to such contested lien, claim or demand indemnifying Landlord against liability for same; or, if Landlord shall request, Tenant shall procure and record the bond provided for in the Civil Code of the State of California, or any comparable statute hereafter enacted providing for a bond freeing the leased land from the effect of such lien or claim or action thereon.

## ARTICLE VIII
### INDEMNIFICATION AND INSURANCE

8.01  Indemnity.

Landlord shall not be liable for any loss, damage, injury or claim of any kind or character to any person (including a Buyer) or property arising from or caused by

-17-

HOU 000762

the use or development of the leased land and the construc-
tion of improvements thereon, including, without limitation,
any such loss, damage, injury or claim arising from or
caused by (i) any use of the leased land, or any part
thereof; (ii) any defect in the design, construction of or
material in any structure or other improvement upon the
leased land or in any other facility therein; (iii) any
defect in soils or in the preparation of soils or in the
design and accomplishment of grading; (iv) any act or
omission of Tenant or any of its agents, employees,
licensees, invitees or contractors; (v) any accident on the
leased land or other casualty thereon; (vi) any represen-
tations by Tenant or any of its agents or employees; (vii) a
violation or alleged violation by Tenant, its employees or
agents, of any law now or hereafter enacted; (viii) any
other cause whatsoever in connection with Tenant's use of
the leased land; or (ix) the application of the principles
of strict liability with respect to any act or omission
during the term of this Lease of Tenant or its agents,
employees, licensees, invitees or contractors in connection
with the leased land, and Tenant, as a material part of the
consideration of this Lease, except to the extent occasioned
by the sole act or negligence or willful misconduct of
Landlord or its employees, hereby waives on its behalf all
claims and demands against Landlord for any such loss,
damage or injury of Tenant, and hereby indemnifies and
agrees to hold Landlord entirely free and harmless from all
liability for any such loss, damage, injury or claim with
respect to any person or property made by other persons, and
with respect to any such violations or charges arising
therefrom, including, without limitation, attorneys' fees
and court costs incurred by Landlord in connection there-
with.

8.02  Insurance.

    Tenant shall maintain at all times during the term
of the Lease, at its expense and in companies acceptable to
Landlord:

        (a)  Workmen's compensation insurance and employ-
er's liability insurance.

        (b)  Comprehensive liability insurance, with limits
of not less than FIVE HUNDRED THOUSAND ($500,000) DOLLARS
for any one person; ONE MILLION ($1,000,000) DOLLARS for any
one occurrence as to bodily injury or death; and ONE HUNDRED
THOUSAND ($100,000) DOLLARS per occurrence as to property
damage.

    Each policy of insurance shall be issued by insurers of
recognized responsibility, qualified to do business in
California, acceptable to Landlord and which has, at the
execution hereof, a rating at least equal to AXV by Best's
Insurance Guide (or other equivalent rating if such Guide be
discontinued) and shall name Landlord as an additional
insured.  Prior to the time of commencement of this Lease,
Tenant shall deliver certificates of insurance carriers of

-18-            HOU 000763

May-01-02  04:21pm   From-RUTAN & TUCKER LLP,                714-546-8035              T-234   P.20/28   F-670

each policy of insurance as evidence of compliance with the above requirements and stating that not less than ten (10) days' written notice will be given to Landlord prior to cancellation or reduction in coverage or amount.

### 8.03  Landlord's Indemnity.

The parties agree that Tenant shall have no liability by reason of the fact that a portion of Monterey Lane lies within an easement on the leased land as described on Exhibit A.  Landlord hereby agrees to indemnify and hold Tenant and any community association formed by Tenant to service the residents of the leased land absolutely free and harmless from any loss, damage, injury, claim or cause of action of any kind arising out of the use, improvement or maintenance of said Monterey Lane, including, without limitation, attorneys' fees and court costs.

ARTICLE IX
REMOVAL

Upon the expiration of the term of this Lease, Tenant shall quit and surrender possession of the leased land to Landlord.  Upon the expiration of the term of this Lease, Tenant shall have the right to remove from the leased land any improvements erected on the leased land by Tenant and which, at the time of such expiration, remain the property of Tenant.  Tenant shall promptly repair any damage to the leased land caused by such removal.  If Tenant has not completed such removal within sixty (60) days of the expiration of the term hereof, all of such improvements shall automatically become the property of Landlord without the payment of any consideration therefor.  In addition, before surrendering possession of the leased land as aforesaid, Tenant shall, without expense to Landlord, remove or cause to be removed from said leased land all movable signs, furnishings, equipment, trade fixtures, merchandise and other movable personal property installed or placed therein, and all debris and rubbish, and Tenant shall repair all damage to the leased land resulting from such removal.  Upon such expiration, and if requested by Landlord, Tenant shall, within five (5) days of a request therefor, execute, acknowledge and deliver to Landlord an instrument in writing releasing and quitclaiming to Landlord all right, title and interest of Tenant in and to said leased land by reason of this Lease or otherwise.  If Tenant fails to remove any of its signs, furnishings, equipment, trade fixtures, merchandise or other personal property within thirty (30) days after the expiration or earlier termination of this Lease, then Landlord may, at its sole option, (i) deem any or all of such items abandoned as the sole property of Landlord; or (ii) remove any or all of such items and dispose of same in any manner or store same for Tenant, in which event the expense of such disposition or storage shall be borne by Tenant and shall be immediately due and payable.

-19-

HOU 000764

ARTICLE X
CONDEMNATION

The words "condemnation" or "condemned", as used
in this paragraph, shall mean the exercise of, or intent to
exercise, the power of eminent domain expressed in writing,
as well as the filing of any action or proceeding for such
purpose, by any person, entity, body, agency or authority
having the right or power of eminent domain (the "condemning
authority" herein), and shall include a voluntary sale to
any such condemning authority, either under the threat of
condemnation or while condemnation proceedings are pending,
and the condemnation shall be deemed to occur in point of
time upon the actual physical taking of possession pursuant
to the exercise of said power of eminent domain.  All award
or compensation paid upon condemnation shall be allocated as
follows:  (1) Prior to the time the leased land or any
portion is Placed under Development, the entire award shall
be allocated, paid to and be the sole property of Landlord,
except for Tenant's hard costs which shall be paid out of
said award to Tenant, and (2) after the time the leased land
or any portion thereof has been Placed under Development the
entire award shall be allocated as follows:  (a) to Tenant,
a sum equal to the total of (i) the then fair market value
of the buildings and other improvements constructed or
installed by Tenant on the leased land; and (ii) the then
fair market value of Tenant's leasehold interest in the
leased land representing the present value of the aggre-
gate of the difference, if any, between (a) the economic
rental and (b) the basic rental, for the unexpired period
prior to a basic rental adjustment as provided in Article
IV; and (b) to Landlord, the remainder.   Landlord may,
with Tenant's written consent, agree to sell and/or convey
the leased land or portion thereof to the condemning author-
ity without first requiring that action or proceeding shall
be instituted or, if any such action or proceeding shall be
instituted, without requiring any trial or hearing thereof.
All amounts paid by the condemning authority upon such
voluntary sale or conveyance shall be allocated as provided
above.

In determining the portion of a condemnation award
or a payment for voluntary sale or conveyance under threat
of condemnation, any appraisal performed by the condemning
authority in connection with such award or conveyance shall
be controlling.  In the absence of such appraisal or agree-
ment between Landlord and Tenant as to such amounts, each
shall appoint an appraiser and the two shall select a third
appraiser, and all three shall appraise the property for the
purpose of such allocation of compensation for a condem-
nation with the average of the two appraisals which are the
closest controlling.

If only a portion of the leased land is condemned, this
Lease shall terminate if the mortgagee shall consent thereto
in writing and if Tenant shall notify Landlord, within sixty
(60) days of the condemnation, that the portion of the
leased land remaining after the condemnation cannot be
developed in the manner chosen by Tenant.  If Tenant fails

-20-

HOU 000765

to timely give such notice, this Lease shall remain in full
force and effect as to the remaining portion of the leased
land, except that (a) the basic rental payable by Tenant
shall be reduced in the proportion that the area of the
portion taken bears to the area of the entire leased land,
and (b) Tenant shall be entitled to use the award payable on
such partial condemnation to repair any damage to the
remaining portion of the leased land and improvements
thereon.

As used in the foregoing, "Tenant's hard costs" shall
mean all of Tenant's direct out-of-pocket expenses incurred
with regard to the development or intended development of
the leased land and shall include, without limitation, the
following but shall not include any charge for overhead or
other administrative expenses: engineering, architectural,
environmental, legal, accounting and other consultants, de-
velopment fees paid to governmental authorities, the cost of
preparing and/or reproducing plans and specifications for
such development, and the contract cost of improving the
leased land (or Tenant's direct costs if such improvement is
done by Tenant's employees).

## ARTICLE XI
### DEFAULT AND REMEDIES IN EVENT OF DEFAULT

### 11.01  Events of Default.

Tenant shall be deemed in default under the terms of
this Lease should Tenant:

(a)  Use the leased land or suffer the same to
be used for any purpose other than as authorized in this
Lease for more than thirty (30) days after notice from
Landlord specifying the unauthorized use; provided, however,
if such unauthorized use is not capable of being cured
within said thirty (30) day period, Tenant shall not be
deemed in default hereunder so long as it commences to cure
such unauthorized use within said period and thereafter
diligently and continuously prosecutes the same to comple-
tion; or

(b)  Default in the payment of any basic rental
payment and such default shall continue for ten (10) days
after notice thereof is given to Tenant; or

(c)  Fail to pay or cause to be paid any tax,
assessment, insurance premium, lien, claim, demand, judgment
or other charge provided in this Lease to be paid or caused
to be paid by Tenant at the times and in the manner herein-
above provided and such breach or default shall continue for
thirty (30) days after notice thereof is given to Tenant;
provided, however, the foregoing shall not prejudice Ten-
ant's right to contest any claim or lien pursuant to Article
VII above; or

(d)  File a voluntary petition in bankruptcy
or be adjudicated a bankrupt or insolvent or shall file

-21-

HOU 000766

any petition or answer seeking or acquiescing in any reorganization, dissolution or similar relief for itself under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, or shall seek or consent to or acquiesce on the appointment of any trustee, receiver or liquidator or shall make a general assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due; or

(e)  A court of competent jurisdiction shall enter an order, judgment or decree approving a petition filed against Tenant seeking any reorganization, dissolution or similar relief under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, and such order, judgment or decree shall remain unvacated and unstayed for an aggregate of ninety (90) days (whether or not consecutive) from the first day of entry thereof; or any trustee, receiver, or liquidator of Tenant shall be appointed without the consent or acquiescence of Tenant and if such appointment shall remain unvacated and unstayed for an aggregate of ninety (90) days (whether or not consecutive); or

(f)  Default in the performance of or breach of any other covenant, undertaking, duty, condition or restriction provided in this Lease to be kept and performed by Tenant thirty (30) days after written notice from Landlord specifying the nature of such default or breach; provided, however, if the nature of such default or breach is such that it is incapable of being cured within said thirty (30) day period, then Tenant shall not be deemed in default under this Lease if Tenant commences to cure the same within said thirty (30) day period and thereafter diligently and continuously (taking into account the nature of the default or breach) prosecutes such cure to completion.

11.02  Remedies.

In the event of Tenant's default, Landlord may, at Landlord's option:

(a)  Continue this Lease in effect without terminating Tenant's right to possession, even though Tenant has breached this Lease and abandoned the leased land; and to enforce all of Landlord's rights and remedies under this Lease, including the right to recover, by suit or otherwise, all sums and installments required to be paid in accordance with the provisions of Article IV above, or other monetary performance as it becomes due hereunder, or to enforce, by suit or otherwise, any other term or provision hereof on the part of Tenant required to be performed, it being specifically agreed that the aggregate unpaid installment indebtedness shall bear simple interest at the rate of ten (10%) percent per annum from the date thereof until paid, provided, however, that Landlord may, at any time thereafter, elect to terminate this Lease for such previous breach by notifying Tenant in writing that Tenant's right to possession of the leased land has been terminated; or

-22-

HOU 000767

(b)  By written notice to Tenant, Landlord may declare this Lease at an end, re-enter the leased land by process of the law, eject all parties in possession thereof therefrom and repossess said leased land, in which event, Landlord shall have the right to recover from Tenant:

(i)  The worth at the time of award of the unpaid rent which has been earned at the time of termination;

(ii)  The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Tenant proves could have been reasonably avoided;

(iii)  The worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss for the same period that the Tenant proves could be reasonably avoided;

(iv)  All other amounts necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations hereunder or which in the ordinary course of things are likely to result therefrom; and

(v)  In computing "worth at the time of award" Landlord shall be allowed interest at the rate of ten (10%) percent per annum.

The remedies of Landlord, as hereinabove provided, are cumulative and in addition to and not exclusive of any other remedy of Landlord herein given or which may be permitted by law.  The remedies of Landlord are subject to the provisions of Section 6.02.

## 11.03  Termination on Default.

Upon such termination, Tenant, if required by Landlord so to do by written notice to Tenant, shall within sixty (60) days, cause all improvements, structures and appurtenances thereto belonging to Tenant or those claiming under Tenant, to be removed from the leased land (or the portion of the leased land being then the subject of this Lease) and Tenant shall cause any excavations to be filled and all foundations, debris and other parts to be removed and the premises thereof surrendered in a clean and orderly condition.  In the event any such improvements shall not be removed within the time period as provided in this Section 11.03, the same shall, at the option of the Landlord, become the property of Landlord, without any requirement for the payment of consideration therefor; provided, however, that any such termination of this Lease shall not relieve the Tenant or its successors and assigns, if any, from liability for damages which Landlord may incur by reason of Tenant's

-23-

HOU 000763

default in failing to remove all structures, improvements and appurtenances (excluding the aforementioned type of improvements and installations) and to remove all debris within said time period.

11.04  Quitclaim.

Upon such termination of this Lease, Tenant, following Landlord's request, shall execute, acknowledge and deliver to Landlord a quitclaim deed quitclaiming all right, title and interest of Tenant in and to the leased land.

ARTICLE XII
MISCELLANEOUS

12.01  Short Form.

This Lease shall not be recorded, but the Ground Lease (Short Form-Memorandum), in the form attached hereto as Exhibit C and by this reference made a part hereof, shall be executed and recorded by the parties hereto upon the execution of this Lease.

12.02  Landlord's Cooperation.

Landlord agrees to cooperate with Tenant in developing the leased land in the manner chosen by Tenant, including, without limitation, attending a reasonable number of meetings with Tenant and/or jurisdictional government agencies.

12.03  Construction of Lease.

The language in all parts of this Lease shall, in all cases, be construed as a whole and in accordance with its fair meaning and not restricted for or against either Landlord or Tenant.  The captions of the paragraphs and subparagraphs of this Lease are for convenience only and shall not be considered or referred to in resolving questions or construction.

12.04  Severability.

If any provision of this Lease shall be adjudged to be invalid, void or illegal, it shall in no way affect, impair or invalidate any other provision hereof, the parties hereby agreeing that they would have entered into the remaining portion of this Lease notwithstanding the omission of the portion or portions adjudged invalid, void or illegal.

12.05  Relationship of the Parties.

The relationship of the parties hereto is that of Landlord and Tenant, and it is expressly understood and agreed that Landlord does not in any way nor for any purpose become a partner of Tenant or a joint venturer with Tenant in the conduct of Tenant's business or otherwise, and that

-24-

HOU 000769

the provisions of any agreement between Landlord and Tenant
relating to rent are made solely for the purpose of pro-
viding a method whereby rental and purchase payments
are to be measured and ascertained.

### 12.06  Notices.

Any notice to be given or other document to be deliver-
ed by either party, or all payments of rental, may be
delivered in person to either party or may be deposited in
the United States mail in the State of California, duly
certified, return receipt requested, with postage prepaid,
and addressed to the party for whom intended at the address
appearing at the head of this Lease.  In the event that
Landlord has received notice of the hypothecation by Tenant
of his leasehold estate with a mortgage, all notices to be
sent by Landlord to Tenant hereunder shall be effective only
if a copy thereof is sent to the Mortgagee at the address
supplied to Landlord by Tenant or such Mortgagee.

Either party hereto may from time to time by written
notice to the other party designate a different address
which shall be substituted for the one above specified.  If
any notice or other document is sent by registered or
certified mail, as aforesaid, the same shall be deemed
served or delivered forty-eight (48) hours after the mailing
in the County of Orange, as above provided.

### 12.07  Attorneys' Fees.

In the event of any dispute between the parties hereto
involving the covenants or conditions contained in this
Lease or arising out of the subject matter of this Lease,
the prevailing party shall be entitled to recover reasonable
expenses, attorneys' fees and costs.

In the event Landlord is made a party to litigation
arising out of acts or negligence by Tenant regarding
the subject matter of this Lease, Landlord shall be entitled
to recover from Tenant its reasonable expenses, attorneys'
fees and costs incurred in such litigation.  Tenant hereby
indemnifies and agrees to hold Landlord harmless of and
from all liabilities, costs and expenses arising from any
such litigation.

### 12.08  Waiver.

No delay or omission by either party hereto in exercis-
ing any right or power accruing upon the noncompliance or
failure to perform by the other party hereto under the
provisions of this Lease shall impair any such right or
power or be construed to be a waiver thereof.  A waiver by
either party hereto of any of the covenants, conditions or
agreements hereof to be performed by the other party shall
not be construed as a waiver of any succeeding breach of
the same or other covenants, agreements, restrictions and
conditions hereof.

-25-                    HOU 000770

### 12.09  Inspection.

Landlord reserves the right for Landlord and Land-
lord's agents and representatives to enter upon the leased
land at any reasonable time following reasonable notice for
the purpose of attending to Landlord's interest hereunder,
and to inspect the leased premises.

### 12.10  Covenants and Conditions.

Each of the covenants in this Lease shall be deemed
and construed as conditions and each and every covenant
shall be deemed covenants running with the land.

### 12.11  Entire Agreement.

This Lease contains the entire agreement of the parties
hereto with respect to the matters covered hereby, and
no other previous agreement, statement or promise made by
any party hereto which is not contained herein shall be
binding or valid.

### 12.12  Non-disturbance.

No mortgage or deed of trust placed on the leased land
by Landlord shall be superior to the interest of Tenant
herein, unless Landlord and Tenant execute an agreement in
recordable form satisfactory to the Tenant that in the event
of judicial or private foreclosure, or deed in lieu of
foreclosure, or any other action taken by such mortgagee or
beneficiary, this Lease and the rights of Tenant hereunder
shall not be disturbed by reason of any such foreclosure or
other action, but shall continue in full force and effect so
long as this Lease shall remain in full force and effect
and that in the event of any conflict between the terms of
this Lease and any such mortgage or deed of trust with
regard to insurance or condemnation proceeds or any other
provisions of the Lease or the mortgage or the deed of
trust, the terms and provisions of this Lease shall prevail.

### 12.13  Estoppel Certificates.

Landlord and Tenant shall at any time and from time
to time, upon not less than ten (10) days prior written
request by the other party or parties to this Lease, exe-
cute, acknowledge and deliver to such party or parties a
statement in writing certifying that this Lease is un-
modified and in full force and effect (or if there has been
any modification thereof that the same is in full force and
effect as modified and stating the modification or modi-
fications) and that there are no defaults existing (or if
there is any claimed default stating the nature and extent
thereof); and stating the dates to which the rent and other
charges have been paid in advance.  It is expressly under-
stood and agreed that any such statement delivered pursuant
to this section may be relied upon by any prospective
assignee or sublessee of the leasehold estate, or estates

-26-                      HOU 000771

of Tenant, or any prospective purchaser of the estate of
Landlord, or any lender or prospective assignee of any
lender on the security of the leased land or the fee estate
or any part thereof, or upon the leasehold estate of Tenant
or any part thereof, and any third person.

### 12.14  Signs.

Tenant shall be entitled to place on the leased land
such advertising signs as it deems necessary or proper for
the development and marketing of the leased land.

### 12.15  Merger.

There shall be no merger of this Lease or the lease-
hold estate hereunder with the fee estate in the leased land
by reason of the fact that the Lease or any interest here-
under may be held for the account of a person or entity who
is the owner of the fee estate in the leased land or any
portion thereof, unless a written instrument effectuating
such merger is recorded.

IN WITNESS WHEREOF, each of the parties hereto has
caused this Lease to be executed as of the day and year
first above written.

                              HOUSER BROS. CO.
                              A California Limited Partnership


                              By _____
                                 CLIFFORD C. HOUSER,
                                 General Partner


                              By _____
                                 VERNON F. HOUSER,
                                 General Partner

                                              "Landlord"




                              _____
                                 ROBERT P. WARMINGTON

                                              "Tenant"




                    -27-            HOU 000772

# Title Chain & Lien Report

**16222 Monterey Ln, Huntington Beach, CA 92649-6214**

APN: 178-011-16

Orange County Data as of: 08/03/2020

| Search Start Date: | 01/01/1967 | Start Date: | 01/01/1967 |
|---|---|---|---|
| Search End Date: | 08/19/2020 | End Date: | 08/19/2020 |

| Date | Type | Grantor | Grantee | Document # | Doc Ref. |
|---|---|---|---|---|---|
| 10/22/1979 | Lease | Warmington Robert | Robert P Warmington | 13362.317 | |
| 10/22/1979 | Lease | Houser Bros | Warmington Robert | 13362.320 | |
| 11/06/1979 | Cancellation | Houser Bros | | 13383.1868 | |
| 12/06/1979 | Lease | Houser Bros | Warmington Robert | 13424.499 | |
| 12/06/1979 | Lease | Warmington Robert | Robert P Warmingto | 13424.504 | |
| 09/02/1980 | Plat, County Miscellaneous Plat | | | 13726.1096 | 43 master lase |
| 09/02/1980 | Plat, County Miscellaneous Plat | | | 13726.1130 | 65 masterlease |
| 09/02/1980 | Plat, County Miscellaneous Plat | | | 13726.1166 | 78 masterlease |
| 09/02/1980 | Plat, County Miscellaneous Plat | | | 13726.1202 | 57 masterlease |
| 09/02/1980 | Plat, County Miscellaneous Plat | | | 13726.1232 | 8 masterlease |
| 09/02/1980 | Plat, County Miscellaneous Plat | | | 13726.1268 | 77 masterlease |
| 09/02/1980 | Plat, County Miscellaneous Plat | | | 13726.1304 | 16 master lease |
| 09/02/1980 | Plat, County Miscellaneous Plat | | | 13726.1340 | 32 sublease |
| 09/02/1980 | Plat, County Miscellaneous Plat | | | 13726.1099 | 43 sublease |
| 09/02/1980 | Plat, County Miscellaneous Plat | | | 13726.1133 | 65 sublease |
| 09/02/1980 | Plat, County Miscellaneous Plat | | | 13726.1169 | ? sublease |
| 09/02/1980 | Plat, County Miscellaneous Plat | | | 13726.1205 | 57 sublease |
| 09/02/1980 | Plat, County Miscellaneous Plat | | | 13726.1235 | 8 sublease |
| 09/02/1980 | Plat, County Miscellaneous Plat | | | 13726.1271 | 77 sublease |
| 09/02/1980 | Plat, County Miscellaneous Plat | | | 13726.1307 | 16 sublease |
| 09/02/1980 | Plat, County Miscellaneous Plat | | | 13726.1343 | 32 sublease |
| 09/08/1980 | Plat, County Miscellaneous Plat | | | 13733.192 | 4 master lease |
| 09/08/1980 | Plat, County Miscellaneous Plat | | | 13733.272 | 21 master lease |
| 09/08/1980 | Plat, County Miscellaneous Plat | | | 13733.195 | 4 sublease |



© 2020 FIRST AMERICAN DATA TREE AND/OR ITS AFFILIATES. ALL RIGHTS RESERVED.

| Date | Type | Subject Name | | Document # | Doc Ref. |
|---|---|---|---|---|---|
| 09/08/1980 | Plat, County Miscellaneous Plat | | | 13733.275 | *21 Sublease* |
| 09/26/1980 | Plat, County Miscellaneous Plat | | | 13760.957 | *master lease 5* |
| 10/03/1980 | Release | | | 13773.4 | *10 master lease* |
| 10/03/1980 | Release | | | 13773.7 | *10 Sublease* |
| 10/10/1980 | Plat, County Miscellaneous Plat | | | 13783.1726 | *50 master lease* |
| 10/10/1980 | Plat, County Miscellaneous Plat | | | 13783.1779 | *40 master lease* |
| 10/10/1980 | Plat, County Miscellaneous Plat | | | 13783.1729 | *Sublease 50* |
| 10/10/1980 | Plat, County Miscellaneous Plat | | | 13783.1782 | *Sublease 40* |
| 10/14/1980 | Plat, County Miscellaneous Plat | | | 13787.1775 | *59 master lease* |
| 10/14/1980 | Plat, County Miscellaneous Plat | | | 13787.1828 | *28 master lease* |
| 10/14/1980 | Plat, County Miscellaneous Plat | | | 13787.1778 | *59 Sublease* |
| 10/14/1980 | Plat, County Miscellaneous Plat | | | 13787.1831 | *28 Sublease* |
| 10/17/1980 | Plat, County Miscellaneous Plat | | | 13793.949 | *master lease 25* |
| 10/17/1980 | Plat, County Miscellaneous Plat | | | 13793.952 | *Sublease 25* |
| 07/06/1990 | Deed | Houser Bros | Houser Bros | 1990.357100 | |
| 07/06/1990 | Deed Of Trust | Houser Bros | Union Bank | 1990.357101 | 342851 |
| ^ 07/21/1997 | Amendment | Houser Bros | | 1997.342851 | |
| 10/06/1993 | Deed | Malmborg Jack N & | Malmborg Jack N & | 1993.678726 | |
| 10/08/1993 | Declaration Of Homestead | Sullivan John L | | 1993.686386 | |
| 01/27/1994 | Declaration Of Homestead | Gibbons Robert L | | 1994.66495 | |
| 07/13/1994 | Declaration Of Homestead | Hunn Nancy C | | 1994.451177 | |
| 01/28/1997 | Declaration Of Homestead | Rounds Royal E | | 1997.40615 | |
| 07/31/1998 | Reconveyance | | | 1998.499256 | |
| 06/19/2000 | Declaration Of Homestead | Newton Carol A | | 2000.321481 | |
| 08/23/2007 | Declaration Of Homestead | Moomau Linda Charl | | 2007.523219 | |
| 09/15/2014 | Declaration Of Homestead | Radzinski Linda M | | 2014.372099 | |
| 05/22/2017 | Declaration Of Homestead | Vanzyl Yvonne H | | 2017.208348 | |

## Liens, Filings & Judgments

16222 Monterey Ln, Huntington Beach, CA 92649-6214

| Search Start Date: | 01/01/1967 | Name(s) Searched: | Houser Bros Co, Houser Bros Co Trust |
|---|---|---|---|
| Search End Date: | 08/19/2020 | Match: | Exact |

| Date | Type | Subject Name | Document # | Doc Ref. |
|---|---|---|---|---|



© 2020 FIRST AMERICAN DATA TREE AND/OR ITS AFFILIATES. ALL RIGHTS RESERVED.





**16222 Monterey Ln #376, Huntington Beach, CA 92649**



1.  *PARCEL MAP 108-47 459 Lots*

2.  *Rancho Del Rey*

    a.  *Unit 1 - Existing Park (132 Lots) Senior MHP Overlay*

    b.  *Unit 2 - C.U.P. 66-7 (37 Lots) Senior MHP Overlay*

    c.  *Unit 3 - C.U.P. 67-17 (135 Lots) Senior MHP Overlay*

    d.  *DV 68-45 178-771-03-Subdivision*

    e.  *Unit 4 - C.U.P. 69-68 (75 Lots) Zoned R-2 With Senior MHP Overlay*

3.  *Parcel Map Book 456 Page 49-50 (8-17-1979)*

    a.  *80 Airspace Units- Zoned Multi family) with Add'l Rec. Vehicle Storage Lots & Trash Enclosures*

4.  *80 Year Unrecorded GROUND LEASE*

    b.  *Parcel 1 & Parcel 2 of Parcel Map Book 108-47*

    *Executed October 19, 1979 Master Lessor Houser Bros Co, Master Lessee Robert P. Warmington*

    *Subject to various documents whether of record or not.*

4.  *Covenant Running With The Land November 6, 1979 Instrument No. 13383.1868 Clerk Recorder, County of Orange.*

    a.  *..."extending the southerly boundary of Parcel 2, and every portion of the area so described (the "Covenant Area"), and shall bind the Covenant Area, Houser and Houser's heirs, assigns, representatives and successors in interest for the benefit of Warmington and the leasehold estate in Parcel 1 under the Ground Lease and any portions into which it may be divided, by Residential Leases (as defined in the Ground Lease) or otherwise.*

North



West

East

South






Units 1, 2, 3 and 4 of Lot 2 of the following:

All that certain land situated in the State of California, County of Orange, City of Huntington Beach, described as follows:

Proposed Tract No. 10542, being a subdivision of the following:

A portion of the northeast one quarter (1/4) of the northwest one quarter (1/4) of Section 20, Township 5 south, Range 11 west, in the Rancho Las Bolsa Chica, as shown on a map recorded in book 51, page 13 of Miscellaneous Maps, records of said Orange County, being described as follows:

Parcel 1 of a map filed in book 108, page 48 of Parcel Maps.

## NOTICE OF COMPLIANCE WITH CONDITIONS ON TRACT

## AUTHORIZATION FOR RELEASE FOR RECORDING

TO:        City Clerk                    Date _A____ 7, 1971_

FROM:      PLANNING DEPARTMENT
           James W. Palin

TRACT NO. _____

RECREATION & PARKS FEES PAID _12,512.00_

Other: _____

_____
            (Signature)





456  49

25824

SHEET 1 OF 2 SHEETS
2 LOTS
8.278 ACRES
ALL OF TENTATIVE
TRACT NO. 10542

DUPLICATE

# TRACT NO. 10542

IN THE CITY OF HUNTINGTON BEACH, COUNTY OF ORANGE, STATE OF CALIFORNIA.

BEING A SUBDIVISION OF PARCEL 1 AS SHOWN ON A MAP RECORDED

IN BOOK 100, PAGES 47 & 48 OF PARCEL MAPS, RECORDS OF ORANGE COUNTY, CALIFORNIA.

MADOLE & ASSOCIATES, INC.
J.M. MADOLE R.C.E. 14814

NOVEMBER, 1978

WE, THE UNDERSIGNED, BEING ALL PARTIES HAVING ANY RECORD
TITLE INTEREST IN THE LAND COVERED BY THIS MAP, DO HEREBY
CONSENT TO THE PREPARATION AND RECORDATION OF SAID MAP,
AS SHOWN WITHIN THE COLORED BORDER LINE.
WE HEREBY DEDICATE TO THE _____ PUBLIC _____ FOR STREET PURPOSES, EDINGER AVENUE.
WE ALSO HEREBY DEDICATE TO THE CITY OF HUNTINGTON BEACH:

1.  SUBSURFACE WATER RIGHTS BUT WITHOUT THE RIGHT OF
    SURFACE ENTRY TO THE SURFACE OR TO THE SUBSURFACE
    ABOVE THE DEPTH OF 500 FEET.

2.  THE DOMESTIC WATER SYSTEM AND APPURTENANCES AS
    SHOWN ON THE IMPROVEMENT PLANS FOR THIS TRACT.

3.  ACCESS RIGHTS IN, OVER, ACROSS, UPON AND THROUGH
    THE PRIVATE STREETS WITHIN SAID TRACT FOR THE
    PURPOSE OF MAINTAINING, SERVICING, CLEANING, RE-
    PAIRING THE WATER SYSTEM WITHIN SAID TRACT.

WE ALSO HEREBY RELEASE AND RELINQUISH TO THE CITY OF
HUNTINGTON BEACH:

1.  ALL VEHICULAR ACCESS RIGHTS TO EDINGER AVENUE,
    EXCEPT AT STREET INTERSECTION.

HOUSER BROS. CO., A LIMITED PARTNERSHIP

VERNON F. HOUSER          CLIFFORD C. HOUSER
GENERAL PARTNER           GENERAL PARTNER

STATE OF CALIFORNIA }
                    } SS
COUNTY OF ORANGE    }

ON THIS __ DAY OF ___, 19__, BEFORE ME,
_____, A NOTARY PUBLIC IN AND FOR SAID
STATE, PERSONALLY APPEARED VERNON F. HOUSER AND
CLIFFORD C. HOUSER, KNOWN TO ME TO BE THE PARTNERS
OF HOUSER BROS. CO., A LIMITED PARTNERSHIP, THE
PARTNERSHIP THAT EXECUTED THE WITHIN INSTRUMENT
AND ACKNOWLEDGED TO ME THAT SUCH PARTNERSHIP
EXCUTED THE SAME.

MY COMMISSION EXPIRES _____
                  WITNESS MY HAND AND
                  OFFICIAL SEAL.

NOTARY PUBLIC IN AND FOR SAID STATE.

ROBERT P. WARMINGTON, OPTIONEE UNDER AN OPTION AGREEMENT
RECORDED IN BOOK 12512 , PAGE 1053 OF OFFICIAL RECORDS.

ROBERT P. WARMINGTON
OPTIONEE

STATE OF CALIFORNIA }
                    } SS
COUNTY OF ORANGE    }

ON THIS ___ DAY OF ___, 19__, BEFORE US _____,
A NOTARY PUBLIC IN AND FOR SAID STATE, PERSONALLY APPEARED
_____, KNOWN TO ME TO BE THE PERSON
DESCRIBED IN, AND WHOSE NAME IS SUBSCRIBED TO THE WITHIN INSTRUMENT
AND HE ACKNOWLEDGED TO ME THAT HE EXECUTED THE SAME

MY COMMISSION EXPIRES _____ WITNESS MY HAND AND OFFICIAL SEAL.

NOTARY PUBLIC IN AND FOR SAID STATE

PURSUANT TO THE PROVISIONS OF SECTION 66436 (c) OF THE
SUBDIVISION MAP ACT THE FOLLOWING SIGNATURES HAVE BEEN OMITTED:
1.  GENERAL TELEPHONE COMPANY OF CALIFORNIA, HOLDER OF AN EASE-
    MENT RECORDED IN BOOK 7329, PAGE 591 OF OFFICIAL RECORDS.
2.  SOUTHERN CALIFORNIA EDISON CO., HOLDER OF AN EASEMENT RECORDED
    IN BOOK 9004, PAGE 722 OF OFFICIAL RECORDS.

PURSUANT TO THE PROVISIONS OF SECTION 66436 (f) OF THE SUBDIVISION
MAP ACT, A SOILS REPORT BY BRUCE A. PICKARD R.C.E. NO. 1550 DATED
FEBRUARY 14, 1978 HAS BEEN PREPARED FOR THIS SUBDIVISION.
THIS REPORT AND ANY SUPPLEMENTS THERETO ARE ON FILE WITH THE
CITY OF HUNTINGTON BEACH - BUILDING DEPARTMENT

## ENGINEER'S CERTIFICATE

I, J.M. MADOLE , DO HEREBY CERTIFY THAT
I AM A REGISTERED CIVIL ENGINEER NO. 14814 OF THE STATE OF
CALIFORNIA; THAT THIS MAP CONSISTING OF 2 SHEETS AND
THE TRUE AND COMPLETE SURVEY MADE IN _____,
WHICH IT CORRECTLY REPRESENTS, WERE MADE BY ME OR UNDER
MY DIRECTION; THAT THE MONUMENTS ARE OF THE CHARACTER AND
OCCUPY THE POSITIONS INDICATED, OR WILL BE SET IN SUCH
POSITIONS WITHIN NINETY DAYS AFTER THE ACCEPTANCE OF
ITS PAVEMENTS; AND THAT SAID MONUMENTS ARE SUFFICIENT TO
ENABLE THE SURVEY TO BE RETRACED.

J.M. MADOLE
R.C.E. NO. 14814

## CITY ENGINEER'S CERTIFICATE

I HEREBY CERTIFY THAT I HAVE EXAMINED THIS MAP AND HAVE FOUND IT TO BE
SUBSTANTIALLY IN CONFORMANCE WITH THE TENTATIVE MAP AS FILED WITH,
AMENDED AND APPROVED BY THE CITY PLANNING COMMISSION; THAT ALL PROVISIONS
OF THE SUBDIVISION MAP ACT AND CITY SUBDIVISION REGULATIONS HAVE BEEN
COMPLIED WITH AND I AM SATISFIED SAID MAP IS TECHNICALLY CORRECT.

DATED THIS 26th DAY OF July , 1979 .

RONALD L. LACHER
ACTING CITY ENGINEER           BY Ronald L. Lacher
OF HUNTINGTON BEACH.

## CITY CLERK'S CERTIFICATE

STATE OF CALIFORNIA }
                    } SS
COUNTY OF ORANGE    }

I HEREBY CERTIFY THAT THIS MAP WAS PRESENTED FOR APPROVAL TO THE CITY
COUNCIL OF THE CITY OF HUNTINGTON BEACH AT A REGULAR MEETING THEREOF
HELD ON THE 6th DAY OF August , 1979 , AND THAT THEREUPON
SAID COUNCIL DID, BY AN ORDER DULY PASSED AND ENTERED, APPROVE SAID MAP
FOR STREET PURPOSES OF: EDINGER AVENUE THE DEDICATION
AND DID ALSO ACCEPT ON BEHALF OF THE CITY OF HUNTINGTON BEACH.
    1.  VEHICULAR ACCESS RIGHTS TO EDINGER AVENUE AS RELEASED AND RELINQUISHED.
    2.  THE DOMESTIC WATER SYSTEM AND APPURTENANCES AS DEDICATED.
    3.  THE SUBSURFACE WATER RIGHTS AS DEDICATED.
    4.  ACCESS OVER PRIVATE STREETS AS DEDICATED FOR WATER SYSTEM
        MAINTENANCE.
AND DID ALSO APPROVE SUBJECT MAP PURSUANT TO THE PROVISIONS OF SECTION
66436 (C) (1) OF THE SUBDIVISION MAP ACT.

DATED THIS 7th DAY OF August , 1979 .

ALICIA M. WENTWORTH         BY Betty J. Date
CITY CLERK OF HUNTINGTON BEACH

## PLANNING DIRECTOR CERTIFICATE

I, JAMES W. PALIN, ACTING SECRETARY TO THE PLANNING COMMISSION
OF THE CITY OF HUNTINGTON BEACH, ORANGE COUNTY, CALIFORNIA, DO
HEREBY CERTIFY THAT I HAVE EXAMINED THIS MAP AND FOUND IT TO BE
SUBSTANTIALLY THE SAME AS THE TENTATIVE MAP FILED WITH, AMENDED
AND APPROVED BY THE CITY PLANNING COMMISSION.

DATED THIS 6th DAY OF Aug , 1979 .

James W. Palin
SECRETARY TO THE PLANNING COMMISSION

## COUNTY TAX COLLECTOR'S CERTIFICATE

I HEREBY CERTIFY THAT ACCORDING TO THE RECORDS OF MY OFFICE THERE
ARE NO LIENS AGAINST THE LAND COVERED BY THIS MAP OR ANY PART THEREOF
FOR UNPAID STATE, COUNTY, MUNICIPAL OR LOCAL TAXES OR SPECIAL ASSESS-
MENTS COLLECTED AS TAXES, EXCEPT TAXES OR SPECIAL ASSESSMENTS COLLECT-
ED AS TAXES NOT YET PAYABLE.

DATED THIS 9th DAY OF August , 1979 .

ROBERT L. CITRON          BY J. Sigafoose
COUNTY TAX COLLECTOR-                DEPUTY
TREASURER                           COLLECTOR

## COUNTY SURVEYOR'S CERTIFICATE

I HEREBY CERTIFY THAT I HAVE EXAMINED THIS MAP AND HAVE FOUND THAT
ALL MAPPING PROVISIONS OF THE SUBDIVISION MAP ACT HAVE BEEN COMPLIED
WITH AND I AM SATISFIED SAID MAP IS TECHNICALLY CORRECT RELATIVE TO
THE TRACT MAP BOUNDARY.

DATED THIS 17th DAY OF Aug , 1979 .

C. R. NELSON              BY Robert H. Wise
COUNTY SURVEYOR                     DEPUTY

## COUNTY CLERK'S TAX CERTIFICATE

STATE OF CALIFORNIA }
                    } SS
COUNTY OF ORANGE    }

I HEREBY CERTIFY TO THE RECORDER OF ORANGE COUNTY THAT THE PROVISIONS
OF THE SUBDIVISION MAP ACT HAVE BEEN COMPLIED WITH REGARDING DEPOSITS
TO SECURE THE PAYMENT OF TAXES OR SPECIAL ASSESSMENTS COLLECTED AS
TAXES ON THE LAND COVERED BY THIS MAP.

DATED THIS 14th DAY OF August , 1979 .

JUNE ALEXANDER            BY June Alexander
CLERK OF THE BOARD

456
49



# TRACT NO. 10542

DUPLICATE

IN THE CITY OF HUNTINGTON BEACH, COUNTY OF ORANGE, STATE OF CALIFORNIA.

MADOLE & ASSOCIATES, INC.
J.M. MADOLE R.C.E. 14614

NOVEMBER      1978

SHEET 2 OF 2 SHEETS
2 LOTS
8.278 ACRES
(ALL OF TENTATIVE
TRACT NO. 10542)

LOT 1
9.466 ACRES

LOT 2
4.157 ACRES

E MONTEREY STREET
(PRIVATE STREET)

RECEIVED

RECEIVED
Headquarters
Subdivisions
JUL 16 1980
Department of Real Estate

DEPARTMENT OF REAL ESTATE
OF THE
STATE OF CALIFORNIA

(213) 620-2700

RECEIVED
JUL 1 1 1980
Dept. of Real Estate
Los Angeles Subdivisions

CONDOMINIUMS

In the matter of the application of

ROBERT P. WARMINGTON COMPANY,
A California Corporation

for a Final Subdivision Public Report on

TRACT NUMBER 10542
THE GABLES-HUNTINGTON BEACH

ORANGE COUNTY, CALIFORNIA

FINAL   SUBDIVISION
PUBLIC REPORT

| | |
|---|---|
| FILE NO. | 46,370 LA |
| ISSUED | JUNE 19, 1980 |
| EXPIRES | JUNE 18, 1985 |

This Report Is Not a Recommendation or Endorsement of the Subdivision
But Is Informative Only.

Buyer or Lessee Must Sign That He Has Received and Read This Report.

This Report Expires on Date Shown Above. If There Has Been a Material Change in the Offering, an
Amended Public Report Must Be Obtained and Used in Lieu of This Report.

Section 35700 of the California Health and Safety Code provides that the practice of discrimination
because of race, color, religion, sex, marital status, national origin or ancestry in housing accommodations is
against public policy.

Under Section 125.6 of the California Business and Professions Code, California real estate licensees are
subject to disciplinary action by the Real Estate Commissioner if they make any discrimination, distinction
or restriction in negotiating a sale or lease of real property because of the race, color, sex, religion, ancestry
or national origin of the prospective buyer. If any prospective buyer or lessee believes that a licensee is
guilty of such conduct, he or she should contact the Department of Real Estate.

Information Regarding Schools can be found on Page
8 and 9 of this report.

READ THE ENTIRE REPORT on the following pages before contracting to purchase a lot in this
SUBDIVISION.

## SPECIAL NOTES

1. THE UNIFORM BUILDING CODE, CHAPTER 70, PROVIDES FOR LOCAL BUILD-
ING OFFICIALS TO EXERCISE PREVENTIVE MEASURES DURING GRADING TO
ELIMINATE OR MINIMIZE DAMAGE FROM GEOLOGIC HAZARDS SUCH AS LAND-
SLIDES, FAULT MOVEMENTS, EARTHQUAKE SHAKING, RAPID EROSION OR
SUBSIDENCE.  THIS SUBDIVISION IS LOCATED IN AN AREA WHERE SOME
OF THESE HAZARDS MAY EXIST.  SOME CALIFORNIA COUNTIES AND CITIES
HAVE ADOPTED ORDINANCES THAT MAY OR MAY NOT BE AS EFFECTIVE IN
THE CONTROL OF GRADING AND SITE PREPARATION.

   PURCHASERS MAY DISCUSS WITH THE DEVELOPER, THE DEVELOPER'S ENGI-
NEER, THE ENGINEERING GEOLOGIST AND THE LOCAL BUILDING OFFICIALS
TO DETERMINE IF THE ABOVE-MENTIONED HAZARDS HAVE BEEN CONSIDERED
AND IF THERE HAS BEEN ADEQUATE COMPLIANCE WITH CHAPTER 70 OR AN
EQUIVALENT OR MORE STRINGENT GRADING ORDINANCE DURING THE CON-
STRUCTION OF THIS SUBDIVISION.

2. NO ESCROWS FOR THE SALE OF UNITS WILL CLOSE UNTIL ALL SOILS AND
FILL WORK HAS BEEN PERFORMED IN ACCORDANCE WITH THE RECOMMENDA-
TIONS OF THE SOILS ENGINEER AND A NOTICE OF COMPLETION COVERING
THE COMMON AREA IMPROVEMENTS HAS BEEN FILED OF RECORD.

3. THIS PROJECT IS A COMMON-INTEREST SUBDIVISION OF THE TYPE RE-
FERRED TO AS A "CONDOMINIUM".  IT WILL BE OPERATED BY AN INCOR-
PORATED OWNERS ASSOCIATION.

4. SINCE THE COMMON PROPERTY AND FACILITIES WILL BE MAINTAINED BY
AN ASSOCIATION OF HOMEOWNERS, AND IT'S ESSENTIAL THAT THIS ASSO-
CIATION BE FORMED EARLY AND PROPERLY, THE DEVELOPER MUST:

   a. COMPLETE ALL COMMON FACILITIES BY APPROXIMATELY JUNE, 1980.
   (SECTION 11018.5 OF THE BUSINESS AND PROFESSIONS CODE.); AND

   b. PAY ALL THE MONTHLY ASSESSMENTS WHICH HE OWES TO THE HOME-
   OWNERS ASSOCIATION FOR UNSOLD UNITS.  THE PAYMENTS MUST COM-
   MENCE ON THE FIRST DAY OF THE MONTH AFTER SUBDIVIDER CLOSES
   FIRST SALE.  (REGULATIONS 2792.9 AND 2792.16).

THE HOMEOWNER ASSOCIATION MUST:

   c. CAUSE THE FIRST ELECTION OF THE ASSOCIATION'S GOVERNING BODY
   TO BE HELD WITHIN 45 DAYS AFTER 51% SELL-OUT, OR IN ANY
   EVENT, NO LATER THAN SIX MONTHS AFTER CLOSING THE FIRST
   SALE.  (REGULATIONS 2792.17 AND 2792.19); AND

   d. PREPARE AND DISTRIBUTE TO ALL HOMEOWNERS A BALANCE SHEET AND
   INCOME STATEMENT.  (REGULATION 2792.22).

# COMMON INTEREST SUBDIVISION GENERAL INFORMATION

The project described in the attached Subdivision Public Report is known as a common-interest subdivision. Read the Public Report carefully for more information about the type of subdivision. The subdivision includes common areas and facilities which will be owned and/or operated by an owners' association. Purchase of a lot or unit automatically entitles and obligates you as a member of the association and, in most cases, includes a beneficial interest in the areas and facilities. Since membership in the association is mandatory, you should be aware of the following information before you purchase:

Your ownership in this development and your rights and remedies as a member of its association will be controlled by governing instruments which generally include a Declaration of Restrictions (also known as CC&R's), Articles of Incorporation (or association) and Bylaws. The provisions of these documents are intended to be, and in most cases are, enforceable in a court of law. Study these documents carefully before entering into a contract to purchase a subdivision interest.

In order to provide funds for operation and maintenance of the common facilities, the association will levy assessments against your lot/unit. If you are delinquent in the payment of assessments, the association may enforce payment through court proceedings or your lot/unit may be liened and sold through the exercise of a power of sale. The anticipated income and expenses of the association, including the amount that you may expect to pay through assessments, are outlined in the proposed budget. Ask to see a copy of the budget if the subdivider has not already made it available for your examination.

A homeowner association provides a vehicle for the ownership and use of recreational and other common facilities which were designed to attract you to buy in this subdivision. The association also provides a means to accomplish architectural control and to provide a base for homeowner interaction on a variety of issues. The purchaser of an interest in a common-interest subdivision should contemplate active participation in the affairs of the association. He or she should be willing to serve on the board of directors or on committees created by the board. In short, "they" in a common-interest subdivision is "you". Unless you serve as a member of the governing board or on a committee appointed by the board, your control of the operation of the common areas and facilities is limited to your vote as a member of the association. There are actions that can be taken by the governing body without a vote of the members of the association which can have a significant impact upon the quality of life for association members.

Until there is a sufficient number of purchasers of lots or units in a common-interest subdivision to elect a majority of the governing body, it is likely that the subdivider will effectively control the affairs of the association. It is frequently necessary and equitable that the subdivider do so during the early stages of development. It is vitally important to the owners of individual subdivision interests that the transition from subdivider to resident-owner control be accomplished in an orderly manner and in a spirit of cooperation.

When contemplating the purchase of a dwelling in a common-interest subdivision, you should consider factors beyond the attractiveness of the dwelling units themselves. Study the governing instruments and give careful thought to whether you will be able to exist happily in an atmosphere of cooperative living where the interests of the group must be taken into account as well as the interests of the individual. Remember that managing a common-interest subdivision is very much like governing a small community . . . the management can serve you well, but you will have to work for its success.



SPECIAL NOTES  (Continued)

5.  THE SUBDIVIDER HAS STATED THAT HE WILL PROVIDE YOU WITH A COPY
    OF THE ARTICLES OF INCORPORATION, RESTRICTIONS AND BYLAWS, ONLY
    BY POSTING THEM IN A PROMINENT LOCATION IN THE SALES OFFICE.
    THESE DOCUMENTS CONTAIN NUMEROUS MATERIAL PROVISIONS THAT SUB-
    STANTIALLY AFFECT AND CONTROL YOUR RIGHTS, PRIVILEGES, USE, OB-
    LIGATIONS AND COSTS OF MAINTENANCE AND OPERATION.  YOU SHOULD
    READ AND UNDERSTAND THESE DOCUMENTS BEFORE YOU OBLIGATE YOURSELF
    TO PURCHASE A UNIT.

6.  THE SUBDIVIDER STATED HE WILL NOT FURNISH THE CURRENT BOARD OF
    OFFICERS OF THE HOMEOWNERS ASSOCIATION THE BUILDING PLANS TO IN-
    CLUDE DIAGRAMS OF LOCATION OF MAJOR COMPONENTS, UTILITIES, AND
    RELATED DATA.

    THESE ITEMS WILL BE IMPORTANT TO THE BOARD OF OFFICERS OR THOSE
    WHO WILL MANAGE OR REPAIR COMMON FACILITIES IN THIS SUBDIVISION.

7.  SINCE THE SUBDIVIDER STATES HE WILL NOT FURNISH THE SAID PLANS
    AND DIAGRAMS, THE BOARD OF OFFICERS OF THE HOMEOWNER ASSOCIATION
    SHOULD TRY TO OBTAIN THEM FROM THE CONTRACTORS WHO WORKED ON THE
    PROJECT OR FROM THE COUNTY/CITY BUILDING DEPARTMENT.

8.  THE SUBDIVIDER HAS AN INTEREST IN THE ESCROW COMPANY WHICH IS TO
    BE USED IN CONNECTION WITH THE SALE OR LEASE OF UNITS IN THIS
    SUBDIVISION.  THE NATURE OF THE SUBDIVIDER'S INTEREST IS SET
    FORTH IN THE ESCROW INSTRUCTIONS WHICH ARE TO BE USED.

9.  IF YOU ACQUIRE TWO OR MORE UNITS YOU MAY BE REQUIRED TO OBTAIN
    AN AMENDED PUBLIC REPORT BEFORE OFFERING TWO OR MORE OF THE
    UNITS FOR SALE TO OTHERS.  IF YOU INTEND TO SELL TWO OR MORE
    UNITS OR LEASE THEM FOR MORE THAN ONE YEAR, YOU ARE REQUIRED TO
    OBTAIN AN AMENDED SUBDIVISION PUBLIC REPORT BEFORE YOU CAN OFFER
    THE UNITS FOR SALE OR LEASE.

10. WARNING: WHEN YOU SELL YOUR LEASEHOLD INTEREST IN A CONDOMINIUM
    UNIT TO SOMEONE ELSE, YOU MUST GIVE THAT PERSON A COPY OF THE
    DECLARATION OF RESTRICTIONS, THE ARTICLES OF INCORPORATION AND
    OF THE BYLAWS.  IF YOU FORGET TO DO THIS, IT MAY COST YOU A PEN-
    ALTY OF $500.00 -- PLUS ATTORNEY'S FEES PLUS DAMAGES.  (SEE
    CIVIL CODE SECTION 1360.)

INTERESTS TO BE CONVEYED:  You will receive a lease to a specified
unit, together with an undivided fractional leasehold interest as a
tenant in common in the common area together with a membership in
"The Gables-Huntington Beach Homeowners Association" and rights to
use the common area.

LOCATION AND SIZE:    This subdivision is located at Edinger Avenue
and Monterey Street within the city limits of Huntington Beach and
is serviced by the usual city amenities.

This is a single phase project which consists of approximately 7.605
acres on which twenty buildings containing 80 units and 100 garage
spaces, 100 driveway spaces, 59 on-street guest spaces and 53 off-
street guest space will be constructed, together with common facili-
ties consisting of a swimming pool, jacuzzi, cabana, volley ball
court, landscaped areas and private drives which will be constructed

MANAGEMENT AND OPERATION:    The Gables-Huntington Beach Homeowners
Association, which you must join, manages and operates the common
areas in accordance with the Restrictions, Articles of Incorporation
and the Bylaws.

MAINTENANCE AND OPERATIONAL EXPENSES:    The subdivider has submitted
a budget for the maintenance and operation of the common areas and
for long-term reserves.  This budget was reviewed by the Department
of Real Estate.  You should obtain a copy of this budget from the
subdivider.  Under this budget, the monthly assessment against each
subdivision unit is $65.74 of which $13.84 is a monthly contribution
to long-term reserves and is not to be used to pay for current oper-
ating expenses.

> IF THE BUDGET FURNISHED TO YOU BY THE DEVELOPER
> SHOWS A MONTHLY ASSESSMENT FIGURE WHICH VARIES
> 10% OF MORE FROM THE ASSESSMENT AMOUNT SHOWN IN
> THIS PUBLIC REPORT, YOU SHOULD CONTACT THE DE-
> PARTMENT OF REAL ESTATE BEFORE ENTERING INTO AN
> AGREEMENT TO PURCHASE.

The association may increase or decrease assessments at any time in
accordance with the procedure prescribed in the CC&R's or Bylaws.
In considering the advisability of a decrease (or a smaller in-
crease) in assessments, care should be taken not to eliminate
amounts attributable to reserves for replacement or major mainte-
nance.

> EXPENSES OF OPERATION ARE DIFFICULT TO PREDICT
> ACCURATELY AND EVEN IF ACCURATELY ESTIMATED
> INITIALLY, MOST EXPENSES INCREASE WITH THE AGE
> OF FACILITIES AND WITH INCREASES IN THE COST OF
> LIVING.

Monthly assessments will commence on all units during the month fol-
lowing the closing of the first sale of a unit.  From that time, the
subdivider is required to pay the association a monthly assessment
for each unit which he owns, which has not been leased.

The remedies available to the association against owners who are de-
linquent in the payment of assessments are set forth in the CC&R's.
These remedies are available against the subdivider as well as
against other owners.

MAINTENANCE AND OPERATIONAL EXPENSES:  (Continued)

The subdivider has posted a bond as partial security for his obliga-
tion to pay these assessments.  The governing body of the associa-
tion should assure itself that the subdivider has satisfied his ob-
ligations to the association with respect to the payment of assess-
ments before agreeing to a release or exoneration of the security.

EASEMENTS:  Easements for utilities and other purposes are shown on
the Title Report and Subdivision Map recorded in the Office of the
Orange County Recorder, Book 456 of Miscellaneous Maps, Pages 48
thru 49 and Condominium Plan recorded in Book 13358, Page 1193.

TITLE:  Title is vested in Houser Bros. Co., a limited partnership,
subject to:

A Ground Lease dated October 19, 1979, executed by Houser Bros. Co.,
a limited partnership, as Lessor, and Robert P. Warmington, a
married man, as Lessee, a memorandum of which was recorded October
22, 1979 in Book 13362, Page 320 of Official Records and re-recorded
December 6, 1979 in Book 13424, Page 499 of Official Records.
Robert P. Warmington in turn has sublet the Ground Lease to Robert
P. Warmington Co., a California corporation, the applicant.

RESTRICTIONS:  This subdivision is subject to Restrictions recorded
in the Office of the Orange County Recorder, Book 13618, Page 982.

> FOR INFORMATION AS TO YOUR OBLIGATIONS AND RIGHTS,
> YOU SHOULD READ THE RESTRICTIONS.  THE SUBDIVIDER
> SHOULD MAKE THEM AVAILABLE TO YOU.

WATER RIGHTS:  You will not own the water rights under your land be-
low a depth of 500 feet.  These have been dedicated to the City of
Huntington Beach.  The right to surface entry has been waived.

USES AND ZONING:  Property to the south is zoned MH (Mobilehome).

TAXES:  The maximum amount of any tax on real property that can be
collected annually by counties is 1% of the full cash value of the
property.  With the addition of interest and redemption charges on
any indebtedness, approved by voters prior to July 1, 1978, the to-
tal property tax rate in most counties is approximately 1.25% of the
full cash value.

For the purchaser of a lot or unit in this subdivision, the "full
cash value" of the lot or unit will be the valuation, as reflected
on the tax roll, determined by the county assessor as of the date of
purchase of the lot or unit or as of the date of completion of an
improvement on the lot if that occurs after the date of purchase.

CONDITIONS OF SALE:  If your purchase involves financing, a form of
deed of trust and note will be used.  These documents may contain
the following provisions:

An <u>Acceleration Clause</u>.  This means that if you sell the prop-
erty or default in your payment, the lender may declare the entire
unpaid loan balance immediately due and payable.

A <u>Late Charge</u>.  This means that if you are late in making your
monthly payment you may have to pay an additional amount as a pen-
alty.

A <u>Prepayment Penalty</u>.  This means that if you wish to pay off
your loan in whole or in part before it is due, you may be required
to pay an additional amount as a penalty in accordance with the
terms of the loan.

Transfer of the interest to the purchaser may be by a lease.  Your
rights and responsibilities are governed by the specific terms of
such lease.  You should read the entire lease.

The lease includes the following provision:

If you do not pay your installment on time, you may lose your prop-
erty and all money you have paid in.

BEFORE SIGNING, YOU SHOULD READ AND <u>THOROUGHLY</u>
UNDERSTAND ALL LOAN DOCUMENTS.

PURCHASE MONEY HANDLING:  The subdivider must impound all funds re-
ceived from you in an escrow depository until legal title is deliv-
ered to you.  (Refer to Sections 11013 and 11013.2(a) of the Busi-
ness and Professions Code.)

If the escrow has not closed on your unit within one (1) year of the
date of your deposit receipt, you may request return of your deposit.

FILLED GROUND:  The common area contains filled ground varying to a
maximum depth of 3.6 feet.  These soils are to be properly compacted
for the intended use under the supervision of a State licensed engi-
neer.

FLOOD AND DRAINAGE:  Orange County advises as follows:

The land lies within the historic floodplain of the Santa Ana River
where the risk of floodng has been substantially reduced since the
completion of Prado Dam and Reservoir by the U. S. Corps of Engi-
neers in 1941.  The largest flood-producing storm since completion
of the dam occurred in 1969, an event which to the best information
now available can be expected to recur on an average of 25 to 30
years over a long period of time.  Peak discharges in 1969 seriously
damaged the Santa Ana River levees within Orange County, but no out-
break occurred and the levees have now been repaired.

FLOOD AND DRAINAGE: (Continued)

In a report entitled "Flood Insurance Study Huntington Beach, California" prepared by the U. S. Army Corps of Engineers for the Federal Insurance Administration, the Corps of Engineers indicates that the occurrence of a storm with a recurrence interval approximating 50 years or greater will generate flows exceeding the present capacity of the Santa Ana River Channel. Such flows will cause breaching of the river levee at indeterminable locations followed by widespread flooding of the Talbert Valley. It is believed impossible to predict in advance where such break-out might occur or what particular area would subsequently be inundated.

The Corps of Engineers recently completed a study proposing modification to the Santa Ana River in the County of Orange, to Prado Dam, and the construction of an additional dam in the Mentone area of San Bernardino County. However, it is impossible to predict when project authorization will be made by Congress, the appropriation approved, and the actual construction accomplished.

It is the opinion of this office that upon completion of the construction in accordance with the proposed grading, storm drain and street plans, the improvements on the building pads will be protected from flooding from storms occurring on an average of once every 50 years or less.

PUBLIC TRANSPORTATION:  Bus service is available adjacent to the site on Edinger Avenue.

SCHOOLS:  The Ocean View School District provides the following information:

| School | Distance |
|---|---|
| Haven View School<br>16081 Waikiki Lane<br>Huntington Beach, California | 1/4 mile |

The projected enrollment from the proposed tract is twenty K-8 grade students. The capacity of Haven View School is 510 and enrollment is 447.

The District shall provide free transportation to and from school for pupils who live beyond the minimum distances, as measured by the shortest route. Where hazardous conditions exist, transportation may be provided for students who live less than the minimum distances. Handicapped children will be provided transportation as needed.

The Huntington Beach Union High School District provides the following information:

| School | Distance |
|---|---|
| Marina High School<br>15871 Springdale | 1.7 miles |

<u>SCHOOLS</u>:  (Continued)

Transportation is furnished at District expense to students living a distance fo more than three miles from their schools.

Huntington Beach Union High School District has six comprehensive high schools with a total capacity of 16,367 and a current enrollment of 21,346. This student overload is being accommodated by temporary structures and extended day schedule. The impact of continued enrollment growth will accelerate the extension of the school day and the continued implementation of other housing alternatives until a new high school is constructed. Any new housing must be considered carefully based on the availability of schools in Huntington Beach Union High School District.

> <u>NOTE</u>:    This school information was correct as of the date of this report. Purchasers may contact the local school district for current information on school assignments, facilities and bus service.

For further information in regard to this subdivision, you may call (213) 620-2700 or examine the documents at the Department of Real Estate, 107 South Broadway, Suite 7001, Los Angeles, CA 90012.



RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

8346

BK 13362 PG 320

The Robert P. Warmington Co.
16592 Hale Avenue
Irvine, California 92714
Attention: Roger D. Darnell

32443

$6.00

BK 13424 PG 499

$7.00
C1.

RECORDED AT REQUEST OF
FIRST AMER. TITLE INS. CO.
IN OFFICIAL RECORDS OF
ORANGE COUNTY, CALIFORNIA
8:01 A.M. OCT 22 1979
LEE A. BRANCH, County Recorder

(Space above line for Recorder's use only)

RECORDING REQUESTED BY
FIRST AMERICAN TITLE INS. CO.

GROUND LEASE

RECORDED IN OFFICIAL RECORDS
OF ORANGE COUNTY CALIFORNIA

(SHORT FORM — MEMORANDUM)     8:11 PM DEC  6 1979

LEE A. BRANCH, County Recorder

THIS GROUND LEASE (SHORT FORM — MEMORANDUM) is made
this 19th day of October    , 1979, by and between
HOUSER BROS. CO., a limited partnership, organized and
existing under the laws of the State of California (herein-
after "Landlord"), and ROBERT P. WARMINGTON, a married man
(hereinafter "Tenant"), upon the following terms and con-
ditions:

W I T N E S S E T H:

1.    Landlord leases to Tenant that certain real prop-
erty (the "leased land") located in the City of Huntington
Beach, County of Orange, State of California, which leased
land is described in Exhibit A attached hereto and made a
part hereof, at the rental and upon all the terms and condi-
tions set forth in that certain unrecorded ground lease of
even date between Landlord and Tenant which is incorporated
herein by this reference.

2.    The property is leased for a term of eighty (80)
years, commencing as of the date first above written and
continuing until the anniversary of the eightieth (80th)
year thereafter.  The aforementioned incorporated ground
lease provides, among other things, that it shall terminate,
as to the real property covered by a Residential Lease (as
defined in said incorporated ground lease) upon the com-
mencement of the term of such Residential Lease, but not as
to the real property covered by a Consumer Sublease or
Affiliate Sublease (as defined in said incorporated ground
lease).

3.    The aforementioned incorporated ground lease pro-
vides, among other things, that the Tenant shall pay all
taxes, general and special assessments and other charges
which, during the term of this lease, may be levied upon or
assessed against the leased land and all interests therein.

4.    The aforementioned incorporated ground lease al-
so provides, among other things, that Tenant shall not en-
cumber, assign or otherwise transfer said lease, or sublet
the whole or any part of the leased land without the prior
written consent and approval of Landlord, except as other-
wise expressly permitted in said incorporated ground lease.

-1-

BK 13362 PG 321

BK 13424 PG 500

5.   Landlord hereby irrevocably makes, constitutes and appoints Tenant as Landlord's true and lawful attorney for it and in its name, place and stead and for its use and benefit to exercise any/or all of the following powers as to the leased land; any interest therein and/or any building or other improvement thereon. To undertake any and all construction activities on or in connection with the leased land and to execute on behalf of Landlord if Landlord has not executed the same, as provided and within the time period set forth in said incorporated ground lease, any map, permit, application, survey, report, approval, easement deed or other documents as are necessary or convenient to obtain the required approvals, permits or other action of the City of Huntington Beach, the County of Orange, California, and other governmental and quasi governmental authorities, including public utilities, for the development of the leased land in the manner contemplated by said incorporated ground lease, giving and granting unto its said attorney full power and authority to do and perform all and every act and thing whatsoever requisite, necessary or appropriate to be done in and about the leased land as fully to all intents and purposes as it might or could do if personally present, hereby ratifying all that its said attorney shall lawfully do or cause to be done by virtue of these presents. It is expressly agreed and understood that the foregoing power of attorney is coupled with an interest.

6.   Should there be any inconsistency between the terms of this instrument and the ground lease incorporated herein, the terms of said incorporated ground lease shall prevail.

IN WITNESS WHEREOF, each of the parties hereto has caused this Short Form – Memorandum of Lease to be duly executed as of the day and year first above written.

HOUSER BROS. CO., a California
limited partnership by its
general partners

By _____
CLIFFORD C. HOUSER,
General Partner

By _____
Vernon F. Houser,
General Partner

"Landlord"

_____
Robert P. Warmington

"Tenant"

-2-

BK 13362 PG 322

BK 13424 PG 501

EXHIBIT "A"

PARCEL A:    Tract No. 10542, as shown on a Map recorded
in book 456, pages 49 and 50 of Miscellaneous
Maps, records of Orange County, California.

EXCEPTING and reserving a non-exclusive
easement for ingress and egress within
and upon the Westerly 30.00 feet there-
of appurtenant to Parcel 2 as Per Map
recorded in Book 108, Pages 47 and 48,
inclusive, Official Records of Orange
County, California within the private
street known as "Monterey Lane".

PARCEL B:    A non-exclusive easement for ingress
and egress within and upon an area 30.00
feet in width within the private street
known as "Monterey Lane", within Parcel
2 as per Map recorded in Book 108, Pages
47 and 48, inclusive, Official Records of
Orange County, California the Easterly
boundary of which shall be Co-Terminus
with the Westerly boundary of said Parcel
1.

**THIS DOCUMENT IS RE-RECORDED TO CORRECT THE LEGAL DESCRIPTION
OF PARCEL A.

EXHIBIT "A"



BK 13362 PG 323
BK 13424 PG 502

STATE OF CALIFORNIA )
                    ) ss.
COUNTY OF Orange )

On this 19th day of OCTOBER, 1979, before me, a Notary Public, personally appeared Clifford C. Houser and Vernon P. Houser, known to be to be the general partners of the partnership that executed the within instrument, and acknowledged to me that such partnership executed the same.

WITNESS my hand and official seal.

OFFICIAL SEAL
CHRISTINE A. BELMONTE
Notary Public-California
ORANGE COUNTY
My Commission Expires March 14, 1981

Christine Anne Belmonte
Notary Public in and for said
County and State

STATE OF CALIFORNIA )
                    ) ss.
COUNTY OF ORANGE )

On this 19th day of October, 1979, before me, the undersigned, a Notary Public in and for said State, personally appeared Robert P. Warmington, known to me to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same.

WITNESS my hand and official seal.

OFFICIAL SEAL
FRANK L. HUNT
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Commission Expires Mar. 26, 1983

Frank L. Hunt
Notary Public in and for said
County and State

-3-



STATE OF CALIFORNIA
COUNTY OF  Orange                                    BK 13424 PG  503
On                                        before me, the undersigned, a Notary Public in and for
said State, personally appeared
Clifford G. Houser and Vernon F. Houser,

known to me to be  all of  the partners of the partnership
that executed the within instrument and acknowledged to me that
such partnership executed the same.

WITNESS my hand and official seal.

Signature  Kerry K. Hoffman
Kerry K. Hoffman
(Name Typed or Printed)

OFFICIAL SEAL
KERRY K. HOFFMAN
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Commission Exp. Oct. 23, 1982

(This area for official notarial seal)

STATE OF CALIFORNIA
COUNTY OF  Orange
On  December 6, 1979  before me, the undersigned, a Notary Public in and for
said State, personally appeared
Robert P. Warmington

known to me to be the within instrument and acknowledged
that  he

WITNESS my hand and official seal.

Signature  Pearl L. Hunt
Pearl L. Hunt
(Name Typed or Printed)

OFFICIAL SEAL
PEARL L. HUNT
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Commission Expires May 25, 1983

(This area for official notarial seal)



8347

32442

$5.00

$6.00
Q1

BK 13362 PG  317

BK 13424 PG  504

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

The Robert P. Warmington Co.
16592 Hale Avenue
Irvine, California  92714

RECORDED AT REQUEST OF
FIRST AMER. TITLEINS. CO.
IN OFFICIAL RECORDS OF
ORANGE COUNTY, CALIFORNIA
8:01 A.M. OCT 22 1979
LEE A. BRANCH, County Recorder

Space Above This Line for Recorder's Use Only

RECORDING REQUESTED BY
FIRST AMERICAN TITLE INS. CO.
RECORDED IN OFFICIAL RECORDS
OF ORANGE COUNTY, CALIFORNIA
-3 35 PM DEC  6 1979
LEE A. BRANCH, County Recorder

**GROUND SUBLEASE**
**(SHORT FORM MEMORANDUM)**

THIS GROUND SUBLEASE (SHORT FORM MEMORANDUM) is made this
19th day of  October , 1979, by and between ROBERT P.
WARMINGTON (hereinafter "Landlord") and THE ROBERT P. WARMINGTON CO.,
a California Corporation (hereinafter "Tenant"), upon the following
terms and conditions:

W I T N E S S E T H :

1. Landlord leases to Tenant that certain real property
(the "leased land") located in the City of Huntington Beach, County of
Orange, State of California, which leased land is described on
Exhibit "A" attached hereto and made a part hereof, at the rental and
upon all of the terms and conditions set forth in that certain unrecorded
Ground Sublease of even date between Landlord and Tenant which is
incorporated herein by this reference.

2. The Property is leased for a term of eighty (80) years,
commencing as of  October 19 , 19 79 and ending
October 18,  2059 . The aforementioned incorporated Ground Sublease
provides, among other things, that it shall terminate as to the real
property covered by a Consumer Sublease (as defined in said incorporated
Ground Sublease) upon the commencement of the term of such Consumer
Sublease.

3. The aforementioned incorporated Ground Sublease provides,
among other things, that the Tenant shall pay all taxes, general and
special assessments and other charges which, during the term of this
lease, may be levied upon or assessed against the leased land and all
interests therein.

4. The aforementioned incorporated Ground Sublease also
provides, among other things, that Tenant shall not encumber, assign or
otherwise transfer said Sublease, or sublet the whole or any part of
the leased land without the prior written consent and approval of
Landlord, except as otherwise expressly permitted in said incorporated
Ground Sublease.

5. Landlord hereby irrevocably makes, constitutes and
appoints Tenant as Landlord's true and lawful attorney for him and
in his name, place and stead and for his use and benefit to exercise
any or all of the following powers as to the leased land, any interest
therein and/or any building or other improvement thereon: To undertake
any and all construction activities on or in connection with the leased
land and to execute on behalf of Landlord, if Landlord has not executed
the same, as provided and within the time period set forth in said
incorporated Ground Sublease, any map, permit, application, survey,
report, approval, easement deed or other documents as are necessary or
convenient to obtain the required approvals, permits or other action of
the City of Huntington Beach, the County of Orange, California, and

BK 13362 PG 318
BK 13424 PG 505

other governmental and quasi governmental authorities, including public utilities, for the development of the leased land in the manner contemplated by said incorporated Ground Sublease, giving and granting unto his said attorney full power and authority to do and perform all and every act and thing whatsoever requisite, necessary or appropriate to be done in and about the leased land as fully to all intents and purposes as he might or could do if personally present, hereby ratifying all that his said attorney shall lawfully do or cause to be done by virtue of these presents. It is expressly agreed and understood that the foregoing power of attorney is coupled with an interest.

6. Should there be any inconsistency between the terms of this instrument and the Ground Sublease incorporated herein, the terms of said incorporated Ground Sublease shall prevail.

IN WITNESS WHEREOF, each of the parties hereto has caused this Short-Form-Memorandum of Ground Sublease to be duly executed as of the day and year first above written.

LANDLORD:

_____
Robert P. Warmington

TENANT:

The Robert P. Warmington Co.
a California Corporation

By _____
Roger D. Darnell
Vice President

STATE OF CALIFORNIA )
                              ) ss:
COUNTY OF ORANGE )
On October 19____, 1979, before me, the undersigned, a Notary Public in and for said State, personally appeared ROBERT P. WARMINGTON known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same.
WITNESS my hand and official seal.

_____
Pearl L. Hunt

[SEAL: OFFICIAL SEAL / PEARL L. HUNT / NOTARY PUBLIC-CALIFORNIA / ORANGE COUNTY / Commission Expires May 25, 1983]

STATE OF CALIFORNIA )
                              ) ss:
COUNTY OF ORANGE )
On October 19____, 1979, before me, the undersigned, a Notary Public in and for said State, personally appeared ROGER D. DARNELL known to me to be the Vice President of the Corporation that executed the within instrument, and known to me to be the person who executed the within instrument on behalf of the Corporation therein named, and acknowledged to me that such Corporation executed the within instrument pursuant to its by-laws or a resolution of its Board of Directors.
WITNESS my hand and official seal.

_____
Pearl L. Hunt

[SEAL: OFFICIAL SEAL / PEARL L. HUNT / NOTARY PUBLIC-CALIFORNIA / ORANGE COUNTY]

[SEAL: OFFICIAL SEAL / PEARL L. HUNT / NOTARY PUBLIC-CALIFORNIA / ORANGE COUNTY / My Commission Expires May 25, 1983]

-2-



STATE OF CALIFORNIA
COUNTY OF **Orange**                          BK 13424 PG - 506
On December 6, 1979 before me, the undersigned, a Notary Public in and for
said State, personally appeared
**Robert P. Warmington**

known to me to be the
subscribed to the within instrument and acknowledged to me
that _____ **he** _____ executed the same.
WITNESS my hand and official seal.

Signature _Pearl L. Hunt_

**PEARL L. HUNT**
Name (Typed or Printed)                    (This area for official notarial seal)

OFFICIAL SEAL
PEARL L. HUNT
NOTARY PUBLIC - CALIFORNIA
ORANGE COUNTY
My Commission Expires Mar 25, 1983

STATE OF CALIFORNIA
COUNTY OF **Orange**
On December 6, 1979 before me, the undersigned, a Notary Public in and for
said State, personally appeared **Roger D. Darnell**
known to me to be the _____ **vlad** _____ President, and
_____ of the corporation that executed the within instrument,
and known to me to be the persons who executed the within instrument
on behalf of the corporation therein named, and ac-
knowledged to me that such corporation executed the within
instrument pursuant to its by-laws or a resolution of its board of
directors.
WITNESS my hand and official seal.

Signature _Pearl L. Hunt_

**PEARL L. HUNT**
Name (Typed or Printed)                    (This area for official notarial seal)

OFFICIAL SEAL
PEARL L. HUNT
NOTARY PUBLIC - CALIFORNIA
ORANGE COUNTY
My Commission Expires Mar 25, 1983

BK 13424 PG 507

BK 13362 PG 319

EXHIBIT "A"

PARCEL A:    Tract No. 10542, as shown on a Map recorded
in book 456, pages 49 and 50 of Miscellaneous
Maps, records of Orange County, California.

EXCEPTING and reserving a non-exclusive
easement for ingress and egress within
and upon the Westerly 30.00 feet there-
of appurtenant to Parcel 2 as per Map
recorded in Book 108, Pages 47 and 48,
inclusive, Official Records of Orange
County, California within the private
street known as "Monterey Lane".

PARCEL B:    A non-exclusive easement for ingress
and egress within and upon an area 30.00
feet in width within the private street
known as "Monterey Lane", within Parcel
2 as per Map recorded in Book 108, Pages
47 and 48, inclusive, Official Records of
Orange County, California the Easterly
boundary of which shall be Co-Terminus
with the Westerly boundary of said Parcel
1.

*THIS DOCUMENT IS RE-RECORDED TO CORRECT THE LEGAL DESCRIPTION
OF PARCEL A

EXHIBIT "A"

Branch :A14,User :2004                    Comment:                    Station Id :M3Y7

BK 13362 PG 317

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:                        32442

The Robert P. Warmington Co.
16592 Hale Avenue                        $3.00
Irvine, California  92714

RECORDED AT REQUEST OF
FIRST AMER. TITLE INS. CO.
IN OFFICIAL RECORDS OF
ORANGE COUNTY, CALIFORNIA
8:01 A.M. OCT 22 1979
LEE A. BRANCH, County Recorder

Space Above This Line for Recorder's Use Only

GROUND SUBLEASE
(SHORT FORM-MEMORANDUM)

THIS GROUND SUBLEASE (SHORT FORM-MEMORANDUM) is made this
19th day of October , 1979, by and between ROBERT P.
WARMINGTON (hereinafter "Landlord") and THE ROBERT P. WARMINGTON CO.,
a California Corporation (hereinafter "Tenant"), upon the following
terms and conditions:

W I T N E S S E T H:

1.  Landlord leases to Tenant that certain real property
(the "leased land") located in the City of Huntington Beach, County of
Orange, State of California, which leased land is described on
Exhibit "A" attached hereto and made a part hereof, at the rental and
upon all of the terms and conditions set forth in that certain unrecorded
Ground Sublease of even date between Landlord and Tenant which is
incorporated herein by this reference.

2.  The Property is leased for a term of eighty (80) years,
commencing as of October 19 , 19 79 and ending
October 18 , 2059 . The aforementioned incorporated Ground Sublease
provides, among other things, that it shall terminate as to the real
property covered by a Consumer Sublease (as defined in said incorporated
Ground Sublease) upon the commencement of the term of such Consumer
Sublease.

3.  The aforementioned incorporated Ground Sublease provides,
among other things, that the Tenant shall pay all taxes, general and
special assessments and other charges which, during the term of this
lease, may be levied upon or assessed against the leased land and all
interests therein.

4.  The aforementioned incorporated Ground Sublease also
provides, among other things, that Tenant shall not encumber, assign or
otherwise transfer said Sublease, or sublet the whole or any part of
the leased land without the prior written consent and approval of
Landlord, except as otherwise expressly permitted in said incorporated
Ground Sublease.

5.  Landlord hereby irrevocably makes, constitutes and
appoints Tenant as Landlord's true and lawful attorney for him and
in his name, place and stead and for his use and benefit to exercise
any or all of the following powers as to the leased land, any interest
therein and/or any building or other improvement thereon: To undertake
any and all construction activities on or in connection with the leased
land and to execute on behalf of Landlord if Landlord has not executed
the same, as provided and within the time period set forth in said
incorporated Ground Sublease, any map, permit, application, survey,
report, approval, easement deed or other documents as are necessary or
convenient to obtain the required approvals, permits or other action of
the City of Huntington Beach, the County of Orange, California, and

BK 13362 PG 318

other governmental and quasi governmental authorities, including public
utilities, for the development of the leased land in the manner
contemplated by said incorporated Ground Sublease; giving and granting
unto his said attorney full power and authority to do and perform all
and every act and thing whatsoever requisite, necessary or appropriate
to be done in and about the leased land as fully to all intents and
purposes as he might or could do if personally present, hereby ratifying
all that his said attorney shall lawfully do or cause to be done by
virtue of these presents. It is expressly agreed and understood that
the foregoing power of attorney is coupled with an interest.

6. Should there be any inconsistency between the terms of
this instrument and the Ground Sublease incorporated herein, the terms
of said incorporated Ground Sublease shall prevail.

IN WITNESS WHEREOF, each of the parties hereto has caused
this Short Form-Memorandum of Ground Sublease to be duly executed as
of the day and year first above written.

LANDLORD:

_____
Robert P. Warmington

TENANT:

The Robert P. Warmington Co.,
a California Corporation

By _____
Roger D. Darnell
Vice President

STATE OF CALIFORNIA)
COUNTY OF ORANGE   )  ss:
On   October 19   , 1979, before me, the undersigned, a Notary
Public in and for said State, personally appeared ROBERT P. WARMINGTON
known to me to be the person whose name is subscribed to the within
instrument and acknowledged to me that he executed the same.
WITNESS my hand and official seal.

OFFICIAL SEAL
PEARL L. HUNT
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Commission Expires May 25, 1983

_____
Pearl L. Hunt

STATE OF CALIFORNIA)
COUNTY OF ORANGE   )  ss:
On   October 19   , 1979, before me, the undersigned, a Notary
Public in and for said State, personally appeared ROGER D. DARNELL,
known to me to be the Vice President of the Corporation that executed the
within instrument, and known to me to be the person who executed the within
instrument on behalf of the Corporation therein named, and acknowledged to
me that such Corporation executed the within instrument pursuant to its
by-laws or a resolution of its Board of Directors.
WITNESS my hand and official seal.

OFFICIAL SEAL
PEARL L. HUNT
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Commission Expires May 25, 1983

OFFICIAL SEAL
PEARL L. HUNT
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Commission Expires May 25, 1983

_____
Pearl L. Hunt

-2-

Branch :A14,User :2004                    Comment:                    Station Id :M3Y7



BK 13362 PG 319

EXHIBIT "A"

PARCEL A:    Parcel 1 as per Parcel Map recorded in
             Book 108, Pages 47 and 48, inclusive,
             Official Records of Orange County,
             California.

             EXCEPTING and reserving a non-exclusive
             easement for ingress and egress within
             and upon the Westerly 30.00 feet there-
             of appurtenant to Parcel 2 as Per Map
             recorded in Book 108, Pages 47 and 48,
             inclusive, Official Records of Orange
             County, California within the private
             street known as "Monterey Lane".

PARCEL B:    A non-exclusive easement for ingress
             and egress within and upon an area 30.00
             feet in width within the private street
             known as "Monterey Lane", within Parcel
             2 as per Map recorded in Book 108, Pages
             47 and 48, inclusive, Official Records of
             Orange County, California the Easterly
             boundary of which shall be Co-Terminus
             with the Westerly boundary of said Parcel
             1.

EXHIBIT "A"

RECORDED IN

Branch :A14,User :2004                    Comment:                    Station Id :M3Y7



RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:                    BK 13362 PG. 320

The Robert P. Warmington Co.  32443
1659 Hale Avenue
Irvine, California  92714,          $6.00
Attention: Roger D. Darnell

RECORDED AT REQUEST OF
FIRST AMER, TITLE INS. CO.
IN OFFICIAL RECORDS OF
ORANGE COUNTY, CALIFORNIA
8:01 A.M. OCT 22 1979
LEE A. BRANCH, County Recorder

(Space above line for Recorder's use only)

GROUND LEASE

(SHORT FORM — MEMORANDUM)

THIS GROUND LEASE (SHORT FORM — MEMORANDUM) is made
this 19th day of    October    , 1979, by and between
HOUSER BROS. CO., a limited partnership, organized and
existing under the laws of the State of California (herein-
after "Landlord"), and ROBERT P. WARMINGTON, a married man
(hereinafter "Tenant"), upon the following terms and con-
ditions:

W I T N E S S E T H:

1.  Landlord leases to Tenant that certain real prop-
erty (the "leased land") located in the City of Huntington
Beach, County of Orange, State of California, which leased
land is described in Exhibit A attached hereto and made a
part hereof, at the rental and upon all the terms and condi-
tions set forth in that certain unrecorded ground lease of
even date between Landlord and Tenant which is incorporated
herein by this reference.

2.  The property is leased for a term of eighty (80)
years, commencing as of the date first above written and
continuing until the anniversary of the eightieth (80th)
year thereafter.  The aforementioned incorporated ground
lease provides, among other things, that it shall terminate
as to the real property covered by a Residential Lease (as
defined in said incorporated ground lease) upon the com-
mencement of the term of such Residential Lease, but not as
to the real property covered by a Consumer Sublease or
Affiliate Sublease (as defined in said incorporated ground
lease).

3.  The aforementioned incorporated ground lease pro-
vides, among other things, that the Tenant shall pay all
taxes, general and special assessments and other charges
which, during the term of this lease, may be levied upon or
assessed against the leased land and all interests therein.

4.  The aforementioned incorporated ground lease al-
so provides, among other things, that Tenant shall not en-
cumber, assign or otherwise transfer said lease, or sublet
the whole or any part of the leased land without the prior
written consent and approval of Landlord, except as other-
wise expressly permitted in said incorporated ground lease.

-1-

BK 13362 PG 321

5.    Landlord hereby irrevocably makes, constitutes
and appoints Tenant as Landlord's true and lawful attorney
for it and in its name, place and stead and for its use and
benefit to exercise any or all of the following powers as
to the leased land, any interest therein and/or any building
or other improvement thereon. To undertake any and all con-
struction activities on or in connection with the leased
land and to execute on behalf of Landlord if Landlord has
not executed the same, as provided and within the time
period set forth in said incorporated ground lease, any map,
permit, application, survey, report, approval, easement deed
or other documents as are necessary or convenient to obtain
the required approvals, permits or other action of the City
of Huntington Beach, the County of Orange, California, and
other governmental and quasi governmental authorities, in-
cluding public utilities, for the development of the leased
land in the manner contemplated by said incorporated ground
lease, giving and granting unto its said attorney full power
and authority to do and perform all and every act and thing
whatsoever requisite, necessary or appropriate to be done in
and about the leased land as fully to all intents and pur-
poses as it might or could do if personally present, hereby
ratifying all that its said attorney shall lawfully do or
cause to be done by virtue of these presents.  It is ex-
pressly agreed and understood that the foregoing power of
attorney is coupled with an interest.

6.    Should there be any inconsistency between the
terms of this instrument and the ground lease incorporated
herein, the terms of said incorporated ground lease shall
prevail.

IN WITNESS WHEREOF, each of the parties hereto has
caused this Short Form - Memorandum of Lease to be duly ex-
ecuted as of the day and year first above written.

HOUSER BROS. CO., a California
limited partnership by its
general partners

By _____
Clifford C. Houser,
General Partner

By _____
Vernon F. Houser,
General Partner

"Landlord"

_____
Robert P. Warmington

"Tenant"

-2-

Branch :A14,User :2004                          Comment:                          Station Id :M3Y7

BK 13362 PG 322

## EXHIBIT "A"

PARCEL A:    Parcel 1 as per Parcel Map recorded in
Book 108, Pages 47 and 48, inclusive,
Official Records of Orange County,
California.

EXCEPTING and reserving a non-exclusive
easement for ingress and egress within
and upon the Westerly 30.00 feet there-
of appurtenant to Parcel 2 as Per Map
recorded in Book 108, Pages 47 and 48,
inclusive, Official Records of Orange
County, California within the private
street known as "Monterey Lane".

PARCEL B:    A non-exclusive easement for ingress
and egress within and upon an area 30.00
feet in width within the private street
known as "Monterey Lane", within Parcel
2 as per Map recorded in Book 108, Pages
47 and 48, inclusive, Official Records of
Orange County, California the Easterly
boundary of which shall be Co-Terminus
with the Westerly boundary of said Parcel
1.

## EXHIBIT "A"

BK 13362 PG. 323

STATE OF CALIFORNIA )
                    ) SS.
COUNTY OF _ORANGE_ )

On this _19th_ day of _OCTOBER_ , 1979,
before me, a Notary Public, personally appeared Clifford C.
Houser and Vernun F. Houser, known to be to be the general
partners of the partnership that executed the within instru-
ment, and acknowledged to me that such partnership executed
the same.

WITNESS my hand and official seal:



_Christina Anne Belmonte_
Notary Public in and for said
County and State

STATE OF CALIFORNIA )
                    ) SS.
COUNTY OF _ORANGE_ )

On this 19th day of _October_ , 1979, before me, the
undersigned, a Notary Public in and for said State, person-
ally appeared Robert F. Warmington, known to me to be the
person whose name is subscribed to the within instrument,
and acknowledged to me that he executed the same.

WITNESS my hand and official seal:

_Pearl L. Hunt_
Notary Public in and for said
County and State

-3-

RECORDED IN

Branch :A14,User :2004                    Comment:                                    Station Id :M3Y7

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

BK 13383 PG 1868

ROBERT P. WARMINGTON
16592 Hale Avenue
Irvine, California 92714

$5.00

RECORDED AT REQUEST OF
FIRST AMER. TITLE INS. CO.
IN OFFICIAL RECORDS OF
ORANGE COUNTY, CALIFORNIA

8:01 A.M.  NOV  6 1979

LEE A. BRANCH, County Recorder

(Space above line for Recorder's use only)

## COVENANT RUNNING WITH THE LAND

THIS INSTRUMENT is made this 19th day of October, 1979, by HOUSER BROS. CO., a California limited partnership ("Houser") whose sole general partners are Clifford C. Houser and Vernon F. Houser.

### RECITALS

A.  Houser is the owner of certain real property in the City of Huntington Beach, County of Orange, State of California, described as Parcels 1 and 2 as shown on a Parcel Map recorded in Book 108, Pages 47 and 48, inclusive, of Parcel Maps in the Office of the County Recorder of said County (hereinafter "Parcel 1" and "Parcel 2" respectively).

B.  Concurrently herewith, Houser is leasing Parcel 1 to ROBERT P. WARMINGTON, a married man ("Warmington") by a Ground Lease of even date herewith (the "Ground Lease"), a memorandum of which is being recorded concurrently or substantially concurrently with this instrument.

C.  Pursuant to the Ground Lease, Warmington may use Parcel 1 to develop thereon single-family residences or condominiums.  The Ground Lease further provides that access to Parcel 1 from Edinger Avenue (the abutting public street) is to be had over a portion of Monterey Lane, a private street located on right-of-way easements on either side of the southerly boundary of Parcel 1 with Parcel 2.  The maintenance of the portion of Monterey Lane as to which Warmington (and the residents of homes or condominiums to be built by Warmington on Parcel 1) has easement rights is the responsibility of Houser as Landlord under the Ground Lease as provided therein.

D.  It is the intention of Houser and Warmington that Houser's obligations under the Ground Lease also run with and bind a portion of Parcel 2 and the successive owners thereof as described in this instrument.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt of which is hereby acknowledged, including without limitation, Warmington's execution of the Ground Lease, Houser hereby covenants, declares and agrees that Houser's obligations as

-1-

BK 13383 PG 1869

Landlord concerning Monterey Lane as set forth in Section 7.9 of the unrecorded Option Agreement between Landlord and Tenant, as optionor and optionee respectively, which preceded the execution of the Ground Lease, hereby incorporated herein by reference, are also covenants running with the portion of Parcel 2 described by extending the southerly boundary of Parcel 1 parallel to Edinger Avenue to the westerly boundary of Parcel 2, and every portion of the area so described (the "Covenant Area"), and shall bind the Covenant Area, Houser and Houser's heirs, assigns, representatives and successors in interest for the benefit of Warmington and the leasehold estate in Parcel 1 under the Ground Lease and any portions into which it may be divided, by Residential Leases (as defined in the Ground Lease) or otherwise. In the event of a breach of the foregoing covenants, or any of them, Warmington may seek any remedy available at law or in equity, including without limitation an action seeking damages, to seek specific enforcement thereof, or to enjoin the breach or continued breach thereof. It is specifically understood that any of the foregoing remedies may be employed at the option of Warmington, and the failure to do so upon any one or more of any such breach shall not be a waiver of the right to employ any of such remedies upon the continuance of such breach or any subsequent breach. As used in the foregoing, "Warmington" shall include any of Warmington's heirs, successors or representatives as well as any assignee or sublessee of Warmington's leasehold estate under the Ground Lease in Parcel 1 or any portion into which it may be divided and any leasee under a Residential Lease, Consumer Sublease or Affiliate Sublease (as defined in the Ground Lease); provided, however, lessees under such Residential Leases and sublessees under such Consumer Subleases shall not have the right to enforce such covenant except on the majority vote of the association of such lessees or sublessees formed by Warmington to manage Parcel 1. If Warmington or such lessees under such Residential Leases acquire the fee interest in all or a portion of Parcel 1, the benefit of the covenant described above shall run in favor of such fee interests and their successors therein, but subject to the same restriction concerning enforceability by residents of Parcel 1 set forth above. Nothing herein shall relieve Warmington or lessees under such Residential Leases or sublessees under such Consumer Subleases from their obligations to pay for a share in the maintenance of the portion of Monterey Lane used to gain access to Parcel 1.

IN WITNESS WHEREOF, Houser has executed this instrument on the day and year first above written.

HOUSER BROS. CO., a California
limited partnership by its
general partners

By _Clifford C. Houser_
   Clifford C. Houser

By _Vernon F. Houser_
   Vernon F. Houser

BK 13383 PG 1870

STATE OF CALIFORNIA )
                    ) ss.
COUNTY OF ORANGE    )

On this _14th_ day of _October_, 1979, before me, a Notary Public, personally appeared Clifford C. Houser and Vernon F. Houser, known to me to be the general partners of the partnership that executed the within instrument, and acknowledged to me that such partnership executed the same.

WITNESS my hand and official seal.

OFFICIAL SEAL
CHRISTINE A. BELMONTE
Notary Public-California
ORANGE COUNTY
My Commission Expires March 14, 1981

Notary Public in and for said
County and State

- 3 -



# STATE OF CALIFORNIA - DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT
## CERTIFICATE OF TITLE

Manufactured Home                                        **Decal:    LBM1081**

| Manufacturer ID/Name | Trade Name | Model | DOM | DFS | RY |
|---|---|---|---|---|---|
| 90002    SKYLINE HOMES INC | CUSTOM VILLA | | 05/29/2014 | 07/28/2014 | |

| Serial Number | Label/Insignia Number | Weight | Length | Width | Issued |
|---|---|---|---|---|---|
| AC7V710394GB | PFS1130281 | 22,383 | 56' | 15' 2" | Aug 12, 2021 |
| AC7V710394GA | PFS1130282 | 25,068 | 60' | 15' 2" | |

**Addressee**

J-PAD LLC
21742 ANZA AVE
TORRANCE, CA  90503

**Registered Owner(s)**

JAMIE LYNN GALLIAN
16222 MONTEREY LN SPACE 376
HUNTINGTON BEACH, CA 92649

**Situs Address**

16222 MONTEREY LN SPACE 376
HUNTINGTON BEACH, CA 92649

**Legal Owner(s)**

J-PAD LLC
21742 ANZA AVE
TORRANCE, CA 90503

Lien Perfected On:        01/14/19 15:22:00

**IMPORTANT**

**THE OWNER INFORMATION SHOWN ABOVE MAY NOT REFLECT ALL LIENS RECORDED WITH THE
DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT AGAINST THE DESCRIBED UNIT.  THE
CURRENT TITLE STATUS OF THE UNIT MAY BE CONFIRMED THROUGH THE DEPARTMENT.**

DTN: 12339739                                                                08122021 - 2

STATE OF ... DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT

LBM1081

| Manufacturer ID/Name | | | RY |
|---|---|---|---|
| 90002   SKYLINE HOMES INC | C | 014 | |
| Serial Number | La | | |
| AC7V710394GB | Pl | 2021 | |
| AC7V710394GA | Pl | | |

**Addressee**

J-PAD LLC
21742 ANZA AVE
TORRANCE, CA  90503

**Registered Owner(s)**

JAMIE LYNN GALLIAN
16222 MONTEREY LN SPA
HUNTINGTON BEACH, CA

**Situs Address**

16222 MONTEREY LN SPA
HUNTINGTON BEACH, CA

**Legal Owner(s)**

J-PAD LLC
21742 ANZA AVE
TORRANCE, CA 90503
Lien Perfected On:     01/1

FIRST-CLASS MAIL
PRSRT
US POSTAGE $000.46⁰
ZIP 95833
041M12251094
neopost 08/12/2021

RETURN
SERVICE
REQUESTED

DEPARTMENT OF HOUSING AND
COMMUNITY DEVELOPMENT
DIVISION OF CODES AND STANDARDS
REGISTRATION & TITLING PROGRAM
P O BOX 277820
SACRAMENTO CA  958277820

108 GBMP 9583

**THE OWNER INFORMATION SHOWN ABOVE MAY NOT REFLECT ALL LIENS RECORDED WITH THE
DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT AGAINST THE DESCRIBED UNIT.  THE
CURRENT TITLE STATUS OF THE UNIT MAY BE CONFIRMED THROUGH THE DEPARTMENT.**

DTN: 12339739

08122021 - 2

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF ORANGE**
**CENTRAL JUSTICE CENTER**

**MINUTE ORDER**

DATE: 03/06/2019                TIME: 08:30:00 AM        DEPT: C61

COMMISSIONER: Carmen Luege
CLERK:  Ryan Castillo
REPORTER/ERM:
BAILIFF/COURT ATTENDANT:  C. Gonzalez

CASE NO: **30-2018-01013582-CL-UD-CJC**  CASE INIT.DATE: 08/21/2018
CASE TITLE: **Houser Bros. Co. vs. Ryan**
CASE CATEGORY: Civil - Limited        CASE TYPE: Unlawful Detainer - Residential

---

EVENT ID/DOCUMENT ID: 72999194

**EVENT TYPE**: Ex Parte
MOVING PARTY: Jamie L Gallan
CAUSAL DOCUMENT/DATE FILED: Ex Parte Application - Other, 03/05/2019

EVENT ID/DOCUMENT ID: 72999195

**EVENT TYPE**: Ex Parte
MOVING PARTY: Jamie L Gallan
CAUSAL DOCUMENT/DATE FILED: Ex Parte Application - Other, 03/05/2019

---

**APPEARANCES**
Vivienne J. Alston, from Alston, Alston & Diebold Attorneys at Law, present for Plaintiff(s).
Jamie L Gallan, self represented Interested Party, present.

---

Proceedings recorded electronically.

Ex-Parte application for reconsideration to intervene and TRO to stay writ of possession is requested by Jaime Gallion.

Ex-parte Application is read and considered.

The Court having fully considered the arguments of all parties, both written and oral, as well as the evidence presented, now rules as follows:

The motion for reconsideration to intervene and TRO to stay writ of possession is GRANTED .

The Court allows Gallian to intervene as to the writ of possession execution in this case.  The Court finds there was improper execution as the judgment was against Lisa Ryan and all unknown occupants.  On 1/2/2019, Plaintiff filed an unlawful detainer for the premises address in this matter against Jamie Gallian.  The Court finds on these facts, Jamie Gallian is NOT an unknown occupant.

The Court orders Plaintiff to place Jamie Gallian back in possession by 5:00 PM today.



DATE: 03/06/2019                                        Page 1
DEPT: C61                        MINUTE ORDER            Calendar No.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE

DEPARTMENT C61

HOUSER BROS COMPANY            )
                              )
            PLAINTIFF,         )
                              )
        V.                    )        NO. 30-2018-01013582
                              )
LISA RYAN, AN INDIVIDUAL,      )
                              )
            DEFENDANT.         )
_____)

HONORABLE CARMEN R. LUEGE, JUDGE PRESIDING

REPORTER'S TRANSCRIPT

MARCH 6, 2019

APPEARANCES OF COUNSEL:

  FOR PLAINTIFF:            ALSTON, ALSTON & DIEBOLD
                           BY:  VIVIENNE J. ALSTON, ESQ.

  FOR DEFENDANT:           *(NO APPEARANCE.)

  FOR INTERESTED PARTY:    JAMIE LYNN GALLIAN,
                           IN PROPRIA PERSONA

PATRICK R. BREZNA, CSR #5288
CERTIFIED REALTIME REPORTER,
REGISTERED PROFESSIONAL REPORTER

1        SANTA ANA, CALIFORNIA - WEDNESDAY, MARCH 6, 2019

2               (MORNING SESSION)

3          (THE FOLLOWING PROCEEDINGS WERE HAD IN

4    OPEN COURT AND ARE BASED ON AN AUDIO

5    RECORDING:)

6    **THE COURT:**  JAMIE GALLIAN.

7    **MS. ALSTON:**  GOOD MORNING.

8         VIVIENNE ALSTON APPEARING ON BEHALF OF THE

9    PLAINTIFFS, HOUSER BROTHERS.  I HAVE WITH ME KATHERINE

10   CURTISS, A MEMBER OF HOUSER BROTHERS.

11   **THE COURT:**  ALL RIGHT.  THIS CASE IS ELECTRONICALLY

12   RECORDED AND CREATES AN OFFICIAL RECORD OF THE

13   PROCEEDINGS.

14        WHO'S HERE FOR THE PLAINTIFFS?

15   **MS. ALSTON:**  VIVIENNE ALSTON APPEARING ON BEHALF OF

16   THE PLAINTIFFS, HOUSER BROTHERS.

17   **THE COURT:**  GO AHEAD AND STATE YOUR APPEARANCE.

18   **JAMIE LYNN GALLIAN:**  GOOD MORNING, YOUR HONOR.

19       JAMIE GALLIAN.

20   **THE COURT:**  ALL RIGHT.  SO DO WE HAVE A TRIAL DATE ON

21   THIS CASE, THE UNLAWFUL DETAINER THAT IS PENDING AGAINST

22   MS. GALLIAN?

23   **MS. ALSTON:**  NO, YOUR HONOR, WE DON'T HAVE A TRIAL

24   DATE.

25   **JAMIE LYNN GALLIAN:**  NO.

26   **THE COURT:**  EXCUSE ME.

1      **MS. ALSTON:**  NO, YOUR HONOR, WE DO NOT HAVE A TRIAL

2   DATE.

3      **THE COURT:**  WHY NOT?

4      **MS. ALSTON:**  BECAUSE SHE ANSWERED WITHIN THE LAST, I

5   THINK, NINE DAYS.  WE STILL HAVE DISCOVERY TO GO THROUGH

6   BEFORE A TRIAL DATE IS SET.

7      **THE COURT:**  SO HERE'S MY PROBLEM.  I HAVE A TENTATIVE

8   ALREADY IN MIND.  AND MY TENTATIVE IS THAT I'M GOING TO

9   STAY EXECUTION OF ANY WRIT IN THIS CASE, IN THIS CASE

10  WHICH IS AGAINST MS. RYAN, NOT AGAINST MS. GALLIAN, THIS

11  DEFENDANT.  AND I'M GOING TO ALLOW YOU, BECAUSE I KNOW

12  YOU HAVE A PENDING CASE AGAINST MS. GALLIAN FOR UNLAWFUL

13  DETAINER, TO LITIGATE THAT IN C66.

14         AND THE REASON I SAY THAT, THE WRIT IN THIS

15  CASE WAS AGAINST LISA RYAN.  THE WAY THAT -- THAT SHE --

16  THAT MS. GALLIAN GETS INVOLVED IN THIS SITUATION IS THAT,

17  BETWEEN THE PERIOD THAT THE COURT ISSUES JUDGMENT AGAINST

18  RYAN, RYAN SELLS THE PROPERTY TO GALLIAN, OKAY.

19         NOW, ONE OF THE THINGS THAT I THINK IS

20  ENCOURAGED IN CASES INVOLVING MOBILE HOMES IS THAT WHEN

21  THE PERSON WHO OWNS THE MOBILE HOME IS OUSTED FROM THERE,

22  OF THE PARK, IS USUALLY BECAUSE THEY'RE BEHIND IN RENT

23  PAYMENTS ON THE SPACE, OR SOMETIMES FOR OTHER CAUSES

24  BECAUSE YOU HAVE TO HAVE CAUSE FOR A MOBILE HOME REMOVAL.

25  IT'S THE SPACE THAT IS AT ISSUE, NOT THE MOBILE HOME

26  ITSELF.  BUT THE MOBILE HOME OFTENTIMES CANNOT BE MOVED,

1    EITHER BECAUSE OF THE EXPENSE PROHIBITS IT, OR BECAUSE

2    MAYBE THE MOBILE HOME PARK DO NOT ACCEPT OLDER MOBILE

3    HOMES.  I HAVE HAD EXPERTS IN HERE TESTIFY COST CAN BE IN

4    EXCESS OF $10,000.

5            AND SO, UH, THE REALITY BECOMES THAT WHAT

6    HAPPENS WHEN YOU SAY, OKAY, THE PLAINTIFF IS ENTITLED TO

7    THE SPACE IN THERE, THE MOBILE HOME CANNOT BE MOVED.  AND

8    USUALLY WHAT HAPPENS, OFTEN HAPPENS, IS THAT THE MOBILE

9    HOME PARK, THEY MOVE THE PERSON OUT AND THEY SELL THE

10   PROPERTY THEMSELVES.  THAT'S ONE OPTION.  THE OTHER

11   OPTION IS GIVING ENOUGH TIME FOR THE OWNER OF THE MOBILE

12   HOME TO SELL.

13           NOW, IN THIS PARTICULAR INSTANCE, WE HAVE AN

14   INTERESTING SITUATION WHICH, BY THE WAY, I HAVEN'T SEEN

15   IT IN THE EIGHT YEARS I'VE BEEN SITTING HERE, WHERE THE

16   ACTUAL MOBILE HOME IS SOLD, PRESUMABLY, IN THE TIME

17   PERIOD THAT IS BETWEEN THE JUDGMENT AND THE EXECUTION OF

18   THE WRIT, WHICH REALLY IS WHAT THE WHOLE FRAMEWORK OF

19   THIS ENCOURAGES; THAT THE HOMEOWNER, THE PRIOR, MS. RYAN,

20   WILL FIND A BUYER AND SELL IT.  AND THAT'S EXACTLY WHAT

21   HAPPENED.  THAT'S HOW GALLIAN CAME INTO POSSESSION.

22           NOW, I KNOW THAT SHE MADE A MOTION TO INTERVENE

23   BEFORE IT CAME TO THIS DIRE SITUATION WE HAVE NOW.  AND

24   AT THE TIME, I DIDN'T WANT HER TO BE INTERVENING BECAUSE

25   THIS CASE HAS REALLY NOTHING TO DO WITH HER, AS FAR AS I

26   CAN TELL.  MY THOUGHT WAS THAT ONCE SHE BOUGHT THE

1   PROPERTY, THAT THERE WILL BE A PROCESS.  BECAUSE I KNOW

2   THAT PEOPLE ARE ENTITLED TO DUE PROCESS IN THE MOBILE

3   HOME CONTEXT; OTHERWISE, THERE WOULD BE AN ASSESSMENT

4   MADE WHETHER OR NOT SHE'S A GOOD CANDIDATE TO BECOME A

5   MEMBER OF THE PARK.

6             AND THAT'S WHERE MY WHOLE THOUGHT IS AT; THAT

7   AT THE TIME OF THE SITUATION, I DIDN'T THINK -- AND I

8   THINK I MAY HAVE TOLD HER -- I DIDN'T EXPECT THAT THE

9   WRIT THAT I HAD ISSUED IN THIS CASE WOULD BE USED AGAINST

10  ANY OWNER OF THE MOBILE HOME BECAUSE I THOUGHT THAT THERE

11  WOULD BE A PROCESS BY WHICH THE MOBILE HOME PARK WOULD

12  MAKE A DETERMINATION OF WHETHER OR NOT SHE SATISFIES THE

13  REQUIREMENTS THEY HAVE TO BECOME A PARK MEMBER.

14            I GATHERED THAT NOW, FOR WHATEVER REASONS, THE

15  PARK HAS DECIDED THAT SHE'S NOT A GOOD TENANT THERE.

16  THEY DON'T WANT HER AS A TENANT, SO THEY'RE NOT WILLING

17  TO APPROVE.  SO NOW WE HAVE A SITUATION WHERE MS. GALLIAN

18  OWNS THE MOBILE HOME, BUT THE PARK IS NOT GIVING HER

19  AUTHORIZATION TO STAY IN THIS SPACE BECAUSE SHE'S NOT A

20  TENANT THAT THEY WANT TO HAVE THERE.  THAT'S WHAT I THINK

21  IS HAPPENING HERE.

22            AND I'M OKAY WITH THAT, BUT I'M NOT GOING TO

23  LITIGATE THAT ISSUE HERE.  SO I'M STILL ALLOWING HER TO

24  INTERVENE BECAUSE I DON'T THINK IT SHOULD BE LITIGATED

25  HERE.  THE ISSUE OF WHETHER OR NOT GALLIAN HAS THE RIGHT

26  TO POSSESSION NEEDS TO BE DETERMINED IN THE CASE THAT IS

1   PENDING IN C66.

2          AND PERHAPS ONE OF THE ISSUES THAT WILL BE

3   LITIGATED THERE IS THE QUESTION OF, ONE, DID SHE ACTUALLY

4   BUY THE PROPERTY; DID SHE BECOME THE OWNER OF THE MOBILE

5   HOME.  AND THE SECOND ISSUE IS, MY THOUGHT IS, UNDER THE

6   MOBILE HOME LAW, YOU KNOW, YOU HAVE TO HAVE GOOD CAUSE TO

7   REJECT A TENANT.  YOU CANNOT JUST WILLY-NILLY START

8   REJECTING PEOPLE.  SO I THINK THAT THERE ARE REGULATIONS

9   AND RULES THAT COME INTO PLAY.  AND IT COULD BE LITIGATED

10  IN THE OTHER CASE AGAINST MS. GALLIAN WHETHER THE PARK

11  FOLLOWED CORRECT PROCEDURE, WHETHER, YOU KNOW -- I DON'T

12  KNOW.  IT'S OPEN TO LITIGATION, I THINK.

13         SO FOR ALL THOSE REASONS, I THINK IT WOULD BE

14  PREMATURE AT THIS MOMENT TO SAY MS. GALLIAN NEEDS TO BE

15  EVICTED ON THE WRIT ISSUED IN THIS CASE BECAUSE WE

16  ALREADY KNOW THAT, IN SHORT NOTICE, YOU'RE GOING TO HAVE

17  A TRIAL IN HER CASE.  AND I THINK THAT JUDGE HONER WAS

18  RIGHT WHEN SHE SAID THAT SHE COULD STOP EXECUTION OF THE

19  WRIT I ISSUED, BECAUSE I ISSUED IT IN THIS MATTER.

20         BUT I HAVE THE DISCRETION, ON THESE FACTS, I

21  THINK, TO STAY EXECUTION OF THIS WRIT AGAINST MS. GALLIAN

22  AS AN UNKNOWN OCCUPANT, WHICH IS THE ONLY WAY YOU GUYS

23  CAN GET HER OUT BECAUSE SHE IS NOT A NAMED DEFENDANT.

24  BUT EVEN AS AN UNKNOWN OCCUPANT, I HAVE THE DISCRETION TO

25  STOP THAT AND GIVE HER THE OPPORTUNITY TO GIVE HER THE

26  TRIAL THAT SHE'S ENTITLED TO HAVE.

1          THOSE ARE MY THOUGHTS.  THAT'S MY TENTATIVE.

2      **MS. ALSTON:**  YOUR HONOR, FIRST OF ALL, I WANT TO MAKE

3  SURE THE COURT IS AWARE THAT THE WRIT HAS BEEN EXECUTED.

4      **THE COURT:**  NO.  I KNOW.

5      **MS. ALSTON:**  OKAY.

6      **THE COURT:**  I'M AWARE.  BUT I'M GOING TO PUT IT BACK,

7  WHICH IS RARE, BUT...

8      **MS. ALSTON:**  AND I DON'T THINK --

9      **THE COURT:**  IT'S A RARE CASE IN MANY WAYS, BECAUSE I

10  DON'T UNDERSTAND --

11      **MS. ALSTON:**  BUT --

12      **THE COURT:**  CAN I SAY WHAT I DON'T UNDERSTAND?

13          IF YOU HAVE A CASE AGAINST MS. RYAN, AND YOU

14  KNOW THAT RYAN SOLD THE PROPERTY TO GALLIAN, I DON'T

15  UNDERSTAND WHY YOU'RE TRYING TO EXECUTE THIS WRIT THAT'S

16  ISSUED IN THIS CASE.  AND THE PROBLEM IS THAT YOU DON'T

17  THINK THAT GALLIAN QUALIFIES, THEN I THINK IT'S --

18      **MS. ALSTON:**  WE DON'T BELIEVE THAT SHE QUALIFIES,

19  YOUR HONOR --

20      **THE COURT:**  I UNDERSTAND.  BUT --

21      **MS. ALSTON:**  -- AND WE WILL FIGHT THAT OUT AS TO

22  POSSESSION OF THE PROPERTY BY THE OCCUPATION OF

23  THE MOBILE HOME.  HOWEVER, WE EXECUTED THE WRIT AGAINST

24  MS. GALLIAN AS AN UNKNOWN OCCUPANT.  THIS COURT ALLOWED

25  IT.

26      **THE COURT:**  NO, NO.  THIS COURT -- NO, NO, I DID NOT

1    I ALLOW IT.  WHAT IT WAS IS, SHE COULDN'T INTERVENE WHEN

2    I THOUGHT THERE WOULD BE A PROCESS.  I -- I -- I DID NOT

3    EXPECT -- PART OF THE PROBLEM IS THAT EVEN AT THE TIME

4    THAT YOU EXECUTED IT, BECAUSE IT WAS AFTER THE HEARING,

5    SHE'S NOT EVEN AN UNKNOWN OCCUPANT AT THE TIME.  SHE IS A

6    KNOWN OCCUPANT.  IN FACT, YOU WENT AND FILED THE OTHER

7    CASE.

8         SO THAT'S WHY I DON'T THINK THAT THE SHERIFF

9    CAN EXECUTE AN UNKNOWN OCCUPANT WRIT IN THIS CASE AGAINST

10   WHAT NOW IS A KNOWN OCCUPANT.  AND AT THE TIME OF THE

11   EXECUTION OF THE WRIT, SHE IS A KNOWN OCCUPANT, NOT AN

12   UNKNOWN ONE.  AND YOU ALREADY HAVE ACKNOWLEDGED THAT

13   BECAUSE YOU HAVE FILED THE CASE AGAINST HER AS A KNOWN

14   OCCUPANT IN THE U.D. YOU FILED AGAINST MS. GALLIAN.

15       **MS. ALSTON:**  I BELIEVE THAT SHE IS AN OWNER OCCUPANT,

16   YOUR HONOR.  I MEAN, WE HAD -- BUT SHE HAS OBTAINED

17   POSSESSION OF THE PROPERTY THROUGH MS. RYAN, PLACED HER

18   IN POSSESSION OF THE HOME, AND --

19       **THE COURT:**  WHO SOLD THE HOME TO HER?

20       **MS. ALSTON:**  BUT THE SALE OF THE HOME DOES NOT GIVE

21   HER ANY POSSESSORY RIGHTS OF THE LAND.

22       **THE COURT:**  NO, NOT OF THE LAND.  BUT THAT'S WHY I

23   MADE THE PREMISE I MADE, BECAUSE IN THE CONTEXT OF MOBILE

24   HOME LAW, ONCE THE PERSON'S GOING TO BUY THE PROPERTY,

25   THERE'S A PROCESS THAT SHE HAS TO BE AN ACCEPTABLE

26   TENANT.  I UNDERSTAND THAT.  AND I SAID TO THE TENANT, "I

1    UNDERSTAND THAT."  THAT HAS TO BE LITIGATED IN THIS

2    PARTICULAR CASE.

3              BECAUSE, THINK ABOUT IT.  I DON'T KNOW HOW MANY

4    TIMES I DO MOBILE HOME UNLAWFUL DETAINER CASES WHERE WHAT

5    I'M ENCOURAGING THE DEFENDANT TO DO IS TO ACTUALLY DO

6    WHAT THE DEFENDANT DID HERE.  BECAUSE THAT'S THE WHOLE

7    GOAL.  I THINK YOU SELL IT, AND PART OF THE MONEY IS USED

8    TO COVER WHATEVER IS OWED, AND THEN THE OTHER NEW PERSON

9    BECOMES THE NEW TENANT IN THE PARK.  I MEAN, THAT'S THE

10   IDEAL SITUATION.  I DON'T KNOW WHY YOU'RE DOING THAT

11   HERE, BUT I DON'T WANT TO LITIGATE THAT HERE.

12       MS. ALSTON:  WELL, IT DIDN'T WORK HERE BECAUSE --

13   WELL, IT DIDN'T WORK HERE, YOUR HONOR, BECAUSE THEY

14   DIDN'T FOLLOW THE STIPULATED JUDGMENT.  THE STIPULATED

15   JUDGMENT HAD A LIST OF THINGS -- OF TERMS THAT THEY WERE

16   PROVISIONS THEY WERE SUPPOSED TO FOLLOW IN THE SALE, AND

17   THEY COMPLETELY BREACHED THOSE.

18       THE COURT:  "THEY" WHO; MS. RYAN?

19       MS. ALSTON:  MS. RYAN AND MS. GALLIAN.

20       THE COURT:  WELL, MS. GALLIAN IS NOT A PARTY TO THAT

21   AGREEMENT.

22       MS. ALSTON:  BUT SHE WAS BUYING IT FROM MS. RYAN.

23       THE COURT:  I KNOW.  BUT --

24       MS. ALSTON:  AND GOES FOR --

25       THE COURT:  BUT SHE -- NO.  BUT SHE'S NOT AN OWNER

26   OCCUPANT.

1   **MS. ALSTON:** I THINK THAT SHE IS, YOUR HONOR. AND I

2   THINK PRACTICALLY -- I MEAN, I'VE NOT BRIEFED IT, AND I

3   DON'T HAVE CASES AND STATUTES THAT I CAN POINT TO IN THIS

4   ISSUE BEFORE THE COURT --

5   **THE COURT:** WHAT ISSUES?

6   **MS. ALSTON:** THE ISSUE OF OWNER OCCUPANCY.

7   **THE COURT:** WELL, IF THE ISSUE OF UNKNOWN OCCUPANT IS

8   NOT BEFORE THE COURT, I DON'T UNDERSTAND, BECAUSE THE

9   ONLY WAY THAT THE PLAINTIFF IN YOUR CASE GETS TO EXECUTE

10  THIS WRIT AGAINST MS. GALLIAN IS BECAUSE OF THE

11  NONOCCUPANT.

12  **MS. ALSTON:** YES.

13  **THE COURT:** THE ISSUE WAS AGAINST RYAN.

14  **MS. ALSTON:** YES, AND ALL UNKNOWN OCCUPANTS.

15  **THE COURT:** THEN YOU'RE SAYING SHE IS AN UNKNOWN

16  OCCUPANT?

17  **MS. ALSTON:** WHAT I'M SAYING IS THAT I DON'T HAVE A

18  BRIEF TO PRESENT TO THIS COURT BECAUSE I WASN'T AWARE

19  THAT THIS WAS GOING TO BE THE WAY THE COURT WAS GOING TO

20  MOVE. AND IT WASN'T IN THE DOCUMENTS, SO IT'S TAKEN ME A

21  LITTLE BIT UNAWARE.

22          HOWEVER, WHAT THE COURT IS CONTEMPLATING IS

23  THAT ANYTIME THIS PERSON WHO IS GIVEN A JUDGMENT -- GETS

24  A JUDGMENT, THAT THEY CAN SIMPLY TRANSFER THE UNIT OVER

25  TO -- WHETHER IT'S AN APARTMENT, MOBILE HOME OR R.V., OR

26  WHATEVER IT IS THAT THEY HAVE THAT IS LOCATED ON THE

1  PROPERTY, AND THEN TAKE THE -- THE PERSON TAKES

2  POSSESSION OF THE UNIT, AND THEN THE WRIT CAN'T BE

3  EXECUTED.

4     **THE COURT:**  YOU MEAN, AS TO THAT PERSON.  NO.  THAT'S

5  MY WHOLE POINT.

6     **MS. ALSTON:**  I DON'T BELIEVE THE LAW WORKS THAT WAY,

7  YOUR HONOR, BECAUSE THIS IS NEVER-ENDING POSSESSION OR

8  OCCUPATION THAT PREVENTS THE PLAINTIFF FROM OBTAINING

9  POSSESSION OF THE PROPERTY.

10     **THE COURT:**  I AM CONCERNED ABOUT IT -- AND I

11  UNDERSTAND YOUR POINT -- BUT I'VE DONE THIS FOR YEARS.

12  SO IT'S UNCOMMON, FIRST, SO I'M TRYING TO ADDRESS ALL

13  FUTURE OCCUPATION PROBLEMS.  I'M ONLY TRYING TO ADDRESS

14  THE PROBLEMS IN THIS PARTICULAR CASE ON THESE PARTICULAR

15  FACTS.

16        WHAT I UNDERSTAND IS THAT GALLIAN BOUGHT THE

17  PROPERTY FROM RYAN.  AND I WANT TO EMPHASIS THAT.  IT'S

18  NOT RYAN BROUGHT SOME OTHER PERSON TO LIVE WITH HER.  MY

19  UNDERSTANDING IS, RYAN MOVED OUT, AND SORT OF ANTICIPATED

20  BY THE STIPULATION, RYAN SOLD THE PROPERTY, ALL RIGHT,

21  THE MOBILE HOME TO GALLIAN.  AND NOW KNOWING THAT, WHAT

22  I'M BEING ASKED TO SAY IS, IT'S OKAY TO USE THE WRIT IN

23  THIS CASE AGAINST GALLIAN AS AN UNKNOWN OCCUPANT.  THAT'S

24  THE PROBLEM I HAD.

25        MY ANALYSIS SIMPLY SAYS TO ME, I AM NOT GOING

26  TO DO THAT BECAUSE GALLIAN DOES -- IF I DID THAT, GALLIAN

1   DOES NOT GET TO LITIGATE THE QUESTION OF WHETHER THE

2   HOME -- MOBILE HOME PARK IS CORRECT IN SAYING THAT SHE

3   DOESN'T QUALIFY.  I DON'T KNOW WHETHER SHE -- I DON'T

4   KNOW WHETHER SHE QUALIFIES.

5        BUT I DO KNOW THIS IN MY HEAD:  I WANT TO BE

6   SURE THAT GALLIAN'S RIGHT TO LITIGATE WHETHER OR NOT,

7   WHETHER OR NOT SHE QUALIFIES TO BE A TENANT AT THE PARK,

8   BECAUSE THERE ARE PROVISIONS IN THE MOBILE HOME PARK THAT

9   HAVE TO BE FOLLOWED TO DENY THAT.  I WANT TO BE SURE

10  THAT'S -- THAT SHE HAS A PLACE TO ARGUE THAT.  NOW, I

11  DON'T KNOW WHETHER MS. GALLIAN'S GOING TO WIN OR NOT, BUT

12  WHAT I WANT IS TO CREATE A PROCESS THAT DOES NOT

13  IMPEDE -- THAT DOES NOT INTERFERE WITH HER ABILITY TO

14  LITIGATE THAT ISSUE.

15        AND IF YOU'RE RIGHT THAT MS. GALLIAN DOESN'T

16  QUALIFY, THEN I'M ASSUMING YOU'RE GOING TO WIN THE CASE

17  ACROSS THE HALL.  AND IF YOU'RE WRONG AND THE JUDGE FINDS

18  THAT SHE DOES QUALIFY, THEN MAYBE SHE GETS TO CONTINUE TO

19  BE IN POSSESSION.

20        AND THIS IS PARTICULARLY IMPORTANT IN MOBILE

21  HOME PARK SITUATIONS BECAUSE OF THE SPECIAL CIRCUMSTANCES

22  THAT I JUST FINISHED EXPLAINING THAT APPLIES TO MOBILE

23  HOMES, WHICH IS THE REASON WHY THE LEGISLATURE IMPOSES SO

24  MANY REGULATIONS ON THE WAY YOU CAN EVICT, ON THE WAY

25  THAT -- YOU KNOW, IT'S SORT OF LIKE A WHOLE DIFFERENT

26  SYSTEM PARALLEL TO THE REGULAR EVICTION STATUTES THAT ARE

1   MUCH MORE ONEROUS AND COMPLICATED.  I THINK THAT THAT'S

2   MOTIVATED BY WANTING TO PROTECT OWNERS IN MOBILE HOME

3   PARKS.

4        SO THAT'S ALL I WANT, TO BE SURE -- I WANT TO

5   BE SURE SHE GETS A SHOT.  AND I DON'T THINK THERE'S ANY

6   HUGE DETRIMENT TO THE PLAINTIFF BECAUSE SHE'S IN THE

7   PARK, YOU ALREADY HAVE FILED THE CASE, SO THAT'S PENDING.

8   I NOTICE THAT THERE IS AN ANSWER.  AND I NOTICE --

9   BRIEFLY I WAS LOOKING TO SEE IF THERE WAS A TRIAL IN THE

10  OTHER CASE.  I THINK THERE'S NO TRIAL, BUT WE KNOW THAT

11  WITHIN 21 DAYS OF YOU'RE MAKING YOUR REQUEST, YOU'RE

12  GOING TO HAVE A TRIAL DATE.  SO I THINK THIS IS ALL GOING

13  TO GET RESOLVED VERY PROMPTLY IN THE OTHER CASE.

14       NOW, I'M LIMITING MY RULING ACCORDING TO THIS.

15  I'M NOT TRYING TO GO ACROSS THE BOARD BECAUSE I COULD

16  IMAGINE THAT SOMEONE COULD DO WHAT YOU JUST DESCRIBED,

17  WHICH IS ABUSE THE PROCESS, RIGHT.  SOMEBODY WHO IS AN

18  ILL-INTENDED TENANT COULD BE GOING FOR POSSESSION, AND

19  THEN YOU SAY THEY'RE NOT OWNER OCCUPANTS.  I GET THAT.

20  SO I AM NOT TRYING TO COME UP HERE WITH A RULING THAT'S

21  GOING TO BE APPLYING ACROSS THE BOARD BECAUSE THAT IS NOT

22  MY INTENT AT ALL.  THIS IS VERY FACT-SPECIFIC IN WHAT I

23  THINK IS A HIGHLY UNUSUAL CASE BECAUSE I HAVEN'T SEEN IT

24  HAPPEN BEFORE.

25       **MS. ALSTON:**  THIS HAS BEEN LITIGATED, YOUR HONOR.

26  MS. GALLIAN BROUGHT A T.R.O., AND IT WAS GRANTED.  THEY

1   WENT THROUGH A PRELIMINARY INJUNCTION.  AND AT THE

2   PRELIMINARY INJUNCTION, THE COURT MADE A RULING AS TO HER

3   RIGHT TO POSSESSION, AND IT DETERMINED THAT SHE DIDN'T

4   HAVE ANY.

5       **THE COURT:**  I JUST SAID -- I READ THE RULINGS, BY THE

6   WAY.  THE PROBLEM THAT I WASN'T SATISFIED WITH IS WHETHER

7   OR NOT SHE GOT TO LITIGATE THE QUESTION OF WHETHER THERE

8   HAD BEEN COMPLIANCE WITH THE REGULATIONS OF MOBILE HOME

9   PARKS, AND WHETHER SHE WAS A TENANT THAT MET THE

10  REQUIREMENTS OF THE PARK SO THAT THEY COULD NOT --

11      **MS. ALSTON:**  SHE DID.

12      **THE COURT:**  THAT'S NOT APPARENT FROM THE

13  MOVING PAPERS.  THAT'S WHAT I HAVE.  AND IF I DID HAVE

14  THAT, THEN THE CASE NEXT DOOR IS GOING TO BE EVEN FASTER

15  BECAUSE IN THE CASE NEXT DOOR, YOU'RE GOING TO HAVE

16  COLLATERAL ESTOPPEL, AND YOU'RE GOING TO BE ABLE TO SAY,

17  "OH, THIS AS ALREADY LITIGATED, SO WE DON'T HAVE TO

18  LITIGATE IT."

19      **MS. ALSTON:**  I THINK THE COURT DID ADDRESS IT.  IT'S

20  THERE, YOUR HONOR.  BUT I DO BELIEVE IT IS THERE WHEN IT

21  SAYS THAT MS. GALLIAN'S POSSESSION OF THE SUBJECT MOBILE

22  HOME WAS NEVER AUTHORIZED BY THE DEFENDANT, AND SHE IS,

23  IN ESSENCE, A SQUATTER.

24      **THE COURT:**  EXCUSE ME.  I'M GOING TO TAKE ISSUE WITH

25  THAT.  I DON'T KNOW WHETHER THAT MEANS THAT SHE BECAME

26  THE OWNER WITHOUT THE PERMISSION.  AND I UNDERSTAND

1    THAT -- HOWEVER, I DON'T KNOW IF SHE GOT TO LITIGATE

2    WHETHER THE PERMISSION WAS RIGHTFULLY OR WRONGFULLY

3    DENIED.  AND IT SEEMS TO ME THAT, IN THE CONTEXT OF

4    ISSUING A TEMPORARY RESTRAINING ORDER OR NOT, THAT

5    PROBABLY WOULDN'T BE THE BEST FORUM TO DO THAT.  SHE

6    PROBABLY NEEDS TO GO TO TRIAL.

7         BUT YOU DON'T HAVE TO CONVINCE ME OF THAT

8    BECAUSE, AGAIN, THIS IS A SHORT DELAY.  IF YOU'RE RIGHT,

9    YOU'RE GOING TO GET A WRIT RIGHT ACROSS THE DOOR FROM

10   HERE IN THAT COURTROOM WHEN YOU LITIGATE IT.  AND IF YOU

11   BELIEVE IT WAS LITIGATED, AND YOU BELIEVE YOU ALREADY

12   HAVE A RULING ON THAT ISSUE, THEN YOU CAN ARGUE THAT WITH

13   JUDGE HONER.  BUT ALL I WANT TO DO IS STOP THIS

14   PROCESS -- IN MY CASE, THAT'S ALL I CARE, IS TO GIVE

15   MS. GALLIAN THE FULL OPPORTUNITY TO ARGUE WHETHER SHE HAS

16   THE RIGHT TO POSSESSION IN THE CASE THAT YOU ALREADY

17   FILED.

18       **MS. ALSTON:**  I WOULD LIKE TO REQUEST THAT THE COURT

19   TAKE JUDICIAL NOTICE OF THE RULINGS MADE IN FRONT OF

20   JUDGE BAUER.  AND THE CASE NUMBER IS -- I THINK I HAVE

21   THE CASE NUMBER ON THE MINUTE ORDER.

22       **THE COURT:**  I TAKE JUDICIAL NOTICE OF THE CASES IN

23   THE ORANGE COUNTY SUPERIOR COURT.

24       **MS. ALSTON:**  BUT SHE DID HAVE --

25       **THE COURT:**  WHAT IS IT THAT YOU'RE LOOKING AT?

26       **MS. ALSTON:**  I'M LOOKING AT MY DOCUMENTS, YOUR HONOR,

1   WHICH IS WHAT I QUOTED.

2       **THE COURT:** I HAVE SEEN IT. I JUST WANT TO BE SURE I

3   KNOW WHAT I'M LOOKING AT, OKAY.

4       **MS. ALSTON:** BUT, YOUR HONOR --

5       **THE COURT:** WAIT A MINUTE. I THINK YOU DID HAVE AN

6   ORDER. SO THE MINUTE ORDER BY JUDGE BAUER ISSUED

7   1/4/2019 -- WHICH, BY THE WAY, THE OTHER WAY I HAVE OF

8   LOOKING AT THIS --

9       **JAMIE LYNN GALLIAN:** I HAVE A COPY OF IT, YOUR HONOR,

10  IF YOU WANT TO SEE IT.

11      **THE COURT:** -- WHICH, YOU KNOW, AGAIN, PRIOR TO

12  EXECUTION OF THE WRIT, WHICH MEANS, IF ANYTHING, THAT BY

13  THE EXECUTION OF THE WRIT, IT JUST MEANS, BECAUSE OF HER

14  EFFORTS, SHE IS AN UNKNOWN OCCUPANT. I'M STILL CONCERNED

15  ABOUT THAT.

16          BUT I DON'T EVEN HAVE TO GO ON THAT POINT. I'M

17  NOT TRYING TO GO ON THAT POINT, EITHER. I JUST WANT YOU

18  TO UNDERSTAND, ALL I'M GOING TO DO IS STAY PROCEEDINGS

19  BASED ON MY WRIT TO SEE WHAT HAPPENS IN THE CASE IN FRONT

20  OF JUDGE HONER, AND THEN WE'LL SEE WHERE WE'RE AT.

21      **MS. ALSTON:** THE POINT I WANTED TO MAKE, SHE DID HAVE

22  AN ATTORNEY PRESENT, AND IT WAS LITIGATED. THE COURT DID

23  HAVE A NUMBER OF DECLARATIONS REGARDING EXPRESSLY

24  EXPLAINING ALL OF THE REASONS THAT HER APPLICATION WAS

25  DENIED. SO THAT HAD TO COME BEFORE A JUDGE, THAT HAS

26  BEEN RULED UPON BY A JUDGE.

1      **THE COURT:**  I DON'T UNDERSTAND.

2           WHAT IS THE DETRIMENT OF JUST, LIKE -- THIS IS

3   GOING TO GET RESOLVED WITHIN THE NEXT 30 DAYS.  IF YOU

4   RIGHT NOW GO DOWNSTAIRS AND YOU ASK FOR THAT TRIAL, YOU

5   GET A TRIAL IS WITHIN 30 DAYS.  I DON'T UNDERSTAND.

6           WHAT IS THE DETRIMENT?

7           I'M TRYING TO UNDERSTAND.

8           IF I SAY THAT SHE'S IN POSSESSION OF THIS

9   MOBILE HOME WHILE THE OTHER CASE IS BEING LITIGATED, WHAT

10  IS THE DETRIMENT?

11     **MS. ALSTON:**  THERE ARE A NUMBER OF DETRIMENTS.  FIRST

12  OF ALL, SHE'S HARASSING THE NEXT-DOOR NEIGHBORS, SHE'S

13  ATTACHING FENCING TO THAT PROPERTY, AND THEY'RE HAVING

14  FIGHTS OVER THAT AND SCREAMING MATCHES OVER THAT.  THERE

15  IS A T.R.O. IN PLACE AGAINST MS. GALLIAN WHERE SHE IS NOT

16  SUPPOSED TO COME WITHIN --

17     **THE COURT:**  THERE'S A T.R.O. OF HOW FAR?

18     **MS. ALSTON:**  THREE HUNDRED FEET.

19     **JAMIE LYNN GALLIAN:**  TEN YARDS, MA'AM.  AND IT WAS

20  FROM A PREVIOUS, UH -- THE MOBILE HOME PARK SHARES THE

21  SAME SECURITY GATE WITH ANOTHER COMMUNITY THAT I SOLD MY

22  PROPERTY.  I LIVED THERE FOR OVER TEN YEARS, AND IT WAS

23  TEN YARDS T.R.O. OF A BOARD MEMBER.  TEN YARDS IS 30

24  FEET, SO IT HAS NOTHING TO DO WITH THIS CASE.  IT'S NO

25  VIOLENCE, NO NOTHING, RIGHT?

26     **MS. ALSTON:**  WELL, THE T.R.O. HAS BEEN GRANTED.  THE

1    INJUNCTION, IT'S A FIVE-YEAR INJUNCTION TO STAY AWAY OVER

2    THAT ISSUE.

3        **JAMIE LYNN GALLIAN:**  SHE FILED IT ON --

4        **THE COURT:**  WHAT'S THE ISSUE?

5        **MS. ALSTON:**  IT WAS APPROXIMATELY SIX, EIGHT WEEKS

6    AGO, YOUR HONOR.

7        **THE COURT:**  WHAT TYPE OF CASE IS THAT?

8        **JAMIE LYNN GALLIAN:**  IT'S RIGHT ACROSS AT JUDGE

9    HONER'S.

10        **MS. ALSTON:**  IT WAS SHERRI HONER'S COURT, YOUR HONOR.

11        **THE COURT:**  WAS THAT A CIVIL HARASSMENT CASE?

12        **MS. ALSTON:**  YES, IT WAS A CIVIL HARASSMENT CASE.

13    THERE WERE TWO -- EVERY TIME THAT SHE'S IN -- GOES

14    THROUGH THE GATE, SHE VIOLATES THAT T.R.O.

15        **JAMIE LYNN GALLIAN:**  NO, THAT IS NOT TRUE, MA'AM.

16        **MS. ALSTON:**  AND SHE HAS A CRIMINAL CASE PENDING

17    AGAINST HER AS WELL FOR VIOLATIONS OF ANOTHER T.R.O.

18    AGAINST A YOUNG CHILD.

19        SO THESE ARE CONTINUING HARASSMENTS THAT ARE

20    ONGOING.  SO THE DETRIMENT IS THAT SHE'S VIOLATING A

21    T.R.O., SHE'S HARASSING HER NEIGHBORS.  I UNDERSTAND THAT

22    THIS WILL BE HAPPENING QUICKLY, BUT SHE HAS THE COURT'S

23    CONCERN THAT SHE HASN'T HAD AN OPPORTUNITY TO PRESENT HER

24    CASE TO THE COURT AND DETERMINE WHETHER OR NOT HER

25    OCCUPATION IS PROPER BECAUSE SHE WAS NOT APPROVED HAS

26    BEEN LITIGATED AND HAS BEEN ADJUDGED BY THE COURT.

1          THE COURT HAS HAD --

2      **THE COURT:**  WHEN DID YOU FILE THE OTHER CASE?

3      **MS. ALSTON:**  THE OTHER CASE WAS FILED --

4      **THE COURT:**  THE CASE, MA'AM?

5      **JAMIE LYNN GALLIAN:**  JANUARY 2ND.

6      **MS. ALSTON:**  YOUR HONOR, IT WAS JANUARY.

7      **THE COURT:**  JANUARY 2ND?

8      **MS. ALSTON:**  I DON'T KNOW THE DATE.

9      **JAMIE LYNN GALLIAN:**  JANUARY 2ND, YOUR HONOR.  IT WAS

10  SERVED FEBRUARY 5TH ON ME.  I HAVE IT RIGHT HERE, YOUR

11  HONOR, IF YOU'D LIKE TO SEE IT.

12          (PAUSE IN PROCEEDINGS.)

13      **THE COURT:**  THAT'S WHAT I MEAN.  THAT'S MY WHOLE

14  PROBLEM WITH THIS CASE.  SHE'S NOT AN UNKNOWN OCCUPANT.

15  THAT'S THE PROBLEM.  SO I'M STILL BACK TO THIS PROBLEM.

16  ON JANUARY 2ND, YOU FILED THE CASE.  YOU KNOW SHE'S IN

17  POSSESSION.  AND SHE TOOK POSSESSION UNDER COLOR OF SOME

18  RIGHTS BECAUSE SHE BOUGHT THE PROPERTY.  AND YOU KNEW IN

19  ORDER -- IN ORDER -- THE ONLY WAY THE WRIT IN THIS CASE

20  AGAINST RYAN GETS TO BE EXECUTED AGAINST GALLIAN IS IF

21  SHE IS AN UNKNOWN OCCUPANT.

22          AND WHEN THAT WRIT IS EXECUTED, SHE IS NOT AN

23  UNKNOWN OCCUPANT.  YOU HAVE FILED AN UNLAWFUL DETAINER ON

24  JANUARY 2ND, WHICH MEANS TO ME SHE'S NOT AN UNKNOWN

25  OCCUPANT.  I AM NOT -- I -- THE BEST I CAN DO HERE IS,

26  I'M PRETTY SURE I CAN RULE HERE THAT THE WRIT HERE IS NOT

1   EFFECTIVE, WHICH I THINK I'M ABOUT TO DO, OR I CAN JUST

2   SAY IT'S WAITING FOR PROCEEDINGS NEXT DOOR.

3          BUT I WILL NOT HAVE THIS PERSON EVICTED UNDER

4   THE UMBRELLA OF AN UNKNOWN OCCUPANT WHEN YOU FILED AN

5   UNLAWFUL DETAINER ON JANUARY 2ND.  AND BY THEN, SHE'S NO

6   LONGER AN UNKNOWN OCCUPANT.  SO BY THE TIME THIS GETS

7   EXECUTED, SHE'S NOT AN UNKNOWN OCCUPANT.  I THINK THAT'S

8   A LOGICAL ISSUE OF WHAT AN UNKNOWN OCCUPANT IS.  A

9   NONOCCUPANT IS, THEY OPEN THE DOOR AND FIND FIVE PEOPLE

10  LIVING THERE; THEY ONLY HAVE THE NAME OF RYAN.  THEY

11  DON'T HAVE THE FIVE PEOPLE TO GET OUT.  THAT'S NOT WHAT

12  HAPPENED IN THIS CASE.  THAT'S NOT HERE BEFORE ME.

13     **MS. ALSTON:**  YOUR HONOR, I DO BELIEVE THAT SHE

14  QUALIFIES AS AN OWNER OCCUPANT.  I DO BELIEVE THAT MY

15  CONCERNS -- AND I KNOW THE COURT DOESN'T WANT TO RULE ON

16  THIS MATTER, BUT AGAIN, IT'S A CONCERN IF ONE PERSON

17  SAYS, "I'M GOING TO BE LOCKED OUT.  I'M GOING TO PUT

18  ANOTHER PERSON IN."  AND --

19     **THE COURT:**  IF YOU WANT TO LITIGATE -- IF YOU'RE

20  ASKING ME TO LITIGATE WHETHER OR NOT SHE'S AN UNKNOWN

21  OCCUPANT, SURE, WE CAN HAVE A BRIEFING SCHEDULE.  I JUST

22  THINK THE SOONER YOU GET OVER THERE, THE SOONER THIS CASE

23  GETS DONE.  I DON'T WANT TO HAVE AN ISSUE THAT STAYS --

24  WHICH SAYS THAT THE STAY IS GOING TO BE BEYOND THE COURT

25  RULES IN THIS UNLAWFUL DETAINER, OR IF YOU WANT TO

26  LITIGATE WHETHER OR NOT YOU CAN EXECUTE A WRIT AGAINST

1   THIS PARTICULAR INDIVIDUAL AS AN UNKNOWN OCCUPANT, YOU

2   CAN GIVE ME -- COME UP WITH A BRIEFING SCHEDULE.  BUT YOU

3   GET TIME, SHE GETS TIME, BECAUSE THIS GOES TO THAT.

4       **JAMIE LYNN GALLIAN:**  YOUR HONOR, I HAVE ONE MORE

5   THING.

6       **MS. ALSTON:**  YOUR HONOR, I AM CONCERNED.  I DON'T

7   WANT TO MAKE PEOPLE -- YOU KNOW, I DON'T WANT TO

8   UNNECESSARILY EXPEND ATTORNEYS' FEES FOR MY CLIENT.  IF

9   THE COURT IS NOT GOING TO EXECUTE THE WRIT AT THIS TIME,

10  I THINK IT WOULD BE BEST FOR US TO PROCEED.  I DO,

11  HOWEVER, HAVE GRAVE CONCERNS THAT THIS COURT IS

12  OVERRULING JUDGE BAUER'S DECISION THAT'S BEEN LITIGATED.

13      **THE COURT:**  IT'S NOT MY INTENT TO OVERRULE ANYBODY.

14  IN FACT, I DON'T HAVE THE POWER TO OVERRULE ANYBODY.  I

15  ONLY HAVE THE POWER TO MAKE AN ASSESSMENT ABOUT THIS

16  PARTICULAR CASE.

17      **MS. ALSTON:**  THAT'S WHAT'S HAPPENING.  AND I JUST

18  WANT TO PRESENT THAT TO THE COURT.

19      **THE COURT:**  I'M NOT OVERRULING JUDGE BAUER.  I THINK

20  HE FOUND THAT THE INJUNCTIVE RELIEF WAS NOT AVAILABLE IN

21  THAT OTHER CASE.  I'M NOT RULING ON THAT HERE.  I DON'T

22  EVEN KNOW THE IN'S AND OUT'S OF THAT.

23          MY RULING IS SIMPLY THAT, IN THIS -- AND I AM

24  GOING TO RULE ON IT.  IN THIS PARTICULAR CASE WHEN THE

25  CASE WAS FILED, JAMIE GALLIAN WAS NOT A DEFENDANT.  ONLY

26  LISA RYAN WAS A DEFENDANT.  LISA RYAN EXECUTED THE

1  STIPULATION.  THE STIPULATION CONTEMPLATED HER TO STAY IN

2  THE MOBILE HOME.  THE MOBILE HOME -- LISA RYAN VACATED

3  THE PROPERTY PURSUANT TO THE STIPULATION; THE MOBILE HOME

4  WAS SOLD TO JAMIE GALLIAN.

5      **MS. ALSTON:**  SHE DID NOT VACATE ON A TIMELY BASIS.

6      **THE COURT:**  I DON'T WANT TO ARGUE THAT, AND THAT'S

7  NOT BEFORE ME.  SO PER THE STIPULATION, JAMIE GALLIAN

8  PURCHASED THE PROPERTY FROM MS. RYAN AND MOVED INTO THE

9  MOBILE HOME THAT MS. RYAN USED TO OCCUPY.  AND ON JANUARY

10  2ND, 2019, THE PLAINTIFF IN THIS CASE, HOUSER BROTHERS,

11  FILED AN UNLAWFUL DETAINER AGAINST MS. GALLIAN,

12  PRESUMABLY BECAUSE THEY BELIEVE THAT SHE DOESN'T QUALIFY

13  TO BE A PARK TENANT.  AND THEY MAY HAVE OTHER REASONS FOR

14  THAT.  THAT'S NOT BEFORE THIS COURT.

15      WHAT IS BEFORE THIS COURT IS THAT AFTER FILING

16  THAT UNLAWFUL DETAINER IN CASE NUMBER 2019-01041423,

17  AFTER FILING THAT UNLAWFUL DETAINER, THE PLAINTIFFS HAVE

18  SOUGHT TO EXECUTE IN THIS CASE A WRIT THAT WAS ISSUED IN

19  THIS CASE -- IN THE CASE THAT I'M PRESIDING OVER -- WHICH

20  IS 3582.

21      AND THE COURT FINDS THAT THAT'S NOT A PROPER

22  EXECUTION OF THE WRIT.  AND IT'S GOING TO ALLOW

23  MS. GALLIAN TO INTERVENE FOR THE PURPOSE OF CHALLENGING

24  THE EXECUTION OF THE WRIT AGAINST HER, WHICH HAD NOT

25  OCCURRED, BACK IN JANUARY WHEN SHE TRIED TO INTERVENE.

26  AT THAT POINT, SHE DIDN'T HAVE ANY INTEREST IN THE CASE.

1    AT THIS POINT, BECAUSE PLAINTIFF CHOSE TO EXECUTE THE

2    WRIT AGAINST MS. GALLIAN, SHE NOW HAS THE RIGHT TO

3    INTERVENE.

4          SO THE COURT HAS CONSIDERED THE MOTION THAT SHE

5    WAS NOT PROPERLY EVICTED IN THIS CASE, BASED ON THIS

6    CASE.  AND THE COURT IS GOING TO RULE THAT THAT WAS

7    IMPROPER EXECUTION OF THE WRIT, THE WRIT THAT WAS ISSUED

8    BY MY COURT.  THE WRIT ISSUED WAS CASE NUMBER 01013852 --

9    THE CASE IN FRONT OF ME -- AGAINST LISA RYAN.

10          AND THE ONLY WAY THAT JAMIE GALLIAN WOULD BE

11    EVICTED WITH THAT WRIT, YOU KNOW, THE COURT FINDS THAT

12    SHE'S NOT AN UNKNOWN OCCUPANT WHEN THE WRIT WAS EXECUTED,

13    BECAUSE PLAINTIFF ALREADY KNEW THAT SHE WAS TRYING TO

14    INTERVENE TO STOP EVICTION ON THIS WRIT.  AND, IN FACT,

15    THEY -- THERE HAD BEEN A PRIOR RULING ON THE INJUNCTIVE

16    RELIEF IN A SEPARATE CASE IN WHICH PLAINTIFFS WERE

17    WELL-AWARE SHE'S NOT A NONOWNER OCCUPANT AND PURCHASED

18    THE PROPERTY -- THE MOBILE HOME -- FROM MS. RYAN.

19          AND THEY FILED THEIR OWN UNLAWFUL DETAINER

20    AGAINST MS. GALLIAN JANUARY 2ND.  AND WHEN THEY EXECUTED

21    THAT WRIT A FEW DAYS AGO -- YESTERDAY, I THINK -- WHEN

22    THEY EXECUTED THE WRIT, MS. GALLIAN WAS NOT AN UNKNOWN

23    OCCUPANT.  AND THAT WRIT DID NOT EXTEND TO HER.  FOR THAT

24    REASON, THE COURT IS GOING TO HOLD THAT THE PARK HAS

25    MS. GALLIAN BACK IN POSSESSION OF THE MOBILE HOME.

26          THE ISSUE OF WHETHER OR NOT SHE'S A TENANT THAT

1    QUALIFIES UNDER PARK RULES TO BECOME A PERMANENT TENANT

2    OF THE PARK, THAT IS GOING TO BE LITIGATED IN THE CASE

3    PENDING UNDER CASE NUMBER 2019-01041423.  SO THE

4    LITIGATION WILL CONTINUE.

5         AND THIS RESULT, TO THE COURT, IS NOT ONLY TO

6    THE EXTENT BECAUSE OF THE RULINGS I MAKE, BUT IT ALSO

7    PROTECTS MS. GALLIAN'S DUE PROCESS RIGHTS TO LITIGATE THE

8    QUESTION OF WHETHER OR NOT THE PARK PROPERLY EXERCISED

9    ITS DISCRETION IN DECIDING THAT SHE WAS NOT A PROPER

10   TENANT.  SHE GETS TO LITIGATE THAT.

11        SO FOR ALL THOSE REASONS, THE COURT ORDERS THE

12   PARK TO RETURN POSSESSION BY --

13        CAN YOU DO IT BY 5:00 P.M. TODAY?

14    **MS. ALSTON:**  YES, YOUR HONOR.

15    **THE COURT:**  SO THE ORDER IS THAT POSSESSION IS

16   RETURNED TO MS. GALLIAN BY 5:00 P.M. TODAY.

17        ALL RIGHT.  THIS IS GOING BACK TO COUNSEL, AND

18   THIS IS GOING BACK TO THE DEFENDANT.  AND I'M DONE WITH

19   THIS CASE.  THANK YOU VERY MUCH.

20        (PROCEEDINGS CONCLUDED.)

21

22

23

24

25

26

# REPORTER'S CERTIFICATE

STATE OF CALIFORNIA )
                     ) SS.
COUNTY OF ORANGE     )


       I, PATRICK R. BREZNA, CSR NO. 5288, CERTIFIED
REALTIME REPORTER, REGISTERED PROFESSIONAL REPORTER, DO
HEREBY CERTIFY THAT THE FOREGOING REPORTER'S TRANSCRIPT IS
A FULL, TRUE AND CORRECT TRANSCRIPTION OF MY SHORTHAND
NOTES THEREOF, AND A FULL, TRUE AND CORRECT STATEMENT OF
THE PROCEEDINGS HAD IN SAID CAUSE BASED ON AN ELECTRONIC
RECORDING SUBMITTED TO ME BY JAMIE LYNN GALLIAN.

       DATED AT ORANGE, CALIFORNIA, THIS 7TH DAY OF
SEPTEMBER, 2020.


                     PATRICK R. BREZNA, CSR NO. 5288,
                     CERTIFIED REALTIME REPORTER,
                     REGISTERED PROFESSIONAL REPORTER

1/1/2006

# RANCHO DEL REY MOBILE HOME ESTATES
## 16222 MONTEREY LANE
## HUNTINGTON BEACH, CALIFORNIA

## MOBILEHOME RENTAL AGREEMENT

## EQUAL HOUSING OPPORTUNITY

## WE DO BUSINESS IN ACCORDANCE WITH
## THE FEDERAL FAIR HOUSING LAW

**IT IS ILLEGAL TO DISCRIMINATE AGAINST ANY
PERSON BECAUSE OF RACE, COLOR, RELIGION,
SEX, HANDICAP, FAMILIAL STATUS, OR NATIONAL
ORIGIN**

**RANCHO DEL REY MOBILE HOME ESTATES**
**16222 MONTEREY LANE**
**HUNTINGTON BEACH, CALIFORNIA**

MOBILEHOME RENTAL AGREEMENT

TABLE OF CONTENTS

Page

INFORMATION SUMMARY ........................................................................... -1-

DISCLOSURES AND IMPORTANT ACKNOWLEDGMENTS ................................. -2-

1.     TERM ................................................................................................ -3-

2.     RENT ................................................................................................. -3-

3.     UTILITIES ........................................................................................... -3-

4.     RENT AND OTHER CHARGES ............................................................ -3-

5.     SECURITY DEPOSIT ........................................................................... -5-

6.     RESOLUTION OF DISPUTES ............................................................... -4-

7.     SALE OF MOBILEHOME ..................................................................... -7-

8.     REMOVAL OF MOBILEHOME UPON SALE TO THIRD PARTY ............... -7-

9.     APPROVAL OF PURCHASER AND SUBSEQUENT RESIDENTS ............... -7-

10.    ASSIGNMENT AND SUBLEASING ....................................................... -8-

11.    CONFLICTS ........................................................................................ -8-

12.    SERVICES AND IMPROVEMENTS ....................................................... -9-
      12.1    SERVICES AND IMPROVEMENTS PROVIDED ............................. -9-
      12.2    CHANGES IN RULES AND REGULATIONS, STANDARDS OF
            MAINTENANCE, SERVICES, EQUIPMENT, OR PHYSICAL
            IMPROVEMENTS ...................................................................... -10-

13.    TERMINATION OF THIS AGREEMENT BY YOU ................................... -10-

14.    TERMINATION OF THIS AGREEMENT BY THE PARK ........................... -10-

© 2006 Alston  All rights reserved. Reproduction is illegal. (May be reproduced by Park named above.)

15.  INDEMNIFICATION................................................................................-11-

16.  INCORPORATED DOCUMENTS ..............................................................-11-

17.  COMPLIANCE WITH LAW AND RULES AND REGULATIONS.....................-11-

18.  ZONING, USE PERMIT AND OWNER INFORMATION ...............................-11-

19.  TRANSFER OF PARK'S INTEREST .........................................................-11-

20.  NOTICES ...........................................................................................-11-

21.  WAIVER..............................................................................................-11-

22.  ENTIRE AGREEMENT ...........................................................................-12-

23.  ATTORNEY'S FEES ..............................................................................-12-

24.  HEADINGS AND FORMATTING ..............................................................-12-

25.  PARTIAL INVALIDITY ..........................................................................-12-

26.  ALTERATION OF THIS AGREEMENT ......................................................-12-

27.  DEFINITIONS OF OWNER OF THE PARK, HOMEOWNERS,
     RESIDENTS, SALE OF MOBILEHOME AND BUYER...................................-12-

28.  HOLDOVER TENANCY..........................................................................-12-

29.  COUNTERPARTS ..................................................................................-12-

30.  EXHIBITS ...........................................................................................-13-

31.  OWNER'S APPROVAL AND OPTIONS .....................................................-13-

32.  STATUTE OF LIMITATION ....................................................................-13-

33.  USE AND OCCUPANCY .........................................................................-13-

34.  INSPECTION .......................................................................................-13-

35.  ENFORCEMENT OF CONDITIONS OF TENANCY .....................................-13-

36.  MAINTENANCE OF IMPROVEMENTS .....................................................-13-

© 2006 Alston  All rights reserved.  Reproduction is illegal.  (May be reproduced by Park named above.)

37.  CONDEMNATION.................................................................................-14-

38.  TIME OF ESSENCE .............................................................................-14-

39.  MODIFICATION FOR LENDER...........................................................-14-

40.  ESTOPPEL CERTIFICATE ...................................................................-14-

41.  LIMITATION OF OUR LIABILITY .....................................................-14-

42.  MEGAN'S LAW.....................................................................................-14-

43.  EXECUTION ..........................................................................................-15-

© 2006  Alston  All rights reserved. Reproduction is illegal.  (May be reproduced by Park named above.)

**RANCHO DEL REY MOBILE HOME ESTATES**
**16222 MONTEREY LANE**
**HUNTINGTON BEACH, CALIFORNIA**

## MOBILEHOME RENTAL AGREEMENT

### INFORMATION SUMMARY

The following information from the Agreement is summarized for the convenience of both of us. Please see the applicable paragraphs in this Agreement for the complete information which controls if there is a difference between it and the following:

A.   Space Number: _376_

B.   Resident(s): _Laura Ryan, Lisa T. Ryan, Patricia C. Ryan_

C.   Date this Agreement Begins and Length/Term of this Agreement:

   (1)   On a month-to-month basis beginning _____, 20___.

                                                                    _____
                                                                    (Resident's Initials)

   (2)   For a period of _12_ months beginning _1-1-_, 20_06_        _XLR_
         (not to exceed 12 months).                                  (Resident's Initials)

D.   Monthly Rent: Your beginning monthly rent will be $ _696. 00_ . The amount of your rent may be increased at any time on ninety (90) days' notice. The increase in rent may be made because of such things as new or increased operating expenses we may incur, increases in what we believe to be a fair market rent for your mobilehome space or any other reason we believe, in our sole discretion, to be appropriate so long as the rent increase is not otherwise specifically prohibited by law.         _XLR_
                                                                    (Resident's Initials)

E.   Utilities:

   (1)   Utilities You Pay to Park:

         Electricity, Water and Natural Gas on submetered basis.

         Sewer and Trash at an initial charge of $ _10.27_ /month for Sewer and
         $ _12.33_ /month for Trash.

   (2)   Utilities Included in Your Rent: None.

   (3)   Utilities you purchase from Others: Telephone and cable TV.

   Utilities may be increased or changed as allowed by this Agreement.

F.    Other Charges:

    (1)    Late Payment:            $20.00

    (2)    Returned Checks: $20.00

    (3)    Security Deposit: $ -0-

    (4)    RV/Extra Vehicles:        $ 60.00 _____ per month per vehicle

    (5)    Government Fees:        As charged to Park

    (6)    Extra Persons Charge:    $ -0- _____ per day per person

    (7)    Guest Cottage Charge:    $ 50.00 _____ per day.

    (8)    Other:    _____

These above charges may be increased or changed as allowed by this Agreement.

G.    Facilities to be provided by the Park for Residents during the term of this Agreement, unless changed: The streets, R.V. storage area (subject to separate agreement and charge), 2 clubhouses, 2 swimming pools and spas, 4 saunas, 3 laundry rooms and 2 guest cottages which are available for residents to rent to house their short-term guests.

H.    Services to be provided by the Park for Residents during the term of this Agreement, unless changed: Park Manager, electricity, natural gas, water, sewer, and trash.

Facilities and services may be decreased or changed as allowed by this Agreement. The cost of providing and maintaining facilities and services may increase your rent per the provisions of this Agreement.


### DISCLOSURES AND IMPORTANT ACKNOWLEDGMENTS

OUR MOBILEHOME PARK IS AN OLDER PARK; THEREFORE, THE UTILITY SYSTEMS (ELECTRIC, NATURAL GAS, SEWER AND WATER) DO NOT WORK AS WELL AS NEWER SYSTEMS AND DO PERIODICALLY BREAK DOWN OR PROVIDE LESS-THAN-ADEQUATE SERVICE.

YOU ACKNOWLEDGE THAT WE HAVE OFFERED YOU THE OPTION OF HAVING THIS AGREEMENT HAVE A TERM OF 12 MONTHS OR LESS, INCLUDING A MONTH-TO-MONTH TENANCY. YOU ALSO ACKNOWLEDGE THAT YOU HAVE VOLUNTARILY SELECTED THE TERM LISTED AT PARAGRAPH C ON PAGE 1 OF THIS AGREEMENT.

RESOLUTION OF DISPUTES: YOU AGREE THAT THOSE DISPUTES WHICH ARE SPECIFIED IN PARAGRAPH 6 OF THIS AGREEMENT, WHICH IS ENTITLED "RESOLUTION OF DISPUTES," WILL BE DETERMINED BY SUBMISSION TO WHAT IS KNOWN AS A REFERENCE AND NOT BY WHAT MOST PEOPLE CONSIDER THE NORMAL LAWSUIT OR BY RESORTING TO NORMAL COURT PROCESSES. BY SIGNING THIS AGREEMENT, BOTH YOU AND WE ARE GIVING UP OUR CONSTITUTIONAL RIGHT TO HAVE THOSE DISPUTES DECIDED IN A COURT OF LAW BEFORE A JURY AND, INSTEAD, ARE ACCEPTING THE USE OF THE REFERENCE PROCEDURES.

I AGREE I HAVE READ AND UNDERSTOOD THE ABOVE DISCLOSURES AND ACKNOWL-
EDGMENTS.

SIGNATURE: _____   DATE: 1/10/2006

SIGNATURE: _____   DATE: 1/20/2006

SIGNATURE: _____   DATE: _____

1.    **TERM:** You are renting the Space listed at paragraph A on page 1 of this Agreement in Rancho Del Rey Mobile Home Estates located in Huntington Beach, California (the Park). This Agreement is for the term and begins on the date listed at paragraph C on page 1 of this Agreement unless it terminates earlier per the termination paragraphs of this Agreement.

2.    **RENT:** Your rent will be the amount listed at paragraph D on page 1 of this Agreement and it may be increased as permitted by that paragraph.

3.    **UTILITIES:**

    3.1    You are responsible for making sure that your mobilehome and all appliances and equipment in your mobilehome are compatible with the electric service and capacity now available, and we shall have no liability or responsibility to you if the available electrical supply is incompatible. You agree not to install electrical appliances which will use energy in excess of the electrical service and capacity available to your Space. You also agree that you will not attempt to increase the electrical service and capacity of your Space by installing any device or doing anything else unless you have received our prior written permission. If your electrical demands exceed the capability of the Park, or are otherwise inconsistent with the capabilities of the Park, you will be deemed to be in default under your rental or lease agreement and you will, in addition to all of the remedies available to us, reimburse us within ten (10) working days for any costs and expense we incur in remedying the situation created by your use of excessive or inconsistent electrical demands. You also agree to indemnify and hold us harmless against any loss, cost, damage, expense (including attorneys' fees and costs) or other liability incurred or imposed by reason of any injury to persons or property which occurs as a result of your electrical demands. As the amount of such electrical service and capacity will affect your ability to have electrical appliances, you must determine in advance from us in writing the amount of electrical service and capacity available to your Space and insure that your mobilehome and all appliances and equipment in it are compatible with that service and capacity.

    3.2    We will provide, submeter and separately charge you monthly for gas, water, and electricity. Any increases in the cost of utilities submetered will be immediately passed-through and paid by you. We will initially charge you monthly the amount indicated in paragraph E(1) on page 1 of this Agreement for trash and sewer. Any increase in the cost of utilities separately charged will be immediately passed-through and paid by you, at such prevailing rates regulated and authorized by the utility companies. You will contract with and pay directly for all other utilities you require.

4.    **RENT AND OTHER CHARGES:**

    4.1    If you do not maintain your mobilehome or Space as required by this Agreement and the Rules and Regulations, we may give you a notice requiring you to comply in fourteen (14) days. If you do not, we may charge you a reasonable fee for having this work done. In accordance with Civil Code §798.36 Management may after providing you with 14 days notice charge you with the reasonable costs for removal personal property and storage thereof for a period of sixty-day period prior to the ultimate disposal of unclaimed property.

    4.2    If you store or park a vehicle, trailer or something else in the recreational vehicle storage lot or other extra vehicle parking area, you will be charged the amount indicated in paragraph F(4) on page 2 of this Agreement. This charge may be increased at any time on sixty (60) days' written notice. This storage or parking will be per the terms

J:\091512\003\RENTAGR\Rental Agreement revised for 2006.doc       Rancho Del Rey
© 2006  Aston & Gieser, LLP   All rights reserved. Reproduction is illegal. (May be reproduced by Park named above.)

of a separate agreement which you will be required to sign, not by this Agreement. We are not obligated to provide parking for all vehicles, access to this area is on a first-come, first-served basis and it may be eliminated on ninety (90) days' written notice and the area used for another purpose.

4.3    Rent and all other charges except utilities are due in advance on the first day of each month. Utility charges are also due by the first day of each month. Also please refer to our Rules and Regulations for additional requirements regarding your payment of taxes, assessments, license fees, and other charges that are applicable to your personal property and improvements. Rent and all other charges must be paid without any deduction or offset whatsoever and will be late if not paid in full by 5:00 p.m. on the 6th day of each month. You must pay a late charge whenever rent or other charges are paid more than six (6) days after they are due and a handling charge whenever a check is returned for any reason in the amounts indicated in paragraphs F(1) and (2) on page 2 of this Agreement. Outstanding balances over thirty (30) days are subject to compound interest at the rate of 1% per month. Total interest in any calendar year shall not exceed the maximum interest allowed by law. Payment will be made at the Park Office or at such other location we designate. All rents and other charges shall be paid by check or money order. We may, upon ten (10) days' notice, require payment in cash, or its equivalent. All of the charges and other amounts noted in this Agreement may be increased at any time on sixty (60) days' notice without reducing the rent or changing any other term or provision of this Agreement.

4.4    Unless otherwise prohibited by law, all government charges and fees charged the Park may be billed by us to you.

5.    SECURITY DEPOSIT: When you sign this Agreement, you will give us the amount indicated as paragraph F(3) on page 2 of this Agreement as a security deposit for your performance of this Agreement. (If you are already a resident, the amount of any security deposit you previously gave us will be this deposit.) If you default, we can use the security deposit to cure the default or compensate us for any damage because of your default. You will immediately pay us a sum equal to the portion of the security deposit we use to maintain it the sum initially deposited. We can commingle the deposit with our other funds and are not required to pay you interest on it.

6.    RESOLUTION OF DISPUTES:

6.1    EXCEPT AS NOTED IN PARAGRAPH 6.5, YOU AGREE THAT ANY AND ALL DISPUTES YOU HAVE WITH US WILL BE SUBMITTED FIRST TO NON-BINDING MEDIATION AND, IF THE DISPUTE CANNOT BE RESOLVED BY THAT METHOD, SUBMITTED TO WHAT IS CALLED A "GENERAL REFERENCE" WHICH WILL BE CONDUCTED PER THE PROVISIONS OF CODE OF CIVIL PROCEDURE SECTION 638. ALL ISSUES RELATING TO THE DISPUTE WILL BE SUBJECT TO THE REFERENCE AND THE REFEREE WHO IS APPOINTED SHALL HAVE ALL THE NECESSARY POWERS TO DECIDE ALL QUESTIONS OF LAW AND FACT RELATING TO THE DISPUTE.

6.2    THE REFERENCE SHALL BE CONDUCTED AND DECIDED BY A RETIRED JUDGE AND NO JURY WILL BE USED.

6.3    YOU ALSO AGREE THAT, AS IS TRUE OF THE OTHER PROVISIONS OF THIS AGREEMENT, THAT THIS PARAGRAPH 6 IS APPLICABLE TO ALL MEM-BERS OF YOUR HOUSEHOLD, INCLUDING ANY PERSON(S) WHO HAS NOT SIGNED THIS AGREEMENT OR WHO MAY BECOME A MEMBER OF YOUR HOUSEHOLD AFTER THE DATE YOU SIGNED THIS AGREEMENT.

6.4    ALTHOUGH THE WORD "MEDIATION" IS OFTEN NOT USED BE-LOW, UNLESS UNREASONABLE TO DO SO, EVERYTHING IN PARAGRAPH 6

© 2006 Alston & Giesner, LLP  All rights reserved. Reproduction is illegal.  (May be reproduced by Park named above.)

REGARDING A REFERENCE ALSO APPLIES TO MEDIATION.

6.5    WE MAY, AT OUR OPTION, ELECT TO HAVE ANY OF THE FOLLOWING DISPUTES SUBMITTED TO A REFERENCE OR TO BE TRIED IN THE COURTS UNDER NORMAL PROCEDURES TO A JUDGE SITTING ALONE WITHOUT A JURY: (a) TERMINATION OF TENANCY DUE TO A FAILURE TO PAY RENT OR OTHER CHARGES OR FOR ANY OF THE OTHER REASONS TENANCY MAY BE TERMINATED PER CIVIL CODE §798.56(a) THROUGH (e), INCLUSIVE; (b) FORCIBLE DETAINER; (c) INJUNCTIVE RELIEF PER [i] CODE OF CIVIL PROCEDURE §527.6, [ii] CIVIL CODE §798.87(b), OR [iii] CIVIL CODE §798.88; (d) PAYMENT OF THE MAINTENANCE FEE PROVIDED FOR IN CIVIL CODE §798.36; (e) CONDEMNATION OR A CHANGE OF THE USE OF THE PARK AS PROVIDED IN CIVIL CODE §798.56(f) AND (g); AND (f) TO PRESERVE ANY EQUITABLE RIGHTS RELATING TO ANY DISPUTE.    MEDIATION WILL NOT OCCUR FOR THE DISPUTES IN THIS PARAGRAPH 6.5.

6.6    "DISPUTE" INCLUDES NOT ONLY DISPUTES YOU MAY HAVE WITH US BUT ALSO DISPUTES AGAINST ANY OF OUR EMPLOYEES, CONTRACTORS, AGENTS OR ANY OTHER PERSON WHO YOU CONTEND HAS INJURED YOU WHEN YOU ALSO CONTEND THAT WE ARE RESPONSIBLE FOR THAT OTHER PERSON'S ACTS OR FAILURE TO ACT.

6.7    BEFORE THE LAWSUIT REQUIRED TO BEGIN A REFERENCE MAY BE FILED, MEDIATION MUST BE ATTEMPTED. THIS IS DONE BY YOU SERVING US AND THE JUDICIAL ARBITRATION AND MEDIATION SERVICE, INC. ("JAMS") WITH A WRITTEN DEMAND OR NOTICE OF INTENTION TO REQUIRE A REFERENCE.

6.8    YOU MUST GIVE US THIS NOTICE NOT LATER THAN ONE (1) YEAR FROM THE DATE YOU OR ANY MEMBER OF YOUR HOUSEHOLD FIRST BECAME AWARE OF (OR REASONABLY SHOULD HAVE BEEN AWARE OF) THE DISPUTE. IF YOU DO NOT GIVE US NOTICE WITHIN THE ONE (1) YEAR TIME PERIOD, YOU AGREE WE WILL NOT BE LIABLE TO YOU FOR ANY INJURY OR DAMAGE YOU OR OTHERS IN YOUR HOUSEHOLD MAY EXPERIENCE AND, THEREFORE, THAT DISPUTE WILL NOT BE SUBJECT TO A REFERENCE OR ANY PROCEEDING IN THE COURTS.    THIS ONE (1) YEAR TIME LIMITATION APPLIES TO BEING ENTITLED TO BOTH MEDIATION AND A REFERENCE.    FOR EXAMPLE, IF THE DATE WHEN YOU FIRST BECAME AWARE OF THE DISPUTE WAS JANUARY 1, 1995, NOTICE OF THE DISPUTE MUST BE GIVEN BY YOU TO US BY DECEMBER 31, 1995 IN ORDER TO HAVE THE DISPUTE MEDIATED AND HAVE A REFERENCE, AND IF NOTICE WAS GIVEN AFTER DECEMBER 31, 1995, NEITHER MEDIATION OR A REFERENCE WOULD OCCUR.

6.9    THE NOTICE REFERRED TO IN PARAGRAPH 6.8 MUST PROVIDE: (i) A DESCRIPTION OF THE DISPUTE, AND (ii) FACTS FROM WHICH THE DISPUTE ARISES INCLUDING WITNESSES, DATES, TIMES AND CIRCUMSTANCES. IF THE DISPUTE IS NOT RESOLVED IN NINETY (90) DAYS BY MEDIATION, THE DISPUTE

MUST EITHER BE ABANDONED OR RESOLVED BY A REFERENCE.

6.10   EVEN THOUGH YOU MAY HAVE A REASONABLE CLAIM, THE REFEREE SHALL REFUSE TO GRANT ANY RELIEF TO YOU IF YOU DO NOT COMPLY WITH THE ABOVE ONE (1) YEAR TIME PERIOD.  IF MEDIATION FAILS AND YOU CHOOSE TO FILE THE LAWSUIT REQUIRED TO START A REFERENCE, THE LAWSUIT MUST BE FILED BY YOU WITHIN TEN (10) DAYS OF THE DATE THE MEDIATOR DECLARES AN IMPASSE OR THE MEDIATOR ISSUES HIS OR HER RECOMMENDATIONS OR DECISION.

6.11   IF MEDIATION FAILS AND YOU AND WE CANNOT AGREE IN TEN (10) DAYS FROM THE DATE THE LAWSUIT IS FILED WHO THE REFEREE WILL BE, A COURT OF COMPETENT JURISDICTION WILL PROVIDE BOTH OF US WITH A LIST OF AT LEAST FIVE (5) NEUTRAL REFEREES, FROM WHICH YOU AND WE WILL ATTEMPT TO SELECT A REFEREE FROM.  IF WE CANNOT AGREE, THE COURT WILL MAKE THE SELECTION FROM THAT LIST FOR US.  BOTH YOU AND WE WILL BE GIVEN THE RIGHT OF ONE PEREMPTORY CHALLENGE TO DISQUALIFY A PERSON FROM BEING THE REFEREE.  THE REFERENCE SHALL COMMENCE WITHIN ONE HUNDRED TWENTY (120) DAYS FROM THE DATE THE REFEREE IS APPOINTED, UNLESS CONTINUED ON REQUEST TO THE REFEREE, OR BOTH OF US AGREE.  THE REFEREE WILL BE A DIFFERENT PERSON THAN THE MEDIATOR.

6.12   UNLESS BOTH OF US AGREE, NO DISPUTE WILL BE CONSOLIDATED OR JOINED TOGETHER WITH A DISPUTE OF ANY OTHER PERSON.

6.13   UNLESS OTHERWISE DETERMINED BY THE MEDIATOR OR REFEREE THE FEES AND COSTS FOR THE MEDIATION AND REFERENCE SHALL BE PAID IN ADVANCED AND DIVIDED EQUALLY BETWEEN YOU AND US.  THE FEES ARE DUE AND PAYABLE ON REQUEST OF THE MEDIATOR OR REFEREE. IT IS EXPECTED THAT THE MEDIATOR OR REFEREE WILL MAKE A REASONABLE ESTIMATE OF ANTICIPATED FEES AND COSTS OF THE MEDIATION OR REFERENCE AND SEND A STATEMENT TO EACH OF US, AND EACH OF US WILL DEPOSIT OUR ONE-HALF SHARE WITH THE MEDIATOR OR REFEREE WITHIN TEN (10) DAYS. IF PAYMENT IS NOT MADE AS REQUIRED THE MEDIATOR OR REFEREE SHALL HAVE THE AUTHORITY TO: (1) DETERMINE THAT THE PERSON WHO FAILED TO PAY HAS FORFEIT AND GIVEN UP ALL RIGHTS TO PROSECUTE OR DEFEND THE CLAIM; (2) PROCEED WITHOUT PAYMENT AND SHALL INCLUDE IN THE AWARD AS TO WHICH PARTY MUST PAY THE OUTSTANDING AMOUNTS; (3) REQUIRE THAT A PARTY THAT HAS PAID HIS/HER SHARE PAY ADDITIONAL AMOUNTS.  HOWEVER, UNLESS THE MEDIATOR OR REFEREE MAKES A DETERMINATION TO THE CONTRARY THE PARTY WHO PAID ADDITIONAL SUMS IS ENTITLED TO REIMBURSEMNT OF THOSE SUMS AND MAY SUBTRACT SUCH PAYMENTS FROM AN AWARD AGAINST SUCH PARTY OR MAY HAVE SUCH SUMS INCLUDED IN A JUDGMENT ENTERED AS A RESULT OF AN AWARD IN HIS/HER FAVOR.  IF EITHER OF US FAILS TO MAKE A DEPOSIT, INCLUDING ANY ADDITIONAL DEPOSIT LATER

© 2006 Alston & Gieser, LLP   All rights reserved. Reproduction is illegal. (May be reproduced by Park named above.)

DETERMINED TO BE NECESSARY BY THE MEDIATOR OR REFEREE, THE FAILURE OF ONE OF US TO PAY WILL NOT, HOWEVER, ABATE, STAY, OR SUSPEND THE MEDIATION OR REFERENCE AND THE MEDIATOR OR REFERENCE.

6.14    YOU ACKNOWLEDGE HAVING READ THIS PARAGRAPH 6.  YOU ALSO AGREE THAT THESE PROVISIONS WILL APPLY TO YOU AT ALL TIMES IN THE FUTURE (EVEN THOUGH THAT MAY BE BEYOND THE TERM OF THIS AGREEMENT OR AFTER YOUR TENANCY OR THIS AGREEMENT HAS BEEN TERMINATED OR YOU MOVE FROM THE PARK) UNLESS THESE PROVISIONS ARE ELIMINATED AFTER THE TERM OF THIS AGREEMENT ENDS BY A WRIT-TEN 60-DAY NOTICE FROM US TO YOU.

6.15    NOTICE: BY INITIALING IN THE SPACE BELOW, YOU ARE AGREEING TO HAVE YOUR DISPUTES WITH US DECIDED BY A NEUTRAL REFEREE AS PROVIDED BY CALIFORNIA LAW, AND YOU ARE GIVING UP ALL RIGHTS YOU HAVE TO HAVE THE DISPUTES LITIGATED IN A COURT OR BY A JURY TRIAL.  IF YOU REFUSE TO SUBMIT TO A REFERENCE AFTER AGREEING TO THESE PROVISIONS, YOU MAY BE COMPELLED TO A REFERENCE UNDER CALIFORNIA LAW.  YOUR AGREEMENT TO THESE PROVISIONS IS VOLUNTARY. YOU HAVE READ AND UNDERSTAND THIS PARAGRAPH 6 AND AGREE TO SUBMIT YOUR DISPUTES TO A "REFERENCE" AS PROVIDED IN THIS PARAGRAPH 6.

BY INITIALING BELOW, YOU ACKNOWLEDGE THE PROVISIONS AND AGREEMENTS IN PARAGRAPH 6 ABOVE.

Initials of Homeowner(s): _____   _____   _____

7.    **SALE OF MOBILEHOME:** You may sell/transfer your mobilehome per your and our rights and obligations under this Agreement.  You must, however, give us sixty (60) days' written notice of your intent to sell/transfer your mobilehome.  You must also give us written notice at least ten (10) days prior to your execution of any escrow, sale, exchange, transfer or other agreement.  The requirements of this Agreement and this paragraph will apply even if you sell or transfer only a portion of your interest in your mobilehome.

8.    **REMOVAL OF MOBILEHOMES UPON SALE TO THIRD PARTIES:**

We may, in order to upgrade the quality of the Park, require the removal of mobilehomes from the Spaces upon their sale or transfer to a third party, in accordance with the provisions of the Mobilehome Residency Law and other applicable law.  Any such rights granted as due to amendments, deletions, or modifications of the Mobilehome Residency Law and other applicable law may be enforced by us at our option.

9.    **APPROVAL OF PURCHASER AND SUBSEQUENT RESIDENTS:**

9.1    If your prospective buyer/transferee intends for the mobilehome to remain in the Park, or the buyer/transferee intends to reside in the Park, the buyer/transferee must do the following before occupying the mobilehome or Space: complete an application for residency, sign the Park's current rental or lease agreement which may be different than this Agreement and be accepted by us.  The rent we are then charging may be increased to any amount we believe appropriate.  We may request a financial statement, credit report, references and other reasonable information we need from any prospective buyer/ transferee.  If the buyer/transferee is not approved by us or does not

J:\001510\003\RENTAGR\Rental Agreement revised for 2006.doc    Rancho Del Rey    Page 7
© 2006  Alston & Gieser, LLP   All rights reserved.  Reproduction is illegal.  (May be reproduced by Park named above.)

sign the Park's current rental or lease agreement, they will have no rights of tenancy in the Park and they may not leave the mobilehome here or occupy the Space. In such event, you will remain fully responsible to us for the full performance of this Agreement. We may also, at our option, pursue such remedies as we may have against the buyer/ transferee/assignee alone, against both you and them or against you alone.

9.2     The requirements of this Agreement will apply before any person other than the ones listed on the signature page of this Agreement, will be permitted to become a resident of the Park. Unless otherwise prohibited by law all persons residing at your space must be approved for residency. If the person is not going to be a signatory to this lease no financial information will be required. Any person that we determine from prior tenancies will not abide by the rules and regulations will not be approved. A guest or other person who has not previously signed this Agreement who remains in the Park after his host has died, moved, or for any other reason does not physically reside in the Park on a regular basis, will be considered to be the equivalent of a buyer/transferee/assignee and will be subject to the requirements of this Agreement. This means that the guest or other person will have to apply for residency and if approved will be offered a rental agreement and that rental agreement may be higher that what you have been paying under this Agreement. This will be true regardless of whether the guest is listed as a "legal" or "registered" owner of the mobilehome. The requirements of this Agreement will also apply if you only sell/transfer a portion of your interest in your mobilehome or assign only a portion of your right to occupy your Space.

9.3     You agree to do such other things and to execute and deliver to us such additional documents as we may reasonably require to protect our interest in conjunction with the sale/ transfer/assignment of this Agreement.

10.   ASSIGNMENT AND SUBLEASING:

10.1     You may not assign this Agreement and any purported assignment will be void. You may not assign the right to occupy your mobilehome or Space and any such assignment will be void. (If the mobilehome is to be removed from the Space and not replaced with another mobilehome, we must also be given at least 60 days' advance written notice and the right to possession and control of the Space will, at our option, revert to us. The only exception is if you replace it with another mobilehome you personally occupy as your residence.) Unless required by law, including, as is presently the case, an ordinance of the City of Huntington Beach, subleasing is prohibited and any attempted subleasing will be void.

10.2.     Subletting, except as permitted under Civil Code Section 798.23.5 and/or The City of Huntington Beach Municipal Ordinance 3277 is prohibited, and all other subletting will be void. "Subletting" means any renting, regardless of the time period or how it is characterized, of the mobilehome or Space. If you have lived in the Park for one or more years, you may sublease your mobile home and space for no less than six months and no more than twelve (12) months pursuant to the provisions of Civil Code Section 798.23.5. You must provide the Park with written notice of your intent to sublease your mobile home along with proof of the medical emergency or treatment requiring your absence from your mobile home. Your prospective sublesee shall be required to complete a residency application and be approved for residency by the Park. The Park may at its sole option elect to charge your prospective sublesee for any appropriate credit screening and personal reference checks the Park elects to make. The Park shall require your prospective sublesee to sign the Rules and Regulations. You shall continue to remain responsible for all rent and other charges pursuant to your Rental Agreement. The Park may, at its sole election, require that you pay an additional security deposit of not more than two (2) month's rent which shall be refunded at the end of the subleasing period. You must keep on file with the Park the current address and telephone number at which you may be contacted during the subleasing period.

10.3     This Agreement may be terminated, at our option, if you assign or sublet in violation of this Agreement. The Park or anyone it designates may rent, lease or sublet any Space or any mobilehome.

10.4     If you sublet in accordance with 798.23.5 and our Rules and Regulations and you or the sublessee fail, in advance of the sublessee taking possession of the mobilehome or Space, to comply with our requirements, execute the documents, or obtain the Park's approval of the sublessee, the sublessee will have no right to live in the Park and may not reside on any basis in the mobilehome or at the Space. Subletting means any renting, regardless of the time period or how it is characterized, of the mobilehome or Space.

Page 9

Is missing from the complaint filed by

HOUSER BROS Co dba Rancho Del Rey MHE

Unlawful Detainer against Lisa Ryan.

Page 10

Is missing from the complaint filed by

HOUSER BROS Co dba Rancho Del Rey MHE

Unlawful Detainer against Lisa Ryan.

in effect after your breach and abandonment and recover rent as it becomes due, if you have the right to sublet or assign, subject only to reasonable limitations).

     14.3    You agree that the amount of our damages against you per the terms of this paragraph 13 may, at our sole option, be determined by paragraph 6 of this Agreement and that the mediation portions of such provisions shall not be applicable.

**15.    INDEMNIFICATION:** To the fullest extent the law allows, we have no liability to you or anyone else for anything which is not caused by our active negligence or willful acts and you agree to completely release, discharge, indemnify, and hold us free and harmless from all claims for which we are not liable, including providing a defense and the payment of attorneys' fees and costs of an attorney we choose. You agree to indemnify and hold us harmless from all claims, including providing a defense and the payment of attorneys' fees, and costs of an attorney we choose, which occur because of the negligent or willful conduct of you or others who you invite to be in the Park. You also agree to indemnify and hold us harmless from all claims you may have of economic loss, diminution in market value, or depreciation of your mobilehome, and other improvements.

**16.    INCORPORATED DOCUMENTS:** You agree that you have received, read and understood a copy of: This Agreement; the Mobilehome Residency Law which is effective as of January 1st of the year in which you signed this Agreement or signed a document accepting an assignment of this Agreement (which you agree was attached to this Agreement at the time you received it); the Rules and Regulations (including signs posted in the common areas) which you agree are effective immediately; R.V. Storage Agreement; and other: _____.
You understand that by signing this Agreement, you are bound by all of the terms and conditions of these documents and signs as they may be revised per this Agreement.

**17.    COMPLIANCE WITH LAW AND RULES AND REGULATIONS:** You agree to comply with all applicable laws, ordinances, regulations and all terms of this Agreement, the Rules and Regulations, and all terms contained in any document referred to in this Agreement, as they may be changed.

**18.    ZONING, USE PERMIT AND OWNER INFORMATION:** The zoning under which the Park operates is MHP - Mobilehome Park. The permits under which the Park operates are not subject to expiration or renewal. The Park is not located on land which we lease from someone else, but we do have the option to enter into such a lease at any time in the future. If we exercise this option, we will notify you of the expiration date of the lease.

**19.    TRANSFER OF PARK'S INTEREST:** If we sell or transfer our interest in the Park to anyone else, we will be automatically relieved of our obligations under this Agreement which occur after the date of the sale/transfer.

**20.    NOTICES:** All notices required or allowed by this Agreement must be in writing. Except for notices terminating your tenancy, the service of any other notice on you will be valid if it is personally served on you or mailed to you at your address in the Park by First Class United States Mail, postage prepaid.

**21.    WAIVER:**

     21.1    If you fail to meet any of your obligations under this Agreement, a delay or omission by us in exercising any right or remedy we have because of your default will not impair any of our rights or remedies against you, nor will it be considered a waiver by us of any right or remedy. No waiver by us of our right to enforce any provision of this Agreement after any default on your part will be effective unless it is made in writing and signed by us, nor will it be considered a waiver of our rights to enforce each and every provision of this Agreement upon any further or other default on your part. Our acceptance of rent will also not be a waiver of any breach by you of any term or provision of this Agreement, including any rule, regulation or other term or provision contained in any document referred to in this Agreement.

     21.2    Any delay, omission, or mistake by us in exercising any right to make any of the increases allowed by paragraph 2 of this Agreement or other provisions of this Agreement will not impair any of our rights or be considered to be a waiver by us. Instead, we may, at any time, correct our delay, omission, or mistake and collect from you the full

© 2006 Alston & Giezer, LLP   All rights reserved.  Reproduction is illegal.  (May be reproduced by Park named above.)

increase retroactive to the date we could have first collected it from you. This will be true even though we may have accepted payment from you of a lesser amount. Examples include: We make an error and do not send a rent increase notice ninety (90) days in advance of your normal rent increase anniversary date. Although you will still be entitled to a 90-day notice, we may send that notice at a later date and retroactively collect the full amount of the increase to your normal rent increase anniversary date. Or, because of a miscalculation or clerical error, we did not charge you the full amount of an increase we are permitted to make. When we discover that error, we may send you a notice and retroactively collect from you the full amount of the increase.

22.    **ENTIRE AGREEMENT:** Please understand that our Park Manager, other personnel, mobilehome dealers, the selling homeowner or sales person who sold you your mobilehome and other persons are not authorized to make any representations or agreements with you about the Park unless those agreements and representations are contained in this Agreement and the other documents and posted signs referred to in it. Therefore, you agree that this Agreement and the other documents and posted signs referred to in it are the entire agreement between you and us regarding the subjects covered by this Agreement, other documents and signs. This Agreement completely supersedes and replaces any and all prior and contemporaneous agreements, representations and understandings of you, any other person, or us.

23.    **ATTORNEY'S FEES:** Attorney's fees and costs may be awarded to you or us per the provisions of the Mobilehome Residency Law, or other laws, including changes to these laws which may occur in the future. The same is true of any other litigation, disputes covered by the "RESOLUTION OF DISPUTES" provisions of this Agreement, between the two of us that is not covered by the Mobilehome Residency Law or other laws.

24.    **HEADINGS AND FORMATTING:** The titles of the paragraphs and subparagraphs in this Agreement or in other documents or posted signs are only for convenience and under no circumstances are they to be considered as any part of this Agreement. You agree that this Agreement is to be considered a typed, not printed document, so that any legal requirements regarding printed documents are not applicable.

25.    **PARTIAL INVALIDITY:** If any part of this Agreement or any document referred to in it is, in any way, invalid or unenforceable, the remainder of this Agreement or the other document shall not be affected, and will be valid and enforceable to the fullest extent permitted by law. The same is true if the application of any part of this Agreement, or any document referred to in this Agreement, is, in any way, invalid or unenforceable to any person or circumstance. The preceding shall not, however, at our sole option, be applicable if our ability to charge for or increase the amount of rent, utilities, or make other charges provided for by this Agreement is held in any way, in whole or in part, to be invalid or unenforceable. In such circumstances, we may, at our sole option, either keep this Agreement in full force and effect or terminate this Agreement or convert your tenancy under this Agreement to a 12-month or less tenancy.

26.    **ALTERATION OF THIS AGREEMENT:** This Agreement may be changed only as provided for by this Agreement or by a written agreement signed by you and us or by operation of law. This Agreement will be construed and interpreted as though both of us had written it together, not as if it had been written by us alone.

27.    **DEFINITIONS OF OWNER OF THE PARK, HOMEOWNERS, RESIDENTS, SALE OF MOBILE-HOME AND BUYER:** The terms "we," "us," and other similar terms used in this Agreement which refer to the owners and the operators of the Park include all owners of the Park and their partners, shareholders, directors, representatives, officers, employees and agents, and their successors and assigns. The term "Park" means the mobilehome park identified in this Agreement. The term "you," "Homeowners," "residents" or any other similar term used in this Agreement which refer to the person(s) who has signed this Agreement or signed another document accepting an assignment of this Agreement includes not only those persons but all members of their household who resided with them at the time this Agreement, or another document accepting an assignment of this Agreement, was signed who had been approved by us for residency in the Park or who were subsequently approved by us for residency in the Park. Note: To shorten this Agreement, the term "sale" is used to refer to any sale or other transfer of the mobilehome and/or any assignment or other transfer of the right to occupy the Space. The term "buyer" is used to refer to anyone buying or otherwise acquiring the mobilehome and/or acquiring the right to occupy the Space by an assignment or other method permitted by this Agreement. Other similar terms consistent with the preceding have also been used.

© 2006 Alston & Gieter, LLP   All rights reserved. Reproduction is illegal. (May be reproduced by Park named above.)

28.     **HOLDOVER TENANCY:** If you continue to live in the Park after the term of this Agreement has expired or it has been terminated (including any extension of the initial term we agree to), and you have not signed a new rental or lease agreement with us, you shall be on a month-to-month tenancy. During that month-to-month tenancy, you will pay all rent and other charges required by this Agreement and all the terms and provisions of this Agreement, including the "Resolution of Disputes" provisions will continue to apply to you. We may, however, increase the rent or charges you pay or change any other terms of this Agreement upon ninety (90) days' written notice to you.

29.     **COUNTERPARTS:** This Agreement may be signed in duplicate copies, each of which shall be considered an original, but all of which taken together will be one and the same document.

30.     **EXHIBITS:** Each exhibit or other document referred to in this Agreement is attached or enclosed and incorporated in this Agreement by this reference.

31.     **OWNER'S APPROVAL AND OPTIONS:** All references in this Agreement and documents it refers to that our approval is required or other similar terms indicating our approval must be obtained by you means you must obtain our prior written approval by submitting a written request to us which describes what you want to do. References in this Agreement that we may, at our option, adjust or increase rents up to or by a certain amount or do anything else at our option, means we have the right, if we wish, to do so.

32.     **STATUTE OF LIMITATION:** ANY LAWSUIT OR OTHER ACTION AGAINST US MUST BE FILED BY YOU WITH THE COURT NOT LATER THAN ONE (1) YEAR FROM THE DATE YOU OR ANY MEMBER OF YOUR HOUSEHOLD FIRST BECAME AWARE OF (OR REASONABLY SHOULD HAVE BEEN AWARE OF) THE DISPUTE OR CLAIM. IF YOU DO NOT FILE THE LAWSUIT OR OTHER ACTION AGAINST US WITH THE COURTS WITHIN THIS ONE (1) YEAR TIME PERIOD, YOU WILL HAVE NO RIGHT TO PROSECUTE OR PURSUE THE LAWSUIT OR OTHER ACTION AND YOU AGREE WE WILL NOT BE LIABLE TO YOU FOR ANY OF THE CLAIMS, DAMAGES, OR OTHER ALLEGATIONS AND RELIEF ASSERTED IN THE LAWSUIT OR OTHER ACTION. IF THE RESOLUTION OF DISPUTES PROVISIONS OF THIS AGREEMENT ARE APPLICABLE TO YOUR DISPUTE OR CLAIM, THEY, TOO, WILL BE SUBJECT TO THE LIMITATIONS OF THIS PARAGRAPH.

33.     **USE AND OCCUPANCY:** Unless otherwise specifically allowed by this Agreement or other documents it incorporates, at all times one of the persons listed on the last page of this Agreement, or on the document assigning this Agreement, must be the "registered" owner of the mobilehome, and that person must regularly occupy the mobilehome, and it must also be their primary residence. When title to the Mobilehome is held in a trust which has been established for the purpose of estate planning one of the person(s) who established the trust must reside in the home on full time basis. You agree that the information you have provided us regarding you, other members of your household and your mobilehome is true and correct. You also agree to promptly notify us, in writing, of any change in this information. Please refer to the Rules and Regulations for further clarification of your use and occupancy of the mobilehome and Space. We, or someone we designate, may conduct a mobilehome sales or rental business in the Park.

34.     **INSPECTION:** By signing this Agreement, or accepting an assignment of it, you agree you have carefully inspected the Space you are renting and all of our services, improvements and facilities and you have found them to be safe and as represented by us to you, either orally or in writing, and you accept them as they are. To the extent that you have found such services, improvements and facilities not to be safe or not to be as represented by us to you, either orally or in writing, you nonetheless agree to accept them as they are.

35.     **ENFORCEMENT OF CONDITIONS OF TENANCY:** You agree that the enforcement of this Agreement, the Rules and Regulations and the provisions of other documents and conditions of tenancy are a private matter between us and each resident on an individual basis and the enforcement or the lack thereof by us with regard to any resident shall not result in any damage or injury to, or claim by you. You also agree that you are not a third party beneficiary of any agreement between us and any other residents or person(s).

36.     **MAINTENANCE OF IMPROVEMENTS:** You are financially responsible to maintain, repair and replace as reasonably necessary your mobilehome and all equipment, structures and other improvements to your mobilehome

and Space in good and safe condition and repair and in an aesthetically pleasing condition at all times. This includes, without limitation, the following: the mobilehome, accessory equipment and structures, fences, driveways (except park installed driveways), trees (except trees which present a specific health and safety violation or hazard), banks, and landscaping. Regardless of whether you are the original homeowner/occupant of the Space or of your mobilehome or purchased your mobilehome from a former homeowner who previously lived at your Space, this paragraph applies to you and you are responsible even for those things which were installed by a former owner or resident of the mobilehome or Space, us, or any prior or future owner of the Park. You are financially responsible for insuring at all times that the mobilehome, Space, and their improvements complies with all local, state and federal laws and regulations. (The only exception is any of the Park's utility systems on your Space which are owned by us or a utility company so we or they are responsible for them and park installed driveways.) The preceding includes without limitation such things as: insuring that the drainage is sufficient to prevent water from accumulating on your Space or under your mobilehome or running off so it adversely affects other Spaces or our property; that all required setbacks and lot line requirements are met and there are no encroachments on other property; that all building code and other similar requirements are met; and that all building and other permits have been obtained.

37.    **CONDEMNATION:** If any portion of the Park is taken under the power of eminent domain, or is sold to any authority having the power of eminent domain, either under threat of condemnation or while condemnation proceedings are pending or the utility systems or other portions of the Park are or will be affected by the condemnation to the point where, in our sole opinion, it is not economically desirable to continue operations, we will have the right to terminate this Agreement as of the date the condemning authority takes possession. The entire amount of any award for taking of all or any part of a space or the Park or for any other reason under the power of eminent domain will be our property whether such award shall be made as compensation for diminution in value of the leasehold or for taking the fee or the taking of any interest you may have because of this Agreement or any other lease or rental agreement you have with us or your tenancy in the Park. Nothing contained in this paragraph, however, will preclude you from obtaining any award from the condemning authority to you for the loss of or damage to your mobilehome or other removable personal property.

38.    **TIME OF ESSENCE:** Time is of the essence in this Agreement and each and every provision thereof.

39.    **MODIFICATION FOR LENDER:** If, in connection with our obtaining financing where we use the Park as security, a lender requests reasonable changes in this Agreement as a condition to such financing, you agree to promptly consent to those changes if they do not increase your obligations under this Agreement or materially adversely affect you.

40.    **ESTOPPEL CERTIFICATE:** You shall, on our request, sign and deliver to us a written statement certifying that (a) this Agreement is unmodified and in full force and effect (or if there have been modifications that they are in full force and effect as modified; (b) the dates to which the rent and other charges have been paid; (c) the term of this Agreement; (d) the amount of any security deposit; (e) we are not in default nor have we been in the past under any provision of this Agreement or any laws or regulations affecting our obligations; and (f) any other matters as may be reasonably requested by us. Any such statement may be relied on by us or any person we give it to. You will be in default of this Agreement if you fail to do the above within 10 days of your receipt of a written request for such statement. We may, at our option, treat your failure to sign and deliver this document to us as your agreement to the information we've requested and that we are not in default nor have we been in the past under any provision of this Agreement or any laws, or regulations affecting our obligations to you.

41.    **LIMITATION OF OUR LIABILITY:** In consideration of this Agreement, you agree that, in the event of any actual or alleged failure, breach or default by us under this Agreement or otherwise, your sole and exclusive remedy shall be against the value of our mobilehome park which is identified in this Agreement as the Park (including any insurance policies of us or the Park), not other property or assets which we may own.

42.    **MEGAN'S LAW:** The California Department of Justice, sheriff's departments, other local law enforcement authorities maintain for public access a database of the locations of persons required to register as an identified sex offender. The database is updated on a quarterly basis and a source of information about the presence of these individuals is any neighborhood. The Department of Justice also maintains a Sex Offender Identification Line

© 2006 Alston & Glazer, LLP   All rights reserved.  Reproduction is illegal.  (May be reproduced by Park named above.)

through which inquires about individuals may be made. This is a "900" telephone service. Callers must have specific information about individuals they are checking. There is a charge for "900" calls information regarding neighborhoods is not available through the "900" telephone service.

**The phone numbers to call for information: (714) 960-8843**

Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.**Meganslaw.ca.gov** . Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides. *on 11-16-18*

*Executed, Huntington Bch, 1:25pm,*

43.    **EXECUTION:** The Agreement is signed by you at __1__ : __23__ o'clock __p__.m., on ____1-26__: 20__06__
This Agreement is signed by us on ____1-26__, 20 __06__

NOTE TO NEW RESIDENTS:  THIS AGREEMENT WILL NOT BE EFFECTIVE UNLESS YOU COMPLETE THE PURCHASE OF THE MOBILEHOME AND IF YOU DO NOT, YOU WILL HAVE NO RIGHTS OF TENANCY IN THE PARK.

PLEASE READ CAREFULLY BEFORE SIGNING THIS AGREEMENT AND ALL OF THE OTHER DOCUMENTS REFERRED TO IN THIS AGREEMENT.

I/WE AGREE THAT WE HAVE READ, UNDERSTOOD AND VOLUNTARILY AGREED TO ALL OF THE PROVISIONS OF THIS AGREEMENT WHICH CONSIST OF THIS MOBILEHOME RENTAL AGREE-MENT AND THE OTHER DOCUMENTS REFERRED TO IN IT.

I/WE HAVE BEEN ADVISED BY REPRESENTATIVES OF THE PARK THAT I/WE HAVE THE RIGHT TO CONSULT A LAWYER AND GET THE LAWYER'S ADVICE BEFORE SIGNING THIS AGREEMENT.

[ ]    RESIDENT(S)' INITIALS: _____    I/WE HAVE TAKEN THIS AGREEMENT TO A LAWYER BEFORE SIGNING IT. THE LAWYER IS:

Name: _____

Address: _____

Telephone: _____

[ ]    RESIDENT(S)' INITIALS: _____    I/WE HAVE DECLINED TO SEEK LEGAL COUNSEL BEFORE SIGNING THIS AGREEMENT.

NOTICE:  BY SIGNING THIS AGREEMENT, YOU ARE AGREEING THAT THOSE DISPUTES WHICH ARE SPECIFIED IN PARAGRAPH 6 OF THIS AGREEMENT, WHICH IS ENTITLED "RESOLUTION OF DISPUTES" WILL BE DECIDED BY A NEUTRAL REFEREE AND YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL. SEE PARAGRAPH 6 OF THIS AGREEMENT.

HOMEOWNER(s) SIGNATURE(s)                RANCHO DEL REY MOBILE HOME ESTATES

By: _____

C:\991510\003\RENTAGR\Rental Agreement revised for 2006.doc    Rancho Del Rey    Page 15
© 2006 Alston & Gieser, LLP  All rights reserved. Reproduction is illegal. (May be reproduced by Park named above.)

11/16/2018

11/18/18 Person(s) in addition to the above who
will reside in the above Space for whom
applications for residency were submitted
and approved,

I. Sandcastle Co. LLC

Jennie L. Gallian

© 2006 Alston & Gieser, LLP    All rights reserved.  Reproduction is illegal.  (May be reproduced by Park named above.)

# HUNTINGTON BEACH CITY ORDINANCE

## 17.38.020 Temporary Rental of Mobile Home

**D.**      Hereafter, "renter" refers to the person or persons who pay rent to the mobile home owner in exchange for the temporary right to reside within the subject mobile home (and the related right to occupy the space upon which the mobile home is located), but not as a co-occupant with the owner. Any renter of a mobile home must meet all the rules of occupancy of the mobile home park in which the mobile home is located with the exception of any rule which directly or indirectly prohibits, in conflict with this section, the temporary rental of a mobile home for up to one year

Prior to the mobile home renter's taking occupancy, that renter and the mobile home owner shall provide the park owner with:

1.      A copy of the mobile home rental agreement;
2.      The true names of all intended occupants and their residential phone number;
3.      Business phone numbers for all adult occupants who have such numbers; and
4.      An agreement signed by all adult occupants, which reads as follows:

**E.**      Such temporary rentals authorized by this chapter may not exceed 12 months in any two-year period subject to renewal because of continued hardship. **(3277-5/95)**

I have received copies of the lease between the park owner and the homeowner for Space # **376** and current park rules.
I have read those documents with care. I believe I understand them. I believe that I qualify for occupancy under those rules and the master lease (except for provisions prohibiting subleasing). I agree to abide by those Park Rules and to meet all obligations of that master lease which are relevant to an occupant. I understand that the park owner may directly enforce the within agreement against me without giving up any rights against the mobile home owner.

Sincerely,

*Jami L Gallien* 11/16/18

Jamie L Gallian

5002

BK 13680 PG 1091

RECORDED BY

WHEN RECORDED RETURN TO:

KESERVE, MUMPER & HUGHES
5190 Campus Drive
Newport Beach, CA  92660

Attn:  Frank D. Stiefel

$6.00
C1

RECORDED IN OFFICIAL RECORDS
OF ORANGE COUNTY, CALIFORNIA

•3 00 P.M.    AUG 5 '80

LEE A. BRANCH, County Recorder

---

**FIRST AMENDMENT TO
DECLARATION OF COVENANTS, CONDITIONS & RESTRICTIONS
FOR THE HUNTINGTON BEACH GABLES**

Tract 10542
City of Huntington Beach
Orange County, California

This First Amendment to Declaration of Covenants, Conditions and Restrictions is made this 30 day of JULY, 1980, by THE ROBERT P. WARMINGTON CO., a California corporation ("RPW Co."), HOUSER BROS. CO., a California limited partnership ("Houser") and ROBERT P. WARMINGTON, an individual ("Warmington").

WHEREAS, Houser is the owner of the fee interest in the following described property (the "Property"):

Lots 1 and 2 of Tract No. 10542 as per map recorded in Book 456, Pages 49 and 50, inclusive, of Miscellaneous Maps, in the Office of the County Recorder of Orange County, California; and

WHEREAS, Warmington is the lessee of the Property; and

WHEREAS, RPW Co. is the sublessee and the developer of the improvements constructed on the Property, and is also the Declarant as that term is defined in that certain Declaration of Covenants, Conditions and Restrictions recorded May 28, 1980, in Book 13618, pages 982 through 1030, inclusive, Official Records of Orange County, California (the "Declaration"); and

WHEREAS, Warmington and RPW Co. intend to assign, convey and set over to ultimate consumers, various leasehold and fee interests in the Condominium Units, as defined in the Declaration, which collectively shall constitute the Condominium to be acquired by said consumer; and

WHEREAS, Warmington, Houser and RPW Co. desire to clarify the Declaration to insure that the interests so conveyed are inseparable and constitute the entire interest to be conveyed, which clarification requires an amendment to the Declaration.

1

BK 13890PG 1092

NOW THEREFORE, Warmington, Houser and RPW Co., do hereby declare as follows:

1.  That collectively they are the sole owners of the Property as their interests may appear.

2.  That they retain the exclusive and sole right to amend the Declaration.

3.  That, in furtherance of the foregoing, the following amendments are hereby made to the Declaration:

    (a)  Section 1.13 of the Declaration is hereby amended to read as follows:

"Section 1.13.  Owner/Ownership:  "Owner" shall mean and refer to the record assignee of the rights of Declarant and/or a lessee or sublessee to a Unit, but excluding those having such interest merely as security for the performance of an obligation.  Such term shall also mean and refer to the Lessee or Lessor if either succeeds to the rights of said assignee through termination of any lease or sublease or by any other means.  All references herein to "ownership" shall mean and refer to the ownership of a leasehold or subleasehold interest."

    (b)  Section 2.2 of the Declaration is hereby amended to read as follows:

"Section 2.2.  Elements of Condominium:  Each Condominium shall be comprised of the following elements:

    (a)  A leasehold or sub-leasehold estate in a Unit as shown and defined on the Condominium Plan, excepting that portion of a Unit consisting of buildings and other improvements;

    (b)  An undivided one-eightieth (1/80) interest in a leasehold or subleasehold interest in the Common Area as shown and defined on the Condominium Plan, excepting that portion of the Common Area consisting of building and other improvements;

    (c)  An exclusive easement on the leasehold or sub-leasehold estate referred to in item (b) above, which easement is defined as Restricted Common Area as described on the Condominium Plan for entry, staircases and attic space relating to each Unit, excepting that portion consisting of buildings and other improvements;

2

BK 13690PG 1093

(d) A non-exclusive easement and right to use the leasehold or sub-leasehold estate referred to in item (b) above except the Restricted Common Area, excepting that portion consisting of buildings and other improvements;

(e) A fee interest in that portion of a Unit, as shown and defined on the Condominium Plan, which consists of buildings and other improvements;

(f) An undivided one eightieth (1/80) fee interest in and to those portions of the Common Area, as shown and defined on the Condominium Plan which consist of buildings and other improvements;

(g) An exclusive easement on the fee estate referred to in item (f) above which easement is defined as Restricted Common Area as described on the Condominium Plan for entry, staircases and attic space relating to each Unit which consist of buildings and other improvements;

(h) A non-exclusive easement and right to use the fee estate referred to in item (f) above except the Restricted Common Area, which consist of buildings and improvements; and

(i) A membership in the Association."

4.    All other terms and conditions of the Declaration shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment as of the day first above written, its effective date.

THE ROBERT P. WARMINGTON CO., a California corporation

By _____

HOUSER BROS., CO., a California Limited Partnership

By _____

By _____

_____
Robert P. Warmington

3

BK 1369PG 1094

TO 1946 CA (8-76)

(Corporation)

STATE OF CALIFORNIA
COUNTY OF _Orange_ } ss.

On _July 31, 1980_ before me, the undersigned, a Notary Public in and for said State, personally appeared _Roger D. Daniel_ known to me to be the ____ President, and ____ known to me to be the ____ Secretary of the corporation that executed the within instrument, known to me to be the persons who executed the within instrument on behalf of the corporation therein named, and acknowledged to me that such corporation executed the within instrument pursuant to its by-laws or a resolution of its board of directors.

WITNESS my hand and official seal.

Signature _Pearl L. Hunt_

OFFICIAL SEAL
PEARL L. HUNT
NOTARY PUBLIC - CALIFORNIA
ORANGE COUNTY
My Commission Expires Mar 23, 1983

(This area for official notarial seal)

---

TO 1946 CA (8-76)

(Partnership)

STATE OF CALIFORNIA
COUNTY OF _ORANGE_ } ss.

On _AUGUST 4, 1980_ before me, the undersigned, a Notary Public in and for said State, personally appeared _CLIFFORD C. HOUSER AND VERNON F. HOUSER_ known to me to be _BOTH_ of the partners of the partnership that executed the within instrument, and acknowledged to me that such partnership executed the same.

WITNESS my hand and official seal.

Signature _G. McDonald_

OFFICIAL SEAL
G. McDONALD
NOTARY PUBLIC CALIFORNIA
PRINCIPAL OFFICE IN
ORANGE COUNTY
My Commission Expires June 15, 1984

(This area for official notarial seal)

---

TO 1946 CA (8-76)

(Individual)

STATE OF CALIFORNIA
COUNTY OF _Orange_ } ss.

On _July 31, 1980_ before me, the undersigned, a Notary Public in and for said State, personally appeared _Robert P. Warrington_ known to me to be the person ____ whose name ____ is ____ subscribed to the within instrument and acknowledged that ____ he ____ executed the same.

WITNESS my hand and official seal.

Signature _Pearl L. Hunt_

OFFICIAL SEAL
PEARL L. HUNT
NOTARY PUBLIC - CALIFORNIA
ORANGE COUNTY
My Commission Expires Mar 23, 1983

(This area for official notarial seal)

AMENDED

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
5801 Skylab Road Huntington Beach, CA 92647

A true and correct copy of the foregoing document entitled: **DEBTORS OPPOSITION MOTION TO CONTINUE PRETRIAL CONFERENCE OR IN THE ALTERNATIVE SET PRETIAL ON JULY 14, 2022** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 7, 2022**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **TRUSTEE JEFFREY I GOLDEN (TR):** Jeffrey I Golden (TR) lwerner@wgllp.com, jig@trustesolutions.net; kadele@wgllp.com
- **ATTORNEY FOR PLAINTIFF HOUSER BROS. CO.:** D Edward Hays ehays@marshackhays.com, ehays@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com; cmendoza@marshackhays.com; cmendoza@ecf.courtdrive.com
- **ATTORNEY FOR PLAINTIFF HOUSER BROS. CO.:** Laila Masud lmasud@marshackhays.com, lmasud@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com
- **U.S. TRUSTEE:** United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**: On , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on        I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

PURSUANT TO THE COURTROOM POLICIES AND PROCEDURES OF THE HONORABLE ERITHE A. SMITH, COURTROOM 5A, §VIII. JUDGES' OR COURTESY COPIES, EXCEPT FOR DOCUMENTS 200 PAGES OR OVER, INCLUDING EXHIBITS, JUDGE SMITH **DOES NOT** REQUIRE JUDGES' COPIES.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 7, 2022 | ROBERT MCLELLAND | *Robert McLelland* |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                                   **F 9013-3.1.PROOF.SERVICE**