D. EDWARD HAYS, #162507
ehays@marshackhays.com
LAILA MASUD, #311731
lmasud@marshackhays.com
BRADFORD N. BARNHARDT, #328705
bbarnhardt@marshackhays.com
MARSHACK HAYS LLP
870 Roosevelt
Irvine, CA 92620
Telephone: (949) 333-7777
Facsimile: (949) 333-7778

Attorneys for Plaintiff,
HOUSER BROS. CO. dba RANCHO DEL
REY MOBILE HOME ESTATES

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>JAMIE LYNN GALLIAN,<br><br>Debtor. | Case No. 8:21-bk-11710-SC<br><br>Chapter 7<br><br>Adv. No. 8:21-ap-01097-SC |
| HOUSER BROS. CO. dba RANCHO DEL REY MOBILE HOME ESTATES,<br><br>Plaintiff,<br><br>v.<br><br>JAMIE LYNN GALLIAN,<br><br>Defendant. | NOTICE AND COMPENDIUM OF UNPUBLISHED AUTHORITY FILED IN SUPPORT OF:<br><br>PLAINTIFF'S TRIAL BRIEF<br><br>Date:   February 23, 2023<br>Time:   9:30 a.m.<br>Ctrm:  5C<br>Location: 411 W. Fourth Street, Santa Ana, CA 92701 |

TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE,

DEFENDANT JAMIE LYNN GALLIAN, AND ALL INTERESTED PARTIES:

Plaintiff, HOUSER BROS. CO., a California limited partnership dba RANCHO DEL REY

MOBILE HOME ESTATES ("Houser Bros." or "Plaintiff"), in accordance with Local Bankruptcy

Rule 9013-2(b)(4), attaches a copy of the following unpublished decisions cited in Trial Brief

("Brief"), filed on February 9, 2023, as Dk. No. 55.  The unpublished cases were retrieved from

Lexis.

1

1

**Unpublished Cases**

2

1. *Faith v. Miller (In re Miller)*, 2015 Bankr.LEXIS 1929 (Bankr. C.D. Cal. June 12, 2015)

3

2. *Hunter v. Martin (In re Martin)*, 2019 Bankr.LEXIS 2073 (Bankr. C.D. Cal. July 10, 2019)

4

3. *In re Baljian*, 2014 WL 1287127 (Bankr. S.D. Cal. Mar. 26, 2014)

5

4. *In re Biswas*, 2009 WL 7809011 (B.A.P. 9th Cir. Sept. 2, 2009)

6

5. *JP Morgan Chase Bank, N.A. v. Ellison (In re Ellison)*, 2016 Bankr.LEXIS 3475 (Bankr.

7

C.D. Cal. Sept. 23, 2016)

8

6. *Ravasia v. U.S. Tr. (In re Ravasia)*, 2021 Bankr.LEXIS 1033 (B.A.P. 9th Cir. Apr. 16, 2021

9

7. *Schoenmann v. Chen (In re Chen)*, 2009 Bankr.LEXIS 3636, (Bankr. N.D. Cal. Nov. 9,

10

2009)

11

8. *Zeeb v. Farah (In re Zeeb)* 2019 Bankr.LEXIS 2477 (B.A.P. 9th Cir. Aug. 9, 2019)

12

DATED: February 9, 2023                     MARSHACK HAYS LLP

13

14

                                            /s/ D. Edward Hays
                                    By:_____
15

                                        D. EDWARD HAYS
                                        LAILA MASUD
16

                                        BRADFORD N. BARNHARDT
                                        Attorneys for Plaintiff,
17

                                        HOUSER BROS. CO. dba RANCHO DEL
                                        REY MOBILE HOME ESTATES
18

19

20

21

22

23

24

25

26

27

28

2

4886-1591-1427,v.1

**EXHIBIT 1**



**User Name:** Layla Buchanan

**Date and Time:** Thursday, February 9, 2023 6:45:00PM PST

**Job Number:** 190002613

## Document (1)

1. *Faith v. Miller (In re Miller), 2015 Bankr. LEXIS 1929*

   **Client/Matter:** 1673-001

   **Search Terms:** 2015 Bankr.LEXIS 1929

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | Cases | -None- |

LexisNexis| About LexisNexis | Privacy Policy | Terms & Conditions | Copyright © 2023 LexisNexis

**A** Neutral
As of: February 10, 2023 2:45 AM Z

## *Faith v. Miller (In re Miller)*

United States Bankruptcy Court for the Central District of California, Northern Division

June 12, 2015, Decided; June 12, 2015, Filed & Entered

Case. No. 9:13-bk-10313-PC, Adversary No. 9:13-ap-01133-PC, Chapter 7

**Reporter**
2015 Bankr. LEXIS 1929 *

In re: LOREN MILLER AND SARAH MILLER, Debtors.JEREMY W. FAITH, CHAPTER 7 TRUSTEE, Plaintiff, v. LOREN MILLER AND SARAH MILLER, Defendants.

**Notice:** NOT FOR PUBLICATION

**Subsequent History:** Related proceeding at *In re Miller, 2016 U.S. Dist. LEXIS 53084 (C.D. Cal., Apr. 20, 2016)*

Decision reached on appeal by *Miller v. Faith (In re Miller), 2017 U.S. App. LEXIS 15889 (9th Cir., Aug. 21, 2017)*

Decision reached on appeal by *Miller v. Geller (In re Miller), 2017 U.S. App. LEXIS 15888 (9th Cir. Cal., Aug. 21, 2017)*

Decision reached on appeal by *Miller v. Faith (In re Miller), 2017 U.S. App. LEXIS 15883 (9th Cir. Cal., Aug. 21, 2017)*

## Core Terms

turnover order, genuine, concealed, summary judgment, hinder, summary judgment motion, material fact, defraud, badges, funds, transferred

## Case Summary

### Overview

HOLDINGS: [1]-Debtor's discharge was denied under *11 U.S.C.S. § 727(a)(2)(A)* and *(B)*, as he transferred or concealed property within one year prior to and one year after the petition date; he failed to disclose assets and transactions; he concealed corporate accounts and disposed of funds in those accounts for personal use; and he acted with the subjective intent to hinder or

delay, if not defraud, trustee and creditors; [2]-Discharge was denied under *§ 727(a)(4)(A)*, as debtor's false statements and omissions were so intertwined with his business and financial affairs and trustee's ongoing efforts to investigate and recover property of the estate that the court inferred that his failure to make full and accurate disclosure was intentional and for the purposes of deceiving creditors and the trustee; [3]-Discharge was denied under *§ 727(a)(6)(A)*, as debtor disobeyed a turnover order.

### Outcome

The court granted the Chapter 7 trustee's motion for summary judgment and denied debtor husband's discharge.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal Entitlement

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

*HN1*[ ] **Entitlement as Matter of Law, Genuine Disputes**

*Fed. R. Civ. P. 56(a)* authorizes a party to move for summary judgment, identifying each claim or defense -- or the part of each claim or defense -- on which summary judgment is sought. Summary judgment must be granted if the movant shows that there is no genuine

Layla Buchanan

2015 Bankr. LEXIS 1929, *1929

dispute as to any material fact and the movant is entitled to judgment as a matter of law.

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

## *HN2*[ ] Entitlement as Matter of Law, Appropriateness

In determining whether a genuine factual issue exists, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability. The judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. However, the court's function on a motion for summary judgment is issue-finding, not issue-resolution.

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Need for Trial

## *HN3*[ ] Entitlement as Matter of Law, Appropriateness

*Fed. R. Civ. P. 56* does not permit trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are fact finder functions.

> Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

> Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

## *HN4*[ ] Summary Judgment, Supporting Materials

*Fed. R. Civ. P. 56(c)* identifies the procedures the court and parties must follow in conjunction with motions for summary judgment.

> Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

> Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

## *HN5*[ ] Summary Judgment, Supporting Materials

See *Fed. R. Civ. P 56(c)*.

> Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

> Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

## *HN6*[ ] Summary Judgment, Opposing Materials

A court may grant summary judgment if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by *Fed. R. Civ. P. 56(c)*. *Rule 56(e)(3)*.

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

## *HN7*[ ] Entitlement as Matter of Law, Genuine Disputes

A court may, after notice and a reasonable opportunity to respond, grant summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute. *Fed. R. Civ. P. 56(f)(3)*

2015 Bankr. LEXIS 1929, *1929

Bankruptcy Law > ... > Liquidations > Denial of Discharge > General Overview

**HN8**[⤓] **Liquidations, Denial of Discharge**

Objections to discharge are to be literally and strictly construed against the objector and liberally construed in favor of the debtor. Courts should deny discharge only for very specific and serious infractions.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

Evidence > Burdens of Proof > Preponderance of Evidence

**HN9**[⤓] **Denial of Discharge, Concealment & Fraudulent Transfers**

To deny discharge under *11 U.S.C.S. § 727(a)(2)(A)*, a plaintiff must establish by a preponderance of the evidence (1) a disposition of property (i.e., transfer or concealment); (2) with subjective intent to hinder, delay or defraud a creditor; and (3) it must occur within one year prior to filing bankruptcy. Because the statute is written in the disjunctive, an intent to hinder or delay is sufficient to deny discharge under *§ 727(a)(2)*. Proof of fraud is not necessary nor is injury to creditors relevant for purposes of *§ 727(a)(2)*.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

**HN10**[⤓] **Denial of Discharge, Concealment & Fraudulent Transfers**

The standard for denial of discharge under *11 U.S.C.S. § 727(a)(2)(B)* is the same as *§ 727(a)(2)(A)*, but the disposition must be of estate property occurring after the petition date.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

Evidence > Types of Evidence > Circumstantial Evidence

Evidence > Inferences & Presumptions > Inferences

**HN11**[⤓] **Denial of Discharge, Concealment & Fraudulent Transfers**

For purposes of a denial of discharge under *11 U.S.C.S. § 727(a)(2)*, intent may be established by circumstantial evidence, or by inferences drawn from a course of conduct.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

Evidence > Types of Evidence > Circumstantial Evidence

Evidence > Inferences & Presumptions > Inferences

**HN12**[⤓] **Denial of Discharge, Concealment & Fraudulent Transfers**

Whether a debtor harbors intent to hinder, or delay, or defraud a creditor for purposes of denial of discharge under *11 U.S.C.S. § 727(a)(2)* is a question of fact reviewed for clear error. Intent may be inferred from surrounding circumstances. The surrounding circumstances include the various "badges of fraud" that constitute circumstantial evidence of intent. Certain badges of fraud strongly suggest that a transaction's purpose is to defraud creditors unless some other convincing explanation appears. These factors, not all of which need be present, include (1) a close relationship between the transferor and the transferee; (2) that the transfer was in anticipation of a pending suit; (3) that the transferor debtor was insolvent or in poor financial condition at the time; (4) that all or substantially all of the debtor's property was transferred; (5) that the transfer so completely depleted the debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and (6) that the debtor received inadequate consideration for the transfer.

Civil Procedure > Judgments > Enforcement & Execution > Fraudulent Transfers

**HN13**[⤓] **Enforcement & Execution, Fraudulent Transfers**

A non-exclusive list of "badges of fraud" has been codified by California's Uniform Fraudulent Transfer Act

Layla Buchanan

EXHIBIT 1, PAGE 6

2015 Bankr. LEXIS 1929, *1929

(UFTA). The UFTA factors are intended to provide guidance to a trial court, not compel a finding one way or another. They include: (1) whether the transfer or obligation was to an insider; (2) whether the debtor retained possession or control of the property transferred after the transfer; (3) whether the transfer or obligation was disclosed or concealed; (4) whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) whether the transfer was of substantially all the debtor's assets; (6) whether the debtor absconded; (7) whether the debtor removed or concealed assets; (8) whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) whether the transfer occurred shortly before or shortly after a substantial debt was incurred; (11) whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor. *Cal. Civ. Code § 3439.04(b)*.

Civil Procedure > Judgments > Enforcement & Execution > Fraudulent Transfers

*HN14*[ ]  **Enforcement & Execution, Fraudulent Transfers**

The California Uniform Fraudulent Transfer Act (UFTA) list of "badges of fraud" in *Cal. Civ. Code § 3439.04(b)* provides neither a counting rule, nor a mathematical formula. No minimum number of factors tips the scales toward actual intent. A trier of fact is entitled to find actual intent based on the evidence in the case, even if no badges of fraud are present. Conversely, specific evidence may negate an inference of fraud notwithstanding the presence of a number of badges of fraud.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

Evidence > Types of Evidence > Circumstantial Evidence

Evidence > Inferences & Presumptions > Inferences

*HN15*[ ]  **Denial of Discharge, False Accounts &**

**Oaths**

Under *11 U.S.C.S. § 727(a)(4)(A)*, a debtor's discharge will be denied if it is proven that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. The debtor's knowledge and fraudulent intent may be shown by circumstantial evidence and inferred from the debtor's course of conduct.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > General Overview

*HN16*[ ]  **Liquidations, Denial of Discharge**

*11 U.S.C.S. § 727(a)(6)* states that a court shall grant a debtor a discharge, unless the debtor has refused to obey and lawful order of the court, other than an order to respond to a material question or to testify. *§ 727(a)(6)(A)*.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > General Overview

*HN17*[ ]  **Liquidations, Denial of Discharge**

The term used in *11 U.S.C.S. § 727(a)(6)(A)* is "refused," not "failed."

Bankruptcy Law > ... > Liquidations > Denial of Discharge > General Overview

*HN18*[ ]  **Liquidations, Denial of Discharge**

A party objecting to discharge under *11 U.S.C.S. § 727(a)(6)(A)* satisfies its burden by demonstrating that a debtor received the order in question and failed to comply with its terms. Such a showing then imposes upon the debtor an obligation to explain his non-compliance.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > General Overview

*HN19*[ ]  **Liquidations, Denial of Discharge**

EXHIBIT 1, PAGE 7

2015 Bankr. LEXIS 1929, *1929

It is totally within the discretion of a bankruptcy court to find a particular violation of the court's order so serious as to require denial of discharge under *11 U.S.C.S. § 727(a)(6)(A)*.

**Counsel:** [*1] For OneWest Bank, FSB, Creditor (9:13bk10313): Mark D Estle, The Estle Law Firm, San Diego CA.

For Loren Miller, Debtor (9:13bk10313): Vaughn C Taus, San Luis Obispo CA; Meghann A Triplett, Margulies Faith LLP, Encino CA.

For Sarah Miller, Joint Debtor (9:13bk10313): Reed H Olmstead, Hurlbett & Olmstead, Santa Barbara CA; Vaughn C Taus, San Luis Obispo CA; Meghann A Triplett, Margulies Faith LLP, Encino CA.

For Courtesy NEF, Interested Party (9:13bk10313): Meghann A Triplett, Margulies Faith LLP, Encino CA; Gilbert B Weisman, ll, Becket & Lee LLP, Malvern PA.

For Andrew and Eileen Geller, Interested Party (9:13bk10313): Howard Camhi, Beverly Hills CA.

For Jeremy W. Faith (TR), Trustee (9:13bk10313): Craig G Margulies, Meghann A Triplett, Margulies Faith LLP, Encino CA.

For Jeremy W. Faith, Chapter 7 Trustee, Plaintiff (9:13-ap-01133-PC): Noreen A Madoyan, Encino, CA; Craig G Margulies, LEAD ATTORNEY, Meghann A Triplett, Margulies Faith LLP, Encino CA.

Loren Miller, Defendant (9:13-ap-01133-PC), Pro se, Seabrook, TX.

For Jeremy W. Faith (TR) on (9:13-ap-01133-PC): Meghann A Triplett, Margulies Faith LLP, Encino CA.

**Judges:** Peter H. Caroll, United States Bankruptcy Judge.

**Opinion by:** Peter H. Caroll

# Opinion

**MEMORANDUM [*2]  REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT LOREN MILLER UNDER *11 U.S.C. § 727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)*, AND *(a)(6)(A)***

At the above captioned date and time, the court considered the Plaintiff's Motion for Summary Judgment Against Defendant Loren Miller Under *11 U.S.C. §* *727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)*, and *(a)(6)(A)* ("Motion"). Appearances were stated on the record. Having considered Plaintiff's Motion, the response of Defendant, Loren Miller ("Miller") in opposition thereto, the summary judgment evidence and argument of counsel, the court will grant Plaintiff's Motion and deny Miller's discharge pursuant to *11 U.S.C. § 727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)*, and *(a)(6)(A)* based on the following findings pursuant to *F.R.Civ.P. 56*,[1] as incorporated into *FRBP 7056* and applied to contested matters by *FRBP 9014(c)*.

A. Standard for Summary Judgment.

1. **HN1**[⬆] *Rule 56(a)* authorizes [*3] a party to "move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought." *F.R.Civ.P. 56(a)*. Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id.

2. **HN2**[⬆] In determining whether a genuine factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability . . . ." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial . . . . If the evidence is merely colorable, or is not significantly probative, . . . summary judgment may be granted. *Id. at 249-250*. However, the court's function on a motion for summary judgment is "issue-finding, not issue-resolution." *United States v. One Tintoretto Painting Entitled "The Holy Catholic Family With Saint Catherine and Honored Donor", 691 F.2d 603, 606 (2d Cir. 1982)*.

3. **HN3**[⬆] *Rule 56* does not permit "trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts

---

[1] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, *11 U.S.C. §§ 101-1330* after its amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, **Pub. L. 109-8, 119 Stat. 23 (2005)**. "Rule" references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable certain Federal Rules of Civil Procedure ("F.R.Civ.P."). "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR").

Layla Buchanan

EXHIBIT 1, PAGE 8

2015 Bankr. LEXIS 1929, *3

are [fact finder] functions . . . ." *Anderson, 477 U.S. at 255.*

4. *HN4*[⬆] *Rule 56(c)*, which identifies the procedures the court and parties must follow **[*4]** in conjunction with motions for summary judgment, states:

*HN5*[⬆] (1) **Supporting Factual Positions**. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
    (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
    (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) **Objection That a Fact Is Not Supported by Admissible Evidence**. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) **Materials Not Cited**. The court need consider only the cited materials, but it may consider other materials in the record.

(4) **Affidavits or Declarations**. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant **[*5]** is competent to testify on the matters stated.

*F.R.Civ.P. 56(c)*. *HN6*[⬆] The court may grant summary judgment "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by *Rule 56(c)*." See *F.R.Civ.P. 56(e)(3)*.

5. *HN7*[⬆] The court may, after notice and a reasonable opportunity to respond, grant summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute. *F.R.Civ.P. 56(f)(3)*.

B. Undisputed Facts.

The court adopts and incorporates herein by reference

Uncontroverted Fact Nos. 1 through 95 set forth in Plaintiff's Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment Against Defendant Loren Miller Denying Debtor's Discharge Under *11 U.S.C. § 727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)*, and *(a)(6)(A)* filed on March 11, 2015,[2] as though fully set forth herein.

C. Conclusions of Law:

1. This court has jurisdiction over this adversary proceeding pursuant to *28 U.S.C. §§ 157(b)* and *1334(b)*. This matter is a core proceeding under *28 U.S.C. § 157(b)(2)(A)*, *(J)* and *(O)*. Venue is appropriate in this court. *28 U.S.C. § 1409(a)*.

2. *HN8*[⬆] Objections to discharge **[*6]** are to be literally and strictly construed against the objector and liberally construed in favor of the debtor. *Lansdowne v. Cox (In re Cox), 41 F.3d 1294, 1297 (9th Cir. 1986)*. "Courts should deny discharge only for very specific and serious infractions." *Martin Marietta Materials Southwest, Inc. v. Lee (In re Lee), 309 B.R. 468, 476 (Bankr. W.D. Tex. 2004)*.

3. *HN9*[⬆] To deny discharge under *§ 727(a)(2)(A)*, the plaintiff must establish by a preponderance of the evidence (1) a disposition of property (*i.e.*, transfer or concealment); (2) with subjective intent to hinder, delay or defraud a creditor; and (3) it must occur within one year prior to filing bankruptcy. See *Fogal Legware of Switzerland, Inc. v. Wills (In re Wills), 243 B.R. 58, 65 (9th Cir. BAP 1999)*. Because the statute is written in the disjunctive, an intent to hinder or delay is sufficient to deny discharge under *§ 727(a)(2)*. See *Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279, 1281 (9th Cir. 1996)*. Proof of fraud is not necessary nor is injury to creditors relevant for purposes of *§ 727(a)(2)*. See *Id. at 1281-82*.


Miller's Discharge Will Be Denied Pursuant to *11 U.S.C. §§ 727(a)(2)(A)* & *(B)*

4. *HN10*[⬆] The standard for denial of discharge under *§ 727(a)(2)(B)* is the same as *§ 727(a)(2)(A)*, but the disposition must be of estate property occurring after the

---

[2] Notice of Lodgment of Order or Judgment in Adversary Proceeding Re: Motion for Summary Judgment Against Defendant Loren Miller Denying Debtor's Discharge Under *11 U.S.C. § 727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)*, and *(a)(6)(A)* [Dkt. # 48], Exhibit A.

2015 Bankr. LEXIS 1929, *6

5. *HN11*[⬆] Intent "may be established by circumstantial evidence, or by inferences drawn from a course of conduct." *First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir. 1986)* (citation omitted).

6. "*HN12*[⬆] Whether a debtor harbors intent to hinder, or delay, or defraud a creditor is a question of fact reviewed for clear error. Intent may be inferred from surrounding **[*7]** circumstances. The surrounding circumstances include the various 'badges of fraud' that constitute circumstantial evidence of intent." *Wolkowitz v. Beverly (In re Beverly), 374 B.R. 221, 243 (9th Cir. BAP 2007)* (citations omitted).

7. "Certain 'badges of fraud' strongly suggest that a transaction's purpose is to defraud creditors unless some other convincing explanation appears. These factors, not all of which need be present, include 1) a close relationship between the transferor and the transferee; 2) that the transfer was in anticipation of a pending suit; 3) that the transferor Debtor was insolvent or in poor financial condition at the time; 4) that all or substantially all of the Debtor's property was transferred; 5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and 6) that the Debtor received inadequate consideration for the transfer." *Emmett Valley Assocs v. Woodfield (In re Woodfield), 978 F.2d 516, 518 (9th Cir. 1992).*

8. *HN13*[⬆] A non-exclusive list of "badges of fraud" has been codified by California's Uniform Fraudulent Transfer Act ("UFTA").[3] The UFTA factors are intended

_____

[3] (1) Whether the transfer or obligation was to an insider; (2) whether the debtor retained **[*8]** possession or control of the property transferred after the transfer; (3) whether the transfer or obligation was disclosed or concealed; (4) whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) whether the transfer was of substantially all the debtor's assets; (6) whether the debtor absconded; (7) whether the debtor removed or concealed assets; (8) whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) whether the transfer occurred shortly before or shortly after a substantial debt was incurred; (11) whether the debtor transferred the essential assets of the business to a

"to provide guidance to the trial court, not compel a finding one way or another." *Filip v. Bucurenciu, 129 Cal.App.4th 825, 834, 28 Cal. Rptr. 3d 884 (2005).*

9. *HN14*[⬆] "The UFTA list of 'badges of fraud' provides neither a counting rule, nor a mathematical formula. No minimum number of factors tips the scales toward actual intent. A trier of fact is entitled to find actual intent based on the evidence in the **[*9]** case, even if no "badges of fraud" are present. Conversely, specific evidence may negate an inference of fraud notwithstanding the presence of a number of 'badges of fraud.'" *Beverly, 374 B.R. at 236.*

10. Miller transferred or concealed property within one year prior to the petition date, and transferred or concealed property of the estate within one year after the petition date.

11. Miller disposed of $27,173.38 through the Kitco Purchases of silver coins and gold bars in the months preceding the bankruptcy filing, and Defendant's Schedule B and SOFA failed to disclose these assets/transactions.

12. Miller also concealed his interest in the 2012 State Refund and 2012 Federal Refund.

13. Miller's Accounting admits to spending $68,000.00 of the Cash in the month prior to bankruptcy and during the three months following the petition date. Evidence recovered by Plaintiff shows that Miller was holding approximately $76,000.00 in additional undisclosed cash as of the petition date.

14. Miller concealed the Corporate Accounts and disposed of funds in the undisclosed Corporate Accounts for personal use both before and after the petition date.

15. Miller also concealed the post-petition rents generated by the Nevada Property **[*10]** and $100,000.00 worth of miscellaneous furniture.

16. Miller's transfer or concealment of property prior to the petition date was made with the subjective intent to hinder or delay, if not defraud, a creditor.

17. Miller's transfer or concealment of property of the estate after the petition date was made with the subjective intent to hinder or delay, if not defraud, the trustee and creditors of the estate.

_____

lienholder who transferred the assets to an insider of the debtor. *Cal. Civ. Code § 3439.04(b).*

2015 Bankr. LEXIS 1929, *10

18. Miller admits in his Accounting to spending $68,000 of the Cash on personal expenses in the three months following the petition date, with full knowledge of Trustee's efforts to recover said funds.

19. Miller disposed of funds in the Corporate Accounts for personal use, knowing that Trustee was examining said accounts after questioning Miller about them at a *§ 341(a)* meeting.

20. Miller's failure to disclose transfers and assets, as well as the dissipation of estate funds with knowledge of Trustee's efforts to recover said funds, are "badges of fraud" indicative of an intent to hinder or delay, if not defraud, creditors.

21. Miller's subjective intent to hinder or delay, if not defraud, the Trustee and creditors of the estate is further evidenced by Miller's overall course of conduct, which [**11**] includes multiple instances of concealment of assets, frustrating Trustee's recovery efforts and ignoring the court's turnover orders.

22. There being no genuine issue of material fact with respect to Plaintiff's claims against Miller under *11 U.S.C. § 727(a)(2)(A)* or *(B)*, the court will enter an order granting Plaintiff's Motion against Miller on such claims.

Miller's Discharge Will Be Denied Pursuant to *11 U.S.C. §§ 727(a)(4)(A)*

23. **HN15**[⬆] "Under *section 727(a)(4)(A)*, the defendant's discharge will be denied if it is proven that: (1) the defendant made a statement under oath; (2) the statement was false; (3) the defendant knew the statement was false; (4) the defendant made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Stanley v. Hoblitzell (In re Hoblitzell), 223 B.R. 211, 215 (Bankr. E.D. Cal. 1998)*.

24. "The debtor's knowledge and fraudulent intent may be shown by circumstantial evidence and inferred from the debtor's course of conduct." Id.

25. Miller made false statements under oath by failing to disclose in the schedules and statements property owned on the petition date, including (a) the Kitco Purchases; (b) the Cash; (c) the 2012 State Refund; (d) the 2012 Federal Refund; and (e) the Corporate Accounts.

26. Defendant also made false statements under oath at

the July 15, 2013 *§ 341(a)* meeting [**12**] when he confirmed that: (a) he had scheduled all of his interests in entities and/or assets; (b) he had not sold, transferred or given away anything of value in the last four years; and (c) the Nevada Property was not generating any rental income.

27. In each instance, Miller's false statement under oath related to a material fact because it bore a relationship to Miller's business transactions or the estate, or concerned the discovery of assets, business dealings, or the existence or disposition of property of the debtor or the estate.

28. Miller's false statements and omissions were so intertwined with his business and financial affairs and the Trustee's ongoing efforts to investigate and recover property of the estate that the court infers his failure to make full and accurate disclosure in his statements under oath was intentional and for the purpose of deceiving creditors and the Trustee.

29. There being no genuine issue of material fact with respect to Plaintiff's claim against Miller under *11 U.S.C. § 727(a)(4)(A)*, the court will enter an order granting Plaintiff's Motion against Miller on such claim.

Miller's Discharge Will Be Denied Pursuant to *11 U.S.C. §§ 727(a)(6)(A)*.

30. **HN16**[⬆] *Section 727(a)(6)* states that the court shall grant the debtor a discharge, [**13**] unless the debtor has refused to obey and lawful order of the court, other than an order to respond to a material question or to testify. *11 U.S.C. § 727(a)(6)(A)*.

31. **HN17**[⬆] "The term used in *§ 727(a)(6)(A)* is 'refused,' not 'failed.'" *Smith v. Jordan (In re Jordan), 521 F.3d 430, 433 (4th Cir. 2008)*.

32. **HN18**[⬆] "The party objecting to discharge [under *§ 727(a)(6)(A)*] satisfies [its] burden by demonstrating that the debtor received the order in question and failed to comply with its terms. Such a showing then imposes upon the debtor an obligation to explain his non-compliance." Id. (citations omitted). See *Hicks v. Decker (In re Hicks), 2006 Bankr. LEXIS 4897, 2006 WL 6810987, *8 (9th Cir. BAP 2006)* ("Once Trustee has produced sufficient evidence to support the claim, the burden of going forward then shifts to the Debtor to satisfactorily explain his behavior.").

2015 Bankr. LEXIS 1929, *13

33. *HN19*[⬆] "[I]t is totally within the discretion of the bankruptcy court to find a particular violation of the court's order so serious as to require denial of discharge under *§ 727(a)(6)(A)*." *Devers v. Bank of Sheridan (In re Devers), 759 F.2d 751, 755 (9th Cir. 1985)*.

34. On June 18, 2013, the court entered an Order Granting Chapter 7 Trustee's Motion for Turnover of Property of the Estate and Order Directing Debtors to Appear at Continued *11 U.S.C. § 341(a)* Meetings of Creditors [Dkt. # 54] ("First Turnover Order") which provided, in pertinent part: "[Loren Miller and Sarah Miller] are directed to immediately, but no later than five (5) days after of entry of this **[*14]** Order, turn over to the Trustee, by and through his counsel Margulies Faith LLP ("MF"), $182,000, the amount listed in the Debtor's Schedule B filed on February 21, 2013 (Dkt. No. 11) by way of a Cashier's Check made payable to 'Jeremy W. Faith, Chapter 7 Trustee.'"

35. The First Turnover Order was served on Miller and his spouse, Sarah Miller, by United States mail, first class mail, postage prepaid, at 702 Whitecap Drive, Seabrook, TX 77586, on June 13, 2013.

36. The First Turnover Order was served electronically on Debtors' attorney of record, Vaughn C. Taus on June 13, 2013.

37. Miller had knowledge of the First Turnover Order either directly or through counsel.

38. Miller did turnover to the Trustee the sum of $182,000 by June 23, 2013, as required by the First Turnover Order.

39. On July 12, 2013, Miller ultimately turned over to the Trustee the sum of $101,731 and a one-page accounting prepared by Miller describing how $68,000 of the funds were spent prior to and approximately 3 months after the petition date.

40. Miller has neither turned over nor accounted for the balance of the funds -- $12,269, despite the First Turnover Order and repeated demands by the Trustee.

41. Miller attended **[*15]** a creditors' meeting on July 15, 2013, but did not appear for any continued creditors' meetings after July 15, 2015, despite the First Turnover Order and repeated demands by the Trustee.

42. On March 19, 2014, the court entered an Order Granting Chapter 7 Trustee's Motion for Turnover of Property of Estate [Dkt. # 124] ("Second Turnover Order") which provided, in pertinent part: [Loren Miller]

is directed to immediately, but no later than ten (10) days after entry of this order, turn over to the Trustee, by and through his counsel Margulies Faith LLP, (i) $6,716 received post-petition from the 2012 State Refund; and (ii) the Kitco Purchases (as detailed in Exhibit A to the Motion), or their cash value of $27,173.38"

43. The Second Turnover Order was served on the Miller by United States mail, first class mail, postage prepaid, at 600 E. Medical Center Blvd., # 1509, Webster, TX 77598, on March 21, 2014.

44. The First Turnover Order was served electronically on Debtors' attorney of record, Vaughn C. Taus on March 21, 2014.

45. Miller had knowledge of the Second Turnover Order either directly or through counsel.

46. Despite the Second Turnover Order and repeated demands by the Trustee, Miller **[*16]** has not turned over to the Trustee either the 2012 State Refund or the Kitco Purchases.

47. Miller has not responded to explain his behavior nor produce significantly probative evidence to establish a genuine issue of material fact regarding his ability or inability to comply with either the First Turnover Order or the Second Turnover Order.

48. There being no genuine issue of material fact with respect to Plaintiff's claim against Miller under *11 U.S.C. § 727(a)(6)(A)*, the court will enter an order granting Plaintiff's Motion against Miller on such claim.

<u>CONCLUSION</u>

For the reasons stated, the court will enter an order granting Plaintiff's Motion against Miller on Plaintiff's claims against Miller under *11 U.S.C. § 727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)* and *(a)(6)(A)*.

A separate order will be entered consistent with this memorandum.

Date: June 12, 2015

/s/ Peter H. Caroll

Peter H. Caroll

United States Bankruptcy Judge

Layla Buchanan

2015 Bankr. LEXIS 1929, *16

**ORDER GRANTING PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AGAINST DEFENDANT
LOREN MILLER UNDER *11 U.S.C. § 727(a)(2)(A)*,
*(a)(2)(B)*, *(a)(4)(A)*, AND *(a)(6)(A)***

Based on the memorandum of even date herewith, it is

ORDERED that Plaintiff's Motion for Summary
Judgment Against Defendant Loren Miller Under *11
U.S.C. § 727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)*, and *(a)(6)(A)*
is granted.

Date: June 12, 2015

/s/ Peter H. Carroll

Peter H. Carroll

United States Bankruptcy Judge

---

**End of Document**

**EXHIBIT 2**



**User Name:** Layla Buchanan

**Date and Time:** Thursday, February 9, 2023 6:45:00PM PST

**Job Number:** 190002621

## Document (1)

1. *Hunter v. Martin (In re Martin), 2019 Bankr. LEXIS 2073*

   **Client/Matter:** 1673-001

   **Search Terms:** 2019 Bankr.LEXIS 2073

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | Cases | -None- |

EXHIBIT 2, PAGE 14

✚ Positive
As of: February 10, 2023 2:45 AM Z

# *Hunter v. Martin (In re Martin)*

United States Bankruptcy Court for the Central District of California, Los Angeles Division

July 10, 2019, Decided; July 10, 2019, Filed & Entered

Case No.: 2:17-bk-16996-ER, Adv. No.: 2:17-ap-01587-ER

**Reporter**
2019 Bankr. LEXIS 2073 *; 67 Bankr. Ct. Dec. 124; 2019 WL 3025248

In re: Paul William Martin, Debtor. Kevin Hunter, Plaintiffs v. Paul William Martin DBA Veronica Rose Productions, Inc., Defendant

**Subsequent History:** Costs and fees proceeding at, Judgment entered by *In re Martin, 2019 Bankr. LEXIS 4037, 2019 WL 9242995 (Bankr. C.D. Cal., Dec. 10, 2019)*

Affirmed by *Martin v. Hunter (In re Martin), 2021 Bankr. LEXIS 507 (B.A.P. 9th Cir., Mar. 3, 2021)*

## Core Terms

Collateral, E-mail, attorney's fees, actual fraud, Sheets, projections, paintings, Overview, financial condition, costs, representations, technology, false representation, proposed terms, fees incurred, proceeds, due diligence, tort claim, attachments, provisions, documents, qualify, prevailing party, indebtedness, fiduciary, Investor, deceive, music, materially false, false pretenses

## Case Summary

### Overview

HOLDINGS: [1]-Debt was excepted from debtor's discharge pursuant to *11 U.S.C.S. § 523(a)(2)(A)* on the ground of actual fraud because debtor sold the vehicle to a mechanic for $10,000, even though debtor knew that the vehicle was collateral for the Note and debtor did not inform creditor of the sale or remit any of the sale proceeds to creditor; [2]-Creditor's *§ 523(a)(4)* claim failed because no fiduciary relationship existed between the parties where the debtor and creditor conducted no business prior to execution of the Note; [3]-None of debtor's conduct qualified as "willful" and "malicious" within the meaning of *§ 523(a)(6)* as debtor did not solicit the loan with the intent of injuring creditor.

### Outcome

Debt excepted from discharge.

## LexisNexis® Headnotes

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

Evidence > Burdens of Proof > Preponderance of Evidence

*HN1*[⇗]  **Exceptions to Discharge, Embezzlement & False Representations**

*11 U.S.C.S. § 523(a)(2)(A)* provides: A discharge under *11 U.S.C.S. § 727* does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. To except debts from discharge, a creditor has the burden of proof under the preponderance of the evidence standard. Statements respecting the debtor's or an insider's financial condition are governed by the heightened standard set forth in *§ 523(a)(2)(B)*. A statement is "respecting" a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status. Such statements can include statements pertaining to a single asset. A single asset has a direct relation to and impact on aggregate financial condition, so a statement about a single asset bears on a debtor's overall financial condition and can help indicate whether a debtor is solvent or insolvent, able to repay a given debt or not.

Layla Buchanan

2019 Bankr. LEXIS 2073, *2073

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

**HN2[ ]** **Exceptions to Discharge, Embezzlement & False Representations**

To prevail on a *11 U.S.C.S. § 523(a)(2)(A)* claim on the grounds of false pretenses or false representation, a creditor must prove that: (1) the debtor made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

**HN3[ ]** **Exceptions to Discharge, Embezzlement & False Representations**

Under *11 U.S.C.S. § 523(a)(2)(A)*, a debt is not excepted from discharge unless the creditor justifiably relies upon the debtor's representation.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

**HN4[ ]** **Exceptions to Discharge, Embezzlement & False Representations**

A creditor may prevail on a *11 U.S.C.S. § 523(a)(2)(A)* claim on the ground of actual fraud. Actual fraud includes a fraudulent conveyance of property made to evade payment to creditors. Such fraudulent conveyance schemes fall within the ambit of *§ 523(a)(2)(A)* even when they do not involve a false representation or are carried out subsequent to the credit transaction that created the debt. "Actual fraud" has two parts: actual and fraud. The word "actual" has a simple meaning in the context of common-law fraud: It denotes any fraud that involves moral turpitude or

intentional wrong. "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that may exist without the imputation of bad faith or immorality. Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

**HN5[ ]** **Exceptions to Discharge, Embezzlement & False Representations**

A fraudulent conveyance constitutes "actual fraud" for purposes of *11 U.S.C.S. § 523(a)(2)(A)* if the purpose of the conveyance is to conceal assets from a creditor or hinder the creditor's ability to collect a debt.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

**HN6[ ]** **Exceptions to Discharge, Embezzlement & False Representations**

To prevail upon a claim under *11 U.S.C.S. § 523(a)(2)(B)*, a creditor must satisfy, by a preponderance of the evidence, the following requirements: (1) a representation of fact by the debtor, (2) that was material, (3) that the debtor knew at the time to be false, (4) that the debtor made with the intention of deceiving the creditor, (5) upon which the creditor relied, (6) that the creditor's reliance was reasonable, (7) that damage proximately resulted from the representation. The requirements are similar to those imposed by *§ 523(a)(2)(A)*, except that the creditor must make a heightened showing in two respects: (1) the representation at issue must be materially false (as opposed to simply false), and (2) the creditor's reliance must be reasonable (as opposed to justifiable). A statement is materially false if it includes information which is substantially inaccurate and is of the type that would affect the creditor's decision making process. To except a debt from discharge, the creditor must show not only that the statements are inaccurate, but also that they contain important and substantial untruths.

Layla Buchanan

2019 Bankr. LEXIS 2073, *2073

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

### HN7[⤓] Exceptions to Discharge, Embezzlement & False Representations

*11 U.S.C.S. § 523(a)(4)* excepts from discharge any debt for fraud or defalcation while acting in a fiduciary capacity. To prevail on a nondischargeable claim under *§ 523(a)(4)* the plaintiff must prove not only the debtor's fraud or defalcation, but also that the debtor was acting in a fiduciary capacity when the debtor committed the fraud or defalcation. Federal bankruptcy law determines whether a fiduciary relationship exists within the meaning of *§ 523(a)(4)*. For purposes of *§523(a)(4)*, the fiduciary relationship must be one arising from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt. State law determines whether the requisite trust relationship exists.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Malicious & Willful Injury

### HN8[⤓] Exceptions to Discharge, Malicious & Willful Injury

*11 U.S.C.S. § 523(a)(6)* excepts from discharge debts arising from a debtor's willful and malicious injury to another person or to the property of another. The willful and malicious requirements are conjunctive and subject to separate analysis. An injury is "willful" when a debtor harbors either subjective intent to harm, or a subjective belief that harm is substantially certain. The injury must be deliberate or intentional, not merely a deliberate or intentional act that leads to injury. An injury is "malicious" if it involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse. In addition, the injury-producing conduct must be tortious in order to be excepted from discharge under *§ 523(a)(6)*. Conduct is not tortious under *§ 523(a)(6)* simply because injury is intended or substantially likely to occur, but rather is only tortious if it constitutes a tort under state law.

Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > Statutory Awards

### HN9[⤓] Basis of Recovery, Statutory Awards

No general right to attorney fees exists under the Bankruptcy Code. However, a prevailing party in a bankruptcy proceeding may be entitled to an award of attorney fees in accordance with applicable state law if state law governs the substantive issues raised in the proceedings.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge

Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > Statutory Awards

### HN10[⤓] Discharge & Dischargeability, Exceptions to Discharge

*Cal. Civ. Code § 1717(a)* applies only to attorney's fees incurred in actions involving a contract claim. A non-dischargeability claim based on actual fraud is not a contract claim.

Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > Statutory Awards

### HN11[⤓] Basis of Recovery, Statutory Awards

*Cal. Code Civ. Proc. § 1021* does not limit the recovery of attorney's fees to certain claims. Fees may be recoverable under *Cal. Code Civ. Proc. § 1021* even if not recoverable under *Cal. Civ. Code § 1717(a)*. *Section 1021* allows the parties to agree that the prevailing party in litigation may recover attorney's fees, whether the litigation sounds in contract or in tort. To determine whether a prevailing party may recover attorney's fees for non-contractual claims under *§ 1021*, a court must look to the language of the agreement. Fee provisions limited to the enforcement of the terms of the contract or to the collection of monies owed under the contract have been held not to extend to fees incurred in litigating tort claims. In contrast, provisions with broader language—suits arising from or with respect to the subject matter or enforcement of a contract—have been held to extend to fees incurred in litigating tort claims.

**Counsel:  [*1]** For Kevin Hunter, Plaintiff (2:17-ap-

Layla Buchanan

2019 Bankr. LEXIS 2073, *1

01587-ER): Robert A Brock, LEAD ATTORNEY, Law Office of Robert A Brock, Los Angeles, CA; Eric Gassman, Gassman Law, Encino, CA.

Paul William Martin DBA Veronica Rose Productions, Inc, Defendant (2:17-ap-01587-ER), Pro se, Venice, CA.

Trustee (2:17-ap-01587-ER): Elissa Miller (TR), SulmeyerKupetz, Los Angeles, CA.

For Paul William Martin, dba One-17 Publishing dba Veronica Rose Productions, Inc., Debtor (2:17-bk-16996-ER): Matthew D. Resnik, Resnik Hayes Moradi LLP, Los Angeles, CA.

Trustee (2:17-bk-16996-ER): Elissa Miller (TR), Los Angeles, CA.

**Judges:** Ernest M. Robles, United States Bankruptcy Judge.

**Opinion by:** Ernest M. Robles

## Opinion

**MEMORANDUM OF DECISION FINDING THAT MARTIN'S INDEBTEDNESS TO HUNTER, IN THE AMOUNT OF $10,000, IS EXCEPTED FROM DISCHARGE**

### I. Introduction

In this dischargeability action, Plaintiff Kevin Hunter ("Hunter") alleges that Defendant Paul William Martin ("Martin") is liable in the amount of $141,582.88 under §§ 523(a)(2)(A), (a)(2)(B), (a)(4) (for committing fraud or defalcation in a fiduciary capacity), and (a)(6). The alleged liability arises from a $50,000 loan that Hunter extended to Martin in 2010. In addition to recovery of the loan's principal, Hunter seeks recovery of interest **[*2]** in the amount of $25,232.88 and attorneys' fees and costs in the amount of $66,350.

Trial was conducted on January 28 and February 4, 2019.[1] The parties filed closing briefs on May 10, 2019.[2]

---

[1] A transcript of the proceedings occurring on January 28, 2019 is available as docket entry 50 and is cited as "Tr. Jan. 28." A transcript of the proceedings occurring on February 4, 2019 is available as docket entry 51 and is cited as "Tr. Feb. 4."

This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law pursuant to *Civil Rule 52*, made applicable to these proceedings by *Bankruptcy Rule 7052*.[3]

For the reasons set forth below, the Court finds that Martin is indebted to Hunter in the amount of $10,000, and that such indebtedness is excepted from Martin's discharge pursuant to § 523(a)(2)(A), on the ground of actual fraud. Hunter is not entitled to judgment on any of his other claims for relief; judgment will be entered in favor of Martin as to those claims.

### II. Facts

Martin was the founder, president, and Chief Executive Officer of Veronica Rose Productions, Inc. ("VRP").[4] VRP was a start-up company attempting to develop a software platform that would help music owners maximize royalty collections.[5]

George Shohet ("Shohet") is a licensed attorney who maintains an office in Venice, California.[6] Shohet and Martin were acquainted because they both lived in the same neighborhood.[7] Martin would occasionally talk to Shohet about his latest business project when he **[*3]** encountered Shohet on the street.[8]

In the summer of 2010, Martin approached Shohet and

---

[2] Doc. Nos. 53-54.

[3] Unless otherwise indicated, all "Civil Rule" references are to the *Federal Rules of Civil Procedure, Rules 1-86*; all "Bankruptcy Rule" references are to the *Federal Rules of Bankruptcy Procedure, Rules 1001-9037*; all "Evidence Rule" references are to the *Federal Rules of Evidence, Rules 101-1103*; all "LBR" references are to the *Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California, Rules 1001-1-9075-1*; and all statutory references are to the Bankruptcy Code, *11 U.S.C. §§ 101-1532*.

[4] Joint Proposed Pre-Trial Stipulation and Order as Modified by the Court [Doc. No. 38] (the "Pretrial Order") at ¶ 14.

[5] Plaintiff's Ex. 2 (investor presentation describing VRP's business).

[6] Pretrial Order at ¶ 15.

[7] Tr. Jan. 28 at 96:1-5 (testimony of Shohet).

[8] *Id.*

Layla Buchanan

2019 Bankr. LEXIS 2073, *3

asked Shohet if he could help VRP raise capital.[9] Shohet agreed to help, and commenced negotiations regarding a potential investment with his friend, Kevin Hunter ("Hunter"). Shohet and Hunter had been friends for close to thirty years, having met at law school.[10] At the time of the negotiations, Hunter worked as a managing director and portfolio manager at NWQ Investment Management.[11]

Shohet was not formally retained as counsel by either Martin or VRP in connection with the negotiations,[12] and received no payments for his work. Shohet became involved because he believed VRP's technology showed promise and he anticipated receiving some form of compensation in the future:

> The technology looked very promising and the fact that there were already two significant contractual relationships with major music industry participants was intriguing.... [A]ssuming commercialization ... I might be in a position to, you know, receive compensation or get involved in [an] actual role in, you know, corporate governance of the enterprise.

Tr. Jan. 28 at 134:22-135:17 (testimony of Shohet).

Hunter declined Shohet's initial proposal [*4] that Hunter make an equity investment in VRP.[13] Hunter did not have time to perform due diligence on VRP and so was not comfortable making an equity investment.[14] Shohet then proposed that Hunter make a short-term loan secured by VRP stock owned by Martin.[15] Hunter declined this proposal, again because he did not have time to perform due diligence on VRP.[16] Shohet's next pitch was that Hunter extend a short-term loan to Martin personally, to be secured by collateral owned by Martin,

with the understanding that the proceeds would be used by VRP. In furtherance of this proposal, Shohet e-mailed Hunter a term sheet on Friday, August 20, 2010 (the "Final Term Sheet").[17] The Final Term Sheet provided for a $50,000 loan from Hunter to Martin, secured by "two Chris Reilly original paintings and a 1996 Porsche 993."[18] Regarding the collateral, the Final Term Sheet stated: "The art work and Porsche are owned free and clear by Mr. Martin. VRP and Mr. Martin represent that the value of the collateral exceeds $50,000."[19]

Shohet prepared the Final Term Sheet using two proposed term sheets that Martin had e-mailed to Shohet the previous day (the "Proposed Term Sheets").[20] Specifically, on August 20, [*5] 2010, at 9:19 a.m., Martin sent Shohet an e-mail with the subject line "Stab at term sheets for 50k" (the "August 20th E-mail").[21] The body of the August 20th E-mail provided in its entirety: "George I have taken a stab at this...let me know what you think..." The Proposed Term Sheets were attached to the August 20th E-mail as Microsoft Word documents. One of the Proposed Term Sheets prepared by Martin stated that the value of the collateral exceeded $50,000.[22]

Martin denied preparing the Proposed Term Sheets, but his testimony in this respect was not credible. On August 19, 2010, Shohet sent Hunter an e-mail containing three attached documents (the "August 19th E-mail").[23] The attached documents provided an overview of VRP's business plan.[24] Martin was blind carbon copied on the August 19th E-mail. At trial, Martin attempted to exploit a formatting ambiguity to argue that

---

[9] Tr. Feb. 4 at 100:12-18 ("I had approached George Shohet seeking financing, not personal loans, and so the plan was, you know, that we get away from these friends and family and get into a more sophisticated investor type who would then be able to introduce us to angels, and—George [Shohet] was, at least at the time, acting as if he was going to be helping us with large capital raises") (testimony of Martin).

[10] Tr. Jan. 28 at 95:23-96:1 (testimony of Shohet).

[11] Tr. Jan. 28 at 44:8-9 (testimony of Hunter).

[12] Tr. Feb. 4 at 196:21-197:3 (testimony of Martin).

[13] Tr. Jan. 28 at 20:23-21:9 (testimony of Hunter).

[14] Id.

[15] Tr. Jan. 28 at 21:10-16 (testimony of Hunter).

[16] Id.

[17] Plaintiff's Ex. 7.

[18] Id.

[19] Id.

[20] Plaintiff's Ex. 5-6.

[21] Plaintiff's Ex. 5.

[22] The Proposed Term Sheet provided in relevant part: "Collateral is to be issued in the form of Art work held by Paul Martin. They are Chris Reilly originals and have a retail market value of 50k. Mr. Martin will discount the Art work to 25k for both pieces. In addition, Mr. Martin will put up a 1996 Porsche 993 with a retail value of 34k discounted to 25k to the investor." Plaintiff's Ex. 5 at GS082.

[23] Plaintiff's Ex. 1.

[24] The attached documents are Plaintiff's Exhibits 2-4.

Layla Buchanan

2019 Bankr. LEXIS 2073, *5

the Proposed Term Sheets were originally sent as attachments to the August 19th E-mail sent by Shohet, and were not attachments to the August 20th E-mail sent by Martin.[25] A careful review of both e-mails shows that Martin's contention is meritless.

The filenames of the three attachments to the August 19th E-mail are "VRP Investor [*6] Letter2.5.doc," "VRP competitive analysis v4.doc," and "VRP Overview 7-2010.pdf." Martin sent the August 20th E-mail to Shohet by replying to the August 19th E-mail. As a result, the August 20th E-mail contains the text of the August 19th E-mail. The August 20th E-mail does **not** contain the attachments to the August 19th E-mail—the filenames "VRP Investor Letter2.5.doc," "VRP competitive analysis v4.doc," and "VRP Overview 7-2010.pdf" do not appear in the August 20th E-mail. Instead, the August 20th E-mail contains two new attachments, with the filenames "TS.doc" and "Tsprop.doc." The difference in the filenames shows that the "TS.doc" and "Tsprop.doc" files were attachments to the August 20th E-mail, not attachments to the August 19th E-mail.

Martin admitted at trial that he wrote the August 20th E-mail.[26] Based upon this admission, the text of the August 20th E-mail which clearly indicates that the e-mail is Martin's "stab" at creating term sheets, and the fact that the Proposed Term Sheets were attached to the August 20th E-mail, the Court finds that Martin prepared the Proposed Term Sheets.

On August 26, 2010, at 7:33 a.m., Shohet sent Martin a draft promissory note, created by Shohet, [*7] that was based upon the terms set forth in the Final Term Sheet.[27] At 8:12 a.m. that morning, Shohet sent Martin a revised version of the draft promissory note.[28] Approximately an hour later, at 9:34 a.m., Shohet sent Hunter the final version of the promissory note signed by Martin.[29] At 1:32 p.m. that afternoon, Hunter e-mailed Shohet a fully executed copy of the promissory

_____

[25] Tr. Jan. 28 at 100:17-102:11 (Martin's objection to admission of the August 20th E-mail).

[26] Tr. Feb. 4 at 145:24-146:1.

[27] Tr. Jan. 28 at 111:22-112:24 (testimony of Shohet) and Plaintiff's Ex. 13.

[28] Tr. Jan. 28 at 113:6-22 (testimony of Shohet) and Plaintiff's Ex. 14.

[29] Tr. Jan. 28 at 114:4-115:4 (testimony of Shohet) and Plaintiff's Ex. 15.

note (the "Note").[30]

The Note memorialized a $50,000 loan from Hunter to Martin, bearing interest at the rate of 6%. A balloon payment of the principal and unpaid interest was due on September 1, 2011. The Note was secured by the following collateral:

> 1) 1996 Porsche 993; License No. 5DMX 199; VIN: WPOAA2999TS322286; located in New York, NY (the "Porsche"); and
> 2) Two untitled, signed original Chris Reilly art works: (i) painting on white wooden door with red border and two thornless red roses in a gold leaf window; (ii) painting on canvas, "Color of Money" effect with carvings, Japanese maple leaf and a border of silver leaf; located at 34 Ozone Ave. #3, Venice, CA 90291 (both paintings collectively, the "Artwork," and the Artwork and Porsche collectively, the "Collateral").

*See* Note at Ex. A (Plaintiff's Ex. 16).

The Note [*8] contained the following provisions regarding the Collateral

> On and as of the date of this Note, Borrower [Martin] represents and warrants to Lender [Hunter] that Borrower is the true and lawful owner of the Collateral, having good and marketable title thereto, free and clear of any and all Liens other than the Lien and security interest granted to Lender hereunder and Permitted Liens. Borrower shall not create or assume or permit to exist any such Lien on or against any of the Collateral except as created or permitted by this Note and Permitted Liens, and Borrower shall promptly notify Lender of any such other Lien against the Collateral and shall defend the Collateral against, and take all such action as may be necessary to remove or discharge, any such Lien.

Note at ¶ G.

The Note further provided that upon and during the continuance of any event of default, Hunter would have the right to sell all or any part of the Collateral.[31] The Note provided that Hunter had the right, but not the obligation, to convert the Note into shares of VRP common stock.[32] Hunter never made any representation that he would exercise his option to

_____

[30] Plaintiff's Ex. 16.

[31] Pretrial Order at ¶ 26; Note at ¶ J.

[32] Pretrial Order at ¶¶ 26 and 28; Note at ¶ E.

Layla Buchanan

convert the Note into equity in VRP.[33]

Martin used the proceeds of **[*9]** the Note to fund VRP's operations.[34] Martin has not repaid any portion of the Note's principal and has not repaid any portion of the accumulated interest.[35]

In determining whether to loan Martin the funds, Hunter considered various documents describing VRP's business sent to him by Shohet (all such documents collectively, the "VRP Investment Materials").[36] In particular, Hunter relied upon statements in a document titled *Veronica Rose Productions Partner Overview* (the "VRP Overview").[37] Hunter testified that he focused on the following statements in making the lending decision:

> So I looked to these documents to give me an indication of the time to market and the potential magnitude of revenues to determine having made a loan that was collateralized—would this be a company that I might be interested in converting my loan into stock as stated in the loan document over the next few months as I did my due diligence.... [I looked at] Paragraph 4 on page 3 which indicated that the product was fully prototyped from both the technical and business aspect and that they planned to have the product in market in the fall of 2010. I also focused on the statements that there was the potential of 50 million **[*10]** dollars in gross revenues by 2015.

---

[33] Pretrial Order at ¶ 28.

[34] Tr. Feb. 4 at 198:18-22 (testimony of Martin).

[35] Pretrial Order at ¶ 30.

[36] The VRP Investment Materials consisted of the following documents:

> 1) A document titled Veronica Rose Productions Partner Overview (the "VRP Overview") (Plaintiff's Ex. 2);
>
> 2) A revised version of the Veronica Rose Productions Partner Overview (Plaintiff's Ex. 10);
>
> 3) An investor letter, dated August 13, 2010, addressed to "Tom" (Plaintiff's Ex. 3);
>
> 4) An investor letter, dated August 16, 2010, addressed to "Amy" (Plaintiff's Ex. 9);
>
> 5) A set of financial assumptions and projections (Plaintiff's Ex. 4);
>
> 6) A revised set of financial assumptions and projections (Plaintiff's Ex. 11).

[37] Plaintiff's Ex. 2.

On page 5, [the] statement that stuck out was "Generate the first $100,000 of gross revenue in the second quarter of 2011." And those were the two—I guess two areas that had statements that I would, you know, reflect [that] ... this company has significant revenue potential and their product should be coming to market or almost immediately. Tr. Jan. 28 at 30:10-31:8 (testimony of Hunter).

At trial, the Court admitted the VRP Overview only for the limited purpose of establishing that Hunter received the VRP Overview and that Hunter understood that the VRP Overview had been created by Martin.[38] This ruling was based upon the absence of evidence showing **[*11]** either that Martin had created the VRP Overview or that Martin knew that Shohet had sent the VRP Overview to Hunter to solicit funds for VRP. Later in the trial, Martin admitted that he prepared the VRP Overview with the assistance of others.[39] Martin further testified that Shohet was heavily involved in the process of soliciting funds for VRP:

> George [Shohet] had already started taking me out and introducing me to other venture capital. We had, you know, a specific meeting with a VC in Santa Monica that had experience investing in the music—disruptive music space and so, you know, I was very optimistic and that's when he said he was going to get Mr. Hunter to invest.

Tr. Feb. 4 at 192:25-193:5 (testimony of Martin).

Martin's testimony shows that at the time of the communications between Shohet and Hunter, Shohet was actively soliciting funding for VRP on Martin's behalf. Based upon this relationship between Martin and Shohet, the Court finds that the VRP Investment Materials that Shohet sent to Hunter had been provided by Martin, and that Martin intended for Shohet to use the VRP Investment Materials to pitch VRP to potential investors and lenders. Martin's contention that he did not intend **[*12]** for Shohet to use the VRP Investment Materials in this manner is simply not plausible.[40] In view of this finding, the Court will not limit the scope of the admissibility of the VRP Overview or the VRP Investment Materials.

The most significant factor motivating Hunter's decision

---

[38] Tr. Jan. 28 at 29:22-25.

[39] Tr. Feb. 4 at 100:12-18.

[40] *See* Tr. Feb. 4 at 200:8-11 ("I wasn't under the impression that these numbers went out to Mr. Hunter in regards to making an investment") (testimony of Martin).

Layla Buchanan

to extend the loan to Martin was that Shohet had vouched for Martin and that Shohet was working with VRP. Hunter testified:

> George [Shohet] came to me for short-term financing. I knew he was working with this company, that he would be involved. He had sent me these documents which I reviewed, showed the company through the projections obviously thought they had potential. I knew that that was—it was one indicator that, okay, it's here. It's something that the company is of interest, something that I can do due diligence on given the financials I've seen and the terms of the loan that I had some time to do that due diligence.

> I matched that with the term sheet, the stated value of the collateral, the fact that it was a short-term loan, the fact that George can vouch for Paul's integrity said, "Okay, I'll make the loan. It's collateralized."

Tr. Jan. 4 at 67:12-25.

Hunter did not perfect his security interest in **[*13]** the Porsche or the Artwork based upon Shohet's representations as to Martin's integrity. Hunter testified:

> No, I didn't [perfect my security interest]. And George [Shohet] and I discussed it. I said "Look, it's a short-term loan. You're working with the company. You've ask [sic] for Paul Martin's integrity. I don't want to hold his car as collateral for him. Is he trustworthy?" "Yes, he is," according to George. "Friendly deal. Let's move forward."

Tr. Jan. 4 at 78:25-79:5.

Hunter's actions subsequent to Martin's failure to repay the loan further establish that Hunter made the lending decision primarily because Shohet had vouched for Martin. The Note came due in November 2011.[41] Martin had made no payments. Hunter did not contact Martin to discuss the Note until 2014.[42] Instead, Hunter periodically asked Shohet about VRP and the status of the Note. Hunter was "a little uncomfortable,"[43] but was satisfied with Shohet's statements that Martin just needed more time to repay:

> Remember, this was a friendly deal. George [Shohet] is working with the company. He had

vouched for the honesty and integrity of Paul [Martin], so I went with it. You know, I wanted to be supportive, I would say. But obviously **[*14]** at some point I would want my money back with a six percent nominal interest rate.

Tr. Jan. 4 at 87:8-14 (testimony of Hunter).

That Hunter placed only minimal reliance upon the VRP Investment Materials is also shown by Hunter's testimony that VRP was "a technology company that's in an area which I'm not familiar with at all" and that Hunter lacked time "to do any due diligence, real due diligence on this company."[44] That is, Hunter admitted that he lacked the expertise to assess VRP's business and did not have the time to do the work that would be necessary to gain such expertise. These admissions show that Hunter did not place substantial weight upon the VRP Investment Materials in making the lending decision.

VRP did not achieve the financial projections set forth in the VRP Investment Materials. However, the projections were not unreasonable as of August 2010, when they were presented to Hunter. This finding is based upon the testimony of Edward Hunter Williams ("Williams"), which the Court found to be especially credible, given that Williams has no financial stake in the outcome of this litigation. As of 2010, Williams was the Senior Vice President of Strategic Development and Royalty **[*15]** Distribution at SESAC.[45] SESAC is a performing rights organization that licenses the public performances of songs on behalf of composers and music publishers.[46] Williams' responsibilities at SESAC included assessing the impact of new technologies on the music licensing business.[47] Williams was familiar with VRP's technology because SESAC had entered into an agreement to invest $150,000 in VRP.[48]

Williams testified that the financial projections set forth in the VRP Investment Materials were "not unrealistic numbers for the type of industry that we [are] in,"[49] considering that VRP's business had the potential to

---

[41] The Note initially came due in September 2011. Hunter agreed to Martin's request to extend the deadline by two months to November 2011.

[42] Tr. Jan. 28 at 86:23-87:3 (testimony of Hunter).

[43] Tr. Jan. 28 at 87:8 (testimony of Hunter).

[44] Tr. Jan. 28 at 21:4-7 (testimony of Hunter).

[45] SESAC was originally known as the "Society of European Stage Authors and Composers." The organization no longer uses its full name and is now known only as SESAC.

[46] Tr. Jan. 28 at 173:12-19 (testimony of Williams).

[47] Tr. Jan. 28 at 182:13-19 (testimony of Williams).

[48] Tr. Jan. 28 at 188:2-7 and Plaintiff's Ex. 18.

[49] Tr. Jan. 28 at 182:23-24 (testimony of Williams).

2019 Bankr. LEXIS 2073, *15

"scale quickly, very easily."[50] He testified that VRP's "technology was there"[51] and that the "business plan was very real to us."[52] In Williams' view, VRP failed to achieve the financial projections because its technology "was ahead of its time":

> It—not to digress or get sidetracked, but I think it's relevant to the relationship with Mr. Martin is that, you know, when I first met him he was talking about things that the industry is just now—and I'm not trying to set him up as some savant or, you know, whatever, but he was truly talking about things that the world is just now starting to [*16] realize, starting to really seriously consider....
> [The] [t]echnology was there. It's just—it's like a lot of products that are launched. The ideas, the technology. It works, but there's more to it. You know, there has to be other things to—for it to really fly. And it was close.

Tr. Jan. 28 at 196:19-197:11.

In 2015, Martin sold the Porsche to a mechanic for $10,000.[53] Martin did not inform Hunter of the sale or remit any of the sale proceeds to Hunter.[54] Martin sold the Porsche because the engine required major repairs that Martin could not afford to have completed.[55]

## III. Discussion

### A. *Section 523(a)(2)(A)*—False Pretenses or False Representations

HN1[⬆]    *Section 523(a)(2)(A)* provides: "A discharge under *section 727* ... of this title does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." To except debts from discharge, a creditor has the burden of proof under the preponderance of the

---

evidence standard. *Grogan v. Garner, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L. Ed. 2d 755 (1991)*.

Statements respecting the debtor's or an insider's financial condition are governed by the heightened [*17] standard set forth in *§ 523(a)(2)(B)*. *See Lamar, Archer & Cofrin, LLP v. Appling, 138 S. Ct. 1752, 1763-64, 201 L. Ed. 2d 102 (2018)* (explaining the structure and legislative history of *§ 523(a)(2)*). A "statement is 'respecting' a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status." *Lamar, 138 S.Ct. at 1761*. Such statements can include statements pertaining to a single asset. A "single asset has a direct relation to and impact on aggregate financial condition, so a statement about a single asset bears on a debtor's overall financial condition and can help indicate whether a debtor is solvent or insolvent, able to repay a given debt or not." *Id*.

Martin's representations can be grouped into two categories: representations regarding VRP's business potential and representations regarding the value of the Collateral. Representations regarding VRP's business potential do not qualify as statements respecting Martin's financial condition. Although Martin held an interest in VRP, other investors did as well. VRP's performance undoubtedly had the potential to have some effect on Martin's financial condition, but since Martin was not the sole owner of VRP, that effect was too attenuated for Martin's statements regarding VRP to qualify as statements respecting Martin's financial [*18] condition.[56] In contrast, Martin's statements regarding the value of the Collateral—which Martin owned free and clear—do qualify as statements respecting Martin's financial condition.

HN2[⬆]    To prevail on a *§ 523(a)(2)(A)* claim on the grounds of false pretenses or false representation, a creditor must prove that:
> (1) the debtor made the representations;
> (2) that at the time he knew they were false;

---

[50] Tr. Jan. 28 at 182:19-20 (testimony of Williams).

[51] Tr. Jan. 28 at 187:4-5 (testimony of Williams).

[52] Tr. Jan. 28 at 187:4 (testimony of Williams).

[53] Tr. Feb. 4 at 205:2-5 (testimony of Martin).

[54] Tr. Feb. 4 at 205:12-15 (testimony of Martin).

[55] Tr. Feb. 4 at 205:2-11 (testimony of Martin).

---

[56] Even if Martin's representations regarding VRP were statements respecting Martin's financial condition, the Court's ultimate conclusion (explained below) that such representations do not give rise to non-dischargeable indebtedness would remain unchanged. The standard imposed by *§ 523(a)(2)(B)* is more difficult to satisfy than the standard imposed by *§ 523(a)(2)(A)*. Therefore, Hunter's failure to demonstrate non-under *§ 523(a)(2)(A)* means that Hunter could not demonstrate non-dischargeability under *§ 523(a)(2)(B)*.

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations; and

(5) that the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made.

*Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010)*.

Martin's representations regarding VRP's business potential were not false at the time they were made. Williams' testimony established that the financial projections set forth in the VRP Investment Materials were not unreasonable when presented to Hunter in August 2010. The fact that VRP, like many start-up companies, did not achieve its ambitions does not show that the projections were false or misleading. As Williams testified, VRP failed because its technology was "ahead of its time."[57]

The determination that the VRP Investment Materials were not false or [*19] misleading must also take into account that the materials were projections describing a fast-moving start-up enterprise. As a sophisticated investor, Hunter understood that it was necessary to approach the projections with a degree of caution. Hunter's own testimony acknowledged this reality: "I did note that they [VRP] missed the milestone of actually bringing the product to market in the fall, you know, but these things are somewhat in flux."[58] Like nearly all investor presentations, the projections reflected an aggressively optimistic view of VRP's future. But Hunter, whose job is to assess investment opportunities, knew that. In hindsight, the gap between VRP's failure and the $50 million gross revenue projected by 2015 appears striking. However, when considering the context in which they were made, even such aggressively optimistic projections do not qualify as false or misleading.

Hunter did not rely primarily upon the representations contained in the VRP Investment Materials when making the lending decision, which is also fatal to Hunter's *§ 523(a)(2)(A)* claim. HN3[↑] Under *§ 523(a)(2)(A)*, a debt is not excepted from discharge unless the creditor justifiably relies upon the debtor's representation. *Field v. Mans, 516 U.S. 59, 77, 116 S.*

*Ct. 437, 447, 133 L. Ed. 2d 351 (1995)*. As discussed [*20] above, the most significant factor motivating Hunter's decision to extend the loan to Martin was that Shohet had vouched for Martin and that Shohet was working with VRP. Hunter reviewed the VRP Investment Materials, but did not place substantial weight upon them when making the lending decision. Therefore, Hunter did not justifiably rely upon the VRP Investment Materials.

Hunter contends that the Note's option for Hunter to convert his loan into an equity interest in VRP amounts to a false representation under *§ 523(a)(2)(A)*. Hunter's theory is that it would have been impossible for him to exercise the conversion option, because VRP had not issued a sufficient number of shares to accommodate Hunter in the event he elected conversion. Hunter's argument lacks merit. As a result of a typographical error, VRP issued only 100,000 shares of stock, when it had intended to issue 100 million shares.[59] The error was not intentional and could have easily been corrected had Hunter actually been interested in exercising his conversion option.

### B. *Section 523(a)(2)(A)—Actual Fraud*

HN4[↑] A creditor may also prevail on a *§ 523(a)(2)(A)* claim on the ground of "actual fraud." "Actual fraud" includes "a fraudulent conveyance of property made to evade payment [*21] to creditors." *Husky Int'l Elecs., Inc. v. Ritz, 136 S. Ct. 1581, 1585, 194 L. Ed. 2d 655 (2016)*. Such fraudulent conveyance schemes fall within the ambit of *§ 523(a)(2)(A)* even when they do not involve a false representation or are carried out subsequent to the credit transaction that created the debt. *See Husky, 136 S.Ct. at 1589-90* (holding that *§ 523(a)(2)(A)* does not require that the relevant debt "result from fraud *at the inception of a credit transaction*") (emphasis in original); *id. at 1590* ("[W]e interpret 'actual fraud' to encompass fraudulent conveyance schemes, even when those schemes do not involve a false representation").

As stated by the Supreme Court in *Husky*:

"Actual fraud" has two parts: actual and fraud. The word "actual" has a simple meaning in the context of common-law fraud: It denotes any fraud that "involv[es] moral turpitude or intentional wrong." "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception

---

[57] Tr. Jan. 28 at 196:19-20.

[58] Tr. Jan. 28 at 80:7-9 (testimony of Hunter).

[59] Tr. Jan. 28 at 161:22-162:1 (testimony of Shohet).

2019 Bankr. LEXIS 2073, *21

that "may exist without the imputation of bad faith or immorality." Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

*Husky Int'l Elecs., Inc. v. Ritz, 136 S. Ct. 1581, 1586, 194 L. Ed. 2d 655 (2016)* (internal citations omitted).

HN5[⬆] A fraudulent conveyance constitutes "actual fraud" for purposes of *§ 523(a)(2)(A)* if the purpose of the conveyance is to conceal assets from a creditor or hinder the creditor's ability **[*22]** to collect a debt. *Husky, 136 S. Ct. 1581, 1587, 194 L. Ed. 2d 655 (2016)*.

In 2015, Martin sold the Porsche to a mechanic for $10,000, even though Martin knew that the Porsche was collateral for the Note. Martin did not inform Hunter of the sale or remit any of the sale proceeds to Hunter. This conduct qualifies as "actual fraud." It was wrong for Martin to sell the Porsche without remitting the sales proceeds to Hunter. Martin was aware that the Porsche was Hunter's collateral, and thus knew that the unauthorized sale was wrong. By disposing of Hunter's collateral without authorization, the sale hindered Hunter's ability to collect upon the Note.

### C. Section 523(a)(2)(B)

*Section 523(a)(2)(B)* excepts from discharge indebtedness obtained through use of a statement in writing:

    i. that is materially false;
    ii. respecting the debtor's or an insider's financial condition;
    iii. on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
    iv. that the debtor caused to be made or published with intent to deceive....
*§ 523(a)(2)(B)*.

HN6[⬆] To prevail upon a claim under *§ 523(a)(2)(B)*, a creditor must satisfy, by a preponderance of the evidence, the following requirements:

    (1) a representation of fact by the debtor,
    (2) that was material,
    (3) that the debtor knew at the time **[*23]** to be false,
    (4) that the debtor made with the intention of deceiving the creditor,
    (5) upon which the creditor relied,
    (6) that the creditor's reliance was reasonable,
    (7) that damage proximately resulted from the

representation.

*In re Candland, 90 F.3d 1466, 1469 (9th Cir. 1996)*, as amended (Oct. 2, 1996).

The requirements are similar to those imposed by *§ 523(a)(2)(A)*, except that the creditor must make a heightened showing in two respects: (1) the representation at issue must be *materially* false (as opposed to simply false), and (2) the creditor's reliance must be *reasonable* (as opposed to justifiable).

A statement is "materially false if it includes information which is 'substantially inaccurate' and is of the type that would affect the creditor's decision making process. To except a debt from discharge, the creditor must show not only that the statements are inaccurate, but also that they contain important and substantial untruths." *Candland, 90 F.3d at 1470*.

Hunter's *§ 523(a)(2)(B)* claim fails because he failed to show, by a preponderance of the evidence, that (1) Martin's claims regarding the value of the Collateral were materially false when made, or that (2) Martin intended to deceive Hunter with respect to the Collateral's value.

First, Hunter presented no evidence establishing the **[*24]** value of the Collateral as of August 2010, when Martin represented that the Collateral's value exceeded $50,000. Martin testified that he sold the Porsche to a mechanic for $10,000 in 2015 after the engine stopped working. This testimony sheds no light on the Porsche's value as of August 2010. Martin was using the Porsche as his daily driver in New York City subsequent to August 2010, which would have caused its value to depreciate.

Martin testified that as of the present time, one of the two paintings would be worth $3,500, but only after receiving rehabilitation costing between $2,000 to $3,000.[60] Martin testified that the other painting likely had no value because it had decayed as a result of exposure to the salt and air in his seaside apartment.[61] Martin's testimony did not indicate precisely when either painting began to deteriorate or what the paintings were worth as of August 2010. Martin's testimony does little to establish the value of the paintings at the time of execution of the Note.

_____

[60] Tr. Feb. 4 at 207:10-19 (testimony of Martin).

[61] Tr. Jan. 28 at 206:18-207:5 (testimony of Martin).

Layla Buchanan

Without presenting evidence as to what the Collateral was worth as of August 2010, Hunter cannot carry his burden of showing that Martin's claimed valuation as of that date was materially false. **[*25]**

Second, Hunter has failed to establish that Martin intended to deceive Hunter with respect to the Collateral's value. As discussed above, in August 2010, Martin represented that the Porsche and both paintings were collectively worth more than $50,000. Testimony at trial did not clearly elucidate exactly how Martin derived this valuation. It appears that the portion of the valuation attributable to the paintings was Martin's estimate, informed by Martin's understanding that the artist had sold a different painting for $30,000.[62] Martin plausibly testified that he did not have the qualifications to value art.[63] The Court finds that the $50,000 valuation of the Collateral was Martin's unsophisticated estimate, but that Martin did not present this valuation with the intent to deceive Hunter.

### D. *Section 523(a)(4)*

*HN7*[⬆️] *Section 523(a)(4)* excepts from discharge "any debt for fraud or defalcation while acting in a fiduciary capacity." "To prevail on a nondischargeability claim under *§ 523(a)(4)* the plaintiff must prove not only the debtor's fraud or defalcation, but also that the debtor was acting in a fiduciary capacity when the debtor committed the fraud or defalcation." *In re Honkanen, 446 B.R. 373, 378 (B.A.P. 9th Cir. 2011)*.

Federal bankruptcy law determines whether a fiduciary relationship exists **[*26]** within the meaning of *§523(a)(4)*. *Cal-Micro, Inc. v. Cantrell (In re Cantrell), 329 F.3d 1119, 1125 (9th Cir. 2003)*. For purposes of *§523(a)(4)*, the fiduciary relationship "must be one arising from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt." *Lewis v. Scott (In re Lewis), 97 F.3d 1182, 1185 (9th Cir. 1996)*. State law determines whether the requisite trust relationship exists. *In re Mele, 501 B.R. 357, 363 (B.A.P. 9th Cir. 2013)*.

Hunter's *§ 523(a)(4)* claim fails because no fiduciary relationship existed between Hunter and Martin. Martin and Hunter conducted no business prior to execution of

---

[62] Tr. Feb. 4 at 207:16-19 (testimony of Martin).

[63] Tr. Feb. 4 at 206:23 (testimony of Martin).

the Note. The parties' business relationship was limited to Hunter's extension of credit to Martin through the Note. Hunter's act of extending credit did not create an express or technical trust under California law.

### E. *Section 523(a)(6)*

*HN8*[⬆️] "*Section 523(a)(6)* excepts from discharge debts arising from a debtor's 'willful and malicious' injury to another person or to the property of another. The 'willful' and 'malicious' requirements are conjunctive and subject to separate analysis." *Plyam v. Precision Development, LLC (In re Plyam), 530 B.R. 456, 463 (9th Cir. B.A.P. 2015)* (internal citations omitted).

An injury is "willful" when "a debtor harbors 'either subjective intent to harm, or a subjective belief that harm is substantially certain.' The injury must be deliberate or intentional, 'not merely a deliberate or intentional act that leads to injury.'" *Id. at 463* (internal citations omitted). **[*27]** An injury is "malicious" if it "involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'" *Carrillo v. Su (In re Su), 290 F.3d 1140, 1146-47 (9th Cir. 2002)* (internal citations omitted).

In addition, the injury-producing conduct must be tortious in order to be excepted from discharge under *§523(a)(6)*. *Lockerby v. Sierra, 535 F.3d 1038, 1040 (9th Cir. 2008)*. "[C]onduct is not tortious under *§ 523(a)(6)* simply because injury is intended or 'substantially likely to occur,' but rather is only tortious if it constitutes a tort under state law." *Id. at 1041*.

None of Martin's conduct qualifies as "willful" and "malicious" within the meaning of *§ 523(a)(6)*. Martin did not solicit the loan with the intent of injuring Hunter. Martin genuinely believed that VRP would be a success and that he would be able to repay the proceeds. Martin's decision to sell the Porsche and retain the proceeds, all without telling Hunter, was wrongful, but does not qualify as a deliberate and intentional injury. Martin did not sell the Porsche for the purpose of injuring Hunter; he sold the Porsche because he could no longer afford the expensive engine repairs the car required.

### F. Damages

As a result of the "actual fraud" that Martin committed by

---

Layla Buchanan

2019 Bankr. LEXIS 2073, *27

selling the Porsche and failing to remit the sales proceeds **[\*28]** to Hunter, Hunter was damaged in the amount of $10,000. Martin's unauthorized sale prevented Hunter from foreclosing upon the Porsche and applying its value toward repayment of the Note. The only evidence of the Porsche's value at the time of the sale was Martin's testimony that the sale price was $10,000.

Hunter seeks an award of attorney's fees. The Note contains the following provision with respect to attorney's fees:

> Borrower shall pay all costs and expenses, including, without limitation, reasonable attorneys' fees and expenses Lender expends or incurs in connection with the enforcement of this Note, the collection of any sums due hereunder, any actions for declaratory relief in any way related to this Note, or the protection or preservation of any rights of the holder hereunder.

Note at ¶ S (Plaintiff's Ex. 16).

*HN9*[⬆] "No general right to attorney fees exists under the Bankruptcy Code. However, a prevailing party in a bankruptcy proceeding may be entitled to an award of attorney fees in accordance with applicable state law if state law governs the substantive issues raised in the proceedings." *Ford v. Baroff (In re Baroff), 105 F.3d 439, 441 (9th Cir. 1997)*. The applicable provisions of California law governing the award of attorney's fees are *Cal. Civ. Code § 1717(a)* and **[\*29]** *Cal. Code Civ. Proc. § 1021*.

*Cal. Civ. Code § 1717(a)* provides in relevant part:

> In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs.

*HN10*[⬆] *Cal. Civ. Code § 1717(a)* applies only to attorney's fees incurred in actions involving a contract claim. *Santisas v. Goodin, 17 Cal.4th 599, 71 Cal.Rptr.2d 830, 951 P.2d 399 (1998)*. A non-dischargeability claim based on actual fraud is not a contract claim. *Redwood Theaters v. Davison (In re Davison), 289 B.R. 716, 724 (B.A.P. 9th Cir. 2003)*. Hunter is not entitled to attorney's fees pursuant to *Cal. Civ. Code § 1717(a)*.

*Cal. Code Civ. Proc. § 1021* provides in relevant part:

> Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties; but parties to actions or proceedings are entitled to their costs, as hereinafter provided.

*HN11*[⬆] *Cal. Code Civ. Proc. § 1021* does not limit the recovery of attorney's fees to certain claims. *3250 Wilshire Boulevard Bldg. v. W.R. Grace & Co., 990 F.2d 487, 489 (9th Cir. 1993)*. Fees may be recoverable under *Cal. Code Civ. Proc. § 1021* even if not recoverable under *Cal. Civ. Code § 1717(a)*. *Id.* "*Section 1021* allows the parties to agree that the prevailing party in litigation **[\*30]** may recover attorney's fees, whether the litigation sounds in contract or in tort." *Taburaza v. Zarate (In re Zarate), 567 B.R. 176, 182 (Bankr. N.D. Cal. 2017)*. "To determine whether a prevailing party may recover attorney's fees for non-contractual claims under *Section 1021*, a court must look to the language of the agreement." *Terra Nova Industries, Inc. v. Chen (In re Chen), 345 B.R. 197, 201 (N.D. Cal. 2006)*.

Fee provisions limited to the enforcement of the terms of the contract or to the collection of monies owed under the contract have been held not to extend to fees incurred in litigating tort claims, such as the instant non-dischargeability action. *See, e.g.*, *Exxess Electronixx v. Heger Realty Corp., 64 Cal.App.4th 698, 707-708, 75 Cal.Rptr.2d 376 (1998)* (an action or proceeding to "enforce the terms or declare rights" under a lease did not cover tort claims); *Sharma v. Salcido (In re Sharma), 2013 Bankr. LEXIS 2286, 2013 WL 1987351, *18 (9th Cir. B.A.P. 2013)* (suit to "enforce or interpret" a settlement agreement did not cover fees in a § 523(a)(2)(A) case involving fraud in inducement of settlement agreement). In contrast, provisions with broader language—suits arising from or with respect to the subject matter or enforcement of a contract—have been held to extend to fees incurred in litigating tort claims. *See, e.g.*, *3250 Wilshire Boulevard Bldg. v. W. R. Grace & Co., 990 F.2d 487, 489 (9th Cir. 1993)* (contract providing for fees for any suit with respect to "the subject matter or enforcement" of contract covered tort claims); *Santisas v. Goodin, 17 Cal.4th 599, 608, 71 Cal.Rptr.2d 830, 951 P.2d 399 (1998)* (agreement for fees for any "litigation arising out of the execution" of agreement or sale of property covered **[\*31]** tort claims); *Xuereb v. Marcus & Millichap, Inc., 3 Cal.App.4th 1338, 1341, 5 Cal.Rptr.2d 154 (1992)* (agreement providing for prevailing party fees in "any lawsuit or other legal proceeding to which it gives rise"

covered tort claims including events that occurred prior to agreement's formation).

The Note's fee provision provides for the recovery of fees incurred "in connection with the enforcement of this Note" or in "the collection of any sums due hereunder." Consistent with the authorities cited above, these provisions do not extend to fees incurred in the litigation of the instant dischargeability action. The Note provides for a recovery of fees incurred in an action "for declaratory relief in any way related to this Note." This dischargeability action is not an action for declaratory relief.

Finally, the Note provides for the recovery of fees incurred in connection with "the protection or preservation of any rights of the holder hereunder." This language is sufficiently broad to encompass the instant dischargeability action. The language is similar to provisions allowing recovery for fees incurred with respect to suits arising from or with respect to the subject matter of a contract; such provisions have been held to extend to tort claims.

Hunter is entitled to an **[*32]** award of attorney's fees incurred in connection with establishing Martin's liability for "actual fraud" on account of the unauthorized sale of the Porsche. Hunter is not entitled to attorney's fees incurred in presenting other aspects of his case against Martin. By separate order, the Court will set deadlines for Hunter to submit evidence establishing the fees incurred in connection with his *§ 523(a)(2)(A)* claim for "actual fraud."

## III. Conclusion

Based upon the foregoing, Martin is indebted to Hunter in the amount of $10,000. Such indebtedness is excepted from Martin's discharge pursuant to *§ 523(a)(2)(A)*, on the ground of "actual fraud." The Court will not enter final judgment until the issue of Hunter's attorney's fees has been determined.

/s/ Ernest M. Robles

Ernest M. Robles

United States Bankruptcy Judge

Date: July 10, 2019

**ORDER REQUIRING HUNTER TO SUBMIT**

**EVIDENCE REGARDING ATTORNEY'S FEES AND COSTS BY NO LATER THAN SEPTEMBER 10, 2019**

For the reasons set forth in the concurrently issued *Memorandum of Decision Finding that Martin's Indebtedness to Hunter, in the Amount of $10,000, is Excepted from Discharge* (the "Memorandum of Decision"), the Court **HEREBY ORDERS AS FOLLOWS**:

1) Final judgment in this adversary proceeding **[*33]** will not be entered until the Court has determined the amount of attorney's fees and costs to which Kevin Hunter ("Hunter") is entitled. Once the issue of attorney's fees and costs has been determined, the Court will enter final judgment in favor of Paul William Martin ("Martin") as to Hunter's claims under *§ 523(a)(2)(A)* (for false pretenses and false representations), *523(a)(2)(B)*, *523(a)(4)*, and *523(a)(6)*. As to Hunter's claim under *§ 523(a)(2)(A)* on the ground of actual fraud, the Court will enter final judgment that Martin is indebted to Hunter in the amount of $10,000 (plus the amount of attorney's fees and costs awarded), and that such indebtedness is excepted from Martin's discharge.

2) By no later than **September 10, 2019**, Hunter shall submit evidence showing the amount of attorney's fees and costs incurred to establish Martin's liability under *§ 523(a)(2)(A)* on the ground of actual fraud. The evidence shall be limited to fees and costs incurred with respect to the issue of actual fraud, and shall not include evidence of fees and costs incurred attempting to establish Martin's liability under *§ 523(a)(2)(A)* (for false pretenses and false representations), *523(a)(2)(B)*, *523(a)(4)*, and *523(a)(6)*.

3) Martin's opposition to Hunter's evidence **[*34]** shall be submitted by no later than **October 10, 2019**.

4) This matter shall stand submitted as of **October 10, 2019**.

IT IS SO ORDERED.

/s/ Ernest M. Robles

Ernest M. Robles

United States Bankruptcy Judge

Date: July 10, 2019

Layla Buchanan

2019 Bankr. LEXIS 2073, *34

---

**End of Document**

Layla Buchanan

**EXHIBIT 3**

**LexisNexis**

**User Name:** Layla Buchanan

**Date and Time:** Thursday, February 9, 2023 6:46:00PM PST

**Job Number:** 190002635

## Document (1)

1. *Sharma v. Baljian (In re Baljian), 2014 Bankr. LEXIS 1419*

   **Client/Matter:** 1673-001

   **Search Terms:** 2014 WL 1287127

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |

EXHIBIT 3, PAGE 30

**A** Neutral

As of: February 10, 2023 2:46 AM Z

# *Sharma v. Baljian (In re Baljian)*

United States Bankruptcy Court for the Southern District of California

March 26, 2014, Decided; March 26, 2014, Entered, Filed

Bankruptcy Case No. 12-02357-CL7, Adversary Proceeding No. 12-90166-CL, Chapter 7

**Reporter**
2014 Bankr. LEXIS 1419 *; 2014 WL 1287127

In re: CAIN BALJIAN & LUCY BALJIAN, Debtors,PREM M. SHARMA, Plaintiff, v. CAIN BALJIAN & LUCY BALJIAN, Defendants.

**Notice:** NOT FOR PUBLICATION

## Core Terms

damages, attorney's fees, omissions, costs, parties, nondischargeable, representations, promise, business deal, lease, false representation, settlement agreement, bank account, term sheet, capital contribution, prejudgment interest, disclose, misrepresentations, proximately, settlement, licenses, bankruptcy court, premises, partial, financial records, intent to deceive, fail to disclose, business record, transferring, fraudulent

## Case Summary

### Overview
HOLDINGS: [1]-Damages sustained by business partners of the debtors were nondischargeable in the debtors' bankruptcy under *11 U.S.C.S. § 523(a)(2)(A)* because the debtors made representations that at the time they knew to be false, they failed to disclose information they had a duty to disclose, they made these representations and omissions with the intent to deceive the business partners, the business partners justifiably relied on these representations and omissions, and these representations and omissions proximately caused the business partners $278,000 in damages, attorney's fees and costs.

### Outcome
Damages plus prejudgment interest awarded to business partners and determined nondischargeable.

## LexisNexis® Headnotes

Bankruptcy Law > Procedural Matters > Adversary Proceedings > General Overview

Evidence > ... > Hearsay > Unavailability > Absence of Declarants

*HN1*[⬇] **Procedural Matters, Adversary Proceedings**

A deposition may be read into the record under *Fed. R. Bankr. P. 7032* and *Fed. R. Evid. 804(a)(5)* and *804(b)(1)* for a witness unavailable to testify.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

*HN2*[⬇] **Exceptions to Discharge, Embezzlement & False Representations**

*11 U.S.C.S. § 523(a)(2)(A)* provides that debts are nondischargeable if they are obtained by false pretenses, a false representation, or actual fraud. To except her debt from discharge under *§ 523(a)(2)(A)*, a creditor must show by a preponderance of the evidence that: (1) The debtor made representations; (2) The debtor knew at the time that the representations were false; (3) The debtor made those representations with the intention and purpose of deceiving the plaintiff creditor; (4) The creditor justifiably relied on the representations; and (5) The creditor sustained losses as a proximate result of the debtor's representations.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to

Layla Buchanan

2014 Bankr. LEXIS 1419, *1419

Discharge > Embezzlement & False Representations

**HN3**[🔻]  **Exceptions to Discharge, Embezzlement & False Representations**

A promise made with a positive intent not to perform or without a present intent to perform satisfies the false representation requirements of *11 U.S.C.S. § 523(a)(2)(A)*. A debtor's failure to disclose material facts also constitutes a fraudulent omission under *§ 523(a)(2)(A)* if the debtor was under a duty to disclose and the debtor's omission was motivated by an intent to deceive. And a party to a business transaction has a duty to disclose matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

**HN4**[🔻]  **Exceptions to Discharge, Embezzlement & False Representations**

To find nondischargeability under *11 U.S.C.S. § 523(a)(2)(A)*, the debtors must have had the subjective intent to deceive at the time of the transaction. The court may infer this intent from the surrounding circumstances. Additionally, intent to deceive may be inferred if a debtor takes no steps to perform under a contract.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

**HN5**[🔻]  **Exceptions to Discharge, Embezzlement & False Representations**

For purposes of a finding of nondischargeability under *11 U.S.C.S. § 523(a)(2)(A)*, reliance on a representation

need not reach the level of reasonableness; it need only be justifiable. This is a subjective standard that considers the relationship between the parties. A person is justified in relying on a representation of fact although he might have ascertained the falsity of the representation had he made an investigation. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases. Although one cannot close his eyes and blindly rely, mere negligence in failing to discover an intentional misrepresentation is no defense to fraud.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

**HN6**[🔻]  **Exceptions to Discharge, Embezzlement & False Representations**

In cases under *11 U.S.C.S. § 523(a)(2)(A)* involving fraudulent omissions, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable person might have considered them important in the making of this decision. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

**HN7**[🔻]  **Exceptions to Discharge, Embezzlement & False Representations**

For purposes of an action under *11 U.S.C.S. § 523(a)(2)(A)*, proximate cause entails causation in fact, which requires a defendant's misrepresentations to be a substantial factor in determining the course of conduct that results in loss, and legal causation, which requires a creditor's loss to reasonably be expected to result from the reliance. A debtor's failure to satisfy his or her obligation to disclose a material fact establishes causation in fact.

2014 Bankr. LEXIS 1419, *1419

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Judgments

Civil Procedure > Remedies > General Overview

### HN8[🔖] Adversary Proceedings, Judgments

*Fed. R. Civ. P. 54(c)* provides that a non-default judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings. *Fed. R. Bankr. P. 7054* incorporates by reference *Fed. R. Civ. P. 54*.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

Torts > ... > Types of Damages > Compensatory Damages > General Overview

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Judgments

### HN9[🔖] Exceptions to Discharge, Embezzlement & False Representations

With respect to the measure of damages for fraud, in addition to the pecuniary loss for which the misrepresentation is a legal cause, the recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty. The damages in a nondischargeability action are not limited to the amount of money the debtors obtained from fraud. They extend to the creditor's loss resulting from the fraud, even if this exceeds the value the debtors received. And this may include attorney's fees, costs, and treble damages.

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Judgments

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > General Overview

Contracts Law > Contract Interpretation > General Overview

### HN10[🔖] Adversary Proceedings, Judgments

The determinative question for awarding attorney's fees in an action under *11 U.S.C.S. § 523* is whether the creditor should be able to recover the fee outside of bankruptcy under state or federal law. The California courts have repeatedly interpreted clauses that authorize attorney's fees to "enforce" or "interpret" a contract to not include tort claims for fraud. On the other hand, California courts have held that certain broadly-worded clauses do cover fraud claims.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

### HN11[🔖] Exceptions to Discharge, Embezzlement & False Representations

The federal prejudgment interest rate applies to actions brought under federal statute, such as bankruptcy proceedings, unless the equities of the case require a different rate. And, in particular, an action under *11 U.S.C.S. § 523(a)(2)(A)* is a product of federal law engendering federal prejudgment interest.

**Counsel:  [*1]** For Cain Baljian, Debtor (12-02357-CL7): Marc A. Duxbury, Law Offices of Marc A. Duxbury, Carlsbad, CA.

For Lucy Baljian, Joint Debtor (12-02357-CL7): Marc A. Duxbury, Law Offices of Marc A. Duxbury, Carlsbad, CA.

Trustee (12-02357-CL7): Leonard J. Ackerman, San Diego, CA.

For Prem M. Sharma, Plaintiff (12-90166-CL): Joseph S. Carmellino, LEAD ATTORNEY, Solana Beach, CA.

For Cain Baljian, Lucy Baljian, Defendants, Counters-Claimants (12-90166-CL): Paul K. Fine, Fine & Associates, San Diego, CA.

**Judges:** CHRISTOPHER B. LATHAM, United States Bankruptcy Judge.

**Opinion by:** CHRISTOPHER B. LATHAM

Layla Buchanan

2014 Bankr. LEXIS 1419, *1

## Opinion

### MEMORANDUM DECISION AND ORDER FINDING NONDISCHARGEABILITY AND AWARDING DAMAGES

In September 2009, plaintiff Prem M. Sharma filed a complaint in San Diego Superior Court against defendants Cain Baljian, Lucy Baljian and Keshant, Incorporated ("Keshant"). Her complaint asserted claims for: (1) corporate dissolution; (2) breach of fiduciary duty; and (3) common law fraud arising from a business venture between herself, her husband — Sukhdev R. Sharma — and the Baljians. The Superior Court set the matter for trial twice. And twice, on the eve of trial, Mrs. Baljian filed for bankruptcy — thereby invoking the automatic stay. The **[*2]** Superior Court then set trial a third time for February 24, 2012. And on February 23, both Mr. and Mrs. Baljian filed a voluntary joint Chapter 7 petition in the instant bankruptcy case; Case No. 12-02357-CL7.

Approximately three months later, on May 15, Mrs. Sharma initiated the above-captioned adversary proceeding. She seeks damages, costs, attorney's fees and a finding of nondischargeability under *11 U.S.C. § 523(a)(2)*. On July 9, the Baljians answered the complaint and filed a counterclaim against Mrs. Sharma. The court tried the matter over three days. At the trial, the Baljians effectively abandoned their counterclaim.[1] And the Sharmas testified that they incurred approximately $57,800 in attorney's fees and costs to prosecute this action. At the trial's conclusion, the court took the matter under submission. For the following reasons, the court: (1) awards Mrs. Sharma damages, attorney's fees and costs; and (2) finds this award nondischargeable under *11 U.S.C. § 523(a)(2)(A)*.

---

[1] The court further notes that, at the trial, Mrs. Sharma's counsel stated that Mr. Yusuf Arnitah — a witness — could not be located, and was thus unavailable to testify. As such, he proposed to read portions **[*3]** of Mr. Arnitah's deposition into the record. Counsel for the Baljians objected. But the court overruled the objection.*HN1*[⬆] It allowed the deposition into the record under *Rule 7032 of the Federal Rules of Bankruptcy Procedure* and *Rules 804(a)(5)* and *804(b)(1) of the Federal Rules of Evidence.* And the Baljians' counsel interposed no further objections to any specific portion of the deposition read into the record.

### I. JURISDICTION AND VENUE

The court has jurisdiction over this adversary proceeding under *28 U.S.C. §§ 1334(b)* and *157(b)(2)(I)*. Venue is proper under *28 U.S.C § 1409(a)*.

### II. FACTUAL BACKGROUND AND FINDINGS

The Baljians and the Sharmas have known each other for over eighteen years. Mr. Sharma, a government aeronautical engineer, regularly took his cars to Mr. Baljian's garage for maintenance. The two men would often chat when Mr. Baljian came for service, and in that manner became steady acquaintances. On one such visit in early 2008, the topic turned to how the Baljians' other business — a convenience store known as the San Diego Service Center ("SDSC") — was doing. Mr. Baljian told Mr. Sharma that things were going very well and that the business was quite profitable. Shortly thereafter, **[*4]** the Sharmas became investors in SDSC. The parties intended the wives to be the named owners, and the husbands to play different managerial roles. Things did not go well for them, however — either in their relationship or in the expected success of SDSC.

### A. The DBA, the LLC and Mr. Arnitah

SDSC was first a fictitious business named used by Mrs. Baljian. It leased its location at 3865 Fifth Avenue in San Diego, California. It sold the usual convenience store array of goods, including alcohol and tobacco, along with some clothing and San Diego-themed novelties. It held a postal annex — with a corresponding a U.S. Postal Service ("USPS") contract — as well as liquor, tobacco and check cashing permits. And it had a bank account at Neighborhood National Bank, opened in June 2005 under the name "Lucy C. Baljain [sic] DBA The Service Center." The signatories to the account were Mrs. Baljian and Mr. Yusuf Arnitah.

Then, in early 2007, Mr. Baljian and Mr. Arnitah organized a California limited liability company named "The San Diego Service Center LLC." The LLC was located at 3870 Fifth Avenue, across the street from SDSC's 3865 Fifth Avenue location. The LLC's operating agreement named Mr. Baljian **[*5]** the managing member, CEO and president; it named Mr. Arnitah a fellow member. Mr. Arnitah contributed some $30,000 in capital to the LLC, hoping to become Mr. Baljian's "partner." For his part, Mr. Arnitah considered the DBA and the LLC to be the same business. And he

EXHIBIT 3, PAGE 34

believed that his capital contribution conferred some sort of ownership interest in that business.

But Mr. Baljian disagreed. His subjective view of the matter was that Mr. Arnitah's interest related only to the LLC. And he opined that this interest never matured into any ownership stake because Mr. Arnitah made only partial capital contributions. Mr. Baljian, however, kept open the possibility that Mr. Arnitah might make additional capital contributions that could, eventually, make him a "partner." Nevertheless, the Baljians allowed Mr. Arnitah to function as SDSC's on-site manager, even permitting him to live on the premises. And the evidence shows that Mr. Arnitah's role in the business — and the Baljians' treatment of him — was far from that of an ordinary employee.

Mr. Arnitah was a signatory to the lease of SDSC's business premises. He opened SDSC's bank account with Mrs. Baljian, and thus had unfettered access to [*6] it. He was the named contact for SDSC's Merchant Card Processing Statements. And testimony revealed that he did not take orders or direction from Mrs. Baljian. In fact, it appears that the Baljians were quite dissatisfied with Mr. Arnitah; they tried several times to fire him. But Mr. Arnitah nevertheless kept working, and the Baljians allowed it. Indeed, this was easy for the Baljians because they did not pay Mr. Arnitah for his work. They did, however, let him take cash and in-kind merchandise from the store. This dysfunctional relationship between the Baljians and Mr. Arnitah continued into 2008, when the Sharmas became investors in SDSC.

## B. The Baljian-Sharma Business Deal

The Baljians and the Sharmas formalized their business venture through three writings: a shareholder agreement and shareholder resolution — both dated March 1, 2008 — as well as a term sheet dated March 15, 2008. At that time, SDSC had net profits of $10,000 to $12,000 on monthly revenues of about $30,000. Approximately half of these profits came from the USPS contract. The Sharmas questioned the Baljians about Mr. Arnitah's role at SDSC. And the Baljians represented that Mr. Arnitah was simply an employee. They [*7] did not inform the Sharmas about Mr. Arnitah's history with the store, the extent of his role there or his relationship to the business.[2]

The term sheet specified that California law would govern the agreement. It further provided that,

> In the event that it becomes necessary to initiate legal proceedings by either party to interpret or enforce any of the terms or provisions of this Agreement, to recover damages, or to obtain any relief, at law or in equity, the prevailing party shall be entitled to recover . . . reasonable attorneys' fees and costs as well as any court costs incurred by such party in connection with any such action(s).

Both the shareholder agreement and the term sheet called for the transfer of all of SDSC's assets to a new company, Keshant, created for this purpose. These assets included SDSC's fictitious business name, the premises lease, the USPS contract and the permits authorizing check cashing, [*8] alcohol and tobacco sales. And the court finds that the parties orally agreed to conduct SDSC's business through a new bank account in Keshant's name.

The shareholder resolution designated Mr. Baljian as Keshant's Chief Operating Officer. Mr. Baljian's responsibilities as Chief Operating Officer included managing SDSC's day-to-day affairs, its resources and its employees. The resolution named Mr. Sharma Keshant's Chief Financial Officer. As Chief Financial Officer, Mr. Sharma would manage SDSC's banking services, accounts receivables and accounts payables. To fulfill his duties, the parties orally agreed that Mr. Sharma would be given full access to all of SDSC's books and financial records. For their services, Keshant was to pay both Mr. Baljian and Mr. Sharma $4,000 per month. And, finally, for their stake in SDSC, the Sharmas promised to make a $225,000 capital contribution.

### 1. The Sharmas' Payments

The Sharmas made their first payment through a $50,000 cashier's check dated February 29, 2008. Trusting the Baljians, they paid this sum directly to USPS on SDSC's behalf; the parties intended that it would be part and parcel of the Sharma's capital investment. Thus, the Sharmas paid $50,000 [*9] to the Baljians' benefit before they even signed the writings. Thereafter, they made the following payments:

   • One $10,000 personal check of Sukhdev Sharma,

---

[2] But the court need not determine, for purposes of this action, whether Mr. Arnitah was their employee or their business

partner. It is enough to find — as the court does, below — the Baljians had a duty to disclose this information to the Sharmas, and they failed to do so.

dated March 7, 2008, payable to Keshant, Inc. [Ex. 6].

• Two $50,000 personal checks of Sukhdev Sharma, both dated March 21, 2008, payable to Lucy Baljian [Exs. 8 & 9];

• One $50,000 cashiers check, dated March 24, 2008, payable to Lucy Baljian [Ex. 10];

And Mr. Sharma asserts that he paid an additional $6,000 in capital, for a total of $216,000 paid towards the contractual amount. The Baljians did not dispute this.

## 2. The Bank Accounts

The parties agreed orally that SDSC's merchant account with Neighborhood National Bank would be closed and a new account in Keshant's name at the same bank be thenceforth used for SDSC's business banking. To that end, the parties caused a merchant account for Keshant to be opened at Neighborhood National Bank, with a $100 initial balance. [Exs. 44 & 45]. All four Baljians and Sharmas signed the account signature card. [Ex. 44]. But the Baljians steadfastly resisted using the new account. Mr. Sharma repeatedly asked the Baljians to use it. The trial evidence, however, showed effectively no activity in **[*10]** the Keshant account from April to December 2008. [Exs. 45-54].

Instead, the Baljians and Mr. Arnitah continued to do SDSC's banking through the old account. And, by continuing to use the old account, the Baljians were able to conceal numerous transactions from the Sharmas' view. Notable among these is some $373,000 in cash withdrawals or checks written out to: Mrs. Baljian; the Baljians' auto business (Euro 1 Kar); or their mortgages with Countrywide and IndyMac. Additionally, the Baljians issued several checks to Keshant. But these funds never reached Keshant's bank account. The evidence presented at trial, and largely admitted by Mr. Baljian, shows the following payments from SDSC's bank account to the Baljians or in their interest during the time period relevant to this case:

⊞*Go to table1*

[Exs. 140-148].

This state of affairs continued until the Baljians had to abandon SDSC's old account. The Baljians argue that they could not use the Keshant account due to technical issues; they asserted that using it required more paperwork. But the record **[*11]** is clear that Mrs.

Baljian began using the Keshant account in December 2008, after they closed SDSC's old account. [Exs. 45-55]. And she provided no explanation for why the required paperwork — or any other prerequisite to using the Keshant account — could not be completed before December 2008.

On the stand, Mr. Baljian alleged that he instructed Mr. Arnitah to use the new Keshant account, but that Mr. Arnitah failed to do so. Yet: (1) it was Mr. Baljian's responsibility as Chief Operating Officer to run SDSC's day-to-day affairs and manage its "employees;" (2) they knew Mr. Arnitah's history of not following their directions; and (3) Mrs. Baljian could have just as easily used the Keshant account. The court therefore finds that, when the Baljians promised to use the new Keshant bank account to conduct SDSC's business, they never intended to follow through on that promise. The court further finds that: (1) the Baljians treated SDSC's old account with Neighborhood National Bank as a personal bank account; and (2) they failed to disclose this to the Sharmas.

## 3. The Name, the Lease and the Licenses

Under the term sheet, all of SDSC's assets were to be transferred to Keshant. This implicitly **[*12]** included transferring SDSC's fictitious business name to Keshant's control. It called for the premises lease and the various business licenses to be put in Keshant's name. And the Baljians explicitly represented, in the term sheet, that they would "perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby." [Ex. 7, ¶ 6]. They failed to perform these acts, however, and Keshant never took the business name, the lease or the licenses.

There was no indication that the Baljians — or Mr. Arnitah — approached SDSC's landlord to transfer the lease. Nor was there any evidence that the Baljians took any steps to get the licenses in Keshant's name. The reason they gave for this at trial was that the Sharmas were responsible for transferring the lease and the licenses. But that argument is neither reasonable nor persuasive. Obviously, the holder of a lease or license is the natural party to ask the issuer to formalize the transfer. Why would an issuer make the change on the mere word of an apparent stranger to the document? The court therefore finds **[*13]** that, when the Baljians represented that they would act as necessary to

Layla Buchanan

2014 Bankr. LEXIS 1419, *13

effectuate the transfers described in the term sheet, they did not in fact intend to do so.

### 4. The Business Records

The court finds that the Baljians also agreed orally to make SDSC's financial records available to the Sharmas — particularly Mr. Sharma, Keshant's Chief Financial Officer. Mr. Sharma asked Mr. Baljan and Mr. Arnitah repeatedly for the records, but they never gave meaningful access to them. Moreover, the trial evidence showed that SDSC kept hardly any records. The Baljians did not prepare a regular payroll. Instead, Mr. Arnitah — if employee he was — got his cash directly from the till and helped himself to merchandise. Further, the trial testimony of all the witnesses consistently showed SDSC's cash controls were very weak. The physical inventory was not well accounted for. There was no running tally of it or its cost. And the merchandise bore no price tags.

These irregularities in the company's internal controls concerned Mr. Sharma. He desired and attempted to regularize them. But he was met with intransigence on the Baljians' and Mr. Arnitah's part. The Baljians kept what few records they had of **[*14]** SDSC's transactions in a box, on shelves behind the store's counter. They assert that Mr. Sharma could have taken them at any time. But there's no indication that they ever disclosed the existence or location of this box to Mr. Sharma. And Mr. Arnitah was always at the store, preventing Mr. Sharma's access. Indeed, Mr. Sharma's repeated requests to see the business records occasioned several confrontations with Mr. Arnitah. At first, Mr. Arnitah agreed to give Mr. Sharma the business records at the end of each month. But every time Mr. Sharma returned to the store, Mr. Arnitah rebuffed him. And Mr. Arnitah quickly grew abrasive and belligerent. According to Mr. Sharma, Mr. Arnitah would claim to own the store, and he would tell Mr. Sharma to get out.

Eventually, Mr. Sharma insisted that the inventory be evaluated. The Baljians engaged a third party company to conduct this evaluation. But, due to SDSC's poor controls, the company generated a highly unreliable number. The combination of SDSC's poor controls, the inability to obtain an accurate inventory evaluation, as well as Mr. Arnitah's insubordination and cash skimming, caused Mr. Sharma to believe that SDSC might be violating the **[*15]** law. And, in fact, SDSC's substandard controls lead to the loss of both its USPS contract and its Moneygram account. Fearful of the

liability SDSC might incur, on July 31, 2008, Mr. Sharma wrote Mr. Baljian a letter detailing his concerns and resigning his position as Chief Financial Officer. [Ex. 12].

Like before, Mr. Baljian alleged that he instructed Mr. Arnitah to provide the business records to Mr. Sharma, but that Mr. Arnitah failed to do so. Yet, again: (1) it was Mr. Baljian's responsibility to manage Mr. Arnitah and run SDSC's day-to-day affairs; (2) Mr. Baljian knew of Mr. Arnitah's history of insubordination; and (3) Mr. Baljian could have simply given Mr. Sharma the box, or at least disclosed its location. The Baljians also argued that it was Mr. Sharma's responsibility as Chief Financial Officer to deal with SDSC's finances on a daily basis. But Mr. Sharma already had a busy job as a government engineer, and the Baljians knew this. They knew that Mr. Sharma could not be at the store every day, and they knew that they would have to provide Mr. Sharma with SDSC's financial records if he was to be effective as Chief Financial Officer. The court therefore finds that, when the **[*16]** Baljians agreed to make SDSC's financial records available to Mr. Sharma, they did not in fact intend to make that happen.

### C. The Settlement Agreement

The Sharmas testified that if they had known any of the above-described facts, they would never have entered this business deal with the Baljians. And, after Mr. Sharma resigned his position as Chief Financial Officer, he attempted to get his capital investment back. He told Mr. Baljian that he would file a lawsuit if the parties could not reach a resolution. As a result, on October 1, 2008, Mrs. Sharma and Mr. Baljian entered into a settlement agreement on Keshant's behalf. [Ex. 14]. The agreement called for Keshant to pay Mrs. Sharma a $4,500 "Owner's Draw" every month. The trial testimony showed that the parties intended this draw to be a return of the Sharmas' capital contribution. The settlement further provided that, if Keshant failed to pay the Owner's Draw, Mr. Baljian personally guaranteed to buy out Mrs. Sharma's interest in Keshant — and thus SDSC — for $235,000 cash.

Keshant paid Mrs. Sharma for just two months; she received only $9,000. It then defaulted on the settlement agreement. And when the Sharmas called upon Mr. Baljian **[*17]** to make good his guarantee, he failed to do so. Instead, he tried to offer Mr. Sharma a rare car in partial satisfaction of the amount owed. But when Mr. Sharma asked Mr. Baljian to produce the car's title, Mr.

Baljian prevaricated. Mr. Baljian first claimed that he did not have the title on his person. He then claimed that Mr. Dennis Calkins — a man with whom he was negotiating the purchase and sale of SDSC — might have the car's title. Ultimately, Mr. Baljian was unable to produce the title, and he otherwise failed to satisfy his obligation under the settlement agreement.

In September 2009, Mrs. Sharma filed an action against the Baljians and Keshant in San Diego Superior Court. In March 2010, they entered default against Keshant. The Superior Court set trial for January 21, 2011. On the eve of trial, Mr. Baljian filed a voluntary bankruptcy petition in Case No. 11-00883-LT13. In March 2011, the bankruptcy court dismissed Mrs. Baljian's case for failure to appear at the 341(a) meeting of creditors. And the Superior Court reset trial for September 23, 2011. But again, on the eve of trial, Mrs. Baljian filed bankruptcy in Case No. 11-15707-LT13. The following month, the bankruptcy **[*18]** court dismissed this second case for failure to file a certificate of credit counseling. The Superior Court then set a third trial date for February 24, 2012. And on February 23, the Baljians filed their instant bankruptcy case.

Mr. Baljian testified that, when he personally guaranteed the settlement, he intended to follow through. He asserted that he was trying to make things right with the Sharmas, and he earnestly wanted to get them their money back. But the court does not find Mr. Baljian's testimony credible. On the stand, he was frequently evasive, unclear and inconsistent. It is more likely that Mr. Baljian's personal guarantee, his offer of the rare car and the successive bankruptcy filings were all tactics meant to forestall the Sharmas' lawsuit. The court therefore finds that, when Mr. Baljian personally guaranteed the settlement agreement, he had no intention to follow through with it.

## III. LEGAL ANALYSIS AND CONCLUSIONS

The court finds Mrs. Sharma's debt nondischargeable under *§ 523(a)(2)(A)*.[3] *HN2*[⬆] *Section 523(a)(2)(A)*

provides that debts are nondischargeable if they are obtained by: "false pretenses, a false representation, or actual fraud . . . ." To except her debt from discharge **[*19]** under *§ 523(a)(2)(A)*, Mrs. Sharma must show by a preponderance of the evidence that:

> (1) The Baljians made representations;
>
> (2) The Baljians knew at the time that the representations were false;
>
> (3) The Baljians made those representations with the intention and purpose of deceiving the plaintiff;
>
> (4) Mrs. Sharma justifiably relied on the representations; and
>
> (5) Mrs. Sharma sustained losses as a proximate result of Debtors' representations.

*In re Sabban, 600 F.3d 1219, 1222 (9th Cir. 2010)*; *In re Galindo, 467 B.R. 201, 208 (Bankr. S.D. Cal. 2012)*.

## A. False Representations and Omissions

*HN3*[⬆] "[A] promise made with a positive intent not to perform or without a present intent to perform satisfies [the false representation **[*20]** requirements of] *§ 523(a)(2)(A)*." *Rubin v. West (In re Rubin), 875 F.2d 755, 759 (9th Cir. 1989)*. "A debtor's failure to disclose material facts [also] constitutes a fraudulent omission under *§ 523(a)(2)(A)* if the debtor was under a duty to disclose and the debtor's omission was motivated by an intent to deceive." *In re Harmon, 250 F.3d 1240, 1246 n.4 (9th Cir. 2001)* (citing *In re Eashai, 87 F.3d at 1089-90*). And a party to a business transaction has a duty to disclose:

> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and . . . ( e ) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

*Restatement (Second) of Torts § 551*.[4]

---

*523(a)(2)(B)*.

---

[3] Unless otherwise noted, all sections referred to in this memorandum decision relate to the Bankruptcy Code, Title 11 of the United States Code. Mrs. Sharma's complaint asserted nondischargeability under *§ 523(a)(2)*, but did not specify whether she was invoking *§§ 523(a)(2)(A)*, *523(a)(2)(B)*, or both. The pretrial order, however, made clear that Mrs. Sharma is moving under the elements of *§ 523(a)(2)(A)*. And Mrs. Sharma presented no arguments at trial with respect to *§*

[4] The Restatement also provides, "[a] representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation." **[*21]** *Restatement (Second) of Torts §*

In *In re Rubin*, debtor Rubin was a real estate broker. *In re Rubin, 875 F.2d at 757*. The Wests were a married couple facing the foreclosure of their home. *Id. at 756-57*. Rubin approached the Wests and convinced them to sell him their home for *$4,000. Id. at 757*. And he promised to help them obtain financing so that they could repurchase their home back from him. *Id.* Subsequent events allowed the inference that he never intended to fulfill this promise; he, *inter alia*, borrowed money against the property and tried to evict the Wests. *Id.* The Wests then sued Rubin for fraud. *Id.* The parties eventually settled for $125,000. *Id.* And Rubin promptly filed bankruptcy. *Id.* When the Wests brought an action under *§ 523(a)(2)(A)*, the bankruptcy court held the settlement nondischargeable. *Id. at 758*. On appeal, the Ninth Circuit Court of Appeals affirmed, finding that Rubin's lack of intent to fulfill his promise satisfied *§ 523(a)(2)(A)*'s false representation requirement. *Id. at 759-760*.

In *In re Lopez*, debtor Lopez borrowed $60,000 from creditor Pagliero to pay for living expenses so she could quit her job a pursue a career in art. *In re Lopez, No. 09-1277-A, 2011 Bankr. LEXIS 5566, 2011 WL 10642952, at *2 (Bankr. E.D. Cal. May 18, 2011)*.    **[*22]** She represented to Pagliero that, if she could not sell enough artwork to repay the loan, she would either go back to work or sell her house. *Id.* But she failed to disclose to Pagliero that: (1) her employer was ready to lay her off because it was discontinuing her department; (2) she possessed a retirement account that she could cash out; (3) she had recently borrowed $50,000 against the equity in her house; (4) she held a large amount of credit card debt; (5) she had previously filed bankruptcy; and (5) she had no intent to make enough money to pay back her loan to Pagliero. *2011 Bankr. LEXIS 5566 [ WL]at *3*. The bankruptcy court found that these omissions satisfied *§ 523(a)(2)(A)*'s false representation requirement.

Like Rubin's promise to help the Wests repurchase their home, the Baljians promised that they would: (1) use Keshant's bank account to conduct SDSC's business; (2) perform all acts necessary to effectuate the transfer of SDSC's assets to Keshant — including SDSC's fictitious business name, its premises lease and its various licenses; and (3) make SDSC's financial records available to the Sharmas. Mr. Baljian further represented that he would buy out Mrs. Sharma's interest in Keshant for $235,000.    **[*23]** And, like *In re Rubin*, subsequent events made clear that the Baljians

never intended to do any of these things.

The Baljians were using SDSC's bank account as their own personal account. They therefore had ample incentive to deny Mr. Sharma access to the business records. Further, their testimony shows that they unreasonably intended to shunt the work of transferring SDSC's assets onto the Sharmas — they had no intention of doing it themselves. Finally, Mr. Sharma's threat of litigation, Mr. Baljian's evasiveness about the vehicle title, and the Baljians' successive bankruptcy filings are all indicia that Mr. Baljian executed the settlement guarantee solely to delay the Sharmas' collection efforts. Because the Baljians did not intend to follow through on their promises at the time they made them, the court finds that the promises constitute false representations under *§ 523(a)(2)(A)*.

Like Lopez's partial representations about her employment and her home equity, the Baljians only partially represented the extent of Mr. Arnitah's involvement and interest in SDSC. They told the Sharmas that Mr. Arnitah was merely an employee. But the entire truth was that: (1) Mr. Arnitah was — at the very    **[*24]** least — vying for some ownership interest in SDSC; (2) Mr. Arnitah had made a $30,000 capital contribution to the business; (3) the Baljians did not pay Mr. Arnitah for his work at the store; (4) Mr. Arnitah did not take directions from the Baljians; and (5) Mr. Arnitah helped himself to the store's money and merchandise. And, like Lopez, the Baljians did not disclose this truth. Further, like Lopez's failure to disclose her financial condition and her lack of intent to repay the loan, the Baljians failed to disclose their treatment of SDSC's bank account and their lack of intent to fulfill their promises.

The essence of the Baljian-Sharma business deal was to create joint ownership of SDSC between the Baljians' and the Sharmas' through Keshant. The Baljians and the Sharmas were Keshant's directors. The wives owned Keshant's shares, and the husbands were Keshant's officers. The transaction contemplated that they would, together, operate the store for their mutual gain. The transaction did not contemplate any ownership interest or executive level involvement from other parties. Nor did it contemplate the use of SDSC for the Baljians' sole benefit. Thus, the facts above were all fundamental    **[*25]** to the Baljian-Sharma transaction. Moreover, their partial representation about Mr. Arnitah was misleading. The Baljians therefore had a duty to disclose these facts to the Sharmas. Because the Baljians failed to disclose these facts, and because the

_____

529.

court finds below that the Baljians intended to deceive the Sharmas by their omissions, the court finds that the Baljian's omissions and half-truths constitute false representations under *§ 523(a)(2)(A)*.

## B. Intent to Deceive

**HN4**[⬆] To find nondischargeability under *§ 523(a)(2)(A)*, the debtors must have had the subjective intent to deceive at the time of the transaction. The court may infer this intent from the surrounding circumstances. *In re Kennedy, 108 F.3d 1015, 1018 (9th Cir. 1997)*. Additionally, "intent to deceive may be inferred if a debtor takes no steps to perform under a contract." *In re Sharma, Nos. CC-12-1302-MkTaMo, CC-12-1520-MkTaMo, 2013 Bankr. LEXIS 2286, 2013 WL 1987351, at \*11 (B.A.P. 9th Cir., May 14, 2013)* (citing *Merchs. Nat'l Bank & Trust Co. of Indianapolis v. Pappas (In re Pappas), 661 F.2d 82, 86 (7th Cir. 1981))*.

The trial record made clear that, although SDSC was generating revenue, its operations were a disaster waiting to happen. The Baljian-Sharma **[*26]** transaction was to provide $225,000 in capital contributions and the assistance of Mr. Sharma, who had some experience operating small businesses. The Baljians must have known that had they presented the whole truth about their circumstances with Mr. Arnitah and SDSC, the Sharmas would likely not have consummated the transaction. Moreover, the Baljians took almost no steps to perform under the subject agreements. The court therefore finds that - for purposes of *§ 523(a)(2)(A)* - the Baljians made the representations and omissions described above with the intent to deceive the Sharmas and induce them into entering the business deal.

## C. Justifiable Reliance

**HN5**[⬆] Reliance on the representation need not reach the level of "reasonableness;" it need only be justifiable. *Field v. Mans, 516 U.S. 59, 73-76, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995)*; *In re Eashai, 87 F.3d 1082, 1090 (9th Cir. 1996)*. This is a subjective standard that considers the relationship between the parties. *In re Tallant, 218 B.R. 58, 67 (B.A.P. 9th Cir. 1998)*.

[A] person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation. . . . Justification is a matter of the

qualities **[*27]** and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."

*Field v. Mans, 516 U.S. at 70-71* (quoting *Restatement (Second) of Torts §§ 540, 545A, Comment b*). "Although one cannot close his eyes and blindly rely, mere negligence in failing to discover an intentional misrepresentation is no defense to fraud." *In re Apte, 96 F.3d 1319, 1322 (9th Cir. 1996)*. Further, **HN6**[⬆] in cases involving fraudulent omissions,

[P]ositive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable [person] might have considered them important in the making of this decision. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

*Id. at 1323* (quoting *Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972))*.

The Sharmas had known the Baljians for approximately thirteen years at the time they entered into the business deal at issue here. They were steady acquaintances — if not friends — and it appears that they had developed a dependable **[*28]** relationship as customer and proprietor of the auto shop. Thus, when the Baljians made their affirmative representations regarding the business deal, there was no reason for the Sharmas to suspect the Baljians had no intention of following through. Moreover, even if the Sharmas had suspected it, a reasonable investigation is unlikely to have uncovered the Baljians' fraudulent intent. And when Mr. Baljian personally guaranteed the settlement agreement, there's no indication that the Sharmas were privy to his personal finances. As such, they had no reason to suspect that he wouldn't eventually pay to settle the Sharmas' potential lawsuit.

Counsel for the Baljians emphasizes Mr. Sharma's business experience, and argues that Mr. Arnitah's signature on the premises lease was a red flag with respect to his involvement and interest in SDSC, and that the Sharmas should have investigated it. The court agrees that the Sharmas could have been more discerning about the transaction as a whole. Had the Sharmas probed the Baljians' history with Mr. Arnitah, they might have discovered that he was something more than an employee. And had the Sharmas reviewed SDSC's bank records, they would likely have

2014 Bankr. LEXIS 1419, *28

**[\*29]** discovered that the Baljians used SDSC's account as their own personal account.

However, Mr. Sharma's limited business experience did not necessarily make him business savvy. He is not a business person; he is an engineer by vocation. The court therefore finds that his failure to investigate did not rise above the level of mere negligence. Moreover, the court finds that a reasonable person would have considered these undisclosed facts important in deciding whether to enter the Baljian-Sharma business deal. These facts are therefore material, and, accordingly, the Sharmas justifiably relied on both the Baljians affirmative misrepresentations and fraudulent omissions for purposes of § 523(a)(2)(A).

**D. Proximate Cause**

The Restatement (Second) of Torts (1976) explains that *HN7*[⬆] proximate cause entails (1) causation in fact, which requires a defendant's misrepresentations to be a substantial factor in determining the course of conduct that results in loss, *§ 546*; and (2) legal causation, which requires a creditor's loss to "reasonably be expected to result from the reliance." *§ 548A*.

*In re Brown, 217 B.R. 857, 862 (Bankr. S.D. Cal. 1998)*. And, again: a debtor's failure to satisfy his or her obligation **[\*30]** to disclose a material fact establishes causation in fact. *In re Apte, 96 F.3d at 1323*.

The court found above that the Baljians' affirmative misrepresentations and material omissions induced the Sharmas to enter both the business deal and the settlement agreement. And, in the end, the Sharmas lost the capital they contributed in the business deal, they delayed filing their lawsuit without receiving the benefit of Mr. Baljian's settlement guarantee, and they incurred attorney's fees and court costs to pursue their damages. It is reasonable to expect that the Sharmas' reliance on the Baljian's false representations and omissions would result in these losses. The court therefore finds that the Baljians' false representations and omissions proximately caused the Sharmas' losses. Mrs. Sharma has accordingly shown all the elements necessary to find nondischargeability under *§ 523(a)(2)(A)*.

**E. Damages**

Mrs. Sharma's complaint sought compensatory damages of at least $216,000; punitive damages; attorney's fees; and costs. The pretrial order sought damages "proximately caused" by the Baljians. At trial, Mrs. Sharma's counsel did not raise any arguments with respect to punitive damages. And neither **[\*31]** party raised the issue of prejudgment interest. Even so, *HN8*[⬆] *Rule 54(c) of the Federal Rules of Civil Procedure*[5] provides: "[a non-default judgment] should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."

*HN9*[⬆] The Restatement describes the measure of damages for fraud:

[In addition to] the pecuniary loss . . . which the misrepresentation is a legal cause . . . (2) [t]he recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover [] damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.

*Restatement (Second) of Torts § 549*. Indeed, the damages in a nondischargeability action are not limited to the amount of money Debtors obtained by fraud. They extend to the creditor's loss resulting from the fraud, even if this exceeds the value Debtors received. And this may include attorney's fees, costs, and treble damages. *Cohen v. de la Cruz, 523 U.S. 213, 214-18, 118 S. Ct. 1212, 140 L. Ed. 2d 341 (1998)*; *Muegler v. Bening, 413 F.3d 980, 983 (9th Cir. 2005)*.

Mrs. **[\*32]** Sharma argues that her damages include: (1) their $216,000 capital contribution; (2) the value of their one-half interest in Keshant and SDSC, which the Sharmas assert to be approximately $350,000 based on a state court complaint Mr. Baljian filed; (3) Mr. Sharma's salary had he continued working for Keshant; and (4) Mrs. Sharma's attorney's fees and costs in prosecuting this action. For the following reasons, the court awards Mrs. Sharma damages of $278,000 plus prejudgment interest at the federal rate.

**1. Benefit of the Bargain**

With respect to the $350,000 valuation of Mrs. Sharma's

---

[5] *Rule 7054 of the Federal Rules of Bankruptcy Procedure* incorporates by reference *Rule 54 of the Federal Rules of Civil Procedure*.

2014 Bankr. LEXIS 1419, *32

one-half interest in Keshant and SDSC: the court finds that Mrs. Sharma has not proved this amount with reasonable certainty. Nor has she demonstrated a causal nexus between the Baljians' misrepresentations and damages based on this valuation. At best, she implies that the Baljian-Sharma business deal entitled her to sell her one-half interest in Keshant for $350,000. But none of the business documents provide for this. And it s not clear that Mrs. Baljian could have sold her one-half interest for any amount, let alone $350,000.

With respect to Mr. Sharma's salary damages: the court finds no basis to award **[\*33]** them here. It is true that Keshant was to pay Mr. Sharma a salary of $4,000 per month. And, as a benefit of this bargain, Mr. Sharma would have been entitled to damages for this salary. But Mr. Sharma is not a plaintiff to this action. The Sharmas made the strategic decision not to include Mr. Sharma as a plaintiff. And, because Mr. Sharma is the one entitled to the salary damages, the court cannot award them to Mrs. Sharma.

Nevertheless, as the court found above, the Baljians' false representations and omissions did proximately cause the Sharmas' loss of $216,000 in capital contributions. Moreover, the Baljians and the Sharmas struck two bargains: (1) the business deal regarding Keshant and SDSC; and (2) the subsequent settlement agreement. The settlement agreement provided that Mr. Baljian would purchase Mrs. Sharma's equity interest in Keshant for $235,000. Mrs. Sharma, however, had already received $9,000 in Owner's Draws under this settlement. And the parties understood the Owner's Draws to be a return of the Sharmas' equity. Consequently, the Sharmas' capital contributions totaled $207,000 out-of-pocket. And Mr. Baljian owed Mrs. Sharma $226,000 total under his guarantee. The **[\*34]** court therefore finds the Baljians jointly and severally liable to Mrs. Sharma for $207,000. It further finds Mr. Baljian separately liable to Mrs. Sharma for an additional additional $19,000 under his guarantee.

## 2. Attorney's Fees and Costs

*HN10*[↑] "[T]he determinative question for awarding attorney's fees is whether the creditor should be able to recover the fee outside of bankruptcy under state or federal law." *Fry v. Dinan (In re Dinan), 448 B.R. 775, 785 (B.A.P. 9th Cir. 2011)*. Under the term sheet, California law governs. And,

> The California courts have repeatedly interpreted clauses that authorize attorney's fees to "enforce"

or "interpret" a contract to not include tort claims for fraud. [Citations omitted]. On the other hand, California courts have held that certain broadly-worded clauses do cover fraud claims. [Citations omitted].

*In re Sharma, 2013 Bankr. LEXIS 2286, 2013 WL 1987351, at \*18*. *Miske v. Bisno* involved an action for fraud in the inducement of a contract. *Miske v. Bisno, 204 Cal. App. 4th 1249, 1252, 139 Cal. Rptr. 3d 626 (Cal. Ct. App. 2012)*. This contract provided that: "[i]f any dispute arises between the [parties], whether or not resulting in litigation, the prevailing party shall be entitled to recover from the **[\*35]** other party all reasonable costs, including, without limitations, reasonable attorneys' fees." *Id. at 1259*. The California Appellate Court concluded that the broad language of this attorney's fees provision encompassed any conflict concerning the agreement's effect, including a tort claim. *Id*.

Counsel for the Baljians argued that, because this action sounds in fraud instead of contract, the parties' attorney's fees provision does not apply. But the term sheet entitles a prevailing party to reasonable attorney's fees and costs in an action "to interpret or enforce . . . this Agreement, to recover damages, *or to obtain any relief, at law or in equity* . . . ." Like the attorney's fees provision in *Miske*, the one in the term sheet also uses broad language. The court therefore finds that — under California law — this provision encompasses any conflict concerning the agreement's effect, including Mrs. Sharma's present nondischargeability action.

The Sharmas testified that they incurred approximately $57,800 in attorney's fees and costs to prosecute this action. But the settlement agreement between the Baljians and the Sharmas did not provide for attorney's fees. And the court finds that the **[\*36]** Sharmas devoted approximately ten percent of their case to issues related solely to this settlement agreement. Accordingly, the Sharmas incurred approximately $52,000 in recoverable attorney's fees and costs under the term sheet. The court therefore finds the Baljians jointly and severally liable for this additional $52,000.

## 3. Prejudgment Interest

*HN11*[↑] "The federal prejudgment interest rate applies to actions brought under federal statute, such as bankruptcy proceedings, unless the equites of the case require a different rate." *Banks v. Gill Distribution*

Centers, Inc. (In re Banks), 263 F.3d 862, 871 (9th Cir. 2001) (citing *Nelson v. EG & G Energy Measurements Group, Inc., 37 F.3d 1384, 1392 (9th Cir. 1994))*. And, in particular, an action under *§ 523(a)(2)(A)* is a product of federal law engendering federal prejudgment interest. *In re Eberts, No. CV 11-08827-MWF, 2013 U.S. Dist. LEXIS 44215, 2013 WL 1248637, at *10-11 (C.D. Cal., March 27, 2013)*. The parties provided no arguments with respect to prejudgment interest. The court therefore awards Mrs. Sharma prejudgment interest at the federal rate from the date she first filed her state court complaint, namely September 4, 2009.

## IV. CONCLUSION

For the foregoing reasons, **[*37]** the court finds that: (1) the Baljians made representations that at the time they knew to be false; (2) they failed to disclose information they had a duty to disclose; (3) they made these representations and omissions with the intent to deceive the Sharmas; (4) the Sharmas justifiably relied on these representations and omissions; and (5) these representations and omissions proximately caused Mrs. Sharma $278,000 in damages, attorney's fees and costs.

The court does not find punitive damages appropriate under the facts at bar. It therefore awards Mrs. Sharma **$278,000** plus interest as follows: the Baljians are jointly and severally liable to Mrs. Sharma for **$259,000**; and Mr. Baljian is separately liable to Mrs. Sharma for an additional **$19,000**. Prejudgment interest at the federal rate is awarded from September 4, 2009. This award is **nondischargeable** under *§ 523(a)(2)(A)*, and accrues postjudgment interest at the federal rate. A separate judgment in favor of Mrs. Sharma against the Baljians shall issue.

IT IS SO ORDERED.

Dated: March 26, 2014

/s/ Christopher B. Latham

CHRISTOPHER B. LATHAM, JUDGE

United States Bankruptcy Court

JUDGMENT IN FAVOR OF PLAINTIFF PREM M. SHARMA

## **JUDGMENT**

The court hereby **[*38]** enters judgment in favor of Prem M. Sharma and against Cain Baljian and Lucy Baljian as follows.

• Cain and Lucy Baljians are jointly and severally liable to Prem Sharma for $259,000.00.
• In addition, Cain Baljian is separately liable to Mrs. Sharma for a further $19,000.00.
• Prejudgment interest is awarded at the federal rate from September 4, 2009.
• Postjudgment interest accrues at the federal rate.

This judgment is nondischargeable under *11 U.S.C. § 523(a)(2)(A)*.

IT IS SO ORDERED.

Dated: March 26, 2014

/s/ Christopher B. Latham

CHRISTOPHER B. LATHAM, JUDGE

United    States    Bankruptcy    Court

Layla Buchanan

2014 Bankr. LEXIS 1419, *38

**Table1 (***Return to related document text***)**

| No. of Checks | Recipient | $Total |
|---|---|---|
| 55 | Cash Withdrawal / Mrs. Baljian | $225,336.84 |
| 16 | Euro 1 Kar | $45,102.22 |
| 14 | Countrywide / IndyMac | $42,047.45 |
| 4 | Keshant, Incorporated | $61,200.00 |

**Table1 (***Return to related document text***)**

---

**End of Document**

**EXHIBIT 4**

**User Name:** Layla Buchanan

**Date and Time:** Thursday, February 9, 2023 6:46:00PM PST

**Job Number:** 190002648

## Document (1)

1. *Narang v. Biswas (In re Biswas), 2009 Bankr. LEXIS 4518*

   **Client/Matter:** 1673-001

   **Search Terms:** 2009 WL 7809011

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |

EXHIBIT 4, PAGE 45

Ⓐ Neutral

As of: February 10, 2023 2:47 AM Z

## *Narang v. Biswas (In re Biswas)*

United States Bankruptcy Appellate Panel for the Ninth Circuit

July 30, 2009, Argued and Submitted at San Francisco, California; September 2, 2009, Filed

BAP No. EC-09-1064-DJuMk

### Reporter
2009 Bankr. LEXIS 4518 *; 2009 WL 7809011

In re: ASHISH J. BISWAS, Debtor. YADIVINDER NARANG AND RAUSHANI NARANG, Appellants, v. ASHISH J. BISWAS, Appellee.

**Notice:** THIS DISPOSITION IS NOT APPROPRIATE FOR PUBLICATION. ALTHOUGH IT MAY BE CITED FOR WHATEVER PERSUASIVE VALUE IT MAY HAVE (SEE *FED. R. APP. P. 32.1*), IT HAS NO PRECEDENTIAL VALUE. SEE 9TH CIR. BAP RULE 8013-1.

**Prior History: [*1]** Appeal from the United States Bankruptcy Court for the Eastern District of California. Bk. No. 07-10440-WRL, Adv. No. 07-01097-WRL. Hon. W. Richard Lee, Bankruptcy Judge, Presiding.

*Narang v. Biswas (In re Biswas), 2009 Bankr. LEXIS 5638 (Bankr. E.D. Cal., Feb. 18, 2009)*

## Core Terms

bankruptcy court, contractor's license, contractor, build, state court, disgorgement, residential, draws, unlicensed contractor, representations, circumstances, fraudulent, suspended, lapse, intent to deceive, nondischargeable, subcontractors, licensed, reckless, deceive, hired

## Case Summary

### Procedural Posture
Appellant judgment creditors, a couple who hired appellee debtor in the construction of their home and obtained a state court judgment against the debtor for damages due to poor workmanship and for disgorgement of monies paid, brought an adversary action to except the judgment from discharge under *11 U.S.C.S. § 523(a)(2)(A)*. The U.S. Bankruptcy Court for the Eastern District of California held the debt was dischargeable. The creditors appealed.

### Overview
The bankruptcy court did not err in its determination of knowledge and intent under *§ 523(a)(2)(A)*. The creditors failed to show that the debtor represented his qualifications with reckless disregard as to their truth. The debtor's exaggerated belief in his competence and experience to build the house did not mean that he knowingly or recklessly misrepresented his ability; there was some foundation for his belief. The evidence showed merely that the debtor undertook more than he could achieve. The court did not have a definite and firm impression that the bankruptcy court clearly erred in finding that the debtor did not intend to deceive the creditor. The bankruptcy court did not err in finding that the lapse in the debtor's contractor license did not constitute fraud within the meaning of *§ 523(a)(2)(A)*. The creditors did not establish that they sustained damage as a result of the debtor's representation regarding the status of his contractor's license, and the lapse did not support an exception to discharge for the disgorgement award obtained by the creditors pursuant to *Cal. Bus. & Prof. Code § 7031*. Actions under *§ 7031* were not limited to fraud actions.

### Outcome
The court affirmed the judgment of the district court.

## LexisNexis® Headnotes

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

Bankruptcy Law > Discharge & Dischargeability > General Overview

*HN1*[🔽]  **Standards of Review, De Novo Standard of**

2009 Bankr. LEXIS 4518, *1

**Review**

Whether a claim is nondischargeable presents mixed issues of law and fact, which a court reviews de novo.

Bankruptcy Law > ... > Judicial Review > Standards of Review > Clear Error Review

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

*HN2*[🔻]  **Standards of Review, Clear Error Review**

A court reviews a bankruptcy court's conclusions of law and its interpretations of the Bankruptcy Code de novo and its findings of fact for clear error.

Bankruptcy Law > ... > Judicial Review > Standards of Review > Clear Error Review

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

*HN3*[🔻]  **Standards of Review, Clear Error Review**

A finding of whether a requisite element of a *11 U.S.C.S. § 523(a)(2)(A)* claim is present is a factual determination reviewed for clear error.

Bankruptcy Law > ... > Judicial Review > Standards of Review > Clear Error Review

*HN4*[🔻]  **Standards of Review, Clear Error Review**

A finding of fact is clearly erroneous, even though there is evidence to support it, if we have the definite and firm conviction that a mistake has been committed.

Bankruptcy Law > ... > Judicial Review > Standards of Review > Clear Error Review

*HN5*[🔻]  **Standards of Review, Clear Error Review**

Where there are two permissible views of the evidence, a factfinder's choice between them cannot be clearly erroneous.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

*HN6*[🔻]  **Exceptions to Discharge, Embezzlement & False Representations**

*11 U.S.C.S. § 523(a)(2)(A)* excepts from discharge debts for money, property or services obtained by the debtor by false pretenses, a false representation or actual fraud. Because excepting a claim from the debtor's discharge limits the debtor's "fresh start" following a bankruptcy, *§ 523(a)(2)(A)* should not be read more broadly than necessary to effectuate policy, e.g., preventing debtors from avoiding debts incurred by fraud or other culpable conduct. In other words, the exception to discharge provided for in *§ 523(a)(2)(A)* should be construed strictly against creditors and in favor of debtors.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > General Overview

Evidence > Burdens of Proof > Preponderance of Evidence

Bankruptcy Law > Claims > Proof of Claim > General Overview

*HN7*[🔻]  **Discharge & Dischargeability, Exceptions to Discharge**

A creditor seeking to except a debt from the debtor's discharge generally bears the burden of proof. The burden of proof standard for exception to discharge actions under *11 U.S.C.S. § 523* is preponderance of the evidence. The relatively lenient burden of proof standard set against the consistent admonition to construe the standards to except a debt from the debtor's discharge strictly in favor of debtors creates a tension that informs the decision making of bankruptcy courts in considering exception to discharge claims.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False

Layla Buchanan

EXHIBIT 4, PAGE 47

2009 Bankr. LEXIS 4518, *1

Representations

Evidence > Burdens of Proof > Preponderance of Evidence

*HN8*[⤓]  **Exceptions to Discharge, Embezzlement & False Representations**

To prevail on a *11 U.S.C.S. § 523(a)(2)(A)* claim, a creditor must show, by a preponderance of evidence, that: (1) the debtor made representations; (2) the debtor knew at the time they were false; (3) the debtor made them with the intent to deceive the creditor; (4) the creditor justifiably relied on such representations; and (5) the creditor sustained the alleged damage as a proximate result of the debtor's false representations.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

*HN9*[⤓]  **Exceptions to Discharge, Embezzlement & False Representations**

Reckless disregard for the truth of a representation satisfies the knowledge element under *11 U.S.C.S. § 523(a)(2)(A)*.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

*HN10*[⤓]  **Exceptions to Discharge, Embezzlement & False Representations**

A representation may be fraudulent, without knowledge of its falsity, if a person making it is conscious that he or she has merely a belief in its existence and recognizes that there is a chance, more or less great, that the fact may not be as it is represented. In such circumstances, the person makes the representation without believing in its truth or recklessly, careless of whether it is true or false.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

Representations

*HN11*[⤓]  **Exceptions to Discharge, Embezzlement & False Representations**

"Reckless disregard for the truth of the representation" is used interchangeably with "reckless indifference to a debtor's actual circumstances" within the Ninth Circuit.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

*HN12*[⤓]  **Exceptions to Discharge, Embezzlement & False Representations**

Fraudulent intent may be demonstrated by circumstantial evidence, or by inferences drawn from a course of conduct. Intent to deceive can be inferred from surrounding circumstances.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

*HN13*[⤓]  **Exceptions to Discharge, Embezzlement & False Representations**

A promise made with a positive intent not to perform or without a present intent to perform satisfies *11 U.S.C.S. § 523(a)(2)(A)*.

Business & Corporate Compliance > ... > Real Property Law > Construction Law > Contractors & Subcontractors

*HN14*[⤓]  **Construction Law, Contractors & Subcontractors**

*Cal. Bus. & Prof. Code § 7031* prohibits unlicensed contractors from initiating or maintaining actions to recover compensation and allows persons who have utilized the services of an unlicensed contractor to recover all compensation paid to the contractor. *Section 7031* does not limit disgorgement to persons who have been defrauded by an unlicensed contractor. It operates even where the person for whom the work was

EXHIBIT 4, PAGE 48

2009 Bankr. LEXIS 4518, *1

performed knew the contractor was unlicensed.

Business & Corporate Compliance > ... > Real Property Law > Construction Law > Contractors & Subcontractors

*HN15*[] **Construction Law, Contractors & Subcontractors**

See *Cal. Bus. & Prof. Code § 7031(a)*.

Business & Corporate Compliance > ... > Real Property Law > Construction Law > Contractors & Subcontractors

*HN16*[] **Construction Law, Contractors & Subcontractors**

See *Cal. Bus. & Prof. Code § 7031(b)*.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

Business & Corporate Compliance > ... > Real Property Law > Construction Law > Contractors & Subcontractors

*HN17*[] **Exceptions to Discharge, Embezzlement & False Representations**

Because *Cal. Bus. & Prof. Code § 7031(b)* is neutral as to fraudulent intent and was enacted to deter unlicensed contractors from offering their services for pay, an award under the statute does not arise from a debtor's fraudulent representations as required under *11 U.S.C.S. § 523(a)(2)(A)*.

**Judges:** Before: DUNN, JURY and MARKELL, Bankruptcy Judges.

# Opinion

### MEMORANDUM

Yadivinder Narang, M.D. ("Dr. Narang") and Raushani

Narang (collectively, the "Narangs") employed the debtor, Ashish Biswas ("Biswas"), as the general contractor in the construction of their custom home. Midway through construction, the Narangs fired Biswas and employed another contractor to complete the house and correct the various defects throughout the house caused by Biswas's poor workmanship. The Narangs subsequently obtained a state court judgment against Biswas for their damages.

Shortly after Biswas filed for chapter 7 relief, the Narangs initiated an adversary proceeding to except the state court judgment from discharge under *§ 523(a)(2)(A)*.[2] Because the Narangs did not provide sufficient evidence to establish fraud under *§ 523(a)(2)(A)*, the bankruptcy court determined that the state court judgment was dischargeable. We AFFIRM.

### I. FACTS

On June 2, 2003, Biswas, doing business as Biswas Construction Company, contracted with the Narangs to act as the general contractor in the construction of their home ("Construction Contract").[3] The Narangs hired Biswas based on the recommendation of friends, who themselves had hired Biswas to build their home, and on his bid, which was significantly lower than the next competing bid.

The Construction Contract provided that Biswas was to supply all work, labor and services and to furnish all the materials necessary to construct the house. It further provided that Biswas was to complete construction within twelve months and in a "workmanship like manner" in compliance with applicable building codes and laws. The Construction Contract acknowledged that state law required contractors to be licensed through the state contractor's licensing board.

Before forming Biswas Construction Company, Biswas's experience was in commercial and residential remodels and **[*3]** residential additions. Before entering into the Construction Contract, Biswas told Dr. Narang that he

---

[2] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, *11 U.S.C. §§ 101-1532*, **[*2]** and to the *Federal Rules of Bankruptcy Procedure, Rules 1001-9037*.

[3] The original contract amount was $986,080, but during the course of construction, change orders increased the contract amount by $78,905, for a total of $1,064,985.

had built a few houses in Fresno, California and a temple in Bakersfield, California. Dr. Narang was familiar with the temple.[4] Biswas assured Dr. Narang that he would be able to "build a good house" according to the plans and complete construction of the house within twelve months. Dr. Narang did not inquire further into Biswas's experience in residential construction, nor did he question Biswas about the status of his contractor's license.

The house designed for the Narangs was approximately 7,000 square feet; it consisted of two stories and a basement. The house was the largest residential project Biswas had undertaken and the first with a basement.

Biswas held a valid contractor's license when he entered into the Construction Contract. However, during construction of the Narangs' home, from June 2, 2004 to February 7, 2005, Biswas's contractor's license was suspended because he did not renew his contractor's bond. Biswas was unaware that his contractor's license was suspended until after the suspension had occurred; though he received notice of the suspension by mail, he did not read the notice because it "got caught up in [his moving residences]." Tr. of January 8, 2009 Hr'g, 22:21-25, 23:1-2. A few weeks after Biswas obtained a new contractor's bond, his contractor's license was reinstated. Biswas did not inform the Narangs that his contractor's license had been suspended.

The Narangs obtained a $975,000 home construction loan from Bank of America. Loan funds were disbursed to Biswas based upon the percentage of work completed after an inspection by the bank's representative. Between July 1, 2003 and **[*5]** October 22, 2004, Biswas received draws totaling 80% of the available funds.

Progress of the construction was slow and subject to excessive delays. Biswas did not pay some

subcontractors and materials suppliers. On February 7 and February 8, 2005, when the house was only 50% complete and while the house had water damage and mold issues, Biswas requested two additional draws.

On February 18, 2005, the Narangs notified Biswas that he was to cease and desist his work on the house. A week later, concerned with the quality of the work done by Biswas, the Narangs hired an inspection company which concluded that the house was not near completion. The Narangs hired another general contractor to complete construction of the house, who performed substantial remedial and corrective work of various defects throughout the house at a cost of $299,313.27, over and above the amount agreed in the Construction Contract.

The Narangs initiated a state court action against Biswas, alleging breach of contract, fraud and negligent misrepresentation. They also demanded that Biswas disgorge $220,128, which Biswas received while his contractor's license was suspended, on the grounds that California Business and **[*6]** Professions Code ("B & P Code") § 7031 bars an unlicensed contractor from demanding or receiving payment for labor and services rendered. On February 1, 2007, they obtained a state court judgment in the total amount of $519,441.27 ("state court judgment").[5] The damages awarded in the state court judgment consisted of the $299,313.27 in costs the Narangs incurred to complete corrective work on their home ("construction cost award") and the $220,128 in funds Biswas received while his contractor's license was suspended ("disgorgement award").

Three months after Biswas filed for chapter 7 relief on February 20, 2007, the Narangs initiated an adversary proceeding against Biswas to except the state court judgment from discharge under § 523(a)(2)(A).[6] They

---

[4] At the trial, Dr. Narang testified that he viewed a home under construction by Biswas and learned that the homeowners were satisfied with the construction at the time. Dr. Narang further testified that he did not ask Biswas to see any other houses Biswas had built. He also stated that Biswas did not take him to view any other projects.

The bankruptcy court did not make a finding as to whether Dr. Narang managed to observe Biswas's work to ascertain his ability. The bankruptcy court instead found that the Narangs could have asked for prior examples of Biswas's work to verify his qualifications but did not do so, instead relying on their friends' **[*4]** recommendations.

---

[5] The state court judgment was entered after an unopposed motion for summary judgment filed by the Narangs.

[6] The Narangs also asserted that the debt owed by Biswas arose from his willful and "maliciously made" misrepresentations to the Narangs under **[*7]** § 523(a)(6). The bankruptcy court determined that the debt did not arise from a willful and malicious injury within the meaning of § 523(a)(6); it found that the Narangs did not produce any evidence demonstrating that Biswas acted willfully with the intent to cause them injury. The Narangs do not appeal the bankruptcy court's determination as to their § 523(a)(6) claim for relief. Appellants' Opening Brief at 2. In fact, the Narangs assert that they dropped their § 523(a)(6) claim before the trial in the adversary proceeding. Appellants' Opening Brief at 2.

EXHIBIT 4, PAGE 50

2009 Bankr. LEXIS 4518, *7

alleged that Biswas fraudulently represented that he was qualified to construct the Narangs' home competently and that he would maintain a contractor's license during the course of the construction.

Before the two-day trial, the parties stipulated to many of the material facts. Biswas admitted that he caused some of the construction delays because he did not properly organize the project. He also stipulated that he had neither the experience nor the competence to take on the project, as evident from the manner in which he ran it.[7] He further stipulated that his work was substandard and did not conform with industry standards.

Dr. Narang and Biswas testified at the trial. After the trial, the bankruptcy court took the matter under submission. On February 18, 2009, the bankruptcy court issued its Memorandum Decision and entered a judgment in favor of Biswas. The bankruptcy court held that the Narangs did not establish fraud under *§ 523(a)(2)(A)*, as they did not present any evidence demonstrating that at the time he induced the Narangs to enter into the Construction Contract, Biswas subjectively knew he was not competent to build the house and that he intended to deceive the Narangs. The bankruptcy court opined that, in light of his experience in residential and commercial construction, as well as the fact that a professional architect designed the house and that subcontractors performed much **[*9]** of the work, "it [was] more likely than not that Biswas actually believed he could build the house . . . [and] the fact that Biswas overestimated his own ability does not mean that he knowingly lied." Memorandum Decision, 6:5-11. The bankruptcy court concluded that Biswas simply exaggerated his qualifications, which did not rise to the level of fraud.

The bankruptcy court further held that the Narangs did not show that Biswas's lapse of his contractor's license

---

We therefore do not address the bankruptcy court's determination as to the § 523(a)(6) claim.

[7] The bankruptcy court noted that Biswas stipulated to this statement in the state court action. Memorandum Decision **[*8]** Regarding Complaint to Determine Dischargeability of Debt ("Memorandum Decision"), 4:8-10. Based on our review of the record, Biswas stipulated to this fact in the adversary proceeding, but not in the state court action. This same statement was made in the Narangs' statement of undisputed facts in support of their motion for summary judgment in the state court action. Biswas did not oppose the motion for summary judgment.

constituted fraud within the meaning of *§ 523(a)(2)(A)*. The bankruptcy court found that the Narangs did not provide evidence that they suffered actual injury as a result of the lapse of Biswas's contractor's license.[8]

The Narangs timely appealed the bankruptcy court's judgment.

## II. JURISDICTION

The bankruptcy court had jurisdiction under *28 U.S.C. §§ 1334* and *157(b)(2)(I)*. We have jurisdiction under *28 U.S.C. § 158*.

## III. ISSUES

(1) Did the bankruptcy court err in its determinations of knowledge and intent under *§ 523(a)(2)(A)*?

(2) Did the bankruptcy court err in finding that the lapse of Biswas's contractor's license did not support an award of damages for fraud within the meaning of *§ 523(a)(2)(A)*?

## IV. STANDARDS OF REVIEW

*HN1*[↑] Whether a claim is nondischargeable presents mixed issues of law and fact, which we review de novo. *Carrillo v. Su (In re Su), 290 F.3d 1140, 1142 (9th Cir.*

---

[8] On appeal, the Narangs claim that the bankruptcy court incorrectly referenced B & P Code *§ 7160* in its Memorandum Decision analysis. Appellant's Opening Brief at 14 n.3. B & P Code *§ 7160*, entitled "Contract induced by falsity or fraud; suit for penalty, fees and damages," provides:

> Any person who is induced to contract for a work of improvement, including but not limited to a home improvement, in reliance on false or fraudulent representations or false statements knowingly made, may sue and recover from such contractor **[*10]** or solicitor a penalty of five hundred dollars ($500), plus reasonable attorney's fees, in addition to any damages sustained by him by reason of such statements or representations made by the contractor or solicitor.

The bankruptcy court questioned whether B & P Code *§ 7160* even applied to the facts in the case before it. Memorandum Decision, 8: 18-20. In any event, the bankruptcy court's decision rests on *§ 523(a)(2)(A)*, so B &P Code *§ 7160* is not dispositive as to the handling of the case.

2009 Bankr. LEXIS 4518, *10

*2002*)(citing *Murray v. Bammer (In re Bammer), 131 F.3d 788, 792 (9th Cir. 1997)*(en [*11] banc)). *HN2*[⬆] We review the bankruptcy court's conclusions of law and its interpretations of the Bankruptcy Code de novo and its findings of fact for clear error. Id.

*HN3*[⬆] "A finding of whether a requisite element of a section 523(a)(2)(A) claim is present is a factual determination reviewed for clear error." *Anastas v. Am. Sav. Bank (In re Anastas), 94 F.3d 1280, 1283 (9th Cir. 1996)*. *HN4*[⬆] A finding of fact is clearly erroneous, even though there is evidence to support it, if we have the definite and firm conviction that a mistake has been committed. *Banks v. Gill Distribution Ctrs., Inc. (In re Banks), 263 F.3d 862, 869 (9th Cir. 2001)*. *HN5*[⬆] "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985)*.


## V. DISCUSSION

A. Exception to discharge standards

*HN6*[⬆] *Section 523(a)(2)(A)* excepts from discharge debts for money, property or services obtained by the debtor by false pretenses, a false representation or actual fraud. Because excepting a claim from the debtor's discharge limits the debtor's "fresh start" following a bankruptcy, *§ 523(a)(2)(A)* "should not be read more broadly than necessary [*12] to effectuate policy, e.g., preventing debtors from avoiding debts incurred by fraud or other culpable conduct." *Hayhoe v. Cole (In re Cole), 226 B.R. 647, 654 (9th Cir. BAP 1998)*. In other words, the exception to discharge provided for in *§ 523(a)(2)(A)* "should be construed strictly against creditors and in favor of debtors." *Ghomeshi v. Sabban (In re Sabban), 384 B.R. 1, 5 (9th Cir. BAP 2008)*.

*HN7*[⬆] The creditor seeking to except a debt from the debtor's discharge generally bears the burden of proof. Since the Supreme Court's decision in *Grogan v. Garner, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991)*, the burden of proof standard for exception to discharge actions under *§ 523* is preponderance of the evidence. *Id. at 286-91*. The relatively lenient burden of proof standard set against the consistent admonition to construe the standards to except a debt from the debtor's discharge strictly in favor of debtors creates a tension that informs the decision making of bankruptcy courts in considering exception to discharge claims.

*HN8*[⬆] To prevail on a § 523(a)(2)(A) claim, a creditor must show, by a preponderance of evidence, that: (1) the debtor made representations; (2) the debtor knew at the time they were false; (3) the debtor [*13] made them with the intent to deceive the creditor; (4) the creditor justifiably relied on such representations; and (5) the creditor sustained the alleged damage as a proximate result of the debtor's false representations. *In re Britton, 950 F.2d 602, 604 (9th Cir. 1991)*; see also *Turtle Rock Meadows Homeowners Assoc. v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000)*(citations omitted).

The bankruptcy court concluded that the Narangs established all but the second and third elements of fraud under *§ 523(a)(2)(A)*, finding that the Narangs did not provide sufficient evidence to demonstrate that Biswas knew he falsely represented his competence and experience with the intent to deceive them. Memorandum Decision, 5:26-27, 6:2-4, 7:13-16. On appeal, the Narangs contend that they did not need to show that Biswas had actual knowledge of the falsity of his representations; rather, they only needed to show that he made the representations with reckless disregard for their truth. They further argue that Biswas's intent to deceive may be gleaned from the surrounding circumstances.

B. The bankruptcy court did not clearly err in its determination of knowledge and intent under *§ 523(a)(2)(A)*

1. [*14] Knowledge

*HN9*[⬆] Reckless disregard for the truth of a representation satisfies the knowledge element under *§ 523(a)(2)(A)*.[9] *Houtman v. Mann (In re Houtman), 568 F.2d 651, 656 (9th Cir. 1978)*, overruled in part on other grounds by *Grogan, 498 U.S. at 284* & n.11; see also *Rubin v. West (In re Rubin), 875 F.2d 755, 759 (9th Cir. 1989)*("[D]eclarations made with reckless indifference for the truth may be found to be fraudulent.")(quoting *Chase Manhattan Bank v. Fordyce (In re Fordyce), 56 B.R. 102, 105 (Bankr. M.D. Fla. 1985)*(internal quotation marks omitted)); *Gertsch v. Johnson & Johnson Finance Corp. (In re Gertsch), 237 B.R. 160, 167 (9th Cir. BAP 1999)*(quoting *Houtman, 568 F.2d at 656*); *Arm v. A.*

---

[9] *HN11*[⬆] "Reckless disregard for the truth of the representation" is used interchangeably with "reckless indifference to [the debtor's] actual circumstances" within the Ninth Circuit. *Advanta Nat'l Bank v. Kong (In re Kong), 239 B.R. 815, 826 (9th Cir. 1999)*.

2009 Bankr. LEXIS 4518, *14

*Lindsay Morrison, M.D., Inc. (In re Arm), 175 B.R. 349, 354 (9th Cir. BAP 1994)*. **HN10**[⬆] "A representation may be fraudulent, without knowledge of its falsity, if a person making it is conscious that he [or she] has merely a belief in its existence and recognizes that there is a chance, more or less great, that the fact may not be as it is represented." *Gertsch, 237 B.R. at 168* (quoting *Restatement (Second) of Torts § 526 cmt. e* (1977)(internal quotation marks omitted)). In such circumstances, the person **[*15]** makes the representation "without [believing] in its truth or recklessly, careless of whether it is true or false." *Kong, 239 B.R. at 827* (quoting *Restatement (Second) of Torts § 526 cmt. e*).

However, even applying the concept of reckless disregard, based on the record before us, the Narangs do not establish that Biswas represented his qualifications with reckless disregard as to their truth.[10] At the trial, Biswas testified that he intended to comply with the Construction Contract and to build the house according to the Narangs' plans. Tr. of January 8, 2009 Hr'g, 18:19-24. Though the house was the largest he had undertaken to build, Biswas testified that he believed he would be able to perform the Construction Contract, using experienced subcontractors to "make sure [he would] be able to perform [under the Construction Contract]." Tr. of January 8, 2009 Hr'g, 18:25, 19:1, 19:5-7. Biswas's testimony reflects his belief that he had the **[*16]** competence and experience to build the Narangs' house.

As the bankruptcy court pointed out, Biswas may have exaggerated his ability to build the house, but this does not mean he knowingly or recklessly misrepresented his

_____

[10] The Narangs cite *McCain v. Fuselier (In re Fuselier), 211 B.R. 540 (Bankr. W.D. La. 1997)*, as factually similar to the instant case. Appellant's Opening Brief at 9. In *Fuselier*, the debtor, who was not a licensed contractor in Louisiana, accepted a project to construct a home for the creditors. *Id. at 541*. The debtor obtained a written proposal from the construction company for which he worked, substituting his name as the general contractor and using the contractor's license number of the construction company's owner without his permission. Id. The creditors eventually terminated the debtor's services. *Id. at 542*. The bankruptcy court in *Fuselier* found that the debtor represented that he was a licensed contractor to induce the creditors to hire him. *Id. at 543*.

Unlike the creditors in *Fuselier*, the Narangs have not demonstrated that Biswas knew that he misrepresented his qualifications at the time he made the representations.

ability.[11] See, e.g., *In re Schwartz & Meyers, 130 B.R. 416, 423 (Bankr. S.D.N.Y. 1991)*(holding **[*17]** that, for a representation to be actionable under *§ 523(a)(2)(A)*, it must be one of existing fact and not simply an expression of opinion, expectation or a declaration of intention). Biswas had prior experience in residential construction; he had built several homes in Fresno, California. He also used experienced subcontractors to work on the Narangs' house. Given these circumstances, we agree with the bankruptcy court's conclusion that Biswas's "high opinion of his ability was not without some foundation." Memorandum Decision, 6:6. In any event, we are in no position to substitute our perceptions from the evidence for those of the bankruptcy court on what is admittedly a close question. We therefore conclude that the bankruptcy court's finding as to the second element of *§ 523(a)(2)(A)* was not clear error.

2. Intent to deceive

**HN12**[⬆] Fraudulent intent may be demonstrated "'by circumstantial evidence, or by inferences drawn from a course of conduct.'" *McCrary v. Barrack (In re Barrack), 217 B.R. 598, 607 (9th Cir. BAP 1998)*(quoting *Devers v. Bank of Sheridan (In re Devers), 759 F.2d 751, 753-54 (9th Cir. 1985))*. Intent to deceive can be inferred from surrounding circumstances. *Cowen v. Kennedy (In re Kennedy), 108 F.3d 1015, 1018 (9th Cir. 1997)*(citing *In re Kurdoghlian, 30 B.R. 500, 502 (9th Cir. BAP 1983))*; see also *Gertsch, 237 B.R. at 167-68*; *Barrack, 217 B.R. at 607*; *In re Hultquist, 101 B.R. 180, 183-84 (9th Cir. BAP 1989)*(citations omitted).

The Narangs contend that the surrounding circumstances indicate that Biswas intended to deceive them into contracting with him. Though he never previously had constructed such a large home, and never previously had constructed a home with a basement, Biswas did not disclose this information to the Narangs. He instead assured the Narangs that he would be able to "build [them] a good house" according to the plans and within a year. More than a year after commencing **[*19]** construction, the Narangs assert, Biswas had only completed 50% of the house, with

_____

[11] The Narangs stress that Biswas stipulated that he lacked the competence and experience to build their house. Such after-the-fact stipulations do not establish that Biswas represented his qualifications without believing them to be true or represented his qualifications without caring whether they were true or false. In short, the stipulations do not go to his state of mind at the **[*18]** time he made the representations.

2009 Bankr. LEXIS 4518, *18

much of the construction defective and below industry standards. Based on these circumstances, the Narangs argue, Biswas misrepresented his qualifications in order to induce them into hiring him as their general contractor.

Reviewing the record, we do not have a definite and firm impression that the bankruptcy court clearly erred in finding that Biswas did not intend to deceive the Narangs. Even though he never had built such a large house, with a basement, Biswas had prior experience in commercial and residential construction to bolster his assertion that he had the ability to build the Narangs' home. He also used experienced subcontractors to ensure that he built the home according to the plans. Biswas testified that he fully intended to comply with the Construction Contract. The fact that he fell short of his promise to build the Narangs a "good house" does not demonstrate that he intended to deceive them. *Cf. Rubin, 875 F.2d at 759* (*HN13*[⬆] "[A] promise made with a positive intent not to perform or without a present intent to perform satisfies *§ 523(a)(2)(A)*."). Rather, it shows that Biswas simply bit off **[*20]** more than he could chew, as he later admitted in his stipulations. We therefore conclude that the bankruptcy court did not clearly err in finding that Biswas did not intend to deceive the Narangs.

C. The bankruptcy court did not clearly err in finding that the lapse in Biswas's contractor's license did not constitute fraud within the meaning of *§ 523(a)(2)(A)*

At the trial, the Narangs sought to have the disgorgement award deemed nondischargeable.[12] Relying on *Ghomeshi v. Sabban (In re Sabban), 384 B.R. 1 (9th Cir. BAP 2008)*, the bankruptcy court declined to do so, finding that the Narangs produced no evidence demonstrating that they suffered actual injury from the lapse in Biswas's contractor's license. Memorandum Decision, 8:18-20, 9:24-25.

As noted earlier, the Narangs' disgorgement award was

_____

[12] The Narangs did not distinguish between the construction cost award and the disgorgement award in their adversary proceeding complaint; rather, they sought a determination that the entire state court judgment was nondischargeable on the grounds that both the construction cost award and the disgorgement award arose from Biswas's fraudulent representations. We nonetheless analyze the disgorgement award separately because the state court judgment was  **[*21]** based, in part, on the Narangs' claim under B & P Code *§ 7031*.

based on B & P Code *§ 7031*. *HN14*[⬆] B & P Code *§ 7031* prohibits unlicensed contractors from initiating or maintaining actions to recover compensation and allows persons who have utilized the services of an unlicensed contractor to recover all compensation paid to the contractor.[13] *Sabban, 384 B.R. at 3*. B & P Code *§ 7031* does not limit disgorgement to persons who have been defrauded by an unlicensed contractor. *Id.* It "operates even where the person for whom the work was performed knew the contractor was unlicensed." *Id. at 4* (quoting *Hydrotech Sys., Ltd. v. Oasis Waterpark, 52 Cal. 3d 988, 277 Cal. Rptr. 517, 803 P.2d 370, 376 (1991)*(internal quotation marks omitted)).

In *Sabban*, we confronted the issue of whether an amount awarded under B & P Code *§ 7031(b)* constituted a nondischargeable debt within the meaning of *§ 523(a)(2)(A)*. In *Sabban*, the debtor, an unlicensed contractor, performed remodeling work for the creditor. *384 B.R. at 3*. To induce the creditor into engaging his services, the debtor represented that he was a licensed contractor. *Id.* The creditor later obtained a state court judgment against the debtor under B & P Code *§ 7031(b)* for disgorgement of the $123,000 compensation the debtor received for the remodeling work ("award"). *Id. at 3-4*. After the debtor filed for **[*23]** chapter 7 relief, the creditor filed a complaint for a determination that the award was nondischargeable under *§ 523(a)(2)(A)*. *Id. at 4*. The bankruptcy court determined that the award

_____

[13] B & P Code *§ 7031(a)* provides:

*HN15*[⬆] Except as provided in subdivision (e), no person engaged in the business of or acting in the capacity of a contractor, may bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act or contract where a license is required by this chapter without alleging that he or she was a duly licensed contractor at all times **[*22]** during the performance of that act or contract, regardless of the merits of the cause of action brought by the person, except that this prohibition shall not apply to contractors who are each individually licensed under this chapter but who fail to comply with Section 7029.

B & P Code *§ 7031(b)* provides:

*HN16*[⬆] Except as provided in subdivision (e), a person who utilizes the services of an unlicensed contractor may bring an action in any court of competent jurisdiction in this state to recover all compensation paid to the unlicensed contractor for performance of any act or contract.

Layla Buchanan

EXHIBIT 4, PAGE 54

2009 Bankr. LEXIS 4518, *22

was dischargeable because it was not proximately caused by the creditor's reliance on the debtor's misrepresentation regarding his unlicensed status. Id.

In light of *Cohen v. De La Cruz, 523 U.S. 213, 118 S. Ct. 1212, 140 L. Ed. 2d 341 (1998)*, which emphasized that a debtor's liability for a debt must flow from his or her fraud, we agreed with the bankruptcy court in Sabban that an award under B & P Code *§ 7031(b)* did not necessarily constitute a nondischargeable debt under *§ 523(a)(2)(A)*. *Id. at 6-7*. **HN17**[↑] Because B & P Code *§ 7031(b)* was "neutral as to fraudulent intent and was enacted to deter unlicensed contractors from offering their services for pay[,]" the award did not arise from the debtor's fraudulent representations as required under *§ 523(a)(2)(A)*. *Id. at 7*. We pointed out that, even if the creditor had known about the debtor's unlicensed status, the creditor still could have obtained an award under B & P Code *§ 7031(b)*. Id. The award, we concluded, was unrelated to the debtor's fraud and could have been granted in the absence of justifiable  **[*24]** reliance. Id. Indeed, the state court awarded statutory damages under B & P Code *§ 7031(b)*, even though it held that the creditor had suffered no compensatory damages. *Id. at 6-7*.

On appeal, the Narangs attempt to distinguish Sabban from the instant case. Appellant's Opening Brief at 16. The Narangs contend that, unlike the creditor in Sabban, they suffered actual injury as a result of Biswas's false representation to maintain a valid contractor's license. When the Narangs entered into the Construction Contract with Biswas, Biswas represented that he was a licensed contractor. The Narangs relied on this representation in allowing Biswas to take draws on their construction loan. Appellant's Opening Brief at 16. While his license was suspended, Biswas received two draws, which brought the total amount of draws to 80% of the construction loan, even though he had completed only approximately 50% of the work on the house. Appellant's Opening Brief at 16. As a result, the Narangs claim, they overpaid Biswas. Appellant's Opening Brief at 16.

We agree with the bankruptcy court that the Narangs did not establish that they sustained damage as a result of Biswas's representation regarding the status  **[*25]** of his contractor's license. Nothing in the record indicates that the Narangs conditioned construction loan draws on the continued validity of Biswas's contractor's license. The Narangs made the alleged overpayment to Biswas based on the work performed on the house, not on

whether Biswas maintained his contractor's license.[14] As noted above, draws on the construction loan were allowed based on the percentage of work completed, after inspections by the bank's representatives. Based on our review of the record, we do not have a definite and firm conviction that the bankruptcy court clearly erred in finding that the lapse in Biswas's contractor's license did not support an exception to discharge under *§ 523(a)(2)(A)* for the disgorgement award.

**VI. CONCLUSION**

Based on the record before us, we conclude that the bankruptcy court did not clearly err in its findings supporting its ultimate holding that the Narangs' state court judgment against the debtor was not excepted  **[*26]** from discharge under *§ 523(a)(2)(A)*. We AFFIRM.

─────────────────────────

*End of Document*

─────────────────────────

[14] Interestingly, Dr. Narang testified that, had he known Biswas's contractor's license was suspended, he simply would have had Biswas stop work until his contractor's license was reinstated. Tr. of January 8, 2009 Hr'g, 16:17-24.

Layla Buchanan

EXHIBIT 4, PAGE 55

**EXHIBIT 5**

**LexisNexis**

**User Name:** Layla Buchanan

**Date and Time:** Thursday, February 9, 2023 6:47:00PM PST

**Job Number:** 190002659

## Document (1)

1. _JP Morgan Chase Bank, N.A. v. Ellison (In re Ellison), 2016 Bankr. LEXIS 3475_

   **Client/Matter:** 1673-001

   **Search Terms:** 2016 Bankr.LEXIS 3475

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | Cases | -None- |

➕ Positive
As of: February 10, 2023 2:47 AM Z

## JP Morgan Chase Bank, N.A. v. Ellison (In re Ellison)

United States Bankruptcy Court for the Central District of California, Los Angeles Division

September 23, 2016, Decided; September 23, 2016, FILED & ENTERED

Case No. 2:14-bk-24463-RK, Chapter 7, Adv. No. 2:15-ap-01001-RK

**Reporter**
2016 Bankr. LEXIS 3475 *

In re: JOSEPH ELLISON, Debtor.JP MORGAN CHASE BANK, N.A., JP MORGAN SECURITIES, LLC, Plaintiffs, vs. JOSEPH ELLISON, Defendant.

**Subsequent History:** Affirmed by *Ellison v. JPMorgan Chase Bank, N.A. (In re Ellison), 2017 Bankr. LEXIS 2561 (B.A.P. 9th Cir., Sept. 8, 2017)*

**Prior History:** *JPMorgan Chase Bank, N.A. v. Ellison (In re Ellison), 2015 Bankr. LEXIS 2571 (Bankr. C.D. Cal., Aug. 3, 2015)*

## Core Terms

transfers, funds, intent to hinder, exempt, hinder, non-exempt, prepetition, defraud a creditor, defraud, judgment creditor, actual intent, bankruptcy court, bankruptcy case, purposes, home loan, non-preferred, determines, fraudulent, prepayments, trial testimony, mere fact, preferential, refinancing, prepay, circumstances, fraudulent transfer, transactions, planning, insider, lenders

## Case Summary

### Overview

HOLDINGS: [1]-Pursuant to *11 U.S.C.S. § 727(a)(2)(A)*, debtor was not entitled to a discharge because, under the totality of the circumstances, debtor's prepetition transfers, including transfers to his wife and pre-payment of mortgage payments, resulted in dilution of at least $247,350 in non-exempt assets and thereby "crossed the line" of permissible behavior, evidencing that debtor had acted with an intent to hinder, delay or defraud creditors; [2]-Debtor's express admissions supported a finding that debtor undertook the prepetition transfers in an effort to become judgment proof as to his non-preferred creditors, and thwart their collection efforts against him.

### Outcome
Debtor's discharge denied.

## LexisNexis® Headnotes

Family Law > ... > Property Distribution > Characterization > Community Property

Family Law > ... > Property Distribution > Characterization > Separate Property

### HN1[⤓]  Characterization, Community Property

The mere commingling of separate property and community property funds does not alter the status of the respective property interests, provided that the components of the commingled mass can be adequately traced to their separate property and community property sources. But if the separate property and community property interests have been commingled in such a manner that the respective contributions cannot be traced and identified, the entire commingled fund will be deemed community property pursuant to the general community property presumption of *Cal. Fam. Code § 760*.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

### HN2[⤓]  Denial of Discharge, Concealment & Fraudulent Transfers

Under *11 U.S.C.S. § 727*, the court shall grant the debtor a discharge, unless the debtor, with intent to

Layla Buchanan

2016 Bankr. LEXIS 3475, *3475

hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed, (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition. *11 U.S.C.S. § 727(a)(2)*.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN3*[⬇] **Denial of Discharge, Concealment & Fraudulent Transfers**

A party seeking denial of discharge under *11 U.S.C.S. § 727(a)(2)* must prove two things: (1) a disposition of property, such as transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act of disposing of the property. Under *11 U.S.C.S. § 101(54)*, the term "transfer" means each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property. Those objecting to discharge bear the burden of proving by a preponderance of the evidence that the debtor's discharge should be denied.

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Denial of Discharge

*HN4*[⬇] **Liquidations, Denial of Discharge**

In keeping with the "fresh start" purposes behind the Bankruptcy Code, courts should construe *11 U.S.C.S. § 727* liberally in favor of debtors and strictly against parties objecting to discharge. While this does not alter the burden on the objector, it rather means that actual, rather than constructive intent is required on the part of debtor.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN5*[⬇] **Denial of Discharge, Concealment & Fraudulent Transfers**

For purposes of *11 U.S.C.S. § 727(a)(2)*, "transferred"

means transferred and remained transferred. i.e., a debtor who fraudulently transfers property out of the bankruptcy estate during the one-year pre-petition period but then returns the property to the estate before filing the petition may still receive a discharge.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN6*[⬇] **Denial of Discharge, Concealment & Fraudulent Transfers**

For purposes of *11 U.S.C.S. § 727(a)(2)*, regarding the second Lawson element, the intent element, a debtor's intent does not need to be fraudulent to meet the requirements of *11 U.S.C.S. § 727(a)(2)*. Because the language of the statute is in the disjunctive, it is sufficient if the debtor's intent is to hinder or delay a creditor.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN7*[⬇] **Denial of Discharge, Concealment & Fraudulent Transfers**

The intent to hinder or delay for purposes of *11 U.S.C.S. § 727(a)(2)(A)* is a question of fact that requires the trier of fact to delve into the mind of the debtor and may be inferred from surrounding circumstances. Furthermore, intent for purposes of *11 U.S.C.S. § 727(a)(2)* may be inferred from the surrounding circumstances, including certain "badges of fraud" that constitute circumstantial evidence of intent: These factors, not all of which need be present, include 1) a close relationship between the transferor and the transferee; 2) that the transfer was in anticipation of a pending suit; 3) that the transferor Debtor was insolvent or in poor financial condition at the time; 4) that all or substantially all of the Debtor's property was transferred; 5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and 6) that the Debtor received inadequate consideration for the transfer. A course of conduct may also be probative of the question of intent.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Intent

Layla Buchanan

2016 Bankr. LEXIS 3475, *3475

HN8[↓] **Fraudulent Transfers, Intent**

The statutory text of *11 U.S.C.S. § 548(a)(1)(A)* focuses on the debtor's intent. The debtor must possess an intent to hinder, an intent to delay or an intent to defraud. The requirement is disjunctive; any one of the three intents is sufficient for liability.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

HN9[↓] **Denial of Discharge, Concealment & Fraudulent Transfers**

The words "hinder," "delay" and "defraud" used to describe the intent required under *11 U.S.C.S. § 727(a)(2)* are not defined terms under the Bankruptcy Code. The meaning of these terms comes from the common law and is codified in the Uniform Fraudulent Conveyance Act, now the Uniform Voidable Transactions Act. The terms of hinder, delay and defraud connote intentional actions by a debtor to frustrate or thwart collection by creditors and describe a continuum of intents that may differ temporally or in substance and effect, but each of which is impermissible for purposes of *11 U.S.C.S. § 727(a)(2)*.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

HN10[↓] **Denial of Discharge, Concealment & Fraudulent Transfers**

The intent to prefer creditors is not equivalent to the intent to hinder, delay or defraud creditors. A transfer preferring one creditor over another does not amount to an act to "hinder, delay, or defraud" an unpreferred creditor. Nonetheless, even if the intent to prefer creditors is not equivalent to the intent to hinder, delay or defraud creditors, the intent to prefer creditors may still coincide with the intent to hinder, delay or defraud creditors if there is other evidence of intent.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

HN11[↓] **Denial of Discharge, Concealment & Fraudulent Transfers**

The Ninth Circuit's statement in Hultman that the mere fact of a preferential transfer does not justify discharge denial means that such a transfer by itself is not grounds to deny a discharge, but it says nothing about a preferential transfer being considered as evidence of intent in the context of other facts that may evidence intent.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

HN12[↓] **Denial of Discharge, Concealment & Fraudulent Transfers**

The court may consider preferential payments to creditors for purposes of determining an intent to hinder, delay or defraud under *11 U.S.C.S. § 727(a)(2)(A)*.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

HN13[↓] **Denial of Discharge, Concealment & Fraudulent Transfers**

When a debtor admits that he acted with the intent penalized by *11 U.S.C.S. § 727(a)(2)(A)*, there is no need for the court to rely on circumstantial evidence or inferences in determining whether the debtor had the requisite intent. Additionally, entry of a discharge order should be denied if a debtor had the intent penalized by the statute notwithstanding any other motivation he may have had for the transfer.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

Civil Procedure > Judgments > Enforcement & Execution > Fraudulent Transfers

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Constructively Fraudulent Transfers

HN14[↓] **Denial of Discharge, Concealment & Fraudulent Transfers**

Under the Uniform Fraudulent Transfer Act (now the Uniform Voidable Transactions Act), a transfer is constructively fraudulent if the debtor made the transfer without receiving a reasonably equivalent value for the

EXHIBIT 5, PAGE 59

2016 Bankr. LEXIS 3475, *3475

transfer in exchange for the transfer and the debtor was insolvent at the time of the transfer or became insolvent as result of the transfer. *Cal. Civ. Code § 3439.05(a)*. Although the finding of lack of reasonably equivalent value is not directly relevant for a claim under *11 U.S.C.S. § 727(a)(2)*, such a finding would itself be a badge of fraud indicating actual intent to hinder, delay or defraud current creditors under the Uniform Fraudulent Transfer Act (now Uniform Voidable Transactions Act) and under the Ninth Circuit's listing of badges of fraud.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN15*[⤓] **Denial of Discharge, Concealment & Fraudulent Transfers**

"Insider" as defined in *11 U.S.C.S. § 101(31)* specifically includes the spouse of the debtor.

**Counsel:** **[*1]** For Joseph Ellison, Debtor (2:14-bk-24463-RK): David S Hagen, Encino, CA.

For Trustee (2:14-bk-24463-RK): Brad D Krasnoff (TR), Los Angeles, CA.

For JPMORGAN CHASE BANK, N.A., J.P. Morgan Securities LLC, Plaintiffs (2:15-ap-01001-RK): Bryant S Delgadillo, Jeffrey N Williams, Wargo French LLP, Los Angeles, CA.

For Joseph Ellison, Defendant (2:15-ap-01001-RK): David S Hagen, Encino, CA.

For Trustee (2:15-ap-01001-RK): Brad D Krasnoff (TR), Los Angeles, CA.

**Judges:** Robert Kwan, United States Bankruptcy Judge.

**Opinion by:** Robert Kwan

# Opinion

MEMORANDUM DECISION ON PLAINTIFFS' ADVERSARY COMPLAINT OBJECTING TO ENTRY OF DISCHARGE PURSUANT TO *11 U.S.C. §§ 727(a)(2)(A)* AND *(a)(2)(B)*

The above-captioned adversary proceeding on the complaint of plaintiffs JP Morgan Chase Bank, N.A. and JP Morgan Securities, LLC ("Plaintiffs" or collectively, "JPMorgan"), asserting claims objecting to discharge of

defendant Joseph Ellison ("Defendant"), Debtor, under *11 U.S.C. §§ 727(a)(2)(A)* and *(a)(2)(B)* came on for trial before the undersigned United States Bankruptcy Judge on November 19, 2015. Bryant S. Delgadillo, of the law firm of Wargo & French LLP, appeared for Plaintiffs. David S. Hagen, of the Law Offices of David S. Hagen, appeared for Defendant.

After trial, on January 15, 2016, Plaintiffs lodged their **[*2]** Proposed Findings of Fact and Conclusions of Law, and on February 1, 2016, Defendant lodged his Proposed Findings of Fact and Conclusions of Law. ECF 26 and 27. On February 4, 2016, Defendant filed objections to Plaintiffs' Proposed Findings of Fact and Conclusions of Law. ECF 28. Afterwards, the court then took the matter under submission.

Having considered the witness testimony and exhibits received at trial, and the other matters in evidence, the court hereby makes the following findings of fact and conclusions of law pursuant to *Rule 7052 of the Federal Rules of Bankruptcy Procedure* and *Rule 52 of the Federal Rules of Civil Procedure*.[1]

## FINDINGS OF FACT

Findings of Fact 1 through 39 are undisputed facts that were established through the Pre-Trial Stipulation for Claims for Relief, ECF 22, which the parties jointly filed and was approved by the court in its Order Approving Joint Pretrial Stipulation and Setting Trial Date, ECF 24.

1. Defendant was employed by JPMorgan as a financial advisor until approximately April 2012.

2. During the course of his employment, Defendant **[*3]** developed an animus towards JPMorgan.

3. In or about June 2012, Defendant initiated an arbitration action against JPMorgan before a Financial Regulatory Authority panel, FINRA case number 12-02244 ("FINRA Action"), by asserting various claims related to his employment.

4. JPMorgan filed a counterclaim in the FINRA Action for breach of contract related to a loan, in the approximate amount of $750,000, that Defendant obtained from JPMorgan as part of his employment, but

---

[1] Any findings of fact that should be properly characterized as conclusions of law will be considered as such, and any conclusions of law that should be properly characterized as findings of fact will be considered as such.

2016 Bankr. LEXIS 3475, *3

failed to repay.

5. During the FINRA Action, Defendant was represented by counsel. His original counsel, Shustak & Partners LLP ("Shustak"), was replaced during the proceeding as the result of a fee dispute.

6. Defendant's replacement counsel, Jeffrey Sigler, represented Defendant on a contingency basis.

7. The FINRA panel conducted an evidentiary hearing from April 28, 2014 to May 6, 2014.

8. On or about June 3, 2014, the FINRA panel found against Defendant on his claims and in favor of JPMorgan on its counterclaim, entering an award in favor of JPMorgan in the amount of $789,624.06 ("FINRA Award").

9. On July 17, 2014, JPMorgan initiated a proceeding with the United States District Court for the Central District of California, [*4] case number CV14-05567, for judicial confirmation of the FINRA Award ("FINRA Award Confirmation Action").

10. Less than two weeks later, on July 29, 2014, Defendant filed a voluntary petition for relief under chapter 7 of Title 11 of the United States Code ("Petition Date"), thereby initiating bankruptcy case number 2:14-bk-24463-RK, in the U.S. Bankruptcy Court for the Central District of California, Los Angeles Division ("Bankruptcy Case").

11. The FINRA Award Confirmation Action was stayed as a result of Defendant filing the Bankruptcy Case. *See* _11 U.S.C. § 362(a)_.

12. In the Schedule F filed concurrently with the petition in the Bankruptcy Case, Defendant reported unsecured debts totaling $926,506.00, including: (1) $789,000 owed to JPMorgan on account of the FINRA Award (not listed as disputed, contingent, or unliquidated); and (2) $45,000 owed to Shustak related to the attorney fee dispute (listed as disputed).

13. JPMorgan and Shustak are Defendant's two largest unsecured creditors and the debts owed to them account for approximately 90 percent of all of the Defendant's unsecured debt.

14. Eleven Sixteen LLLP is a limited liability company was [sic] created in January 2014. [LLLP refers to limited **[*5]** liability limited partnership. *See* Plaintiff's Exhibit 9, Proof of Claim No. 2, filed by Wood, Erickson & Whittaker on April 27, 2015, referring to billing statement for "Drafting and formation of limited liability limited partnership: Eleven Sixteen LLLP [Flat fee] Amount - $7,500.00".]

15. Defendant admits that he retained a firm to form a trust and limited liability partnership, but denies that he formed or created Eleven Sixteen LLLP.

16. Defendant and his wife, Ellen Ellison, are the owners of the residential real property located at 555 S. Norton Avenue, Los Angeles, California 90020 ("Property").

17. In addition to the Property, Defendant holds interests in various bank accounts including: (1) Joseph Ellison ITF Ellen Ellison, City National Bank, account ending 1756 ("Defendant's CNB Account"); and (2) Joseph Ellison and Ellen Ellison Joint WROS, Mutual Securities, Inc., account ending 9350 ("Joint Account").

18. While the FINRA Action was pending, on or about February 14, 2014, Defendant and his wife obtained a loan, in the principal amount of $1,496,500 from Greenbox Loans, Inc. ("First DOT"). Dovenmuehle Mortgage, Inc. is the current servicer of the First DOT. [The court understands **[*6]** that "DOT" refers to a Deed of Trust securing a loan on Defendant's residence. *See* Plaintiff's Exhibit 8, Voluntary Petition for Relief and Schedules filed on July 29, 2014, referring to Schedule D listing "1st trust deed on residence" held by Dovenmuehle Mortgage Inc.; Defendant's Exhibit A, Closing Statement, referring to loan by Greenbox Loans, Inc., to Joseph Ellison and Ellen Ellison.].

19. The funds from the First DOT were disbursed as follows: (1) payoff of a deed of trust in favor of Ocwen Loan Servicing in the approximate amount of $605,728.11; (2) payoff of deed of trust in favor of Morgan Stanley Home Loans in the approximate amount of $742,802.77; and (3) disbursement in the approximate amount of $69,441.17 to Defendant's CNB Account.

20. Additionally, while the FINRA Action was pending, on or about February 28, 2014, Defendant and his wife obtained a loan, in the principal amount of $200,000 from Brian Dror and Rafael Ryzman ("Second DOT"). Logan Investments is the current servicer of the Second DOT.

21. The funds from the Second DOT, in the approximate amount of $178,509.68, were disbursed to Defendant's CNB Account.

Layla Buchanan

2016 Bankr. LEXIS 3475, *6

22. The First DOT and Second DOT fully encumbered the Property **[*7]** (reflecting value of the property of $1,500,000 and encumbered with debts totaling $1,716,551.00).

23. On or about March 1, 2014, the funds disbursed to Defendant from the First DOT and the Second DOT, totaling $247,950.85, were in Defendant's CNB account.

24. Later that same month, Defendant transferred a total of $38,000 to two of his friends, Ed Jeffers and Charles Springer. Defendant testified that he was repaying one personal and one business project loan to these individuals, although the purported business loan was to pay for Defendant's living expenses.

25. While the FINRA Action was pending and shortly after the evidentiary hearing in the matter concluded, on or about May 12, 2014, Defendant transferred $18,000 from Defendant's CNB Account to an account held by the Law Offices of Ellen Ellison, at City National Bank, account ending 5499 ("Wife's CNB Account").

26. Approximately one week after the issuance of the FINRA Award, on or about June 10 and June 11, 2014, Defendant transferred, through two transactions, a total of $51,000 from Defendant's CNB Account to his Wife's CNB account.

27. Less than two weeks after the entry of the FINRA Award, on or about June 16, 2014, Defendant **[*8]** transferred $121,000 from Defendant's CNB Account to the corporate account of Clownputsch, Inc., a corporation wholly owned by Defendant, at City National Bank, account ending in 7881 ("Clownputsch Account").

28. Defendant testified during the 2004 examination that he transferred the funds, in part, because he was afraid people were going to take all his money away and leave his family destitute.

29. Defendant retained bankruptcy counsel on or about June 15, 2014.

30. On or about June 21, 2014, Defendant transferred $119,000 from Clownputsch Account to Defendant's CNB Account.

31. On or about July 9, 2014, six days after receiving notice of the FINRA Award against him and three weeks before filing his petition, Defendant transferred $41,415.30 from Defendant's CNB Account to Dovenmuehle Mortgage, thereby prepaying the First

DOT for six months[2].

32. Also on or about July 9, 2014, Defendant transferred $11,062 from Defendant's CNB Account to Logan Investments, thereby prepaying the Second DOT for six months.[3]

33. Defendant testified at his 2004 Examination as follows:

A. Well, at the time that the payments were made — let's see. . . . July was the prepayment[,] by then the case had been decided, and I didn't know what I was going to do. Really, we were trying to make up our mind what we were going to do, and then I just wanted to make sure that those -- that whatever happened -- I mean, I got a threatening letter. I got threatening letters from the beginnings of what might have been attempts to collect money or whatever, and I just wanted to make sure that we wouldn't be thrown out in the street.
Q. And who did those letters come from?

A. Well, I got -- well, the award in and of itself was pretty breathtaking. When I got the notice of the award, that was F.I.N.R.A., and the F.I.N.R.A. fees. I didn't know if I would lose my license. I didn't. J.P. Morgan, obviously, they had sent me by July -- yeah. They had sent me a letter by then saying they wanted their money. **[*10]** And who else was there? I was having a fee disputes. That's another thing. I was having a fee dispute. I found out that I was grossly overcharged by the attorneys I used first, and I got several attorneys' opinions, and so I was possibly fighting with them. Whatever else was going to go on, I wanted to make sure my family was at least ensconced in our home until the end of the year.
[. . .]
Its a priority of survival. I wanted to make sure we had a home to live in and a place to live in while all this was going on.
Q. So if you had kept the funds in your city national

_____

[2] Although the parties stipulated that Defendant prepaid both the First and Second DOT by six months, as clarified by Defendant's testimony at trial, it appears that the six month figure included the then currently due monthly payment, and thus, the court finds that Defendant prepaid the First and Second DOT by five months, not six months. *Trial Testimony* **[*9]** *of Joseph Ellison*, November 19, 2015 at 9:22-9:23 a.m.

[3] *Supra* note 2.

2016 Bankr. LEXIS 3475, *9

bank account, why wouldn't they have been there for you to be able to pay your mortgage?
A. Well, I didn't know if, for example, Shustak had gotten a judgment, which he didn't. They threw him out of court, but he kept trying to do things. I didn't know where -- I felt under siege. I guess you can understand that. So I had to prioritize where this money went, and other than food and other -- certain other things that had to be accounted -- you know, taken care of. This was a pretty important piece of that puzzle.
Q. Okay. So were [you] concerned that Shustak might get the judgment and then take the money?

A. That was a possibility. **[*11]** I thought I had -- I mean, I had a few disputes. I reported . . . .
Q. Were you concerned that the money would have gone to J.P. Morgan?
A. I don't remember my thinking about that. But I remember thinking, "if I don't keep a roof over our heads right now, we're going to be in a lot of trouble."

34. Defendant further testified that he "had to prioritize where this money went" and that repayment of the First DOT and Second DOT "was a pretty important piece of that puzzle."

35. The funds transferred to Dovenmuehle Mortgage and Logan Investments, totaling $52,477.30 are not available for distribution to Defendant's unsecured creditors.

36. Defendant transferred, through four separate transactions, a total of $31,600 from the non-exempt Joint Account to various destinations. This included a transfer of $17,000.00 to his wife on the Petition Date.

37. The four transactions posted to the Joint Account after the Petition Date.

38. As a result of the four transfers, the balance of the Joint Account decreased from $33,494.92 to $1,895.02.

39. Defendant disclosed a balance for the Joint Account of $1,895.02 in the Schedule B.

40. The parties in their Pre-Trial Stipulation for Claims for Relief, ECF 22, **[*12]** designated the following as Disputed Fact 1 for determination at trial:

[Disputed Fact] "1. Defendant's bankruptcy schedules and statement of financial affairs did not disclose any interest in a limited liability limited partnership, or a bank account in the name of a company owned by the

Defendant, Clownputsch, Inc."

The court finds that this disputed fact is not supported by a preponderance of the evidence because Defendant's Schedule B-Personal Property, Petition, Exhibit 8 at 16, disclosed the existence of Clownputsch, Inc.

41. The parties in their Pre-Trial Stipulation for Claims for Relief, ECF 22, designated the following as Disputed Fact 2 for determination at trial:

[Disputed Fact] "2. Defendant held no interest in his Wife's CNB Account."

The court finds that this disputed fact is not supported by a preponderance of the evidence. Based on *California Family Code § 760* and *In re Marriage of Braud, 45 Cal.App.4th 797, 822-823, 53 Cal. Rptr. 2d 179 (1996)*, the court finds that the evidence shows that Defendant had a community property interest in the funds in his Wife's CNB Account. At trial, Defendant testified that he was not involved in opening his Wife's CNB Account, which belonged to his wife's law practice, that he was not a signatory on that account, that he had no control over the **[*13]** account, that he had nothing to do with the account and that he was not a member of his wife's law practice. *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:17-9:18 a.m. Although Defendant's testimony on these points is credible and although Defendant listed the account as his wife's personal checking account on his bankruptcy schedules, the court gives more weight to other admitted evidence. First, the court observes that Defendant listed his Wife's CNB Account as community property on Defendant's Schedule B, Exhibit 8 at 14, and claimed a $24,925.00 exemption in that account, whose value on the Petition Date was scheduled at $25,793.00 pursuant to Defendant's Schedule C, Exhibit 8 at 20. Further, even if Defendant's Wife's CNB Account was his wife's separate property, because community property was commingled with separate property in Wife's CNB Account, and because no evidence was presented tracing the source of any separate funds, the court determines that based upon the admitted evidence, Defendant has a community property interest in the funds in his Wife's CNB Account. That is, given that less than three months before the Petition Date, shortly after Defendant refinanced **[*14]** the Property, Defendant transferred at least $69,000.00 to his Wife's CNB Account from the refinancing of the Property, which Defendant listed as community property on Defendant's Schedule A, Exhibit 8 at 13, and given

2016 Bankr. LEXIS 3475, *14

that no evidence was presented tracing the funds in his Wife's CNB Account to a separate property source and no other evidence was admitted regarding the characterization of the Property, the court determines that Defendant had a community interest in his Wife's CNB Account. *In re Marriage of Braud, 45 Cal.App.4th at 822-823* (citations omitted) (*HN1*[↑]) "[T]he mere commingling of separate property and community property funds does not alter the status of the respective property interests, provided that the components of the commingled mass can be adequately traced to their separate property and community property sources. But if the separate property and community property interests have been commingled in such a manner that the respective contributions cannot be traced and identified, the entire commingled fund will be deemed community property pursuant to the general community property presumption of *section 760*.").

42. The parties in their Pre-Trial Stipulation for Claims for Relief, ECF 22, designated the following as Disputed Fact 3 for **[*15]** determination at trial:

> [Disputed Fact] 3. Defendant prepaid the First DOT and Second DOT because he had received a collection letter related to the FINRA Award and had a fee dispute pending with Shustak, and wanted to ensure that his family could remain in the Property and that the funds used for the prepayment would not go to pay any judgment obtained by Shustak.

As discussed in detail below, the court finds this disputed fact to be supported by a preponderance of the evidence.

43. There are no liens on Defendant's CNB Account or the Joint Account.

Finding of Fact 43 was established through the Order on Plaintiffs JPMorgan Chase, N.A. and J.P. Morgan Securities, LLC's Motion for Summary Judgment, ECF 19, which treated certain facts as established pursuant to *Federal Rule of Civil Procedure 56(g)*, but was left out of the parties Pre-Trial Stipulation for Claims for Relief, ECF 22. *See* ECF 11, Exhibit 10, Proposed Uncontroverted Fact No. 18.

In addition to the findings of fact set forth above, the court makes the following findings of fact based on the testimony at trial.

44. As indicated by Defendant's testimony that less than one month after the FINRA award, he thought of prepaying the loans secured by DOTs on his

residence **[*16]** by five months because "I had the money at that time and I wanted to make sure my family was protected and that I had paid my primary obligation to them for that period of time," *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:22-9:23 a.m., and that a primary motivation behind his home loan prepayments was that he was concerned about his prior lawyer, who he was having a fee dispute with, and who has a disputed claim in Defendant's bankruptcy case, "from coming in and attaching his assets," *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:24-9:25 a.m., such loan prepayments by Defendant indicate an intent on his part to hinder or delay payment of his non-preferred creditors, including Shustak, his prior lawyer, and JPMorgan, the FINRA awardee, in taking his nonexempt home equity to prepay the preferred home loan lenders holding DOTs on the home where he and his family resided.

45. As indicated by Defendant's testimony that he prepaid Dovenmuehle Mortgage, the servicer for the First DOT on the Property, roughly $40,000.00 (i.e., $41,415.30), and Logan Investments, the servicer for the Second DOT on the Property, roughly $11,000.00 (i.e., $11,062.00), "to assure that **[*17]** my wife and my daughter and myself had a home to live in through the end of the year . . . I did prepay [the home loans in the past] but not to that degree, not six months, or four months, five months, whatever it was in advance, normally." *Trial Testimony of Joseph Ellison*, November 19, 2015 at 10:43 a.m., the number of advance mortgage payments were admittedly out of the ordinary and further indicate an intent to hinder or delay payment of his non-preferred creditors.

46. As indicated by Defendant's testimony that prior to filing his bankruptcy petition, he met with an asset protection firm, and one of his goals in doing so, was to potentially protect his assets from potential creditors, *Trial Testimony of Joseph Ellison*, November 19, 2015 at 10:58-10:59 a.m., and while he changed his mind about using the asset protection firm, the evidence of his consideration, meeting and paying the asset protection firm supports a finding that Defendant intended to hinder or delay his non-preferred creditors.

47. From his refinancing of the Property, Defendant took out cash of almost $250,000.00 (i.e., $247,950.85) from the equity in the Property. *Trial Testimony of Joseph Ellison*, November 19, **[*18]** 2015 at 9:15 a.m.; *see also*, Finding of Fact No. 23, *supra*.

48. As stated on his bankruptcy schedules, as of the

2016 Bankr. LEXIS 3475, *18

Petition Date, Defendant had $600.00 in his CNB Account, for which he did not claim an exemption. Exhibit 8 at 14 and 20. Furthermore, as stated on his bankruptcy schedules, as of the Petition Date, Defendant had $1,894.00 in the Joint Account, for which he did not claim an exemption. *Id.*

## CONCLUSIONS OF LAW

*HN2*[⬆] Under *11 U.S.C. § 727*,

[t]he court shall grant the debtor a discharge, unless . . . the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed[,] (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition.

*11 U.S.C. § 727(a)(2)*.

*HN3*[⬆] A party seeking denial of discharge under *§ 727(a)(2)* must prove two things: "(1) a disposition of property, such as transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act [of] disposing of the property." **[*19]** *Hughes v. Lawson (In re Lawson), 122 F.3d 1237, 1240 (9th Cir. 1997)*; *accord, In re Retz, 606 F.3d 1189, 1200 (9th Cir. 2010)*; *Cooke v. Renshaw (In re Cooke), 2016 Bankr. LEXIS 2703, *12, 2016 WL 4039699, at *5 (9th Cir. BAP 2016)*, *appeal pending*, No. 16-60068 (9th Cir., notice of appeal filed on August 5, 2016). Under *11 U.S.C. § 101(54)*, "The term 'transfer' means . . . (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with— (i) property; or (ii) an interest in property." "Those objecting to discharge 'bear [ ] the burden of proving by a preponderance of the evidence that [the debtor's] discharge should be denied." *In re Retz, 606 F.3d at 1196*, *quoting, Khalil v. Developers Surety & Indemnity Co. (In re Khalil), 379 B.R. 163, 172 (9th Cir. BAP 2007)*, *affirmed*, *578 F.3d 1167, 1168 (9th Cir. 2009)*; *see also, Beverly v. Beverly (In re Beverly), 374 B.R. 221, 243 (9th Cir. BAP 2007)* ("The burden of proof on an objection to discharge under *§ 727(a)(2)* is preponderance of the evidence."), *affirmed in part and appeal dismissed in part*, *551 F.3d 1092 (9th Cir. 2008)*, *citing inter alia, Grogan v. Garner, 498 U.S. 279, 289, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991)*.

*HN4*[⬆] "In keeping with the 'fresh start' purposes behind the Bankruptcy Code, courts should construe *§ 727* liberally in favor of debtors and strictly against parties objecting to discharge." *In re Retz, 606 F.3d at 1196*, *quoting, Bernard v. Sheaffer (In re Bernard), 96 F. 3d 1279, 1281 (9th Cir. 1996)*. While "[t]his does not alter the burden on the objector, [it] rather means that 'actual, rather than constructive intent is required' on the part of debtor." *In re Retz, 606 F.3d at 1196*, *quoting, In re Khalil, 379 B.R. at 172*.

## I. Prepetition Transfers Under *11 U.S.C. § 727(a)(2)(A)*

The court first addresses the relevant prepetition transfers at issue in this case under *11 U.S.C. § 727(a)(2)(A)*. As explained in more detail below, based on evidence of Defendant's prepetition **[*20]** transfers and of his intent to hinder, delay or defraud creditors JPMorgan and Shustak, his prior lawyer, the court determines that Defendant's discharge should be denied pursuant to *11 U.S.C. § 727(a)(2)(A)*.

Within one year prior to filing his bankruptcy petition, Defendant refinanced the Property by taking out a loan in the principal amount of $1,496,500.00 secured by the First DOT in favor of Greenbox Loans, Inc., used the $1,496,500.00 to pay off the previous first deed of trust to Ocwen Loan Servicing and the previous second deed of trust to Morgan Stanley Home Loans in the amounts of $605,728.11 and $742,802.77 respectively, deposited the remaining $69,441.17 in Defendant's CNB account, took out another loan in the amount of $200,000.00 secured by the Second DOT in favor of Brian Dror and Rafael Ryzman, and then deposited $178,509.68 of the $200,000.00 in Defendant's CNB account. Subsequently, from the refinancing proceeds deposited into Defendant's CNB account, Defendant transferred $38,000.00 to two friends, Ed Jeffers and Charles Springer, allegedly in satisfaction of two debts owed to them, separately transferred $18,000.00 and $51,000.00 from Defendant's CNB Account to his Wife's CNB Account, and **[*21]** transferred $41,415.30 to Dovenmuehle Mortgage and $11,062.00 to Logan Investments, thereby prepaying the loans secured by the First and Second DOTs on the Property by five months. At or just before the petition date, Defendant also transferred $31,600.00 from Defendant's non-exempt Joint Account to various destinations, including a $17,000.00 transfer to his wife on the Petition Date. Because all of the above-described acts involved the disposition of or parting with of property within the

2016 Bankr. LEXIS 3475, *21

statutory time period, the court determines that each of the above-described acts constitute transfers under the first *Lawson* element.

Additionally, Defendant transferred $121,000.00 from Defendant's CNB Account into the Clownsputsch Account, then transferred $119,000.00 from the Clownsputsch back to Defendant's CNB Account. The court determines that the net of $2,000.00 that remained in the Clownsputsch Account constitutes a transfer under *Lawson* because the $2,000.00 was disposed of or parted with, but the $119,000.00 that was transferred back to Defendant's CNB Account does not constitute a transfer under *Lawson* because that money did not remain in the Clownsputsch Account. 4 March, Ahart [*22] and Shapiro, *California Practice Guide: Bankruptcy*, ¶ 22:856 at 22-118 (2015) (*HN5*[↑]) "For purposes of *§ 727(a)(2)*, 'transferred' means 'transferred and *remained transferred*." I.e., a debtor who fraudulently transfers property out of the bankruptcy estate during the one-year prepetition period but then *returns the property to the estate* before filing the petition may still receive a discharge.") (emphasis in original), *citing, In re Adeeb, 787 F.2d at 1339, 1344-1345 (9th Cir. 1986)*.

**A. Both Intent to Hinder and Intent to Delay are Individually Sufficient to Deny a Debtor's Discharge Under *11 U.S.C. § 727(a)(2)***

*HN6*[↑] ] Regarding the second *Lawson* element, the intent element, "[a] debtor's intent does not need to be fraudulent to meet the requirements of *11 U.S.C. § 727(a)(2)*. *In re Retz, 606 F.3d at 1200*. "Because the language of the statute is in the disjunctive, it is sufficient if the debtor's intent is to hinder or delay a creditor." *Id., citing, In re Bernard, 96 F.3d at 1281; accord, In re Cooke, 2016 Bankr. LEXIS 2703 at *14, 2016 WL 4039699, at *5*; *see also*, 6 Resnick and Sommer, *Collier on Bankruptcy*, ¶ 727.02[3][a] at 727-17 (16th ed. 2016) ("The language of *section 727(a)(2)*, drawn from the Uniform Fraudulent Conveyance Act, implies that the debtor must have intent to defraud a creditor or officer of the estate. However, some courts have found that, under a literal reading of the language, an intent to hinder or delay creditors, even [*23] if not fraudulent, may be sufficient to warrant denial of discharge.") (footnotes and citations omitted), *citing inter alia, In re Retz, supra; First Beverly Bank v. Adeeb, 787 F.2d 1339, 1343 (9th Cir. 1986)* (concluding that trial court's finding that the debtor "acted with actual intent to hinder or delay a creditor" was not clearly erroneous

based on the debtor's admission that "he transferred the property intending to put it out of the reach of one of his creditors"); *but see, In re Cooke, 2016 Bankr. LEXIS 2703 at *27, 2016 WL 4039699, at *9* (Taylor, J., dissenting) (noting the bankruptcy court and the majority opinion affirming the bankruptcy court "fail to cite a single reported Ninth Circuit or Panel decision where a court denied discharge based on efforts to hinder or delay that did not involve deceit or other objectively or subjectively improper conduct"); *cf., Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 804-812 (9th Cir. 1994)* (reviewing for clear error and affirming trial court's holding and sustaining reorganized debtor's fraudulent transfer claims under *11 U.S.C. §§ 544(b)* and *548(a)(1)* against debtor's insider as transferee of corporate funds based on factual findings that the insider caused debtor to transfer the funds with intent to hinder or delay debtor's creditors); *Pioneer Liquidating Corp. v. San Diego Trust & Savings Bank, 211 B.R. 704, 717 (S.D. Cal. 1997)* (stating that "the purpose of fraudulent transfer recovery is to prevent a debtor from putting assets otherwise available to its creditors [*24] out of their reach"), *citing and quoting*, Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law*, *8 Bankr. Dev. J. 55, 128 (1991)* ("In our quest to understand fraudulent transfer liability, we often overlook first principles. At its core, fraudulent transfer law is a debt-collection device and not a revenue generating tool; its mission is to prevent the unjust diminution of the debtor's estate.").

*HN7*[↑] ] "The intent to hinder or delay [for purposes of *11 U.S.C. § 727(a)(2)(A)*] 'is a question of fact that requires the trier of fact to delve into the mind of the debtor and may be inferred from surrounding circumstances.'" *In re Cooke, 2016 Bankr. LEXIS 2703 at *15-16, 2016 WL 4039699, at *6*, *citing, Searles v. Riley (In re Searles), 317 B.R. 368, 379 (9th Cir. BAP 2004)*, *affirmed in an unpublished decision*, *212 Fed. Appx. 589 (9th Cir. 2006)*, *citing, Emmett Valley Associates v. Woodfield (In re Woodfield), 978 F.2d 516, 518 (9th Cir. 1992)*. Furthermore, intent for purposes of *11 U.S.C. § 727(a)(2)* may be inferred from the surrounding circumstances, including certain "badges of fraud" that constitute circumstantial evidence of intent:

These factors, not all of which need be present, include 1) a close relationship between the transferor and the transferee; 2) that the transfer was in anticipation of a pending suit; 3) that the transferor Debtor was insolvent or in poor financial condition at the time; 4) that all or substantially all of

2016 Bankr. LEXIS 3475, *24

the Debtor's property was transferred; 5) that the transfer so completely **[\*25]** depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and 6) that the Debtor received inadequate consideration for the transfer.

*In re Woodfield, 978 F.2d at 518*, citing inter alia, *Evans v. Trude, 193 Or. 648, 240 P.2d 940, 944 (1952)* (citing state court cases listing "badges of "fraud" to infer actual intent to prove fraudulent transfer) and *Matter of Ayala, 107 B.R. 271, 274-275 (Bankr. E.D. Cal. 1989)* (citing federal court cases listing similar but not identical indicia of fraud to prove intent under *11 U.S.C. § 727(a)(2)*). "A course of conduct may also be probative of the question of intent." *In re Beverly, 374 B.R. at 243*, citing, *In re Adeeb, 787 F.2d at 1343*.

As previously noted, *Collier on Bankruptcy* commented that the language of *11 U.S.C. § 727(a)(2)* was drawn from the Uniform Fraudulent Conveyance Act and "implies that the debtor must have intent to defraud a creditor or officer of the estate", but that citing the Ninth Circuit in *In re Retz*, "some courts have found that, under a literal reading of the language, an intent to hinder or delay creditors, even if not fraudulent, may be sufficient to warrant denial of discharge." 6 Resnick and Sommer, *Collier on Bankruptcy*, ¶ 727.02[3][a] at 727-17 (footnotes and citations omitted). In this court's view, *Collier*'s comment is somewhat overstated because the Uniform Fraudulent Conveyance Act, later the Uniform **[\*26]** Fraudulent Transfer Act, and now the Uniform Voidable Transactions Act, does not draw any distinction in proving actual intent to prove a "fraudulent", now voidable, transfer, whether to hinder, to delay, or to defraud, because to prove any of these forms of intent stated in the disjunctive may be proven by a common set of factors, or indicia, as indicated by the current California version of the Uniform Fraudulent Conveyance Act, now the Uniform Voidable Transactions Act, *California Civil Code § 3439.04(a)*, which provides as follows:

(a) A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:

(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

(B) Intended to incur, or believed or reasonably should **[\*27]** have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(b) In determining actual intent under *paragraph (1) of subdivision (a)*, consideration may be given, among other factors, to any or all of the following:

(1) Whether the transfer or obligation was to an insider.

(2) Whether the debtor retained possession or control of the property transferred after the transfer.

(3) Whether the transfer or obligation was disclosed or concealed.

(4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(5) Whether the transfer was of substantially all the debtor's assets.

(6) Whether the debtor absconded.

(7) Whether the debtor removed or concealed assets.

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11) Whether the debtor transferred the essential assets of the business to a lienor **[\*28]** that transferred the assets to an insider of the debtor.

(c) A creditor making a claim for relief under *subdivision (a)* has the burden of proving the elements of the claim for relief by a preponderance of the evidence.

*See also*, 8 Witkin, *California Procedure*, Enforcement of Judgment, § 495 at 534-536 (2008 and 2016 Supp.); *cf.*, 5 Resnick and Sommer, *Collier on Bankruptcy*, ¶ 548.04[1][a] at 548-56 and n. 5 (*HN8*[⬆]) "The statutory text [of *11 U.S.C. § 548(a)(1)(A)*] focuses on the debtor's intent. The debtor must possess an intent to hinder, an intent to delay or an intent to defraud. The

2016 Bankr. LEXIS 3475, *28

requirement is disjunctive; any one of the three intents is sufficient for liability." *citing inter alia, Lippe v. Bairnco Corp., 249 F. Supp. 2d 357, 374 (S.D.N.Y. 2003)* ("As the use of the disjunctive 'or' makes clear, '[o]nly an actual intent to hinder and delay need be established, not an actual intent to defraud.'") (citation omitted).

*HN9*[⬆] The words "hinder," "delay" and "defraud" used to describe the intent required under *11 U.S.C. § 727(a)(2)* are not defined terms under the Bankruptcy Code. *See 11 U.S.C. § 101*. The meaning of these terms comes from the common law and is codified in the Uniform Fraudulent Conveyance Act, now the Uniform Voidable Transactions Act. *See In re Woodfield, 978 F.2d at 518*, *citing inter alia, Evans v. Trude, supra*, and *Matter of Ayala, supra.* The terms of hinder, delay and defraud connote intentional actions [*29] by a debtor to frustrate or thwart collection by creditors and describe a continuum of intents that may differ temporally or in substance and effect, but each of which is impermissible for purposes of *11 U.S.C. § 727(a)(2)*. The dictionary definitions of these words reinforce these observations. The word "hinder" has been defined as a transitive verb: "1. To be or get in the way of. 2. To obstruct or delay the progress of." *The American Heritage Dictionary of the English Language* at 830 (4th ed. 2006). The word "delay" has been defined as a transitive verb: "1. To postpone until a later time; defer. 2. To cause to be later or slower than expected or desired." *Id.* at 480. The word "defraud" has been defined as a transitive verb: "To take something by fraud; swindle." *Id.* at 477. The word "fraud", in turn, has been defined as a noun: "1. A deception deliberately practiced in order to secure unfair or unlawful gain. 2. A piece of trickery; a trick . . . ." *Id.* at 699.

**B. An Examination of *In re Cooke* and *Hultman v. Tevis*: the Court May Consider Prepetition Preferential Payments to Creditors for Purposes of Determining Whether There is Intent to Hinder, Delay or Defraud Under *11 U.S.C. § 727(a)(2)(A)***

Before the court addresses whether, under *Lawson*, Defendant's [*30] pre-bankruptcy acts of using non-exempt assets to pay, and thus prefer, some creditors, including the home loan lenders holding the First and Second DOTs on the Property, and his friends as well as an insider, his wife, involved the requisite actual intent to hinder, delay or defraud a creditor, the court must also carefully consider the overlay between the intent to prefer creditors and the intent to hinder, delay or defraud creditors. *HN10*[⬆] "The intent to prefer

creditors is not equivalent to the intent to hinder, delay or defraud creditors." 6 Resnick and Sommer, *Collier on Bankruptcy*, ¶ 727.02[3][c] at 727-19, *citing inter alia, Equitable Bank v. Miller (In re Miller), 39 F.3d 301 (11th Cir. 1994)* and *In re Richter, 57 F.2d 159 (2d Cir. 1932)*; *see also, In re Chu, 511 B.R. 681, 685 (Bankr. D. Hawaii 2014)* ("An intent to prefer one creditor over others is not necessarily the same as an intent to hinder, delay, or defraud creditors."). A transfer preferring one creditor over another does not amount to an act to "hinder, delay, or defraud" an unpreferred creditor. 8 Witkin, *California Procedure*, Enforcement of Judgment, § 495 at 534, *citing inter alia, California Civil Code § 3432* and *Wyzard v. Goller, 23 Cal.App.4th 1183, 28 Cal. Rptr. 2d 608 (1994)*; *see also, Hultman v. Tevis, 82 F.2d 940, 941 (9th Cir. 1936)* (mere fact of a preferential transfer does not establish an act to "hinder, delay or defraud" to deny discharge). Nonetheless, in this court's view, as discussed below, even [*31] if the intent to prefer creditors is not equivalent to the intent to hinder, delay or defraud creditors, the intent to prefer creditors may still coincide with the intent to hinder, delay or defraud creditors if there is other evidence of intent as was recently held by a divided Bankruptcy Appellate Panel of the Ninth Circuit ("BAP") in an unpublished memorandum decision in *In re Cooke, 2016 Bankr. LEXIS 2703, 2016 WL 4039699, at *1-8* (majority opinion) and *2016 Bankr. LEXIS 2703, [WL] *8-17* (Taylor, J., dissenting); affirming a decision of another judge of this court (the Honorable Peter H. Carroll); *cf.*, 5 Resnick and Sommer, *Collier on Bankruptcy*, ¶ 548.04[1][a] at 548-57 and n. 6 ("The requisite actual intent [to hinder, delay or defraud to prove fraudulent transfer under *11 U.S.C. § 548(a)(1)(A)*], however, must be something more than just an intent to prefer one creditor over another." *citing inter alia, Stone v. Abraham (In re Prestige Spring Corp.), 628 F.2d 840, 842-843 (4th Cir. 1980)*. For purposes of determining whether the court may consider prepetition preferential payments to creditors when determining whether there is intent to hinder, delay or defraud under *11 U.S.C. § 727(a)(2)(A)*, the court now examines the BAP's decision in *Cooke* and the Ninth Circuit's decision in *Hultman*.

In *Cooke*, the debtor and the judgment creditor were involved in a multi-vehicle accident in which the creditor, [*32] a former fireman, was seriously and permanently injured. *2016 Bankr. LEXIS 2703 at *1, [WL] at *1*. The judgment creditor sued the debtor in state court for negligence and the debtor who was insured was defended by the counsel retained by the insurance company. *Id.* The state court entered a

judgment in favor of the judgment creditor against the debtor of $1.6 million, and in October 2012, the insurance company paid the judgment creditor directly the amount of the policy limits of $250,000. *Id.* The debtor's insurance policy also provided for certain supplemental payments to be made on behalf of the debtor as the insured, including postjudgment interest, which was $45,147.62 as of the date the insurance company paid the judgment creditor on the judgment. *Id.* On November 13, 2012, the insurer mailed a check for the postjudgment interest to the debtor, who deposited the check in his checking account on November 19, 2012. *2016 Bankr. LEXIS 2703 at \*3-4, [WL] at \*1-2.* On November 30, 2012, the debtor filed a Chapter 7 bankruptcy case in this court; however, shortly before filing his Chapter 7 bankruptcy case, he spent approximately $30,000 from the insurance payment not to the judgment creditor on the judgment, but for other purposes, including: (1) $1,040 in cash paid for **[\*33]** miscellaneous items, $1,040; (2) $5,600 for on-campus housing at the university he was attending for the upcoming quarter; (3) $4,670 for tuition and fees to the university for the upcoming quarter; (4) $11,000 for taxes on the insurance payment he received, which was paid to the IRS; (5) $4,306 for bankruptcy attorney and filing fees; (6) $2,800 for taxes on the insurance payment he received, which was paid to the state taxing authority; and (7) $2,500 for the purchase of a personal computer for his use. *2016 Bankr. LEXIS 2703, [WL] at \*2.* The debtor claimed the remaining amount of $14,250 as exempt on his bankruptcy schedules. *Id.* The judgment creditor filed an adversary proceeding under *11 U.S.C. § 727(a)(2)* against the debtor to deny his discharge. *2016 Bankr. LEXIS 2703, [WL] at \*3.* During his meeting of creditors under *11 U.S.C. § 341(a)*, during an examination under *Federal Rule of Bankruptcy Procedure 2004* by the judgment creditor and during the trial in the adversary proceeding, the debtor gave inconsistent testimony about whether he received and read the letter from the insurance company transmitting the supplemental payment check which told him what the check was for before depositing the check into his account, and he admitted in his testimony that he knew the insurance payment he received represented the interest accrued **[\*34]** from the judgment creditor's judgment, that based on his attorney's advice (never disclosed due to the continued assertion of the attorney-client privilege), the debtor concluded that the money from the insurance payment belonged to him and not the judgment creditor, that the judgment creditor might try to collect the money and that he could have given the money to the judgment creditor, but elected to use the

money for other purposes, and that he contemplated filing for bankruptcy before depositing the check. *2016 Bankr. LEXIS 2703, [WL] and n. 5.*

Among other things, the bankruptcy court in *Cooke* found that the debtor intended to hinder or delay the judgment creditor in his ability to collect on the judgment by transferring the funds. *Id.* Based on the totality of the circumstances, the bankruptcy court believed that the debtor's transfers went beyond legitimate prebankruptcy planning and were done with the intent to keep the funds from the judgment creditor, his most significant creditor, and to maximize the benefit of the funds for himself. *2016 Bankr. LEXIS 2703, [WL] at \*8.* The bankruptcy court entered judgment in favor of the judgment creditor, denying the debtor his discharge under *11 U.S.C. § 727(a)(2)*, and the Bankruptcy Appellate Panel in a divided vote **[\*35]** affirmed.

In affirming the bankruptcy court's judgment denying the discharge, the majority in *Cooke* held that the bankruptcy court applied the correct law articulating the elements for a claim under *11 U.S.C. § 727(a)(2)* and made the necessary findings of fact to determine the debtor's actual intent to hinder or delay the creditor, including inferences and course of conduct that may be considered as circumstantial evidence of intent. *2016 Bankr. LEXIS 2703, [WL] at \*8.* "The party objecting to discharge under *§ 727(a)(2)(A)* must prove two things: (1) the disposition of property, whether by transfer, removal, destruction, mutilation or concealment (within the statutory time period); and (2) the debtor's subjective intent to hinder, delay or defraud a creditor through the act of disposition of the property." *2016 Bankr. LEXIS 2703, [WL] at \*5, citing, In re Retz, 606 F.3d at 1200, citing, In re Lawson, 122 F.3d at 1240.* As to the second *Lawson* element, the majority held that the bankruptcy court's factual findings of intent were not clearly erroneous because the court could properly have found actual intent to hinder or delay based on the facts and debtor's course of conduct that he made the transfers with the knowledge that he was liable to the judgment creditor in excess of the policy limits, that the supplemental insurance payment was for accrued **[\*36]** interest on the judgment owed to the judgment creditor, that the judgment creditor might try to collect the payment from him, that he did not want the judgment creditor to get the payment, and that the debt owed to the judgment creditor was the reason he filed for bankruptcy as he had no other material debt as of the petition date. *2016 Bankr. LEXIS 2703, [WL] at \*6.* The majority finally observed that "[a]lthough two views of the evidence may exist, the court's choice between

EXHIBIT 5, PAGE 69

2016 Bankr. LEXIS 3475, *36

them in determining that [the debtor] actually intended to hinder or delay, cannot be clearly erroneous." *2016 Bankr. LEXIS 2703, [WL] at *8*.

The dissent in *Cooke* observed that the critical inquiry in the case came down to the question of "what did [the debtor] do with the Funds that would justify the loss of discharge?", and the dissent's answer was that "he did nothing that was an appropriate basis for discharge denial under *§ 727(a)(2)(A)*." *2016 Bankr. LEXIS 2703, [WL] at *9*. Among the eleven reasons that the dissent gave for reversal and possible remand of the bankruptcy court's judgment denying discharge was that reversal is warranted as a matter of law because the bankruptcy court's factual finding of intent was based on transfers which it could not consider for purposes of *§ 727(a)(2)(A)*. *2016 Bankr. LEXIS 2703, [WL] at *9-17*.

The debtor in *Cooke* has appealed the judgment of the **[*37]** Bankruptcy Appellate Panel affirming the bankruptcy court to the Ninth Circuit, which will decide the appeal in due course. This court specifically addresses some of the concerns raised in *Cooke* which are germane to the discussion of the issues in this case, particularly whether reversal is warranted as a matter of law because the bankruptcy court's factual finding of intent was based on transfers which it could not consider for purposes of *11 U.S.C. § 727(a)(2)(A)*, and in support of that ground for reversal, the dissent in *Cooke* cited the Ninth Circuit's decision in *Hultman v. Tevis, supra*, which was decided under the Bankruptcy Act of 1898 rather than the modern Bankruptcy Code.

The facts in *Hultman v. Tevis* were as follows. *82 F.2d at 940-941*. The debtor filed a petition for relief under the Bankruptcy Act and was adjudged a voluntary bankrupt. *Id. at 940*. The trustee in bankruptcy opposed the petition and sought denial of the debtor's discharge on two grounds, including the transfer of large sums of money within one year of the petition date to his son with the intent to hinder, delay or defraud his creditors. *Id. at 940-941*, *citing*, Bankruptcy Act of 1898, § 14b, as amended by § 6 of the Act of May 27, 1926, c. 406, 44 Stat. 663, former 11 U.S.C § 32(b). The debtor owed a debt to his son, which had not **[*38]** been fully paid. *Id. at 941*. Debtor began receiving money from a spendthrift trust set up by his sister, and he transferred some of that money to his son within one year of the petition date. *Id.* The debtor had been advised by his attorney, to whom all the facts were fully disclosed, that the money received from the spendthrift trust could not be subjected to the claims of his creditors, even after it reached his hands. *Id.* The debtor in good faith believed and relied upon the attorney's advice and acted on it in making the transfer to his son. *Id.* The amount of money that the debtor transferred to his son was less than the amount owed. *Id.* The special master in bankruptcy made the above findings of fact, which were not excepted to at trial, and further found that the money which the debtor transferred to his son was not transferred with the intent to hinder, delay or defraud his creditors and that the debtor was entitled to a discharge of his debts. *Id.* The trustee in bankruptcy interposed exceptions to the special master's findings of fact and conclusions of law, but the district court accepted the special master's findings and conclusions granting the debtor a discharge. *Id.* The Ninth Circuit **[*39]** in *Hultman* affirmed the district court's judgment upholding the debtor's discharge. In so holding, the Ninth Circuit made two specific observations germane here. *Id.* First, the Ninth Circuit stated: "Whether [the lawyer's] advice was correct or not is a question which the District Court did not, nor do we, deem it necessary to decide." *Id.* Second, the Ninth Circuit stated: "The mere fact that a bankrupt has made a preferential payment or transfer to one of his creditors is no ground for denying a discharge." *Id.* (citations omitted).

The dissent in *Cooke* concluded that "[t]he bankruptcy court here did not acknowledge the rule in *Hultman* and erroneously relied on [the debtor]'s use of the Funds to pay other creditors." *In re Cooke, 2016 Bankr. LEXIS 2703 at *34, 2016 WL 4039699, at *11* (Taylor, J., dissenting). The dissent in *Cooke* asserted that the majority opinion only addressed one of the two relevant rulings of the Ninth Circuit in *Hultman* for not denying the debtor's discharge based on reliance of counsel and simply disregarded the other relevant ruling relating to preferential payments. *Id.* Relying on the Ninth Circuit's statement in *Hultman* that "[t]hat the mere fact that a bankruptcy has made a preferential payment or transfer to one of his creditors is **[*40]** no grounds for denying a discharge," the dissent in *Cooke* stated: "*Hultman* clearly states that payment of legitimate creditor claims, even to insiders, is not a basis for discharge denial. Both the bankruptcy court and the majority ignore this authority; I cannot and do not do so." *Id.* In other words, as the dissent stated, "as the Ninth Circuit made clear in *Hultman*, some transfers do not support discharge denial as a matter of law." *2016 Bankr. LEXIS 2703, [WL] at *12 n. 4*.

In asserting that reversal in *Cooke* was warranted as a matter of law because the bankruptcy court's factual finding was based on transfers which it could not consider for purposes of *11 U.S.C. § 727(a)(2)(A)*, the

2016 Bankr. LEXIS 3475, *40

dissent in *Cooke* also criticized the majority's analysis based on another Ninth Circuit decision in *In re Adeeb, supra*. *2016 Bankr. LEXIS 2703, [WL] at *14*. The dissent stated:

> In summary, I would reverse because the bankruptcy court erred as a matter of law when it based its decision almost entirely on [the debtor]'s payment of other debt. *Hultman*, as recognized by this Panel, does not permit this reliance. I also conclude that the laptop computer acquisition in isolation did not justify *§ 727(a)(2)(A)* denial of discharge.

> I emphasize that my analysis is independent of the bankruptcy court's finding of intent. As **[*41]** already noted, all commencements of bankruptcy cases involve, to some extent, an express intent to hinder and delay a creditor. Further, almost all bankruptcy cases involve some measure of transfer in anticipation of the creditor-hindering-or-creditor-delaying bankruptcy; bankruptcy lawyers are paid, creditors are preferred, and in some reasonable regards non-exempt assets become exempt or goods or services essential to day-to-day existence are obtained. These types of transfers do not justify a denial of discharge, so one never need consider a debtor's intent when causing them. And *Hultman* provides a firm foundation for a determination that not all transfers are appropriately considered in a *§ 727(a)(2)(A)* context. *Adeeb* is another such case.

> In *Adeeb*, the debtor admitted to making pre-petition transfers with improper intent. *787 F.2d at 1341-42*. But, he repented and attempted to retrieve the assets. *Id.* The Ninth Circuit, thus, reversed the district court and remanded to the bankruptcy court for a determination as to whether recovery had been complete. *Id. at 1346*. The Ninth Circuit read transferred in *§ 727(a)(2)(A)* as meaning 'transferred and remained transferred.' *Id. at 1345*. And it noted that Congress intended to deny discharge where debtors took **[*42]** actions **to keep assets from their creditors** by hiding assets or destroying them. *Id.* The facts here evidence no such improper conduct. Instead, in *Hultman*, the transfers did not support *§727(a)(2)(A)* discharge denial.

*2016 Bankr. LEXIS 2703, [WL] at *14* (emphasis in original).

With respect to the debtor's use of the insurance payment funds to purchase a laptop computer, the dissent in *Cooke* commented:

> Moreover, the Ninth Circuit allows debtors to engage in some forms of pre-bankruptcy planning and to protect assets by converting them from non-exempt to exempt. *See, e.g., Gill v. Stern (In re Stern), 345 F.3d 1036, 1043 (9th Cir. 2003)* ("[T]he purposeful conversion of nonexempt assets to exempt assets on the eve of bankruptcy is not fraudulent per se." (quoting *Wudrick v. Clements, 451 F.2d 988, 989 (9th Cir. 1971))*. The bankruptcy court acknowledged this fact, stating that this was a close case, but finding that combined expenditures from the Funds tipped the balance towards a denial of discharge. In a close case, the bankruptcy court could not find that the purchase of a much-needed tool of [the debtor]'s trade as a student, one that involved use of less than ten percent of the Funds, justified discharge denial.

*Id.* (footnote omitted).

In response to the dissent's analysis, the majority in *Cooke* stated that "[i]n the requisite analysis for this appeal, we need **[*43]** to determine if the bankruptcy court's finding of actual intent was clear error." *2016 Bankr. LEXIS 2703, [WL] at *7 n. 7*. In addressing the dissent's analysis, citing *Hultman*, the majority stated:

> The dissent's analysis doesn't consider intent, but rather questions whether any transfers contemplated by *§ 727(a)(2)* occurred if the transfers constitute preferment of other creditors. *See Hultman v. Tevis, 82 F.2d 940, 941 (9th Cir. 1936)*. As noted in *First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir. 1986)*, the real issue in *Hultman* involved whether the debtor acted with the requisite intent when he "in good faith, believed and relied upon his attorney's advice and acted on it in making the transfer to his son." *Id.* The Hultman court concludes no other indicia of intent existed, warranting a discharge. The facts in this present appeal distinguish this appeal from *Hultman*. Although [the debtor] vaguely raised an advice of counsel defense, he inconsistently testified as to whether he talked to his counsel. Further he declined to waive his attorney-client privilege so [the attorney] could testify or submit a declaration as to his advice to [the debtor]. However, in raising such a defense, [the debtor] could not invoke an attorney-client privilege. *Chevron Corp. v. Pennzoil Co., 974 F.2d 1156,*

2016 Bankr. LEXIS 3475, *43

*1163 (9th Cir. 1992)*.

*2016 Bankr. LEXIS 2703, [WL] at *5 n. 5*.

With respect to the bankruptcy court's factual findings on intent, the majority in *Cooke* noted **[*44]** that "[b]eyond the credibility determination, the bankruptcy court also identified several elements as support for the inference that [the debtor] acted with the requisite intent under *§ 727(a)(2)(A)*," citing what the bankruptcy court considered as reflected in the trial transcript:

> The bankruptcy court considered: "(1) the timing of the transfer; (2) the amount of the transfer in relation to the remaining property of the debtor; (3) whether the transfer occurred after the entry of a large judgment against the debtor; (4) whether the transfer rendered the debtor insolvent; (5) the debtor's motivation to make the transfers; and (6) the credibility of the debtor's explanation regarding the transfers."

*2016 Bankr. LEXIS 2703, [WL] at *7 and n. 6*, *citing*, Trial Tr. (Jan.12, 2015) 10:23-11:5.

This court has quoted the dissent and majority opinions in *Cooke* at length because the issues raised are germane to this case, that is, whether, as the dissent in *Cooke* concluded, based on the Ninth Circuit's decision in *Hultman* that some transfers by a bankruptcy debtor, including preferential payments to other creditors, do not support discharge denial as a matter of law. In considering the merits of the analyses of the majority and dissent in *Cooke*, this **[*45]** court concludes that while the dissent makes cogent points, the majority has the better side of the argument. The majority in *Cooke* is correct in emphasizing that "[i]n the requisite analysis for this appeal, we need to determine if the bankruptcy court's finding of actual intent was clear error." The bankruptcy court's analysis based on its findings considering "(1) the timing of the transfer; (2) the amount of the transfer in relation to the remaining property of the debtor; (3) whether the transfer occurred after the entry of a large judgment against the debtor; (4) whether the transfer rendered the debtor insolvent; (5) the debtor's motivation to make the transfers; and (6) the credibility of the debtor's explanation regarding the transfers" was not clear error, though a reasonable finder of fact could decide differently. *Id*.

In this court's view, *Hultman* does not dictate a different result in *Cooke* or in this case. The Ninth Circuit's statement in *Hultman* that "[t]hat the mere fact that a bankruptcy has made a preferential payment or transfer to one of his creditors is no grounds for denying a discharge" does not support the broad reliance of the dissent in *Cooke* for its proposition that **[*46]** preferential transfers do not support discharge denial as a matter of law and cannot be considered for determining intent for purposes of *11 U.S.C. § 727(a)(2)(A)*. That is not what the Ninth Circuit said in *Hultman*. As worded, *HN11*[⬆] the Ninth Circuit's statement in *Hultman* that the mere fact of a preferential transfer does not justify discharge denial means that such a transfer by itself is not grounds to deny a discharge, but says nothing about a preferential transfer being considered as evidence of intent in the context of other facts that may evidence intent. The analysis in *Hultman* indicated that the appropriate inquiry was to determine the existence of an intent on behalf of the debtor to hinder, delay or defraud creditors, which is a fact-based inquiry, and the findings of fact and conclusions of law proposed by the special master adopted by the district court that the debtor lacked such intent was reviewed for clear error, which was affirmed by the Ninth Circuit. The *Cooke* majority's analysis of *Hultman* was correct that the district court's finding of lack of intent based on the debtor's reliance on counsel's advice without other evidence of intent was not clearly erroneous and was appropriately affirmed. **[*47]** *See also*, *In re Perrine, 2008 Bankr. LEXIS 4719, 2008 WL 8448835, at *5-6 (9th Cir. BAP 2008)* (unpublished BAP memorandum decision discussing *Hultman* and acknowledging the Ninth Circuit's determination in that case the fact that a preferential payment did not necessitate a finding that it was made with an intent to hinder or delay creditors, upholding the district court's finding of lack of intent without additional evidence of intent, but distinguishing *Hultman* on its facts to uphold discharge denial involving a preferential or fraudulent transfer with additional evidence of intent).

The court acknowledges what the Ninth Circuit stated in *Hultman* about the *mere* fact that a preferential transfer is not a ground to deny a discharge under *11 U.S.C. § 727(a)(2)(A)*, but the circumstantial evidence in this case supports a finding that Defendant made transfers to prefer creditors, including the home loan lenders holding the First and Second DOTs on the Property and his wife, with the intent to hinder, delay or defraud creditors beyond the mere fact that he made certain preferential transfers to other creditors and, as discussed in more detail below, beyond the mere fact that he converted nonexempt assets into exempt assets.

Layla Buchanan

2016 Bankr. LEXIS 3475, *47

## C. Based on *In re Beverly*, Defendant "Crossed the Line"

Beyond the **[*48]** previous determination that _HN12_[↑] the court may consider preferential payments to creditors for purposes of determining an intent to hinder, delay or defraud under _11 U.S.C. § 727(a)(2)(A)_, the court is persuaded by the decision and analysis of the Bankruptcy Appellate Panel for the Ninth Circuit ("BAP") in *In re Beverly*, which dealt with another issue that is relevant to this case: whether the pre-bankruptcy conversion of non-exempt assets into exempt assets, which is nonfraudulent by itself as a matter of law under the Ninth Circuit's decision in _Gill v. Stern (In re Stern), 345 F.3d 1036, 1044 (9th Cir. 2003)_, warrants denial of a bankruptcy debtor's discharge if there was also a subjective intent to hinder, delay or defraud a creditor. _In re Beverly, 374 B.R. at 242-246_. The court believes the BAP's framework in that case is instructive here because in addition to Defendant's use of non-exempt assets to prefer certain creditors prepetition, this case also involves the transfer of non-exempt assets to Defendant's Wife's CNB Account which Defendant claimed an exemption in. As discussed in more detail below, the totality of circumstantial evidence in this case shows an intent to hinder, delay or defraud creditors to warrant denial of discharge as shown by Defendant's prepayments of the First and Second DOTs **[*49]** with five advance monthly payments, and transfers to his Wife's CNB Account which Defendant claimed an exemption in, all of which, like in *Beverly*, are forms of improper pre-bankruptcy planning that furthered Defendant's intent to keep certain assets for his personal benefit and out of reach of his creditors who might have received the value of these assets through a bankruptcy distribution.

In *Beverly*, the BAP reversed the bankruptcy court's holding that the debtor's pre-bankruptcy conversion of non-exempt assets to exempt assets during the debtor's divorce was non-fraudulent as a matter of law for purposes of denying the debtor's discharge under _11 U.S.C. § 727(a)(2)_. _Id. at 246_. In *Beverly*, the facts were as follows. The debtor, anticipating a large judgment on a community debt, executed a marital settlement agreement with his wife prepetition whereby he transferred a $1 million interest of non-exempt property to his non-filing wife in exchange for his wife's interest in his $1.1 million exempt retirement fund. _Id. at 226-227_. By doing so, the debtor would shoulder the impending judgment debt, but having first stripped himself of the non-exempt liquid assets with which to pay that debt. _Id. at 227_. After the debtor filed for bankruptcy, **[*50]** the trustee and the judgment creditor objected to the debtor's discharge under various _11 U.S.C. § 727(a)_ theories. _Id. at 229_. The bankruptcy court ruled for the debtor, reasoning that the toleration of bankruptcy exemption planning meant that the discharge cannot be denied because there could not have been an intent to hinder, delay or defraud creditors. _Id. at 244_.

On the creditor's appeal of its _11 U.S.C. § 727(a)(2)(A)_ claim, the BAP in *Beverly* specifically addressed the relationship between the conversion of non-exempt assets to exempt assets, which is not by itself fraudulent, and an intent to defraud creditors, stating:

> [I]t is difficult to draw the line between legitimate bankruptcy planning and intent to defraud creditors. Only two things are certain about the line.
> First, as already explained, denial of discharge involving exemption planning requires that there be evidence other than the mere timing of the transformation of property from nonexempt to exempt status.
> Second, there is a principle of "too much." In classical terms, it is the Sword of Damocles. In the agrarian terms used by the Fifth Circuit affirming the denial of a discharge, "when a pig becomes a hog it is slaughtered."
>
> The reality is that cases finding discharge-disqualifying **[*51]** intent to hinder, delay, or defraud creditors typically involve some combination of large claims of exemption and overtones of overreaching.

_Id. at 245_ (citations omitted). Based upon the fact of the debtor's conversion of at least $424,450 in non-exempt assets to exempt assets and a record replete with evidence that the debtor was fixated on moving assets away from the reach of the judgment creditor, the BAP in *Beverly* held that the bankruptcy court's factual finding that the debtor did not have the requisite intent to hinder or delay the judgment creditor was clearly erroneous. _Id. at 245_. In so holding, the court stated,

> [t]here is a remarkably large volume of evidence of [the debtor]'s intent to hinder or delay that is extrinsic from the fact that he transferred nonexempt property for exempt property in the MSA. As a result, it is beyond cavil that [the debtor]'s intent was to become judgment proof and not just to protect his assets.

_Id. at 246_.

Based on the BAP's analytical framework in *Beverly* regarding the relationship between a debtor's intent and the conversion of assets from nonexempt to exempt status, and based on additional evidence of intent beyond the mere conversion of assets from nonexempt to exempt, the court **[*52]** considers, as discussed below, whether Defendant "crossed the line" based on additional evidence of intent beyond the mere fact that some of the transfers appear to be preferential only when Defendant used his non-exempt assets to make prepetition transfers to preferred payees when he made five months of prepayments to his home lenders totaling $51,000.00 and transferred $38,000.00 to two of his friends on debts allegedly owed to each of them, as well as when Defendant converted non-exempt assets to exempt assets by transferring $86,000.00 to his Wife's CNB Account which Defendant claimed an exemption in.

### i. Defendant's Prepayments of First and Second DOTs on the Property

Regarding the additional evidence of intent beyond the mere preferential payments and conversion of nonexempt assets to exempt assets, and specifically, Defendant's act of prepaying the First and Second DOTs on his home, the court first notes that aside from the timing of Defendant's prepetition transfers of nonexempt assets and the amounts of those transfers, he made multiple admissions in his trial testimony that evidence his intent to hinder or delay his non-preferred creditors. *HN13*[⬆] "When a debtor admits that he acted **[*53]** with the intent penalized by *section 727(a)(2)(A)*, there is no need for the court to rely on circumstantial evidence or inferences in determining whether the debtor had the requisite intent." *In re Adeeb, 787 F.2d at 1343* ("Adeeb admitted that he transferred the property intending to put it out of the reach of one of his creditors."). Additionally, entry of a discharge order should be denied if a debtor "had the intent penalized by the statute notwithstanding any other motivation he may have had for the transfer." *Id. at 1343*; *accord*, *In re Beverly, 374 B.R. at 246*; *cf. Matter of Trinity Baptist Church, 25 B.R. 529, 532-533 (Bankr. M.D. Fla. 1982)* (analyzing fraudulent transfer claim under Florida law) ("Intent to defraud within the meaning of the statute is the debtor's intention to prevent his creditors from satisfying their debts . . . An evil motive is not required in order to set aside a transfer.") (citations omitted).

Specifically, at his *Rule 2004* examination, Defendant testified to the following:

> Well, at the time that the payments were made — let's see. . . . July was the prepayment[,] by then the case had been decided, and I didn't know what I was going to do. Really, we were trying to make up our mind what we were going to do, and then I just wanted to make sure that those -- that whatever happened -- I mean, I got a threatening letter. I got threatening **[*54]** letters from the beginnings of what might have been attempts to collect money or whatever, and I just wanted to make sure that we wouldn't be thrown out in the street.
>
> Well, I got -- well, the award in and of itself was pretty breathtaking. When I got the notice of the award, that was F.I.N.R.A., and the F.I.N.R.A. fees. I didn't know if I would lose my license. I didn't. J.P. Morgan, obviously, they had sent me by July -- yeah. They had sent me a letter by then saying they wanted their money. And who else was there? I was having a fee disputes. That's another thing. I was having a fee dispute. I found out that I was grossly overcharged by the attorneys I used first, and I got several attorneys' opinions, and so I was possibly fighting with them. Whatever else was going to go on, I wanted to make sure my family was at least ensconced in our home until the end of the year.
>
> [. . .]
>
> Its a priority of survival. I wanted to make sure we had a home to live in and a place to live in while all this was going on.
>
> Well, I didn't know if, for example, Shustak had gotten a judgment, which he didn't. They threw him out of court, but he kept trying to do things. I didn't know where -- I felt under **[*55]** siege. I guess you can understand that. So I had to prioritize where this money went, and other than food and other -- certain other things that had to be accounted -- you know, taken care of. This was a pretty important piece of that puzzle.

Furthermore, at trial, Defendant testified that he thought of prepaying his home loans by five months because "I had the money at that time and I wanted to make sure my family was protected and that I had paid my primary obligation to them for that period of time", *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:22 a.m., and that a primary motivation behind his prepayments was that he was concerned about his prior lawyer, Shustak, who he was having a fee dispute with, and who has a disputed claim in Defendant's bankruptcy

Layla Buchanan

2016 Bankr. LEXIS 3475, *55

case, "from coming in and attaching his assets", *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:24-9:25 a.m. *In re Adeeb, 787 F.2d at 1343* ("Adeeb admitted that he transferred the property intending to put it out of the reach of one of his creditors."). Although Defendant had a benign motive of protecting his family, the evidence otherwise indicates that he still had the intent to hinder or delay his creditors. *Matter of Trinity Baptist Church, 25 B.R. at 532-533* (mixed motive of a debtor **[*56]** does not defeat a finding of intent, stating: "Clearly, the Debtor intended to hold those dissatisfied creditors at bay, and prevent levy and sale of the property, in hopes of rehabilitation and the satisfaction of all creditors. While admirable, the end result of this scheme was nonetheless hindrance and delay of creditors.").

Moreover, Defendant testified that he prepaid the home loans secured by the First and Second DOTs "to assure that my wife and my daughter and myself had a home to live in through the end of the year . . . I did prepay [the mortgage in the past] but not to that degree, not six months, or four months, five months, whatever it was in advance, normally." *Trial Testimony of Joseph Ellison*, November 19, 2015 at 10:43 a.m. This out of the ordinary course transaction and Defendant's admissions are additional evidence of his intent to hinder or delay his creditors by putting these funds out of their reach for his personal benefit. *Silagy v. Morris (In re Morris), 2013 Bankr. LEXIS 4369, 2013 WL 5705630, at *17 (Bankr. N.D. Ohio 2013)* (transfers of debtor's property in exchange for waiver of future child support was a badge of fraud due to detriment of debtor's current creditors indicating intent to hinder, delay or defraud creditors as fraudulent transfer under *11 U.S.C. § 548(a)(1)(A)*), *objections* **[*57]** to bankruptcy court's proposed findings of fact and conclusions of law overruled in pertinent part and sustained in part on other grounds, *2015 U.S. Dist. LEXIS 23565, 2015 WL 853499 (N.D. Ohio 2015)*. In holding that the debtor's transfers of her equity in the marital residence to her spouse in a martial dissolution for a waiver of her future child support obligations was a badge of fraud with respect to her current creditors, the bankruptcy court stated in *In re Morris*:

Debtor's actions amount to accelerating an unmatured, future obligation and allowed her to prepay it. Assets that were immediately available, equity in the real estate, were traded for a future obligation that has not yet come due. This is little different than allowing a debtor to prepay ten years of rent or any other future expense saving tactic at the expense of current creditors holding liquidated, matured debts. While this action has not been previously listed as a badge of fraud, under the particular facts of this case, the court finds that the transaction increases the overall likelihood of actual fraudulent intent.

*2013 Bankr. LEXIS 4369, 2013 WL 5705630, at *17*. The court in *In re Morris* also held that the transfer was also constructively fraudulent because prepayment of a future obligation was not reasonably equivalent **[*58]** value and the transfer harmed creditors:

. . . Debtor should not be able to reduce the amount she will pay to her current creditors by either obtaining a waiver of a future obligation or withholding money to satisfy a future debt. For example, a debtor should not be allowed to set aside money for her next five years of rent under the guise that the money will be used to pay her future creditor (the landlord) at the expense of her current creditors. In *In re Strasser*, a debtor moved $62,000 out of reach of her current creditors by transferring the money to her father, who then gave the money back to the debtor for the payment of her living expenses. *303 B.R. 841, 847-48 (Bankr. D. Ariz. 2004)*. The court held that the debtor should not be able to harm her current creditors by withholding money under the guise that the property would be used to pay her future expenses, and therefore her future creditors. *Id.* Such an action is putting money out of the reach of current creditors, and then claiming 'no harm no foul, I used it on my future creditors.' *Id.* (internal quotation marks omitted). While the facts are different in the current case, the theory is the same: Debtor is not allowed to give significant value to her future creditors **[*59]** in order to harm her current creditors. For the above reason, the court will not consider the waiver of the child support in calculating reasonable equivalence.

*2013 Bankr. LEXIS 4369, 2013 WL 5705630, at *11*.

*HN14*[↑] Under the Uniform Fraudulent Transfer Act (now the Uniform Voidable Transactions Act), a transfer is constructively fraudulent if the debtor made the transfer without receiving a reasonably equivalent value for the transfer in exchange for the transfer and the debtor was insolvent at the time of the transfer or became insolvent as result of the transfer. *California Civil Code § 3439.05(a)*. Although the finding of lack of reasonably equivalent value was made in support of the holding of constructive fraudulent transfer in *In re Morris*, though not directly relevant for a claim under *11*

Layla Buchanan

2016 Bankr. LEXIS 3475, *59

U.S.C. § 727(a)(2), such a finding would itself be a badge of fraud indicating actual intent to hinder, delay or defraud current creditors under the Uniform Fraudulent Transfer Act (now Uniform Voidable Transactions Act) and under the Ninth Circuit's listing of badges of fraud in *In re Woodfield, supra.  California Civil Code § 3439.04(b)(8)* ("(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred."); *In re Woodfield, 978 F.2d at 518* ("6) that the Debtor received inadequate consideration **[*60]** for the transfer.") (citations omitted).

Although Defendant might have argued that the prepayments of the home loans are not indicative of an intent to hinder, delay or defraud creditors because these payments to the home lenders were to fully secured creditors, the court would not be persuaded by such. *See Pioneer Liquidating Corp. v. San Diego Trust & Savings Bank, 211 B.R. at 717 (S.D. Cal. 1997)* (holding that payment to a fully secured creditor does not hinder, delay or defraud creditors because it does not put assets otherwise available in a bankruptcy distribution out of the reach of other creditors), *cited in, Henry v. Lehman Commercial Paper, Inc. (In re First Alliance Mortgage Co.), 471 F.3d 977, 1008 (9th Cir. 2006)*. This argument fails under the circumstances of this case because Defendant had refinanced his existing home loans by taking out new home loans to repay the old ones and to extract and monetize the existing equity in his home that was otherwise available to pay his current creditors. Defendant took out the surplus refinancing proceeds, which were converted home equity, and transferred such proceeds for his personal purposes rather than to pay debt to current creditors. Defendant made transfers to his wife, and he made prepayments to his new home loans five months in advance as he admitted so he and his family had a place to live. Although the new home lenders **[*61]** are secured creditors, the liens they hold are based on trust deeds on the home as real property, and not on the surplus refinancing proceeds. Findings of Fact Nos. 18-22. Defendant's transfers in his home loan prepayments from the refinancing proceeds were thus not payments of the home lenders as fully secured creditors from their collateral, the home itself, which is different from the circumstances in *Pioneer Liquidating Corp. v. San Diego Trust & Savings Bank, supra*, where the fully secured lender was paid from its collateral on which it had a security interest, which was held not to be a transfer involving an intent to hinder, delay or defraud creditors since there was no diminution of the

bankruptcy estate as the transferred assets were fully encumbered by the secured creditor's lien. This is not the situation here because the funds used to make Defendant's home loan prepayments were from the surplus refinancing proceeds from his converted home equity, which were prepetition assets not encumbered by the home lenders' security interests, and thus, these funds had been prepetition assets otherwise available to his current creditors which he put out of their reach resulting in a diminution of the bankruptcy estate. Why this is overreaching and **[*62]** improper is that Defendant converted the prepetition asset of nonexempt home equity available to pay prepetition debts for which he was legally obligated to pay at the time into a postpetition asset by prepaying his future obligations which were not yet legally due, thus, diminishing the pool of prepetition assets available to pay current creditors otherwise barred from further collection due to the bankruptcy discharge and relieving him of having to use his postpetition assets to pay debts for which he had to pay in the future, but he did not yet have to pay at the time, and conferring a financial benefit to him at the expense of his current creditors. Accordingly, the court finds on this record that Defendant's transfers of $41,415.30 and $11,062.00 to prepay his home loans for five months are badges of fraud indicating an intent to hinder, delay or defraud his current creditors, including JP Morgan Chase, by putting these otherwise available assets out of the reach of these creditors and by not receiving reasonably equivalent value in doing so.

Additionally, Defendant testified that prior to filing his bankruptcy petition, he met with an asset protection firm, and one of his goals **[*63]** in doing so was to potentially protect his assets from potential creditors. *Trial Testimony of Joseph Ellison*, November 19, 2015 at 10:58-10:59 a.m. These admitted facts of Defendant's knowledge and planning are additional evidence of his intent to hinder or delay his creditors. Accordingly, based on the Ninth Circuit's decisions in *Adeeb* and *Retz*, the court determines that Defendant's admissions that he prepaid the home loans secured by the First and Second DOTs to prevent other creditors from gaining access to equity in the Property and collecting on those assets, constitutes additional and sufficient evidence of an actual intent to hinder, delay or defraud creditors beyond the mere fact of making preferential transfers, and thus, establishes a claim to deny Defendant's discharge under *11 U.S.C. § 727(a)(2)(A)*. Furthermore, based on the analytical framework set forth in *Beverly*, the court also determines that such admissions constitute evidence of defendant's actual intent to

Layla Buchanan

2016 Bankr. LEXIS 3475, *63

hinder, delay or defraud his creditors beyond the mere fact of the timing of using non-exempt funds to prepay the home loans secured by the First and Second DOTs immediately before he filed for bankruptcy.

Defendant's admissions notwithstanding, **[*64]** the sequence of events preceding the filing of his bankruptcy petition provides circumstantial evidence of his actual intent to hinder or defraud his creditors. *See In re Beverly, 374 B.R. at 243* (for the purposes of *11 U.S.C. § 727(a)(2)(A)*, intent to hinder, delay, or defraud may be established by circumstantial evidence or by inferences drawn from a course of conduct); *In re Adeeb, 787 F.2d at 1343*, *citing, In re Devers, 759 F.2d 751, 755 (9th Cir. 1985)*. The Ninth Circuit in *Woodfield* identified certain "badges of fraud" indicative of circumstantial evidence of an intent to hinder or defraud, which can be found here, including factors (1) a close relationship between the transferor (Debtor) and the transferee (his wife and friends); (2) that the transfers were in anticipation of a pending suit (Plaintiffs' counterclaims in the FINRA Action and suit to confirm their award); (3) that the transferor Debtor was insolvent or in poor financial condition at the time (Defendant's filing of his bankruptcy case with his schedules showing insufficient nonexempt assets to pay his outstanding debts); (4) that all or substantially all of the Debtor's property was transferred (prepetition payment of preferred parties, his wife, his friends and his home lenders, and Debtor's conversion of nonexempt assets into exempt assets); **[*65]** (5) that the transfers so completely depleted the Debtor's assets that the creditors have been hindered or delayed in recovering any part of the judgment (reduction of most, if not all, value in nonexempt assets as of the petition date). *In re Woodfield, 978 F.2d at 518*.

Defendant took out the equity from the Property and used the proceeds to pay his wife, friends, and the First DOT and the Second DOT on the Property so that his family could continue to retain the benefits of the funds and live in the Property. As a result of Defendant depleting the equity in the Property through the refinancing and prepetition transfers, there is little or no equity in the Property available to pay nonpreferred creditors through Defendant's bankruptcy case. Though the refinancing transactions, Defendant pulled out net equity of almost $250,000 from his residence, solving his practical problem of shielding the nonexempt equity from his creditors based on the limited $100,000 homestead exemption for Defendant and his spouse as a "family unit" under *California Code of Civil Procedure § 704.730(a)(2)*. Likewise, as a result of the transfers,

the disbursed funds, which would have otherwise remained in Defendant's [unencumbered] CNB Account, are also **[*66]** unavailable for distribution to Defendant's unsecured creditors. Defendant's nonpreferred unsecured creditors, JPMorgan and Shustak, representing 90 percent of the value of Defendant's general unsecured claims, are thus likely to recover little or nothing from Defendant's bankruptcy estate in light of Defendant's prepetition transfers, while he continues to benefit from these transfers diverting his assets which would have otherwise been intended and available for distribution to these creditors in this bankruptcy case.

According to Defendant's bankruptcy schedules, his real property asset, the home, is fully encumbered, and of his personal property assets with a total value of $303,587.00, most of the value of these assets is claimed as exempt in the amount of $254,673.00, leaving a net of $48,914.00 as non-exempt property. Schedule A-Real Property, Schedule B-Personal Property, Schedule C-Property Claimed as Exempt, Petition, Exhibit 8 at 13-21. Most of the value of Defendant's nonexempt assets comes from an account receivable valued at $35,914.00, which he says is owed from his former employer, Morgan Stanley, in company stock from a performance award, and is thus not traceable to **[*67]** the subject transfers from Defendant's converted home equity. Schedule B-Personal Property, Petition, Exhibit 8 at 17. In comparison, on March 1, 2014, Defendant received the funds of $247,950.85 disbursed to him from the refinancing of his home not claimed as exempt on his bankruptcy schedules representing the home equity that he took out and converted for his use, and not available to pay claims of current creditors, including the transfers discussed herein. These circumstances indicate perfect prebankruptcy planning from Defendant's perspective because through the transfers, he was able to extract the net equity of almost $250,000 from his home and provide for himself and his family and his preferred creditors, leaving almost nothing for his nonpreferred creditors, despite the limited $100,000 homestead exemption, and are the result of Defendant's design and actual intent to hinder or delay his creditors.

Furthermore, the court also observes that the timing, quantity, and circumstances surrounding Defendant's transfers—which occurred while the FINRA Action was pending, while an evidentiary hearing was ongoing, while the issuance of an adverse FINRA award was imminent, and shortly **[*68]** after the issuance of the FINRA award, highlight that Defendant made the transfers intending to hinder creditors' ability to recover

Layla Buchanan

2016 Bankr. LEXIS 3475, *68

from his assets. Moreover, within the five months preceding the Petition Date and while the FINRA Action was pending, Defendant sought the assistance of an asset protection law firm to create an asset protection trust and establish a Limited Liability Limited Partnership (LLLP) to shield his assets from creditors, and while Defendant said that he changed his mind about forming the asset protection trust and tried to instruct the asset protection law firm not to go ahead with the trust formation, such consultation reflects Defendant's state of mind with an awareness and intent not to pay his nonpreferred creditors. During this same time period, Defendant then refinanced the loans on the Property and, in the process, took out cash of nearly $250,000.00 from the equity in the Property, and then transferred much of this cash to pay preferred parties, his wife and his home lenders, notably, so he would be able to stay in his residence through advance loan payments.

### ii. Defendant's Prepetition Transfers to His Friends

Nonetheless, regarding Defendant's $38,000 **[*69]** of prepetition payments to his friends, the court does not find that such payments by themselves indicate an intent to hinder, delay or defraud his other creditors because the evidence indicates that Defendant was repaying loan obligations to them, which makes these transfers only preferential payments to these creditors, which transfers by themselves do not indicate an intent to hinder, delay or defraud under applicable law. *California Civil Code § 3432*; *Hultman v. Tevis, supra.* According to Defendant, Mr. Springer had advanced Defendant $30,000 in advance capital for a joint business venture that they were going to have, and that he did not have a contractual or written obligation to repay him, and Mr. Jeffers had loaned him $8,000.00 to help him pay personal expenses, and that he did not have a written agreement to repay the loan. *Trial Testimony of Joseph Ellison*, November 19, 2015 at 10:46-10:48 a.m. The court determines that Defendant's payment of $30,000.00 to Mr. Springer was to repay money held by Defendant for their joint business venture, but the money belonged to Mr. Jeffers, and not Defendant, as the evidence does not indicate that a gift to Defendant was intended. The court further determines that Defendant's payment of **[*70]** $8,000.00 to Mr. Jeffers was to repay a loan made by Mr. Jeffers to Defendant. These transfers, while preferential, do not indicate an intent to hinder, delay or defraud other creditors.

### iii. Defendant's Prepetition Transfers to His Wife's CNB Account

Regarding Defendant's prepetition transfers to his Wife's CNB Account, by transferring a total of $86,000.00 to his wife prepetition, Defendant hindered, delayed and defrauded his creditors' ability to collect on their claims by putting these funds out of his name and into his wife's name and control, which transactions do not exemplify the actions of an "honest but unfortunate debtor." *See Grogan v. Garner, 498 U.S. at 286-287*. Specifically, six days after the conclusion of a week-long evidentiary hearing in the FINRA Action, Defendant transferred $18,000.00 to his wife's CNB Account. One week after the FINRA Award issued, Defendant, through two transactions, transferred an additional $51,000.00 to his wife's CNB Account because he was worried about what would happen, he wanted to retain the funds to benefit him and his family, and he did not want anyone to gain access to these funds. Defendant's wife is an insider for purposes of the Bankruptcy Code pursuant to *11 U.S.C. § 101(31)(A)(i)* as a relative **[*71]** of an individual debtor. *See Hahn v. Leong (In re Llamas), 2011 Bankr. LEXIS 4779, 2011 WL 7637254, at *7 (Bankr. C.D. Cal. 2011)* (dicta in unpublished opinion holding former spouse is not an insider) (*HN15* ) "'Insider,' as defined in *§ 101(31)*, specifically includes the spouse of the debtor . . . ."), citing, *Miller v. Schuman, 81 B.R. 583, 585 (9th Cir. BAP 1987)* ("A spouse of the debtor is a relative . . . because the definition includes individuals 'related by affinity.'") (dicta as holding related to former spouse). Defendant's pattern of asset diversions to his wife continued all the way to the Petition Date, when Defendant transferred an additional $17,000.00 to his wife. Given that within three months of the Petition Date, Defendant transferred at least $86,000.00 from the CNB account in his name to his Wife's CNB Account in which, as previously stated, Defendant had a community property interest, and given that the account belonged to his wife's law practice and that Defendant was not a signatory on the account, the court determines that through such transfers, Defendant intended to hinder, delay and defraud creditors by making it difficult for them to collect on their claims because they would have had to establish that his interest in property no longer in his name was still his, having transferred funds in his name to another. **[*72]** *See In re Woodfield, 978 F.2d at 518* (intent may be inferred from certain "badges of fraud" that constitute circumstantial evidence of intent, including a close relationship between the transferor and the transferee); *California Civil Code § 3439.04(b)(1)* and *(2)* ("(1) Whether the transfer or obligation was to an insider" and

2016 Bankr. LEXIS 3475, *72

"(2) Whether the debtor retained possession or control of the property transferred after the transfer"); 6 Resnick and Sommer, *Collier on Bankruptcy*, ¶ 727.02[3][b] at 727-18 and n. 37 ("The fact that a transfer is to a relative or close associate can also be indicative of fraud, as can the debtor's retaining possession, benefits or use of the property that was transferred."), *citing, Pavy v. Chastant (In re Chastant), 873 F.2d 89 (5th Cir. 1989)*.

Defendant argues that the transfers to his wife of $86,000 in the three months before his bankruptcy case was filed were to "pay customary bills," but there is no evidence to corroborate Defendant's testimony that this was the purpose of the transfers and for the court to determine that such "customary" bills were reasonable living expenses. *See Defendant's Post-Trial Proposed Findings of Fact and Conclusions of Law*, ECF 27 at 6-7, *citing inter alia, Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:16 a.m. and 9:51-9:52 a.m. The court cannot **[*73]** accept at face value Defendant's assertion that his wife used the funds transferred by him to her bank account to pay "customary bills", implicitly suggesting that her use of the transferred funds was reasonable or justifiable, since he admitted in his testimony that her bank account was her own account, that he had nothing to do with it, that he was not a signatory on her bank account, and had no control over the account, thus indicating that he may not have personal knowledge of what she did with the funds transferred to her bank account . *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:16 a.m. and 9:16-9:18 a.m.; *Federal Rule of Evidence 602* (A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. . . ."). The only person with personal knowledge of what Defendant's wife did with the funds transferred to her bank account over which she had sole control was the wife, and she did not testify at trial. It appears that he would only have known what she did with the transferred funds based on what she told him. Thus, the court determines that Defendant's testimony as to what his wife did with the transferred **[*74]** funds is not credible because he has not provided a foundation for the court to make a finding that he has personal knowledge of that matter, and that the court otherwise has no reliable evidence as to what Defendant's wife did with the funds that Defendant transferred to her account, that is, there is no way of ascertaining from this record whether she used the funds to make preferential transfers to existing creditors, which may indicate a lack of intent to hinder, delay or defraud, or she went on a shopping spree before

Defendant filed his bankruptcy case, which may indicate such intent. Given the timing of the transfers by Defendant to his wife's bank account and the amounts transferred within three months of his filing this bankruptcy case totaling $86,000, of which only $25,793 was listed in her bank account on his bankruptcy schedules, the court infers that the unaccounted for amount of about $61,000 was dissipated for the benefit of Defendant and his wife to avoid paying his nonpreferred creditors, which is similar to the situation in *In re Cooke, supra*, i.e., expenditures for the personal benefit of the debtor rather than payment of current creditors.

According to Defendant, the $18,000 transferred **[*75]** to his wife right before the petition date is accounted for on his bankruptcy schedules as his community property interest in his wife's bank account which is a listed asset on Schedule B-Personal Property (i.e., part of the $25,793 listed on Schedule B for her account). *Id.* at 7. This interest is claimed as exempt on Schedule C-Property Claimed as Exempt and is apparently intended to pay for "customary bills" in the future (i.e., postpetition). Exhibit 8 at 21; *see In re Beverly, 374 B.R. at 245* ("Even if the exemption is not defeated, the existence of intent to hinder, delay, or defraud creditors nevertheless may warrant denial of discharge under *§ 727(a)(2)*."), *citing inter alia, Norwest Bank Neb., N.A. v. Tveten, 848 F.2d 871, 874-876 (8th Cir. 1988)* ("debtor did not want a mere *fresh* start, he wanted a *head* start") (emphasis in original; internal quotation marks omitted). Thus, the circumstances of Defendant's transfers to his wife go beyond the mere fact that Defendant converted his nonexempt home equity to exempt property to be outside the holding of *Gill v. Stern, supra. See also, In re Beverly, 374 B.R. at 240-241* (discussing *Gill v. Stern, supra*, in that it involved a transfer from one form of exempt asset to another form of exempt asset, and was "not a simple instance of eve-of-bankruptcy exemption planning").

### iv. Defendant's Other Prepetition Transfers Right Before [*76] Filing for Bankruptcy

At or just before the petition date, Defendant also transferred $31,600.00 from Defendant's non-exempt Joint Account to various destinations. Aside from the $17,000.00 transfer to his wife on the Petition Date, which was discussed above regarding his transfers to his wife, Defendant made two transfers to benefit himself and his wife by making a contribution of $6,500.00 to a Roth Individual Retirement Account (IRA)

Layla Buchanan

2016 Bankr. LEXIS 3475, *76

in his name and a contribution of $6,500.00 to a Roth IRA in his wife's name. Apparently, these were new accounts because Defendant's bankruptcy schedules only show the amounts of these contributions in the accounts. *See Defendant's Post-Trial Proposed Findings of Fact and Conclusions of Law*, ECF 27 at 6-7. Both of these assets are claimed by Defendant as exempt. *Id.; see also, In re Beverly, 374 B.R. at 245* ("Even if the exemption is not defeated, the existence of intent to hinder, delay, or defraud creditors may warrant denial of discharge under *§ 727(a)(2)*.") (citations omitted). These transfers are additional evidence of Defendant's actual intent to hinder or delay his creditors in light of the other circumstances of his transfers in this case as discussed herein.

**v. The Totality of Circumstances [*77] Showing Defendant's Actual Intent to Hinder, Delay or Defraud Creditors**

The court considers Defendant's admitted animus towards JPMorgan and his fear of former counsel, Shustak, obtaining a judgment and levying Defendant's CNB Account, as further evidence of his actual intent to hinder, delay or defraud creditors through his prepetition asset transfers. Defendant has been open about his hostility towards both creditors, who and which are the largest unsecured creditors in his bankruptcy case, and the transfer of Defendant's property prevented the distribution of the value of such property to these creditors. Indeed, if Defendant had not transferred the funds, the funds would be in Defendant's CNB Account and available for distribution as part of the bankruptcy estate. For instance, had Defendant not made the transfers to Dovenmuehle Mortgage and Logan Investments, $52,477.30 would have been in Defendant's CNB Account on the Petition Date, would have become part of the bankruptcy estate by operation of law, and thus, would have been available for distribution to Defendant's unsecured creditors. The same is true for all of Defendant's prepetition transfers. Indeed, Defendant recognized **[*78]** that, absent the transfers, the funds would be available to benefit his creditors, including JPMorgan and Shustak. In order to avoid that outcome however, Defendant admitted at trial that he "had to prioritize where this money went" and the court determines that he made the various transfers at issue to his wife and preferred creditors in the weeks preceding the Petition Date to ensure the funds were distributed, as he, and not the Bankruptcy Code, deemed appropriate.

The court concludes that under these circumstances, as in *Beverly*, Defendant's prepetition transfers were "too much" because they involved a large dilution of non-exempt assets. *In re Beverly, 374 B.R. at 245*. On or about March 1, 2014, before Defendant prepaid the loans secured by the First and Second DOTs on the Property, Defendant had at least $247,950.85 in his CNB Account, and considering that Defendant did not claim an exemption in his CNB account, Defendant would have had non-exempt assets of at least $247,950.85 that could have been used to pay Defendant's unsecured creditors. After the various transfers described above, Defendant had only $600.00 in his CNB Account on the Petition Date, and almost no assets with which to pay his non-preferred **[*79]** creditors like Plaintiffs and Shustak. Furthermore, as detailed above, the record is replete with evidence that Defendant focused on preventing his non-preferred creditors from reaching the value in his assets, including the nonexempt equity in the Property. Accordingly, based on the dilution of at least $247,350.85 in non-exempt assets, leaving little to pay the claims of nonpreferred creditors shortly before filing for bankruptcy, who would be otherwise barred from collecting due to the bankruptcy discharge, and the dilution of the pool of prepetition assets included Defendant's transfers of $52,000.00 in non-ordinary course prepayment of his home loans (i.e., paying future creditors as opposed to current nonpreferred creditors), and his insider transfers of $86,000.00 to his wife, and based on evidence of Defendant's prior animus towards, and intent not to pay, his nonpreferred creditors, such as JPMorgan, including express admissions, the court determines that Defendant undertook the prepetition transfers involving large claims of exemption and overtones of overreaching, like the debtor in *Beverly*, in an effort to become judgment proof as to his non-preferred creditors, including **[*80]** JPMorgan and Shustak, and thwart their collection efforts against him, and the evidence surrounding the circumstances of these transfers demonstrate his intent to hinder, delay, or defraud his creditors to warrant denial of his bankruptcy discharge under *11 U.S.C. § 727(a)(2)(A)*.

In making such a determination in this case, the court does not intend to "draw a line" that demarcates the line between permissible and impermissible prebankruptcy planning, but rather, the court determines that based on the additional and sufficient evidence of intent presented in this case beyond the mere fact that Defendant made some preferential transfers to other creditors immediately preceding his bankruptcy filing, and beyond the mere fact that Defendant converted nonexempt

2016 Bankr. LEXIS 3475, *80

assets to exempt assets, Defendant "crossed over the line" of what is permissible behavior. See *In re Beverly, 374 B.R. at 244-246* (discussing the difficulty in drawing the line between legitimate bankruptcy planning and intent to hinder, delay or defraud creditors). Accordingly, the court determines that under the totality of the circumstances here, the preponderance of the evidence shows that Defendant transferred property prepetition with the intent to hinder, delay or defraud creditors, **[*81]** and therefore, the court should deny the entry of a discharge order in Defendant's bankruptcy case under *11 U.S.C. § 727(a)(2)(A)*.

## II. Postpetition Transfers Under *11 U.S.C. § 727(a)(2)(B)*

Through their complaint, Plaintiffs argue that Defendant's discharge should be denied pursuant to *11 U.S.C. § 727(a)(2)(B)*. Nonetheless, the court observes that Plaintiffs abandoned this claim by failing to introduce evidence supporting the existence of any postpetition transfers and by failing to argue such at trial. Accordingly, the court denies Plaintiffs' claim under *11 U.S.C. § 727(a)(2)(B)* for lack of proof.

## III. Conclusion

For the foregoing reasons, the court determines that there is adequate and sufficient evidence to establish by a preponderance that Defendant made prepetition transfers to preferred parties with actual intent to hinder or delay non-preferred creditors, including JPMorgan and Shustak, and therefore, Defendant's discharge should be denied pursuant to *11 U.S.C. § 727(a)(2)(A)*.

This memorandum decision constitutes the court's findings of fact and conclusions of law pursuant to *Rule 7052 of the Federal Rules of Bankruptcy Procedure* and *Rule 52 of the Federal Rules of Civil Procedure*. A separate judgment is being entered concurrently.

IT IS SO ORDERED.

Date: September 23, 2016

/s/ Robert Kwan

Robert Kwan

United States Bankruptcy Judge

JUDGMENT

The court having issued its memorandum decision in this adversary **[*82]** proceeding on the complaint objecting to entry of discharge pursuant to *11 U.S.C. § 727(a)(2)(A)* and *(a)(2)(B)*, which decision sets forth its findings of fact and conclusions of law after trial, pursuant to *Rule 7052 of the Federal Rules of Bankruptcy Procedure* and *Rule 52 of the Federal Rules of Civil Procedure*,

Judgment is hereby entered in favor of Plaintiffs JP Morgan Chase Bank, N.A., and JP Morgan Securities, LLC, and against Defendant Joseph Ellison that the discharge of Defendant Joseph Ellison, the debtor in this bankruptcy case, is denied pursuant to *11 U.S.C. § 727(a)(2)(A)*.

IT IS SO ORDERED.

Date: September 23, 2016

/s/ Robert Kwan

Robert Kwan

United States Bankruptcy Judge

Layla Buchanan

EXHIBIT 5, PAGE 81

**EXHIBIT 6**

**LexisNexis**

**User Name:** Layla Buchanan

**Date and Time:** Thursday, February 9, 2023 6:48:00PM PST

**Job Number:** 190002702

## Document (1)

1. *Ravasia v. United States Tr. (In re Ravasia), 2021 Bankr. LEXIS 1033*

   **Client/Matter:** 1673-001

   **Search Terms:** 2021 Bankr.LEXIS 1033

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |

 Positive

As of: February 10, 2023 2:48 AM Z

# *Ravasia v. United States Tr. (In re Ravasia)*

United States Bankruptcy Appellate Panel for the Ninth Circuit

April 16, 2021, Filed

BAP No. EW-20-1212-BTL

**Reporter**

2021 Bankr. LEXIS 1033 *; 2021 WL 1511940

In re: SAJID A. RAVASIA and DEBRA J. RAVASIA, Debtors.SAJID A. RAVASIA; DEBRA J. RAVASIA, Appellants, v. UNITED STATES TRUSTEE, Appellee.

**Notice:** THIS DISPOSITION IS NOT APPROPRIATE FOR PUBLICATION. ALTHOUGH IT MAY BE CITED FOR WHATEVER PERSUASIVE VALUE IT MAY HAVE, SEE *FED. R. APP. P. 32.1*, IT HAS NO PRECEDENTIAL VALUE, SEE 9TH CIR. BAP RULE 8024-1.

**Subsequent History:** Affirmed by *In re Ravasia, 2022 U.S. App. LEXIS 4808 (9th Cir., Feb. 23, 2022)*

**Prior History: [*1]** Appeal from the United States Bankruptcy Court for the Eastern District of Washington. Bk. No. 2:17-bk-00106-FPC, Adv. No. 2:17-ap-80021-FPC. Frederick P. Corbit, Bankruptcy Judge, Presiding.

*Garvin v. Ravasia (In re Ravasia), 2020 Bankr. LEXIS 2176, 2020 WL 4726416 (Bankr. E.D. Wash., Aug. 13, 2020)*

## Core Terms

false oath, schedules, bankruptcy court, expenses, amend, original complaint, amended complaint, fraudulently, knowingly, income and expenses, monthly, discovery, leave to amend, omission, financial affairs, business debt, tax refund, underreported, estimated, false statement, time of filing, postpetition, disclose, refund, cases, monthly income, relates back, credit card, misrepresentations, revocation

## Case Summary

### Overview

HOLDINGS: [1]-Order denying debtors' discharge under

*11 U.S.C.S. § 727(a)(4)(A)* for false oaths was affirmed because the debtors' continued false oath as to the husband's income in the Amended Schedule I established an intent to deceive and the advice-of-counsel defense was not available because it should have been, and admittedly was, evident to the debtors by no later than July 2017 that their schedules were inaccurate.

### Outcome

Order affirmed.

## LexisNexis® Headnotes

Bankruptcy Law > ... > Judicial Review > Standards of Review > Abuse of Discretion

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Relation Back

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Commencement of Adversary Proceedings

*HN1*[⬇] **Standards of Review, Abuse of Discretion**

An appellate court reviews de novo whether an amended complaint relates back to the original pleading. An appellate court reviews for abuse of discretion the bankruptcy court's decision to allow or deny amendment of pleadings under *Fed. R. Civ. P. 15(c)* and *Fed. R. Bankr. P. 7015*. Whether cause exists

2021 Bankr. LEXIS 1033, *1

to extend the filing deadline to object to a debtor's discharge is reviewed for abuse of discretion.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law

**HN2[⬇]  Standards of Review, Abuse of Discretion**

A trial court abuses its discretion if it applies the wrong legal standard or if its factual findings were clearly erroneous.

Bankruptcy Law > ... > Judicial Review > Standards of Review > Clear Error Review

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Denial of Discharge

**HN3[⬇]  Standards of Review, Clear Error Review**

In an action for denial of discharge under *11 U.S.C.S. § 727*, an appellate court reviews: (1) the bankruptcy court's legal conclusions de novo, (2) factual findings for clear error, and (3) mixed questions of law and fact de novo. Under *§ 727(a)(4)(A)*, whether a debtor made a false oath, whether the false statements were material, and whether the debtor had the requisite fraudulent intent are all questions of fact reviewed under the clearly erroneous standard. Factual findings are clearly erroneous if they are illogical, implausible, or without support in the record.

Civil Procedure > Appeals > Record on Appeal

**HN4[⬇]  Appeals, Record on Appeal**

An appellate court may affirm on any ground supported by the record, regardless of whether the bankruptcy court relied upon, rejected or even considered that ground.

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Commencement of Adversary Proceedings

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Relation Back

**HN5[⬇]  Adversary Proceedings, Commencement of Adversary Proceedings**

A court should freely give leave to amend when justice so requires. *Fed. R. Civ. P. 15(c)* and *Fed. R. Bankr. P. 7015*. The Ninth Circuit applies this rule with extreme liberality. In discharge cases, the opportunity to amend is especially important because of the short time frame under which such a complaint must be filed. *Fed. R. Bankr. P. 4004(a)*.

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Causes of Action

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Relation Back

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Commencement of Adversary Proceedings

**HN6[⬇]  Adversary Proceedings, Causes of Action**

Under *Fed. R. Civ. P. 15(c)(1)*, made applicable to adversary proceedings by *Fed. R. Bankr. P. 7015*, an amendment to a pleading relates back to the date of the original pleading when it asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading. *Rule 15(c)(1)(B)*; *Rule 7015*. This link will be found when the claim to be added is likely to be proven by the same kind of evidence that would be used to support the original pleading. The focus of the inquiry is on the factual allegations made in the two complaints so as to give the opposing party fair notice of the claims against him.

2021 Bankr. LEXIS 1033, *1

Civil Procedure > ... > Pleadings > Amendment of
Pleadings > Relation Back

## HN7[⬇] Amendment of Pleadings, Relation Back

In applying the relation back doctrine in the context of
objections to discharge and the dischargeability of
certain debts, the basic test is whether the evidence
with respect to the second set of allegations could have
been introduced under the original complaint, liberally
construed; or as a corollary, that in terms of notice, one
may fairly perceive some identification or relationship
between what was pleaded in the original and amended
complaints.

Bankruptcy
Law > ... > Bankruptcy > Claims > Objections to
Claims

Bankruptcy Law > ... > Discharge &
Dischargeability > Liquidations > Revocation of
Discharge

## HN8[⬇] Claims, Objections to Claims

_Fed. R. Bankr. P. 4004(b)(2)_ provides for the addition of
objection to discharge claims after the time for objection
has expired but before discharge is granted when: (A)
the objection is based on facts that, if learned after the
discharge, would provide a basis for revocation under
_11 U.S.C.S. § 727(d)_; and (B) the movant did not have
knowledge of those facts in time to permit an objection.

Bankruptcy Law > Discharge &
Dischargeability > Exceptions to
Discharge > Embezzlement & False
Representations

Bankruptcy Law > ... > Discharge &
Dischargeability > Liquidations > Revocation of
Discharge

## HN9[⬇] Exceptions to Discharge, Embezzlement &
False Representations

_11 U.S.C.S. § 727(d)(1)_ provides for revocation of
discharge when it is shown that the debtor obtained a
discharge through fraud and the plaintiff was not aware
of the fraud until after the discharge was entered.

Bankruptcy Law > ... > Liquidations > Denial of
Discharge > False Accounts & Oaths

Evidence > Burdens of Proof > Preponderance of
Evidence

## HN10[⬇] Denial of Discharge, False Accounts &
Oaths

The bankruptcy court may deny a chapter 7 debtor's
discharge if the debtor knowingly and fraudulently, in or
in connection with the case-(A) made a false oath or
account. _11 U.S.C.S. § 727(a)(4)(A)_. The fundamental
purpose of _§ 727(a)(4)(A)_ is to insure that the trustee
and creditors have accurate information without having
to conduct costly investigations. To prevail on a claim
under this section, a plaintiff must show, by a
preponderance of the evidence, that: (1) the debtor
made a false oath in connection with the case; (2) the
oath related to a material fact; (3) the oath was made
knowingly; and (4) the oath was made fraudulently. A
false statement or an omission in the debtor's
bankruptcy schedules or statement of financial affairs
can constitute a false oath. It is crucial to the proper
operation of the bankruptcy system that chapter 7
debtors ensure to the greatest extent possible that the
information turned over to the bankruptcy court is
accurate.

Bankruptcy Law > ... > Liquidations > Denial of
Discharge > False Accounts & Oaths

## HN11[⬇] Denial of Discharge, False Accounts &
Oaths

The second element necessary for a _11 U.S.C.S. §
727(a)(4)(A)_ claim is that the false oath relate to a
material fact. A fact is material if it bears a relationship
to the debtor's business transactions or estate, or
concerns the discovery of assets, business dealings, or
the existence and disposition of the debtor's property.
An omission or misstatement that detrimentally affects
administration of the estate is material.

Bankruptcy Law > ... > Liquidations > Denial of
Discharge > False Accounts & Oaths

## HN12[⬇] Denial of Discharge, False Accounts &
Oaths

Layla Buchanan

2021 Bankr. LEXIS 1033, *1

The third element necessary for a *11 U.S.C.S. § 727(a)(4)(A)* claim is that the debtor makes the false oath knowingly. A debtor acts knowingly if he or she acts deliberately and consciously.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

Evidence > Types of Evidence > Circumstantial Evidence

Evidence > Inferences & Presumptions > Inferences

*HN13*[⤓]  **Denial of Discharge, False Accounts & Oaths**

To prevail on a claim under *11 U.S.C.S. § 727(a)(4)(A)*, the objecting party must establish that the debtor's false oath was made fraudulently. Intent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct. Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent. But the existence of more than one falsehood, together with a debtor's failure to take advantage of the opportunity to clear up all inconsistencies and omissions, such as when filing amended schedules, can be found to constitute reckless indifference to the truth satisfying the requisite finding of intent to deceive.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

*HN14*[⤓]  **Denial of Discharge, False Accounts & Oaths**

In the context of *11 U.S.C.S. § 727(a)(4)(A)*, nondisclosure of creditors (and debts) can be just as important as nondisclosure of assets. Information regarding business and personal dealings can lead to discovery of assets, potentially avoidable transfers, or other relevant information such as grounds to deny a debtor's discharge. A false statement or omission may be material even if it does not cause direct financial prejudice to creditors. A discharge may be denied if the omission adversely affects the trustee's or creditors' ability to discover other assets or to fully investigate the debtor's pre-bankruptcy dealing and financial condition.

Bankruptcy Law > ... > Bankruptcy > Debtor Benefits & Duties > Debtor Duties

*HN15*[⤓]  **Debtor Benefits & Duties, Debtor Duties**

Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge of his debts. However, the debtor's reliance must be in good faith. The advice of counsel is not a defense when the erroneous information should have been evident to the debtor. The advice of counsel is also not a defense when it is transparently plain that the property should be scheduled.

**Counsel:** For SAJID A. RAVASIA, Appellant: Daniel P. O'Rourke, Esquire, Attorney, SOUTHWELL & O'ROURKE, PS, Spokane, WA.

For DEBRA J. RAVASIA, Appellant: Darren M. Digiacinto, Esquire, AT, Winston & Cashatt, Spokane, WA.

For UST- UNITED STATES, TRUSTEE, SPOKANE, Appellee: James David Perkins, Trial Attorney, Office of the United States Trustee, United States Courthouse, Spokane, WA.

**Judges:** Before: BRAND, TAYLOR, and LAFFERTY, Bankruptcy Judges.

# Opinion

**MEMORANDUM**

**INTRODUCTION**

Chapter 7[2] debtors Dr. Sajid Ravasia and Dr. Debra Ravasia[3] appeal an order denying their discharge under *§ 727(a)(4)(A)* for false oaths. The Ravasias also appeal a prior order granting the U.S. Trustee ("UST") leave to file an amended complaint. We AFFIRM.

――――――――――――――――――

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, *11 U.S.C. §§ 101-1532*, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

[3] Because the Ravasias are both physicians, we refer to them individually as Mr. Ravasia and Mrs. Ravasia to avoid any confusion. No disrespect is intended.

EXHIBIT 6, PAGE 86

2021 Bankr. LEXIS 1033, *1

**FACTS**

**A. The bankruptcy filing and the § 727 complaint**

The Ravasias are both physicians. Mr. Ravasia is a psychiatrist and at all times relevant was employed by a private health care provider. Mrs. Ravasia is an obstetrician/gynecologist.

The Ravasias filed a joint chapter 7 bankruptcy case on January 19, 2017, after closing **[*2]** a medical clinic they owned and operated. Their debts were primarily business debts. In their schedules and statement of financial affairs signed under penalty of perjury, the Ravasias represented: (1) Mr. Ravasia's estimated monthly gross wages were $26,818.05, and his estimated monthly overtime pay was $0; (2) Mrs. Ravasia was unemployed with estimated monthly gross wages of $0, but an increase in income was expected because she was looking for work; (3) their estimated monthly expenses were $26,805.06, with no indication if any increase or decrease was expected; and (4) there was a "possible tax refund" for 2016 in an "unknown amount" and its value was $0.

At the § 341(a) meeting of creditors, the Ravasias confirmed under oath that they reviewed their bankruptcy petition, schedules, and statement of financial affairs before signing them and that the information contained therein was "truthful and accurate." Mrs. Ravasia testified that, following the closure of their clinic, she was "not terribly employable" as an OB-GYN. To become gainfully employed in that area of practice, she was leaving for seven weeks to do volunteer work in Afghanistan to get recent experience delivering babies. Mrs. **[*3]** Ravasia testified that she was also inquiring about locum tenens (temporary) work in Canada, but there was "nothing really on the horizon" for paid employment, and if she did obtain such work, it would be sporadic and part-time and she could not estimate what the compensation would be.

After two extensions, the chapter 7 trustee filed a timely complaint to deny the Ravasias' discharge. He alleged that the Ravasias knowingly and fraudulently made materially false statements or accounts in their bankruptcy case under § 727(a)(4)(A), including failing to disclose payments made to creditors within 90 days prior to filing bankruptcy and failing to disclose certain prepetition cash withdrawals. Ultimately, the chapter 7 trustee reached a settlement with the Ravasias, but the

UST objected to the portion of the proposed settlement to dismiss the § 727 complaint. The bankruptcy court agreed with the UST and entered an order that preserved the monetary settlement but allowed the § 727 action to proceed with the UST substituted as plaintiff.

Upon completing her volunteer work in Afghanistan in May 2017, Mrs. Ravasia found steady locum work in Canada and the United States for the remainder of the year. For her various **[*4]** locum positions, Mrs. Ravasia grossed $260,462 in 2017. Mr. Ravasia grossed $668,000 in 2017, or about $55,000 per month.[4]

Nearly two years after the § 727 complaint had been filed, the Ravasias filed Amended Schedules I and J. On the Amended Schedule I, the Ravasias represented that Mr. Ravasia's gross monthly wages were $20,630.40, about $6,000 less than originally reported, and that Mrs. Ravasia's income was $0. To explain the $6,000 decrease in Mr. Ravasia's income, the Ravasias represented that, with Mrs. Ravasia leaving the country for an indefinite period of time for employment, Mr. Ravasia would become a solo parent and unable to do his usual extra shift work, if that was still an option given his employer's plan to hire additional psychiatrists. Therefore, Mr. Ravasia expected to earn only his base salary of $250,000 per year.

On the Amended Schedule J, the Ravasias represented that their estimated monthly expenses were $90,955.76, about $64,000 more than originally reported. This figure included more unreported business expenses and student loan payments for their children.

**B. Bankruptcy court grants the UST leave to amend [*5] the § 727 complaint**

Two years after the § 727 complaint was filed, the UST sought leave to amend. The amended complaint asserted the same claim for relief under § 727(a)(4)(A), but alleged that the Ravasias made additional false oaths by understating their expected income and

---

[4] Mr. Ravasia's W-2's and tax statements for 2013 through 2016 revealed his gross annual wages as follows:

2013: $575,641

2014: $569,946

2015: $530,503.99

2016: $481,268

2021 Bankr. LEXIS 1033, *5

expenses for 2017. For example, Schedule I listed Mr. Ravasia's expected gross income at $27,000 per month, but his gross monthly income for 2016 was $40,000, and his gross monthly income for 2017 was $55,000. Further, Schedule J understated the Ravasias' expected living expenses on non-essentials such as foreign travel, private school and college tuition for their children, frequent spa visits, and extensive dining out.

The UST alleged that the Ravasias knowingly and fraudulently made these (and other) misrepresentations about their financial situation at the time of their filing to mislead the court and creditors about their ability to repay their debts. The UST alleged that had it known the truth about the Ravasias' financial condition, a conversion to chapter 11 would likely have been pursued and granted.

Over the Ravasias' objection, the bankruptcy court granted the UST's motion for leave to amend the § 727 complaint. The Ravasias' appeal **[*6]** of that interlocutory order to the district court was denied.

**C. The § 727 trial and the bankruptcy court's decision**

After a three-day trial, the bankruptcy court entered its order denying the Ravasias' discharge under § 727(a)(4)(A), finding that they made multiple false oaths on their schedules with respect to their income and expenses.

Schedule I and Amended Schedule I both indicated Mr. Ravasia's income was substantially less than what he earned in each of the several years before and after he filed for bankruptcy. The Ravasias also failed to indicate that his income could increase, and in fact had increased substantially, within the year of filing. The court found that Mr. Ravasia's reduced income in January 2017 - the month the Ravasias filed for bankruptcy — was not a representative month for his income, and the use of that month, especially without consideration of his substantial annual July bonus and their failure to amend the schedules to reflect that known bonus, was fraudulent. The court found that the Ravasias' repeated misrepresentations and omissions about Mr. Ravasia's income were materially false. It further found that it was evident to the Ravasias that Mr. Ravasia's income on Schedule **[*7]** I was substantially underreported, and thus their false oaths related to his income were made knowingly, deliberately, and consciously. Finally, the court found that the Ravasias

acted with intent to deceive interested parties about Mr. Ravasia's income given their failure to update their schedules with accurate income information for him and the Amended Schedule I continuing to dramatically underreport it.

While the court did not find the initial reported income for Mrs. Ravasia as $0 materially false, it did find her testimony that she was not employable and that her income was uncertain "not credible." The court found that the Ravasias' failure to amend the schedules with accurate income information for Mrs. Ravasia, and failure to disclose her substantial income in the Amended Schedule I, established that their false oaths about her income were made knowingly and fraudulently and that they had acted with intent to deceive interested parties about her income.

The court also found that the Ravasias made false oaths about their expenses. The evidence established that the Ravasias' combined net income for 2017 was approximately $550,000, and that they spent substantially all of this **[*8]** income, or an average of $45,000 per month, as compared to the $26,000 they reported on Schedule J. The Ravasias acknowledged the underestimated expenses in Schedule J as inaccurate. The court found that the Ravasias' misrepresentation of their expected ongoing expenses was a material fact, made knowingly, deliberately, and consciously. The court found that the Ravasias knowingly and fraudulently provided false information about their expenses and failed to amend their schedules with accurate information.

In summary, the court found that, in what might have been an attempt to prevent conversion of the case to chapter 11, the Ravasias adopted a zealous position regarding their financial reporting. However, their zealous actions amounted to fraud. The Ravasias timely appealed.

**JURSIDICTION**

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(J). We have jurisdiction under 28 U.S.C. § 158.[5]

_____

[5] The order granting leave to amend the § 727 complaint was an interlocutory order that merged into the final order denying discharge. Therefore, we have jurisdiction to review that earlier, non-final order. *See Harvey v. Waldron, 210 F.3d 1008, 1012 (9th Cir. 2000), overruled in part on other grounds*

EXHIBIT 6, PAGE 88

2021 Bankr. LEXIS 1033, *8

## ISSUES

1. Did the bankruptcy court err in granting the UST leave to amend the *§ 727* complaint?

2. Did the bankruptcy court err in denying the Ravasias' discharge under *§ 727(a)(4)(A)*?

## STANDARDS OF REVIEW

*HN1*[↑] We review de novo whether an amended complaint relates back to the original pleading. *Alfaro v. Johnson, 862 F.3d 1176, 1179 (9th Cir. 2017)*; *Magno v. Rigsby (In re Magno), 216 B.R. 34, 37-38 (9th Cir. BAP 1997)*. We review for **[*9]** abuse of discretion the bankruptcy court's decision to allow or deny amendment of pleadings under Civil *Rule 15(c)* and *Rule 7015*. *In re Magno, 216 B.R. at 38*; *First Fed. Sav. Bank v. Gunn (In re Gunn), 111 B.R. 291, 292 (9th Cir. BAP 1990)*. Whether cause exists to extend the filing deadline to object to a debtor's discharge is reviewed for abuse of discretion. *McDermott v. St. George (In re St. George), Nos. 16-8017/8018, 2017 Bankr. LEXIS 1065, 2017 WL 1379321, at *1 (6th Cir. BAP Apr. 17, 2017)*; *Rupp v. Auld (In re Auld), 561 B.R. 512, 515-16 (10th Cir. BAP 2017)*. *HN2*[↑] A trial court abuses its discretion if it applies the wrong legal standard or if its factual findings were clearly erroneous. *United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009)* (en banc).

*HN3*[↑] In an action for denial of discharge under *§ 727*, we review: (1) the bankruptcy court's legal conclusions de novo, (2) factual findings for clear error, and (3) mixed questions of law and fact de novo. *Searles v. Riley (In re Searles), 317 B.R. 368, 373 (9th Cir. BAP 2004)*, *aff'd*, *212 F. App'x 589 (9th Cir. 2006)* (citing *Murray v. Bammer (In re Bammer), 131 F.3d 788, 791-92 (9th Cir. 1997)* (en banc)). Under *§ 727(a)(4)(A)*, whether a debtor made a false oath, whether the false statements were material, and whether the debtor had the requisite fraudulent intent are all questions of fact reviewed under the clearly erroneous standard. *Retz v. Samson (In re Retz), 606 F.3d 1189, 1197 (9th Cir. 2010)*. Factual findings are clearly erroneous if they are illogical, implausible, or without support in the record. *Id. at 1196*.

*HN4*[↑] We may affirm on any ground supported by the

_____

by *Wallace v. Kato, 549 U.S. 384, 393-94, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007)*.

record, regardless of whether the bankruptcy court relied upon, rejected or even considered that ground. *Fresno Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2014)*.

## DISCUSSION

**A. The bankruptcy court did not err in [*10] granting the UST leave to amend the *§ 727* complaint**.

*HN5*[↑] "The court should freely give leave [to amend] when justice so requires." *Civil Rule 15(a)*; *see also Rule 7015*. The Ninth Circuit applies this rule with "extreme liberality." *Brown v. Stored Value Cards, Inc., 953 F.3d 567, 574 (9th Cir. 2020)* (citations omitted). In discharge cases, the opportunity to amend is especially important because of the short time frame under which such a complaint must be filed. *In re Gunn, 111 B.R. at 293*; *Mission Viejo Nat'l Bank v. Englander (In re Englander), 92 B.R. 425, 428 (9th Cir. BAP 1988)*; *Rule 4004(a)*.

*HN6*[↑] Under *Civil Rule 15(c)(1)*, made applicable here by *Rule 7015*, an amendment to a pleading relates back to the date of the original pleading when it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading[.]" *Civil Rule 15(c)(1)(B)*; *see also Rule 7015*. This link will be found when the claim to be added is likely to be proven by the same kind of evidence that would be used to support the original pleading. *In re Magno, 216 B.R. at 39*; *see also Dominguez v. Miller (In re Dominguez), 51 F.3d 1502, 1510 (9th Cir. 1995)*. "The focus of the inquiry is on the factual allegations made in the two complaints so as to give the opposing party fair notice of the claims against him." *In re Magno, 216 B.R. at 39-40* (holding that amended complaint alleging *§ 523(a)(6)* claim did not relate back to original complaint for denial of debtor's discharge under *§ 727(a)(2)(A)* and *(a)(4)(A)*, because mere mention of a $120,040 claim in the original complaint **[*11]** was not enough to put debtor on notice of a *§ 523(a)(6)* claim and original complaint did not allege any facts which would have proven the required elements of a *§ 523(a)(6)* claim).

*HN7*[↑] In applying the relation back doctrine in the context of objections to discharge and the dischargeability of certain debts, we have held:

The basic test is whether the evidence with respect to the second set of allegations could have been

2021 Bankr. LEXIS 1033, *11

introduced under the original complaint, liberally construed; or as a corollary, that in terms of notice, one may fairly perceive some identification or relationship between what was pleaded in the original and amended complaints.

*Gelling v. Dean (In re Dean), 11 B.R. 542, 545 (9th Cir. BAP 1981)*, aff'd, *687 F.2d 307 (9th Cir. 1982)* (internal citations omitted); *see also In re Gunn, 111 B.R. at 292-94* (allowing amendment of original complaint under *§ 523(a)(2)(A)* and *(B)* and *§ 727(a)(5)* that added claims under *§ 727(a)(3)* and *(4)*, because "[t]he objection to discharge and dischargeability claims of the original complaint would certainly have put the debtor on notice of the two related theories of the amended complaint.").

It is undisputed that the UST's motion for leave to amend the *§ 727* complaint was filed after the deadline expired for filing such a complaint by two years. *See Rule 4004(a).*[6] The Ravasias argue that the bankruptcy court erred by granting leave to amend because **[*12]** the allegations of false oaths as to income and expenses were new, did not relate back to the original complaint, and were therefore time barred. The Ravasias have not cited a case where a court denied leave to amend a complaint alleging a claim for false oath under *§ 727(a)(4)(A)*, when that same claim was alleged in the original complaint but the amended complaint asserted additional false oaths learned in discovery.

We conclude that the amended complaint related back to the original complaint. Both complaints challenged the veracity of the representations the Ravasias made in connection with their bankruptcy case, particularly those made in their schedules and statement of financial affairs. For example, the original complaint alleged that the Ravasias failed to disclose certain credit card debts owed and that those debts were paid shortly before their chapter 7 filing. The amended complaint alleged that the Ravasias made false oaths with respect to their income and expenses including, among other things, these same, undisclosed credit card expenditures. Hence, the Ravasias were on notice that they might have to defend false oath claims, and the evidence of their income and expenses could have **[*13]** been introduced under the original complaint, liberally construed. *In re Dean, 11*

*B.R. at 545*. Further, the original complaint alleged facts which would have proven the required elements for a claim under *§ 727(a)(4)(A)*. *In re Magno, 216 B.R. at 39-40*.

This case is strikingly similar to *Kennicott Brothers Co. v. Fidanovski (In re Fidanovski), 347 B.R. 343 (Bank. N.D. Ill. 2006)*. There, the creditor sought leave to amend after filing an original complaint under *§ 727(a)(4)(A)* that listed a single example of a false oath committed by the debtors in their statement of financial affairs. The amended complaint, filed after discovery, set forth "an immense list (some 31 paragraphs, in all) of instances in which [the debtors] committed false oaths either in their schedules and statement of financial affairs or at the *[§] 341* meeting." *Id. at 346*. The court concluded that, while the creditor's new claim under *§ 727(a)(3)* did not relate back to the original complaint, the *§ 727(a)(4)(A)* claim did. *Id. at 347-48*. Specifically, the court found that the amendment consisting of additional facts supporting the existing *§ 727(a)(4)(A)* claim related back since the new allegations concerned the same "core of facts" alleged in the original complaint. Thus, the amendment to add these facts was timely. *Id.* [7]

*HN8* We also conclude that the amendments to the *§ 727* complaint were permissible under *Rule 4004(b)(2)*,[8] which provides for the addition of objection to **[*14]** discharge claims after the time for objection has expired but before discharge is granted when: (A) the objection is based on facts that, if learned after the discharge, would provide a basis for revocation under *§*

_____

[6] *Rule 4004(a)* provides, in relevant part, that "[i]n a chapter 7 case, a complaint . . . objecting to the debtor's discharge shall be filed no later than 60 days after the first date set for the meeting of creditors under *§ 341(a)*."

_____

[7] The court in *Fidanovski* ultimately denied leave to amend on the grounds of futility, because it determined that the amendment was unnecessary pursuant to *Civil Rule 8. 347 B.R. at 348*. The court found that the original complaint "gave perfectly adequate notice of its *[§] 727(a)(4)(A)* claim," *id. at 348*, and that "[a]dding 31 more paragraphs of 'false oaths' to the complaint . . . serve[d] no purpose." *Id. at 349*.

[8] *Rule 4004(b)(2)* provides:

A motion to extend the time to object to discharge may be filed after the time for objection has expired and before discharge is granted if (A) the objection is based on facts that, if learned after the discharge, would provide a basis for revocation under *§ 727(d)* of the Code, and (B) the movant did not have knowledge of those facts in time to permit an objection. The motion shall be filed promptly after the movant discovers the facts on which the objection is based.

727(d); and (B) the movant did not have knowledge of those facts in time to permit an objection. *See Heartwood 4, LLC v. Tabor (In re Tabor), Adv. No. 15-01616-EPK, 2016 Bankr. LEXIS 2382, 2016 WL 3598643 (Bankr. S.D. Fla. June 24, 2016); Link v. Mauz (In re Mauz), 513 B.R. 273 (Bankr. M.D. Pa. 2014)* (considering propriety of motion for leave to amend objection to discharge complaint under both *Civil Rule 15(c)(1)(B)* and *Rule 4004(b)(2)*). *HN9*[↑] *Section 727(d)(1)* provides for revocation of discharge when it is shown that the debtor obtained a discharge through fraud and the plaintiff was not aware of the fraud until after the discharge was entered.

Thus, under *Rule 4004(b)(2)* as relevant to the motion to amend, the UST had to show **[*15]** the amended complaint alleged that the Ravasias committed an act of fraud that would provide a basis for revocation of discharge under *§ 727(d)(1)*, that the UST did not know of the act in time to permit an objection to discharge prior to the expiration of the *Rule 4004(a)* deadline, and that the UST filed the motion to amend promptly upon discovering the facts on which the objection was based. *In re Tabor, 2016 Bankr. LEXIS 2382, 2016 WL 3598643, at *8.*

All three elements were met here. In the amended *§ 727* complaint, the UST alleged that the Ravasias made multiple false oaths about their income and expenses in their schedules and at the *§ 341(a)* meeting in violation of *§ 727(a)(4)(A)*. Those facts, if learned after entry of the discharge, would constitute fraud that would support revocation of discharge under *§ 727(d)(1)*. *Jones v. U.S. Tr., 736 F.3d 897, 900 (9th Cir. 2013)* (material false oath which would have resulted in denial of discharge had it been known at the time can justify subsequent revocation of discharge under *§ 727(d)(1)*) (citing cases). In the motion to amend, the UST asserted that the extent of the Ravasias' false oaths about their income and expenses was not learned until the parties had engaged in formal discovery, which was not until early-mid 2019 - long after the deadline had run under *Rule 4004(a)* - and the delay in discovery was due, in some part, to **[*16]** the Ravasias. The Ravasias filed their Amended Schedules I and J on May 28, 2019, wherein they made further misrepresentations about their income and expenses. The UST promptly filed its motion to amend the *§ 727* complaint on June 4, 2019, to include these additional facts learned in discovery.

Accordingly, because the amended *§ 727* complaint related back to the original *§ 727* complaint, and because the amendments were permissible under *Rule*

*4004(b)(2)*, the bankruptcy court did not abuse its discretion in granting the UST leave to amend.

**B. The bankruptcy court did not err in denying the Ravasias' discharge under *§ 727(a)(4)(A)*.**

**1. Law governing *§ 727(a)(4)(A)***

*HN10*[↑] The bankruptcy court may deny a chapter 7 debtor's discharge if "the debtor knowingly and fraudulently, in or in connection with the case - (A) made a false oath or account[.]" *§ 727(a)(4)(A)*. "The fundamental purpose of *§ 727(a)(4)(A)* is to insure that the trustee and creditors have accurate information without having to conduct costly investigations." *Fogal Legware of Switz., Inc. v. Wills (In re Wills), 243 B.R. 58, 63 (9th Cir. BAP 1999)* (citation omitted).

To prevail on a claim under this section, a plaintiff must show, by a preponderance of the evidence, that: "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and **[*17]** (4) the oath was made fraudulently." *In re Retz, 606 F.3d at 1197* (citations omitted).

"A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath." *Khalil v. Devs. Sur. & Indem. Co. (In re Khalil), 379 B.R. 163, 172 (9th Cir. BAP 2007)*, *aff'd*, *578 F.3d 1167 (9th Cir. 2009)*; *see also In re Searles, 317 B.R. at 378*. It is crucial to the proper operation of the bankruptcy system that chapter 7 debtors "ensure to the greatest extent possible that the information turned over to the bankruptcy court is accurate." *In re Retz, 606 F.3d at 1199*; *see also In re Searles, 317 B.R. at 378* ("The continuing nature of the duty to assure accurate schedules of assets is fundamental because the viability of the system of voluntary bankruptcy depends upon full, candid, and complete disclosure by debtors of their financial affairs.").

*HN11*[↑] The second element necessary for a *§ 727(a)(4)(A)* claim is that the false oath relate to a material fact. "A fact is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property. An omission or misstatement that detrimentally affects administration of the estate is material." *In re Retz, 606*

2021 Bankr. LEXIS 1033, *17

*F.3d at 1198* (citations and quotation marks omitted).

**HN12**[🔼] The third element necessary for a *§ 727(a)(4)(A)* claim is that the debtor makes the false oath knowingly. **[*18]** "A debtor acts knowingly if he or she acts deliberately and consciously." *Id.* (citations and quotation marks omitted) (debtor's signing of schedules when he knew the information was incomplete was sufficient to support a finding that the debtor acted knowingly).

**HN13**[🔼] Finally, to prevail on a claim under *§ 727(a)(4)(A)*, the objecting party must establish that the debtor's false oath was made fraudulently. "Intent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct." *Id. at 1199* (citing *Devers v. Bank of Sheridan (In re Devers), 759 F.2d 751, 753-54 (9th Cir. 1985)*; *Roberts v. Erhard (In re Roberts), 331 B.R. 876, 884 (9th Cir. BAP 2005)*, *aff'd and remanded*, *241 F. App'x 420 (9th Cir. 2007))*. "Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent." *Id.* (citing *In re Khalil, 379 B.R. at 172*). But "the existence of more than one falsehood, together with a debtor's failure to take advantage of the opportunity to clear up all inconsistencies and omissions, such as when filing amended schedules, can be found to constitute reckless indifference to the truth satisfying the requisite finding of intent to deceive." *In re Khalil, 379 B.R. at 175* (citation omitted).

**2. Analysis**

The Ravasias raise several challenges to the bankruptcy court's decision to deny discharge. First, they challenge the court's finding of knowing and fraudulent **[*19]** false oaths about their expenses, arguing that chapter 7 debtors do not have a duty to report expenses that did not exist at the time of the filing. The court found that the Ravasias made a false oath by intentionally underreporting their expenses by nearly $20,000 per month.

The evidence showed that the Ravasias failed to disclose several credit cards on which they were making payments, in addition to other luxury expenses, and that these expenses existed at the time of filing. The chapter 7 trustee testified that the Ravasias continued to use and pay for credit cards and other expenses that were not listed on Schedule J. He testified that he requested their credit card information to see what the

expenditures were, because there was no change in lifestyle yet the bills were getting paid. In addition, the evidence showed that the Ravasias were spending on average $45,000 per month, as compared to the $26,000 they reported on Schedule J. Clearly, the Ravasias did not comply with their duty to provide an accurate account of their monthly expenditures.

The Ravasias argue that, while perhaps Schedule J was inaccurate, their monthly expenditures were difficult to project at the time of filing **[*20]** given Mrs. Ravasia's extensive travel to obtain employment and the expenses of the failed medical clinic that were being paid off by credit cards. While that may be true, the point is that significant debts were being paid off by credit cards and other means. But it takes income to do that, and the income the Ravasias reported was insufficient to do so given their other debts.

The Ravasias argue that underestimating expenses could not impact the bankruptcy estate or prejudice creditors and should have not resulted in a denial of discharge. In other words, they argue that their underreporting of expenses was not material. We disagree. **HN14**[🔼] "Nondisclosure of creditors (and debts) can be just as important as nondisclosure of assets. Information regarding business and personal dealings can lead to discovery of assets, potentially avoidable transfers, or other relevant information such as grounds to deny a debtor's discharge." *In re Khalil, 379 B.R. at 177*. "'A false statement or omission may be material even if it does not cause direct financial prejudice to creditors.'" *Id.* (quoting *In re Wills, 243 B.R. at 63*). "[A] discharge may be denied if the omission adversely affects the trustee's or creditors' ability to discover other assets or to fully **[*21]** investigate the debtor's pre-bankruptcy dealing and financial condition." *In re Wills, 243 B.R. at 63* (citation omitted).

The Ravasias' monthly expenses bore a relationship to their business and personal transactions and concerned the discovery of the existence and disposition of their assets. Their underreporting of expenses also adversely affected the trustee's ability to fully investigate their financial condition, detrimentally affected the administration of the estate, and prejudiced creditors. Both the chapter 7 trustee and the UST testified that, had the Ravasias provided accurate income and expenses information, they would have handled the case differently. Specifically, they likely would have sought to convert the case to chapter 11, and the chapter 7 trustee (who also has extensive chapter 11 experience) testified that there would have been a

2021 Bankr. LEXIS 1033, *21

substantial distribution to creditors through a plan.

Next, the Ravasias argue that in business debt cases, unlike consumer debt cases, there is no legal requirement to provide future averages of net income or gross wages for the months or year following the bankruptcy filing. They argue that the bankruptcy court erred by using postpetition income in hindsight to **[*22]** find that they made false statements, when Schedule I does not require them to forecast future income or average past fluctuating income. They argue that their statements with respect to income were not false as a matter of law, because they had no obligation to provide anything more than a "snapshot" of their income at the time the petition was filed.

The only case the Ravasias cite in support of their argument is *Westland Architecture & Development Corp. v. Matthews (In re Matthews), Adv. No. 2:12-01499-RK, 2016 Bankr. LEXIS 3609, 2016 WL 5746251 (Bankr. C.D. Cal. Oct. 3, 2016)*, an unreported case from a California bankruptcy court. *Matthews* was not a business debt case. Further, it does not help the Ravasias. While the court stated that a debtor's income as calculated on Schedule I is a "snapshot" of the debtor's income at the time the petition is filed, it also noted that a debtor's income as calculated on Schedule I is an **"estimate of average projected income."** *2016 Bankr. LEXIS 3609, [WL] at *26* (emphasis in original). In other words, it considers future income.

The bankruptcy court was aware that this was a business debt case. Contrary to the Ravasias' argument, the court did not impose an improper legal requirement with respect to the reporting of income. The court was allowed to consider **[*23]** Mr. Ravasia's historical income from 2013 to 2016 and what he actually made in 2017, as well as what Mrs. Ravasia made in 2017, to determine the truthfulness of what they reported on their Schedule I and Amended Schedule I.

Further, Schedule I contemplates not simply a "snapshot" of monthly income but the forecasting of such income for the year with question 13, which asks if the debtor expects an increase or decrease "within the year" after the bankruptcy filing. And the publicly available instructions for filling out bankruptcy forms instruct debtors to "give details about the monthly income you currently expect to receive," i.e., in the future, and to "show all totals as monthly payments, even if income is not received in monthly payments," and if the "income is received in another time period, such as daily, weekly, quarterly, annually, or irregularly,"

i.e., irregular overtime/ bonus income, "calculate how much income would be by month." *See* Instructions: Bankruptcy Forms for Individuals at 28, available at https:// www.uscourts.gov/sites/default/files/instructions_individuals.pdf (last visited Apr. 16, 2021). Finally, Attachment 1 to the Amended Schedule I — where the Ravasias stated their expectation that postpetition income would **[*24]** be less than it was prepetition — demonstrates that they understood the instruction in Part 2 of Schedule I to "[e]stimate monthly income as of the date you file this form" to mean expected income going forward, not a snapshot on the day of filing.

The Ravasias also argue that, in a chapter 7 case, there is no duty to amend to update postpetition changes in income or to retroactively add income that was not earned and did not exist at the time of the filing. They argue that the bankruptcy court could not have found a false oath with respect to their income or that one was made knowingly and fraudulently for failure to perform a non-existent duty.

The Ravasias' argument misses the point. Regardless of any duty to update postpetition changes in income, they did have a duty to assure accurate schedules. The evidence showed that Mr. Ravasia made substantially more money in 2017 than what the Ravasias reported, and that they knew such income existed at the time of filing. At minimum, the Ravasias were required to amend and report a more accurate figure for Mr. Ravasia's income once the inaccuracy became apparent. *See In re Searles, 317 B.R. at 378* ("Postpetition discovery of rights that actually existed at the time of **[*25]** filing must be addressed in the schedules. This implies a duty to amend."). They did not do so, at least not until over two years later and only after the UST started asking questions. *See id. at 377* (failure to amend schedules promptly upon noting the discrepancy supports an inference of intent). When the Ravasias did amend, they falsely reported that Mr. Ravasia made even less money in 2017 than what they reported before. Their continued false oath as to Mr. Ravasia's income in the Amended Schedule I further established an intent to deceive.

The Ravasias next argue that their reliance on their counsel's advice for filling out their schedules was reasonable, and that the bankruptcy court erred in finding that their reliance was not in good faith because the "erroneous" information "should have been evident." *HN15*[⬆] "Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to

2021 Bankr. LEXIS 1033, *25

deny him a discharge of his debts. However, the debtor's reliance must be in good faith. The advice of counsel is not a defense when the erroneous information should have been evident to the debtor." *In re Retz, 606 F.3d at 1199* (internal citations omitted). The advice of counsel is also not a defense "'when it is transparently **[*26]** plain that the property should be scheduled.'" *Shoemaker v. U.S. Tr. (In re Shoemaker), BAP No. CC-18-1020-KuFL, 2019 Bankr. LEXIS 1966, 2019 WL 2774265, at *15 (9th Cir. BAP July 1, 2019)* (quoting *In re Mascolo, 505 F.2d 274, 277 n.4 (1st Cir. 1974))*.

The bankruptcy court found that the advice-of-counsel defense was not available because it should have been, and admittedly was, evident to the Ravasias by no later than July 2017 that their schedules were inaccurate. We see no error in that finding. Further, the Ravasias did not present any evidence at trial that their attorney advised them to make the specific false oaths they made. *See id.* (affirming denial of discharge under *§ 727(a)(2)(A)* and *(a)(4)(A)* where there was no evidence that counsel had advised debtor not to disclose assets). Accordingly, the bankruptcy court did not err in rejecting the reliance on counsel defense in this case.

Lastly, the Ravasias argue that the bankruptcy court improperly relied on standards relating to an overall "means" analysis in determining whether they made false oaths. The Ravasias argue that by analyzing pre- or postpetition income and expenses, as well as bank deposits and withdrawals, the court was applying the "means test" or "totality of the circumstances test" used to dismiss or convert a chapter 7 case to chapter 11 or 13. They argue that such **[*27]** tests apply only in consumer debt cases.

While these tests do apply in consumer debt cases under *§ 707(b)*, the Ravasias do not cite any authority that it was error for the court to consider some of this same type of evidence in a business debt case to determine a false oath and deny discharge under *§ 727(a)(4)(A)*. In the usual corporate-type business debt case under chapter 7, a discharge of debts is not at issue. But in this case it was. The fact that this was a business debt case did not insulate the Ravasias from making false statements in their schedules or at the *§ 341(a)* meeting or from abusing the bankruptcy system. Therefore, we do not believe that the bankruptcy court erred in considering the income and expense evidence to find a false oath and deny discharge. The Ravasias' underreported expenses, especially when combined with their underreported income, supported the

bankruptcy court's ultimate finding that their misrepresentations and omissions about their income and expenses were an intentional and material false oath.

The bankruptcy court declined to address the additional allegation that the Ravasias made a false oath related to their 2016 income tax refund. We conclude that they did, and that this **[*28]** is an additional basis to affirm.

The UST presented evidence that the Ravasias knew when they filed their chapter 7 case that they were getting a refund of at least $28,000 (and maybe as much as $100,000), yet they represented in their schedules that any potential refund was "unknown" and valued it at $0. Emails between the Ravasias and their accountant in December 2016 revealed that such a refund was likely, that the chapter 7 trustee would inquire about the amount of the refund anticipated, and that Mrs. Ravasia was searching for ways to prevent the bankruptcy estate from getting it.

Mrs. Ravasia testified that she did not disclose at the *§ 341(a)* meeting that she had spoken to her accountant about the tax refund and that it could range from $28,000 to $100,000, because she was trying to answer "yes" or "no" to the questions being asked. The chapter 7 trustee testified that, based on the schedules and the Ravasias' testimony at the *§ 341(a)* meeting, he was led to believe that a refund, if any, would be de minimis. However, he testified, had he known that a minimum of $28,000 was coming to the cash-poor estate, he might have litigated against (as opposed to settling with) Mr. Ravasia's employer over **[*29]** whether Mr. Ravasia's deferred employee compensation plan — which was a significant asset — was an estate asset, and the outcome may have been more favorable to the estate and creditors. In any case, he said he certainly would have done more follow up had the extent of the tax refund been disclosed. Ultimately, the Ravasias received a tax refund of $177,000. The chapter 7 trustee only learned about the refund after reviewing a copy of the UST's deposition of Mrs. Ravasia. It does not appear that the Ravasias ever filed an amended Schedule A/B to correct the false information about the tax refund.

Accordingly, the evidence established that the Ravasias' false statements and omissions about their 2016 income tax refund constituted a false oath, that it was material, and that it was made knowingly and fraudulently.

**CONCLUSION**

Layla Buchanan

2021 Bankr. LEXIS 1033, *29

For the reasons stated above, we AFFIRM.

---

**End of Document**

**EXHIBIT 7**



**User Name:** Layla Buchanan

**Date and Time:** Thursday, February 9, 2023 6:49:00PM PST

**Job Number:** 190002713

## Document (1)

1. *Schoenmann v. Chen (In re Chen), 2009 Bankr. LEXIS 3636*

   **Client/Matter:** 1673-001

   **Search Terms:** 2009 Bankr.LEXIS 3636

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | Cases | -None- |

EXHIBIT 7, PAGE 96

Ⓐ Neutral
As of: February 10, 2023 2:49 AM Z

## *Schoenmann v. Chen (In re Chen)*

United States Bankruptcy Court for the Northern District of California

November 9, 2009, Decided; November 9, 2009, Filed; November 10, 2009, Entered on Docket

Bankruptcy Case No. 03-32157DM, Chapter 7, Adversary Proceeding No. 07-3108DM

**Reporter**
2009 Bankr. LEXIS 3636 *; 2009 WL 3788898

In re GEORGE QUINN CHEN, Debtor. E. LYNN SCHOENMANN, as Trustee of the Chapter 7 Estate of George Quinn Chen, Debtor, Plaintiff, v. GEORGE QUINN CHEN, an individual, CYNTHIA WONG, an individual, SHANGHAI 1930 LLC, a California limited liability company, and SHANGHAI 1930 RESTAURANT PARTNERS, L.P., a California limited partnership, Defendants.

**Prior History:** *Schoenmann v. Chen, 2009 Bankr. LEXIS 2534 (Bankr. N.D. Cal., Aug. 4, 2009)*

## Core Terms

Restaurant, Distributions, property of the estate, claim for relief, post-petition, bookkeeper, Partnership, Partner, posted, tips, reimbursements, sales, estate's interest, advances

## Case Summary

### Procedural Posture

Plaintiff Chapter 7 trustee filed a complaint against defendants, a debtor, his wife, a limited liability corporation (LLC), and a limited partnership (LP). The LLC and LP were eliminated as defendants by an unopposed motion for summary judgment. The only issues remaining for consideration were the avoidance and recovery of postpetition transfers and revocation of the debtor's discharge under *11 U.S.C.S. 727(d)*.

### Overview

The trustee sought to avoid and recover numerous postpetition transfers made by the LP, under the control and direction of the debtor and his wife, during the period between the petition date and the date of sale of the estate's ownership interest in a restaurant to the debtor's wife. With the approval of the court, the trustee had sold all of the estate's interest in the LLC and the LP to the debtor's wife. As of the petition date, there was an outstanding amount owed by the LP to the debtor. The trustee was unaware of the existence of the loan because the debtor did not list it on his schedules. The trustee was entitled to judgment on its claim to recover postpetition transfers in amounts representing repayments of the loan to the debtor and certain partnership distributions. The debtor's discharge was revoked under *§ 727(d)* because he failed to disclose the substantial loan owed to him and he did not disclose the partnership distributions that he received. The debtor possessed the necessary intent because he procured his discharge by fraud or knowingly and fraudulently failed to schedule debt, report the payments, or deliver the monies to the trustee.

### Outcome

The trustee was awarded judgment on her claims to avoid and recover postpetition transfers. The trustee was also awarded a judgment revoking the debtor's discharge.

## LexisNexis® Headnotes

Contracts Law > ... > Discharge & Payment > Payments > General Overview

*HN1*[⤓]  **Discharge & Payment, Payments**

When payment is made on an obligation, unless there is some indication to the contrary, the practical and ordinary interpretation must undoubtedly be that payment is to be applied to the part first coming due to be paid.

Layla Buchanan

2009 Bankr. LEXIS 3636, *3636

Bankruptcy Law > ... > Bankruptcy > Estate Property > Contents of Estate

**HN2**[⬇]  **Estate Property, Contents of Estate**

Property of a bankruptcy estate includes money that a debtor has a right to receive.

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Revocation of Discharge

**HN3**[⬇]  **Liquidations, Revocation of Discharge**

The benefit of discharge is reserved for the honest but unfortunate debtor. If *11 U.S.C.S. § 727(d)* is satisfied, a debtor has been less than honest and deserves no discharge.

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Revocation of Discharge

**HN4**[⬇]  **Liquidations, Revocation of Discharge**

To warrant revocation under *11 U.S.C.S. § 727(d)*, a trustee must show that (1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge; (2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee. *§ 727(d)(1)-(2)*.

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Revocation of Discharge

Evidence > Types of Evidence > Circumstantial Evidence

**HN5**[⬇]  **Liquidations, Revocation of Discharge**

*11 U.S.C.S. § 727(d)* does not require direct evidence of intent.

**Counsel:**  **[*1]** For George Quinn Chen, Debtor: Cynthia L. Cox, Law Offices of Cynthia Cox, Oakland, CA; Trevor Caudle, Rubinstein Law Group PC, San Francisco, CA.

For E. Lynn Schoenmann, Trustee: Daniel M. Linchey, Goldberg, Stinnett, Davis and Linchey, San Francisco, CA; Kathy Quon Bryant, Merle C. Meyers, Meyers Law Group, PC, San Francisco, CA.

U.S. Trustee: William T Neary, San Francisco, CA.

**Judges:** DENNIS MONTALI, U.S. Bankruptcy Judge.

**Opinion by:** DENNIS MONTALI

# Opinion

*MEMORANDUM DECISION ON COMPLAINT TO REVOKE DISCHARGE AND TO RECOVER MONEY*

*I. INTRODUCTION.*

E. Lynn Schoenmann, the Chapter 7 [1] trustee ("Trustee"), initiated this adversary proceeding by filing a complaint (the "Complaint") against George Q. Chen ("Debtor"), his wife, Cynthia Wong ("Wong"), Shanghai 1930 LLC ("Shanghai LLC"), and Shanghai 1930 Restaurant Partners, L.P. ("Shanghai LP") on September 24, 2007. The Complaint sought declaratory relief regarding Debtor's ownership interest in Shanghai LLC, the avoidance of postpetition transfers and revocation of the Debtor's discharge.

More specifically, the Complaint sought a determination that as of July 23, 2003, the date of commencement of this bankruptcy case (the "Petition Date"), the Debtor was the sole member of Shanghai LLC. The Debtor contended that as of the Petition Date, Wong owned a 51% membership interest in Shanghai LLC, by way of transfer from the Debtor. On this claim for relief the parties brought cross motions for summary judgment and the Court granted summary judgment in favor of the

_____

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, *11 U.S.C. §§ 101-1532*, and to the *Federal Rules of Bankruptcy Procedure, Rules 1001-9037* **[*2]** in effect prior to October 17, 2005, the effective date of most of the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, April 20, 2005, 119 Stat. 23, as Debtor's case was filed prior to its effective date.

2009 Bankr. LEXIS 3636, *2

Trustee on November 14, 2008, determining that all membership interests in Shanghai LLC were owned by the Debtor as of the Petition Date.

On October 21, 2008, Shanghai LLC and Shanghai LP were eliminated as defendants by way of their summary judgment motion that was not opposed by the Trustee.

On April 20, 2009, the Debtor and Wong, the only remaining defendants, filed a motion seeking reconsideration of the court's ruling in favor of the Trustee on the first claim [*3] for relief. On August 4, 2009, the court issued its Memorandum Decision on Motion to Reconsider, stating its reasons for denying the motion. That denial will be incorporated into the Final Judgment to be issued.

By the second claim for relief, the Trustee seeks to avoid and recover numerous postpetition transfers made by Shanghai LP (under the Debtor's and Wong's control and direction) to the Debtor and Wong during the period between the Petition Date and the date of sale of the estate's ownership interest in the Restaurant (as hereafter defined) to Wong.

In the third claim for relief, the Trustee seeks revocation of Debtor's discharge.

The matter was tried to the court on June 1 & 2, 2009; appearances were noted in the record. Having considered the testimony of the witnesses, the documentary evidence, and the arguments of counsel, the court now issues it decision, subject to further consideration of the evidence as discussed below.

For the reasons to be explained, on the second claim for relief the court will award Trustee damages in the sum of $ 38,806.84 against Debtor based upon his receipt of that amount by way of two equity distributions that were property of the estate and in the [*4] sum of $ 729,044.19 based upon proof that he received at least that amount on account of a prepetition loan owed to him that also was property of the estate. The court will award Trustee damages in the sum of no less than $ 11,000 against Wong based upon her receipt of a portion of the debt owed to Debtor. It will not award damages against Wong based upon her receipt of two equity distributions.

On the third claim for relief, Debtor's discharge will be revoked.

*II. FACTS.* [2]

The Debtor filed for chapter 13 relief on July 25, 2003 (the "Petition Date"). The Debtor's case was converted to chapter 11 on August 13, 2003, and Trustee was appointed. Then on July 15, 2005, the Debtor's case was converted to chapter 7; the Trustee continues to serve as trustee. The court entered an order discharging the Debtor on October 26, 2005.

Debtor founded a restaurant known as "Shanghai 1930" in 1997 in San Francisco, California (the "Restaurant"). It has operated [*5] ever since, and is owned and operated by Shanghai LP, the general partner of which is Shanghai LLC. Debtor was the 100% separate property owner of Shanghai LLC. Debtor and Wong are also limited partners in Shanghai LP.

On April 25, 2007, Debtor filed a motion seeking the estate's abandonment of his interest in Shanghai LP. His expert appraisal witness concluded that that interest had a nominal or no value as of February 28, 2007.

In opposition the Trustee located a third-party buyer willing to buy the estate's interest for $ 25,000. Wong objected to the sale and ultimately purchased the estate's interest for $ 50,000.

With the approval of the court, Trustee sold all of the estate's interests in Shanghai LP and Shanghai LLC to Wong on November 14, 2007 (the "Sale Date"). The sale did not include any claims held by the estate against the Debtor or Wong with respect to payments made by either Shanghai LP or Shanghai LLC prior to the Sale Date. At issue before the court are activities that occurred between the Petition Date and the Sale Date (the "Subject Period").

As of the Petition Date there was an outstanding amount owed by Shanghai LP to the Debtor of no less than $ 935,709.98 (the "Chen [*6] Loan"). The Chen Loan is reflected in Shanghai's general ledger as a liability account (Loan from George Chen - Account 2300, or "Chen Loan Account"). Most, if not all, of the Chen Loan represents cash advances Debtor made prior to the Petition Date to help the Restaurant deal with cash flow needs, including covering employees' tips, cash purchases, etc. The Trustee was unaware of

---

[2] The following discussion constitutes the court's findings of fact and conclusions of law. *Fed. R. Bankr. P. 7052(a)*. Some of the findings are based upon the parties' Stipulation Of The Parties To Undisputed Facts filed May 29, 2009 (docket # 76).

the existence of or the outstanding balance on the Chen Loan until conducting discovery involving the sale of the estate's interest in Shanghai LP because the Debtor did not list it on his schedules. The Trustee has received no payments from Shanghai or anyone else on account of the Chen Loan.

A. *Equity Distributions.*

During the Subject Period, and disregarding management fees and salary payments, $ 20,880 was paid to the Debtor in December, 2005 and $ 17,926.84 more in April 2007. The same amounts were paid to Wong on the same dates, and all four payments were distributions on equity interests in Shanghai LP (the "Partner Distributions"). The Partner Distributions to Debtor were property of the estate, as the estate owns the entirety of Shanghai LLC and Debtor's limited partnership interest in Shanghai LP. **[*7]** Trustee did not prove that Wong's Partner Distributions were on account of her own interest as a limited partner in Shanghai LP.

Debtor attempts to justify his Partnership Distributions on the basis of his apparent belief that Trustee told him after entry of his discharge that he could build the Restaurant. The Trustee did not authorize him to withdraw and keep any Partner Distributions as Debtor never asked Trustee about them.

B. *Payments on the Chen Loan.*

Trustee contends that during the Subject Period the Debtor and Wong caused Shanghai LP to repay the entire balance of the Chen Loan to the Debtor and Wong, in the amount of $ 935,709.98. She maintains that Shanghai had sufficient cash to make those payments from its cash sales to customers. Debtor contends that these payments to him were on account of post-petition loans or alternatively that the Restaurant lacked sufficient cash to make any payments on the Chen Loan. He contends that the Restaurant's outside bookkeeper simply used the Chen Loan Account to post transactions that were not otherwise documented, primarily cash the Restaurant needed to pay weekly to its servers as tips that were given by customers via credit card charges. **[*8]** The bookkeeper, only a few weeks prior to trial, came to realize that cash used to pay those tips to the servers should have been posted as such, rather than shown as advances by Debtor, increasing the Chen Loan. These were described at trial as "unsubstantiated entries." Similarly, she maintains that reductions in the Chen Loan account were not that at all, but were simply incorrect postings.

The Trustee's accounting expert prepared a report that demonstrated that Debtor received transfers during the Subject Period by checks to various payees, including the Debtor, Wong, "cash," and "Shanghai 1930." Some of those payments were debited to sales and sales tax accounts, resulting in a reduction of reported sales.

If the journal entries that resulted in an increase to the Chen Loan account actually reflected reimbursements to the Debtor, such reimbursements would be posted as costs in the "costs of sale" or "operating expenses" accounts.

Although the Chen Loan account balance increased during the Subject Period, the increases were largely based on the unsubstantiated entries made by the bookkeeper on the books. Basically, because she was not aware of the Restaurant's recording of tips, she **[*9]** increased the Chen Loan balance for any otherwise undocumented receipts. Actual restaurant sales were reported to her on a reliable point-of-sale system; credit card receipts, representing 95% of all Restaurant revenues, were greater than reported sales because customers included sales taxes and tips; sales taxes were easily calculated and paid by the bookkeeper, but since she did not know about the tips, she assumed the additional cash came from Debtor and posted it accordingly. In fact, five percent of the Restaurant's sales revenues came from cash-paying customers.

When she had more money on hand than was reported in sales of the Restaurant, the bookkeeper automatically attributed that excess to monies that came from Debtor by posting increases in Account 2300, using it as a balancing account because of the lack of credible documentation. However, the Debtor, Wong nor the bookkeeper provided documents to substantiate such a practice.

Debtor's claims that he advanced monies to the Restaurant post-petition, but he has offered no documentary evidence or entries in the Restaurant's books and records to support that contention. The evidence establishes that what the bookkeeper posted as **[*10]** postpetition payments on the Chen Loan should have been booked as expenses. Further, Trustee's expert examined the records and concluded, convincingly, that Debtor did not make any advances to increase the Chen Loan. They cannot be verified through corresponding bank deposits.

The court is faced with the task of determining whether there were in fact payments to Debtor and/or Wong on

2009 Bankr. LEXIS 3636, *10

the Chen Loan during the Subject Period. On the Trustee's side there is an expert report (Exhibit 14), modified by and adjusted after accepting the bookkeeper's concessions of erroneous postings of unsubstantiated transactions and cash payments (Exhibit 19); on the Debtor's side there is no expert witness, inconclusive and somewhat confusing financial accounting, and capable counsel's creative arguments and speculation about large amounts of unproven tip receipts that do not amount to evidence. On balance, the preponderance of the evidence supports the court's acceptance of the Trustee's accountant's opinion that *at least* $ 729,044.19 of the Chen Loan was paid to Chen or Wong during the Subject Period. The court rejects the Trustee's suggestion that under a last-in, first out theory, Chen should **[*11]** be liable for the entire amount of the prepetition Chen Loan, $ 935,709.98.

At the minimum, Chen is liable to the estate in this amount of repayments of the Chen Loan. As to Wong, the specific evidence alluded to by Trustee's counsel during argument is found in Exhibit 1, p. 1147. There the court notes a total of $ 11,000 paid to Wong and booked as payments on the Chen Loan. As such, Wong had no right to that money, has not proven that she was otherwise entitled to it, and must reimburse the estate for it.

Whether Wong received more than $ 11,000 on the Chen Loan may have been established in the documentary evidence, but the court will not wade through that detailed evidence to find other similar entries to make out the case against Wong. But to the extent the admitted evidence does show similar disbursements, the court will permit the Trustee to point out such disbursements and add them to the amount of Wong's liability, as discussed in the Conclusion to this Memorandum Decision.

Postpetition, the Debtor claims that he has had an ongoing relationship with the Restaurant whereby he purchases wine, restaurant supplies and other merchandise and is reimbursed for it. These "reimbursements" **[*12]** are reflected on the Restaurant's books and records as payments on the Chen Loan. There is no indication to which debt the payment is applied. Accordingly, *HN1*[🔼] when payment is made on an obligation, unless there is some indication to the contrary, the practical and ordinary interpretation must "undoubtedly be that payment is to be applied to the part first coming due to be paid." *Smith v. Renz, 122 Cal. App. 2d 535, 538, 265 P.2d 160 (Cal. App. 1st Dist. 1954)*.

The Petition Date balance of the Chen Loan of $ 935,709.98 is an earlier obligation than any postpetition advances, and therefore any pay-down of the Chen Loan must be credited to the prepetition debt. No logical reason has been offered as to why, in the ordinary course of events, it should be approached in inverse order. Therefore, it must be assumed that if the parties intended to "depart from the ordinary" they would have specifically so provided. *Id.*

Because general credits on open accounts stand as payments on the oldest items of such accounts, the Debtor's contention that the payments made were post-petition reimbursements for post-petition advances is incorrect. *Jessup Farms v. Baldwin, 33 Cal. 3d 639, 190 Cal. Rptr. 355, 660 P.2d 813 (Cal. 1983)*.

The Trustee's counsel **[*13]** asked that all of the amounts repaid Chen Loan during the Subject Period be declared as a joint and several liability of Chen and Wong. Absent facts and law to support such a result, the court will not do that. Wong's liability is limited to distributions to her on the Chen Loan.

### C. *Revocation of Discharge*.

The Debtor was aware of the Chen Loan when he filed his bankruptcy petition, related schedules and statement of financial affairs, but he failed to disclose this substantial debt owed to him. His Schedule B declared no debt owing. It showed $ 228,141.17 in personal property, $ 200,000 of which was stock in an unrelated company that has since been sold. Debtor also knew that payments on the Chen Loan and the Partnership Distributions made during the Subject Period belonged to the estate, but he knowingly failed to report them or turn them over to the Trustee.

Debtor also misled the Trustee when he argued that the estate's interest in Shanghai LLP had a nominal value at best and the Restaurant was operating at a loss when in the same year he and received a Partnership Distribution of $ 17,926.,84, having earlier received a Partnership Distribution of $ 20,880.

*HN2*[🔼]  Property of the estate includes **[*14]** money that a debtor has a right to receive. *In re Crysen/Montenay Energy Co., 902 F.2d 1098, 1101 (2d Cir. 1990)* (debtor's right to collect accounts receivable is "property of the estate"). An outstanding loan that a debtor expects to be repaid is property of the debtor's bankruptcy estate. *In re Martin, 141 B.R. 986, 993 (Bankr. N. D. Ill. 1992)*. The Chen Loan and the right to collect it became property of the Estate as of the

EXHIBIT 7, PAGE 101

2009 Bankr. LEXIS 3636, *14

Petition Date. All payments made on account of that loan prior to the Sale Date, therefore, belonged to the estate. Debtor and Wong had no right to retain the payments on the Chen Loan that they received.

Similarly, the two Partner Distributions to Chen made prior to the Sale Date constituted property of the estate as well and Debtor has no right to retain them.

_HN3_[⬆] The benefit of discharge is reserved for "the honest but unfortunate debtor." _In re Holstein, 299 B.R. 211, 233 (Bankr. N.D. Ill. 2003)_. If _section 727(d)_ is satisfied, the debtor has been less than honest and deserves no discharge. _In re Barr, 207 B.R. 160, 165 (Bankr. N.D. Ill. 1997)_.

_HN4_[⬆] To warrant revocation under _section 727(d)_, the Trustee must show that (1) such discharge was obtained through the fraud **[*15]** of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge; (2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee. _11 U.S.C. § 727(d)(1)-(2)_.

Debtor failed to report the Chen Loan on his schedules when his petition was filed and at no point did he amend his schedules to reflect the debt. The evidence shows that the Trustee did not learn of the Chen Loan until it was revealed in through discovery in 2007. This was after the court discharged the Debtor. By then, a substantial portion of the Chen Loan outstanding as of Petition Date had already been paid to the Debtor. Debtor also made no attempt to disclose the 2005 and 2007 Partnership Distributions he received. These facts establish all the necessary elements under both _Sections 727(d)(1)_ and _(2)_.

The Debtor possessed the necessary intent because he procured his discharge by "fraud" or that he "knowingly and fraudulently" failed to schedule the **[*16]** debt, report the payments or deliver the monies to the Trustee. _HN5_[⬆] _Section 727(d)_ does not require direct evidence of intent.

The Debtor's fraudulent intent is clear from the fact that he was aware of the omitted assets and knew his failure to list the assets could seriously mislead the Trustee; in the alternative, Debtor acted so recklessly in not reporting the asset that fraud is implied.

Based on the behavior of the Debtor, his discharge should be revoked pursuant to _Section 727(d)_.

_IV. CONCLUSION._

Trustee is entitled to a judgment on the second claim for relief against Debtor in the amount of $ 729,044.19 (for repayments of the Chen Loan) and $ 38,806.84 (for the Partnership Distributions), plus costs. She is entitled to judgment against Wong in the amount of at least $ 11,000, plus costs.

At the time her counsel submits a form of judgment he may also submit (without argument) a list of citations to the appropriate exhibit number, page and entries where additional payments on the Chen Loan to Wong have been documented. The list should include a total dollar amount Trustee contends the judgment against Wong should be. Counsel for Wong will then have ten days to file a designation (also **[*17]** without argument) of any of the Trustee's citations to the record he believes do not show a payment to Wong on the Chen Loan. The court will determine whether Trustee is entitled to a judgment against Wong in excess of $ 11,000.

On the third claim for relief, Trustee is entitled to a judgment revoking Chen's discharge.

Counsel for the Trustee should submit and serve in accordance with _B.L. R. 9021-1_ a form of final judgment consistent with the foregoing and for the reasons stated in this Memorandum Decision (with the amount to be awarded against Wong left blank so the court may insert an amount) and consistent with the court's denial of the motion to reconsider the grant of summary judgment in her favor on the first claim for relief.

**Signed and Filed: November 09, 2009**

/s/ Dennis Montali

**DENNIS MONTALI**

**U.S. Bankruptcy Judge**

_End of Document_

Layla Buchanan

EXHIBIT 7, PAGE 102

**EXHIBIT 8**



**User Name:** Layla Buchanan

**Date and Time:** Thursday, February 9, 2023 6:49:00PM PST

**Job Number:** 190002731

## Document (1)

1.  *Zeeb v. Farah (In re Zeeb), 2019 Bankr. LEXIS 2477*

    **Client/Matter:** 1673-001

    **Search Terms:** 2019 Bankr.LEXIS 2477

    **Search Type:** Natural Language

    **Narrowed by:**

    | Content Type | Narrowed by |
    |---|---|
    | Cases | -None- |

➕ Positive
As of: February 10, 2023 2:49 AM Z

# *Zeeb v. Farah (In re Zeeb)*

United States Bankruptcy Appellate Panel for the Ninth Circuit

July 18, 2019, Argued and Submitted at Pasadena, California; August 9, 2019, Filed

BAP No. CC-19-1019-SKuTa

**Reporter**
2019 Bankr. LEXIS 2477 *; 2019 WL 3778360

In re: KAMAL ZEEB, Debtor.KAMAL ZEEB, Appellant, v. SAMUEL FARAH, Appellee.

**Notice:** This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, see *Fed. R. App. P. 32.1*, it has no precedential value. See 9th Cir. BAP Rule 8024-1.

**Subsequent History:** Affirmed by *Zeeb v. Farah (In re Zeeb), 2020 U.S. App. LEXIS 21411 (9th Cir., July 9, 2020)*

**Prior History: [*1]** Appeal from the United States Bankruptcy Court for the Central District of California. Bk. No. 8:13-bk-14883-CB, Adv. No. 8:13-ap-01301-CB. Honorable Catherine E. Bauer, Bankruptcy Judge, Presiding.

## Core Terms

bankruptcy court, damages, state court, conversion, breach of contract, conversion claim, issue preclusion, cause of action, nondischargeability, inventory, amended judgment, malicious, willful, conversion cause, punitive damages, award damages, jury award, prevailed, summary judgment, no damage, compensatory, duplicative, warehouse, tortious conduct, preclusive, tortious, parties, breach of contract claim, public policy, zero damages

## Case Summary

### Overview

HOLDINGS: [1]-Given the conflict between the award of no damages on the one hand, and the finding of harm and entry of judgment on the conversion claims on the other, issue preclusion did not prevent the bankruptcy court from determining damages in the nondischargeability action; [2]-Evidence was sufficient to support the bankruptcy court's inferences regarding willfulness, pursuant to *11 U.S.C.S. § 523(a)(6)*, because while the parties presented conflicting evidence, debtor simply had not persuaded the instant court that the bankruptcy court's inference of willfulness was illogical, implausible, or unreasonable on the record.

**Outcome**
Judgment affirmed.

## LexisNexis® Headnotes

Bankruptcy Law > ... > Judicial Review > Standards of Review > Abuse of Discretion

Civil Procedure > ... > Preclusion of Judgments > Estoppel > Collateral Estoppel

Bankruptcy Law > ... > Judicial Review > Standards of Review > Clear Error Review

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

*HN1*[⬇]  **Standards of Review, Abuse of Discretion**

Where a bankruptcy court enters its judgment after trial, the appellate court reviews the bankruptcy court's findings of fact for clear error, and its conclusions of law de novo. The bankruptcy court's factual findings are clearly erroneous if they are illogical, implausible, or without support in the record. An appellate court also reviews de novo the bankruptcy court's determination as to whether the threshold elements for the application of issue preclusion have been satisfied. When a court engages in de novo review, it considers the matter anew, as if the bankruptcy court did not address it.

2019 Bankr. LEXIS 2477, *1

When issue preclusion is available, an appellate court reviews the bankruptcy court's decision whether to apply it for an abuse of discretion. The bankruptcy court abuses its discretion when it applies the wrong rule of law, misapplies the correct rule of law, or if its factual findings are illogical, implausible, or without support in the record.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Malicious & Willful Injury

*HN2*[ ]  **Exceptions to Discharge, Malicious & Willful Injury**

Generally speaking, *11 U.S.C.S. § 523(a)(6)* excepts from discharge debts arising from willful and malicious injuries to the creditor or the creditor's property. A debtor's conduct is willful if he or she had a subjective intent to harm or subjectively believed that harm was substantially certain to occur as a result of his or her conduct. As for maliciousness: a malicious injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse. Though the requirements for proving a willful and malicious injury are simple enough, application of the statute is not always so straightforward.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Malicious & Willful Injury

*HN3*[ ]  **Exceptions to Discharge, Malicious & Willful Injury**

To properly apply *11 U.S.C.S. § 523(a)(6)* to a debt, the injury from which the debt arises not only must be willful and malicious but also tortious. More specifically, a debt arising from a breach of contract can qualify as nondischargeable only under certain circumstances. The breach of contract must be accompanied by malicious and willful tortious conduct. A debtor's conduct is intentionally tortious if that conduct would constitute an intentional tort under state law.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Malicious & Willful Injury

*HN4*[ ]  **Exceptions to Discharge, Malicious & Willful Injury**

There are at least two relevant ways a creditor may take a judgment consisting of damages for breach of contract and prove that it is nondischargeable under *11 U.S.C.S. § 523(a)(6)*. The first would be to establish that the breach of contract also constituted a tort such as conversion that the debtor undertook willfully and maliciously within the meaning of *§ 523(a)(6)*. In California, the elements of a conversion are the creditor's ownership or right to possession of the property at the time of the conversion; the debtor's conversion by a wrongful act or disposition of property rights; and damages. Damages from conversion in California need not be from a willful or malicious injury, so a creditor seeking to except a debt from discharge under *§ 523(a)(6)* must also prove that the conversion was undertaken willfully and maliciously. Alternatively, the creditor could prove a tortious breach of contract. But to do so, the creditor would need to show not only tortious conduct, but also that the debtor's conduct violated a fundamental public policy of the state.

Civil Procedure > ... > Preclusion of Judgments > Estoppel > Collateral Estoppel

Civil Procedure > Judgments > Preclusion of Judgments > Full Faith & Credit

*HN5*[ ]  **Estoppel, Collateral Estoppel**

Under full faith and credit principles, bankruptcy courts must give state court judgments the same issue preclusive effect that the state court would give them.

Civil Procedure > ... > Preclusion of Judgments > Estoppel > Collateral Estoppel

*HN6*[ ]  **Estoppel, Collateral Estoppel**

When applicable and appropriate, issue preclusion can be applied in nondischargeability actions. In California, issue preclusion prevents parties from relitigating issues already decided in prior proceedings. For issue preclusion to apply to a California judgment, five elements must be met: (1) identical issues decided in the prior proceeding; (2) the issues were actually litigated; (3) the issues were necessarily decided; (4) the prior proceeding ended in a final decision on the merits;

2019 Bankr. LEXIS 2477, *1

and (5) the party to be precluded must be identical to or in privity with a party in the prior proceeding. Even when the threshold elements are satisfied, this means only that issue preclusion is "available." The decision to apply issue preclusion to a California judgment is discretionary. In exercising that discretion, the bankruptcy court is obliged to consider whether application would advance one or more of the policy considerations underlying issue preclusion: preservation of the integrity of the judicial system, promotion of judicial economy, and protection of parties from vexatious litigation.

Civil Procedure > ... > Preclusion of Judgments > Estoppel > Collateral Estoppel

*HN7*[🔽] **Estoppel, Collateral Estoppel**

The party asserting issue preclusion bears the burden to establish the threshold requirements. Thus, the proponent must provide a record sufficient to reveal the controlling facts and pinpoint the exact issues litigated in the prior action. Ultimately, any reasonable doubt as to what was decided by a prior judgment should be resolved against allowing the issue preclusive effect.

Business & Corporate Compliance > ... > Contracts Law > Breach > Breach of Contract Actions

*HN8*[🔽] **Breach, Breach of Contract Actions**

A breach of contract is not considered tortious unless the breach violated some independent duty under state tort law and also violated state public policy.

Civil Procedure > Appeals > Appellate Briefs

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN9*[🔽] **Appeals, Appellate Briefs**

Issues not specifically and distinctly argued in appellant's opening appeal brief are forfeited.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to

Discharge > Malicious & Willful Injury

*HN10*[🔽] **Exceptions to Discharge, Malicious & Willful Injury**

*11 U.S.C.S. § 523(a)(6)*'s willful injury requirement requires proof of a subjective intent to injure or a subjective belief that injury is substantially certain to occur. But the debtor is charged with the knowledge of the natural consequences of his actions. And, in addition to what the debtor might admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action.

**Counsel:** Andrew Edward Smyth argued for appellant.

Jeffrey Valentine Weber of Briggs and Alexander, APC argued for appellee.

**Judges:** Before: SPRAKER, KURTZ, and TAYLOR, Bankruptcy Judges.

# Opinion

### MEMORANDUM

### INTRODUCTION

This is the third time we have considered an appeal arising from the above-referenced adversary proceeding. We dismissed chapter 7[1] debtor Kamal Zeeb's first appeal as interlocutory because the summary judgment on appeal only addressed and disposed of creditor Samuel Farah's *§ 523(a)(6)* claim ("*Zeeb I*"). After our dismissal, the parties stipulated to dismiss all other claims for relief set forth in Farah's complaint. In Zeeb's second appeal, we vacated the summary judgment in an unpublished memorandum decision. *Zeeb v. Farah (In re Zeeb), BAP No. CC-15-1012-FKiKu, 2015 Bankr. LEXIS 3765, 2015 WL 6720934 (9th Cir. BAP Nov. 3, 2015)* ("*Zeeb II*"). We held in *Zeeb II* that Farah's state court judgment did not establish the willfulness and maliciousness required for

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, *11 U.S.C. §§ 101-1532*, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

non-dischargeability under *§ 523(a)(6)*.

Zeeb now appeals the bankruptcy court's judgment after trial excepting the debt he owes to Farah from [*2] discharge under *§ 523(a)(6)*. The two arguments Zeeb raises on appeal have no merit. Zeeb first argues that the state court jury's award of zero damages on the conversion cause of action conclusively established that Farah suffered no damages from the tortious conduct. We disagree. Though the jury awarded Farah no damages on his conversion claims, it also found that he had proven all the elements of conversion, including harm. Moreover, the state court ultimately entered judgment for Farah on his conversion claims. Given the conflict between the award of no damages on the one hand, and the finding of harm and entry of judgment on the conversion claims on the other, issue preclusion did not prevent the bankruptcy court from determining damages in the nondischargeability action.

Zeeb's second argument concerns the sufficiency of the evidence before the bankruptcy court. He contends that the evidence was insufficient to support a finding that he willfully injured Farah within the meaning of *§ 523(a)(6)*. Again, we disagree. The trial record, when combined with the state court jury's findings regarding Zeeb's conduct in misappropriating inventory and cash from Farah's company, was sufficient to support the bankruptcy [*3] court's inferences regarding willfulness.

Accordingly, we AFFIRM.

**FACTS**

Farah and Zeeb worked together in two businesses: Storm Distribution, Inc. ("Storm Distribution") and JSSA Enterprises, Inc. ("JSSA"). Both businesses concerned the importation and sale of hookahs and related accessories. Farah managed the sales and accounts, while Zeeb managed the facilities and employees. Farah claimed Storm Distribution as his wholly owned business. JSSA was a partnership between Farah, Zeeb, and Ahmed Shamekh.

When Farah traveled abroad for a vacation in September 2010, he left Zeeb in charge of all aspects of Storm Distribution. According to Farah, while he was traveling Zeeb misappropriated the inventory and cash of both Storm Distribution and JSSA. Farah sued Zeeb and others in the Superior Court for Orange County, California. Farah's first amended complaint stated thirteen causes of action, but only four of the causes of action are relevant to this appeal. Farah stated two

causes of action for conversion — one pertaining to Storm Distribution and the other to JSSA — and two corresponding causes of action for breach of contract. All four of these causes of action relied on the allegations that [*4] Zeeb misappropriated the assets of Storm Distribution and JSSA as the grounds for relief.

In May 2013, the state court held a jury trial on Farah's first amended complaint. The jury rendered a special verdict that found, in relevant part, that Farah and Zeeb entered into a contract pursuant to which Zeeb agreed to oversee Storm Distribution. The jury also found that Zeeb breached that contract, which caused Farah to suffer $330,514.25 in damages. As for the conversion cause of action pertaining to Storm Distribution, the jury found that:

1. Farah had a right to possess Storm Distribution's inventory and funds.
2. Zeeb intentionally and substantially interfered with Farah's property by taking possession of Storm Distribution's inventory and funds.
3. Farah did not consent to Zeeb's taking possession.
4. Farah was harmed thereby.
5. Zeeb's conduct was a substantial factor in causing Farah's harm.
6. As a result of that harm, Farah suffered $0 in damages.
7 Zeeb engaged in the conduct with malice, oppression or fraud.
8. Farah was entitled to a punitive damages award of $50,000.

The jury's breach of contract and conversion findings pertaining to JSSA were substantially similar to the above-referenced [*5] findings, except that the jury awarded $101,091.45 in compensatory damages for the breach of contract pertaining to JSSA.

Zeeb filed his chapter 7 case in June 2013. In August 2013, the bankruptcy court granted Farah relief from stay to enter judgment in the state court action. Notwithstanding the jury verdict awarding punitive damages, the state court entered a minute order striking the jury's punitive damages awards. The state court reasoned, in part, that the jury had not awarded Farah any tort damages. As the state court explained:

> The Special Verdict and the evidence do not support an award for punitive damages. CC *3294(a)* provides for punitive damages "In an action for the breach of an obligation not arising from contract." Plaintiff's success on the breach of

2019 Bankr. LEXIS 2477, *5

contract action does not support punitive damages. Plaintiff must prove compensatory tort damages to support [punitive] damages. Additionally, Plaintiff did not introduce evidence of defendant's financial condition. *See Simon v. San Paolo U.S. Holding Co., Inc. (2009) 35 Cal. 4th 1159, 1185, 29 Cal. Rptr. 3d 379, 113 P.3d 63*. Without this evidence the jury cannot calculate a proper award of punitive damages.

*Zeeb II, 2015 Bankr. LEXIS 3765, 2015 WL 6720934, at *2* (quoting Minute Order, Orange Cnty. Sup. Ct. Case No. 30-2011-00529564-CU-NP-CJC (Sept. 9, 2013)).

Because the jury verdict **[*6]** did not award Farah any compensatory tort damages, the state court's original judgment entered in September 2013 provided that judgment was not awarded on the conversion causes of action. The state court originally entered judgment against Farah and in favor of Zeeb on the conversion claims.

On September 16, 2013, Farah commenced his adversary proceeding seeking, among other things, to except the judgment debts from discharge under *§ 523(a)(6)*. Farah also filed a motion in the state court to amend the underlying judgment to recognize that he had prevailed on the conversion claims. The state court agreed with Farah. In February 2014, the state court entered a minute order granting Farah's motion to amend the judgment. The state court held that Farah was the "prevailing party" on both conversion causes of action even though the jury verdict and the judgment awarded him $0 in damages on those causes of action.

The state court entered its amended judgment in February 2014. The amended judgment provided in relevant part as follows:

1. On the cause of action for breach of contract regarding Storm Distribution by Samuel Farah against Kamal Zeeb judgment is awarded in favor of Samuel Farah against Kamal **[*7]** Zeeb in the amount of $330,514.24[.]
3. On the cause of action for conversion regarding Storm Distribution by Samuel Farah against Kamal Zeeb, including a prayer for punitive damages, judgment is awarded in favor of Samuel Farah against Kamal Zeeb in the amount of $0.00 in compensatory damages and $0.00 in punitive damages.
4. On the cause of action for breach of contract regarding JSSA Enterprises, Inc. by Samuel Farah against Kamal Zeeb and against Zeeb Brothers,

Inc. judgment is awarded in favor of Samuel Farah jointly and severally against Kamal Zeeb and against Zeeb Brothers, Inc. in the amount of $101,091.45[.]
6. On the cause of action for conversion regarding JSSA Enterprises, Inc. by Samuel Farah against Kamal Zeeb and against Zeeb Brothers, Inc., including a prayer for punitive damages, judgment is awarded in favor of Samuel Farah jointly and severally against Kamal Zeeb and against Zeeb Brothers, Inc. in the amount of $0.00 in compensatory damages and $0.00 in punitive damages.

7. Pursuant to the election of remedies, Samuel Farah has elected to take the remedies awarded under breach of contract. The aggregate judgment award to Samuel Farah, therefore, is $431.605.69, of which **[*8]** the entire amount is enforceable against Kamal Zeeb and of which $10l,091.45 is enforceable against Zeeb Brothers, Inc.

In May 2014, Farah moved for summary judgment in the nondischargeability action. He argued that the state court judgment conclusively established that Zeeb had willfully and maliciously injured him within the meaning of *§ 523(a)(6)*. The bankruptcy court agreed with Farah and entered summary judgment on his *§ 523(a)(6)* claim for relief. On appeal, however, we vacated the summary judgment in favor of Farah. We held that, as a matter of settled Ninth Circuit law, the preclusive effect of the state court's conversion judgment did not establish the requisite mental state for finding a willful injury under *§ 523(a)(6)*. We also held that the conversion judgment did not establish three of the four elements necessary to establish a malicious injury. As for the effect of the award of $0 in conversion damages, we stated:

Mr. Zeeb argues that the jury's award of zero dollars necessarily means that the jury did not find for Mr. Farah on the conversion claims. The fact that the judgment is for zero dollars on the conversion claims raises the question of whether there is in fact a "debt" that could be nondischargeable. **[*9]** However, the bankruptcy court did not address this question, and the parties only tangentially raised this issue in their briefs. We make no determination on this question and will leave it for the bankruptcy court to consider on remand.

*Zeeb II, 2015 Bankr. LEXIS 3765, 2015 WL 6720934, at *5 n.5*

2019 Bankr. LEXIS 2477, *9

On remand, the bankruptcy court held a one-day bench trial.[2] The court took direct testimony by declaration. Farah's testimony was consistent with the allegations he made in his state court complaint. Farah testified that, in September 2010, he was the sole owner of Storm Distribution, which sold hookahs and hookah-related accessories. According to Farah, Storm Distribution stored its inventory in a warehouse in Anaheim, California. Farah further testified that Zeeb worked for him as a manager of Storm Distribution. When Farah took his overseas vacation in September 2010, he left Zeeb in charge of all aspects of this business. However, Farah maintained, soon after he left the country, Zeeb removed all of the inventory from the Storm Distribution warehouse and removed all of the cash from Storm Distribution's bank accounts. Farah also maintained that Zeeb removed these items and used them for his own purposes, rather than for Storm Distribution's business, **[*10]** without Farah's knowledge or consent. Farah concluded that, as a result of his loss of Storm Distribution's inventory and cash, he was forced to close this business down.

As for JSSA, Farah testified that he invested $101,091.45 in JSSA consisting of cash and inventory. According to Farah, during his September 2010 vacation, Zeeb wrongfully took all of JSSA's inventory and other assets and used them for his own purposes rather than for JSSA's business. Farah maintained that, as a result of Zeeb's actions, he lost the full value of his $101,091.45 investment.

The court also heard the testimony of Fasi Ali Khan, who worked in Storm Distribution's warehouse in 2010. He testified that, while Farah was out of the country in September 2010, Zeeb was left in charge of Storm Distribution. According to Khan, shortly after Farah left the country, Zeeb contacted Khan and asked him to help move all of the inventory in the Storm Distribution warehouse to a location in downtown Los Angeles. In accordance with Zeeb's request, Khan stated that he helped move the inventory, which he only later learned was moved without Farah's knowledge or consent. Around the same time, Khan started receiving calls on **[*11]** the warehouse telephone from bill collectors indicating that Storm Distribution's bills were not being paid, including its rent payments for the warehouse. According to Khan, when he asked Zeeb about the unpaid bills and the rent payments, Zeeb told him it was

not Zeeb's problem and he did not care because the warehouse was not in his name.

Zeeb's testimony told a different story. Zeeb claimed that he and Farah were business partners in Storm Distribution and that it was agreed between them that Storm Distribution's inventory could be "marketed" from whatever outlet they chose. He further claimed that all transfers and transactions he made were in furtherance of his partnership agreement. But he never specifically said that Farah agreed that all of Storm Distribution's inventory should be moved prior to sale or stored somewhere else.

After trial, the bankruptcy court issued a statement of decision. The court held that Farah was entitled to a judgment excepting Zeeb's debt from discharge under *§ 523(a)(6)*. In support of that holding, the court recognized the state court's amended judgment and then found that Zeeb's conduct was both willful and malicious within the meaning of *§ 523(a)(6)*. The bankruptcy court **[*12]** more specifically found with respect to Storm Distribution that, in late 2010, while Farah was out of the country, he left Zeeb in charge. According to the court, without Farah's knowledge, Zeeb moved substantially all of Storm Distribution's inventory to various stores in downtown Los Angeles. And he wrote checks on Storm Distribution's bank account to himself or to cash. Based on these facts, the court determined that "Debtor had to know and believe that what he had done was substantially certain to cause Farah to lose his businesses and his Money." Statement of Decision after Trial (Dec. 21, 2018) at 6:4-5.

During trial, Zeeb argued that the state court award of zero damages on Farah's conversion causes of action precluded the bankruptcy court from excepting the debt from discharge under *§ 523(a)(6)*. The bankruptcy court rejected this argument. In its recitation of facts, the court emphasized that Farah had elected to recover on his contract claim. The bankruptcy court then explained:

> Debtor's counsel makes much of the fact that the Amended Judgment had awards of $0 on the causes of action for conversion. He claims that the lack of money awards on the conversion causes of action means this Court **[*13]** cannot find in favor of Farah in this action. This argument has no merit. The Amended Judgement [sic] did rule in favor of Farah on the conversion causes of action on the merits. The fact that Farah **chose** to receive the damage awards under breach of contract was merely for the sake of avoiding duplicative awards

---

[2] After our remand, Farah filed a second summary judgment motion, which the bankruptcy court denied. The denial of that motion is beyond the scope of this appeal.

2019 Bankr. LEXIS 2477, *13

of damages. Farah could have elected damages pursuant to the conversion causes of action.

Statement of Decision after Trial (Dec. 21, 2018) at 6:11-14. (Emphasis in original).

On January 24, 2019, the bankruptcy court entered judgment excepting from discharge under *§ 523(a)(6)* the state court judgment debt in the amount of $431,605.69. Zeeb timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to *28 U.S.C. §§ 1334* and *157(b)(2)(I)*. We have jurisdiction under *28 U.S.C. § 158*.

## ISSUES

1. Did issue preclusion bar the bankruptcy court from determining that Zeeb's debt arose from tortious conduct?

2. Was there sufficient evidence to support the bankruptcy court's finding that Zeeb willfully injured Farah?

## STANDARDS OF REVIEW

*HN1*[↑] "Because the bankruptcy court entered its judgment after trial, we review the bankruptcy court's findings of fact for clear error, and its conclusions of law de novo." *Thiara v. Spycher Brothers (In re Thiara), 285 B.R. 420, 426-427 (9th Cir. BAP 2002)* (citing *Carrillo v. Su (In re Su), 290 F.3d 1140, 1142 (9th Cir. 2002))*. The bankruptcy court's **[*14]** factual findings are clearly erroneous if they are illogical, implausible, or without support in the record. *United States v. Hinkson, 585 F.3d 1247, 1261-62 & n.21 (9th Cir. 2009)* (en banc).

We also review de novo the bankruptcy court's determination as to whether the threshold elements for the application of issue preclusion have been satisfied. *Plyam v. Precision Dev., LLC (In re Plyam), 530 B.R. 456, 461 (9th Cir. BAP 2015)*. When we engage in de novo review, we consider the matter anew, as if the bankruptcy court did not address it. *Francis v. Wallace (In re Francis), 505 B.R. 914, 917 (9th Cir. BAP 2014)*.

When issue preclusion is available, we review the bankruptcy court's decision whether to apply it for an abuse of discretion. *In re Plyam, 530 B.R. at 461*. The bankruptcy court abuses its discretion when it applies the wrong rule of law, misapplies the correct rule of law, or if its factual findings are illogical, implausible, or without support in the record. *See TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 832 (9th Cir.2011)* (citing *Hinkson, 585 F.3d at 1262*).

## DISCUSSION

In *Zeeb II*, we set forth at length the legal principles governing nondischargeability under *§ 523(a)(6)* and the doctrine of issue preclusion. We reiterate a number of these principles here to emphasize their importance to our decision.

### A. Nondischargeability Under *§ 523(a)(6)*.

*HN2*[↑] Generally speaking, *§ 523(a)(6)* excepts from discharge debts arising from willful and malicious injuries to the creditor or the creditor's property. *In re Plyam, 530 B.R. at 463*. A debtor's conduct is willful if he or she had a subjective **[*15]** intent to harm or subjectively believed that harm was substantially certain to occur as a result of his or her conduct. *In re Su, 290 F.3d at 1144-45*. As for maliciousness: "a 'malicious' injury involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'" *Id. at 1146-47* (citations omitted). Though the requirements for proving a willful and malicious injury are simple enough, application of the statute is not always so straightforward.

For instance, *HN3*[↑] to properly apply *§ 523(a)(6)* to a debt, the injury from which the debt arises not only must be willful and malicious but also tortious. *Lockerby v. Sierra, 535 F.3d 1038, 1040-41 (9th Cir. 2008)* (citing *Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1205 (9th Cir. 2001))*. More specifically, a debt arising from a breach of contract can qualify as nondischargeable only under certain circumstances. *Lockerby, 535 F.3d at 1040-41*. The breach of contract must be "accompanied by malicious and willful tortious conduct." *Id. at 1040* (citing *In re Jercich, 238 F.3d at 1205*) [emphasis omitted]. A debtor's conduct is intentionally tortious if that conduct would constitute an intentional tort under state law. *Id. at 1041-42*.

*HN4*[↑] There are at least two relevant ways a creditor may take a judgment consisting of damages for breach of contract and prove that it is nondischargeable under *§ 523(a)(6)*. The first would be to establish **[*16]** that the

2019 Bankr. LEXIS 2477, *16

breach of contract also constituted a tort such as conversion that the debtor undertook willfully and maliciously within the meaning of *§ 523(a)(6)*. *See In re Thiara, 285 B.R. at 430-32* (citing *Del Bino v. Bailey (In re Bailey), 197 F.3d 997, 1000 (9th Cir. 1999))*. In California, "[t]he elements of a conversion are the [creditor's] ownership or right to possession of the property at the time of the conversion; the [debtor's] conversion by a wrongful act or disposition of property rights; and damages." *Farmers Ins. Exch. v. Zerin, 53 Cal. App. 4th 445, 451, 61 Cal. Rptr. 2d 707 (1997)*. As we explained in *Zeeb II*, damages from conversion in California need not be from a willful or malicious injury, so a creditor seeking to except a debt from discharge under *§ 523(a)(6)* must also prove that the conversion was undertaken willfully and maliciously. *Zeeb II, 2015 Bankr. LEXIS 3765, 2015 WL 6720934 at *5-6*.

Alternatively, the creditor could prove a "tortious breach of contract." But to do so, the creditor would need to show not only tortious conduct, but also that the debtor's conduct violated "a **fundamental public policy** of the state." *Coastal Indus. Partners, LLC v. Lawson (In re Lawson), BAP No. NC-14-1153-TaPaJu, 2015 Bankr. LEXIS 905, 2015 WL 1291366, at *4 (9th Cir. BAP Mar. 20, 2015)* (quoting *In re Jercich, 238 F.3d at 1206*) (emphasis supplied by *In re Lawson*).


**B. Issue Preclusion**.

Zeeb does not challenge the amended judgment. In fact, he cannot. *HN5*[⬆] Under full faith and credit principles, bankruptcy courts must give state court judgments the same **[*17]** issue preclusive effect that the state court would give them. *Harmon v. Kobrin (In re Harmon), 250 F.3d 1240, 1245 (9th Cir. 2001)* (citing *28 U.S.C. § 1738*). Instead, Zeeb contends that because the jury awarded Farah no damages on the conversion claims, Farah was precluded from relitigating his damages in the nondischargeability action. As Zeeb points out, damages are an essential element of Farah's conversion causes of action. *Zerin, 53 Cal. App. 4th at 451*. Without damages, Zeeb maintains, Farah cannot prove the underlying conversion claim necessary to prevail under *§ 523(a)(6)*.[3] And herein lies the problem

with Zeeb's preclusion argument; the jury awarded Farah zero damages, but at the same time it specifically found all of the elements for conversion, including harm. To determine the effect of the amended state court judgment, we begin with the elements of issue preclusion.

*HN6*[⬆] When applicable and appropriate, issue preclusion can be applied in nondischargeability actions. *Grogan v. Garner, 498 U.S. 279, 284-85, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991)*. "In California, issue preclusion prevents parties from relitigating issues already decided in prior proceedings." *Zeeb II, 2015 Bankr. LEXIS 3765, 2015 WL 6720934, at *4* (citing *Lucido v. Super. Ct., 51 Cal.3d 335, 341, 272 Cal. Rptr. 767, 795 P.2d 1223 (1990))*. For issue preclusion to apply to a California judgment, five elements must be met: (1) identical issues decided in the prior proceeding; (2) the issues were actually litigated; (3) the issues were necessarily decided; **[*18]** (4) the prior proceeding ended in a final decision on the merits; and (5) the party to be precluded must be identical to or in privity with a party in the prior proceeding. *Lucido, 51 Cal.3d at 341*.

Even when the threshold elements are satisfied, this means only that issue preclusion is "available." The decision to apply issue preclusion to a California judgment is discretionary. In exercising that discretion, the bankruptcy court is obliged to consider whether application would advance one or more of the policy considerations underlying issue preclusion: preservation of the integrity of the judicial system, promotion of judicial economy, and protection of parties from vexatious litigation. *Id. at 342-43*; *see also Khaligh v. Hadaegh (In re Khaligh), 338 B.R. 817, 824-25 (9th Cir. BAP 2006), aff'd, 506 F.3d 956 (9th Cir. 2007)* (there is an "'additional' inquiry into whether imposition of issue preclusion in the particular setting would be fair and consistent with sound public policy.").

*HN7*[⬆] The party asserting issue preclusion bears the burden to establish the threshold requirements. *In re Harmon, 250 F.3d at 1245* (citing *Lucido, 51 Cal. 3d at 341*). Thus, the proponent must provide "a record sufficient to reveal the controlling facts and pinpoint the

---

[3] Citing Civil *Rule 8(c)* and *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 350, 91 S. Ct. 1434, 28 L. Ed. 2d 788 (1971)*, Farah argues that defensive issue preclusion is an affirmative defense that must be plead or is deemed waived. Farah thus contends that Zeeb waived his issue preclusion

defense. Assuming without deciding that issue preclusion based on a prior state court judgment must be plead as an affirmative defense, the bankruptcy court nonetheless considered the merits of the defense and substantively rejected it. Because Farah did not file a cross-appeal, we decline to consider whether the court erred in considering the merits of Zeeb's issue preclusion argument.

exact issues litigated in the prior action." *Kelly v. Okoye (In re Kelly), 182 B.R. 255, 258 (9th Cir. BAP 1995)*, *aff'd*, *100 F.3d 110 (9th Cir. 1996)*. Ultimately, "[a]ny reasonable doubt as to what was decided by a prior judgment **[*19]** should be resolved against allowing the [issue preclusive] effect." *Id.*; *see also In re Khaligh, 338 B.R. at 825* ("[T]he proponent bears the risk of nonpersuasion.").

To start with, the bankruptcy court was required to discern what exactly was decided by the state court judgment, and then to give it effect. Obviously, there is no dispute that the jury awarded Farah zero dollars on his conversion claims. Standing alone, the jury's award of no damages for the conversion claims could reasonably be viewed as a determination that Farah did not suffer any damages from the conversion. However, this finding does not stand alone. Rather, it is directly at odds with the jury's specific finding that Zeeb's conversion harmed Farah. Zeeb's construction of the amended judgment is also contrary to the state court's amended judgment holding that Farah prevailed on his conversion claims.

The bankruptcy court rejected Zeeb's interpretation of the jury's findings and the amended judgment. Rather than construing the award of zero damages on the conversion causes of action as evidence that Farah suffered no damages, the bankruptcy court determined that the jury awarded zero damages simply to avoid an award of duplicative damages for **[*20]** different causes of action based on the same conduct. This finding is supported by the state court's jury instructions on this issue. The state court gave the jury the following instruction, which was included in one or more of Farah's requests for judicial notice filed in the bankruptcy court:

> Samuel Farah has made claims against Kamal Zeeb . . . and Zeeb Brothers, Inc., for breach of contract and the torts of conversion and fraud. If you decide that Samuel Farah has proved both the contract and at least one tort claim, the same damages that resulted from these claims can be awarded only once.

*Pl.'s Req. For Jud. Notice (July 1, 2014) at p. 5 of 6.*[4]

---

[4] The above-quoted jury instruction apparently is derived from the first paragraph of a form jury instruction used in California civil trials. Judicial Council Of California Civil Jury Instruction ("CACI") *3934* provides basic instruction to jurors when the plaintiff seeks "damages on multiple legal theories." The first paragraph of *CACI 3934* provides:

We find no error in the bankruptcy's court's construction of the amended judgment. It is consistent with the jury's specific findings on the conversion claims. Indeed, it is the only view that reconciles the otherwise contradictory actions by the jury and state court, culminating with entry of the amended judgment holding that Farah prevailed **[*21]** on his conversion claims. Zeeb's interpretation of the amended judgment cannot be reconciled with the jury's specific findings and the amended judgment. It would require the bankruptcy court to elevate one finding over another, while ignoring the jury instruction on double recovery and the state court's determination that Farah had prevailed on his conversion claims.

Given the conflicting interpretations of the jury's decision, Zeeb failed to prove each of the elements necessary for issue preclusion. The parties actually litigated Farah's conversion claims, and the jury necessarily decided that Zeeb converted Farah's property. In doing so, the jury necessarily, and specifically, found that the conversion *harmed* Farah. But the jury had already awarded damages to Farah under his breach of contract claim. Given the jury instruction that it could only award damages once, it became unnecessary that the jury *award* damages on Farah's conversion claims.

This lead the bankruptcy court to find that the "damage awards under breach of contract was [sic] merely for the sake of avoiding duplicative awards of damages." The court's finding is well supported in the record, and is the only one that reconciles **[*22]** the jury's findings and the amended judgment. Accordingly, the issue of conversion damages was not necessarily decided by the state court judgment because the jury had awarded damages for breach of contract. Nor was the issue of the conversion damages identical to the issue before the bankruptcy court in the nondischargeability case as the jury was instructed not to award duplicative damages.

This case is strikingly analogous to *In re Lawson, 2015 Bankr. LEXIS 905, 2015 WL 1291366*. In *Lawson*, the creditor obtained a state court judgment confirming an arbitration award of damages for breach of contract,

---

[Name of plaintiff] seeks damages from [name of defendant] under more than one legal theory. However, each item of damages may be awarded only once, regardless of the number of legal theories alleged.

*CACI 3934*.

2019 Bankr. LEXIS 2477, *22

fees and costs, and conversion. The underlying acts were the same for both causes of action. *2015 Bankr. LEXIS 905, [WL] at *2*. The judgment awarded separate damages for each cause of action; roughly $92,000 for breach of contract together with $72,000 in fees and costs, and $51,000 for conversion. *2015 Bankr. LEXIS 905, [WL] at *3*.

After the debtor filed for bankruptcy, the creditor sought to except from discharge the entirety of the state court judgment under *§ 523(a)(6)*. *Id.* The bankruptcy court on summary judgment determined that the damages awarded for conversion were excepted from discharge under *§ 523(a)(6)*, but the remaining damages were not. *Id.* The bankruptcy court reasoned that the contract damages did not arise **[*23]** from the debtor's tortious conduct and that "even the worst breaches of contract do not result in a nondischargeable debt absent some fundamental public policy." *Id.* (citing *In re Jercich, 238 F.3d at 1206*). The bankruptcy court therefore granted partial summary judgment to the debtor based on the issue preclusive effect of the sate court judgment. *2015 Bankr. LEXIS 905, [WL] at *2-3*.

On appeal, the sole issue in *Lawson* was whether the bankruptcy court erred when it applied issue preclusion and granted partial summary judgment based on its determination that, as a matter of law, the arbitration award's compensatory contract damages could not be excepted from discharge under *§ 523(a)(6)*. *2015 Bankr. LEXIS 905, [WL] at *4*. We acknowledged that, under *In re Jercich* and California law, **HN8**[⬆] a breach of contract is not considered tortious unless the breach violated some independent duty under state tort law and also violated state public policy. Nonetheless, we held that the bankruptcy court erred when it determined that the breach of contract damages could not be excepted from discharge under *§ 523(a)(6)* as a matter of law.

As in the present case, the creditor in *Lawson* "did not just prevail on a breach of contract claim; it also prevailed on a tort claim based on conversion." *2015 Bankr. LEXIS 905, [WL] at *5*. *Lawson* explained that the record **[*24]** from the state arbitration proceedings indicated that the breach of contract damages were *equally* recoverable under both the tort of conversion and the breach of contract. In contrast, the state court judgments in *Jercich*, *Lockerby*, and their progeny were not "based on both breach of contract and tort; instead, those cases involved solely a breach of contract claim." *Id.* Furthermore, nothing in *Lawson* indicated that the arbitrator duplicated any amount of damages awarded under the two causes of action. Therefore, we

concluded that *In re Jercich*'s limitations for tortious breaches of contract did not apply. Rather, we held that, where a creditor prevails on both contract and tort causes of action, the fact that the judgment ultimately awards damages on the contract claim does not preclude a later determination in a subsequent *§ 523(a)(6)* action that the damages also flowed from the tortious conduct. *2015 Bankr. LEXIS 905, [WL] at *4*. As *Lawson* put it:

> Resort to a *Jerich* analysis [and its requirement of conduct against public policy] . . . is unnecessary where the debt that a creditor seeks to except from discharge under *§ 523(a)(6)* involves duplicative damages on account of both tort and breach of contract theories. In that context, the **[*25]** damages for tort independently support nondischargeability under *§ 523(a)(6)*, and there is no need to determine whether the breach of contract was tortious.

*Id.*

Farah prevailed in his prior state court action on both his contract and tort claims based on the same conduct. As in *Lawson*, the fact that compensatory damages were awarded only on his breach of contract claims did not preclude Farah from litigating his *§ 523(a)(6)* claim based upon conversion. Because the jury was instructed not to award duplicative damages, and had already awarded damages on the breach of contract claim, Zeeb did not prove the state court judgment necessarily decided the identical issue on damages. As a result, the bankruptcy court was not bound to the state court's determination to award Farah no damages on his conversion claim, and correctly permitted Farah to litigate his claims under *§ 523(a)(6)*.

### C. Zeeb's Sufficiency Of The Evidence Argument.

The only other argument Zeeb has raised on appeal concerns the sufficiency of the evidence. He asserts that the bankruptcy should not have found willfulness within the meaning of *§ 523(a)(6)* based on the record before the bankruptcy court. More specifically, he points to certain trial testimony, which he claims **[*26]** should have caused the bankruptcy court to conclude that Zeeb did not intend to harm Farah and did not subjectively believe he would harm Farah when he moved all of Storm Distribution's assets.[5]

---

[5] Zeeb failed to specifically and distinctly argue that the

HN10[⬆] *Section 523(a)(6)*'s willful injury requirement requires proof of a subjective intent to injure or a subjective belief that injury is substantially certain to occur. *Ormsby v. First Am. Title Co. of Nev. (In re Ormsby), 591 F.3d 1199, 1206 (9th Cir. 2010)* (quoting *In re Su, 290 F.3d at 1142*). But "[t]he [d]ebtor is charged with the knowledge of the natural consequences of his actions." *Id.* And, in addition to what the debtor might admit to knowing, "the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action." *In re Su, 290 F.3d at 1146, n.6*. This is exactly what the bankruptcy court did here.

While the parties presented conflicting evidence, Zeeb simply has **[*27]** not persuaded us that the bankruptcy court's inference of willfulness was illogical, implausible, or unreasonable on this record. Therefore, the bankruptcy court's wilfulness finding was not clearly erroneous. *Hinkson, 585 F.3d at 1261-62 & n.21*.

**CONCLUSION**

For the reasons set forth above, we AFFIRM the bankruptcy court's nondischargeability judgment under *§ 523(a)(6)*.

---

End of Document

---

bankruptcy court committed any error with respect to its finding of malicious injury. Nor did Zeeb make any sufficiency of the evidence arguments pertaining to JSSA. Accordingly, he has forfeited these arguments. *See **Leigh v. Salazar, 677 F.3d 892, 897 (9th Cir. 2012)** (HN9[⬆]* issues not specifically and distinctly argued in appellant's opening appeal brief are forfeited); *Deitz v. Ford (In re Deitz), 469 B.R. 11, 22 (9th Cir. BAP 2012)*, aff'd and adopted, *760 F.3d 1038 (9th Cir. 2014)* (same).

Layla Buchanan

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
870 Roosevelt, Irvine, CA 92620.

A true and correct copy of the foregoing document entitled: **NOTICE AND COMPENDIUM OF UNPUBLISHED AUTHORITY FILED IN SUPPORT OF: PLAINTIFF'S TRIAL BRIEF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **February 9, 2023**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Bradford Barnhardt**    bbarnhardt@marshackhays.com, bbarnhardt@ecf.courtdrive.com,kfrederick@ecf.courtdrive.com
- **Jeffrey I Golden (TR)**    lwerner@go2.law, jig@trustesolutions.net;kadele@go2.law
- **D Edward Hays**    ehays@marshackhays.com, ehays@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendoza@ecf.courtdrive.com
- **Laila Masud**    lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**: On **February 9, 2023**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**DEBTOR AND DEFENDANT**
JAMIE LYNN GALLIAN
16222 MONTEREY LANE, SP #376
HUNTINGTON BEACH, CA 92649

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **February 9, 2023**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Honorable Scott C. Clarkson
United States Bankruptcy Court
Central District of California
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5130
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| February 9, 2023 | Layla Buchanan | */s/ Layla Buchanan* |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**