1          UNITED STATES BANKRUPTCY COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                  --oOo--

4  In Re:                    )  Case No. 8:21-bk-11710-SC
                             )
5  JAMIE LYNN GALLIAN,       )  Chapter 7
                             )
6          Debtor.           )  Santa Ana, California
   _____)  Wednesday, April 26, 2023
7                            )  9:30 a.m.
                             )
8  HOUSER BROS. CO.,         )  Adv. No. 8:21-ap-01097-SC
                             )
9          Plaintiff,        )
                             )
10     vs.                   )
                             )
11 GALLIAN,                  )
                             )
12         Defendant.        )
   _____)

13

14                           CONT'D TRIAL RE: FIRST AMENDED
                             COMPLAINT TO (2) DENY
15                           DISCHARGE PURSUANT TO 11
                             U.S.C. SECTIONS 727(A)(2)(A),
16                           (A)(4), AND (A)(5) (COMPLAINT
                             FILED 10/22/2021) (FIRST
17                           AMENDED COMPLAINT FILED
                             10/22/2021) [CASE TRANSFERRED
18                           FROM ES ON 9/1/2022] (SET AT
                             SC HELD 1-6-22) (TRIAL SET AT
19                           HEARING HELD 9/27/2022) [TRIAL
                             ONLY AS TO 727 ACTION]
20                           [IN-PERSON HEARING]

21            TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE SCOTT C. CLARKSON
22            UNITED STATES BANKRUPTCY JUDGE

23

24
   Proceedings produced by electronic sound recording;
25 transcript produced by transcription service.

ii

1 APPEARANCES:

2 For the Plaintiff:            D. EDWARD HAYS, ESQ.
                               BRADFORD N. BARNHARDT, ESQ.
3                              Marshack Hays, LLP
                               870 Roosevelt
4                              Irvine, California 92620
                               (949) 333-7777
5

6 For the Defendant:           JAMIE LYNN GALLIAN, IN PRO PER
                               16222 Monterey Lane
7                              Unit 376
                               Huntington Beach, California
8                                92649
                               (714) 321-3449
9

10 Court Recorder:             James Le
                               United States Bankruptcy Court
11                             411 West Fourth Street
                               Suite 2030
12                             Santa Ana, California 92701

13 Transcriber:                Briggs Reporting Company, Inc.
                               9711 Cactus Street
14                             Suite B
                               Lakeside, California 92040
15                             (310) 410-4151

16

17

18

19

20

21

22

23

24

25

iii

1                    I N D E X

2  WITNESSES              DIRECT   CROSS   REDIRECT   RECROSS

3  Jamie L. Gallian          9      --        --         --
                           135
4
   Gregory J. Buysman      240     243        --         --
5
   Christopher C. Houser   278     287        --         --
6
   Jamie L. Gallian        303     384        --         --
7  (recalled)

8

9  EXHIBITS                        IDENTIFIED        RECEIVED

10 Plaintiff's:

11 1      Documents                    50               51
   thru
12 3

13 4      Ryan release form, certificate   36           51
          of title
14
15 5      Ryan notice of sale or transfer  31           51

16 6      Documents                    50               51
   thru
   9
17
18 10     Security agreement w/promissory  50           51
          note

19 11     Documents                    50               51
   thru
20 24

21 25     Statement to encumber        50               51

22 26     Documents                    50               51
   thru
23 27

24 28     Original voluntary petition  50               51

25

iv

| | EXHIBITS (cont'd.) | IDENTIFIED | RECEIVED |
|---|---|---|---|
| | Plaintiff's: | | |
| 29 thru 30 | Amended schedules and statements | 50 | 51 |
| 31 | Document | 50 | 51 |
| 32 thru 34 | Amended schedules and statements | 50 | 51 |
| 35 thru 37 | Documents | 50 | 51 |
| 38 | Amended schedules and statements | 50 | 51 |
| 39 | Document | 50 | 51 |
| 40 | Debtor's opposition to objection to exemption | 50 | 51 |
| 41 | Document | 50 | 51 |
| 42 | Declaration of Buysman | 50 | 51 |
| 43 thru 46 | Documents | 50 | 51 |
| 47 | Claim 4-1, filed 10/5/22 | 52 | 52 |
| 48 | Claim 1-2, filed 10/25/22 | 55 | 58 |
| 49 | Deposition transcript | 338 | 338 |

Defendant's:

(None.)

1

1   <u>SANTA ANA, CALIFORNIA  WEDNESDAY, APRIL 26, 2023  9:30 AM</u>

2                              --oOo--

3        (Call to order of the Court.)

4            THE CLERK:  Good morning, everyone.  Please be

5   seated.

6            MR. HAYS:  Good morning, your Honor.

7            MS. GALLIAN:  Good morning, your Honor.

8            THE COURT:  Welcome to the April 26, 2023, 9:30

9   calendar, and today we have Item Number 1, Houser Brothers

10  Company versus Gillian.

11           May I have appearances, please.

12           MR. HAYS:  Yes.  Good morning, your Honor.  For

13  the Plaintiff, Houser Brothers, my name is Ed Hays,

14  accompanied by Bradford Barnhardt, of Marshack Hays LLP.

15           THE COURT:  Good morning.

16           MS. GALLIAN:  Good morning, Judge Clarkson.  My

17  name is Jamie Gallian.  I'm the defendant in this case.

18           THE COURT:  Good morning to you.

19           MS. GALLIAN:  Thank you.

20           THE COURT:  I have to find a yellow pad.  I don't

21  have a yellow pad.  I wouldn't mind having just any color

22  paper, but just something to make notes on.  Thank you.

23           Today we're having the bifurcated episode of this

24  trial on the first amended complaint deny discharge pursuant

25  to 727(a)(2)(A), (a)(4), and (a)(5).

2

1        We've decided that, even though the complaint that

2   is in existence contains actions with respect to Section

3   523, et al., that we should go with the 727 series first, to

4   determine whether the 523 actions are even necessary.

5        What we'll do is we'll have opening statements,

6   first of all by the plaintiff and then by the defendant, and

7   then we will commence to have the trial.

8        So, Mr. Hays, as representative of the plaintiff,

9   would you please perform your opening statement.

10       MR. HAYS:  Yes, your Honor.  Drum roll, please.

11       OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

12       MR. HAYS:  I'm going to keep the opening

13   statements very short today.

14       The Court has outlined and is aware of which

15   claims for relief are the subject of this trial today, and

16   the first of those three claims is 727(a)(2), and that

17   section provides that:

18            "The Court shall grant the Debtor a

19            discharge unless the Debtor, with intent

20            to hinder, delay, or defraud a creditor,

21            has transferred, removed, destroyed,

22            mutilated, or concealed property of the

23            Debtor within one year before the date

24            of the filing of the petition, or if

25            such conduct occurs post-petition."

3

1    The evidence before the Court today will show that

2 the Debtor did violate this section, and several different

3 ways, including concealing her interest in property, making

4 transfers, and also doing those matters before the

5 bankruptcy and after the bankruptcy.

6    There is also a -- the second claim for relief on

7 trial this morning is 727(a)(4), and that section provides

8 that:

9         "The Court shall grant the Debtor a

10         discharge unless the Debtor knowingly

11         and fraudulently, in or in connection

12         with the case, made a false oath or

13         account."

14    The evidence at trial will show that the Debtor

15 has made multiple false oaths, probably more than a dozen

16 false oaths, in this case, and that, based on those false

17 oaths, the Debtor's discharge should be denied.

18    Then, lastly, Section 727(a)(5) provides that:

19         "The Court shall grant the Debtor a

20         discharge unless the Debtor has failed

21         to explain satisfactorily any loss of

22         assets or deficiencies of assets

23         necessary to meet her liabilities."

24    Again, the evidence in this case will show that

25 the Debtor has failed to adequately explain her loss of

4

1 assets, including from the proceeds of sale of a former

2 property that the Debtor owned at the end of 2018, and,

3 based on all of the evidence and on these three separate

4 claims for relief, we believe that the Court will find

5 sufficient evidence to deny the Debtor a discharge.  Thank

6 you.

7          THE COURT:  Thank you, Mr. Hays.

8          Ms. Gallian, am I first of all pronouncing your

9 name correctly, "Gallian"?

10          MS. GALLIAN:  Yes, it is, sir, "Ms. Gallian" --

11          THE COURT:  Ms. Gallian.

12          MS. GALLIAN:  -- like the ship.

13          THE COURT:  Thank you.

14          MS. GALLIAN:  You're welcome.  My pleasure.

15          THE COURT:  Understand that I've read every trial

16 brief and every document submitted to the Court, but take

17 your time.

18          MS. GALLIAN:  Thank you.  Thank you.

19          OPENING STATEMENT ON BEHALF OF THE DEFENDANT

20          MS. GALLIAN:  I believe that I was extremely

21 forthwith (sic) with my petitions, and if I found an error,

22 I would file an amendment.  If an error was brought to my

23 attention by the Trustee or Counsel Hays, I would make an

24 amendment.  I believe that I have provided over probably

25 1,200 pages of documents supporting everything that I did.

5

1  I have never received an order from the Trustee claiming

2  that I didn't abide by anything he asked me of, and I

3  respectfully ask the Court to find in my favor.

4          THE COURT:  Thank you very much.

5          MS. GALLIAN:  My pleasure.

6          THE COURT:  We're going to -- no, please sit down.

7  We're going to be taking testimony, and since -- are you an

8  attorney?

9          MS. GALLIAN:  No, I am not.

10         THE COURT:  Okay.  So any time you feel that the

11 questions that are asked may not correspond to the Rules of

12 Federal Evidence -- and I don't know how much you've

13 studied -- but you simply say, "Objection."  You don't need

14 to be a Perry Mason and yell it.

15         MS. GALLIAN:  Thank you.  My pleasure.

16         THE COURT:  You just say, "Objection," and then

17 try to explain to me what objection you have, and I'll try

18 to change your lay words to what the official objection

19 would be, and I'm going to do that because I do that with

20 every non-attorney who's defending themselves with respect

21 to maintaining your discharge.

22         So I'll help you as much as I can --

23         MS. GALLIAN:  I understand.

24         THE COURT:  -- in the proper phrasing of the

25 objection.  Mr. Hays has done this a bunch of times.  He

6

1  doesn't need my help.  Matter of fact, he discourages me to

2  try to help him.  But I'm going to be there, trying to hear

3  you and understand any objection you might have, and then

4  we'll sort if out.

5           MS. GALLIAN:  Thank you.

6           THE COURT:  So don't be shy.

7           MS. GALLIAN:  Okay.

8           THE COURT:  That's what I'm really trying to tell

9  you.  Don't be shy.

10           MS. GALLIAN:  Okay.

11           THE COURT:  But you don't need to yell it out, and

12  you don't --

13           MS. GALLIAN:  Yes, sir.

14           THE COURT:  This is not a jury trial.  This is

15  more of a conversation.

16           MS. GALLIAN:  Yes, sir.

17           THE COURT:  Okay.

18           MS. GALLIAN:  I just have a couple of things that

19  I might ask the Court before we get started here.

20           THE COURT:  Of course.

21           MS. GALLIAN:  As far as restroom breaks --

22           THE COURT:  I'm sorry.  I can't hear you.

23           MS. GALLIAN:  Restroom breaks.

24           THE COURT:  Any time you want.

25           MS. GALLIAN:  Okay.

7

1        THE COURT:  Any time you want.  Just say, "I need

2   to be excused," and we'll take a break.

3        MS. GALLIAN:  All right.  Okay.  And then I would

4   just ask the Court and, respectfully, Mr. Hays, if we could

5   just speak slowly, just, I mean, not -- you know, I mean,

6   it's my fault.  I'm not an attorney, but I am going to try

7   to keep up, and I just --

8        THE COURT:  You have never suffered with me with

9   lawyers from New York, who I've had to say, "Slow down.  I

10  don't understand a thing you're saying."

11       MS. GALLIAN:  Okay.  Fair enough.

12       THE COURT:  And so we are on the same -- we are

13  absolutely in the same boat, and I try to slow people down,

14  anyway.

15       MS. GALLIAN:  Fair enough, sir.

16       THE COURT:  So, if you need to have something

17  repeated, simply ask.

18       MS. GALLIAN:  Fair enough.

19       THE COURT:  Yes.  We'll do that.

20       MS. GALLIAN:  Thank you.

21       THE COURT:  Okay.

22       MS. GALLIAN:  Okay.

23       THE COURT:  Mr. Hays, would you like to call your

24  first witness?

25       MR. HAYS:  Yes, your Honor, I would.  I'd like to

8

1 call the Debtor, Jamie Gallian.

2         THE COURT:  That's the witness box (indicating).

3 Come on up, and you'll have to stand and be sworn.

4         THE CLERK:  Please raise your right hand.

5          JAMIE LYNN GALLIAN - WITNESS - SWORN

6         THE CLERK:  And please state your full name for

7 the record.

8         THE WITNESS:  Jaime Lynn Gallian.

9         THE CLERK:  Please have a seat.

10         THE WITNESS:  Thank you.

11         THE COURT:  Also, if you need any water, just let

12 us know.

13         THE WITNESS:  Okay.

14         THE COURT:  Okay.

15         THE WITNESS:  I brought some water.  Is that okay,

16 or no?

17         THE COURT:  Absolutely.

18         THE WITNESS:  Okay.

19         THE COURT:  Absolutely.

20         THE WITNESS:  Can I just grab that?

21         THE COURT:  We provide it, too, but I'm glad you

22 brought your water.

23         Mr. Hays, please proceed.

24         MR. HAYS:  Thank you, your Honor.

25 //

9

1                          DIRECT EXAMINATION

2    BY MR. HAYS:

3    Q    Good morning, Ms. Gallian.

4    A    Good morning, sir.

5    Q    Are you the Debtor in this bankruptcy case?

6    A    Yes, sir.

7    Q    And was this bankruptcy case filed on July 9 of 2021?

8    A    Yes, sir.

9    Q    Is it true that you previously filed a bankruptcy case?

10   A    Yes, sir.

11   Q    And do you recall approximately when that was?

12   A    I believe it was 2003.

13   Q    And in that --

14   A    That's a guess.  It's probably 20 years ago.

15   Q    I understand.  It's an estimate.

16   A    Yes, sir.

17   Q    And in that bankruptcy case, is it true that a creditor

18   filed a dischargeability complaint against you?

19   A    No.

20   Q    There was no adversary proceeding pending in that case?

21   A    No, sir.

22   Q    Okay.  And in connection with this case, have you

23   consulted with any attorneys during the pendency of this

24   case?

25   A    Numerous attorneys, sir.

1  Q    And have any of them provided you with legal advice?

2  A    They have all provided advice.

3  Q    And have you paid any of these attorneys for such

4  advice during the pendency of this case?

5  A    Yes, sir.

6  Q    And who are these attorneys that you have paid?

7  A    Bert Briones.

8  Q    And any others?

9  A    There was a gentleman that was on the record at the

10 very first 341 meeting.  He said he was just observing.  He

11 wasn't sure if he was going to take the case, but I had paid

12 him, and he spoke with Judge -- not -- excuse me, sir --

13 Trustee.  I don't remember his name, sir.

14 Q    What about Mr. Casello?

15 A    No.

16 Q    You have not paid him?

17 A    Not for this bankruptcy.  I believed that after Mr. --

18 is there a question?

19 Q    I said you have not paid him, correct?

20 A    Okay.  I believed I did.  After Attorney Briones

21 returned the retainer agreement, Mr. Casello said that he

22 would step in, and I paid Mr. Casello $10,000, and he is not

23 a bankruptcy attorney.

24        THE COURT:  How do you spell that counsel's name?

25        THE WITNESS:  C-A-S-E-L-L-O, sir.

1          THE COURT:  I'm sorry.  C --

2          THE WITNESS:  C-A-S-E-L-L-O.

3          THE COURT:  Thank you.

4          THE WITNESS:  My pleasure.

5    BY MR. HAYS:

6    Q    And isn't it true that none of these payments have been

7    disclosed in filings with the Bankruptcy Court?

8    A    No, that's not true.

9    Q    And can you tell us where you have disclosed these in

10   public filings?

11   A    Yes, sir.

12   Q    Okay.  Where were those?

13   A    The $10,000 is the same $10,000 that was in the J-Pad

14   account that was disclosed on my bankruptcy.

15   Q    My question, though, was did you disclose the payment

16   to any of these attorneys?

17   A    Just to the Trustee.

18          THE COURT:  Mr. Hays?

19          MR. HAYS:  Yes.

20          THE COURT:  I'd like to make an inquiry, for the

21   record, to you.  Where, properly, does a Debtor disclose

22   pre-petition payments to bankruptcy attorneys or other

23   attorneys?  Again, I'm saying this -- I know the answer, Mr.

24   Hays, but I want anybody that reads the record to understand

25   on what document, including the statement of financial

12

1  affairs.  Is there even a requirement for a Debtor to

2  disclose payments for debt relief counsel?

3          MR. HAYS:  Yes, your Honor, there is.  Federal

4  Rules of Bankruptcy Procedure 2016 requires that all

5  payments made by a Debtor to an attorney in connection with

6  a bankruptcy case that were made at any time starting one

7  year prior to bankruptcy and continuing post-bankruptcy be

8  disclosed.  There's a specific form in the local --

9          THE COURT:  No, I know the form.  I wrote the

10 form.  What I want you to do is, I want you to isolate your

11 questions, because I want to make sure that anything that

12 was paid to attorneys pre-petition were paid within that one

13 year.

14         MR. HAYS:  And right now I'm speaking about

15 post-petition payments.

16         THE COURT:  Yes.  I'm talking about pre-petition.

17         MR. HAYS:  Okay.  And so we can pull out the

18 Debtor's schedules and go through that, and ask if that's

19 complete.

20         THE COURT:  Okay.  But she has testified that she

21 did disclose it on her petition, and I don't see how you can

22 do that if you haven't paid it yet.

23         MR. HAYS:  Understood, and that's what I was

24 trying to inquire about, the post-petition aspects.

25         THE COURT:  Well, that's what you have to be clear

13

1 about.

2         MR. HAYS:  Yes.  I understand, your Honor.  So let

3 me ask the question again and see if I can be more clear in

4 this manner.

5 BY MR. HAYS:

6 Q    After the filing of the bankruptcy case, did you ever

7 file anything with the Court?  And the local rule form that

8 Judge Clarkson has worked on is called a "Statement of

9 Compensation Paid," and that has to be filed, disclosing the

10 payments that you made post-petition.  Did you file any such

11 statement with the Court in this case?

12 A    If I understand the question correctly, sir, I have

13 disclosed to the bankruptcy Trustee that after Mr. Bert

14 Briones, I believe his name is, had a conversation with you,

15 he quit, and returned the money to me, and Mr. Casello then

16 called me, and he said, "Hey.  If you give me the $10,000,

17 I'll help you," but later discovered that he is not a

18 bankruptcy attorney, and because I listed him as a Debtor of

19 $50,000 on my bankruptcy petition, he believed I owed it to

20 him.

21 Q    And you said --

22 A    So he is not a bankruptcy attorney.

23 Q    -- you listed him as a Debtor.  Do you mean a creditor,

24 someone you owed money to?

25 A    I'm sorry.  Yes, sir.

14

1  Q    Okay.

2  A    That's correct.  So I was out the $10,000.

3  Q    So let me just be really clear here.

4  A    Yes.

5  Q    I'm asking a very narrow question.  Was there any

6  document ever filed with the Court, not any conversation you

7  had with the Trustee -- was there ever any document filed

8  with the Court that disclosed any payment that you made to

9  any attorney after the bankruptcy was filed?  That was never

10  done, correct?

11  A    For bankruptcy help, you're saying.  Well, as I

12  indicated, your -- excuse me, Mr. Hays -- is that I paid Mr.

13  Briones, okay, to -- he's a certified (sic), and the

14  question is --

15  Q    I'm sorry to --

16         THE COURT:  No, no, no.  Mr. Hays, let me help

17  you.

18         MR. HAYS:  Sure.

19         THE COURT:  Let me help you.  There's a form

20  called --

21         THE WITNESS:  Yes.  I was not aware of the form,

22  sir.

23         THE COURT:  Three-quarters of the attorneys

24  practicing before me don't know about that form.  No

25  problem.

15

1          THE WITNESS:  Thank you.

2          THE COURT:  Okay.  The question is, Mr. Hays, do

3   you know of anything on the docket with Form 2016, any

4   disclosure of compensation filed by anyone in this case?

5          MR. HAYS:  I can make an offer of proof, your

6   Honor, that there is no such document filed with the Court

7   in this case.

8          THE WITNESS:  And I would agree.

9          THE COURT:  You see, let's not waste time in

10  asking her technical questions that three-quarters of the

11  attorneys practicing before me couldn't answer, either.

12          So let me ask you this.  You're making an offer of

13  proof that there's no form on attorney -- on disclosure of

14  compensation?

15          MR. HAYS:  That is correct, your Honor.

16          THE COURT:  Do you know who files that, the Debtor

17  or the attorney who receives the compensation?

18          MR. HAYS:  I believe that the attorney has a duty

19  to file something with the Court, but I also believe that

20  the schedules and statements require the Debtor to disclose

21  the payments as well.

22          THE COURT:  Okay.  Did you ever tell anyone that

23  you paid Mr. Casello the $10,000?

24          THE WITNESS:  The Trustee, sir.

25          THE COURT:  And did you amend your schedules --

16

1          THE WITNESS:  No, I did not.

2          THE COURT:  -- to indicate that he was owed, or

3  you were owed anything?

4          THE WITNESS:  No, I did not.  I asked the Trustee

5  to help me get the money back.

6          THE COURT:  And how did you ask that question to

7  the Trustee, in writing?

8          THE WITNESS:  In a telephone call --

9          THE COURT:  In a telephone call.

10          THE WITNESS:  -- and it might have been an e-mail,

11  but I wasn't prepared to answer that question.

12          THE COURT:  And do you mean the Trustee or the

13  U.S. Trustee?

14          THE WITNESS:  The Trustee, Jeffrey Golden.

15          THE COURT:  Golden.  Okay.

16          THE WITNESS:  Chapter 7.

17          THE COURT:  All right.  Mr. Hays, move on.

18          MR. HAYS:  Thank you, your Honor.

19  BY MR. HAYS:

20  Q    In connection with today's trial, Ms. Gallian, have you

21  consulted with any attorneys?

22  A    No.

23  Q    Okay.  What is the current address of where you live?

24  A    16222 Monterey Lane, Unit 376, Huntington Beach,

25  California, 92649.

17

1  Q    And what type of home is that?

2  A    It's a manufactured home.

3  Q    And does the manufactured home sit on land that is

4  owned by my client, House Brothers?

5          THE COURT:  Now I'm going to tell you that you

6  should object to that question.

7          THE WITNESS:  Objection, please.

8          THE COURT:  And why would you object?  Because

9  it's a legal question.

10         THE WITNESS:  Thank you.

11         THE COURT:  Ask her if she believes that she --

12         MR. HAYS:  I understand.  Let me rephrase the

13 question.  I'll withdraw the last one.

14 BY MR. HAYS:

15 Q    Do you own the land on which that mobile home sits?

16 And I'm sorry.  I said "mobile home."  Would you prefer

17 "manufactured home" or "mobile home"?

18 A    Either one is fine.  It's interchangeable.

19 Q    Interchangeable.  Okay.  Do you own the land?

20 A    No.

21 Q    Okay.  What do you believe the home to be worth?

22 A    I would object to that question, too, as being a legal

23 question.

24         THE COURT:  Well, that's not a legal question.

25         THE WITNESS:  Okay.

18

1          THE COURT:  You own the mobile home, correct?

2          THE WITNESS:  Yes, I do.

3          THE COURT:  Okay.  What's it worth?

4          THE WITNESS:  The mobile home?  Just the box

5    itself.

6          THE COURT:  Just the mobile home?

7          THE WITNESS:  Just the box itself.  I would

8    probably say 125.

9          THE COURT:  One hundred and twenty-five dollars?

10         THE WITNESS:  Thousand, sir.

11         THE COURT:  One hundred and twenty-five thousand

12   dollars?

13         THE WITNESS:  Yes.

14         THE COURT:  Next question, Mr. Hays.

15         MR. HAYS:  Yes.  Thank you, your Honor.

16   BY MR. HAYS:

17   Q    And during this case, you and I have had multiple

18   different discussions, lengthy discussions, from time to

19   time, correct?

20   A    Yes, sir.

21   Q    Okay.  And in some of those conversations, isn't it

22   true that I asked if my client could buy the property from

23   you?

24   A    No, sir.

25   Q    And I recall it differently, so let me see if I can

19

1  refresh your recollection.  Several months ago, immediately

2  prior to the originally scheduled trial date in February,

3  which got continued because I got sick and lost my voice,

4  you and I had a discussion about could my client purchase

5  the property from you, and if so, how much did you think it

6  was worth, and you said $600,000, at least.  Do you recall

7  that conversation?

8  A    I believe you're misstating it, but I remember the

9  600,000 because of the discrepancy -- or not discrepancy.  I

10 believe --

11       THE COURT:  Well, you don't need to -- you just

12 need to answer yes or no.

13       THE WITNESS:  Yes.  The 600,000 was the homestead

14 exemption.

15 BY MR. HAYS:

16 Q    But in terms of how much could my client pay you in

17 order to purchase the property, isn't it accurate that you

18 said $600,000 would be the price?

19 A    I believe I said, "Pay the homestead exemption."

20 Q    Which is 600,000, correct?

21 A    That's correct.

22 Q    So you would sell if my client paid you 600,000?  And

23 I'm not --

24 A    Yes.

25 Q    This is a hypothetical.  That was just what we were

20

1   discussing in a conversation, and no agreement was reached,

2   but that was the conversation?

3   A    Yes, right.  I agree with that.  No agreement was

4   reached.  That's correct.

5   Q    Yes.  Okay.  Where did you live prior to living at the

6   current mobile home?

7   A    In the same tract, 10542, probably quarter-mile or

8   less.

9   Q    When you said, "In the same tract," you then said some

10  numbers.

11  A    It's Tract 10542.  That's how it's described in the --

12  Q    What's the mailing address of that property?

13  A    That is 4476 Alderport Drive, Unit 53, Huntington

14  Beach, California, 92649.

15  Q    And were you the owner of record for the Alderport

16  property?

17  A    Yes, I was.

18  Q    And how did you acquire your interest in that property?

19  A    The legal interest?

20  Q    The title.  How did you become the owner?

21  A    Okay.  On March 23rd, 2017, it was gifted to me by my

22  stepmother.

23  Q    Okay.  And her name is Sandra Bradley?

24  A    That's correct.

25  Q    Okay.  And in late 2018, did you sell the Alderport

21

1  property?

2  A    Yes, I did.

3  Q    And who did you sell it to?

4  A    I sold it to a Mr. Randall L. Nickel.

5  Q    And do you recall the date of that sale?

6  A    I do.  October 31st, 2018.

7  Q    And how much did you sell the property for?

8  A    Three hundred and seventy-nine thousand dollars.

9  Q    How did Mr. Nickel pay you the $379,000?

10 A    In two cashier's checks, one from Wells Fargo and one

11 from Chase.

12 Q    And were those cashier's checks made payable to you

13 individually?

14 A    On the 31st of October, they were made payable to Jamie

15 Gallian.

16 Q    And did you deposit them into your account at Chase

17 Bank?

18 A    After I opened the account.  I opened a brand-new

19 account.

20 Q    And that account was also in your name, correct?

21 A    That's correct.

22       THE WITNESS:  Excuse me, your Honor.

23       THE COURT:  Yes.

24       THE WITNESS:  May I just grab my pillow, just

25 my --

22

1          THE COURT:  Of course.

2          THE WITNESS:  Thank you.  Sorry.

3          Pardon the interruption, Mr. Hays.

4          MR. HAYS:  No worries.

5          THE WITNESS:  Thank you.

6          MR. HAYS:  Tell me when you're ready.  Ready?

7          THE WITNESS:  Yes, sir.

8  BY MR. HAYS:

9  Q    Okay.  Did you use some of these proceeds to purchase

10 the mobile home located on Monterey Lane in Space 376?

11 A    Yes.

12         THE COURT:  You have to speak up.

13         THE WITNESS:  Yes, sir.  Yes, sir.

14 BY MR. HAYS:

15 Q    And how much of the funds were used to purchase the

16 mobile home?

17 A    I would say -- well, I'm going to -- I know what the

18 amount was.  It was 185, $185,000.

19 Q    And who was that money paid to?

20 A    Ms. Lisa Ryan.

21 Q    And when was that money paid to Ms. Ryan?

22 A    The first $10,000 was paid on November 1st.

23 Q    Of 2018?

24 A    That's correct.  That's correct.

25 Q    And the balance of 175,000 was paid when?

23

1  A    That's correct.

2  Q    I said, "Paid when?"

3  A    I believe the balance was 150, 50, because there was

4  three cashier's checks for 50,000.  I believe November 17th.

5  I believe it was November -- I believe the date of the

6  cashier's checks are November 17th.

7  Q    Of 2018?

8  A    That's correct.

9  Q    Okay.  And I think you said three $50,000 cashier's

10 checks --

11 A    That's correct.

12 Q    -- but the balance of the purchase price was 175,000,

13 correct?

14 A    The balance.  Okay.  The balance.  I gave Lisa Ryan

15 $10,000 to deposit.  I gave her three cashier's checks of

16 $50,000 plus -- excuse me -- one cashier's check for $20,000

17 that was returned to me.

18          THE COURT:  So let me --

19          THE WITNESS:  Yes, sir.

20          THE COURT:  -- interrupt you.

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Did you pay $185,000 total?

23          THE WITNESS:  Yes, I did.  Yes.

24          THE COURT:  Okay.  Now, slowly explain to me.  You

25 first paid Lisa Ryan $10,000?

*Briggs Reporting Company, Inc.*

24

```
1              THE WITNESS:  That's correct.
2              THE COURT:  And then you paid several cashier's
3   checks later?
4              THE WITNESS:  Yes.
5              THE COURT:  How many cashier's checks did you give
6   her?
7              THE WITNESS:  There was three for 50,000.
8              THE COURT:  Three for 50,000.
9              THE WITNESS:  Yes, sir.
10             THE COURT:  That's 150,000.
11             THE WITNESS:  That's correct, and one for 20.
12             THE COURT:  So you gave her four cashier's checks?
13             THE WITNESS:  Yes, sir.
14             THE COURT:  Okay.  So that got you to 185,000.
15             THE WITNESS:  Five.
16             THE COURT:  Thank you.
17             THE WITNESS:  Thank you so much.
18  BY MR. HAYS:
19  Q    Maybe my math is off.  Three times 50 is 150, plus 20
20  is 170, and the balance was 175.  Was the 20,000 25, or did
21  you also --
22  A    No, I believe I said 185.
23             THE COURT:  She paid 185.  She paid 10,000.  Then
24  she paid 50, 50, 50.  Right?
25             THE WITNESS:  That's correct.
```

25

1              THE COURT:  So that's 150.

2              THE WITNESS:  Correct.

3              THE COURT:  And then how much did you owe after

4    you paid the 10,000 plus 150?

5              THE WITNESS:  Twenty thousand.

6              THE COURT:  Pardon me?

7              THE WITNESS:  My gosh.

8              THE COURT:  Well, the math is 160.  So 150,000

9    plus 10,000 is 160,000.  So you owed her another $25,000.

10             THE WITNESS:  Okay.  Hold on.

11             THE COURT:  That's okay.

12             THE WITNESS:  Okay.  I know that the notice of

13   transfer that she signed November 1st said $225,000.

14             THE COURT:  Well, how did that happen?  How much

15   did she pay for it?  How much did she pay for -- how much

16   did you pay for that mobile home?

17             THE WITNESS:  Well, I know that I paid the 185,

18   and I know that the $20,000 came back to me because of the

19   $8,700 of the stipulated judgment that she owed, and then I

20   think -- you know what, your Honor?  I am not trying to be

21   evasive, and I have copies of all my checks.

22             THE COURT:  So what do we know for sure?  You paid

23   her $10,000?

24             THE WITNESS:  I know I paid the 10,000.

25             THE COURT:  Okay.  Stop right there.

26

1          THE WITNESS:  Yes, sir.

2          THE COURT:  You paid her 10,000.

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Then you paid three more cashier's

5 checks --

6          THE WITNESS:  Yes, sir.

7          THE COURT:  -- of $50,000 each?

8          THE WITNESS:  Yes, sir.

9          THE COURT:  Okay.  That adds up to 150,000.

10         THE WITNESS:  Correct.

11         THE COURT:  Did you pay her anything else?

12 Because, at that point, it's 160,000.

13         THE WITNESS:  Right.

14         THE COURT:  So did you pay her anything else?

15         THE WITNESS:  I understand.  And is it okay if I

16 very briefly --

17         THE COURT:  You said that there was another

18 $20,000 cashier's check.

19         THE WITNESS:  Cashier's check that went to Lisa.

20         THE COURT:  Did you pay her another $20,000

21 cashier's check?

22         THE WITNESS:  Just that one.

23         THE COURT:  Well, which one?

24         THE WITNESS:  Okay.  And then the five --

25         THE COURT:  No, no, no.

27

1          THE WITNESS:  Yes, sir.

2          THE COURT:  You have not even described that yet.

3  You paid her a $10,000 cashier's check and three $50,000

4  cashier's checks.  You have not told me anything about a

5  $20,000 cashier's check.  Did you pay her a $20,000

6  cashier's check?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  When?

9          THE WITNESS:  The same time as the three 50,000s.

10          THE COURT:  Okay.  So now that adds up to five,

11  six, seven, eight, 180,000.

12          THE WITNESS:  Yes, sir.

13          THE COURT:  Okay.  How much did you pay her

14  totally for that mobile home?  You've been saying 185 now

15  three times.

16          THE WITNESS:  That's correct.

17          THE COURT:  Is that correct or not?

18          THE WITNESS:  And that's what I thought it was.

19          THE COURT:  Is it true or not?

20          THE WITNESS:  I believed I did, but, obviously,

21  the math --

22          THE COURT:  No, it doesn't.  I just want to know,

23  is that all of the cashier's checks you paid her?

24          THE WITNESS:  Fifty, fifty --

25          THE COURT:  Did you pay her any more money?

28

1          THE WITNESS:  -- 170, 180.

2          THE COURT:  You don't know.  Okay.  Thank you.

3          Mr. Hays, please proceed.

4          THE WITNESS:  Sorry.

5    BY MR. HAYS:

6    Q    Did you pay her any cash in addition to the cashier's

7    checks?

8    A    And that was the $10,000.  She never got a $10,000

9    cashier's check, sir.

10          THE COURT:  So the 10,000 was cash?

11          THE WITNESS:  Was cash.  Yes, sir.  I apologize.

12          THE COURT:  Okay.  So 10,000 was cash.  Okay.

13          THE WITNESS:  Yes, sir.

14          THE COURT:  Keep going, Mr. Hays.

15    BY MR. HAYS:

16    Q    Were there any other cash payments to bring the total

17    to 185?  Because what you've described as far as the 10,000

18    cash plus the cashier's checks comes to 180.

19    A    Correct.  And I believe, if I looked at that receipt,

20    there is one for 5,000.  However, I can't with certainty.

21    Q    That's fine.

22    A    Okay.

23    Q    That's good enough for me.

24    A    So I believe that -- yes.

25    Q    Okay.

29

1  A    It could have been five -- I believe there's a

2  cashier's check for five.

3         THE COURT:  Well, we're not take any more time on

4  this subject.

5         THE WITNESS:  Okay.

6         THE COURT:  Keep moving.

7         MR. HAYS:  I'm trying to move on.

8         THE WITNESS:  Okay.  I apologize.

9  BY MR. HAYS:

10  Q    It's fine.  You also referenced that the notice of

11  transfer said 225,000, but that was not the actual purchase

12  price, correct?

13  A    No.  That's correct.

14  Q    Okay.  And the actual purchase price was the 185,

15  correct?

16  A    That's correct.

17  Q    Okay.  When you transfer a mobile home, is there a

18  certificate of title for that particular item of property?

19  A    I received the surrendered certificate of title.

20  Q    Okay.  So, to take a step back for a second, is there a

21  state agency called HCD?

22  A    That's correct.

23  Q    Okay.  And is that Housing and Community Development?

24  A    That's correct.

25  Q    And HCD is the state agency in charge of issuing

30

1  certificates of title to manufactured homes, correct?

2  A    Yes, sir.

3  Q    Okay.  So it's very similar to a car?

4  A    Yes, sir.

5  Q    Okay.  So Ms. Ryan would then sign the certificate of

6  title releasing her interest as part of the sale.  Is that

7  correct?

8  A    Yes, sir.

9  Q    Okay.  And to whom did the paperwork -- well, let me

10 take a step back.  It's not good wording.  When the

11 paperwork reflecting the new owners was submitted to HCD,

12 who was the owner of record of the mobile home?

13 A    I first went to the DMV, sir, with the blank form, and

14 they told me -- that's the first time I knew about the HCD,

15 is after I went to and stood in line at the DMV.  Then I was

16 informed about the HCD, and when I drove to Riverside HCD on

17 November 16th, I placed the name of J-Sandcastle (phonetic)

18 on the -- I think it was Section B.

19            THE COURT:  Would you please spell all of that?

20            THE WITNESS:  Yes, sir.  J-Sandcastle is J,

21 S-A-N-D-C --

22            THE COURT:  I'm sorry.  It's one word?

23            THE WITNESS:  No.  J, hyphen --

24            THE COURT:  Is it one word or two words?

25            THE WITNESS:  It's J, then hyphen, Sandcastle.

31

1          THE COURT:  Okay.  J, hyphen --

2          THE WITNESS:  Sandcastle, S-A-N-D-C-A-S-T-L-E, Co,

3  is the next word, and then the next --

4          THE COURT:  C-O?

5          THE WITNESS:  C-O.

6          THE COURT:  Is that with a period after that?

7          THE WITNESS:  I don't think I used a period.

8          THE COURT:  What does "Co" mean?  Is that a name?

9          THE WITNESS:  "Company," just J-Sandcastle

10 Company.

11         THE COURT:  Okay.

12         THE WITNESS:  And then "LLC."

13         THE COURT:  Thank you.

14         THE WITNESS:  My pleasure.

15 BY MR. HAYS:

16 Q    And just to be clear, the "Sandcastle" has no space

17 between the word "sand" and "castle," correct?  It's all one

18 word?

19 A    No, it doesn't.  It's one word.

20 Q    Yes.  Okay.  And there are a series of binders up there

21 on the witness stand, and they're labeled "Volume One of

22 Six," "Two of Six."  If you could please find volume one of

23 six, and turn to Exhibit 5.

24 A    I'm sorry.  I did not hear you, sir.

25 Q    Turn to Exhibit 5.

32

1  A    Yes, sir.

2  Q    And on Exhibit 5 is a notice of sale or transfer on a

3  state of California form, and in the top right corner,

4  there's a logo for HDC.  Do you recognize this document?

5  A    Yes, I do.  Yes, I do.

6  Q    Okay.  And is this the document by which -- was this a

7  document submitted to HCD in connection with the transfer of

8  title from Lisa Ryan to J-Sandcastle?

9  A    No.  I didn't submit this.  I don't believe I submitted

10 this to Lisa -- to HCD.

11         THE COURT:  Well, he's not asking you that.

12         THE WITNESS:  I'm sorry.

13         THE COURT:  He's asking you, is this the notice of

14 sale or transport (sic), and does it have anybody's name on

15 it?

16         THE WITNESS:  Yes, it had my name right there on

17 the left hand under section three.  It said, "Jamie L.

18 Gallian," and there was whiteout placed on it.

19         THE COURT:  What do you mean, "whiteout"?

20         THE WITNESS:  So right here (indicating) you can

21 see the "J," and then the circle of the "J" right here.

22         THE COURT:  I see that.

23         THE WITNESS:  It said, "Jamie Lynn Gallian," and

24 that was the name that was on there on November 1st, and

25 then on November 15th is when there was a strip of whiteout

33

1  placed over it, and on November 15th, J-Sandcastle Co was

2  added, and I asked Lisa Ryan to then sign again her name on

3  11/15, but she was whiting it out and putting

4  "J-Sandcastle."

5          THE COURT:  Excellent.

6          THE WITNESS:  My pleasure.

7          THE COURT:  No.  What you're doing is you're

8  helping me.  You're really giving me a guide on what this

9  document is.

10          THE WITNESS:  Thank you.

11          THE COURT:  So who put the whiteout on?

12          THE WITNESS:  Lisa Ryan.

13          THE COURT:  Did you see her do it?

14          THE WITNESS:  Yes.

15          THE COURT:  Did she do it because you asked her to

16  do it?

17          THE WITNESS:  No.  It was because of a writ of

18  execution.

19          THE COURT:  Well, I didn't ask you that.

20          THE WITNESS:  I thought you asked why.

21          THE COURT:  I asked you, did you ask her?

22          THE WITNESS:  No, I did not.

23          THE COURT:  Did you ask her to white it out?

24          THE WITNESS:  No, I did not.

25          THE COURT:  How did she know -- and who wrote,

*Briggs Reporting Company, Inc.*

34

1  "J-Sandcastle Company LLC"?  Who wrote those words?  Who

2  wrote, "Its manager"?  Who wrote, "Jamie L. Gallian"?

3          THE WITNESS:  That doesn't look like my printing,

4  your Honor.

5          THE COURT:  I'm not asking you who -- if you

6  didn't do it, say you don't know.

7          THE WITNESS:  I don't remember, sir.  I don't

8  remember, sir.

9          THE COURT:  How did Ms. -- how did anyone know

10  what J-Sandcastle Company LLC was?  Did you tell her?

11          THE WITNESS:  Let me think for a second.

12          THE COURT:  Sure.

13          THE WITNESS:  Okay.  So I don't want to get into

14  storytelling, and this is how I'm not --

15          THE COURT:  You don't need to tell a story.

16          THE WITNESS:  Okay.

17          THE COURT:  You just need to answer my question --

18          THE WITNESS:  Yes, sir.

19          THE COURT:  -- and that is, how did she know to

20  put "J-Sandcastle Company LLC" there?

21          THE WITNESS:  We have a discussion on November

22  15th.

23          THE COURT:  You must have asked her to do it.

24          THE WITNESS:  I don't think I --

25          THE COURT:  Well, how would she have known the

35

1  name?

2          THE WITNESS:  You mean told her the name?  Yes.

3          THE COURT:  Yes.

4          THE WITNESS:  Yes, your Honor.

5          THE COURT:  Okay.

6          THE WITNESS:  Yes.

7          THE COURT:  So you told her to white out the name

8  of -- your name, and put in "J-Sandcastle Company LLC."  Is

9  that correct?

10          THE WITNESS:  I don't believe --

11          THE COURT:  Then who else would have?

12          THE WITNESS:  Well, and if we're going to -- I

13  have documents.

14          THE COURT:  Who else would have?

15          THE WITNESS:  (No response.)

16          THE COURT:  Were you the manager of J-Sandcastle

17  Company LLC?

18          THE WITNESS:  I'm the member, sir.

19          THE COURT:  Are you the manager?

20          THE WITNESS:  I'm the only member.

21          THE COURT:  Okay.  Are you the manager?

22          THE WITNESS:  I suppose so, sir, so yes, sir.

23          THE COURT:  Did you ask her to put "J-Sandcastle

24  Company LLC" as the name of "Purchaser," slash, "New Owner"?

25          THE WITNESS:  (No response.)

36

1          THE COURT:  How would she have known to do it if
2   you didn't ask her?

3          THE WITNESS:  I'm going to say yes, your Honor.

4          THE COURT:  Thank you.

5          Mr. Hays, let's proceed as quickly as we can.
6   We're getting bogged down.

7          MR. HAYS:  I agree, your Honor.  Thank you.

8   BY MR. HAYS:

9   Q    Ms. Gallian, can I have you turn to the previous
10  exhibit, which is Exhibit 4, and that document is a state of
11  California certificate of title, and is this the certificate
12  of title that Ms. Ryan signed releasing her interest in the
13  property?

14         THE COURT:  Excuse me.  Are you talking about
15  Exhibit 4?

16         MR. HAYS:  Yes, your Honor.

17         THE COURT:  Page 41?

18         MR. HAYS:  Yes, your Honor.  That's the front page
19  of the certificate of title, and the document continues to a
20  second page, and on the second page, there's releasing
21  signatures in Section B.

22  BY MR. HAYS:

23  Q    And, Ms. Gallian, is that the document that Ms. Ryan
24  signed releasing her interest in the property?

25  A    Yes, it is.

*Briggs Reporting Company, Inc.*

37

1  Q    Okay.  And in Section C on page 42, it says, "New owner

2  information," and again it says, "J-Sandcastle Co LLC," and

3  then, down in line 7A, there's a signature that appears to

4  be "Jamie Gallian."  It's "Managing member."  Is that your

5  signature?

6  A    Yes, it is.

7  Q    Okay.  And so it was your intention to place title in

8  J-Sandcastle Company when these documents were resubmitted

9  to HCD to reflect the transfer, correct?

10  A    Could you rephrase that again, please?

11  Q    It was your intention to place title in J-Sandcastle

12  when these documents were submitted to HCD requesting a new

13  certificate of title to be issued reflecting that the owner

14  of the home was J-Sandcastle Co LLC, correct?

15  A    That's correct.  It's stamped here, "November 16th."

16  Q    But you said yes, it was your intention to put title in

17  the LLC?

18          THE COURT:  I think she said, "This is correct."

19          MR. HAYS:  I didn't hear.

20          THE COURT:  Is that what you said?

21          THE WITNESS:  I did say, "That is correct."

22          MR. HAYS:  Okay.

23          THE WITNESS:  He refers for --

24          THE COURT:  Okay.  Stop right there.

25          MR. HAYS:  Yes.

38

1          THE COURT:  You just confirmed what he asked you,
2  that's all.
3          THE WITNESS:  Well, I think -- I'm sorry, your
4  Honor.  He asked me about a document dated November 16th.
5          THE COURT:  He didn't ask you about that.  He
6  asked you a question.
7          THE WITNESS:  Pardon me, sir.
8          THE COURT:  He asked you a question.
9          THE WITNESS:  I will listen better.  I apologize,
10  sir.
11          THE COURT:  He asked you whether it was your
12  intention to place this mobile home into the name of
13  J-Sandcastle Company LLC.
14          THE WITNESS:  On what date, sir?
15          THE COURT:  It doesn't matter what date.
16          THE WITNESS:  It was not my intention, sir.
17          THE COURT:  He's asking you about this document.
18          THE WITNESS:  I apologize.
19          THE COURT:  When you signed this document, was it
20  your intention to place the owner as J-Sandcastle Company
21  LLC then?  Was it your intention?
22          THE WITNESS:  On November 16th, yes.
23          THE COURT:  Yes?
24          THE WITNESS:  Yes, sir.
25          THE COURT:  Thank you.

39

1 BY MR. HAYS:

2 Q    Thank you.  Ms. Gallian, at the time that this was

3 happening, in early November of 2018, isn't it true that you

4 were a party to several different lawsuits pending in the

5 Orange County Superior Court?

6 A    Can you be specific of which ones?

7          THE COURT:  Any.

8          THE WITNESS:  Any?

9          THE COURT:  Any.

10          THE WITNESS:  Yes.

11 BY MR. HAYS:

12 Q    Okay.  And in connection with those lawsuits, isn't it

13 true that several money judgments were entered against you?

14 A    No, that's not true.

15          THE COURT:  Mr. Hays, if you'd be more specific,

16 like "Have you ever had a money judgment entered against

17 you?"

18          THE WITNESS:  Yes.

19          THE COURT:  Okay.  Did you happen to have one

20 entered in -- do you recall that you said that you had some

21 lawsuits pending at the same time you placed --

22          THE WITNESS:  That's correct.

23          THE COURT:  Don't interrupt me.

24          THE WITNESS:  Pardon me.

25          THE COURT:  Is it true that you earlier answered

*Briggs Reporting Company, Inc.*

40

1 the question "Yes," to the question "Did you have any

2 lawsuits pending at the time you purchased this home?"

3          THE WITNESS:  That's correct.

4          THE COURT:  Were any of the litigations that were

5 pending at the time resulting in a money judgment against

6 you?

7          THE WITNESS:  Yes.

8          THE COURT:  Please proceed, Mr. Hays.

9          MR. HAYS:  Thank you, your Honor.

10 BY MR. HAYS:

11 Q    Was one of the cases that was pending in November of

12 2018 a lawsuit in which the Huntington Beach Gables

13 Homeowners Association was the plaintiff, and you and Sandra

14 Bradley -- and Sandra Bradley was named individually and as

15 Trustee of the Sandra Bradley Trust -- were named

16 defendants?

17 A    Could you repeat that again?

18 Q    Was one of the lawsuits pending in November of 2018 a

19 lawsuit filed by the Huntington Beach Gables Homeowners

20 Association against you and Ms. Bradley?

21 A    That's correct.

22 Q    Okay.  And in connection with that case, did you also

23 have a cross-complaint that you had filed against several

24 members of the board of the HOA, including Lee Gragnano, Ted

25 Phillips, Lindy Beck, Jennifer Paulin, Janine Jasso, and

41

1 Lori Burrett?

2       THE COURT:  I'm going to interject.  You can

3 object to the question in the form, because it's multiple

4 questions, actually.  You don't know if all of those persons

5 were involved in that lawsuit.  Nobody could remember that.

6 So make your objection.

7       THE WITNESS:  Objection.

8       THE COURT:  Okay.  Sustained.

9       Would you please isolate your questions.

10       MR. HAYS:  Yes, your Honor.

11 BY MR. HAYS:

12 Q    Let me start with, is the Huntington Beach Gables

13 Homeowners Association the homeowners association that was

14 responsible for the property where the Alderport property

15 was located?

16 A    Yes, sir.

17 Q    Okay.  And so that Gables Association filed a lawsuit

18 against you and Ms. Bradley in 2017, correct?

19 A    Yes, sir.

20 Q    Okay.  In connection with that lawsuit, did you file a

21 cross-complaint against anyone?

22 A    Yes, sir.

23 Q    Okay.  And do you recall who you filed the

24 cross-complaint against?

25 A    Yes, sir.

42

1  Q    And who were those cross-defendants?

2  A    The first cross-complaint that I filed was against the

3  stepmother, the second cross-complaint I filed was against

4  the Huntington Beach Gables Homeowners Association, and the

5  third cross-complaint that I filed was against six as

6  individuals.

7  Q    And do you recall who those six people were?

8  A    Yes, I do.

9  Q    If you could --

10       THE COURT:  Excuse me for one second.  You should

11  back up from the microphone.  These are very sensitive

12  microphones.

13       THE WITNESS:  I'm sorry.

14       THE COURT:  That microphone can actually pick up

15  people whispering in the back of our courtroom, and every

16  time you do it, it's clicking because you're too close.

17       THE WITNESS:  Okay.  Yes, sir.

18       THE COURT:  So back up a bit --

19       THE WITNESS:  Relax.  Just nervous.

20       THE COURT:  -- or move the microphone back.

21       THE WITNESS:  Okay.  Move it back?  Okay.

22  Perfect.  Thank you.

23       THE COURT:  Okay.  Please proceed.

24       MR. HAYS:  Thank you, your Honor.

25       THE COURT:  Why don't you ask the question again.

43

1          MR. HAYS:  Yes, I will.

2          THE WITNESS:  Okay.  I remember.

3          MR. HAYS:  I'm just waiting for Ms. Gallian to

4   finish getting a sip of water.

5          THE WITNESS:  Okay.  So the six individuals

6   were --

7   BY MR. HAYS:

8   Q    Yes.  Can you give us the names of the six individuals,

9   please.

10   A    The six individuals were Lee Gragnano, Ted Phillips,

11   Lori Burrett, Jennifer Paulin, Janine Jasso, and Lindy --

12   did I say Lindy Beck already?

13   Q    No.  That would be the sixth.

14   A    Okay.  And Lindy Beck was the sixth, and they were sued

15   as individuals.

16   Q    Yes.  And did you win or lose on that cross-complaint?

17   A    I dismissed them.

18   Q    And did they file a motion for attorney's fees against

19   you after they were dismissed from that lawsuit?

20   A    Yes, sir.

21   Q    And isn't it true that those motions were filed on

22   November 1st of 2018 and November 8th of 2018?

23   A    Repeat your question, sir.

24   Q    The motion for attorney's fees and costs were filed on

25   November 1st of 2018 and November 8th of 2018, correct?

*Briggs Reporting Company, Inc.*

44

1 A    No, sir, that's not correct.

2        MR. HAYS:  Okay.  Your Honor, if I may, I have

3 three copies of documents that I would like to -- and if I

4 may approach the Court, I have one for you and one for the

5 witness.

6        THE COURT:  You have to approach her, our clerk.

7        MR. HAYS:  Yes.

8        THE COURT:  You can bring it here.

9        MR. HAYS:  Yes.

10        THE COURT:  Thank you.

11        MR. HAYS:  Yes.

12        THE COURT:  Are you going to be asking to admit

13 this?

14        MR. HAYS:  I believe I will, your Honor.

15        THE COURT:  Well, then, you're going to have to

16 have another copy for our recording officer.

17        MR. HAYS:  When I'm done, I will provide my copy.

18        THE COURT:  Thank you.

19 BY MR. HAYS:

20 Q    Ms. Gallian, if you could turn to the last two pages of

21 this document.

22        THE COURT:  Do us a favor, Mr. Hays.

23        MR. HAYS:  Yes.

24        THE COURT:  For the record, tell us what this

25 document is.

45

1  BY MR. HAYS:

2  Q    Before you, Ms. Gallian, is a claim filed by the six

3  individuals that you just mentioned on the record, and it's

4  a proof of claim filed in your bankruptcy case.  That claim

5  has been assigned 4-1 by the Court.  It was filed on October

6  25, 2022, and it was filed by the attorney for the claimant,

7  who is Rob Goe of Goe, Forsythe and Hodges at the time.

8       Have you seen this document before?

9  A    The proof of claim?

10  Q    Yes.

11  A    No, sir, I have not.

12  Q    Okay.  And if you can turn to the last two pages of

13  this document, it's a judgment for attorney's fees, and in

14  the top right-hand corner, there's a file stamp bearing --

15  reflecting that it was filed with the Superior Court for the

16  County of Orange on December 4 of 2018.  Have you seen this

17  document before?

18  A    Yes, sir.

19  Q    Okay.  And on the second page of this document, which

20  is the last page of 10-4, it says in the first paragraph on

21  that page that:

22            "The above-captioned matter came on

23            regularly for hearing on

24            cross-defendants'" -- and the six

25            individuals are listed -- "motion for

46

1           attorney's fees and costs on November 1

2           and November 8 of 2018."

3      Does that refresh your memory as to when those

4  attorney's fees and costs motions were filed?

5  A    I'm sorry, sir.  The question that you asked me is the

6  date they were filed.

7           THE COURT:  If you --

8           THE WITNESS:  The motions were heard.

9           THE COURT:  Yes.  Excuse me.

10          MR. HAYS:  Those motions were --

11          THE COURT:  Stop.  Look at paragraph one.  Okay?

12 And it says:

13          "The above-captioned matter" -- let's

14          read it together -- "came on regularly

15          for hearing on cross-defendants Lee,

16          Ted, Lindy, Jennifer, Janine, and Lori's

17          motion for attorney's fees and costs on

18          November 1 and November 8."

19          Mr. Hays, what I'm going to do is simply tell you

20 that this is not clear, that it was filed on November 1 and

21 November 8, but they indicate that it most likely was filed

22 on November 1 and November 8.

23          So what we're here looking at now is a judgment by

24 a court that, in its recitals, isn't completely clear, but

25 it's clear enough to understand that that motion for

47

1   attorney's fees and costs was related to something that

2   happened on November 1, 2018, and November 8, 2018, and what

3   the witness is trying to say is she doesn't know whether or

4   not the hearing was on November 1 and November 8, or the

5   motions were filed.

6           Is that correct?

7           THE WITNESS:  I do know the answer, sir, if I

8   could answer.

9           THE COURT:  Please do.

10          THE WITNESS:  Okay.  The motion was filed on

11  August 7th, sir, 2018, and I appeared by telephone on

12  November 1st, and it was continued to November 8th, and this

13  order was granted on November 8th, and it appears to be

14  signed by Judge Crandall on December 4th.

15          THE COURT:  Right.  The confusion, Mr. Hays, is

16  that your question actually asked whether the motions were

17  filed --

18          THE WITNESS:  That's correct.

19          THE COURT:  -- on November 1 and November 8, and

20  it was confusing to me, and it was confusing to Ms. Gallian.

21  So now we know that the hearings were November 1 and

22  November 8.

23          MR. HAYS:  Thank you, your Honor.

24          THE COURT:  You're welcome.

25          MR. HAYS:  I stand corrected, and I apologize for

48

1 the mistake.

2 BY MR. HAYS:

3 Q    The amount of the judgment listed in this document is

4 $46,138 plus 10 percent interest, correct?

5 A    That's correct.

6         MR. HAYS:  Okay.  And, your Honor, if I may,

7 should I now or later hand this to the recorder for

8 purposes --

9         THE COURT:  You should, first of all, remember to

10 always move your --

11        MR. HAYS:  Understood.

12        THE COURT:  -- exhibits in after you've laid the

13 foundation --

14        MR. HAYS:  Yes.

15        THE COURT:  -- and you already are short two,

16 because the previous ones haven't been -- I believe Number 4

17 and Number 5 of your exhibits have not yet been entered,

18 admitted.

19        MR. HAYS:  Actually, your Honor, I believe that

20 the joint pre-trial stipulation contained the stipulation of

21 Ms. Gallian that those documents were authentic and to be

22 admitted without objection, and there was no need to move

23 for admission at the time of trial.

24        THE COURT:  Yes, but this is called "belt and

25 suspenders."

49

1          MR. HAYS:  Okay.

2          THE COURT:  Sometimes it gets lost.

3          MR. HAYS:  Okay.  So I'd like to point out to the

4    Court, and ask the Court to recognize, that the parties have

5    stipulated to this in the court-approved joint pre-trial

6    stipulation, that all of plaintiff's exhibits that are

7    already in the binders, including Exhibits 4 and 5, are

8    already admitted into evidence.

9          THE COURT:  Ms. Gallian?

10         THE WITNESS:  And I would object to that, sir.

11         THE COURT:  I'm sorry?

12         THE WITNESS:  I would object to that.

13         THE COURT:  Okay.  Well, show me why you didn't

14   stipulate to that in your pre-trial.

15         THE WITNESS:  Okay.  Those two blue books that are

16   right there on my black chair there --

17         THE COURT:  Yes.  Well, stop for a second.

18         Do you have a copy of the pre-trial?

19         MR. HAYS:  I have not a paper copy, your Honor,

20   but I have an electronic copy, and I'm looking at it.

21         THE COURT:  Well, let me look at the pre-trial

22   here.  I have it right here.  First of all -- we'll figure

23   this out.  I have the joint pre-trial stipulation and the

24   order approving the joint pre-trial stipulation.  The

25   pre-trial statement was Docket Number 37, and the order

50

1 approving the pre-trial stipulation was Docket Number 41.

2          So, now, Mr. Hays, show me where there has been a

3 stipulation of admission into evidence at this trial of

4 these documents.

5          MR. HAYS:  Your Honor, if you can turn to page 17

6 of the joint pre-trial stipulation, starting at line 20, the

7 text of the stipulation reads, "Unless otherwise noted, the

8 parties stipulate to the admission into evidence of the

9 following documents, and no additional foundation or

10 authenticity shall be required."

11         Then there's a list of documents that are listed

12 out, and the list is 46 in number, for separate exhibits,

13 and Exhibit 4 is the Ryan release form, and following that,

14 it says, "No objection," and Number 5 is the Ryan notice of

15 sale or transfer, followed by the words "No objection," and

16 these are the documents that we've already referred to.

17         THE COURT:  I understand.  Do you have a copy of

18 this for Ms. Gallian?

19         MR. HAYS:  I don't have a paper copy in front of

20 me.

21         THE COURT:  Well, we'll get you a copy.

22         MR. HAYS:  Okay.

23         THE COURT:  I will tell you that when you see it,

24 you'll see that you signed this agreement that all of these

25 are admissible at this trial.

51

1          THE WITNESS:  Correct, your Honor, and if I may?

2 Okay.

3          THE COURT:  Please.

4          THE WITNESS:  So I believe that, after that

5 stipulation was filed, that we were on the record for

6 another issue, and I had mentioned to your Honor that those

7 books have 1,756 pages in (sic), and there was no way that I

8 would know what those 43 exhibits are unless each document

9 was identified.

10          THE COURT:  But yet you signed it.

11          THE WITNESS:  Because of the only 46 documents,

12 and there was not -- that's what I had mentioned on the

13 record, your Honor, and I said, "Your Honor, there is

14 documents here that I did not agree to."  And you said,

15 "Have you been able -- have you told Mr. Hays what you

16 have" -- and I said, "Your Honor, it's so voluminous that I

17 haven't even been able to go through it."  And so I --

18          THE COURT:  Have you filed today any objections to

19 the admissibility of these and withdrawing your agreement?

20 Have you filed anything?

21          THE WITNESS:  No, I have not, sir.

22          THE COURT:  Thank you very much.

23          THE WITNESS:  Okay.  Thank you, sir.

24          THE COURT:  All right.  The stipulation will

25 stand.

1          THE WITNESS:  Okay.

2          MR. HAYS:  And, your Honor, the joint pre-trial

3  stipulation contains a list of 46 numbered exhibits, which

4  are tagged and in the binders.  I've added Number 47 to the

5  bottom of this document, and I'd like to now move to have it

6  admitted into evidence.

7          THE COURT:  And when you say, "This document,"

8  we're creating a record, so let's try to tell us again what

9  the document is that you're speaking of.

10          MR. HAYS:  Thank you, your Honor.  It's Claim 4-1,

11  filed on October 5 of 2022 in Ms. Gallian's bankruptcy case

12  by the six individuals that we were just discussing.

13          THE COURT:  It's admitted.

14          MR. HAYS:  Thank you.  And may I approach now to

15  hand it to your court reporter?

16          THE COURT:  Please.  And we're going to call this

17  what number?

18          MR. HAYS:  Four, seven.

19          THE COURT:  47.

20          MR. HAYS:  Correct.

21          THE COURT:  Okay.  And that is admitted.

22  BY MR. HAYS:

23  Q   Ms. Gallian, in addition to the lawsuit we were just

24  discussing, isn't it true that you were also a party to a

25  separate lawsuit filed by the Gables against you?  That

53

1 lawsuit was also filed in 2017, and to the extent you know

2 the case number, but, for purposes of the record, it ends in

3 985. Do you recall that lawsuit?

4 A    It's 2017? That was a lot -- could you repeat that,

5 please?

6 Q    Yes, Ms. Gallian. Yes, I can. In 2017, isn't it true

7 that there was also a separate lawsuit filed against you by

8 the Gables ending in 985, case number?

9 A    You'd have to tell me the whole case number, sir.

10 Q    Zero, zero, nine, one, three, nine, eight, five.

11 A    Yes. That's the case number that you referred to that

12 was filed against myself and Ms. Bradley.

13 Q    Okay. So, in connection with -- so you're saying it's

14 the same lawsuit, correct?

15 A    Yes, sir.

16 Q    Okay. And in connection with the Gables claim in that

17 lawsuit, on their complaint against you, isn't it true that

18 they obtained a judgment in excess of $315,000?

19 A    That's correct.

20 Q    Okay. And do you recall when that judgment was entered

21 against you?

22 A    May 6, 2019.

23 Q    Do you recall a separate lawsuit filed in 2017 against

24 you? And you seem to know the case numbers. That case

25 number is 00962999. Do you recall that lawsuit?

54

1  A    Yes, sir.

2  Q    And isn't it true that in that lawsuit --

3          THE COURT:  What was the title of that lawsuit?

4          MR. HAYS:   The Huntington Beach Gables Homeowners

5  Association v. Gallian.

6          THE COURT:  Thank you.

7  BY MR. HAYS:

8  Q    And do you recall in that lawsuit that a money judgment

9  was also entered against you?

10  A    Can you be more specific about the date, sir?

11  Q    Yes, I can.

12  A    May I help you out, here?  If it's the one I listed on

13  my schedules, I believe it was March 2019, for $9,200.

14          MR. HAYS:  That's it, your Honor.

15          THE WITNESS:  Okay.  So March 2019, for 9,200.

16          MR. HAYS:  Okay.  And if I may approach, your

17  Honor, I have a separate proof of claim filed by the Gables

18  that attaches copies of the state court judgments, and I'd

19  like to ask the witness some questions about them, if I may

20  approach.

21          THE COURT:  Yes.

22          MR. HAYS:  Okay.

23          THE COURT:  For the record, the Court has been

24  handed a copy of Claim Number 1-2, filed on October 25,

25  2022, in the main case of 8:21-11710.

55

1  BY MR. HAYS:

2  Q    Okay.  Ms. Gallian, have you seen this proof of claim,

3  which the Court has assigned Claim 1-2, filed on October 25

4  of 2022?  And in the bottom right-hand corner, I've marked

5  it as Exhibit 48.  Have you seen the proof of claim form

6  before?

7  A    No, I haven't, sir.

8  Q    Okay.  And on the -- it's a little bit hard to read, so

9  we'll have to count the pages, one, two, three, four, five,

10 six.  On the seventh page, there's a document entitled

11 "Abstract of Judgment."  Do you see that document?

12 A    The one that says at the bottom, "One of four"?

13 Q    It says, "Two of four."  Go to the next page.

14 A    Yes, sir.

15 Q    Okay.  And on line six, down about two-thirds of the

16 way down the document, it says, "Total amount of judgment as

17 entered is $9,265."  Do you see that?

18 A    Yes, sir.

19 Q    And the judgment was entered on March 21 of 2019, and

20 is that the same date you just testified the judgment was

21 entered?

22 A    Yes, sir.

23 Q    Okay.

24 A    But -- yes.

25 Q    Okay.  And then, if you turn several pages further,

56

1  there's another document entitled "Abstract of Judgment,"

2  the same form that we were looking at, and it also says,

3  "One of four" at the bottom, but it's hard to read the page

4  numbers at the top.  Do you see that document?

5  A    Yes.  The one that says, "One of four" at the bottom,

6  that ends in 259?

7  Q    Yes.

8  A    Okay.

9  Q    So, on paragraph six, about two-thirds of the way down,

10  it says, "Total amount of judgment as entered," and it says,

11  "Three hundred and nineteen thousand six hundred fifty-three

12  dollars and 59 cents."  Do you see that?

13  A    Yes, sir.

14  Q    And is that the judgment that we were referring to 10

15  minutes ago in your testimony, that was entered against you?

16  A    Yes, except for -- the amount is correct, except for

17  there were two, and I listed them in my 522 motion.  For

18  some reason, they filed two abstracts of judgment, and then

19  they rescinded one of them, and I'm not sure if this ending

20  in 259 is the one they rescinded or if it's the active one,

21  I guess.

22  Q    But the judgment was for --

23  A    But the judgment amount is correct.

24  Q    Okay.  And if you skip several pages further, I think

25  it's four or five more pages, there's another one of these

57

1   abstract of judgment forms, and at paragraph six, it says,

2   "Judgment in the amount of $3,070."  Do you see that?

3   A    Yes, sir.

4   Q    And then it says, "Judgment entered on 9/27, 2018,"

5   followed by the word "Sanctions."  Do you see that?

6   A    Yes, sir.

7   Q    Okay.  And was that money judgment for sanctions

8   entered against you in that amount by the Court?

9   A    I believe so, yes.

10  Q    Okay.  You have not paid any of these judgments that

11  we've referenced so far, correct?

12  A    I paid a portion that's listed on the very last page.

13  Some of mine came unstapled, sir, when you handed it to me,

14  but I paid, on page three of the -- it looks like Judge

15  Crandall signed May 6, 2019, a judgment, and I paid the

16  amount on line nine.  I paid that amount when this judgment

17  came out.

18          THE COURT:  Why don't you tell us the amount.

19          THE WITNESS:  I'm sorry.  One thousand two hundred

20  and ninety-five dollars.

21  BY MR. HAYS:

22  Q    And is that the only payment that's been made on

23  account of these several judgments?

24  A    Yes.  That was the damages amount that they asked me to

25  pay.

58

1          MR. HAYS:  Okay.  Your Honor, I'd like to move to

2  have Exhibit 48 admitted into evidence.

3          THE COURT:  Do you have any objection?

4          THE WITNESS:  No, sir.

5          THE COURT:  It's admitted.

6  BY MR. HAYS:

7  Q    Did J-Sandcastle LLC -- and if I may, could I refer to

8  it as "J-Sandcastle"?

9  A    Yes, sir.

10 Q    Okay.  Did J-Sandcastle pay you anything in connection

11 with receiving title to the mobile home?

12 A    Did J-Sandcastle pay me?  If you're asking me -- you

13 know, I need to just stop and let you ask your question.  Go

14 ahead, sir.  Start again.

15 Q    Did J-Sandcastle pay you anything in connection with it

16 receiving title to the mobile home?

17 A    No, not yet.

18 Q    Okay.  And in connection with receiving title to the

19 mobile home, was there a promissory note and security

20 agreement entered?

21 A    That's correct.

22 Q    Okay.  And if we can turn to Exhibit 10 in volume one

23 of six.

24         THE WITNESS:  I'm going to object to this exhibit.

25         THE COURT:  Well, let's stop for a second.

*Briggs Reporting Company, Inc.*

59

1          THE WITNESS:  Pardon me.

2          THE COURT:  You don't object to it until he's

3   sought to admit it --

4          THE WITNESS:  Sorry.

5          THE COURT:  -- and you've already agreed to admit

6   it.

7          Now, Mr. Hays, what tab number?

8          MR. HAYS:  Tab Number 10, your Honor.

9          THE COURT:  So let's just wait and see what he has

10  to ask you about this.

11          THE WITNESS:  Okay.

12  BY MR. HAYS:

13  Q    So the first part of Exhibit 10 is a document that is

14  entitled "Security Agreement."  Do you see that, Ms.

15  Gallian?

16  A    Yes, sir.

17  Q    And if you skip eight pages to page number 115 at the

18  bottom right-hand corner, there's a document entitled

19  "Secured Promissory Note."  Do you see that document?

20  A    Yes, sir.

21  Q    Okay.  And in the security agreement, it reflects that

22  J-Sandcastle is a borrower, and that Jamie Lynn Gallian is a

23  lender, and that's in the first paragraph, on page 107.  Is

24  that correct?

25  A    Yes, sir.

60

1  Q    Okay.  And then, in the secured promissory note on page

2  115, in the first paragraph, it references that J-Sandcastle

3  is a borrower promising to pay $225,000 to an entity called

4  J-Pad LLC, and J-Pad is spelled J, hyphen, P-A, D as in

5  David, LLC.  Do you see that?

6  A    Yes, sir.

7  Q    Okay.  Were these documents that were prepared at or

8  about the time that Ms. Ryan transferred the mobile home

9  into the name of J-Sandcastle?

10 A    After.

11 Q    Okay.  At or about, but immediately after, correct?

12 A    They were prepared on 11/16, 2018.

13 Q    Yes.  So immediately after, correct?

14 A    After I left the court.

15 Q    After you left the what?

16 A    I'm sorry.  Go ahead and ask your question, sir.

17 Q    I didn't hear what you said.

18        THE COURT:  No, I want to hear what you said.

19        THE WITNESS:  I had said that after -- I was in

20 Judge Crandall's courtroom on the morning of November 16.

21        THE COURT:  Well, that's not what you said.

22        THE WITNESS:  Yes.  I said, "After I left the

23 court."

24        THE COURT:  After you left the court?

25        THE WITNESS:  Yes, sir.

61

1          THE COURT:  That's all I needed to hear.

2          THE WITNESS:  Yes, sir.

3  BY MR. HAYS:

4  Q    Okay.  And the court you're referring to is Judge

5  Crandall's court in connection with the other proceedings

6  that resulted in the judgments, correct?

7  A    That's correct.

8  Q    Okay.  And did you, in fact, transfer $225,000 to

9  J-Sandcastle?

10  A    Yes, sir.

11  Q    You individually, correct?

12  A    Uh-huh.

13  Q    And it went from an account in your name to an account

14  in J-Sandcastle's name, correct?

15  A    That's correct.

16  Q    And it was, in fact, 225,000?

17  A    Not all at one time.  I think the first deposit was

18  175.

19  Q    And when did the balance of 50,000 get transferred?

20  A    I don't have a specific date.  I'm sorry.  I wasn't

21  prepared.  I have the bank accounts.

22          THE COURT:  Well, if you don't know, you don't

23  know.

24          THE WITNESS:  I don't know.

25          THE COURT:  Just say you don't know.

62

1          THE WITNESS:  I don't know.

2   BY MR. HAYS:

3   Q    Was it shortly after these --

4   A    I don't know, sir.

5   Q    Okay.  It wasn't recently, correct?  It was back around

6   shortly after -- or you have no idea if it was last week

7   or --

8          THE COURT:  Well, let's try it this way.  Was it

9   done in 2018?

10          THE WITNESS:  No.

11          THE COURT:  Was it done in 2019?

12          THE WITNESS:  Yes, sir.

13          THE COURT:  It was done in 2019.  Was it done --

14          THE WITNESS:  Yes, 2019.

15          THE COURT:  -- in the first half of 2019?

16          THE WITNESS:  I believe the first half is correct,

17   your Honor.

18          THE COURT:  Very good.

19          THE WITNESS:  Thank you.

20   BY MR. HAYS:

21   Q    And is the $225,000 that you're transferring here

22   separate and apart from the $185,000 transferred to Ms.

23   Ryan?

24   A    Yes, sir.

25   Q    Okay.  And the promissory note, however, reflects that

63

1  J-Sandcastle is the borrower, and that J-Pad is the holder

2  that is owed the $225,000, correct?

3  A    That's correct, sir.

4  Q    And this promissory note is dated November 16 of 2018,

5  as reflected on page 115?

6  A    That's correct.

7  Q    Okay.  Did J-Pad, in fact, loan any money to

8  J-Sandcastle?

9  A    No, they did not.

10 Q    But the promissory note requires J-Sandcastle to pay

11 J-Pad the money, correct?

12 A    They are the holder of the note, yes, with me.

13 Q    On page 120 of Exhibit 10, there is a certification

14 under penalty of perjury that the contents of the document

15 are true, and it's signed by Jamie Gallian.  Do you see that

16 signature?

17 A    Yes, I do.

18 Q    Okay.  And is that your signature?

19 A    Yes, it is.

20        THE WITNESS:  And at this time, can I object to

21 this document?

22        THE COURT:  Go ahead.

23        THE WITNESS:  Okay.  All right.  There is another

24 exhibit, and this is only a part of the agreement, and you

25 have the full exhibit, and I believe it is Exhibit Number

64

1  43.

2          THE COURT:  You'll get a chance to --

3          THE WITNESS:  I'm so sorry.

4          THE COURT:  -- offer that as evidence later.

5          THE WITNESS:  Okay.  I'm sorry.  I apologize, sir.

6          THE COURT:  No, you don't need to apologize.  I

7  want you to, in any time you feel you need to object, state

8  your objection, and what I will do is I'll get the timing

9  right, so that it doesn't hurt you, or hurt Mr. Hays.  My

10 point is that we take care of everything.  If there is

11 another part of this document that you'd like made part of

12 the record, let me ask you this.  Where do you find it?

13         THE WITNESS:  I believe it was Number 43 --

14         THE COURT:  Is it in Mr. Hays' --

15         THE WITNESS:  -- Exhibit Number 43.

16         THE COURT:  Is it Mr. Hays' exhibits or your

17 exhibits?

18         THE WITNESS:  No, it's Mr. Hays'.

19         THE COURT:  Okay.  And you believe that 43 is part

20 of this?

21         THE WITNESS:  It's the whole document.

22         THE COURT:  Okay.  And so that's already been

23 admitted, also.

24         THE WITNESS:  Yes.

25         THE COURT:  So that's already there.

65

1              THE WITNESS:  Right.

2              THE COURT:  So all we need to do is -- it's not a

3  real objection.  What you say is you "Understand, Judge,

4  that this is just a partial."

5              THE WITNESS:  Okay.

6              THE COURT:  And now I know.  See, you've helped me

7  already.

8              THE WITNESS:  I believe it was 43.

9              THE COURT:  Well, we'll find it.

10             THE WITNESS:  Yes.

11             THE COURT:  But the point is that, when you raise

12 these objections, you help me --

13             THE WITNESS:  Thank you, your Honor.

14             THE COURT:  -- and I want that assistance from

15 you.

16             THE WITNESS:  Thank you.  I appreciate that.

17             THE COURT:  Thank you.

18 BY MR. HAYS:

19 Q    The collateral that was the subject of the security

20 agreement was the manufactured home in Space 376, correct?

21 A    That's correct.

22 Q    Okay.  And so J-Sandcastle, who was on title, pledged a

23 security interest in the mobile home to secure repayment of

24 this $225,000 we're talking about.  That's what these

25 documents were accomplishing, correct?

66

1  A    Yes.

2  Q    Okay.  Did J-Sandcastle ever pay $225,000 to J-Pad?

3  A    No, sir.

4  Q    Okay.  Was the money ever paid to you individually?

5  A    No, sir.

6  Q    Was there ever any lawsuit filed to enforce payment

7  under this note obligation?

8  A    No, sir.  It's not due yet.

9  Q    At the time that this was being done, were you the 100

10 percent owner of J-Sandcastle?

11 A    That's correct.

12 Q    And have you always been the 100 percent owner of

13 J-Sandcastle?

14 A    That's correct.

15 Q    At the time that these documents were being drafted,

16 who were the members of J-Pad?

17 A    In November of 2000 (sic), the only members of J-Pad

18 were Mr. Calderon, I believe is his name, and myself.

19 Q    I think you just said, "In November of 2000."  Do you

20 mean November of 2018?

21 A    I'm sorry.  2018, sir, yes.

22 Q    Okay.  And how much did Mr. Calderon own of J-Pad?

23 A    I believe at the time only $5,000 worth.

24 Q    Was that a percentage, or was it just the dollar

25 amount?

67

1  A    It was just a dollar amount.

2  Q    Okay.  And the members of J-Pad changed over time,

3  correct?

4  A    That's correct.

5  Q    Okay.  If I can have you turn to page 122 on Exhibit

6  10.  It's the final page of Exhibit 10.  There's a UCC

7  financing statement which reflects that the Debtor is

8  J-Sandcastle Co LLC, and that the secured party is J-Pad

9  LLC.  Do you see that document?

10  A    That's correct.

11  Q    And the document in the top right-hand corner of the

12  text on the document reflects a filing date with the

13  Secretary of State of January 14 of 2019, correct?

14  A    That's correct.

15  Q    So this financing statement was filed in connection

16  with the security agreement and note that we were just

17  referring to, correct?

18  A    That's correct.

19  Q    Okay.  Were there amendments to this UCC financing

20  statement that had been filed with the Secretary of State?

21  A    Yes.

22  Q    Okay.  If I can get you to turn to page -- or to Tab

23  14, tab one, four, and turn to page 178, which is the second

24  page of Tab 14.

25  A    Yes, sir.

68

1 Q    There's a document that is a UCC financing statement

2 amendment, which is form UCC3, reflecting a file date in the

3 top right-hand corner of December 4 of the year 2020.  Have

4 you seen this document before?

5 A    Yes, sir.

6 Q    And were the party that -- the person that prepared

7 this document?

8 A    Yes, sir.

9 Q    Okay.  And in the middle of the page, it says, "Add

10 secured party Steven D. Gallian and Brian J. Gallian."  Do

11 you see that?

12 A    Yes, sir.

13 Q    And are those your sons?

14 A    Two of them, yes.

15 Q    And it says that this document is amending a previous

16 document filed on January 14 of 2019, which was the original

17 UCC financing statement we just looked at, correct?

18 A    That's correct.

19         THE COURT:  May I interrupt for one second?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  Just to have a little bit of

22 completeness, this was filed on December 4, 2020.  What were

23 the ages of Steven and Brian at the time, approximately?

24         THE WITNESS:  Maybe 29 and 31.

25         THE COURT:  And were these the mailing addresses

69

1  of Steven and Brian?

2          THE WITNESS:  No, they are not.

3          THE COURT:  Whose mailing address was this?

4          THE WITNESS:  That's my address, sir.

5          THE COURT:   Thank you.

6  BY MR. HAYS:

7  Q    Did Steven or Brian pay anything in order to become

8  secured parties holding the lien that was recorded against

9  the mobile home?

10  A    No, they did not.

11  Q    Okay.  And was this a gift that you made to them?  Was

12  this evidence of the gift you made to them?

13  A    No.

14  Q    Did you, in fact, make gifts to Steven and Brian in the

15  period of time after Lisa Ryan sold the mobile home and the

16  time of the bankruptcy?

17  A    No, I've never made any gifts to my children.

18          THE COURT:  Mr. Hays, we're going to take a

19  10-minute break at 11:00 o'clock, which is in approximately

20  three minutes.

21          MR. HAYS:  Okay.  Your Honor, I'm about to refer

22  to a deposition transcript, and that will probably take more

23  than three minutes.  Would you prefer to take the break now?

24          THE COURT:  What would you like to do?

25          MR. HAYS:  I'm fine to just take the break now.

70

1           THE COURT:  Let's do that, then.  Where would I

2  find the deposition transcript?

3           MR. HAYS:  That's part of what I'm looking at, is

4  where to be able to tell the Court how to find it.

5           THE COURT:  Okay.  Well, be prepared in 10 minutes

6  to do that.

7           MR. HAYS:  Yes.

8           THE COURT:  Let's take a break.  All right.  We'll

9  be back in 10 minutes.

10          MR. HAYS:  Very good.  Thank you, your Honor.

11      (Proceedings recessed briefly.)

12          THE CLERK:  Please remain seated.  This Court is

13  again in session.

14          THE COURT:  Please be seated, and we're back on

15  the record.

16          Mr. Hays.

17          MR. HAYS:  Yes.  Thank you, your Honor.  I have

18  copies of the deposition transcript, and if I may approach

19  the bench and the witness?

20          THE COURT:  Yes.

21  BY MR. HAYS:

22  Q    Ms. Gallian, do you recall sitting for a deposition

23  that I conducted on June 28 of 2022?

24  A    Yes, sir.

25  Q    And it was conducted remotely, correct?

71

1  A     Yes, sir.

2  Q     Okay.  And this is a transcript of that deposition,

3  which I believe you've been provided a copy after the

4  deposition so you could decide whether to make changes,

5  correct?

6  A     I believe that there's a portion of it in this book, or

7  in the exhibit books, but this is the whole thing.

8  Q     I'm not referring to the exhibit book.  I'm referring

9  to this document I just handed you.

10 A     Okay.  So this isn't in there.  Okay.

11 Q     This is a --

12 A     Because I only read the little part.

13 Q     Yes.

14 A     Okay.

15 Q     And so you did get a copy of this before, correct?

16 A     The rough draft, yes, sir.

17 Q     And did you get a full copy of the reporter's

18 certificate?

19 A     I don't recall.

20       THE COURT:  Do you know what a reporter's

21 certificate is?  See, I'm trying to protect you again.

22       THE WITNESS:  Okay.

23       THE COURT:  She doesn't know what a reporter's

24 certificate is.

25       MR. HAYS:  I apologize.  Let me rephrase the

72

1  question.

2          THE COURT:  No, you don't need to apologize.  You

3  need to just --

4          MR. HAYS:  Be clear.

5          THE COURT:  Why don't you just ask her some

6  questions, and then, if you want to impeach, you can use

7  this deposition.

8          MR. HAYS:  Yes, your Honor.  That's what I will

9  do.

10          THE COURT:  Wouldn't that be a simpler matter?

11          MR. HAYS:  Let me do -- I was just -- I was trying

12  to lay a little bit of foundation, but let me --

13          THE COURT:  Well, you don't need to lay the

14  foundation about a deposition.

15          Do you recall if your deposition was taken?

16          THE WITNESS:  Yes, I do, sir.

17          THE COURT:  Fine.  Ask her some questions.

18          MR. HAYS:  Yes, your Honor.

19  BY MR. HAYS:

20  Q    Why was Brian and Steven added as secured parties on

21  the UCC amendment we were referring to in Exhibit 14?

22          THE WITNESS:  Your Honor, it's a private matter,

23  and I was wondering if the witnesses can be excused, the

24  witness.

25          THE COURT:  You're the witness.

73

1           THE WITNESS:  Well, the other one.

2           THE COURT:  I'm sorry.

3           THE WITNESS:  No?

4           THE COURT:  No.

5           THE WITNESS:  Okay.  Then that's fine.  Then I'll

6  answer.

7           THE COURT:  It's a very simple question.

8           THE WITNESS:  I'm sorry.  It's okay.  It is.

9           Ask me a question again, please.

10  BY MR. HAYS:

11  Q    Why were they added as secured --

12           THE COURT:  Well, hold on.  Wait one second.

13           THE WITNESS:  Yes, sir.

14           THE COURT:  Who is this gentleman?

15           MR. HAYS:  Your Honor, my client contact at Houser

16  Brothers is Mr. Chris Houser, who is sitting here at counsel

17  table.

18           THE COURT:  So he's a party?

19           MR. HAYS:  He's a party.

20           THE COURT:  I just wanted to make sure.  If he's

21  not a party, and just a witness, we could have excused him,

22  but he's a party.

23           THE WITNESS:  Okay.

24           THE COURT:  He's the representative of the

25  plaintiff, correct?

74

1          MR. HAYS:  That is correct, your Honor.

2          THE COURT:  We cannot excuse him.

3          THE WITNESS:  Yes, sir.  Okay.

4          THE COURT:  I apologize

5          THE WITNESS:  No worries.  Okay.

6          THE COURT:  But one more thing.  If there's

7    something so private --

8          THE WITNESS:  It is.

9          THE COURT:  Okay.  If there's something so

10   private, you can have an in camera discussion with me right

11   outside the hall, and you can tell me, and I'll determine

12   whether or not it's too private to discuss.

13         THE WITNESS:  Yes, sir.

14         THE COURT:  Would you like to do that?

15         THE WITNESS:  Yes, sir.

16         THE COURT:  We'll take one minute.  You go to that

17   door.  James will help you.  Don't open the door yet.

18         THE WITNESS:  Yes, sir.

19         THE COURT:  He will.  I'll come down with you.

20         We're off the record, right?  No, no, it's all

21   right.  Stay on the record.  I just want to say this on the

22   record.  I'm going to have an in camera discussion about an

23   assertion that there's something so private that we don't

24   want to have it happen in open court.

25         Mr. Hays, is that okay with you?

75

1          MR. HAYS:  No objection, your Honor.

2      (Proceedings recessed briefly.)

3          THE COURT:  I'm going to ask my clerk to bring a

4  box of Kleenex into the courtroom.

5          THE WITNESS:  I have a paper towel, sir, until we

6  can get some at, maybe, a break.  Thank you, sir.

7          THE COURT:  Okay.  We're still on the record.  Mr.

8  Hays, would you ask your question again.

9          Do you have your paper and pen?  Okay.

10          She wants to take some notes while she's

11  testifying, to remind herself, because she's representing

12  herself, and I've told her, first of all, that she can take

13  some notes if she wants to.

14          Have a seat.

15          Mr. Hays, ask your question again.

16          MR. HAYS:  Yes.  Thank you, your Honor.

17  BY MR. HAYS:

18  Q    The question was -- and let me just start over.  I'm

19  not even sure I remember the exact question.

20          THE COURT:  Well, I'll say it for you.

21          Why did you put Steven and Brian onto this UCC

22  financing statement?

23          MR. HAYS:  Very good.

24          THE WITNESS:  I was getting my affairs in order,

25  and it's further described at some portions of the

76

1  transcript.

2          THE COURT:  Are you telling me that in the

3  transcript of this deposition, you further explained what

4  you're saying here today?

5          THE WITNESS:  I haven't read this, your Honor, and

6  it was quite a while ago.  So you know what?  I just -- it's

7  okay.

8          THE COURT:  Her answer is she was getting her

9  affairs in order.

10          MR. HAYS:  That's fine, your Honor.

11          THE COURT:  Thank you.

12  BY MR. HAYS:

13  Q    If I can have you turn to page 43 of the transcript

14  that we handed you, that has the big black binder clip on

15  top.

16          THE COURT:  What page?

17          MR. HAYS:  Page four, three, starting at line

18  seven.

19  BY MR. HAYS:

20  Q    Tell me when you're at page 43.

21  A    Yes, sir.

22  Q    At line seven, I ask a question:

23          "Q    So, after October 2018, did the

24          membership interest in J-Pad change

25          again?"

77

1    And your answer was:

2        "A    I believe it did."

3    Correct?

4  A    Yes, sir.

5  Q    Okay.  And that's the addition of Brian and Steven as

6  reflected on the UCC filing we were looking at, correct?

7            THE COURT:  Just leave it alone.  That's okay.

8            THE WITNESS:  Okay.  I said I'm not sure, sir.

9  I'd have to read a little bit before and a little bit after,

10 because the next sentence doesn't really --

11           THE COURT:  Why don't you rephrase your question,

12 Mr. Hays.

13 BY MR. HAYS:

14 Q    When I asked you if, after October of 2018, did the

15 membership interest in J-Pad change again, your answer was

16 "I believe it did," correct?

17           THE COURT:  Mr. Hays, it says that.

18           MR. HAYS:  I understand.

19           THE COURT:  Let's not -- I already see it.

20 BY MR. HAYS:

21 Q    Okay.  And further down the page, at line 23, when I --

22 the question was "Had J-Pad ever filed tax returns at any

23 point in time?"  And your answer was "No," correct?

24 A    "No."  That's correct.

25 Q    Yes.  And on line 23, near the end, isn't it true you

78

1  also said, "My intent was to gift a percentage to each one

2  of the children"?  Correct?  And that's a percentage of

3  J-Pad?

4  A    And it goes with the statement of getting my affairs in

5  order.

6  Q    Yes.

7  A    And then, if you go back up to --

8            THE COURT:  Well, hold on.

9            THE WITNESS:  I'm sorry.  I'm sorry.  Let me

10 ask -- okay.  You can ask the question.

11           THE COURT:  First of all, I want everyone to

12 understand I can read a transcript.

13           THE WITNESS:  Right.

14           THE COURT:  I don't need you to read me these

15 transcripts, Mr. Hays, and I don't need you to ask her

16 whether the transcript says what it says it says.  I don't

17 need any of that, Mr. Hays.  I know what it says.  If you

18 have specific questions, just ask her, and don't ask her,

19 "Did you say this in a transcript?"  You can say, "I

20 observed that you said that in the transcript.  Was it

21 true?"  You can say it that way.

22           MR. HAYS:  Very good, your Honor.

23           THE COURT:  But we're just going circular here,

24 and we're going to spend days and days doing this if you

25 continue doing this.

79

1 BY MR. HAYS:

2 Q    In the deposition, when asked about gifts, isn't it

3 correct that you said your intention was to gift $15,000 a

4 year to each of your children?

5 A    That's correct.

6         THE COURT:  And I'm going to follow that up.  And

7 were you telling the truth with that statement?

8         THE WITNESS:  Yes.  Yes, I was.

9         THE COURT:  Thank you.

10 BY MR. HAYS:

11 Q    And so the amounts or percentage that -- interest in

12 J-Pad that Brian and Steven acquired when this document was

13 filed with the Secretary of State was $15,000 a year for

14 three years, correct?

15 A    No, sir.

16 Q    In your deposition, if I can get you to turn to page

17 134.  Are you on page 134?

18 A    Yes, sir.

19 Q    And starting at line 14, I asked you:

20         "Q    And the amounts or percentages

21         that Brian and Steven were due under

22         these UCCs will be reflected in the

23         minutes of J-Pad?"

24     And you testified:

25         "A    Yes, yes, the 15,000 for the three

80

1          years."

2      And I said:

3          "Q    For each of them?"

4      And you said:

5          "A    Yes."

6      Was that a true statement, that they were being gifted

7  $15,000?

8          THE COURT:  Just say, "Was it a true statement?"

9  BY MR. HAYS:

10  Q    Was it a true statement?

11  A    It was my intent, but it never happened.

12          THE COURT:  Was it a true statement?

13          THE WITNESS:  Yes, sir.

14  BY MR. HAYS:

15  Q    And I think I asked you this.  I just want to be sure.

16  Neither Brian nor Steven paid anything to become members of

17  J-Pad, correct?

18  A    They never did become members, sir.

19  Q    And neither of them paid anything to become a secured

20  party as reflected on this UCC3 amendment, correct?

21  A    No.  That was a private issue, just to get my affairs

22  in order.

23  Q    The answer was no, correct?  They didn't pay to become

24  secured parties, correct?

25  A    No, they did not.

81

1          THE COURT:  Did they give anything?

2          THE WITNESS:  No, sir.

3          THE COURT:  Thank you.

4    BY MR. HAYS:

5    Q    If I can have you look on the following page of Exhibit

6    14, which is page 170.  We're looking at the binder.  Are

7    you on page 179?

8    A    That's correct.

9    Q    Okay.  And it's a UCC amendment filed with the

10   Secretary of State on September 8 of 2021.  Do you recognize

11   this document?

12   A    No, because I always put my name here at the top, but

13   they're my children's names, and my granddaughter's name is

14   there.

15   Q    My question was, do you recognize this document?  Have

16   you seen it before?

17   A    I'm going to say yes.

18   Q    Okay.  And this filing date is two months after the

19   bankruptcy case, correct?

20   A    That's correct.

21   Q    Okay.  And four additional people are being added as

22   secured parties under the original security agreement that

23   was -- had a financing statement filed on January 14 of

24   2019, correct?

25   A    That's correct.

82

1  Q    So the secured parties as of this date were now J-Pad,

2  on the original, Brian and Steven on the last amendment, and

3  then these four individuals, correct?

4  A    That's correct.

5  Q    For a total of seven?

6  A    That's correct.

7  Q    Okay.  And who is Ronald Pierpont?

8  A    That's my divorcee from 2015.

9  Q    So former spouse?

10  A    Yes, sir.

11  Q    And Robert McLelland?

12  A    That is my roommate since maybe 2015.

13  Q    And Justin Barkley (phonetic)?

14  A    That's my oldest son.

15  Q    And E.J. Gallian?

16  A    That's my granddaughter.

17        THE COURT:  Mr. Hays, just another inquiry.  Have

18  you established who filed these?

19        MR. HAYS:  I have not yet asked that question.

20        THE COURT:  Thank you.

21  BY MR. HAYS:

22  Q    Ms. Gallian, do you know who filed this document?

23  A    I do not.

24  Q    And do you know who, on behalf of J-Pad, authorized the

25  filing of this document?

83

1  A    I do not.

2  Q    And do you know if the purpose that these four people

3  were being added, or at least with regard to your son,

4  Justin Barkley, and your granddaughter, E.J. Gallian -- was

5  the purpose of that also to get your affairs in order?

6  A    That's correct.

7  Q    And was your intent in getting your affairs in order to

8  gift a portion of the J-Pad lien to your granddaughter?

9  A    So, to answer your -- okay.  Just ask me a question

10  again.

11  Q    Was your intention in adding your son, Justin, and your

12  granddaughter, E.J., as secured parties to gift them a

13  portion of J-Pad's lien?

14  A    Well, I don't know what the intention is with these

15  four people, but I'm looking at your next page, and I know

16  clearly, because it says right there who did file it.  So I

17  would say yes to that question, sir.

18  Q    Okay.  And what was the amount of the yearly gift that

19  you were intending for your sons and granddaughter?

20  A    I think that the amount for the IRS is that you can

21  gift 15,000.

22  Q    And so, for Brian and Steven, it was 15,000 a year for

23  three separate years, correct?

24  A    It could have been.

25  Q    And in your --

84

1  A    I mean, that's what I remember in the transcript, if

2  that's what I said.

3  Q    Yes.  That's what you testified to in the deposition,

4  correct?

5  A    Okay.  Then I think that was my intent.

6  Q    Okay.  And with respect to Emma, do you recall your

7  intent in terms of the amount of the gift?

8  A    I don't know.  She's just a baby.

9  Q    And so she's not -- she's a baby, you said, so she's

10 under 18, correct?

11 A    Of course.

12 Q    And your son, Justin, how old is he?

13 A    He's 44, 43.

14 Q    And these gifts were reflected in the minutes of J-Pad,

15 correct?

16 A    I would hope so.

17        THE COURT:  Well, that's not good enough.

18        THE WITNESS:  I understand, your Honor.  I am

19 going to say yes, because I do have a book with the minutes

20 in them, and I believe I provided that.

21 BY MR. HAYS:

22 Q    And you testified to it in the deposition --

23 A    Yes, that's correct.

24 Q    -- that all of these gifts were reflected in the

25 minutes, correct?

85

1  A     That's correct.

2  Q     And that is true, correct?

3  A     But they did not happen, is what I also said in the

4  transcript, and that's what I was trying just to clarify, is

5  that I think that we skipped some verbiage in between that,

6  and I apologize if that was inappropriate to say.

7  Q     No.  No tax return was ever filed by you with the

8  federal or state taxing agencies reflecting or evidencing

9  that you gave any gift, correct?

10 A     That's correct.

11 Q     Okay.  So is that why you believed the gift never

12 happened?

13 A     Well, yes, and I believe that I said in here that the

14 turmoil, especially with boys, they run the other way, and

15 at first, everybody was all excited, because J-Pad is a

16 member-managed -- or manager-managed, I believe is what I

17 said, and everybody, you know, is all excited, but then,

18 when all this happened, they run the other way.  They don't

19 want any part of it.  And so I did not file any tax returns

20 with my children's names on it.

21 Q     I understand.  But you intended --

22 A     I would have liked to have given them --

23 Q     -- these filings with the Secretary of State to

24 reflect, and the minutes of J-Pad reflect, that you were

25 intending to give gifts to your children of $15,000 a year

86

1  for a three-year period, correct?

2  A    Well, at the time, I had only had it for three years.

3  Q    I understand.

4  A    Yes.

5  Q    So the answer is yes?

6  A    Yes.

7  Q    Okay.

8  A    Yes, that's correct.

9  Q    If I can have you turn to Exhibit 25, which should be

10 in binder two.

11        THE COURT:  It's in volume two.

12 BY MR. HAYS:

13 Q    Page 454.  Can you tell me when you're there?

14 A    Yes, I am, sir.

15 Q    Okay.

16 A    Yes.

17 Q    It's a state of California HCD form entitled "Statement

18 to Encumber," and it bears a signature that appears to be

19 your signature near the bottom on behalf of J-Sandcastle.

20 Do you see that?

21 A    That's correct.

22 Q    And is that your signature?

23 A    Yes, it is.

24 Q    And is it your handwriting that completed the document?

25 A    Yes, it is.

87

1  Q    Okay.  And in this document, Ronald J. Pierpont, as

2  member of J-Pad, is being added as the legal owner of the

3  mobile home, correct?

4  A    It appears that way on this form, yes.

5  Q    And this form was signed on August 20 of 2020?

6  A    I believe it was the 28th.

7  Q    The date appearing on the form is the 20 (sic), but you

8  think it was the 28th?

9  A    Because the notarization was the 28th.

10 Q    Okay.  But the form --

11 A    I do remember that --

12 Q    The form says the 20th --

13 A    -- but it's not in here.

14 Q    -- correct?

15 A    What's that?

16 Q    The form says the 20th, correct?

17 A    That's correct.

18 Q    Okay.  But you believe and recall it was the 28th?

19 A    I believe there should -- the notarization is missing

20 from all these pages, but that's okay.  It should have been

21 the 28th, but that's okay.

22 Q    Okay.  So no doubt in your mind it was August 28th of

23 2020, correct?

24 A    I believe so.

25 Q    Okay.  And the purpose of this form is to add a legal

88

1  owner to the certificate of title as issued by HCD?

2  A    That's correct.

3  Q    Okay.  And is this similar to a vehicle, where the

4  legal owner is, in fact, the lien holder, and the registered

5  owner is, in fact, the owner?  Right?

6  A    That's correct.

7  Q    Okay.  So the purpose of this statement to encumber you

8  signed was to have the certificate of title issued by HCD

9  amended to reflect that there was now a lien in favor of

10 J-Pad, correct?

11 A    No.  It should have said -- this is misleading.  What

12 it said was Ronald J. Pierpont, because he's not a member of

13 J-Pad, or J-Pad LLC, is what the certificate, I believe,

14 ended up coming out as.

15 Q    But the purpose was to add a lien holder where no lien

16 holder had previously appeared, correct?

17 A    That's correct.

18 Q    Okay.  And two pages later, on page 456, there's an HCD

19 form entitled "Statement of Facts."

20        THE COURT:  Instead of saying, "Two pages later,"

21 would you please state the name of the page or the number of

22 the page.

23        MR. HAYS:  Yes, your Honor.

24 BY MR. HAYS:

25 Q    On page 456, there's an HCD form entitled "Statement of

89

1  Facts."

2  A    That's correct.

3  Q    And is that your handwriting on this form?

4  A    Yes, it is.

5  Q    Okay.  And this form says you want to disregard the

6  former statement to encumber to correct the name of the

7  legal owner.  Is that what this is doing?

8  A    Okay.  So let's see, here.  Okay.  You're on page 456,

9  sir?

10  Q    Yes.

11  A    So (indiscernible) disregard former statement to

12  encumber.

13            THE COURT:  Don't read it out loud.

14            THE WITNESS:  Yes.

15  BY MR. HAYS:

16  Q    Did a new certificate of title get issued by HCD that

17  did reflect that J-Pad was the legal owner or lien holder?

18  A    Yes, and Ron Pierpont.

19            THE COURT:  So I'm a little confused.

20            THE WITNESS:  I am, too, by all these pages.

21            THE COURT:  Your question was, unfortunately, a

22  two-part question.  You used the word "or."  You said, "Lien

23  holder or legal owner," and I now -- I'm completely confused

24  of what you're trying to tell me.  Are you saying that this

25  document transferred the ownership to J-Pad LLC or a lien to

90

1 J-Pad LLC?

2          MR. HAYS:  The latter, your Honor.

3          THE COURT:  A lien.

4          MR. HAYS:  And that's because -- and I'll ask the

5 witness to confirm -- the certificates of titles for mobile

6 homes were like vehicles, where the lien holder is listed

7 and described as the legal owner.

8 BY MR. HAYS:

9 Q    And so the intention here that you had, Ms. Gallian, in

10 filling out this form and submitting it to HCD, was to

11 reflect --

12          THE COURT:  No, no, no.  You have to ask her what

13 the intention was.

14 BY MR. HAYS:

15 Q    Was your intention --

16          THE COURT:  No.  Ask her what her intention was.

17 BY MR. HAYS:

18 Q    What was your intention?

19 A    Again, to -- I didn't have a will, and I had some

20 personal issues going on, and I needed to get my affairs in

21 order.

22 Q    That's a different answer.  That's your reason for

23 doing it.  I'm asking --

24 A    What my intent --

25 Q    -- what your intention was.  It was to add J-Pad as the

91

1  legal owner when the certificate of title did not already

2  reflect that, correct?

3  A    Due to the UCC filing of January 14th, 2019.  That's

4  correct.

5  Q    So it's a yes, right?

6  A    Yes, sir.

7  Q    Okay.  And your understanding is that "lien holder" --

8  that "legal owner" is synonymous with "lien holder,"

9  correct?

10  A    You've said the lien holder is --

11  Q    Let me rephrase and be really clear, because this was

12  confusing to me as I was learning this case.  Is it your

13  understanding that a legal owner is a lien holder?

14        THE COURT:  I'm going to ask you to hold back for

15  a second.

16        Do you see this document in front of you?

17        THE WITNESS:  And we're on page 456, sir?

18        THE COURT:  Yes.

19        THE WITNESS:  Yes, sir.

20        THE COURT:  Do you have it in front of you?

21        THE WITNESS:  Yes, sir.

22        THE COURT:  Four fifty-six?

23        THE WITNESS:  Yes, sir.

24        THE COURT:  And, first of all, "I/we, the

25  undersigned, hereby state."  Do you see that?

92

1          THE WITNESS:  Yes, sir.

2          THE COURT:  The handwriting underneath that, whose

3  is that handwriting?

4          THE WITNESS:  The printing?  That's mine, sir.

5          THE COURT:  That's your printing?

6          THE WITNESS:  Yes, it is.

7          THE COURT:  Okay.  "In favor of new legal owner

8  J-Pad LLC."  You want to change that to "J-Pad LLC, Ronald

9  S. Pierpont, member."  So the earlier one had it backwards,

10  right?  And you're trying to fix that, right?

11          THE WITNESS:  Well, your Honor, as we go a couple

12  more pages, it's --

13          THE COURT:  Well, no.

14          THE WITNESS:  Yes, sir.

15          THE COURT:  I'm just asking you about this one.

16          THE WITNESS:  Okay.

17          THE COURT:  You've changed out the order.

18          THE WITNESS:  Did I?

19          THE COURT:  Well, maybe you didn't.  "In favor of

20  new legal owner, J-Pad LLC, Ronald J. Pierpont."  The new

21  legal owner is J-Pad LLC, Ronald S. (sic) Pierpont, member."

22          THE WITNESS:  Statement of facts.  Okay.

23          THE COURT:  So what are you trying -- what did you

24  hope to do here?

25          THE WITNESS:  Well --

93

1          THE COURT:  Just quickly explain.

2          THE WITNESS:  Yes.  Okay.

3          THE COURT:  What did you want the state of

4     California to do?

5          THE WITNESS:  Right.  Okay.  So initially --

6          THE COURT:  No.  Just tell me, what did you want

7     the state of California to do by you filling this out and

8     sending it in?

9          THE WITNESS:  I wanted the state of California to

10    have an individual person listed there with J-Pad LLC.

11         THE COURT:  Listed there as what?

12         THE WITNESS:  Listed as a legal owner.

13         THE COURT:  The legal owner?

14         THE WITNESS:  Yes.

15         THE COURT:  Okay.  What, exactly, did you want --

16    who did you want or what did you want to have named the

17    legal owner when you filed this

18         THE WITNESS:  J-Pad LLC, because of their UCC

19    filing 1/14, 2019.

20         THE COURT:  Okay.  You wanted that entity to be

21    the legal owner?

22         THE WITNESS:  Correct.

23         THE COURT:  Did you want it to be the legal owner

24    solely, or anyone else?

25         THE WITNESS:  No.  The second person, in August

94

1   2020 --

2           THE COURT:  No, I'm talking about this document.

3           THE WITNESS:  Right.  Correct.  That's correct.

4   In my schedules, I listed Mr. Pierpont, that I owed him

5   money, and he wanted some sort of a security, but on that

6   form, it doesn't say how much of a security.  So it was

7   J-Pad, and then "slash" -- or, well, then they called me and

8   said, "You can't do an LLC 'and.'  You have to do 'or.'"

9           THE COURT:  Okay.

10          THE WITNESS:  The HCD called me and said, "'Or,'"

11  "It has to be 'or.'"

12          THE COURT:  Okay.  So the point is that you wanted

13  to transfer the ownership from one thing to another thing?

14          THE WITNESS:  I don't think I wanted to transfer

15  ownership, just add a legal --

16          THE COURT:  Well, legal ownership.

17          THE WITNESS:  Pardon me?

18          THE COURT:  Before this was filed --

19          THE WITNESS:  Yes, sir.

20          THE COURT:  - who was the legal owner?

21          THE WITNESS:  There was nobody.

22          THE COURT:  Nobody owned it?

23          THE WITNESS:  Well, the registered owner was --

24          THE COURT:  Who owned it?

25          THE WITNESS:  J-Sandcastle.

*Briggs Reporting Company, Inc.*

95

1          THE COURT:  Okay.  And so the answer is

2  J-Sandcastle owned it?

3          THE WITNESS:  And that remained the same.

4          THE COURT:  Yes?

5          THE WITNESS:  Yes, sir.

6          THE COURT:  J-Sandcastle owned it?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  And then this document did something,

9  right?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  What did it do?

12          THE WITNESS:  It --

13          THE COURT:  It made someone else an owner, right?

14          THE WITNESS:  Well, it placed a legal owner or a

15  lien owner.

16          THE COURT:  I understand.

17          THE WITNESS:  Okay.  So that the UCC filing that I

18  had filed in January of 2019 would be reflected, but then,

19  at the same time, Mr. Pierpont wanted something.

20          THE COURT:  I understand.

21          THE WITNESS:  Thank you.

22          THE COURT:  Now you've clarified this for the

23  record.

24          Mr. Hays, would you please continue.

25          MR. HAYS:  Yes.

96

1  BY MR. HAYS:

2  Q    Ms. Gallian, perhaps it would be a little bit easier to

3  understand everything if we turn to the actual certificate

4  of title that got issued, and then that's Exhibit 26, page

5  468.

6  A    That's correct.

7  Q    Okay.  And so, halfway down the document, it says,

8  "Registered owner, J-Sandcastle," correct?

9  A    That's correct.

10 Q    And in layman's terms, that's the person or entity that

11 really owns it, right?

12 A    That's correct.

13 Q    Okay.  And then it says below that, "Legal owner,

14 Ronald J. Pierpont, J-Pad LLC, tenants in common, or,"

15 correct?

16 A    That's correct.

17 Q    Okay.  And the "legal owner" is the terminology used by

18 HCD, and it's your understanding that that terminology

19 refers to a party or parties that hold the liens, right?

20 A    That's correct.

21 Q    Okay.  So, at all times from the time Lisa Ryan

22 transferred title in November of 2018, all the way through

23 the -- or at least through the day of the bankruptcy, the

24 certificate of title reflected that J-Sandcastle was the

25 registered owner?

97

1  A    After November 16th.  That's correct.

2  Q    Yes.  And then there was no legal owner until August of

3  2020, when the statements to encumber were filed, and that

4  resulted in this new certificate of title being issued to

5  reflect that there was, in fact, a lien holder?

6  A    That's correct.

7  Q    Okay.

8  A    When I filed the UCCs, I was not aware of what a COTA

9  was.  I didn't know what a COTA was.  I filed a UCC, but it

10  makes sense, like, the way that the judge explains it.

11  Q    When you're saying, "COTA," can you spell that for us?

12  A    Certificate of Title Act.  I did not know what that

13  was.

14  Q    So you were saying C-O-T-A as an acronym for

15  Certificate of Title Act?

16  A    COTA.  Yes, an acronym.  I didn't know what that was,

17  and so, when I filed the UCC filing on January 14th, 2019,

18  it didn't change the legal owner.  It didn't change a

19  lienor.

20  Q    So what you're saying is your understanding was the

21  UCCs did not result in --

22  A    That's correct.

23  Q    -- J-Pad perfecting its lien?

24  A    That's correct.

25  Q    And in order --

98

1   A    I did not know that.

2          THE COURT:  Now, I'm going to interrupt one more

3   time.

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Would you look at Exhibit 26, page

6   468, for me?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  How many mobile homes are we talking

9   about here?

10          THE WITNESS:  Just one.

11          THE COURT:  Okay.  And that's the manufacturer ID

12   number?

13          THE WITNESS:  Yes, sir.

14          THE COURT:  And underneath that, there are two

15   serial numbers, and the only difference is the last letter,

16   B and A.  Do you see that?

17          THE WITNESS:  That's correct, sir.

18          THE COURT:  Why is it that there are two?

19          THE WITNESS:  That's a good question.

20          THE COURT:  Is it because it is a duplex or a

21   dual --

22          THE WITNESS:  It's a double.

23          THE COURT:  It's a double mobile home?

24          THE WITNESS:  A double.  Each side has a serial

25   number.

99

1          THE COURT:  Okay.  And one of them is 56 feet

2  long, and another is 60 feet long?

3          THE WITNESS:  That's correct.

4          THE COURT:  Thank you.  Now, do you see the stamp

5  that says, "July 14, 2021"?

6          THE WITNESS:  I do.

7          THE COURT:  What is that?

8          THE WITNESS:  Well, that's --

9          THE COURT:  If you don't know, you don't know.

10          THE WITNESS:  Well, because -- I'll bring this to

11  the Court's attention.

12          THE COURT:  Just tell me.  What is it?

13          THE WITNESS:  I have no idea.

14          THE COURT:  Then that's all I wanted to know.

15          THE WITNESS:  Okay.

16          THE COURT:  If you have no idea, you have no idea.

17  Now, when was this statement, this Department of Housing and

18  Community Development certificate of title, issued by the

19  state of California?

20          THE WITNESS:  This one?

21          THE COURT:  Yes.  When was it issued?

22          THE WITNESS:  Well, it looks like February 24th.

23          THE COURT:  Okay.  What year?

24          THE WITNESS:  2021.

25          THE COURT:  Mr. Hays, do you have any doubt that

100

1   it was issued on February 24, 2021?

2          MR. HAYS:  I do, your Honor, and I can ask

3   questions about that.

4          THE COURT:  You have a doubt?  Okay.

5          MR. HAYS:  Yes, I do have a doubt.

6          THE COURT:  Okay.  See, I'm getting ahead of you.

7          MR. HAYS:  Yes, you are.

8          THE COURT:  I'm wondering what's going on here.

9          MR. HAYS:  Yes.

10          THE COURT:  Okay.  Do you have an answer, by the

11   way, of what this July 14, 2021, stamp is doing on this

12   document?

13          MR. HAYS:  And I believe I do, and it's a stamp

14   that HCD puts on the document when they issue the new

15   certificate of title.

16          THE COURT:  Is this the certificate of title?

17          MR. HAYS:  Yes, it is.

18          THE COURT:  Why is it that it states, "February

19   24, 2021"?

20          MR. HAYS:  Ms. Gallian testified in her deposition

21   that she believed that to be the effective date of the

22   transfer from J-Sandcastle to her individually, as the

23   registered owner.  So the paperwork was submitted to HCD for

24   the issuance of the new certificate of title reflecting that

25   effective date, even though the paperwork did not arrive at

101

1  HCD until mid to late -- or probably July 14th of 2021.

2          THE COURT:  Okay.  Thank you very much.

3          MR. HAYS:  Okay.

4          THE COURT:  These are clarifications that I wanted

5  to make on the record, and the reason why is that, on a cold

6  reading by any court of appeals, I wanted the judge or the

7  judges or the clerks to understand exactly what we're

8  talking about here, and so I have one more follow-up

9  question, and then I'm going to let Mr. Hays continue.

10          On what date do you believe was this certificate

11  of title provided to you?

12          THE WITNESS:  February 24th, 2021.  It's right

13  down there at the bottom.  It has "0/24 (sic)," slash -- or

14  I don't know if there's a slash there, but I know that it

15  says, "02242021-2."  Well, there's a --

16          THE COURT:  I'm sorry.  At the bottom of page 468?

17          THE WITNESS:  Yes.  In that tiny little print, it

18  says, "0242021-2."

19          THE COURT:  And what do you think that is?

20          THE WITNESS:  That is the date, and it says,

21  "Dash, two" because "Dash, one" is the registration card,

22  and "Dash, two" is the certificate of title.

23          THE COURT:  Okay.  Now, assuming that that was the

24  date by which the state of California issued the certificate

25  of title, we have "Addressee, Ronald J. Pierpont."

102

1          THE WITNESS:  That's correct.

2          THE COURT:  Do you see that?

3          THE WITNESS:  Yes, I do.

4          THE COURT:  What does that mean, "Addressee"?

5          THE WITNESS:  I don't know why they put that.  The

6  addressee --

7          THE COURT:  Okay.  If you don't know, just say you

8  don't know.

9          THE WITNESS:  Well, I do know.

10         THE COURT:  I don't want you to guess.

11         THE WITNESS:  I do know.

12         THE COURT:  Then tell me.

13         THE WITNESS:  Because the certificate of title

14  goes to the legal owner.  The address --

15         THE COURT:  No, no, no.  Why did they put his

16  initial up -- his name up there?

17         THE WITNESS:  Because he's listed as the legal

18  owner.

19         THE COURT:  Okay.  Now, the registered owner.

20         THE WITNESS:  Yes, sir.

21         THE COURT:  What is the registered owner of this

22  mobile home?

23         THE WITNESS:  At the time, it was J-Sandcastle.

24         THE COURT:  On this document?

25         THE WITNESS:  On 2/24, yes.

103

1          THE COURT:  Okay.  J-Sandcastle Co LLC?

2          THE WITNESS:  That's correct.

3          THE COURT:  And the situs address is the address

4    of that mobile home?

5          THE WITNESS:  That's correct.

6          THE COURT:  And then underneath it is the legal

7    owners, and that's Ronald J. Pierpont, J-Pad LLC?

8          THE WITNESS:  That's correct.

9          THE COURT:  Now, are those two different persons?

10         THE WITNESS:  Yes, it is.

11         THE COURT:  Okay.  So the legal owners are

12   Pierpont and J-Pad LLC, correct?

13         THE WITNESS:  That's correct.

14         THE COURT:  Now, here's the question.  If I wanted

15   to sell this mobile home, who in this list would have the

16   right to sell it to me?

17         THE WITNESS:  The way that I understand it,

18   because of that "or," it's Ron or J-Pad, I mean, like,

19   separately.  They don't have to agree together.

20         THE COURT:  So you're telling me the legal owners

21   can actually sell this without the consent of J-Sandcastle

22   Company LLC?

23         THE WITNESS:  That's a legal question.  I defer.

24   I don't know the answer.

25         THE COURT:  So you don't know the answer to,

104

1  really, who has the legal right --

2          THE WITNESS:  But when I'm thinking of a car --

3          THE COURT:  Excuse me.

4          THE WITNESS:  Yes, sir.  Pardon me.

5          THE COURT:  You don't have the -- you don't know

6  who has the legal right to actually transfer title to this

7  document -- to this mobile home?

8          THE WITNESS:  I --

9          THE COURT:  If you do, you do, and if you don't,

10  you don't.

11         THE WITNESS:  I believe that it would be either

12  Ron Pierpont or J-Pad, in my absence.

13         THE COURT:  Well, I don't know what that means.

14  In your absence?

15         THE WITNESS:  Well, because of --

16         THE COURT:  Your name doesn't even appear on this.

17         THE WITNESS:  Well, because the lien was perfected

18  on 8/20.

19         THE COURT:  Yes, but your name doesn't appear on

20  this.  Why would you have any right to sell this mobile

21  home?  Is it because you are the managing member of

22  J-Sandcastle Company LLC?

23         THE WITNESS:  No, because I am the member of J-Pad

24  LLC, and the only member of J-Sandcastle.

25         THE COURT:  So which is it, that you're the

105

1 manager of J-Pad LLC, or member, or J-Sandcastle LLC?  Which

2 is it?

3          THE WITNESS:  Well, I am the member of

4 J-Sandcastle --

5          THE COURT:  Yes.  Which is it, though?

6          THE WITNESS:  -- the only one.

7          THE COURT:  Who can sell this mobile home on the

8 day after this was issued?

9          THE WITNESS:  I believe either Mr. Pierpont or

10 J-Pad.

11          THE COURT:  What about J-Sandcastle Company LLC?

12          THE WITNESS:  Well, I believe that J-Sandcastle,

13 if I remember correctly -- that there is a Secretary of

14 State filing where the member -- that J-Sandcastle is a

15 member of J-Pad, and I would hope --

16          THE COURT:  I don't care about what you hope.

17          THE WITNESS:  Right.

18          THE COURT:  I want you to tell me what you know,

19 and it sounds like you don't know --

20          THE WITNESS:  I don't know.

21          THE COURT:  -- who has the legal right to sell

22 the -- who has the right to transfer the ownership of this

23 mobile home to anyone, and if you don't know, that's fine.

24 I'm just trying to find out what you know.

25          THE WITNESS:  The question, respectfully, sir,

106

1  is --

2        THE COURT:  Don't rephrase my question.  The

3  question is, who has the right to sell this mobile home to

4  another party after this certificate of title has been

5  issued?

6        THE WITNESS:  I don't know.

7        MR. HAYS:  Thank you, your Honor.

8  BY MR. HAYS:

9  Q   On Exhibit 25, page 460, if I can have you turn there,

10  this is also a statement to encumber on an HCD form that's

11  listing new owners as Steven Gallian -- new legal owners as

12  Steven Gallian and Brian Gallian, joint tenants, right of

13  survivorship.

14        THE COURT:  What page number?

15        MR. HAYS:  Four, six, zero.

16  BY MR. HAYS:

17  Q   And this form bears a signature that appears to be

18  yours.  Did you sign this document?

19  A   That's correct.

20  Q   Okay.  And the purpose of this document was to have HCD

21  issue a new certificate of title listing Steven and Brian

22  also as legal owners?

23  A   Well, this document would list them only as the legal

24  owner.

25  Q   Okay.  So the purpose was to have them listed as legal

107

1   owners, correct?

2   A    That's correct.

3   Q    Okay.  And this document is dated August 20th, 2020,

4   correct?

5   A    Correct.

6   Q    And they previously were not lien holders prior to

7   August 20th, 2020, correct?

8   A    No, they were not.

9   Q    On the day of bankruptcy, July 9 of 2021, were you in

10  possession of the HCD certificate of title that was then in

11  effect?

12  A    On the day of bankruptcy?

13  Q    On the day of bankruptcy.

14  A    Was I in possession of --

15  Q    The certificate of title.  Did you have a copy of it,

16  or the actual original, or both?

17  A    On July 9th, 2021, on, I did not have the certificate

18  of title.  It was at HCD being processed.

19          THE COURT:  Excuse me, Mr. Hays.  Can you identify

20  a document in your exhibits when you say "certificate of

21  title" that you're asking her about?  Would you identify the

22  document?

23          MR. HAYS:  Yes, your Honor, and, actually, let me

24  see if I can identify it this way.  If you can go to page --

25          THE COURT:  No, just tell me what tab number it

108

1  is.

2           MR. HAYS:  Yes.  Exhibit 27, page 492.

3           THE COURT:  Let's go to 492, Ms. Gallian.

4           THE WITNESS:  Yes.

5           THE COURT:  Do you see that certificate of title

6  on page 492?

7           THE WITNESS:  That's correct.

8           THE COURT:  Okay.  Mr. Hays, your question implies

9  that that is the certificate of title in effect on the day

10 prior to the filing of the bankruptcy.  Is that correct?

11          MR. HAYS:  No, your Honor.  That's not it.

12          THE COURT:  You see, that's why I'm confused --

13          MR. HAYS:  Well, let me see if I can --

14          THE COURT:  -- and that's why she can't answer

15 your question, because she's as confused as I am to your

16 question.

17 BY MR. HAYS:

18 Q    On the day you filed bankruptcy, was the most recent

19 certificate of title in your possession?

20          THE COURT:  Wrong question.  What was the

21 certificate of title in effect on the day prior to the

22 filing of the bankruptcy?

23          MR. HAYS:  Let me see if I can find that document.

24          THE COURT:  Do you know?  Would you tell me now?

25          THE WITNESS:  Yes, the 2/25/21.

**Briggs Reporting Company, Inc.**

1          THE COURT:  What exhibit number is that?

2          MR. HAYS:  I think it's Exhibit 26, page 468.

3          THE WITNESS:  No, this is not it.

4          MR. HAYS:  Well --

5          THE COURT:  Before we get into your rabbit hole

6  that you're going down, I want to know what certificate of

7  title was in effect on the day prior to the filing of the

8  bankruptcy petition.

9          MR. HAYS:  I understand.

10          THE COURT:  This can go a lot quicker, Mr. Hays.

11          MR. HAYS:  Let me see if I can find that.  I

12  thought it was that document, because there are so many

13  different ones.

14          THE COURT:  Well, it doesn't matter what we think.

15  It's what the truth is.

16          MR. HAYS:  I understand.

17          THE WITNESS:  If I could, for the record?

18          THE COURT:  Do you know which one was in effect,

19  and the active certificate of title, on the day before the

20  filing of the bankruptcy?

21          THE WITNESS:  Yes.  If you go to page 472 of

22  Exhibit 26 --

23          THE COURT:  Four, seven, two.

24          THE WITNESS:  Okay.  So down there -- remember I

25  was just telling you about the number 220 --

110

1          THE COURT:  I don't care.

2          THE WITNESS:  Okay.  Sorry.

3          THE COURT:  Tell me if this is the one that was in

4    effect the day before the filing of the bankruptcy.

5          THE WITNESS:  And the backside is page 469.

6          THE COURT:  I don't know what you mean by

7    "backside."

8          THE WITNESS:  Okay.  So the front -- so it's like

9    a front and a back.

10         THE COURT:  Yes.

11         THE WITNESS:  So page, let's see -- what did you

12   have?

13         THE COURT:  Four seventy-nine is a blank page.

14         THE WITNESS:  Okay.  So four --

15         MR. HAYS:  I believe she said 472, your Honor --

16         THE WITNESS:  No, it's not --

17         MR. HAYS:  -- and 469.

18         THE WITNESS:  No, no, no.  So, just to clarify for

19   everybody, so I just mentioned a couple minutes ago the

20   registration card, and see down --

21         THE COURT:  I don't care.

22         THE WITNESS:  Okay.

23         THE COURT:  Stop.

24         THE WITNESS:  Okay.  Yes, sir.  Okay.

25         THE COURT:  I'm going to laser-light --

1          THE WITNESS:  I'm so sorry.  Okay.

2          THE COURT:  -- my question, and then I'm going to

3  ask the other counsel for the plaintiff to come up if you

4  can't help me.

5          THE WITNESS:  I believe 469.

6          THE COURT:  Stop.  Stop.

7          THE WITNESS:  Yes, sir.

8          THE COURT:  What is the correct document number,

9  page number, for the certificate of title that was effective

10 as of the date of the filing of the bankruptcy petition?

11         MR. HAYS:  Four, seven, two.

12         THE COURT:  Four, seven, two is a registration

13 card.

14         MR. HAYS:  I'm sorry, your Honor.

15         THE COURT:  It is not a certificate of title.

16         MR. HAYS:  I'm so sorry, your Honor.  I thought I

17 had the right document.

18         THE COURT:  I'm just trying not to confuse the

19 record.

20         MR. HAYS:  Your Honor, I think it -- I believe it

21 to be page 368, which was a document we were at earlier, I

22 think, and I thought the witness said this was not the

23 document, but I believe this to be the document.

24         THE COURT:  Four sixty-eight is a document called

25 "Certificate of Title."  Can we at least get everybody on,

112

1  literally, the same page, and answer this one question?  Is

2  page 468, Exhibit 26, the certificate of title that was in

3  effect on the date of the filing of the bankruptcy petition?

4  Do you have an answer to that question?

5           THE WITNESS:  The answer is not, because of --

6           THE COURT:  I don't care why.

7           THE WITNESS:  -- page 469.

8           THE COURT:  I don't care why.

9           THE WITNESS:  Okay.

10          THE COURT:  That is not, you're saying, the

11  certificate of title that was in effect on the date of the

12  filing of the bankruptcy?  Is that your answer?  It's a

13  yes-or-no question.

14          THE WITNESS:  I'm sorry, your Honor.  Patience one

15  more time.  Could you just repeat the question again?

16          THE COURT:  On page 468, you see a certificate of

17  title?

18          THE WITNESS:  Yes.

19          THE COURT:  Is that the certificate of title that

20  was the actual true certificate of title on the date of the

21  filing of the bankruptcy petition?

22          THE WITNESS:  No.

23          THE COURT:  Where can I find the accurate, true

24  certificate of title that was in effect on the date of the

25  filing petition?  What is the page number?

113

1          THE WITNESS:  The page number is 492.

2          THE COURT:  Okay.  Four ninety-two.  I am now at

3   492.  Mr. Hays, would you turn to page 492?

4          MR. HAYS:  I'm there, your Honor.

5          THE COURT:  Okay.  Tell me, do you think that this

6   is the certificate of title that is the actual certificate

7   of title as of the date of the filing of the bankruptcy,

8   which was --

9          MR. HAYS:  July 9 of 2021.

10         THE COURT:  -- July 9, 2021?

11         MR. HAYS:  This was not a document that existed as

12  of July 9, 2021.  In the top right-hand corner of page 492,

13  there's a date issued of August 3 of 2021, and in the bottom

14  corner above the word "Exhibit 27" is fine print that says,

15  "8/3, 2021."  I believe that to be the date that this

16  document was issued by HCD, which is almost a month after

17  the filing of the bankruptcy.

18         THE COURT:  Thank you.  Do you know, Mr. Hays --

19  can you show me some evidence of how this certificate of

20  title was requested?

21         MR. HAYS:  Yes, your Honor.

22         THE COURT:  Would you please ask the witness if

23  she had anything to do with the creation of this certificate

24  of title?

25         MR. HAYS:  Yes.

114

1  BY MR. HAYS:

2  Q    So, Ms. Gallian, page 492 is a certificate of title

3  that was issued by HCD reflecting you as a registered owner,

4  correct, individually?

5  A    That's correct.

6  Q    Okay.  And this is the first document, first

7  certificate of title issued by HCD, that reflected you

8  individually as the owner, the registered owner, of the

9  property, correct?

10  A    That's correct.

11  Q    Okay.  At all times prior to the issuance of this

12  document, every certificate of title that had been issued by

13  HCD reflected that J-Sandcastle was the registered owner,

14  correct?

15  A    Correct.

16  Q    And starting in August of 2020, at your request, HCD

17  started issuing certificates of title reflecting lien

18  holders or legal owners on the certificate of title,

19  correct?

20  A    I'm sorry, sir.  Could you repeat that again?

21  Q    Starting in August of 2020 was the first time that HCD

22  started issuing documents, at your request, reflecting the

23  existence of lien holders, or legal owners, to use HCD's

24  terminology, correct?

25  A    That's correct.

115

1  Q    Okay.  And this document at 492 is the first time a

2  certificate of title is issued after August of 2020,

3  reflecting that there are no legal owners, correct?

4  A    Yes.

5  Q    Okay.  On July 9 of 2021, is it true that you were in

6  the process of trying to get the certificate of title

7  reissued to reflect that J-Sandcastle was no longer the

8  registered owner and that you were the registered owner?

9  Weren't you doing all of this on the day you filed

10 bankruptcy?

11 A    No, sir.

12 Q    And when were you attempting to submit the

13 documentation to HCD that resulted in the issuance of the

14 certificate of title on August 3 of 2021, which is page 492?

15 A    Okay.  I don't know exactly when it went in.  These

16 documents sit in HCD.  On page 469 is when it began.

17          THE COURT:  Exhibit 26?

18          THE WITNESS:  Exhibit 26, page 469 and 470, is the

19 day that I released, February 25th -- is I released --

20 J-Sandcastle released the interest to me solely.

21          THE COURT:  Well, you are J-Sandcastle LLC, or

22 you're the member of that --

23          THE WITNESS:  Correct, and I signed it as the

24 member.

25          THE COURT:  -- and you are the only member of

116

1  that --

2           THE WITNESS:  Yes.  I signed it.

3           THE COURT:  -- and you are the only manager of

4  that?

5           THE WITNESS:  Yes.

6           THE COURT:  So, you know, you say J-Sandcastle LLC

7  released you, but you released it.

8           THE WITNESS:  Me.  My signature is there, sir.

9           THE COURT:  That's right.  You did all of this?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  No one else did this?

12          THE WITNESS:  No, sir.

13          THE COURT:  Okay.  And this document --

14          THE WITNESS:  Yes, sir.

15          THE COURT:  -- that you're saying is page 469 --

16          THE WITNESS:  Yes.

17          THE COURT:  -- what, exactly, is this document?

18          THE WITNESS:  Well, this document, on 2/25/21 --

19          THE COURT:  I just want to know what the document

20  is.

21          THE WITNESS:  It's the backside of the 2/24 --

22  okay.  So, on 2/25, this is -- this was a blank page, and so

23  I filled it out with my name as its signature, with its

24  member.  I released signature now to J-Sandcastle, and then

25  I signed it, the release of signature, J-Sandcastle, and the

*Briggs Reporting Company, Inc.*

117

1  new registered owner was supposed to just be me.

2         THE COURT:  Okay.  And what about the lien

3  holders?  When were those released?

4         THE WITNESS:  The only person that was released

5  was on the day of July 9th, was Mr. Pierpont.  However --

6         THE COURT:  On July 9?

7         THE WITNESS:  July 9th.

8         THE COURT:  You did that on the same date that you

9  filed bankruptcy?

10         THE WITNESS:  There is one document.

11         THE COURT:  Let me ask you that question again.

12         THE WITNESS:  Yes, sir.  Yes, I did, sir.

13         THE COURT:  You took his name off as a lien holder

14  on July 9, 2021?

15         THE WITNESS:  That's correct.

16         THE COURT:  Why did you do that?

17         THE WITNESS:  Because he had paid me -- or not he

18  paid me.  I paid him --

19         THE COURT:  You paid him.

20         THE WITNESS:  --back.

21         THE COURT:  How much did you pay him?

22         THE WITNESS:  It was the amount of that bond.

23         THE COURT:  How much did you pay him?

24         THE WITNESS:  Twelve, five.

25         THE COURT:  Twelve thousand five hundred dollars?

*Briggs Reporting Company, Inc.*

118

1           THE WITNESS:  That's correct.

2           THE COURT:  You paid him 12,500?

3           THE WITNESS:  Not on that day.

4           THE COURT:  When did you pay him?

5           THE WITNESS:  I believe it was in January of 2021.

6           THE COURT:  Mr. Hays.

7           MR. HAYS:  Thank you, your Honor.

8  BY MR. HAYS:

9  Q    Ms. Gallian, in order to have HCD issue a new

10 certificate of title, is it necessary to get what's called a

11 "tax clearance"?

12 A    Yes, it is.

13 Q    Okay.  And without the tax clearance, the application

14 can't be submitted to HCD, and they will not issue the new

15 certificate of title, correct?

16 A    I'm not sure.

17 Q    Okay.  When was the tax certificate -- when did you pay

18 the taxes to get the tax clearance in connection with the

19 transfer of title from J-Sandcastle to yourself

20 individually?

21 A    When did I pay the bill?

22 Q    Yes.

23 A    On July 9th.

24 Q    Of 2021?

25 A    2021.

*Briggs Reporting Company, Inc.*

119

1  Q    So, on the day you filed bankruptcy, you were --

2  A    Wait a minute.  Wait, wait, wait, wait.  I'm getting

3  two dates confused, here.  The tax bill, yes, on July 9th.

4  Q    Okay.  So, on July 9 of 2021, did you physically go to

5  the tax agency office, whatever it's called, to pay that

6  bill?

7  A    Yes.

8  Q    And you stood in line, and you, I believe in your

9  deposition said, used a charge card, and you paid that bill?

10  A    Yes.  He ordered the certificate on line.

11  Q    Okay.  And so, then, that certificate and the other

12  documentation that results in the reissued certificate that

13  was issued on August 3rd of 2021, all of that stuff you were

14  trying to put together on July 9 of 2021, right?

15  A    No, that's incorrect.

16  Q    What's incorrect about it?

17  A    Well, as my deposition stated, is that when I -- the

18  HCD -- not HCD.  The tax certificate is a document that's

19  ordered through the web site, and when I went down there to

20  pick it up, they wanted two years in advance of taxes, and I

21  believe that I testified in my transcript, the transcript,

22  that I didn't have the money two years in advance, and I

23  thought it was unreasonable.  I don't know why the county

24  tax person does this on manufactured homes.  I had already

25  paid the current tax bill, but, to get a tax clearance

120

1  certificate, even if it's the same entity or same party,

2  they want another year, and I testified to that to you.

3  Q    Which you did or did not pay on that day?

4  A    On which day?

5  Q    July 9 of 2021.

6  A    I did pay it.

7  Q    And that resulted in you getting the piece of paper

8  that you could submit to HCD?

9  A    That's correct.

10 Q    Okay.  And then how did you transmit all of these

11 documents to HCD?

12 A    I believe they were e-mailed and they were certified

13 mail, or mailed U.S. Mail.

14 Q    Okay.  And HCD, I imagine, would require the originals

15 before they would -- with blue ink or something on a

16 signature line, before they would reissue a certificate of

17 title, correct?

18 A    No, that's not correct.

19 Q    They would do it all by a facsimile copy?

20 A    Yes.  The first set of documents that I sent up

21 there -- in fact, in one of your documents here, there is a

22 statement of fact saying that it was lost in the mail, and

23 she e-mailed the documents, and so they had changed it, but

24 I don't remember what set it was.  But it is in here.  I saw

25 that.

121

1  Q    So the earliest that HCD would have had all of the

2  documents necessary to reissue the August 3rd, 2021,

3  certificate of title would have been July 9 of 2021?

4  A    The earliest?

5  Q    The earliest.  I mean, you got the tax certificate that

6  day.

7  A    Correct.

8  Q    So, if it was transmitted and received the very same

9  day, the earliest HCD would have had all the documents is

10 July 9, 2021?

11 A    It was in a day or so.  I would believe that.

12 Q    Okay.  So it could have also been after the bankruptcy

13 case?

14 A    I don't know.  You know, I'm --

15 Q    Okay.  I just said it could have been.

16 A    I don't know.

17 Q    Okay.

18 A    The documents sit up there.

19 Q    Okay.  So the earliest would have been the day you got

20 the tax certificate, or it could have been a day or two

21 later.  You don't know which?

22         THE COURT:  Does it matter?  Does it really

23 matter, Mr. Hays?

24         MR. HAYS:  Your Honor, I think it --

25         THE COURT:  Tell me why it matters.  You see, if I

122

1  were counsel, I'd be going, you know, "Half of Mr. Hays'

2  questions are irrelevant to a 727(a)(2)(A) action."  And so

3  is it really important, what you're asking right now?

4          MR. HAYS:  I believe it to be, your Honor.

5          THE COURT:  All right.  Then ask the question, and

6  get a responsive answer or not, and move on.

7  BY MR. HAYS:

8  Q    The earliest all of the documents could have been

9  received by HCD was July 9 of 2021, right?

10 A    I don't believe that is the question that you're trying

11 to get at.

12         THE COURT:  No, he's not.  He's asking you a

13 specific question.

14         THE WITNESS:  I'm sorry, sir.  Okay.  So, on July

15 9th, I received the tax clearance certificate.

16 BY MR. HAYS:

17 Q    And did you transmit it to HCD?

18 A    Yes.

19 Q    Okay.  And you said by e-mail, and you mailed them

20 documents as well?

21 A    I believe that's what happened.

22 Q    Okay.  So my point is that the earliest date that HCD

23 could have received all of these documents was July 9 of

24 2021, and it could have been a couple days later, correct?

25 A    That's correct.

123

1  Q    Okay.

2  A    That's correct, sir.

3  Q    And then, as a result of that submission, they issued

4  the August 3rd, 2021, certificate of title, correct?

5  A    That's correct.

6  Q    Okay.  So, now, moving on --

7        MR. HAYS:  And, your Honor, I see it's 12:15.  Is

8  there a period that you want to --

9        THE COURT:  Yes, at 12:30.

10        MR. HAYS:  12:30.  Thank you.

11        THE COURT:  But it's actually 12:25, because you

12  and I and Ms. Gallian are going to go over the elements of

13  727(a)(2)(A) so that everyone understands what you need to

14  prove under 727(a)(2)(A).

15        MR. HAYS:  I understand, your Honor.

16  BY MR. HAYS:

17  Q    Ms. Gallian, when J-Sandcastle was the registered owner

18  of the property, you were residing there, correct?

19  A    That's correct.

20  Q    And were you paying rent to J-Sandcastle?

21  A    No, I was not.

22  Q    Did you ever pay rent to J-Sandcastle?

23  A    No.

24  Q    Was J-Sandcastle the party tendering payments to my

25  client?

124

1  A    I made sure that there was money in J-Sandcastle's bank

2  account so that they did not get -- that Houser Company,

3  excuse me -- that Houser Company had honored checks when

4  they were presented.

5  Q    My question was, was J-Sandcastle the party tendering

6  rent payments for the site to Houser Brothers?

7  A    That's correct.

8  Q    Okay.  And that was the case at all times through July

9  9 of 2021, correct?

10 A    No.

11 Q    And when did anyone other than J-Sandcastle tender a

12 rent check to my client prior to the bankruptcy?

13 A    After this document, page 469, 2/25/21, when

14 J-Sandcastle transferred the -- released the signature back

15 to me, I made cash payments that were returned to me.  I

16 believe that my credit union made, also, cash payments, and

17 I believe that my name is on the bank account.  Right

18 underneath "J-Sandcastle," it says, "Jamie Lynn Gallian."

19 So I believe one or two checks also went to Houser Brothers.

20 Q    But these were the J-Sandcastle account numbers,

21 correct, the checks?

22 A    I believe one or two checks were J-Sandcastle.  I

23 believe that there was two or three payments.  Because they

24 wouldn't take the checks, I thought, "Okay.  I'll pay cash."

25 So I would give them 1,200 $100 bills.  I did that a couple

125

1  of times, and they taped that to my front door, and I

2  believe -- I think that was it.

3  Q    Did I hear you correctly that you never paid rent to

4  J-Sandcastle?

5  A    I don't pay rent.  I live there, but yet I'm the sole

6  owner.  So I have to make sure that their checks are good

7  when they write a check.

8           THE COURT:  Well, that wasn't the question.

9           THE WITNESS:  I'm sorry.

10          THE COURT:  Do you pay rent to J-Sandcastle?

11          THE WITNESS:  No, sir.  No, sir.

12          THE COURT:  Thank you.

13 BY MR. HAYS:

14 Q    If I can have you turn to page 95 of the deposition

15 transcript you were handed, and starting at line 21, you

16 testified:

17          "And I was paying rent to J-Sandcastle,

18          so, you know, yes.  Though I'm the

19          member, also, I -- in my mind, they are

20          separate, separate, and it's -- I paid

21          rent, just as if I was a stranger off

22          the street."

23      Was that a true statement at the time you made it?

24 A    Yes, that's correct.  I think that you would have to go

25 up a few sentences, but yes, that was my statement.  But I

126

1 think you took it out of context, sir, or I misstated it.

2 Q    So the question now is, you testified here in court you

3 didn't pay rent to J-Sandcastle, you just made sure it had

4 money, but, in your deposition, you testified, "And I was

5 paying rent to J-Sandcastle."  So which was it?

6 A    Yes, I agree with what you're saying.  Yes, that's what

7 I said.

8           THE COURT:  No, that's not what he's asking you.

9           THE WITNESS:  I'm sorry.  Yes, sir.

10          THE COURT:  I'm going to be saying the

11 hackneyed --

12          THE WITNESS:  I'm so sorry.

13          THE COURT:  Excuse me.  I'm going to used the

14 hackneyed phrase, were you lying then or are you lying now?

15          THE WITNESS:  Neither.

16          THE COURT:  Well, you said you were paying rent to

17 J-Sandcastle.  Is that a true statement?

18          THE WITNESS:  (No response.)

19          THE COURT:  My question is, is that a true

20 statement?

21          THE WITNESS:  (No response.)

22          THE COURT:  I will take your nonresponsiveness as

23 a --

24          THE WITNESS:  I did not pay rent, sir.

25          THE COURT:  That's not what I asked you.

127

1          THE WITNESS:  Yes, sir.

2          THE COURT:  I asked you, was it a true statement?

3          THE WITNESS:  No, it was not, on the record.

4          THE COURT:  Thank you.

5          THE WITNESS:  Thank you.  I mean, this record.

6          THE COURT:  It was not a true statement?

7          THE WITNESS:  That's correct.

8    BY MR. HAYS:

9    Q    On the next line of lines 24 and 25, you say:

10          "Just as if" -- "I paid rent" --

11          starting at line 23 -- "just as if a

12          stranger off the street, like I said,

13          that if I was forced to have -- to rent

14          this place."

15      That was also not a true statement, that you were

16   renting from J-Sandcastle?

17   A    No, that's not.

18   Q    Okay.  And then, on the next page, you say, "That's why

19   that $9,000 was there.  Are you referring to money in

20   J-Sandcastle's bank account?

21   A    That's correct.  Well, yes, that's correct.

22   Q    Okay.  And then, on the next line, you said, "It

23   doesn't belong to Jamie Gallian anymore."

24   A    That's correct.

25   Q    "It's rent paid to J-Sandcastle, because they are the

128

1   legal owner."  Was that a true statement?

2   A     Well, that's why I stopped for a second, because --

3           THE COURT:  No.  Answer the question.

4           THE WITNESS:  Well, the $9,000 wasn't in

5   J-Sandcastle's account.  It was in J-Pad's account.

6           THE COURT:  It says:

7           "It's rent paid to J-Sandcastle because

8           they are the legal owner who is trying

9           to pay the debt of the space."

10          Is that a true --

11          THE WITNESS:  That's correct.

12          THE COURT:  He asked you a simple question.  Is

13  that a -- was that a true statement?

14          THE WITNESS:  I misspoke on the record.  I think

15  I --

16          THE COURT:  I don't know what you mean by "on the

17  record."

18          THE WITNESS:  This record.

19          THE COURT:  Do you mean that you -- under oath?

20  You know, this record was under oath, and he's just asking

21  you, was that a true statement made by you under oath?

22          THE WITNESS:  That's correct.

23          THE COURT:  No, that doesn't help me.  I don't

24  know what that means, "That's correct."  Was it a true

25  statement?  It's a yes-or-no question.

129

1           THE WITNESS:  Was it a true statement?  No.

2    BY MR. HAYS:

3    Q    And then, last, starting at line, I say:

4           "Q    So let me clarify something you

5           just said.  I believe you said you've

6           been paying rent to J-Sandcastle.  Is

7           that correct?"

8       And you answered:

9           "A    That's correct, well, until

10          February 25th."

11       Was it a true statement that you were paying rent prior

12   to February 25th?

13   A    No.

14          THE COURT:  At this point, do you have any more

15   questions regarding the transcript?

16          MR. HAYS:  I said the last one, but actually this

17   is the last one.  I'm sorry, your Honor.  So, very quickly.

18          THE COURT:  All right.  Ask one more, and then

19   we're going to have a recess in a few minutes.

20          MR. HAYS:  Yes.

21   BY MR. HAYS:

22   Q    Starting at line 13, I asked you a question:

23          "Q    And so, from November of 2018

24          through February of 2021, you were

25          making monthly rent payments to

130

1          J-Sandcastle for rent?"

2      And your answer is:

3          "A    Yes, or I would make -- give

4          deposits to them.  Correct."

5          THE COURT:  Well, that's not a good question.  Why

6 don't you ask her if it's true or not.

7 BY MR. HAYS:

8 Q    Was it true that you were paying rent?

9 A    You read the statement.

10 Q    Is the statement in the deposition transcript that you

11 were paying rent -- is that a correct statement?

12 A    No, it's not.

13          MR. HAYS:  Okay.  So that's it for the deposition

14 transcript, on that topic, your Honor.

15          THE COURT:  Okay.  We're going to take an

16 hour-long lunch.  Okay?  I would like you to step down and

17 please be seated at the table along with Mr. Hays -- not

18 with Mr. Hays, but he's going to sit down, too.

19          THE WITNESS:  Should I leave this (indicating)?

20          THE COURT:  You leave everything there.  Thank

21 you.  And your pillow.  Bring your pillow.

22          THE WITNESS:  Thank you.

23          THE COURT:  For the purposes of the record, I'm

24 going to talk briefly about 727(a)(2)(A).  So, if you're

25 making notes, you might want to make some notes, Ms.

131

1  Gallian, and Mr. Hays and his co-counsel should take notes,

2  too, after he sits down.

3          I'm going to go over the elements of 727(a)(2)(A)

4  so that everybody gets on the same page.  727(a)(2)(A) says:

5          "A discharge shall be granted unless the

6          Debtor, with intent to hinder, delay, or

7          defraud a creditor or an officer of the

8          estate charged with custody of property

9          under this title, has transferred,

10         removed, destroyed, mutilated or

11         concealed, or has permitted to be

12         transferred, removed, destroyed,

13         mutilated, or concealed, property of the

14         Debtor within one year before the date

15         of the filing of the petition."

16         There are elements to 727(a)(2)(A).  The first is

17 there must be a transfer of property:

18         "The Debtor transferred, removed,

19         destroyed, mutilated or concealed, or

20         has permitted such to be done to

21         property of the Debtor."

22         The second element is it needs to be occurring

23 within one year before the date of the filing of the

24 petition, and then there is an intent element of

25 727(a)(2)(A), and that is:

132

1          "The Debtor intended to hinder, delay,

2          or defraud a creditor or officer of the

3          estate."

4          Those are the elements of 727(a)(2)(A) as I

5     understand them.

6          Mr. Hays, I would like you, with respect to that

7     section of your complaint, to focus on those issues, and not

8     get too deep into the weeds on a lot of minutia, which isn't

9     necessary for this Court to understand what's happened here.

10    Your pre-trial, for instance, has a series of agreements by

11    the parties, the admitted facts -- that's what I'm talking

12    about -- in the pre-trial stipulation.  There are a lot of

13    admitted facts that are relevant.

14         So I'm just encouraging you not to drag this trial

15    out longer than it needs to be, and when you start hitting

16    me on (a)(2) -- pardon me -- (a)(4)(A), which is the false

17    oath provisions, and the 727(a)(5) requirements, again, I

18    hope that everyone focuses on the actual elements of those

19    sections.  The Court has lots of information already

20    contained in your pre-trial stipulation that are admitted

21    facts.

22         You know, I'm not telling you how to run your

23    case, but I'm telling you that I have to manage my docket,

24    and when we get down into the weeds on a lot of these

25    questions, some of it is, frankly, irrelevant to what I need

133

1   to deal with.  So I'm asking everyone to focus, and now I'm

2   asking everyone to have a nice lunch.  Court is in recess

3   until 1:30.

4           MR. HAYS:  Thank you, your Honor.

5           THE COURT:  Thank you.

6       (Proceedings recessed to reconvene.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

134

<u>AFTERNOON SESSION</u>

--oOo--

1   THE CLERK:  Please remain seated.  This court is

2   again in session.

3   THE COURT:  You can leave your coat off, Mr. Hays.

4   MR. HAYS:  I'd better put it on.

5   THE COURT:  Okay.  Please be seated.

6   I think Mr. Hays has more questions for you, so if

7   you're come up to the witness box, please.

8   JAMIE LYNN GALLIAN - WITNESS - PREVIOUSLY SWORN

9   MR. HAYS:  Your Honor, before we get started, may

10  I inquire if the Court has a particular cutoff date in mind

11  today in the event that we're not already done?

12  THE COURT:  5:00 o'clock.

13  MR. HAYS:  5:00 o'clock.  We have one witness that

14  is on call, and so we'll try to be done with Ms. Gallian by

15  4:00, but our witness is not available tomorrow.  So, with

16  the Court's permission, we'll have him come and call him at

17  4:00 o'clock --

18  THE COURT:  Yes, let's do that.

19  MR. HAYS:  -- even if we have to then recall Ms.

20  Gallian.

21  THE COURT:  That would be fine.

22  MR. HAYS:  So we will do that.  Thank you.

23  THE COURT:  You're still under oath.

*Briggs Reporting Company, Inc.*

135

1          THE WITNESS:  Yes, sir.

2                DIRECT EXAMINATION  (RESUMED)

3    BY MR. HAYS:

4    Q    Ms. Gallian, on the date you filed bankruptcy, which

5    was July 9 of 2021, you were a one-third of J-Pad, correct?

6    A    No, that's not.

7          THE COURT:  I'm sorry.  I didn't hear the answer.

8          THE WITNESS:  No, sir, it wasn't.

9    BY MR. HAYS:

10   Q    Can I have you turn to binder two, Exhibit 28, and the

11   document that is Exhibit 28 is your original voluntary

12   petition, schedules, and statements that you filed on July 9

13   of 2021, and if I can have you look at page 505, Is that

14   your signature at the bottom?

15   A    Yes, it is.

16   Q    And that signature was made under penalty of perjury,

17   asserting that all of the information contained in the

18   petition, schedules, and statements was true and correct.

19   Is that correct?

20   A    That's correct.

21   Q    Okay.  And on page 514, at the top, this appears in

22   Schedule AB of property, and under question 19, which says

23   to limit your -- to state and disclose your interests in

24   LLCs, partnerships, and joint ventures, you listed J-Pad LLC

25   at the top of page 514, and indicated that you owned a

136

1   one-third interest in the LLC.  Was that a true statement?

2   A    That's correct that I wrote that, but I made a mistake.

3            THE COURT:  So that's not what he asked you.

4            THE WITNESS:  Yes, sir.

5            THE COURT:  Is it true?

6            THE WITNESS:  Is it true?  No, it is not, sir.

7            THE COURT:  It is not true.  What is the truth?

8            THE WITNESS:  I own 100 percent.

9   BY MR. HAYS:

10  Q    If I can get you to pull up binder three, and binder

11  three is a set of amendments to your schedules and

12  statements of financial affairs filed on September 7 of

13  2021.

14            THE COURT:  I'm sorry.  Did you say binder number

15  three?

16            MR. HAYS:  Binder --

17            THE COURT:  Do you mean volume three?

18            MR. HAYS:  Volume three.

19            THE COURT:  And you just said it's a collection of

20  what?  The first item is a judgment, a Gables judgment.

21            MR. HAYS:  Tab 29 in volume three.

22            THE COURT:  Right.  You just said it's a

23  collection of amendments.

24            MR. HAYS:  I don't know what I said, but what I

25  intended to say is Exhibit 29 is a filing Ms. Gallian made

137

1  with the Court that includes amendments to her schedules and

2  statements of financial affairs.

3         THE COURT:  Okay.  That's better.

4  BY MR. HAYS:

5  Q    And, Ms. Gallian, do you see this document?

6  A    Yes, sir.

7  Q    And is that your signature on page 560?

8  A    Yes, sir.

9  Q    And if I can get you to turn to page 565, under

10  question 19, where you're required to disclose your

11  interests in LLCs.  You state that you are a one-third owner

12  of J-Pad LLC.  Is that what the document says?

13  A    Yes, it does.

14  Q    And is that a true statement?

15  A    No, it is not.

16  Q    If I can get you to turn to the next exhibit, which is

17  Exhibit 30, and this is another set of amendments to your

18  schedules and statements of financial affairs filed on

19  September 22, 2021.  At page 589, do you recognize your

20  signature?

21  A    Yes, sir.

22  Q    And you understood that was under penalty of perjury,

23  correct?

24  A    Yes, sir.

25  Q    And if you turn to page 594, under paragraph 19, where

138

1 you're required to list your interests in LLCs, you list now

2 a one-seventh interest in J-Pad.  Is that correct?

3 A    That's correct.

4 Q    Was that a true statement?

5 A    No, it is not.

6 Q    If I can get you to turn to page -- Tab 32, I'm

7 sorry -- which is yet another set of amended schedules and

8 statements.  On page 633, is that your signature at the

9 bottom of the document?

10 A    Yes, it is.

11 Q    And if I can get you to turn to page 638, again under

12 question 19, requiring you to list your interests in LLCs,

13 you indicated that you were a 70-percent owner of J-Pad,

14 correct?

15 A    Yes, sir.

16 Q    And was that a correct statement?

17 A    Seventy-percent interest?  I am legally 100-percent

18 interest holder.

19           THE COURT:  Well, you have to answer the question.

20           THE WITNESS:  Yes.  Seventy percent, no, that is

21 not correct.

22           THE COURT:  No, no.  You need to answer his

23 specific question for the record.  My job, part of it, is to

24 help have people understand what's been asked --

25           THE WITNESS:  Yes, sir.

139

1          THE COURT:  -- and what's been answered, and so he

2  asked you, is that 70-percent figure correct?  It's a

3  yes-or-no question.

4          THE WITNESS:  (No response.)

5          THE COURT:  By your hesitancy of answering a

6  yes-or-no question, I'm having trouble.

7          THE WITNESS:  The answer is no.

8          THE COURT:  No, what?

9          THE WITNESS:  No, that is not correct.

10          THE COURT:  Thank you.

11  BY MR. HAYS:

12  Q    If I can get you to turn to Exhibit 33, which is

13  another set of amended schedules and statements filed, and

14  it's Docket Number 37 on November 16 of 2021, page 644.  Is

15  that your signature on this document?

16  A    Yes, sir.

17          THE COURT:  Mr. Hays, I'd like to clarify that

18  each of these were signed under penalty of perjury under the

19  laws of the United States.

20          MR. HAYS:  That is correct, your Honor.

21          THE COURT:  Thank you.

22  BY MR. HAYS:

23  Q    And that is your signature, and that is under penalty

24  of perjury, correct, Ms. Gallian?

25  A    That's correct.

140

1 Q    Okay.  And if I can get you to turn to question 19

2 again in the statement of financial affairs, which is page

3 669 of Exhibit 33, when you answered, "What was your

4 interest in J-Pad?," you said, "A one-third interest,"

5 correct?

6 A    That's correct.

7          THE COURT:  Well, actually, it says, "33, dash,

8 one, slash, 3."

9          MR. HAYS:  I know the mathematics are right, but

10 let's just start talking about what the actual document

11 says, Mr. Hays.

12          MR. HAYS:  I will do so, your Honor.

13 BY MR. HAYS:

14 Q    So the document says a 33-and-one-third-percent

15 interest in J-Pad, correct?

16 A    That's correct.

17 Q    Was that a true statement?

18 A    No, it's not.

19 Q    And if I can get you to turn to Exhibit 34, which is

20 yet another set of amended schedules and statements.  At

21 page 690, there's a signature under penalty of perjury on

22 the document.  Ms. Gallian, is that your signature?

23 A    I'm sorry.  Excuse me.  What page, sir?

24 Q    Six, nine, zero.

25 A    Yes, it is.

141

1  Q    And if I can get you to turn to question 19 again,

2  which appears on page 695.  This time, you disclose that you

3  have a 100-percent interest in J-Pad.  Is that what the

4  document says?

5  A    That's correct.

6  Q    And do you believe that to be a true statement?

7  A    That is correct, yes.

8  Q    And when do you believe that you became the 100-percent

9  owner of J-Pad?

10 A    Did you want a specific date, sir?

11 Q    Yes.

12 A    I would say that I was very clear on this date that I

13 was 100-percent owner.

14 Q    That wasn't my question.

15 A    I'm sorry.  November 22nd, 2021.

16 Q    My question is, when did you become the 100-percent

17 owner of J-Pad?  Is your answer in November of 2021?

18 A    No.  I believe that I have always legally been the

19 100-percent owner of a manager-managed (sic), and that I

20 misunderstood what you have been telling me about other

21 people having to contribute things, and I believe that I am

22 100-percent owner of both of these, and, as I testified

23 earlier, Anthony had a $5,000 (sic).  So, as to correct my

24 testimony, he still has a $5,000 interest that I promised

25 him.

142

1 Q    You just said you always believed yourself to be the

2 100-percent owner of both of these, and I just want the

3 record to be clear.  You're referring to J-Sandcastle LLC

4 and J-Pad LLC, correct?

5 A    That's correct.

6 Q    Okay.

7 A    Well, I didn't -- that's not what I said.  I think what

8 I said was -- is that, by November 22nd, 2021, it was very

9 clear to me that I cannot use an LLC to -- if I owe somebody

10 money.  I can't give them -- just arbitrarily give them

11 something.  I am 100-percent owner, and I always have been.

12 Q    When you say you "can't arbitrarily give something to

13 somebody," what are you referring to, specifically?

14 A    The one example that comes to mind is the money from

15 Mr. Pierpont, that, you know, he wanted some security, and

16 so I put him as a lien holder, so that he was insured to be

17 paid back, and I know that that is wrong now, that it's

18 not -- you can't give away something like this.  It's not --

19 I mean, like, I wanted to have -- my kids to have something.

20 I explained to you that in my deposition.  You know, you

21 just -- you have to go through the legal process.

22 Q    At times, the documentation filed with HCD or the

23 Secretary of State or the Bankruptcy Court reflected other

24 owners of J-Pad, correct?

25 A    Uh-huh.

143

1  Q    And are you saying that you intended to and did give

2  things to other people, but that you now realized, as of

3  this date, that you can't do that, so you undid the

4  transfers?  Is that what you're saying?

5  A    Well, I think, even in my transcript, that I explained

6  to you that I never -- you know, you always try to leave

7  your kids something, and that was my intent, and because of

8  personal issue that I was going through, I wanted somebody

9  to be able to make decisions, but you just -- I understand

10 that you just can't, you know, just change it randomly.

11 Okay?

12    And then, you know, with all this -- I don't even know

13 how to describe it.  You know, everybody wants something,

14 but then, when they become responsible for something

15 legally, they don't want it anymore, and so then I have to

16 readjust.  And that's basically what I was trying to

17 explain.

18 Q    I want to try to clarify something in your answer.  Is

19 it true that there were changes to the ownership of J-Pad at

20 various times from 2018 through November of 2021, but, in

21 November of 2021, you realized you should not have made

22 those changes, and you undid them?

23 A    No, I have never undid anything.  I purchased the home.

24 I registered in the name of J-Sandcastle.  I owed people

25 money, and they wanted security, and so there were times

144

1 that I would use the only asset that I had.

2    Mr. Hays, would you kindly, if it pleases the Court --

3 would you be able to hand me my tissue package right there?

4            MR. HAYS:  Your Honor, may I approach?

5            THE COURT:  Would you, please?

6            THE WITNESS:  Thank you.  I appreciate that.

7            MR. HAYS:  Yes.

8            THE WITNESS:  That's very kind.  Thank you.

9 BY MR. HAYS:

10 Q    So are you saying that, notwithstanding what the

11 documentation said, you were always the 100-percent owner of

12 J-Pad?

13 A    Except for Mr. Calderon, yes, sir.

14 Q    For $5,000, correct?

15 A    Yes.

16 Q    Okay.  But, if anybody were to pull records from the

17 Secretary of State, or look at UCC filings with the

18 Secretary of State, or look at --

19 A    Wait.  Slow down.  I'm sorry.

20            THE COURT:  Yes.  Don't have disjointed questions.

21            MR. HAYS:  I'm sorry, your Honor.

22 BY MR. HAYS:

23 Q    If anybody were to pull certificates of title, they

24 would not have known that you were the only lien holder

25 against that property, correct?

145

1  A    At what period of time?

2         THE COURT:  Well, objection.  I'm going to insert

3  an objection.  That's very vague.  You first of all have

4  been talking about business records of the Secretary of

5  State, and now you're talking about titles to property, and

6  so it's very confusing to me, Mr. Hays.

7         If you're asking -- if anybody would look at the

8  official records of the Secretary of State of California at

9  any given time since the creation of J-Pad, what would it

10 say who the owners are?

11        THE WITNESS:  I don't believe that the Secretary

12 of State even says who the owners are.  I think, if I'm

13 remembering correctly, the document says, "Manager or

14 member."

15        THE COURT:  Okay.  And what would it say?

16        THE WITNESS:  And it would say -- sometimes it

17 said Mr. McLelland or Mr. Pierpont or -- I think it was

18 either just either one of those, those two people.  They

19 helped me.

20        THE COURT:  Okay.  So you're telling me the

21 ownership isn't reflected on any official state document?

22        THE WITNESS:  When I read it, it said, "Manager or

23 member."

24        THE COURT:  I understand that.

25        THE WITNESS:  Right.

146

1          THE COURT:  Did you file any -- was there an

2   agreement of any type with respect to the ownership of this

3   particular LLC?

4          THE WITNESS:  Yes, there was an operating

5   agreement, sir.

6          THE COURT:  Yes.

7          THE WITNESS:  Yes, but it wasn't filed.

8          THE COURT:  Okay.  So you have a copy of that

9   operating agreement?

10          THE WITNESS:  Yes, I do, and I gave it to the

11   Trustee.

12          THE COURT:  Is it part of this --

13          THE WITNESS:  No, it is not.

14          THE COURT:  -- set of exhibits, Mr. Hays?

15          MR. HAYS:  No, your Honor.

16          THE COURT:  The operating agreement --

17          THE WITNESS:  Yes, sir.

18          THE COURT:  -- who created that?  And I don't mean

19   who wrote it for you, but who asked that it be created?

20          THE WITNESS:  No.  Mr. Calderon and I --

21          THE COURT:  Who is Mr. --

22          THE WITNESS:  The one that had the $5,000 --

23          THE COURT:  Okay.

24          THE WITNESS:  Okay.

25          THE COURT:  So, then, you created an operating

147

1  agreement?

2          THE WITNESS:  Yes, we did.

3          THE COURT:  And has that operating agreement ever

4  been amended?

5          THE WITNESS:  No.  The only thing that was

6  amended --

7          THE COURT:  It's just a yes or no.

8          THE WITNESS:  No, sir, it has not.

9          THE COURT:  Okay.  So the original operating

10  agreement --

11         THE WITNESS:  Yes, sir.

12         THE COURT:  -- do you know who owned 100 percent

13  of that LLC?

14         THE WITNESS:  I owned 90-something percent, and I

15  had --

16         THE COURT:  Well, 90-what percent?

17         THE WITNESS:  Well, it depends on how much the LLC

18  is worth, I suppose.

19         THE COURT:  No, I don't think so.  It doesn't

20  matter if it's worth a buck or a billion dollars.

21         THE WITNESS:  Okay.

22         THE COURT:  You still own a certain percentage of

23  it.  What was the percentage that you owned?

24         THE WITNESS:  I don't know, sir.

25         THE COURT:  Was it 50 percent?

148

1          THE WITNESS:  I don't know.  I honestly --

2          THE COURT:  You didn't own 50 percent of it?

3          THE WITNESS:  Did I own --

4          THE COURT:  Did you own at least --

5          THE WITNESS:  At least?  Absolutely.

6          THE COURT:  -- 50 percent of it?

7          THE WITNESS:  If I was only given --

8          THE COURT:  I'm asking you a question.

9          THE WITNESS:  Yes, sir.

10         THE COURT:  Did you own at least 50 percent?

11         THE WITNESS:  Absolutely.  Yes, sir.

12         THE COURT:  Did you own at least 75 percent?

13         THE WITNESS:  I would say so.

14         THE COURT:  Did you own at least 80 percent?

15         THE WITNESS:  I would say so.

16         THE COURT:  Did you own at least 90 percent?

17         THE WITNESS:  Yes, sir.

18         THE COURT:  Did you own at least 95 percent?

19         THE WITNESS:  I don't know.

20         THE COURT:  Well, tell me what percent -- it's

21  between 90 and 100 percent, right?

22         THE WITNESS:  Yes, sir.

23         THE COURT:  All right.  What is that number?

24         THE WITNESS:  In the operating agreement?

25         THE COURT:  Yes.

149

 1          THE WITNESS:  Can I bring a copy tomorrow?

 2          THE COURT:  No.  You're not coming back tomorrow.

 3          THE WITNESS:  I'm sorry.  I don't know what it

 4  said.

 5          THE COURT:  Did you own at least 90 percent?  You

 6  don't know, do you?

 7          THE WITNESS:  No, I don't, sir.

 8          THE COURT:  Then why were you signing all of these

 9  amendments under oath?

10          THE WITNESS:  Scheduling?

11          THE COURT:  Yes.

12          THE WITNESS:  These (indicating)?

13          THE COURT:  Why were you saying 33 and a third, 75

14  percent at one time?

15          MR. HAYS:  Seventy and one-seventh.

16          THE COURT:  Seventy percent at one time.  Why were

17  you making all of these random -- putting down all these

18  random numbers?

19          THE WITNESS:  Because I owed people money.

20          THE COURT:  Why were you putting down all of those

21  random numbers?  We know you owed people money.  Why were

22  you saying they owned part of that membership?

23          THE WITNESS:  I guess I made a mistake, and at the

24  time --

25          THE COURT:  So you just don't know?  I'm really

150

1  looking at your credibility.  You've signed several

2  documents, including your first petition, under oath, that

3  it was true and correct, not to the best of your ability,

4  but that it was true and correct, and yet you can't tell me

5  today how much of that percentage you owe, although you've

6  already testified several times today that you own 100

7  percent?

8            THE WITNESS:  That's correct.

9            THE COURT:  Okay.  When do you think you started

10 owning 100 percent?

11           THE WITNESS:  And these aren't in the documents, I

12 don't believe.  I didn't see it.

13           THE COURT:  I don't care if they are.  When did

14 you start believing you owned 100 percent of that LLC?

15           THE WITNESS:  When I was the one that donated most

16 of the money.

17           THE COURT:  When did you do that?

18           THE WITNESS:  It wasn't recorded, but the day

19 before I --

20           THE COURT:  When did you do that?

21           THE WITNESS:  The 30th of October.

22           THE COURT:  What year?

23           THE WITNESS:  2018.

24           THE COURT:  Thank you.

25           Mr. Hays, please continue.

*Briggs Reporting Company, Inc.*

151

1          MR. HAYS:  Thank you.

2    BY MR. HAYS:

3    Q    Earlier, before the lunch break, we were discussing

4    that UCC amendments were getting filed, adding various

5    secured parties as being the parties holding the liens

6    against the mobile home.  Do you recall that?

7    A    I'm sorry?  Say that again.

8    Q    Before the lunch break, we went over several

9    exhibits --

10   A    Yes, sir.

11   Q    -- including UCC3 amendments that were filed with the

12   Secretary of State that reflected that the lien holders

13   against the mobile home were changing or other names were

14   being added.  Do you recall that?

15   A    That's correct.

16   Q    And at first, it was your sons, Brian and Steven,

17   correct?

18   A    That's correct.

19   Q    And then additional names got added, including your son

20   Justin and your granddaughter Emma, and a couple other

21   individuals, Mr. Pierpont and --

22   A    Mr. McLelland.

23   Q    Mr. McLelland.  Thank you.  You remember that, too,

24   right?

25   A    Yes, I do.

*Briggs Reporting Company, Inc.*

152

1  Q    And all of those parties added up, how many parties

2  were there that got reflected on that UCC amendment as being

3  the owners of the liens?

4  A    There were seven.

5  Q    Seven.  So is that the basis of your statement that you

6  held a one-seventh interest in J-Pad, as reflected in your

7  amended schedules filed on September 22, 2021, as Docket

8  Number 16?

9  A    I believe so.

10 Q    Okay.  Was it the case that those parties were the

11 owners of the lien at the time that the document was filed

12 with the Secretary of State?

13 A    Were the parties an owner of a lien?

14 Q    Yes.  They were added as secured parties.

15 A    Correct.

16 Q    Were they, in fact, the secured parties?

17 A    As I said earlier, it was more of because of a personal

18 issue, that if I wasn't available -- there was a dispute

19 between my family and the non-family members.

20 Q    But it was your intention in filing those documents to

21 give portions of that lien to those various different named

22 individuals, correct?

23 A    I wasn't giving -- I didn't believe I was giving

24 anything.  It was somebody only to act in my absence.

25 Q    So were they, in fact, the owners of the liens?

153

1  A    Were they owners of the liens?

2  Q    They were listed as secured parties.  Was that a true

3  statement?

4         THE COURT:  Well, Mr. Hays, it is a true statement

5  that they were listed as the beneficiaries of a security

6  interest.

7         MR. HAYS:  That is correct.

8         THE COURT:  That is a true statement on the

9  document.

10         MR. HAYS:  Yes.

11         THE COURT:  Okay.  The real question you're

12  wanting to ask is this.  Did they have any legal right to be

13  named as a party that is holding a secured interest in

14  that --

15         THE WITNESS:  I guess that's all that I had, and

16  that was what I wanted to leave them.

17         THE COURT:  No, I understand.  I understand that,

18  but did they have a -- did you think that they had a legal

19  right to do that, or were you doing it to transfer an

20  interest to them?

21         THE WITNESS:  It would only come up if something

22  happened to me.

23         THE COURT:  That's right, and if something

24  happened to you, then what would have been the result?

25         THE WITNESS:  They would have all split it,

154

1  one-seventh.

2         THE COURT:  Okay.  So that was the purpose of you

3  thinking that you could transfer that interest in a

4  security --

5         THE WITNESS:  I didn't have a will.

6         THE COURT:  -- an interest in a security

7  interest -- pardon the alliteration -- because you wanted to

8  change the beneficiary of a security interest?

9         THE WITNESS:  I just wanted them to have something

10 if something happened to me.

11        THE COURT:  Yes, I understand that.

12        THE WITNESS:  That's it.

13        THE COURT:  Okay.  I get what you're saying.

14        Mr. Hays, do you understand her response?

15        MR. HAYS:  I'm not entirely sure.

16        THE COURT:  I'm not asking you to understand it.

17 I'm asking you if you do.

18        MR. HAYS:  I'm not entirely sure, and let me if I

19 can get --

20        THE COURT:  Then you should follow up.

21        MR. HAYS:  Yes.

22        THE COURT:  But you see where I'm going?

23        MR. HAYS:  I understand.

24 BY MR. HAYS:

25 Q    They were, in fact, listed as the secured parties, and

155

1  you indicated earlier that the minutes of the J-Pad LLC were

2  amended to reflect that they became the secured parties,

3  correct?

4  A    I put them down in the book, yes, and I asked Mr.

5  Golden if he wanted the book, and he said no.

6  Q    When these various individuals no longer were listed as

7  owners of J-Pad or lien holders holding the lien that was

8  originally created in favor of J-Pad, did any of them ever

9  sign anything?

10  A    No.

11  Q    So you simply filed a document that -- with the

12  Secretary of State to say that the lien holders had released

13  their lien?

14  A    The --

15  Q    I'm sorry, not Secretary of State.  HCD.  How was it

16  that people listed as legal owners released their interest

17  with HCD?  Did they sign anything?

18  A    So, on January 14, 2019, J-Pad LLC filed a UCC with

19  Secretary of State.  The only legal owner, I think I

20  testified to, was either, at one point, Mr. Pierpont, for

21  his 12,500, and J-Pad.  There wasn't anybody else.

22  Q    And did you say you paid Mr. Pierpont in February of

23  2021?

24  A    Mr. Hays, you know why I paid him.  It was for the

25  bail.

156

1  Q    I'm asking a yes or no -- not yes or no, but I'm

2  asking, that payment occurred in February of 2021, correct?

3            THE COURT:  See, he's educating me.  He knows the

4  answers to his questions, but I don't.

5            THE WITNESS:  This is humiliating.

6            THE COURT:  It's okay.

7            THE WITNESS:  It's not okay.

8            THE COURT:  Well, then say you don't want to

9  answer the question.

10           THE WITNESS:  No, it's not that I'm refusing to

11 answer.  It's just that I'm just humiliated that I had to

12 pay it.  Yes, sir.  Go ahead.

13 BY MR. HAYS:

14 Q    That payment occurred in February of 2021, correct?

15 A    I don't remember when he was paid back, sir.

16 Q    Was it in --

17 A    I think that's when I got the money.

18 Q    I --

19 A    There was like two.  There was one August 7th.  I

20 listed it on my bankruptcy here, if you want to know the

21 exact date.

22 Q    Please.

23 A    I think it's in 175 and something else.  Go ahead.  I'm

24 just tired.

25 Q    Was the payment of the $12,500 during the one-year

157

1  period prior to bankruptcy, so sometime after July 9 of --

2  A    I believe it --

3  Q    Let me finish so the record is clear.

4  A    Sorry.  I'm so sorry.

5  Q    Was it made sometime after July 9 of 2020?

6  A    No, it was way before that.

7  Q    And I thought you testified to something earlier, so

8  I'm glad you cleared that up.  So the payment that you made

9  that paid off Mr. Pierpont you are now confident was prior

10 to the one-year period prior to bankruptcy?

11 A    That's why I gave him that August 20th -- wasn't it

12 August 28th or August 20th, 2020?

13 Q    That was when he was added as a lien holder, according

14 to the documents we looked at earlier.

15 A    That's correct.

16 Q    So had you already paid him off before you added him as

17 a lien holder?  You would have had no reason to do that.

18 Are you confused on the dates?

19 A    I could be.  You know, with the COVID thing, the

20 whole -- the issue with the state -- if you don't mind, the

21 issue with -- the only place that processes all of this

22 paperwork is up in Sacramento.  So, for instance, I drove my

23 paperwork out -- if it pleases the Court, I drove my

24 paperwork out to November 16th, to HCD.  I didn't get it

25 back until February of 2019.  So the whole process did not

158

1  make sense to me.

2  Q    I think everything you just said isn't really

3  responsive to my question, so let me repeat my question.  At

4  the time you signed the statement to encumber, on August 28

5  of 2020, which was your recollection of when you did that,

6  had you paid off Mr. Pierpont or not?

7  A    2020?

8  Q    Correct.

9  A    Because I didn't borrow the money -- was it 2020?  I'm

10  sorry, sir.  I can bring the receipt.  I thought I provided

11  it.

12  Q    At the time you signed --

13  A    I don't remember.  I don't recall.

14  Q    -- the statement to encumber in -- listen to my

15  question, please.  At the time you signed the statement to

16  encumber, on August 28 of 2020, did you or did you not owe

17  money to Mr. Pierpont?

18  A    I did.

19  Q    Okay.  And then, sometime after that statement to

20  encumber was signed in August of 2020, you paid Mr. Pierpont

21  off, correct?

22  A    I believe so.

23  Q    Okay.  And was Mr. Pierpont a member of J-Pad on any of

24  the documentation that was ever filed with the Secretary of

25  State, including on a UCC?

159

1  A    No, he was not.  He was just the manager.

2  Q    Earlier, when we were looking at Exhibit 14, which was

3  filed on September 8 of 2021, you added Mr. Pierpont as a

4  secured party.

5  A    I'm sorry.

6  Q    Sure.

7  A    Could you tell me the page number?

8  Q    Let's turn to it, Tab 14.

9  A    In what book, sir?

10 Q    Exhibit 14, page 179.  Tell me when you find that

11 document.

12 A    In what book?

13 Q    It is volume one of six.

14 A    Yes, sir.

15 Q    And you're at page 179?

16 A    Yes, sir.

17 Q    This is a UCC3 financing amendment filed with the

18 Secretary of State on September 8 of 2021, and Mr. Pierpont

19 is added as a secured party, correct?

20 A    That's correct.

21 Q    Did you owe him money or did you not owe him money as

22 of this date?

23 A    I don't believe I did.

24 Q    And he did not pay anything to you to become a

25 secured -- or to J-Pad -- to become a secured party under

160

1  that original financing agreement, correct?

2  A    Did he -- no.

3         THE COURT:  Mr. Hays?

4         MR. HAYS:  Yes.

5         THE COURT:  Under what specific cause of action

6  under 727 are all of these questions related to?

7         MR. HAYS:  Your Honor, twofold is the answer.

8  Under 727(a)(2), the Debtor, in her capacity as manager or

9  member of J-Pad, was -- and she's now testified that she

10 believes she's the 100-percent owner of J-Pad -- was

11 transferring assets of J-Pad to various different parties by

12 adding them as secured parties on these UCC3 amendments, and

13 she's testified this morning, and again right now, with

14 respect to Mr. Pierpont, that none of these individuals paid

15 anything in exchange for acquiring their interest as an

16 additional secured party, and that occurred post-petition.

17        THE COURT:  Okay.  And that would be 727(a)(2)(A)?

18        MR. HAYS:  Correct.

19        THE COURT:  Okay.  And now that we've established

20 that, do you have to go any further --

21        MR. HAYS:  No, your Honor.

22        THE COURT:  -- into the depth of this?

23        MR. HAYS:  No, your Honor.

24        THE COURT:  Thank you.

25        MR. HAYS:  Yes.

161

1        THE COURT:  Mr. Hays, let's try to get to the

2   third element of 727(a)(2)(A).  That would be intent.

3        MR. HAYS:  Yes.  And, your Honor, I believe we've

4   already got evidence in front of the Court on that issue,

5   that these -- titling the property in the name of

6   J-Sandcastle in November of 2018, concurrent with the Debtor

7   going to a hearing on November 1st of 2018 and November 8 of

8   2018, and then suffering a $46,000 adverse judgment that got

9   signed a couple of weeks later, on December 4th of 2018, is

10  evidence of her intent, that she was making these transfers

11  with actual intent to hinder, delay, and defraud creditors.

12        THE COURT:  Within one year of the date of the

13  filing of the petition?

14        MR. HAYS:  By titling the property in the name of

15  J-Sandcastle LLC, the Debtor was concealing her interest in

16  the property as the beneficial or --

17        THE COURT:  Within one year?

18        MR. HAYS:  Getting there, your Honor.

19        THE COURT:  It's an act of -- it's an act --

20        MR. HAYS:  I understand.

21        THE COURT:  -- and the act took place in 2018.

22        MR. HAYS:  But that was concealment, and that

23  concealment continued into the one-year prior to bankruptcy

24  by leaving the property in the name of J-Sandcastle LLC, and

25  the Debtor testified earlier that the earliest possible date

162

1 by which HCD received the request to retitle the certificate

2 of title in the Debtor's name individually would have been

3 on the petition date, but was likely a few days later.

4          So there was a concealment that first took place

5 in 2018.  That concealment continued into the one-year

6 period prior to bankruptcy, and we cited case law, and I

7 believe it's even a stipulated issue of law in our joint

8 pre-trial stipulation, the doctrine of continuing

9 concealment, but if the concealment continues into the

10 one-year period, the element of 727(a)(2) is satisfied.

11          THE COURT:  So, at this point, do you need to ask

12 any more questions, under your theory of the law, about this

13 matter?

14          MR. HAYS:  Not on 727(a)(2).

15          THE COURT:  All right.  Well, then, tell me what

16 else we're going to.

17          MR. HAYS:  Yes.  And, your Honor, if you want --

18          THE COURT:  I'm trying to speed this up.

19          MR. HAYS:  I appreciate that, your Honor,

20 because --

21          THE COURT:  This can take a lot less time.

22          MR. HAYS:  And I appreciate that.  There's one

23 other theory of the case, while we're talking about how all

24 of this is relevant, and this is --

25          THE COURT:  And what is that theory of the case?

163

1          MR. HAYS:  -- good of a time as any to explain it.

2          THE COURT:  I'm sorry.?

3          MR. HAYS:  This is as good of a time as any to

4    explain it and make it clear.

5          THE COURT:  Thank you.

6          MR. HAYS:  The Debtor also, at the time that she

7    spent her personal money by selling property that was in her

8    personal name, but yet titled it into a separate entity

9    because she was a party to these multiple 2017 lawsuits that

10   all started coming up with big money judgments against her

11   at the end of 2018, not only did she put the title in the

12   name of one LLC, the Debtor then creates a lien and a

13   promissory note in favor of another LLC, which then conceals

14   the true amount of equity in the property, because there are

15   all of these liens of record that have been filed with the

16   Secretary of State that are on the HCD certificates of title

17   that the Debtor testified are in the minutes, but she

18   testified in her deposition these people were owed X amount

19   of money.

20         So the Debtor is concealing the true amount of

21   equity in this property by putting on a sham lien in favor

22   of J-Pad, when J-Pad gave no consideration for the lien, and

23   notwithstanding all of the various officially filed

24   documents, including the bankruptcy schedules and statements

25   in this Court, the Debtor is now saying she was always the

*Briggs Reporting Company, Inc.*

164

1 100-percent owner of J-Pad, and, therefore, any creditor

2 that was looking at the situation wouldn't know there was

3 substantial equity in this property, but would instead

4 believe --

5          THE COURT:  Stop right there.  How much

6 substantial equity?

7          MR. HAYS:  Well, we believe the property to be

8 worth more than what the Debtor has said.

9          THE COURT:  How much?

10          MR. HAYS:  We believe the property to be worth

11 approximately 350 to $400,000.

12          THE COURT:  And what is the homestead exemption in

13 2021 with respect to Orange County, California?

14          MR. HAYS:  It changed in the beginning of 2021 to

15 $600,000.

16          THE COURT:  That's right.  So now explain to me,

17 even if she had the mistaken intent that it would have

18 affected somebody, what does it matter?  It's not material.

19 Had she not -- had she actually not made any transfers at

20 all, what would have been the result?

21          MR. HAYS:  If she had --

22          THE COURT:  Who would have collected any more

23 money had she not made the transfers?

24          MR. HAYS:  As it turns out, because the law

25 changed, no one.

165

1          THE COURT:  Exactly.

2          MR. HAYS:  But the focus here is, did the Debtor

3  transfer or conceal with intent to defraud?  That intent was

4  established when she did all of this in 2018, and that

5  continued into the one-year period prior to bankruptcy,

6  which still includes an approximate five-month period before

7  the law changed, which was simply luck for Debtors in

8  California, with the homestead exemption changing

9  substantially, but, still, during the applicable one-year

10 period, she was concealing her equitable interest and true

11 equity in the property at a time when the homestead

12 exemption was limited to $75,000.

13         THE COURT:  Okay.  And so you're suggesting that

14 the continuing concealment caused harm, and then, because

15 the law changed, didn't cause harm?

16         MR. HAYS:  I don't think causing harm is an

17 element to be proven --

18         THE COURT:  Well, you have to have intent --

19         MR. HAYS:  -- but it did, in fact, cause harm.

20         THE COURT:  The element is Debtor intended to

21 hinder, delay or defraud a creditor or officer of the

22 estate.  That's all it says.

23         MR. HAYS:  I understand.

24         THE COURT:  And I'm just -- I'm not arguing with

25 you.

166

1          MR. HAYS:  I --

2          THE COURT:  I'm just trying to get a feel for your

3   theory of law where she hid -- let's assume that she

4   intended, in 2018, because there were cases pending, okay,

5   where she had financial exposure.  There were cases pending

6   where she had financial exposure, and then she purchased the

7   mobile home, but didn't put it in her name, and then she put

8   it into Sandcastle, and then she started dealing off

9   security interests on that property as, perhaps, a

10  belt-and-suspenders situation.  Is that what you're

11  suggesting?

12         MR. HAYS:  Yes, sir.

13         THE COURT:  Okay.  And the continuing concealment,

14  up to and including the petition date -- and that would thus

15  include the one-year period -- is grounds for denying her

16  discharge under 727(a)(2)(A).  That is your theory?

17         MR. HAYS:  Yes, your Honor.

18         THE COURT:  Believe me, Mr. Hays, I have reviewed

19  all of the evidence now, and I understand your theory.

20         MR. HAYS:  Okay.

21         THE COURT:  You're kicking a horse, a dead -- not

22  you -- I believe the facts of this case.  I understand

23  everything that you've now put into the record, and I

24  understand all of the documents that are in the record --

25         MR. HAYS:  Understood, your Honor.

167

1          THE COURT:  -- that have been admitted.

2          MR. HAYS:  Understood.

3          THE COURT:  And I understand also, with respect to

4  the 727(a)(4), the problems of false oath.  I understand all

5  of that.  Okay.  Is there any way I can convince you to

6  speed up?

7          MR. HAYS:  I'm doing my best, your Honor, and I

8  really think I'm getting close to being done.

9          THE COURT:  Thank you.

10          MR. HAYS:  Yes.

11  BY MR. HAYS:

12  Q    Ms. Gallian, on the date that the bankruptcy was filed,

13  July 9 of 2021, what was the amount owed that was secured by

14  the lien against the property?

15  A    One hundred and seventy-five.

16  Q    And has any of that amount ever been paid back?

17  A    As I pointed out in my deposition, I'm not sure, sir.

18  Q    Is $175,000 the total payoff, or would that be the

19  principal amount of money?

20  A    That's just the principal.

21  Q    And the consideration provided was a loan of 175, or

22  was it transfer of cash of 225?

23  A    No, I put $175,000 in J-Sandcastle's account on

24  November 7th.

25  Q    So, on the petition date, the amount of the lien owed

1  was $175,000, correct?

2  A    That was the amount -- it gets a little confusing

3  because, remember, there was money added to that, and that's

4  why the amount was 225, but the purchase price -- everybody

5  keeps saying that that must have been the loan amount, but

6  the loan amount was 225.  But the purchase price --

7  Q    That's the amount reflected on the note, correct?

8  A    Correct.  That's right.

9  Q    But the amount of cash transferred was 175, is what

10  you're saying?

11  A    No, that's not correct.  There was 175 and there was

12  88, remember, that's listed on the bankruptcy petitions --

13  or schedules.

14          THE COURT:  I'm sorry.  Let me ask you this

15  question.

16          THE WITNESS:  Yes, sir.

17          THE COURT:  The 175, $175,000 that you're

18  referring to, that's purchase money.  Is that correct?

19          MR. HAYS:  No.

20          THE COURT:  What is it?

21          MR. HAYS:  After the Debtor individually paid

22  money to the seller, Lisa Ryan, and put title in the name of

23  J-Sandcastle LLC, the Debtor separately entered into the

24  security agreement and promissory note that we referred to

25  this morning, where J-Pad was now being reflected as being

169

1  owed $225,000 under that promissory note, payable not to the

2  Debtor for having personally loaned money to anybody, but to

3  J-Sandcastle.  And so all I was asking was, did

4  J-Sandcastle, in fact, advance any money to anybody, or

5  borrow any money from --

6         THE COURT:  I thought that question was answered

7  four and a half hours ago.

8         MR. HAYS:  And the reason I'm now --

9         THE COURT:  I think she's testified that nobody

10  got anything for that.

11         MR. HAYS:  And now what I'm asking --

12         THE COURT:  Am I right about that?

13         THE WITNESS:  What was the question, sir?

14         THE COURT:  You know, it should be three

15  questions.  Go ahead.

16         MR. HAYS:  Well, I'm now asking for a different

17  purpose, because the schedules reflect different amounts

18  being owed on Schedule D.

19  BY MR. HAYS:

20  Q    So, Ms. Gallian, in your original set of schedules, did

21  you reflect that there was a $175,000 lien against the

22  property in favor of J-Pad?

23  A    Yes, I did.

24  Q    Okay.

25  A    And on what page is that, sir, that you're looking at?

170

1  Q    I can look it up, if you want.

2          THE COURT:  Are we talking about the schedules?

3          MR. HAYS:  The original schedules.  It's Tab 28,

4  in binder two.

5          THE COURT:  I'm sorry.  Tab 20?

6          MR. HAYS:  28 --

7          THE COURT:  28.

8          MR. HAYS:  -- in binder two.

9          THE COURT:  What page?

10          MR. HAYS:  I'm flipping there.  Page 520.

11  BY MR. HAYS:

12  Q    So, Ms. Gallian, page 519 starts what's called Schedule

13  D, "Creditors Who Have Claims Secured by Property," and the

14  second creditor listed at the top of page 520 is J-Pad LLC,

15  for -- it says, "Amount of claim" in column A, and you list

16  the amount of claim as $175,000, correct?

17  A    That's correct, and there's those two dates that you

18  were asking for, sir, right there on the line, the two

19  dates.

20  Q    That's not my question.

21  A    I understand.

22  Q    My question is, is that a true statement?  Was J-Pad,

23  in fact, owed $175,000 on the day you filed bankruptcy?

24  A    Yes.

25  Q    Okay.

171

1 A    They're the holder of the note.

2 Q    If we can go to the third set of amended schedules, and

3 let me pull up the tab number.  Tab 32.  Schedule D starts

4 on page 644, and at the top of page 645, the second creditor

5 listed as being lien holders are J-Pad LLC, Steven and Brian

6 Gallian, for $225,000.  Do you see that?

7 A    Yes, that's correct.

8 Q    And is that a correct statement?

9 A    (Indiscernible) legal owner recorded with HCD, UCC1

10 perfected.  Yes, sir.

11 Q    But you just testified a second ago that in your

12 original schedules, the amount owed was 175, and that that

13 was correct, and you're now saying the amount owed of 225 is

14 correct.  What was the amount owed?

15 A    Because the security agreement and the promissory note

16 are for 225.  I made a mistake.

17        THE COURT:  Let me try it, Mr. Hays.

18        Please go to Exhibit 28, page 520.  Tell me when

19 you're there.

20        THE WITNESS:  Yes, sir.

21        THE COURT:  On Section 2.2 --

22        THE WITNESS:  Yes, sir.

23        THE COURT:  -- do you see where it says, "J-Pad

24 LLC"?

25        THE WITNESS:  Yes, sir.

172

1          THE COURT:  Is there anywhere on these schedules

2    that lists Steven and Brian Gallina as secured creditors?

3          THE WITNESS:  No, there is not.

4          THE COURT:  Okay.  Is that a true statement with

5    respect to J-Pad LLC being owed $175,000?

6          THE WITNESS:  (No response.)

7          THE COURT:  It's a yes-or-no question.  Is that a

8    true statement?

9          THE WITNESS:  Well, I think --

10          THE COURT:  Is it a true statement?

11          THE WITNESS:  Yes.

12          THE COURT:  Okay.  So now you have testified that

13   you have signed a document under penalty of perjury that you

14   say is true and correct, and you signed it on or about

15   7/29/21, in Docket Number 1 of the main case, that J-Pad LLC

16   was owed $175,000, correct?

17          THE WITNESS:  That's correct.

18          THE COURT:  Now, if Mr. Hays has correctly

19   directed you to Exhibit 32, at page 645, section 2.2, it now

20   seems that you've added Steven and Brian Gallian, along with

21   J-Pad LLC, for a total of $225,000.

22          THE WITNESS:  That's correct.

23          THE COURT:  Is that true?

24          THE WITNESS:  Yes.

25          THE COURT:  So how can they both be true?

173

1          THE WITNESS:  Because of the little note that I

2   wrote right down there.  It says, "HCD lien perfected 8/20,

3   2020," and that was the day that Steven and Brian Gallian --

4          THE COURT:  What about J-Pad?

5          THE WITNESS:  Aren't they still there now, sir?

6          THE COURT:  Yes, they are, but which one is owed

7   which, and why didn't you state, "Steven and Brian Gallian"

8   in the original petition?

9          THE WITNESS:  Because I made a mistake.

10         THE COURT:  You made a mistake?

11         THE WITNESS:  Yes, sir.

12         THE COURT:  You're making a lot of mistakes.

13         THE WITNESS:  That's why I have nine amendments,

14  sir.

15         THE COURT:  Okay.  Thank you, Mr. Hays.  Please

16  continue.

17         MR. HAYS:  Thank you.

18  BY MR. HAYS:

19  Q    If I can direct you to your ninth set of amended

20  schedules, which is actually the 10th set of schedules filed

21  in this case, filed on March 15 of 2022, and that is Docket

22  Number 38 -- Tab Number 38, I'm sorry, starting at page 818.

23  A    Yes, sir.

24  Q    Is that your signature?

25  A    Yes, it is.

174

1  Q    And it's under penalty of perjury, correct?

2  A    Yes, it is.

3  Q    And if I can get you to turn to Schedule D, which is on

4  page 823.

5  A    Yes, sir.

6  Q    You list out three different secured parties, which

7  include the Orange County Tax Assessor as claim 2-1 on page

8  823 --

9  A    Yes, sir.

10 Q    Janine Jasso on page 824, and Jennifer Paulin as number

11 2.3 on page 824, and there is no listing of any claim being

12 owed to J-Pad, Steven Gallian, or anybody -- Steven or Brian

13 Gallian or anybody else.  Is this document true, that they

14 weren't owed any money as of the petition date?

15         THE COURT:  Well, rephrase your question.

16 BY MR. HAYS:

17 Q    Is it a true statement in these schedules that J-Pad,

18 Steven, and Brian were not owed any money?

19         THE COURT:  Well, it's not a statement.  It's an

20 omission.

21 BY MR. HAYS:

22 Q    Is it accurate -- are these -- is this Schedule D

23 accurate by omitting J-Pad, Steven, and Brian as being

24 secured creditors?

25 A    They were left off.

175

1  Q    But they are, in fact, secured creditors?

2         THE COURT:  Is that a question?

3         MR. HAYS:  Yes.

4  BY MR. HAYS:

5  Q    But they are still secured creditors, correct?

6  A    J-Pad is the only secured creditor.

7  Q    Okay.

8  A    I don't understand why you keep asking Steven and

9  Brian, because I --

10 Q    You were the one that put them into the schedules.

11 A    I did, but then I amended schedules, and I thought

12 that, once you amend schedules, that the schedule before is

13 no longer accurate, that it's not even relevant.

14        THE COURT:  Let me tell you why it's relevant, so

15 you --

16        THE WITNESS:  I'm sorry.

17        THE COURT:  Let me tell you why it's relevant.

18        THE WITNESS:  Yes, sir.

19        THE COURT:  It goes to your credibility.

20        THE WITNESS:  Because you made a mistake?

21        THE COURT:  No, because you continue to swear

22 under penalty of perjury that it's true and correct.

23        THE WITNESS:  But at the time that I filed it,

24 your Honor, respectfully --

25        THE COURT:  It's not to the best of your ability.

176

1  It's that it is true and correct.  And you wanted -- I'm

2  going to give you an explanation.

3           THE WITNESS:  No, I --

4           THE COURT:  Yes.  I'm going to give you an

5  explanation --

6           THE WITNESS:  Yes, sir, please.

7           THE COURT:  -- so that you fully appreciate the

8  fact --

9           THE WITNESS:  Please.

10           THE COURT:  -- that you're going around signing

11  papers that you say under penalty of perjury are true and

12  correct, and we're clearly knowing that you're not, that you

13  either don't care of don't know enough not to do it.  Do you

14  have a response to that?

15           THE WITNESS:  I made a mistake, and I corrected

16  them as best as I could, and I did that honestly.  I tried.

17           THE COURT:  Mr. Hays?

18  BY MR. HAYS:

19  Q    That is the most recent set of amended schedules you

20  filed, on March 15, 2022, correct?

21  A    Uh-huh.

22  Q    And it omits the secured creditor that's owed, you

23  said, 225,000, correct?

24  A    Yes, sir, that's correct.

25  Q    Okay.

177

1  A     I can see very clearly why it was omitted.

2  Q     Have you filed motions to avoid judgment liens in this

3  bankruptcy case in January of this year?

4  A     Do you have a docket number?

5  Q     There's two docket numbers.

6          THE COURT:  Mr. Hays?

7          MR. HAYS:  Yes.

8          THE COURT:  Let's do it this way.  Fill in the

9  blanks.

10         Ms. Gallian, when did you first file a motion to

11  avoid a judgment lien in this particular case?

12         MR. HAYS:  Your Honor, if I may real quick,

13  there's a number of different motions that have been filed,

14  and the most recent ones, which this Court denied as being

15  premature, are the ones that I'm specifically talking --

16         THE COURT:  What docket number?

17         MR. HAYS:  Docket 294 and 297.

18         THE COURT:  One second.  One second.  Two, nine,

19  four?

20         MR. HAYS:  Correct.

21         THE COURT:  Is that an exhibit of yours?

22         MR. HAYS:  No, your Honor.

23         THE COURT:  All right.  Specifically with respect

24  to Docket Number 294, do you have a question?

25         MR. HAYS:  On page 13 of 242, the Debtor lists

178

1  lien holders against the property, and she lists that J-Pad

2  is a lien holder in the amount of $225,000, but yet the most

3  recent set of schedules in this case do not list them as a

4  secured creditor at all.

5          THE COURT:  Are you asking me to take judicial

6  notice of Docket 294?

7          MR. HAYS:  Yes, I am, your Honor.

8          THE COURT:  The Court takes notice, and I have now

9  in front of me Docket 294.  It is a motion for -- motion to

10  avoid liens under 11 U.S.C. 522(f).  That was filed on

11  January 12, January 12, 2023.

12          I'm going to continue to take judicial notice of

13  some documents -- or some statements in here.  On page 13 of

14  244, Docket Number 294, in paragraph 10, it states, "The

15  subject property is encumbered with the following liens:

16  J-Pad LLC, Exhibit B, page 80 to 81."

17          Is that what you're referring to, Mr. Hays?

18          MR. HAYS:  Yes, your Honor.

19          THE COURT:  Do you recall filing this motion?

20          THE WITNESS:  It was in January 2023?

21          THE COURT:  Yes.

22          THE WITNESS:  Yes, your Honor.

23          THE COURT:  Okay.  January 12th, by the way, 2023,

24  and, as we see, you signed it, and, as we see -- I'm going

25  to your declaration.

179

1          MR. HAYS:  Your Honor, it's the next -- it's page

2    14, at paragraph 13.

3          THE COURT:  Thank you.

4          Again, you've signed this under penalty of

5    perjury, under the laws of the United States of America,

6    that "The foregoing is true and correct"?

7          THE WITNESS:  My declaration?

8          THE COURT:  Yes.

9          THE WITNESS:  Yes, your Honor.

10         THE COURT:  Yes.  You signed it --

11         THE WITNESS:  Yes, sir.

12         THE COURT:  -- saying in 2023 that J-Pad has the

13   lien of 225,000, although Mr. Hays has pointed out that

14   you've removed J-Pad, and you've testified that you removed

15   J-Pad as a lien holder on March 15, 2022.  Now, maybe I'm

16   not understanding something, but you've testified that you

17   took out J-Pad in your amended schedules, in Docket Number

18   75.

19         THE WITNESS:  Right here, yes, sir.

20         THE COURT:  But almost a -- not a year later, but

21   almost a year later, you say it's still there.  And so I'm

22   just trying to make sure the record is clear --

23         THE WITNESS:  That's correct.

24         THE COURT:  -- that those are what the documents

25   reflect.

180

1          Mr. Hays, have I said anything that's incorrect?

2          MR. HAYS:  No, your Honor.

3          THE COURT:  Ms. Gallian, have I said anything

4 that's incorrect?

5          THE WITNESS:  No, your Honor.

6          THE COURT:  Thank you.  Please proceed.

7          MR. HAYS:  Very quickly, your Honor, the next

8 document we request the Court take judicial notice of is

9 Docket 297 --

10         THE COURT:  One second.

11         MR. HAYS:  -- filed the following day, on January

12 13 of 2023.

13         THE COURT:  I'm sorry.  What's the docket number?

14         MR. HAYS:  Two, nine, seven.

15         THE COURT:  That is another motion to avoid lien

16 under 11 U.S.C. Section 522(f).  The Court will take

17 judicial notice of that.  It's in our docket.  Please

18 proceed, Mr. Hays.

19         MR. HAYS:  Thank you, your Honor.  Just so the

20 record is clear, on page two of 229, J-Pad is listed as a

21 lien holder with a claim of 225,000, and on the following

22 page, in paragraph 13, the Debtor declares under penalty of

23 perjury that "The foregoing is true and correct."

24         THE COURT:  Now you may ask a question.

25 //

181

1 BY MR. HAYS:

2 Q    Is J-Pad actually owed $225,000?

3 A    Jamie Gallian is owed 225,000, so J-Pad -- or J-Pad was

4 the holder.  Jamie Gallian, I believe, or earlier, is the

5 lender.

6        THE COURT:  I'm sorry.  Are you referring to

7 yourself in the third person?

8        THE WITNESS:  No, sir.

9        THE COURT:  Is there another person with your

10 name?

11        THE WITNESS:  He asked me if J-Pad was owed money.

12        THE COURT:  Yes, and you said Jamie Gallian is.

13        THE WITNESS:  I said because I --

14        THE COURT:  Yes, and are you speaking about

15 yourself?

16        THE WITNESS:  Yes, sir.

17        THE COURT:  That's what I asked.  I just wanted

18 the record to be clarified.

19        THE WITNESS:  Yes.

20        THE COURT:  When somebody starts speaking in the

21 third person about themselves, it's confusing on the record.

22        THE WITNESS:  Okay.

23        THE COURT:  So usually you might say, "I" or "me."

24        THE WITNESS:  I'm sorry.

25        THE COURT:  We just want to make sure that the

182

1  record is clear, that's all.

2          THE WITNESS:  Okay.  I apologize.

3          THE COURT:  You mean you are owed that money?  Is

4  that what your testimony is?

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Okay.  Thank you.

7          Mr. Hays.

8          THE WITNESS:  Yes.  J-Pad was the holder of the

9  note.

10  BY MR. HAYS:

11  Q    You are not listed on the promissory note as being owed

12  the money, correct?

13  A    Sure I am --

14  Q    Let's find the document.

15  A    -- on Docket Number 40.

16  Q    All right.  Let's turn to Exhibit Number 40, which is

17  the exhibit you were referring to, page -- that's binder

18  five, page 1212.

19  A    Are you on page 1201?

20  Q    No.

21  A    What page?

22          THE COURT:  Everyone is going to have to stop

23  mumbling --

24          THE WITNESS:  I'm sorry, sir.

25          THE COURT:  You don't need to get closer to the

183

1 microphone.  You just have to quit mumbling.  You have to

2 use your words.

3          What was your question to Mr. Hays?

4          THE WITNESS:  I asked if he was on page 1201, sir.

5          THE COURT:  I'm not sure what he's on.

6          MR. HAYS:  I had suggested -- I suggested page

7 1212.

8          THE COURT:  That's the secured promissory note --

9          MR. HAYS:  Yes.

10          THE COURT:  -- between J-Sandcastle Company and

11 Jamie Lynn Gallian.

12 BY MR. HAYS:

13 Q    Ms. Gallian, we were looking -- this document states

14 that you are the holder of the note, correct?

15 A    That's correct.

16 Q    But you just testified that J-Pad was the holder of the

17 note, correct?

18 A    I believe the document you showed me earlier is -- you

19 had J-Pad as the holder.

20 Q    I did, and so now there's a second promissory note that

21 was attached to your opposition to our objection to claim of

22 exemption, where the promissory note is now reflecting a

23 different holder of the note.  So my question to you is,

24 earlier the holder of the note was listed as J-Pad.  This

25 document lists the holder of the note as you individually.

184

1 A    Would you define "holder" for me?

2 Q    It's what the document says.

3        THE COURT:  It means the person who should be

4 paid.

5        THE WITNESS:  I am the lender on page 1201.

6        THE COURT:  Okay.  You're the lender.

7        THE WITNESS:  I was the lender, yes.

8        THE COURT:  Okay.  Now, Mr. Hays, repeat your

9 question about the other note.

10 BY MR. HAYS:

11 Q    Which of these notes is the valid and current and

12 accurate note?

13 A    Do you have a specific page you're like me to refer to?

14        THE COURT:  Yes.  Compare and contrast, Mr.

15 Hays --

16        MR. HAYS:  Yes.

17        THE COURT:  -- for me.

18        MR. HAYS:  Let's -- yes.

19        THE COURT:  Compare and contrast one document to

20 the other --

21        MR. HAYS:  Yes.

22        THE COURT:  -- by use of exhibit numbers.

23        MR. HAYS:  So Exhibit 40 is the Debtor's

24 opposition to my client's objection to exemption, and

25 attached as an exhibit to the Debtor's opposition.  At page

185

1  1212 is a secured promissory note saying that J-Sandcastle

2  is the borrower, promising to pay Jamie Lynn Gallian

3  $225,000.  Go to page 1220 --

4          THE COURT:  Let me go to 1220.

5          MR. HAYS:  Twelve-twenty is a secured promissory

6  note where it says J-Sandcastle is the borrower promising to

7  repay $225,000 to J-Pad LLC.  The notes are dated the very

8  same date.

9  BY MR. HAYS:

10 Q    So who is, in fact, owed $225,000 by J-Sandcastle?

11 A    I believe that I had misunderstood the difference

12 between -- I know what a lender is.  I lent it.  I lent the

13 money.

14         THE COURT:  Well, let's ask it this way.  First of

15 all, you control J-Sandcastle Company LLC, correct?

16         THE WITNESS:  That's correct, sir.

17         THE COURT:  And you obviously -- you're not under

18 conservatorship or anything.  You control yourself, right?

19         THE WITNESS:  That's correct.

20         THE COURT:  So you created this note between

21 J-Sandcastle Company LLC and you?

22         THE WITNESS:  Correct.

23         THE COURT:  And then go to page 1220, and it says,

24 "J-Sandcastle and J-Pad, Inc."  Now, you control J-Pad,

25 Inc., also, correct?

186

1          THE WITNESS:  That's correct.

2          THE COURT:  Right.  So you created this promissory

3  note and put J-Pad LLC in there, correct?

4          THE WITNESS:  So is the Court --

5          THE COURT:  It's not a miscommunication --

6          THE WITNESS:  No, no, no --

7          THE COURT:  -- and it's not a misunderstanding.

8  There are two documents.  One of them says that the holder

9  is J-Pad LLC and one says it's you, and I'm trying to

10  understand now, because I'm the fact finder here, which one

11  did you mean to make the holder?

12          THE WITNESS:  I don't understand what the holder

13  was.  I thought the --

14          THE COURT:  The holder is you.

15          THE WITNESS:  Correct.

16          THE COURT:  That's all.  Either through Jamie Lynn

17  Gallian or J-Pad LLC, it's still you.

18          THE WITNESS:  Correct.

19          THE COURT:  Okay.  So you don't understand by the

20  word "you"?  Is that what you're having a problem

21  understanding?

22          THE WITNESS:  I understand that.  I listed them

23  both on the UCC filing.

24          THE COURT:  Yes.  I didn't ask you that.

25          THE WITNESS:  I am so like --

187

1          THE COURT:  I'm talking about these two promissory

2 notes.

3          THE WITNESS:  Yes.  It's to me, sir.  It's my

4 money.

5          THE COURT:  And why did you make two of them?

6          THE WITNESS:  Because I didn't --

7          THE COURT:  You did.

8          THE WITNESS:  Well, clearly I did.

9          THE COURT:  Yes.  Why did you do it?

10          THE WITNESS:  Because I didn't understand the

11 difference.  I didn't think the holder was the lender.

12          THE COURT:  Well, let's figure this out.  Why did

13 you submit -- Mr. Hays, maybe you can help me here.  Why did

14 she submit Exhibit Number 79?  What was the purpose of that,

15 a court pleading?

16          MR. HAYS:  It was to defeat my client's objection

17 to the claim of exemption.

18          THE COURT:  Okay.  And why would -- what would it

19 have mattered whether she attached Exhibit Number --

20 exhibits starting on page 1212 versus 1220?  Would it have

21 made any difference?

22          MR. HAYS:  I don't know if it makes any difference

23 to the objection to the claim of exemption.

24          THE COURT:  Okay.

25          MR. HAYS:  Those issues are different, but she was

188

1 providing these documents attached to her declaration under

2 penalty of perjury, and the documents themselves -- the one

3 that says J-Pad is the holder of the note is immediately

4 followed by a document that says that she's signing that,

5 that the contents of the note are true and correct under

6 penalty of perjury, and that follows at page 1225.

7           THE COURT:  And how did you acquire the promissory

8 note starting on page 86 -- pardon me, 1220?

9           MR. HAYS:  This was an exhibit to Ms. Gallian's

10 filing.  So she put this --

11           THE COURT:  Which filing?

12           MR. HAYS:  The opposition to our objection to her

13 claim of exemption.

14           THE COURT:  Okay.

15           MR. HAYS:  So she provided these documents as

16 being evidence of, you know, what her interest was in the

17 property in connection with the homestead, and she's now

18 provided two separate inconsistent promissory notes, or

19 maybe there's two promissory notes.

20           THE COURT:  Or maybe there's three.

21           MR. HAYS:  Right.  You never know.  So the point

22 being, I want to know is there really only one note, or is

23 there more than one note, and Ms. Gallian can --

24           THE COURT:  Well, there's obviously two notes.

25           MR. HAYS:  Yes.  Well, I meant --

189

1          THE COURT:  The question is simple.  Which one is

2    the one that we should be looking at?

3          THE WITNESS:  There is only one note, sir.

4          THE COURT:  Yes, I know that.  Which one is it?

5    Is it the one that's on page 79 -- I'm sorry, on page

6    1212 -- or 1220?

7          THE WITNESS:  Twelve-twelve, sir.

8          THE COURT:  I'm sorry.  Twelve-twelve?

9          THE WITNESS:  Twelve-twelve.

10          THE COURT:  Okay.  And why do you think that is

11    the correct one?

12          THE WITNESS:  Because it lists me the holder.

13          THE COURT:  That doesn't make any sense.  Why do

14    you think it is the correct one?  You remember that J-Pad is

15    also you?  So now do you have a better answer?

16          THE WITNESS:  (No response.)

17          THE COURT:  Okay.  You're shaking your head no.

18    You have to say yes or no.  Do you have a better answer?

19          THE WITNESS:  What was the question, again?

20          THE COURT:  How do you know -- explain to me,

21    which one is the true and correct promissory note?  And you

22    say it's the one with your name on it, and I'm asking you,

23    why is that -- why is your name being on it relevant to make

24    that the correct one?

25          THE WITNESS:  Because I lent the money.  It was my

190

1  money for the purchase of the house.

2          THE COURT:  And why did you put J-Pad on it?

3          THE WITNESS:  Because both of our names were on

4  the UCC filings.

5          THE COURT:  That doesn't help.  Tell me why.  It

6  doesn't match up with your answer that it was you that was

7  owed the money.

8          THE WITNESS:  Because they are me.

9          THE COURT:  If it was you that was owed the money,

10 then why did you put --

11         THE WITNESS:  Because they're one and the same,

12 and I'm J-Pad, too.  Is that what you're looking for?

13         THE COURT:  Okay.  I see what you're saying.

14         Go ahead.

15 BY MR. HAYS:

16 Q   You just told us that the note we should be looking at

17 is the one that says you are owed the money by J-Sandcastle,

18 correct?

19         THE COURT:  Mr. Hays, one of the theories that

20 possibly could occur is that she's saying maybe the money

21 was owed to two parties, and instead of combining a

22 promissory note with two names, she created two of them, one

23 and one.  I mean, that's the thing I'm thinking.

24         MR. HAYS:  I didn't hear that.

25 //

191

1 BY MR. HAYS:

2 Q     Can you answer, Ms. --

3           THE COURT:  Yes, I know.  That's why I'm telling

4 you this is what I'm hearing.  If you have a line of

5 questioning --

6           MR. HAYS:  Yes.

7           THE COURT:  -- with respect to what I'm

8 understanding that she's saying -- and let me clarify it one

9 more time for the record.

10          What I think she is trying to explain to me is

11 that both J-Pad, as an entity, and she were owed the same

12 $225,000.  I'm not saying it's true.  I'm just saying that

13 she's thinking that, and that, instead of having one note

14 that said, "Pay to the order of Jamie Lynn Gallian and

15 J-Pad," she created two notes.  That's what I think she has

16 responded to.

17          MR. HAYS:  And --

18          THE COURT:  Now, if you have a series of

19 questions --

20          MR. HAYS:  Yes.

21          THE COURT:  -- to dissuade me from what she has

22 just told me, please feel free.

23          MR. HAYS:  Yes, your Honor.

24 BY MR. HAYS:

25 Q    Ms. Gallian, I think, two or three minutes ago, you

192

1  said the note we should be looking at was the one that

2  listed you as the lender, correct?

3         THE COURT:  She didn't say that, Mr. Hays.  She

4  said that she was owed the money.

5  BY MR. HAYS:

6  Q    Okay.  So you are owed the money.  So which of the two

7  notes -- I thought you said we should be looking at the one

8  that said you were owed the money personally.  Is that the

9  note we should be looking at?

10  A    You have me so confused.  I'm sorry.

11         THE COURT:  That's not a confusing question.

12         THE WITNESS:  I was the lender.  I was the lender

13  of the note.

14  BY MR. HAYS:

15  Q    Just let me try to make it simple.  There were two

16  notes, one that lists you as the lender, one that lists

17  J-Pad as the lender.  Which of the two notes --

18  A    I don't think there's any note that says J-Pad is a

19  lender.

20         THE COURT:  This is why the borrower --

21         THE WITNESS:  Pardon me, sir?

22         THE COURT:  -- promises to pay to the order of

23  blank, whether it says, "Gallian" or "J-Pad" --

24         MR. HAYS:  Page 1220.

25         THE COURT:  -- because someone loaned money to

193

1 J-Sandcastle, according to this note.

2          THE WITNESS:  Yes.

3          THE COURT:  And so it shouldn't be confusing to

4 you.

5          THE WITNESS:  So --

6          THE COURT:  You've told me that you loaned the

7 money.

8          THE WITNESS:  I did, sir.

9          THE COURT:  Did anybody else loan any other money?

10          THE WITNESS:  No, sir.

11          THE COURT:  Okay.  So, now that we know what she's

12 thinking, that she ought to be paid, and not J-Pad -- right?

13          MR. HAYS:  Yes.

14          THE COURT:  Then, okay.  Move on.  I understand

15 what she's saying.

16 BY MR. HAYS:

17 Q    The next question, Ms. Gallian, is, if you were owed

18 the money individually, the lien was still reflected as

19 having been owed to J-Pad in the UCC filings with the

20 Secretary of State, correct?

21 A    You'd have to show me a document, sir.

22          THE COURT:  Well, more importantly, in her motion

23 to avoid a lien, she listed an entity that really wasn't

24 owed the money, in order to obtain a benefit, which I

25 believe Judge Smith granted her.

**Briggs Reporting Company, Inc.**

194

1          MR. HAYS:  I'm not sure if they were --

2          THE COURT:  But I don't care about that.

3          MR. HAYS:  I'd have to go back and -- yes.

4          THE COURT:  I don't care what the result was.

5          MR. HAYS:  Yes.

6          THE COURT:  She promoted that.

7          MR. HAYS:  Yes.

8          THE COURT:  I get it.

9          MR. HAYS:  Well, and she also filed documents with

10 the Secretary of State that listed J-Pad as the secured

11 creditor.

12         THE COURT:  I understand that.

13         MR. HAYS:  Yes.

14         THE WITNESS:  With my name as well.  Both of our

15 names are there.

16         THE COURT:  I understand all of that.

17 BY MR. HAYS:

18 Q    And all of the various schedules list J-Pad, not you,

19 as being the lender, correct?

20 A    J-Pad is not the lender, sir.

21 Q    J-Pad is the lien holder of record, correct?  That was

22 the name added to the certificates of title as the legal

23 owner, correct?  Your name was never added as the legal

24 owner, correct?

25 A    Could we pull up the UCC filing so I could see it, so I

*Briggs Reporting Company, Inc.*

195

1  may --

2  Q    I'm not talking about the UCC filings now.  I'm saying,

3  with the certificates of title issued by HCD, was your name

4  ever listed as the legal owner?

5  A    No.

6  Q    Okay.

7  A    Just -- no, no.

8  Q    And it was J-Pad, among others, that were listed as the

9  legal owner, correct?

10  A    Just J-Pad.

11  Q    Well, other people got named.  The motions to avoid

12  liens you filed in January of this year listed J-Pad as the

13  holder of the lien, correct?

14  A    I don't have that document in front of me, but yes.

15           THE COURT:  I have it in front of me --

16           THE WITNESS:  Yes.  Yes, sir.

17           THE COURT:  -- and it says that.

18           THE WITNESS:  Yes, sir.

19  BY MR. HAYS:

20  Q    Yes.  So your testimony today is that you were owed the

21  money by J-Sandcastle, correct?

22  A    That's correct.

23  Q    So you had a $225,000 asset in the form of a note

24  payable to you, correct?

25  A    For the five and a half percent, yes, correct.

196

1  Q   But in none of your original schedules and statements

2  and the 10 amendments did you ever disclose that "I have a

3  $225,000 asset in the form of a note payable to me

4  individually," correct?

5  A   Say that again?

6         THE COURT:  Repeat it exactly, because I

7  understood completely what he asked you.  Repeat it to her

8  slowly, because she had, at the beginning of this trial,

9  asked you to talk slowly.

10         MR. HAYS:  Yes.

11         THE COURT:  Right, Ms. Gallian?

12         THE WITNESS:  Yes, sir.

13         THE COURT:  Talk slowly.

14  BY MR. HAYS:

15  Q   You just testified that the note is payable to you for

16  225,000, correct?

17  A   Yes, sir.

18  Q   You were owed the money, correct?

19  A   Yes, sir.

20  Q   But, in your schedules, both the original and the 10

21  sets of amended schedules you filed in this Bankruptcy

22  Court, at no time did you disclose under penalty of perjury

23  that you were owed $225,000 as an asset that you had.  That

24  is correct?

25  A   That is correct.

197

1          THE COURT:  Mr. Hays, when is your next witness

2  coming?

3          MR. HAYS:  4:00 o'clock, your Honor.

4          THE COURT:  Okay.

5          MR. HAYS:  And if you want, we can try to call him

6  and see if he can come earlier, because --

7          THE COURT:  Yes.

8          MR. HAYS:  Okay.  Brad, can you --

9          THE COURT:  You can step out and make the call.

10  We're going to continue.

11  BY MR. HAYS:

12  Q    Ms. Gallian, you received $379,000 from Mr. Nickel as

13  far as the proceeds from the sale of Alderport, correct?

14  A    That's correct.

15  Q    And 185,000 went to Ms. Ryan.  Is that correct?

16  A    That was the purchase price, yes, at that time.

17  Q    But that's how much money went to her?

18  A    Yes.

19  Q    And you didn't get any of it back?

20  A    I didn't get any of it back?

21  Q    I'm just trying to say 185 is what you paid her, right?

22  A    Except the $20,000 cashier's check she returned to me.

23  Q    So the net cost to you was 165?

24  A    That sounds right.

25  Q    Okay.  And 379 was the purchase price, and so the

198

1   difference between the two is $214,000.  Does that sound

2   correct?

3   A    That's correct.

4   Q    And where did that $214,000 ultimately go to?  You told

5   us earlier it was first deposited into an account in your

6   individual name, correct?

7   A    That's correct.

8   Q    How much money was loaned to J-Sandcastle out of the

9   214?

10  A    The first was just the one check on November 7th for

11  $175,000, and then there was money out of my 401(k) that

12  also went there.

13  Q    And how much was that?

14  A    I don't know.

15  Q    Do you have an estimate, a range?

16  A    No.  I have no idea.  I am working with --

17  Q    Was it more or less than $50,000?

18  A    I have no idea, sir.  I would love to tell you, but I

19  don't have an idea.

20  Q    Okay.  The promissory note says 225,000 is the amount

21  borrowed.  Does that refresh your recollection --

22  A    That's correct.

23  Q    -- as to the total amount, or should we not rely on

24  that number?

25  A    No, that $225,000 was on November 16th, and, remember,

199

1  the notice of sale or transfer, that was the original price

2  of the house, was 225.

3  Q     But how much money actually went to J-Sandcastle in

4  exchange for it signing a promissory note for 225?  Do you

5  have an answer?

6  A     The first check I told you, November 7th, 175, and then

7  additional monies out of my 401(k).  There was a 15.  I

8  believe there was a 15.  It's listed on my schedule here.

9  Q     Did that happen at or about the time of the promissory

10 note, or did that happen later?

11 A     No, it was way later.

12 Q     So, at the time the promissory note was signed, 175 was

13 actually advanced to J-Sandcastle, but the note reflects 225

14 is owed?

15 A     That's correct.

16 Q     What did J-Sandcastle do with the 175,000 plus the

17 additional amounts you transferred to it from your 401(k)?

18 A     Well, that's what the cashier's checks were bought

19 with.

20 Q     Which cashier's checks?

21 A     For Lisa Ryan.

22 Q     You and I are not on the same page here.  You paid --

23 you testified earlier that you got the 379,000 from Mr.

24 Nickel.  You deposited it into an account in your name,

25 correct?

200

1  A    That's correct.

2  Q    And then you got cashier's checks out of that account,

3  and you paid them to Lisa Ryan.  That's what you testified

4  to earlier?

5  A    I believe that may answer the question.  Is it okay?

6  Q    Yes.

7  A    Okay.

8  Q    So was that a correct statement this morning?

9  A    So, on October 31st, I opened a brand-new Chase account

10  and deposited, I believe it was, $366,000, 366,500.  The

11  difference between the 366 and the 379 was three cashier's

12  checks of -- I believe one was for 7,500, one for 8,700, and

13  they were return of deposits on the Alderport house.  They

14  were the first three people that I paid.

15  Q    So, sort of going back to my question, this morning I

16  believe you testified that the cashier's checks that were

17  made payable to Lisa Ryan and the cash paid to Lisa Ryan

18  came out of the account in your individual name?

19  A    No, that's not correct.

20  Q    Okay.  So what happened to the money that was in the

21  account in your individual name?

22  A    The 175 was transferred to J-Pad -- or not J-Pad,

23  J-Sandcastle -- on November 7th.

24  Q    And let's stop there and be very clear.  J-Pad received

25  the money, and did it deposit it into an account in its

201

1  name?

2  A    J-Pad never received any money.

3  Q    I'm sorry, J-Sandcastle.  Did it deposit it into an

4  account in its name?

5  A    Yes, sir, on November 7th.

6  Q    And then, from that account, the cashier's checks

7  payable to Lisa Ryan were drawn --

8  A    That's correct.

9  Q    -- and delivered to her?

10  A    Yes, that's correct.

11  Q    Okay.  So that explains roughly 175,000 --

12  A    Correct.

13  Q    -- give or take.

14  A    Right.

15  Q    What happened to the balance of the money?  Did it stay

16  in your individual account?

17  A    No, and I believe there were copies.  I didn't see them

18  in the exhibits, but there was -- I don't remember the exact

19  amount, but I think it was 13 or 14 cashier's checks that

20  were in just different amounts.  Most of them were 10,000,

21  but it was to go to an auction.

22  Q    Who were the cashier's checks made payable to?

23  A    Me.

24  Q    Individually?

25  A    Yes, but it was --

202

1  Q    So you took them out of an account in your name, and

2  you had cashier's checks made payable to you individually?

3  A    Correct, to go to an auction.  Okay.  They were never

4  used.  The person that I was working with told me, "Get them

5  in different denominations," and so those cashier's checks

6  were paid to the attorneys that I listed in my bankruptcies.

7  Q    So you signed the check --

8  A    Over to them.

9  Q    -- over to the attorneys --

10 A    That's correct, sir.

11 Q    -- and the attorneys took it?  And so, at the time that

12 the money was transferred to the attorneys, it came out of

13 your individual account to a cashier's check made payable to

14 you, and then you signed it over to the attorneys?

15 A    That's correct.

16 Q    Okay.  And how much was spent on attorneys?

17 A    Close to 150,000.  I think I listed 118 on my

18 bankruptcies so far.

19 Q    If I can get you to turn to Exhibit 28 --

20 A    Yes, sir.

21 Q    -- at page 545, and the question actually is question

22 16 on the statement of financial affairs that starts on the

23 bottom of page 544, and it requires you to list within one

24 year before you filed bankruptcy all of the payments you

25 made to attorneys, and then you've listed out one, two,

203

1  three, four, five, six, seven different attorneys, with

2  amounts totaling $113,700.  Is that correct?

3  A    Yes, that's correct.

4  Q    But you just testified that you spent $150,000 on

5  attorneys?

6  A    That's correct.

7  Q    Did you ever file amendments reflecting where the other

8  approximate 35, $37,000 was paid to?

9  A    No, I have not.

10 Q    Okay.

11 A    Well, I did the one, the one total.  I note that Ms.

12 Garrels, attorney Sherry Garrels, is not on here, and it is

13 one of the amendments that I saw earlier.

14 Q    And --

15 A    That was about 120.

16 Q    Totaling 120 with that payment, so there's still

17 $30,000 unaccounted for?

18 A    I don't know if it's unaccounted for.

19 Q    Well, it's not explained.

20        THE COURT:  Well, account for it right now.  I'm

21 serious.

22        THE WITNESS:  Okay.  No, I will.  I will tell you

23 exactly where it is.

24        THE COURT:  Okay.  Where is it?

25        THE WITNESS:  I had my eyes fixed.

204

1           THE COURT:  You had your eyes fixed?

2           THE WITNESS:  Yes, and I had a tummy tuck.

3  BY MR. HAYS:

4  Q    You've just testified you spent 150 on attorneys, and

5  you've now explained, between your original statement of

6  financial affairs, plus one additional approximate $7,000

7  payment, where 120 went.  What I'm specifically asking now

8  is, which attorneys got the other $30,000 that are not

9  disclosed here?

10  A    There were some attorneys, one for, like,

11  consultations, so I could call and ask questions.  I paid

12  him a couple thousand dollars.

13  Q    Who was that?

14  A    I don't remember his name.  I could bring it to you.  I

15  have it on my debit card.  Christopher Blank, he's a local

16  attorney here.  I've given him four or $5,000 for --

17  Q    Before the bankruptcy, after the bankruptcy, or both?

18  A    Both.  He allows --

19           THE COURT:  Can you do me a big favor?

20           THE WITNESS:  Yes, sir.

21           THE COURT:  Tomorrow --

22           THE WITNESS:  Yes, sir.

23           THE COURT:  You know, I misspoke.  I believe we

24  probably are coming back tomorrow.  Would you bring that

25  information to me, about any money that you paid to Mr.

205

1  Blank?

2          THE WITNESS:  Well, it wasn't for bankruptcy.

3          THE COURT:  It doesn't matter.

4          THE WITNESS:  Okay.  So a bill?

5          THE COURT:  Any money that you've paid to

6  Christopher Blank, I want it accounted for.

7          THE WITNESS:  Yes, sir.

8          THE COURT:  And, matter of fact, every lawyer that

9  you paid money to within a year before the money or after

10 the bankruptcy.  I want a full accounting, but specifically

11 Mr. Blank.

12         THE WITNESS:  Did I do something wrong?

13         THE COURT:  Pardon me?

14         THE WITNESS:  Did I do something wrong by paying

15 them?  They asked me to pay them.

16         THE COURT:  Well, first of all, you didn't

17 disclose it on your petition.  So, you know, I'm not saying

18 it was wrong.  I'm just saying that your petition is now

19 incomplete.  Your statement of financial affairs does not

20 have Christopher Blank on this list.

21         THE WITNESS:  Okay.

22         THE COURT:  You'll get that to me, right?  You'll

23 get that to Mr. Hays?

24         THE WITNESS:  Of course, your Honor.  Yes.

25         THE COURT:  Get it to Mr. Hays --

1          THE WITNESS:  Yes, sir.

2          THE COURT:  -- every attorney that you've paid

3    money to.  This has nothing to do with -- this has a lot to

4    do with this trial, but it also has to do with the

5    administration of this case in its entirety.

6    BY MR. HAYS:

7    Q    So, Ms. Gallian --

8    A    Yes, sir.

9    Q    You'll bring the accounting for the rest of the

10   $30,000, correct, that was paid to attorneys?

11   A    I don't know where you get 30,000, because I just threw

12   out a number and said about 150,000.

13   Q    Okay.  So about $30,000?

14   A    I don't even know if it's that much.  You said 30,000,

15   but it's not 30,000.

16   Q    You said you probably spent 150,000 on lawyers.  We've

17   accounted for 120,000 --

18   A    That's correct.

19   Q    -- and you will figure out the exact amount, and

20   explain who else got the money, both before and after the

21   bankruptcy, correct?

22   A    I believe that I misspoke, okay, that Mr. -- that your

23   Honor had asked me, "What else did you spend money on?"  And

24   I got a tummy tuck and I got my eyes done.

25   Q    But that's a separate issue.  We haven't gone there.

207

1  A     It's part of the money.

2  Q     No, no, no.  Hold on.  Hold on.  One thing at a time,

3  please.  Tomorrow you will come back, and you will tell

4  everyone exactly how much money you spent on lawyers, and

5  who those lawyers were, whether it's 150 or more or less,

6  correct?

7  A     Yes, sir.

8  Q     Okay.  Thank you.  Earlier I referenced your prior

9  bankruptcy case, and you believed it was a 2003 proceeding,

10 and I can tell you that you were correct in your

11 recollection.  It is a 2003 proceeding.  I separately asked

12 you if there had been a known dischargeability action that

13 was brought, and your answer to that question was no,

14 correct?

15 A     I don't believe there was.

16             THE COURT:  That was your answer?

17             THE WITNESS:  Yes.  There's no --

18             THE COURT:  Your answer was there were no

19 nondischargeability action brought --

20             THE WITNESS:  That I know of, no.

21             THE COURT:  -- in your previous case.  That was

22 your answer?

23             THE WITNESS:  That's correct.

24             THE COURT:  Mr. Hays, please continue.

25             MR. HAYS:  Your Honor, I'm looking at the Court's

208

1 docket, and there's an adversary proceeding Case Number

2 8:03-ap-01726, which was a 523(a)(4) and (a)(6) case filed

3 by American Contractors Indemnity against Jamie Gallian, and

4 in that case, Ms. Gallian was represented by Christopher

5 Blank.

6 BY MR. HAYS:

7 Q    Does that refresh your memory?

8 A    They filed an adversary case in my bankruptcy?  I paid

9 them in full.  It was for my mother's probate, sir.  Are you

10 sure?  Yes, Christopher Blank represented me, but there was

11 no adversary.

12        THE COURT:  What was he representing you in?

13        THE WITNESS:  My mother died before she was

14 whatever age when you --

15        THE COURT:  What was he representing you in?

16        THE WITNESS:  The case with American Contractors.

17 It was a probate.

18        THE COURT:  Well, it would seem -- Mr. Hays, why

19 don't you give us the adversary number.

20        MR. HAYS:  Yes, your Honor, I will.  The adversary

21 case number is 8:03-ap-01726.

22        THE COURT:  Thank you.  One second.

23        THE WITNESS:  Okay.  Yes, sir.  I believed Mr.

24 Weber (phonetic) was my bankruptcy attorney.

25        THE COURT:  The beauty of computers is you can

209

1  find out the truth.

2       THE WITNESS:  Thank you.  Mr. Weber, Joe Weber.

3  Pardon me, sir.

4       THE COURT:  Now, Mr. Hays, I don't know what all

5  this is relevant to, but let me give you some facts.  Ms.

6  Gallian filed bankruptcy on September 3, 2003, as Case

7  Number 03-15856.  Judge James Barr was the judge.

8       In that case, an adversary proceeding was filed.

9  It was American Contractors Indemnity, represented by Gibson

10 Pagter, versus the defendant, Jamie Gallian, represented by

11 Christopher Blank.  It was a complaint to determine

12 dischargeability under (a)(4) and (a)(6) of 523.  The answer

13 was filed, and a judgment was granted in favor of the

14 plaintiff.  One second, please.

15      American Contractors Indemnity Company and you,

16 Ms. Gallian, stipulated for an entry of judgment under 523,

17 and the judgment was a determination that something -- I'm

18 going to say this.  This is one of the most incompetent

19 stipulations for entry of judgment I've ever seen.  Now, it

20 does not say how much the judgment that was stated in the

21 case of In Re: Estate of Mary Bradley.

22      THE WITNESS:  Maticia (phonetic)?

23      THE COURT:  It's In Re: Estate of Mary Bradley,

24 but apparently, apparently, in that estate, American

25 Contractors Indemnity Company was owed some money.

210

1          THE WITNESS:  That's correct.

2          THE COURT:  It does not say how much, but

3  apparently whatever money was owed was determined to be

4  nondischargeable in your bankruptcy case, and that is all I

5  have.

6          MR. HAYS:  That is all I'm able to get.  None of

7  the documents are imaged.

8          THE COURT:  Well --

9          THE WITNESS:  Would anybody like the fact?

10          THE COURT:  No.

11          THE WITNESS:  No.  Okay.

12          THE COURT:  Because I'm going to ask the question

13  to Mr. Hays, what does this have to do with this case?

14          MR. HAYS:  Simply the familiarity that the Debtor

15  has with the bankruptcy process, and because she's

16  representing herself as the only person of record,

17  notwithstanding the fact that she's paying attorneys behind

18  the scene, and none of that is being disclosed to the Court,

19  that she's very --

20          THE COURT:  Okay.  Well, that's enough.

21          MR. HAYS:  Yes.

22          THE COURT:  Let's move on.

23          MR. HAYS:  Okay.

24          THE COURT:  Some of this is not worth the squeeze,

25  Mr. Hays.  Is your phone or computer near the microphone?

211

1          MR. HAYS:  I do have a phone that I took out

2    with --

3          THE COURT:  Well, that's the problem with the

4    interference that we're having.

5          MR. HAYS:  I heard it, and I now have it on

6    airplane mode.

7          THE COURT:  Thank you.

8    BY MR. HAYS:

9    Q    Ms. Gallian, on the petition date, did J-Sandcastle

10   have any money in its bank account?

11   A    Was it 9,000 I put on my petition?

12   Q    Yes.  That's what you testified to --

13   A    Nine thousand.

14   Q    -- in the deposition.

15   A    That's correct.

16   Q    And what happened to that money?

17   A    It went to J-Pad's account.

18   Q    And on the petition date, how much money did J-Pad have

19   in its account?

20   A    I don't recall, sir.

21   Q    And what did J-Pad do with the $9,000?  Does it still

22   have it?

23   A    It turned it into cashier's checks and tendered it to

24   Houser Brothers.

25          THE COURT:  Now, I'm sorry.  You're using the

212

1  pronoun "it" --

2          THE WITNESS:  I'm sorry.

3          THE COURT:  -- and I'm not sure what "it" means.

4          THE WITNESS:  Okay.

5          THE COURT:  Do you mean you?

6          THE WITNESS:  So the money went from --

7          THE COURT:  I'm asking you a question.  When you

8  say "it," do you mean you, or "I," in this particular case?

9          THE WITNESS:  Okay.  I guess I get confused when

10 people say, "Don't speak as you're the same person."

11         THE COURT:  Yes, but I don't care.  I appreciate

12 that, but I'm asking you.

13         THE WITNESS:  Okay.

14         THE COURT:  When you're asking his question that

15 "It turned it into a cashier's check," do you mean you

16 turned it into a cashier's check?

17         THE WITNESS:  Okay.  So I deposited the $9,000 --

18         THE COURT:  Did you turn it into a cashier's

19 check?

20         THE WITNESS:  -- to J-Pad, and turned into a --

21         THE COURT:  Yes.  Did you --

22         THE WITNESS:  I --

23         THE COURT:  I want to hear you say it.  Did you --

24         THE WITNESS:  I --

25         THE COURT:  Use your words.

213

1              THE WITNESS:  Yes, sir.

2              THE COURT:  "I" --

3              THE WITNESS:  I'm looking over the water thing.

4              THE COURT:  "I" --

5              THE WITNESS:  I turned the check into a cashier's

6  check and tendered it to Houser Brothers --

7              THE COURT:  See how easy that was?

8              THE WITNESS:  -- for 13,000.  Well, I think I get

9  confused on "I" and -- because it was made payable --

10             THE COURT:  Yes, and I assure you that --

11             THE WITNESS:  You understand.

12             THE COURT:  -- you're trying to confuse people

13  when you say "it," and I don't appreciate it.

14             THE WITNESS:  I apologize, sir.

15             THE COURT:  If you turned it into a cashier's

16  check, I want to hear you say it.

17             THE WITNESS:  But I didn't do it, sir.

18             THE COURT:  Yes, you did.  There was nobody else

19  that did it.  You did it.  You may have used the accounts

20  for Sandcastle, but you did it, right?

21             THE WITNESS:  That's correct.

22  BY MR. HAYS:

23  Q    And did Houser Brothers accept the money --

24  A    No.

25  Q    -- or was it rejected?

214

1  A    It was sent back.

2  Q    Yes.  So where is that money now?  Does it still exist?

3  A    Ten thousand dollars of it went to Bert Briones, and

4  then the other -- then he returned that, and then that went

5  to James Casello.

6  Q    And does J-Pad have any other money in its account?

7  A    No.

8  Q    Okay.  And when you were doing all of this on behalf of

9  J-Sandcastle and J-Pad, you were doing it in your capacity

10 as a manager or member of each entity, correct?

11 A    Yes.

12 Q    Okay.  And you are -- you have testified that you are

13 at least a member of both, and you might even be the

14 100-percent member of both, correct?

15 A    I testified that I was the member of J-Sandcastle, and

16 that J-Pad was set up as a manager-membered (sic).

17 Q    But I'm just -- you are one of the members of each,

18 correct?

19 A    That's correct.

20 Q    Yes.  Is that my phone?

21      THE COURT:  Do you have a cell phone on you?

22      THE WITNESS:  No, I do not.

23      THE COURT:  Okay.

24      THE WITNESS:  It's laid down in my purse on the

25 floor over there.

1          THE COURT:  That's okay.  Thank you.

2          THE WITNESS:  Yes, sir.

3   BY MR. HAYS:

4   Q    Did J-Sandcastle have any business other than holding

5   title to the home?

6   A    J-Sandcastle was originally set up to manage the rental

7   property.  That was the plan, that it was supposed to be a

8   rental.

9   Q    But was the property ever rented to anybody other than

10  you?

11  A    No.

12  Q    Okay.  Did J-Pad have any business other than being the

13  named lien holder in the documents filed in various places?

14  A    Before I got involved, it had --

15  Q    From the time you got involved, in November of -- or

16  October or November of 2018 to the present --

17  A    That's correct.

18  Q    -- did it have any business other than holding title to

19  the lien?

20  A    No.

21  Q    Okay.  After you arranged for the purchase of the

22  property from Ms. Ryan and moved in, did you make an

23  application to Houser Brothers to become a renter or lessee

24  of Space 376?

25  A    No, I did not.

216

1  Q    And did anyone make an application to become the renter

2  of Space 376?

3  A    Yes.

4  Q    And who was that?

5  A    J-Sandcastle.

6  Q    Okay.  And was that application ever granted?  Let me

7  rephrase.  I'm sorry.  Was J-Sandcastle ever approved as a

8  renter of Space 376?

9  A    There was no response.

10 Q    Were you ever approved as a renter for Space 376?

11 A    No.

12 Q    Is there a -- did Houser Brothers ever issue a rental

13 agreement or lease for you or either of these LLCs, or

14 anybody in your family, to lease Space 376?

15 A    The only person I spoke to that said I could move in

16 was Catherine Houser Curtis (phonetic).

17 Q    Not my question.  My question is, was there ever a

18 written lease agreement?

19 A    There was not.  There's just the one --

20 Q    And you or J-Sandcastle have from time to time tendered

21 payments of proposed rent to Houser Brothers since the time

22 you took up occupancy, correct?

23 A    To Rancho del Rey, yes.

24 Q    And Rancho del Rey is the name of the mobile home park,

25 right?

217

1  A     That's correct.

2  Q     Yes.  And did Houser Brothers ever accept any of those

3  payments?

4  A     Yes.

5  Q     And did they accept all of those payments?

6  A     No.

7  Q     And so Houser Brothers has not been paid -- has not

8  received and retained all of the rent that it would have

9  been entitled to if you were an approved tenant, correct?

10  A     Tell me again?

11  Q     Houser Brothers has not received and retained --

12  A     You mean Rancho del Rey?

13  Q     -- all of the money -- or Rancho del Rey, it's one and

14  the same -- has not received and retained all of the money

15  that it would have been paid if there was an approved lease

16  on the property, correct?

17  A     They were paid in full up to 12/31/21.

18  Q     But they didn't retain the money.  My question is, they

19  did not receive and retain all of the money, correct?

20  A     They received the money, but they sent it back.

21  Q     I said, "And retain."  They did not retain it all,

22  correct?

23  A     They did not.

24  Q     Okay.  And, in fact, you applied for COVID rental

25  relief and got some money as rent to be paid to Houser

218

1  Brothers on account of your occupancy, right?

2  A    The check was sent to Houser Brothers directly from

3  COVID.

4  Q    And that was likewise returned, correct?

5  A    That was returned -- no.  That was given to the

6  Trustee.

7  Q    But Houser Brothers did not cash the check, right?

8  A    No.

9  Q    Yes.

10 A    They --

11 Q    Okay.  That's my point.

12 A    -- returned it to the Trustee.

13 Q    Yes.  But yet, when you applied for the COVID rental

14 relief money, you indicated that rent was owed, or would be

15 owed, to Houser Brothers, correct?

16 A    Tell me again?  Be very -- be clear, because I didn't

17 fill out that form.

18 Q    In applying for the rental --

19 A    Houser Brothers did.

20 Q    In applying for the rental relief with the state

21 agency --

22 A    Yes.

23 Q    -- you indicated that rent was owed or would be owed on

24 account of Space 376 to Houser Brothers, correct?

25 A    Yes.

219

1  Q    Okay.  In Exhibit 40, if I can get you to turn to that

2  document, which should be binder five --

3            THE COURT:  What page number?

4            MR. HAYS:  I am looking it up.  Here it is.

5            THE COURT:  While he's looking, can I ask you a

6  few more questions --

7            THE WITNESS:  Of course, sir.

8            THE COURT:  -- about your post-petition payments

9  to attorneys?

10           THE WITNESS:  Yes, sir.

11           THE COURT:  Can you even think of one attorney

12 that you paid money to after you filed bankruptcy, other

13 than Mr. Briones?

14           THE WITNESS:  Mr. Blank, but it wasn't

15 bankruptcy-related.

16           THE COURT:  I understand.

17           THE WITNESS:  Okay.  So it's okay to anybody?

18           THE COURT:  It's okay to tell me the truth.

19           THE WITNESS:  Okay.

20           THE COURT:  That's what it's okay to do.

21           THE WITNESS:  No, I want to tell you the truth.

22           THE COURT:  How much did you pay Mr. Barnhardt at

23 any time after the filing of the bankruptcy?

24           THE WITNESS:  I pay the bill if I --

25           THE COURT:  How much was it?

220

1            THE WITNESS:  Well, I pay the bill if I --

2            THE COURT:  How much was it?

3            THE WITNESS:  I don't know, sir.

4            THE COURT:  Was it under $5,000?

5            THE WITNESS:  Yes.

6            THE COURT:  Was it under $3,000?

7            THE WITNESS:  Yes.

8            THE COURT:  Was it under $2,000?

9            THE WITNESS:  I had a bill for using his -- what's

10 that Westlaw thing?

11            THE COURT:  I don't know.

12            THE WITNESS:  I opened up like things --

13            THE COURT:  Okay.  He had a Westlaw account or a

14 Pacer account?

15            THE WITNESS:  No, Westlaw.

16            THE COURT:  Okay.

17            THE WITNESS:  Westlaw account.

18            THE COURT:  So you used his Westlaw account?

19            THE WITNESS:  And I opened the wrong -- and it

20 just --

21            THE COURT:  It just went out -- it went crazy?

22            THE WITNESS:  And I had to pay it, and I did.

23            THE COURT:  Okay.  So you signed in and you didn't

24 sign out --

25            THE WITNESS:  No.

221

1          THE COURT:  -- or something like --

2          THE WITNESS:  I opened things that I wasn't

3 supposed to.

4          THE COURT:  Uh-oh.

5          THE WITNESS:  Well, you know, like -- yes.

6          THE COURT:  You know what?  Every junior attorney

7 has done that in the past.  Now most law firms are on fixed

8 rates.

9          THE WITNESS:  While you mention that Pacer thing,

10 I probably, for the last six months, have averaged almost

11 $2,000 a month to Pacer.

12          THE COURT:  You have your own account?

13          THE WITNESS:  Yes, I do, and I have --

14          THE COURT:  Okay.  But back to these attorneys.

15          THE WITNESS:  Okay.

16          THE COURT:  Okay.  So you utilized Mr. Blank's

17 Westlaw account?

18          THE WITNESS:  Yes.  He gave me a sign-in --

19          THE COURT:  That was nice of him.

20          THE WITNESS:  -- to do research.  Very nice.

21          THE COURT:  Yes.  But he said, you know, "Try to

22 not open up a million things, because I get charged for

23 that."

24          THE WITNESS:  Right, "I will send you a bill."

25 Yes.

222

1          THE COURT:  And did he send you a bill?

2          THE WITNESS:  Yes.  He sent me the invoice.

3          THE COURT:  Okay.  I need to let you know

4   something.

5          THE WITNESS:  Yes, sir.

6          THE COURT:  What year was this?  Was it last year?

7          THE WITNESS:  I think I learned my lesson in '21.

8          THE COURT:  Okay.  But you need to know

9   something --

10          THE WITNESS:  Yes, sir.

11          THE COURT:  -- while Mr. Hays is looking up his

12   documents.  Law firms are on a flat fee, but what's

13   interesting is, Lexis and Westlaw send you what it would

14   have cost them, a bill -- it looks like an invoice -- as if

15   they had to pay it, but they don't have to pay it.  It's

16   just something for their accounting purposes.

17          THE WITNESS:  I would hope Mr. Blank would not do

18   that to me.

19          THE COURT:  I'm not thinking Mr. Blank would ever

20   do anything like that.

21          THE WITNESS:  You're laughing.

22          THE COURT:  No, I'm not.  No, I'm not.  I can't

23   believe that a member of the California Bar would ever have

24   a client --

25          THE WITNESS:  Heaven forbid.

223

1          THE COURT:  -- that would -- ever have a client,

2 give them what we call the "burden bill," and the burden is

3 what they would have normally charged somebody if they

4 weren't on a flat rate, but everybody is on a flat rate.

5 You'd be insane not to, or it would at least be a bad

6 business model to not be on a flat rate with Westlaw or

7 Lexis.  But every month, you get a bill that's not really a

8 bill.  It's the explanation of what was done and what the

9 charges would have been.

10          THE WITNESS:  And if the --

11          THE COURT:  Let's stop that right now.

12          THE WITNESS:  Okay.

13          THE COURT:  I've told you enough.

14          THE WITNESS:  Of course, but you know I'm going to

15 pick up the phone and call him.

16          THE COURT:  I don't think you should.

17          THE WITNESS:  No?

18          THE COURT:  No.  I don't care.  I don't care.  I'm

19 sure he -- I'm sure it was a legitimate bill.

20          THE WITNESS:  And there was another gentleman.

21          THE COURT:  Yes.  Who else did you pay?

22          THE WITNESS:  Gosh.  BB and B, but I got that

23 money back.

24          THE COURT:  Okay.

25          THE WITNESS:  See, a lot of times, I --

224

1          THE COURT:  Well, who else did you pay?  Let's not

2   have a conversation except for my questions and answers.

3          THE WITNESS:  Okay.

4          THE COURT:  Who else did you pay?

5          THE WITNESS:  I will try to get -- I will go --

6          THE COURT:  Bring that tomorrow.

7          THE WITNESS:  I will go through my -- I'm

8   surprised that they have all my bank accounts, because I use

9   everything for an ATM card.

10          THE COURT:  Well, then you'll easily access it.

11          THE WITNESS:  I hope so.

12          THE COURT:  Mr. Hays, let's proceed.

13          MR. HAYS:  Yes, your Honor.  Thank you.

14   BY MR. HAYS:

15   Q    Ms. Gallian, in opposition to my client's objection to

16   exemption, I believe that you stated in your response

17   that --

18   A    What page?

19   Q    -- the release of the title by J-Sandcastle to you on

20   February 25 of 2021 was a notarized document, correct?

21   A    Yes, that's correct.

22   Q    Okay.  And do you -- and now let's find a copy, and

23   that's the date you contend that J-Sandcastle released its

24   interest to you, correct?

25   A    That's the day that I signed it as its member

225

1  releasing, yes.

2  Q    Yes.  And if we can turn to volume six, Exhibit 42,

3  page 1596.  Tell me when you're there.

4  A    Yes.

5  Q    Okay.  Is that the notarization, at page 1596, for the

6  documents that appear on the two previous pages, which is

7  the certificate of title at 1594 and the backside of the

8  certificate of title on 1595?

9  A    Okay.  As I stated to you previously, Mr. Hays, the --

10             THE COURT:  I'd like you to answer the question.

11             THE WITNESS:  The question was, is this the

12  document --

13             THE COURT:  Mr. Hays?

14  BY MR. HAYS:

15  Q    The question was, is this notarization provided -- or

16  signed by the notary in connection with this certificate of

17  title on February 25 of 2021?

18  A    No, it is not.

19  Q    And what is that a notarization to?

20  A    This was the notarization to a document that Mr.

21  Buysman had notarized for me for a probate, but it was

22  supposed to be a -- not affidavit.  There's another A word.

23  Q    Affidavit of death?

24  A    No, no, no, no.  It's another document that a notary

25  signs when you raise your hand.  You don't sign -- you don't

226

1  raise your hand for this one.  It was -- this is just him

2  verifying that I am Jamie Lynn Gallian.  What's the other

3  document?  I thought it started with an A.  Not affidavit,

4  but where he administers an oath to you.  Nobody remembers

5  the name, nobody?

6          THE COURT:  Why was he doing this?

7          THE WITNESS:  I asked him to notarize a document

8  that I filed in my father's probate, which he did, and when

9  I took it down to the clerk, property records, to record,

10 they said, "No, it can't be an acknowledgment."  It has to

11 be this other type where you have to raise your hand.

12          So I called him from the cell and asked him if he

13 did those types of notary, and he said, "Why?"  He goes,

14 "There's nothing wrong with the one that I gave you,"

15 meaning this (indicating), but he didn't staple them

16 together.  He didn't staple the probate and this

17 acknowledgment together.

18          So, when I went back and told him I needed the

19 other document, he goes, "Well, I guess you're going to want

20 a refund now."  And I said, "No.  I'll just go home and get

21 two documents that I need notarized."  I took these two

22 documents and his acknowledgment that was not stapled to the

23 probate documents.

24          THE COURT:  Thank you.

25          Mr. Hays, what is the relevancy of this?

*Briggs Reporting Company, Inc.*

227

1          MR. HAYS:  The Debtor, in opposing the claim of

2    exemption, represented to the Court -- and these documents

3    were produced by the Debtor to my client -- that when she

4    thought it was in her -- a fact in support of her claim of

5    exemption, that the transfer or the release was signed

6    pre-bankruptcy, as opposed to the documents ending up at HCD

7    on the day of or after bankruptcy.  It was represented to us

8    that she had this document signed, that the release from

9    J-Sandcastle to her individually was a notarized document,

10   and that turns out not to be the case.

11          THE COURT:  Well, how are you going to prove that?

12          THE WITNESS:  The notary is --

13          MR. HAYS:  We have the notary, who is appearing

14   here shortly as a witness, and the notary previously signed

15   a declaration to this effect, which was filed as Docket

16   Number 132 in the main case in connection with the exemption

17   to objection, and Ms. Gallian has admitted to the admission

18   of this document into evidence in this proceeding here

19   today.

20          THE COURT:  So let me see if I can recap.  It is

21   your position -- and you should pay attention to this.  It

22   is your position that this acknowledgment that is on Exhibit

23   42, page 1596, was actually submitted by Ms. Gallian in a

24   court filing in support of her opposition to some motion to

25   exclude all or a portion of a homestead?

228

1          MR. HAYS:  To deny, but yes.

2          THE COURT:  Okay.  To deny a homestead?

3          MR. HAYS:  Yes.

4          THE COURT:  Okay.  And it's your position that

5    this piece of paper was put into that pleading to propose

6    a -- or purport to indicate that an event occurred on or

7    about February 25, 2021 --

8          MR. HAYS:  That is correct.

9          THE COURT:  -- when it really didn't happen?

10          MR. HAYS:  That is correct.

11          THE COURT:  And this was filed as Docket Number

12   132 in the main case on 7/7/22?

13          MR. HAYS:  Yes, your Honor.

14          THE COURT:  Well, maybe we could not need -- maybe

15   we don't need Mr. Buysman.

16          Would you agree with what I've just said, that

17   this was included, this acknowledgment was included, onto

18   papers that purported to be something else?

19          THE WITNESS:  Mr. Buysman gave me this form.

20          THE COURT:  Yes, I believe he did.

21          THE WITNESS:  No, the second time, and I asked him

22   to bring the video from his store that I came back a second

23   time, and he asked me -- he goes, "Well, I guess you're

24   going to want a refund," and I said, "No, you don't have to

25   do a refund.  I'm going to have two other new documents

229

1  recorded."  And he goes, "Okay."  And then he goes, "Well,

2  here."  And I go, "What about your book?"  He goes, "I'll

3  remember."

4         THE COURT:  He said -- well, now I want to talk to

5  him.

6         MR. HAYS:  Yes.

7         THE WITNESS:  Yes, because I wrote him -- I wrote

8  a 12-page declaration, your Honor.

9         THE COURT:  When do you expect him to appear?

10        MR. HAYS:  4:00 o'clock, your Honor.  We asked him

11 to be here by 4:00 o'clock.

12        THE COURT:  Thank you.

13 BY MR. HAYS:

14 Q    Ms. Gallian, if I can ask you to turn to page 1606 on

15 Exhibit 42.  That's a separate notarization by Mr. Buysman?

16 A    It's a second one.  That's correct.

17 Q    Yes, yes.

18 A    Again, it was not --

19 Q    No.  So hold on.  Hold on.

20 A    Okay.

21 Q    That's a notarization or an acknowledgment that's

22 attached to a statement of facts that purports to notarize

23 your signature on February 25, 2021, correct?

24 A    It's not attached to the document, though.  He didn't

25 notarize a statement of fact.

230

1  Q    This was provided to us in documents you produced, and

2  so is it your position that Mr. Buysman notarized one or

3  more than one document in connection with the title to the

4  mobile home?

5  A    Two.

6  Q    Two.  What was the second notarized document, if it's

7  not the statement of facts?

8  A    Well, the first one was the backside.  This is correct.

9  Q    So the first one, at 1596, is the acknowledgment that

10 pertains to 1594 and 1595, correct?

11 A    Fifteen ninety-five is --

12 Q    Yes.  It's the backside of 1594, correct?

13 A    That's correct.

14 Q    Yes.  Okay.

15 A    Okay.  And 1596 was the acknowledgment.

16 Q    Yes.

17 A    Okay.  And then the second document, it was a

18 preprinted HCD document, and it is not here.

19 Q    And do you recall which document that was?

20 A    Yes.  It's page 1610.

21 Q    So your testimony is that Mr. Buysman's second

22 notarization -- or acknowledgment, I should call it -- that

23 appears at page 1606 is actually his acknowledgment of the

24 document that begins at 1610?

25 A    That's correct.

231

1  Q    Okay.

2  A    That's the document that I had taken him.

3  Q    Okay.  And you stand by that testimony that --

4  A    And the reason I know that, if I could just clarify the

5  reason I know that, is because, when I'm having documents

6  notarized, I include my full middle name.

7  Q    So you stand by your testimony today that Mr. Buysman

8  actually witnessed you signing these two separate documents,

9  which is the release on the backside of the certificate of

10 title and this document at 1610 called "Multipurpose

11 Transfer Form," correct?

12 A    Did he witness?  Yes, he did.

13 Q    Yes.  He witnessed you sign those documents, and

14 authorized you to use these acknowledgments with respect to

15 these two documents?

16 A    He handed them to me, because they were not stapled to

17 the probate documents from earlier in the morning --

18 Q    I understand.

19 A    -- and he said, "I will never make that mistake again."

20 Q    I just want to be really clear, though, on this

21 issue --

22 A    Sure.

23 Q    -- and Mr. Buysman is going to come share his

24 recollection of events.

25 A    I understand, but he did not change his book.

232

1 Q    So hold on.  Hold on.  Hold on.  These acknowledgments

2 were originally acknowledgments of unrelated probate

3 documents, correct?

4 A    They were probate documents.  Well, the probate is

5 listed in the bankruptcy.  I don't know if they're

6 unrelated.

7 Q    But this is just not to these two documents.  He

8 notarized two other documents that were being signed in

9 connection with the probate, correct?

10 A    Yes, my signature.

11 Q    Okay.  Yes, yes, yes.

12 A    Yes, on two other documents.

13 Q    So then you left, and you came back, and is it your

14 testimony that you signed these two documents, the

15 multipurpose transfer form and the certificate of title, in

16 his presence?

17 A    I went back home.

18 Q    No, that's not my question.  My question is, did you go

19 back to Mr. Buysman and then sign the multipurpose transfer

20 form and the release on the backside of the certificate of

21 title in his presence?

22 A    Yes, I did.

23 Q    Okay.  And then he authorized you to use the

24 acknowledgments that were done in the morning and attach

25 them to these two documents?  That's your testimony?

233

1  A    He handed them back to me and said, "Well, these are

2  the same thing.  So here, you could have these."

3  Q    That's not an answer to my question.  Did he authorize

4  you to use these notarized acknowledgments in connection

5  with these two documents, the release on the certificate of

6  title and the multipurpose transfer form?

7  A    I believe he did, by handing the document to me, and I

8  left.  Yes.

9  Q    But did he say, "You may use them on some other

10 document"?

11 A    He notarized my signature, sir.  He had his book open.

12        THE COURT:  I understand her response.

13        MR. HAYS:  I don't.  I'm sorry, your Honor.

14        THE COURT:  No, I understand what she's saying,

15 and I think we don't need to go any further.

16        MR. HAYS:  Okay.

17        THE COURT:  I don't know what else to ask her.

18        MR. HAYS:  I just --

19        THE COURT:  She's going to continue saying the

20 same thing.

21        MR. HAYS:  And I was trying to be clear, because

22 it's not clear to me.

23        THE COURT:  Well, I'll give you one more shot.

24 BY MR. HAYS:

25 Q    Okay.  When you went back, did you sign these two

234

1  documents in Mr. Buysman's presence?

2  A    Yes.

3  Q    And did Mr. Buysman then say, "Instead of doing new

4  notarizations, new acknowledgments, you may use the ones

5  from this morning for these two documents"?

6  A    I don't believe -- if that was his -- I don't remember

7  exactly what his words were, but he handed me the documents,

8  all four pieces of paper, and said, "Here you go."  And I

9  said, "Well, what about your book?"  And he goes, "I'll

10  remember," like it was nothing.

11  Q    So it's your position that you understood him to give

12  you permission to use those acknowledgments on these two

13  documents?

14  A    Yes, sir.

15        MR. HAYS:  Okay.  That's the end of the questions

16  there, and if I can look at my notes briefly, I may be done.

17  I have no further questions, your Honor.

18        THE COURT:  Thank you.

19        We're going to take a break, and then this is

20  what's going to happen.  I assume that the witness will

21  appear by 4:00 o'clock.  Would you agree with that?

22        MR. HAYS:  Yes, your Honor.  That's what we were

23  advised.

24        THE COURT:  Okay.  You get to now, in a narrative

25  form, say anything you'd like with respect to anything he's

235

1  asked you, and explain anything and everything.  You have --

2  it's an open book.

3          THE WITNESS:  Okay.  And I have impeachment

4  documents.

5          THE COURT:  Well, impeachment -- do you mean to

6  clarify?  You can just use them yourself.

7          THE WITNESS:  Well, that's what I meant.  I

8  have --

9          THE COURT:  Yes.  They're not impeachment.

10         THE WITNESS:  I have -- and I didn't bring 1,700.

11  I brought -- and I brought four sets of each --

12         THE COURT:  Good.

13         THE WITNESS:  -- and I think there's only five or

14  six.

15         THE COURT:  Did you give them to Mr. Hays?

16         THE WITNESS:  Pardon me?

17         THE COURT:  Have you given a copy to Mr. Hays?

18         THE WITNESS:  No.  I didn't know when it was

19  appropriate.

20         THE COURT:  Yes.  Well, that's okay.  You should

21  give them to Mr. Hays now, and he can look at them.

22         THE WITNESS:  Right now?  Okay.

23         THE COURT:  Yes.  And so what we'll do is, you

24  will exchange those documents --

25         THE WITNESS:  Thank you.

236

1          THE COURT:  -- and then we'll see if -- his name

2   is Buysman?

3          THE WITNESS:  Buysman.

4          THE COURT:  Hopefully, he'll be here, and then Mr.

5   Hays will ask some questions, and then you get to continue

6   on and explain everything that you'd like to explain, either

7   now or wait until he rests his case.

8          Do you have any more witnesses, other than the

9   notary?

10          MR. HAYS:  We may or may not, your Honor.  If it

11   is, it's five or 10 minutes, tops.

12          THE COURT:  Okay.  Who would that be?

13          MR. HAYS:  Mr. Houser.

14          THE COURT:  Okay.  All right.

15          THE WITNESS:  And --

16          THE COURT:  Well, maybe we can get done today.

17          THE WITNESS:  Yes.  Do you want me to move and he

18   can come up here?

19          THE COURT:  Get up for now and take a break.

20   We're going off the record.  We're now off the record.

21       (Proceedings recessed briefly.)

22          THE CLERK:  Please remain seated.  This court is

23   again in session.

24          THE COURT:  You have something?

25          THE WITNESS:  Would it be okay if I gave these to

1 the clerk?

2          THE COURT:  I beg your pardon?

3          THE WITNESS:  These are the documents that you had

4 asked me for.  Is it okay if I give them to the clerk?

5          THE COURT:  Just hold on to those right now, and

6 I'll get those later.

7          Mr. Hays?

8          MR. HAYS:  Your Honor, I have a suggested way to

9 proceed this afternoon, and Mr. Buysman is here, and so I

10 think it would probably be best, since the Debtor is going

11 to be given permission to provide her rebuttal by way of

12 narrative, that we put on the rest of our two witnesses, and

13 then that way, when the Debtor is doing her rebuttal, she

14 can rebut anything that we've put in front of the Court on

15 our case in chief, and then that saves her from going back

16 and forth after each witness.

17          THE COURT:  Well, that does save time, plus it

18 allows you to aggregate all of the testimony from their

19 witnesses, but it's up to you.

20          THE WITNESS:  I guess I'm really not, you know,

21 familiar.  I just want -- if Mr. Buysman is going to

22 testify, then I want an opportunity to question him.

23          THE COURT:  Definitely, you're going to

24 cross-examine him --

25          THE WITNESS:  -- right after, and then Chris, and

238

1  then right after -- Mr. Houser, if that's okay.

2          THE COURT:  Let's do regular order, Mr. Hays.

3          MR. HAYS:  That's fine, your Honor.

4          THE COURT:  Thanks for the try.  You want to call

5  a witness, Mr. Hays?

6          MR. HAYS:  Your Honor, if you're -- my suggestion

7  was to call the next witness, but that would not be regular

8  order.  I think regular order would now be her

9  opportunity --

10          THE COURT:  Do you want her to do that?

11          MR. HAYS:  -- to cross-examine.

12          THE COURT:  Okay.

13          MR. HAYS:  I would rather call my other two

14  witnesses, and then let her provide --

15          THE COURT:  It's up to you.

16          THE WITNESS: That would be fine.

17          THE COURT:  Which would be fine?

18          THE WITNESS:  Well, so I think what I'm

19  understanding you're saying is you're going to call your

20  witness witnesses first?

21          THE COURT:  You have a choice.  You can testify

22  now to everything he's asked for, or you can wait.

23          THE WITNESS:  I will just wait, sir.

24          THE COURT:  It's up to you completely.

25          THE WITNESS:  I will just wait, as long as I have

239

1  an opportunity to --

2          MR. HAYS:  Yes.  Okay.

3          THE WITNESS:  -- afterwards.  Is that okay?

4          THE COURT:  And you get to -- as soon as they

5  testify --

6          THE WITNESS:  They finish.  Okay.

7          THE COURT:  -- you get to ask them questions.

8          THE WITNESS:  All right.  Thank you.

9      (The witness was excused.)

10         MR. HAYS:  Yes.  So we'll proceed now by calling

11 Mr. Buysman, and my associate, Brad Barnhardt, will handle

12 the questioning, with the Court's permission.

13         THE COURT:  Very good.  Welcome to the party.

14         Come on up and stand -- or sit at the witness

15 chair, but please stand and be sworn before you sit down.

16         THE CLERK:  Please raise your right hand.

17          GREGORY JOHN BUYSMAN - WITNESS - SWORN

18         THE CLERK:  Please state your full name for the

19 record.

20         THE WITNESS:  Gregory John Buysman.

21         THE CLERK:  Okay.

22         THE COURT:  And spell it, please.

23         THE WITNESS:  B-U-Y-S-M-A-N.

24         THE COURT:  Thank you.

25         Counsel Barnhardt.

240

DIRECT EXAMINATION

1

2 BY MR. BARNHARDT:

3 Q    Good afternoon, Mr. Buysman.  To begin, can you please

4 state your current occupation?

5 A    I'm a franchisee for the UPS store.

6 Q    And what is the location of that UPS store?

7 A    It's 5942 Edinger Avenue, Suite 113, Huntington Beach,

8 California.

9 Q    How long have you been a franchisee for UPS?

10 A    Six years.

11 Q    Are you a notary public?

12 A    I am.

13 Q    For how long have you been a notary public?

14 A    Six years.

15 Q    Do you notarize documents for customers of the UPS

16 store?

17 A    Yes.

18 Q    Do you keep a record of all documents you notarize?

19 A    In a journal, as required, yes.

20 Q    So that's a yes?

21 A    Yes, that's a yes.

22 Q    As a notary, are you required to do so?

23 A    Yes.

24 Q    And I believe you said you brought a copy of your

25 journal today?

241

1  A    Yes.

2  Q    According to your records, did you notarize any

3  documents for Ms. Gallian on February 25th, 2021?

4  A    Yes.

5  Q    And what were those documents?

6  A    So, again, it's two years ago, but, according to the

7  journal entries, the one was an affiant certificate of

8  death, and the other was a transfer grant deed, at 12:44

9  p.m.

10  Q    I think behind you there's a stack of binders.  One of

11  those should say, "Volume Six."  Could you please turn to

12  Exhibit 42?  And they're tabbed in there.

13  A    Okay.

14  Q    Just to refresh your memory, this is a declaration of

15  Greg Buysman that you signed in June of 2022.  Do you

16  remember signing this document, Mr. Buysman?

17  A    Yes, I do.

18  Q    I'll ask you to please turn to page 1561, and the page

19  numbers are in the bottom right corner.

20  A    Okay.

21  Q    And it goes on to page 1562.

22  A    Right.

23  Q    This is an affidavit of death.

24  A    Right.

25  Q    Mr. Buysman, can you please look at this document, and

242

1  see if this is one of the documents that you mentioned that

2  you notarized on February 25th, 2021?

3  A    Yes, it is, because I can recognize my handwriting, and

4  then the attached acknowledgment behind it, because the

5  document wasn't prepared properly for the state of

6  California.

7  Q    And I'll ask you to please turn to page 1577.

8  A    Okay.

9  Q    Really it's 1578.  Sorry.

10  A    Right.

11  Q    This is an affidavit, death of grantor of interfamily

12  transfer grant deed.  I'll give you a chance to look through

13  this document as well, but is the other document that you

14  said that you notarized on February 25th, 2021?

15  A    Yes.  I can recognize my handwriting, and then the

16  attached acknowledgment behind it.

17  Q    According to your records, did you notarize any

18  additional documents for Ms. Gallian on February 25th, 2021?

19  A    Not according to my records.

20  Q    All right.  Ms. Gallian testified today, I believe,

21  that after you notarized these two documents, she came back

22  and asked you to notarize other documents, and you gave your

23  permission for her to use the notary pages from these

24  documents for the other documents.  Mr. Buysman, did that

25  happen?

243

1  A    So I do remember her returning to the store with the --

2  because this is two years, so my memory is not as good as

3  I'd like it to be at this point, but that the reason for the

4  returning was that whoever was receiving these documents,

5  they had been rejected.  But there's no other journal entry,

6  so, beyond that, I cannot recall.  I don't know what we did.

7  Q    If you had given permission for her to use these notary

8  pages on other documents, would you have recorded that in

9  your journal?

10 A    So, if there's a redo for a defective notary, and it's

11 just a minor administrative -- like a date change or

12 something minor defective with the document, the notary

13 portion of the document, the notarial act, then we would

14 issue another acknowledgment, and staple it to that original

15 document, but I would not make another entry, if it was a

16 minor change like that.  If it was completely something

17 beyond that correction, we would have made another journal

18 entry.

19        MR. BARNHARDT:  I don't believe we have any

20 further questions for you at this time.  Thank you.

21                    CROSS EXAMINATION

22 BY MS. GALLIAN:

23 Q    Good afternoon, Mr. Buysman.

24        THE COURT:  You should go to the podium.

25 //

244

1  BY MS. GALLIAN:

2  Q    Mr. Buysman, I have been a customer at your store for

3  quite a while, so you recognize me by sight?

4  A    Yes.

5  Q    And have you notarized documents for me after this

6  incident?

7  A    I don't know that.

8  Q    Okay.

9  A    I can't recall.

10 Q    Okay.  The affidavit of death -- may I show you a

11 document?  Or I guess you can look at page 1562 and 1563.

12 It's kind of hard because this is not the original.

13 A    Okay.

14 Q    You stated that I returned.  You do remember me

15 returning a second time that day?

16 A    I remember that you returned, yes.

17 Q    Okay.  So, Mr. Buysman, is it possible that you did not

18 staple page 1562 and 1563?  Is it possible that you did not

19 staple the first documents, affidavit of death, when they

20 were first notarized as a --

21 A    Anything is possible.  That is not our practice,

22 because it's an attached acknowledgment.  Legally, it must

23 be attached to the document that we're notarizing.

24 Q    I agree.

25 A    Yes.

245

1  Q    I wish I had the original, but you don't see any staple

2  marks, and you did not comment whether, when I came back to

3  the store -- if I brought this document back to you, as your

4  normal practice, these two (indicating) would be stapled

5  together?

6  A    Correct.

7  Q    Okay.  And as practice, would you take, ever -- what

8  are the situations you would take that staple out?  What

9  does that staple signify, its legal significance?

10 A    It physically attaches the attached acknowledgment to

11 the document being notarized --

12 Q    Correct.

13 A    -- the signature on the document being notarized.

14 Q    Okay.  So it is possible that I came back later that

15 afternoon and brought just the acknowledgment back, with the

16 other two documents, and handed them to you, and you -- as I

17 remember it, sir, you said, "Well, where is the other

18 document?"  And I said, "Well, I left it at home."  And you

19 said, "Well, but they go together."  And then you looked at

20 it and you said, "They weren't stapled."  Okay.

21 A    I literally cannot remember that conversation.  I'm

22 sorry.

23 Q    Right.  And it's two years ago.  Okay?  So, when you

24 sign an acknowledgment like this, tell me what your

25 acknowledgment means as -- what is it that you're

1  acknowledging?

2  A    We're acknowledging -- so there's five steps in the

3  notary process for the state of California.  One is that we

4  certify the identity of the signer, which is you.

5  Q    Correct.

6  A    The second is to make sure the document is complete.

7  Q    Okay.

8  A    So then we make a journal entry.  I can't recall all

9  five at this time, but that's the two big ones, is that we

10  certify the identity of the signer and make sure the

11  document is complete, and make the journal entry, put the

12  stamp on the document or, in this case, the attachment --

13  Q    Correct.

14  A    -- sign it and date it.

15  Q    If I asked you the question -- we couldn't figure it

16  out.  I couldn't remember.  But there is a type of document,

17  and the term of it escapes me right this moment, but when a

18  notary has the client -- and I guess would be me, or a

19  person -- raise their hand --

20  A    That's called a "jurat."

21  Q    Thank you.  Jurat.  I don't know why I thought it

22  started with A, but a jurat.

23  A    Right.

24  Q    Do you ever remember discussing a jurat with me?

25  A    (Indiscernible.)

247

1  Q    Okay.  So do you remember me calling you on my cell

2  phone that morning from the Orange County Superior Court

3  Clerk Office?

4  A    I think so, yes, and said that there was some problem.

5  Q    That they wouldn't accept the acknowledgment, and I

6  asked you if you did jurats, because it's a procedure.

7  A    Okay.

8  Q    Correct?  Okay.  Do you have cameras in your shop?

9  A    We do.

10 Q    Did you bring any film today?

11 A    No.

12 Q    Okay.

13 A    We record for 30 days.  Then it just gets written over.

14 Q    I don't think I have anything else I could ask you.  So

15 let me ask you about one other procedure of the UPS store,

16 if I may, please.  Are you an independent contractor as a

17 notary?

18 A    No.  I'm a franchisee.  I'm in a contract.

19 Q    Right.  I understand you're the franchisee.

20 A    Right.  So I'm not an independent contractor.  I work

21 for myself.

22 Q    Okay.  But is it sometimes practice that a notary is --

23 I don't know what you would call it -- like a separate-type

24 business-type thing?

25 A    That would be possible within the contractual

248

1 arrangement with the UPS store, as a franchisor.

2 Q    Right.

3 A    We do not operate that way.

4 Q    Okay.

5 A    So all of our business is through the door.

6 Q    Okay.

7 A    We get calls to do mobile notaries, when the client

8 can't come to the door, they're not mobile, but we're not

9 signing agents for real estate, for closing documents.  We

10 don't do them.

11 Q    Correct.  Okay.  So, if I did call you and say, "Mr.

12 Buysman" -- is that how you pronounce your name?

13 A    No, it's "Buysman."

14 Q    "Buysman."  Why do I always call you "Busyman"?  Pardon

15 me, sir, for mispronouncing it.  If I did call you from the

16 courthouse and ask you if you performed jurats, is it

17 possible that you asked me if I wanted a refund because this

18 document, the document that I had taken to you, was going

19 into the real property records?

20 A    Again, anything is possible, but here's how it works

21 for us.  It's our store policy --

22 Q    Wait.  Let me ask you a question real quick, because I

23 have one more follow-up one.  Okay?  So the only question

24 I'm asking is, is it possible that if I came back with these

25 two that were not stapled, okay, and with the two documents,

249

1 the two HCD documents -- okay.  It is possible that you saw

2 me, you witnessed me sign those documents, and handed me

3 back the same document?

4 A    Again, anything is possible.

5 Q    That's all I have.

6 A    Okay.

7         MS. GALLIAN:  No further, your Honor.

8         THE COURT:  Well, let me ask you a few

9 questions --

10        MS. GALLIAN:  Yes, sir.

11        THE COURT:  -- just to clarify.  Thank you for

12 coming, by the way.

13        THE WITNESS:  Okay.

14        THE COURT:  Just to clarify, anybody who pays you

15 to notarize goes into the till of the UPS store?

16        THE WITNESS:  Correct.

17        THE COURT:  It doesn't go into your pocket?

18        THE WITNESS:  Right.

19        THE COURT:  Okay.  That solves that problem.  It

20 was never a problem.

21        THE WITNESS:  Right.

22        THE COURT:  It clarifies.  How many documents have

23 you ever, on this day, notarized for Ms. Gallian?

24        THE WITNESS:  Two.

25        THE COURT:  Two.  And the first one was the

250

1  affidavit of death?

2          THE WITNESS:  Right.

3          THE COURT:  And what was the second one?

4          THE WITNESS:  Transfer of grant deed.

5          THE COURT:  Okay.  So those two acknowledgments

6  that you prepared, in your normal course of business, would

7  you have stapled your acknowledgment to each individual

8  document?

9          THE WITNESS:  Yes.

10         THE COURT:  Okay.  In your practice, have you had

11 people come back to you before and say, "I have a problem.

12 Your acknowledgment wasn't stapled to my document"?

13         THE WITNESS:  No.

14         THE COURT:  And that is because what?

15         THE WITNESS:  It's a standard practice.

16         THE COURT:  Because you staple them?

17         THE WITNESS:  Right.

18         THE COURT:  Okay.  But you don't have any

19 recollection of your discussion that date with Ms. Gallian,

20 do you?

21         THE WITNESS:  I don't.

22         THE COURT:  Okay.  Thank you very much.

23         THE WITNESS:  Sure.  Yes.

24         MS. GALLIAN:  I just have two follow-ups, your

25 Honor.

251

1          THE COURT:  Okay.

2   BY MS. GALLIAN:

3   Q    Let's see.  I was back in the store at 12:44?  Is that

4   what you said?  That's what your --

5   A    The time of the journal entry was 12:44, yes.

6          THE COURT:  That's the first time she came in?

7          THE WITNESS:  Yes.

8   BY MS. GALLIAN:

9   Q    Would it surprise you if that was the second time?

10  A    That wouldn't make any sense to me, but, okay.

11  Q    Right.  But I was at the --

12         THE COURT:  Well, stop for a second.  The time

13  that you referred to is the time you notarized these two

14  documents?

15         THE WITNESS:  Correct.

16         THE COURT:  And did you notarize any other

17  documents during the day?

18         THE WITNESS:  Yes.

19         THE COURT:  So how many documents, again, did you

20  notarize on that day?  You said two before.  Now you've said

21  four.

22         THE WITNESS:  I thought it was for the --

23         THE COURT:  Let's try it again.

24         THE WITNESS:  -- for this client.

25         THE COURT:  How many -- it's a very simple

252

1  question, I thought.

2       THE WITNESS:  Right, right

3       THE COURT:  How many documents did you notarize

4  that day?

5       THE WITNESS:  On the 25th?

6       THE COURT:  Yes.

7       THE WITNESS:  Ten.

8       THE COURT:  Ten documents?

9       THE WITNESS:  Uh-huh.

10       THE COURT:  And what time was the first that you

11  notarized?  What time was the first document you notarized?

12       THE WITNESS:  At 11:44.

13       THE COURT:  And what is the last time you

14  notarized a document on that day, on that day?

15       THE WITNESS:  3:12.

16       THE COURT:  3:12.  Are you telling me that she

17  came in more than once to the store, or you stood there for

18  over three hours notarizing documents?

19       THE WITNESS:  No, that's not what I said at all.

20  It's that those -- according to the journal entries, I did

21  10 notaries during that period of time.

22       THE COURT:  You did --

23       THE WITNESS:  We offer probably 15 different

24  profit centers in the store.  I'm doing lots of things all

25  the time.

253

1          THE COURT:  No, I'm talking about for Ms. Gallian.

2          THE WITNESS:  Right.

3          THE COURT:  How many documents did you notarize

4  for her?

5          THE WITNESS:  Two.  As I -- right.  You asked me

6  for the day.  I did 10 for the --

7          THE COURT:  Yes, for her, for the day.

8          THE WITNESS:  Two for the day for her, 10 total

9  for the day.

10          THE COURT:  Okay.  Stop again now.  You see,

11  that's why you're confused.

12          THE WITNESS:  Right.

13          THE COURT:  When was the time that she first asked

14  you to notarize the document, approximately?

15          THE WITNESS:  According to the journal entry,

16  12:44.

17          THE COURT:  Okay.  And when was the second

18  document?

19          THE WITNESS:  They were both -- it's the same

20  entry, at 12:44 --

21          THE COURT:  12:44.  Okay.

22          THE WITNESS:  -- or, excuse me, same time.  Right.

23          THE COURT:  All right.  12:44?

24          THE WITNESS:  Uh-huh.

25          THE COURT:  Okay.  And during that day, did you

254

1 notarize any other documents for her?

2          THE WITNESS:  No.

3          THE COURT:  Two documents?

4          THE WITNESS:  Correct.

5          THE COURT:  And your standard practice is that

6 every acknowledgment gets stapled to the document that it's

7 the acknowledgment for?

8          THE WITNESS:  That is correct.

9          THE COURT:  And you don't recall her coming back?

10          THE WITNESS:  Yes, I think she did, actually.

11          THE COURT:  Okay.  Why do you think she --

12          THE WITNESS:  Right.  Okay.

13          THE COURT:  What is your basic reaction to why

14 someone would come back?

15          THE WITNESS:  A defect in -- something in a defect

16 with the notary.

17          THE COURT:  Okay.  And have you ever run into a

18 defective notary before?

19          THE WITNESS:  Yes.

20          THE COURT:  Okay.  Do you think that this was one

21 of those standard problems, or what do you think?

22          THE WITNESS:  I really don't know.

23          THE COURT:  Well, did you notarize anything else

24 for her that day, other than at 12:44, those two documents?

25          THE WITNESS:  No.  Not according to my journal,

1 no.

2         THE COURT:  Okay.  Why do you think she'd come

3 back, and then how did you solve her problem?

4         THE WITNESS:  I didn't, obviously.  Right?

5         THE COURT:  Well, I don't know.  It's not obvious

6 to me at all.

7         THE WITNESS:  Okay.

8         THE COURT:  I have testimony that you solved her

9 problem.

10         THE WITNESS:  Okay.  Well, I don't -- the store

11 policy is this, that if there's a --

12         THE COURT:  I don't care about the policy right

13 now.

14         THE WITNESS:  Okay.

15         THE COURT:  I'm asking for an explanation of --

16 once she came back to you, now that you recall she's coming

17 back to you, why would she have come back to you?  What are

18 the possibilities?

19         THE WITNESS:  There was a defect in the notary.

20         THE COURT:  In the notary?

21         THE WITNESS:  Right.

22         THE COURT:  Okay.  How often do you run into

23 defects in notaries?

24         THE WITNESS:  Maybe a couple times a year.  That's

25 it, right?  And it's usually just something very simple,

256

1 like somebody didn't sign something or signed in the wrong

2 place, or somebody forgot to -- the stamp was omitted.

3          THE COURT:  Or you smudged your stamp?

4          THE WITNESS:  Something like that.  Yes, sir.

5          THE COURT:  Sometimes that happens?

6          THE WITNESS:  You're right.  It's not legible.

7          THE COURT:  Or the ink doesn't come up on the

8 scan?

9          THE WITNESS:  Right.

10          THE COURT:  Okay.  But you don't have any memory

11 of why she would come back?

12          THE WITNESS:  No.

13          THE COURT:  I realize you're a pleasant person and

14 people like to see you, but her testimony is she came back,

15 and you now have recalled that she did come back.

16          THE WITNESS:  Right.  Right.

17          THE COURT:  Okay.  I think I've drilled down on

18 this.  Thank you very much.

19          THE WITNESS:  Okay.

20 BY MS. GALLIAN:

21 Q    I just wanted to ask one final question.  Is there a

22 document that is an eight-and-a-half-by-11 piece of paper

23 that either the customer signs on the pad acknowledging

24 anything?

25 A    No.

257

1        THE COURT:  Well, did you pay for -- did she pay

2   you to notarize these things?

3        THE WITNESS:  Yes.

4        THE COURT:  And did you refund any money to her?

5        THE WITNESS:  No.

6        THE COURT:  Okay.

7        MS. GALLIAN:  Thank you.

8        THE WITNESS:  Okay.

9        MS. GALLIAN:  Nothing further, your Honor --

10       THE COURT:  Pardon?

11       MS. GALLIAN:  -- unless you had something for me.

12   Did you have something for --

13       THE COURT:  No, no.

14       Mr. Barnhardt, do you have any follow-up?  And

15   then be prepared to explain why any of this is relevant.

16       MR. BARNHARDT:  No follow-up questions for Mr. --

17       THE COURT:  Now explain why any of this is

18   relevant.

19       MR. BARNHARDT:  Your Honor, we believe that this

20   is -- this testimony is relevant to the Section 727(a)(4)

21   claim for false oaths.  Ms. Gallian had represented in

22   filings submitted to the Court that certain submissions to

23   the California HCD were signed and notarized on February

24   25th, 2021.  The notary pages that Mr. Buysman signed,

25   however, were for this affidavit of death and this transfer

258

 1   grant deed, which were not the documents submitted to the

 2   HCD.

 3           THE COURT:  Okay.  Be very specific and explain to

 4   me, first of all, did she use both of these acknowledgments

 5   or just one of those acknowledgments, in your theory?

 6           MR. BARNHARDT:  Your Honor, in our theory, she

 7   used both of these acknowledgments in her --

 8           THE COURT:  Okay.  And so let's just call them

 9   "Acknowledgment A" and "Acknowledgment B."  Okay.

10   Acknowledgment A.  If you look on Exhibit 42, page 1562 --

11   I'm sorry, 1563 -- let's call that one "Acknowledgment A,"

12   just for the purpose of our discussion.  Where is

13   Acknowledgment B?

14           MS. GALLIAN:  May I ask him --

15           THE COURT:  No.

16           MR. BARNHARDT:  Your Honor, I believe it is on

17   page 1579, still on Exhibit 42.

18           THE COURT:  So 1563 and 1569 --

19           MR. BARNHARDT:  Fifteen seventy-nine.

20           THE COURT:  -- 1579 -- is Acknowledgment A and

21   Acknowledgment B, and those are attached to the affidavit of

22   death and -- just bear with me.  The affidavit of death

23   of -- or affidavit, death of grantor of interfamily transfer

24   grant deed.  Okay.  So now you and I and everyone knows what

25   A and B are.  Where do you suggest she used A for another

259

1  document in this bankruptcy proceeding?

2          What I was saying is bear with me, here.

3          THE WITNESS:  Okay.

4          THE COURT:  Stick around for a few minutes.

5          MR. BARNHARDT:  Your Honor, in Exhibit 40, which

6  is volume --

7          THE COURT:  Page number?

8          MR. BARNHARDT:  Page number 1103.

9          THE COURT:  Eleven, zero, three?

10         MR. BARNHARDT:  Correct.

11         THE COURT:  Okay.  What is Exhibit 40, page 1103?

12         MR. BARNHARDT:  Your Honor, this is Debtor's reply

13 opposition, memorandum of points and authorities to Houser

14 Bros.' objection to the homestead exemption.

15         THE COURT:  And what did she use, in your opinion,

16 under your theory, Acknowledgment A for?

17         MR. BARNHARDT:  Your Honor, page 1103, lines 21 to

18 22, provide:

19              "Moving party's own documents establish

20              that ownership of Unit 376 was released

21              by J-Sandcastle Co LLC, signed and

22              notarized by its member, Jamie Lynn

23              Gallian, on February 25th, 2021."

24         THE COURT:  And is there an exhibit to that

25 pleading that contains what you allege to be Acknowledgment

260

1  A?

2         MR. BARNHARDT:  Your Honor, this pleading refers

3  back to Houser Bros.' documents as containing the --

4         THE COURT:  You're making it hard for me.  You've

5  got to connect all the dots, and you haven't connect the

6  dots yet.

7         MR. BARNHARDT:  Your Honor, this document refers

8  back to Houser Bros.' documents, and we received the --

9         THE COURT:  It doesn't help me.

10        MR. BARNHARDT:  -- we received the documents from

11 Ms. Gallian.

12        THE COURT:  Doesn't help me.  Tell me where I can

13 find the legal document that she provided the Bankruptcy

14 Court utilizing this Acknowledgment A.  Give me the page in

15 your exhibits.

16        MR. BARNHARDT:  Your Honor, do you mind if I --

17        THE COURT:  Does it exist?

18        MR. BARNHARDT:  Your Honor, do you mind if I take

19 a minute to locate the page?

20        THE COURT:  I want you to do it, whatever it

21 takes.

22        MR. BARNHARDT:  Thank you.

23        THE COURT:  Can we excuse the witness?

24        MR. HAYS:  Yes.

25        MR. BARNHARDT:  Yes, your Honor.

261

1          THE COURT:  Do you have any more questions for the
2   witness?
3          MS. GALLIAN:  No, sir.
4          THE COURT:  I want to thank you --
5          THE WITNESS:  Thank you.
6          THE COURT:  -- for taking your time.  I know it
7   cost you time and money.  I hope you got your witness fee.
8   If not, ask Mr. Hays for it.
9          THE WITNESS:  Thank you.
10         MS. GALLIAN:  Thank you, Mr. Buysman.
11         THE COURT:  He owes you a witness fee.
12         THE WITNESS:  I got it, actually.
13         THE COURT:  Okay.  You'd better cash it quick.  He
14  sometimes welshes.
15         MS. GALLIAN:  Thank you.
16         Excuse me.  Is it too late -- just give me one
17  second.  Sorry, your Honor.  I just have two final questions
18  that just came into my mind, and if I beg the Court --
19         THE COURT:  Come on back and sit down, and give
20  Mr. Barnhardt --
21         MS. GALLIAN:  I'm so sorry.  Yes.  Give him a
22  minute.
23         THE COURT:  -- some more opportunity to find the
24  answer to my question --
25         MS. GALLIAN:  Perfect.  Okay.

262

1          THE COURT:  -- so that I can actually put some

2 relevance to this.

3          Ask your question.  You can do it from you --

4          MS. GALLIAN:  Is that okay?

5          THE COURT:  Yes.  Please do.

6 BY MS. GALLIAN:

7 Q    And I can't -- I don't want to mispronounced your name,

8 so I'll just call you --

9          THE COURT:  Just ask your question.

10 BY MS. GALLIAN:

11 Q    -- just call you "sir."  When this issue came up, do

12 you remember the date that anybody visited you?

13          THE COURT:  You have to be more specific.

14          MS. GALLIAN:  I'm sorry.

15 BY MS. GALLIAN:

16 Q    You wrote a declaration for the -- objecting to my

17 homestead exemption.  You signed a declaration.  You just

18 referred to the document.  Do you remember what day you

19 signed that on?

20 A    I don't.

21          MS. GALLIAN:  Do you remember, Counsel, what

22 exhibit that was?

23          THE COURT:  Well, he's not being -- go ahead.

24 Continue asking your question.

25          MS. GALLIAN:  Okay.

263

1          THE COURT:  You've delayed this long enough.  Keep
2  going.
3          MS. GALLIAN:  Okay.  I just wanted to know the
4  exhibit, sir, the number, of his declaration, just for the
5  date, and I promise it will be worth my question.  Please.
6          THE COURT:  I'm not stopping you.
7          MS. GALLIAN:  Sir, Mr. Hays, do you remember what
8  the declaration was?
9          MR. HAYS:  It's Exhibit 42 --
10         MS. GALLIAN:  Thank you.
11         MR. HAYS:  -- signed June 20th, 2022.
12  BY MS. GALLIAN:
13  Q   Okay.  Do you remember, sir -- did you hear what he
14  said?
15  A   No.
16         MS. GALLIAN:  If you can be just a little bit
17  louder?
18         MR. HAYS:  June 20, 2022.
19         THE WITNESS:  Okay.
20         MS. GALLIAN:  June 20, 2022.  Okay.
21  BY MS. GALLIAN:
22  Q   Do you remember how long after you were visited at the
23  store that you signed that declaration?
24  A   I don't.
25         MS. GALLIAN:  Okay.  That's all.

264

1        THE COURT:  Thank you very much.  Get out as fast

2   as you can.

3        MS. GALLIAN:  I appreciate that.  Thank you so

4   much.

5        THE COURT:  Run, don't walk.

6        Now, Mr. Barnhardt, what I'm asking you is -- your

7   case seems to be hinged, in this particular issue, on an

8   allegation that the Debtor utilized the acknowledge which we

9   have now identified as Acknowledgment A on a court pleading.

10  Am I right about that?

11      (The witness was excused.)

12        MR. BARNHARDT:  That's our --

13        THE COURT:  Am I right that you're alleging that?

14        MR. BARNHARDT:  That's our allegation, your Honor.

15   Correct.

16        THE COURT:  Okay.  Now prove it.

17        MR. BARNHARDT:  Okay.  Your Honor, it is volume

18   four, Exhibit 39.

19        THE COURT:  Okay.  39.

20        MR. BARNHARDT:  Page --

21        THE COURT:  One second.  I am in 39 now.  What

22   page?

23        MR. BARNHARDT:  Page 1036.

24        THE COURT:  On page 1036.  You're suggesting that

25   this acknowledgment was attached to Docket Number 95, filed

265

1  on May 12, 2022, as page 197 of 259, and it purported to be

2  an acknowledgment of a signature, and is that what you're

3  saying?

4          MR. BARNHARDT:  Correct.

5          THE COURT:  Okay.  What signature on the earlier

6  page -- that would be page 1035 -- do you believe that

7  acknowledgment was purporting to connect?

8          MR. BARNHARDT:  (No response.)

9          THE COURT:  Page 1035.  Where is the signature

10 that relates to the acknowledgment?

11         MR. BARNHARDT:  Your Honor, we believe it's the

12 releasing signature.

13         THE COURT:  Which?

14         MR. BARNHARDT:  The releasing signature, page

15 1035.

16         THE COURT:  Well, I see her signature in at least

17 two places.  I see "Smoke detector and water heaters,

18 seismic bracing certificate," and I think that's her name,

19 her signature, and I see in Section C "New owner

20 information," and that's in 7A, and I think I see her

21 signature.  Okay?  Are you telling me that she placed this

22 acknowledgment onto this document inappropriately?

23         MR. BARNHARDT:  That is our position, your Honor.

24         THE COURT:  Okay.  Prove it.

25         MR. BARNHARDT:  Your Honor, Mr. Buysman just

266

1  testified that this acknowledgment page was, in fact, from

2  the affidavit, death of grantor of interfamily transfer

3  grant deed.

4          THE COURT:  And where in Docket Number 95 that was

5  filed -- well, I guess I'm confused.  It doesn't seem to be

6  a full document.  Well, maybe it is.  Hang on one second.

7  Let's go to the beginning of Docket Number 95.  This Docket

8  Number 95 is a document filed by your firm, correct?

9          MR. BARNHARDT:  Correct.

10          THE COURT:  Okay.  And why did your firm put this

11  document into your pleading?

12          MR. BARNHARDT:  Your Honor, we were -- at the

13  time, our theory was that title to the property as of the

14  petition date was held by J-Sandcastle, as opposed to the

15  Debtor personally.  We attached this document to our

16  pleading to further that assertion.

17          THE COURT:  Okay.  So here's the question.  Where

18  did you get this document?

19          MR. BARNHARDT:  Your Honor, we were provided this

20  document by Ms. Gallian.

21          THE COURT:  Which document were you provided,

22  exactly?

23          MR. BARNHARDT:  Exactly.  It would be Exhibit 21

24  to Docket 95.

25          THE COURT:  I'm sorry.  Exhibit 21?

267

 1          MR. BARNHARDT:  I'm sorry.  It's not Exhibit 21 in

 2   the binders.

 3          THE COURT:  Well, refer to the binder.  Exhibit

 4   39?

 5          MR. BARNHARDT:  I'm sorry.  It's still Exhibit 39,

 6   Trial Exhibit 39, pages 1031 to --

 7          THE COURT:  Well, 1031 is blank.

 8          MR. BARNHARDT:  Correct.  So, then, it would be

 9   1032.

10          THE COURT:  1032 is a cover page.

11          MR. BARNHARDT:  Correct.

12          THE COURT:  And what's 1033, Mr. Barnhardt?  It

13   looks like a blank page, too.

14          MR. BARNHARDT:  Your Honor, I believe that there's

15   a range of pages in here that was an HCD packet.

16          THE COURT:  I believe you, but what I'm asking you

17   is, what is page 1033?

18          MR. BARNHARDT:  It just appears to be a blank page

19   that was in the HCD --

20          THE COURT:  Okay.  Now turn to page 1034, and what

21   is this?

22          MR. BARNHARDT:  Your Honor, this is a certificate

23   of title issued February 24th, 2021.

24          THE COURT:  And how did you acquire this page?

25          MR. BARNHARDT:  Your Honor, I believe we acquired

268

1  it from Ms. Gallian.

2        THE COURT:  Okay.  And then you turn to the next

3  page, 1035, and how did you acquire that page?

4        MR. BARNHARDT:  Your Honor, I believe that we

5  acquired this page from Ms. Gallian.

6        THE COURT:  Okay.  And now we've already explored

7  page 1036, which is the acknowledgment.  Why do you think --

8  I'm asking -- you're not testifying here.  What I'm doing

9  is, I'm asking you for your theory.  Why do you think that

10  she placed this acknowledgment on the back of page 1035?

11        MR. BARNHARDT:  Your Honor, our theory is that she

12  placed this acknowledgment on the back of page 1035 to

13  backdate the date when title was released from J-Sandcastle

14  to herself.

15        THE COURT:  Okay.  So what you're really saying is

16  not to backdate, but to actually give credence to the date

17  of release.  Is that what you're really saying?

18        MR. BARNHARDT:  Correct.

19        THE COURT:  Okay.  So you're saying that she

20  attached this acknowledgment on page 1036, Exhibit 39, to

21  the back of Exhibit 39, page 1035, to give credence to the

22  fact that the date of release of 2/25/21 was the appropriate

23  release?

24        MR. BARNHARDT:  Correct.

25        THE COURT:  Explain to me why she would do that,

1 in your theory.

2         MR. BARNHARDT:  Your Honor, our theory was that

3 she did that so that she could claim that, as the owner of

4 record of the property on the petition date, she was

5 entitled to claim a homestead exemption in the property.

6         THE COURT:  And that's because she claimed that on

7 2/25, 2021, she became the new owner of the property?

8         MR. BARNHARDT:  Correct.

9         THE COURT:  Okay.  So your final -- my final

10 question to you is, what evidence do you have, other than

11 that she put the acknowledgment that's dated 2/25/21 on the

12 back of this document, onto page 1035 -- what other evidence

13 do you have that she backdated this document?

14         Whisper to him, Mr. Hays, not to me.

15         MR. HAYS:  I wasn't whispering.  I was nodding my

16 head.

17         I don't believe we have any other evidence of it

18 other than Mr. Buysman, what was in the declaration, that he

19 didn't notarize those documents on that date, and I believe

20 that Ms. Gallian thought it was important to show that she

21 acquired an interest in the property prior to bankruptcy,

22 and, therefore, attached the notarization on the date to try

23 to establish that this had occurred four and a half, five

24 months prior to the bankruptcy.

25         It's probably legally irrelevant, but it's our

270

1  position that it was still another false oath from Ms.

2  Gallian to submit this to HCD, to produce it to us in

3  discovery, when she's got a duty to provide true and correct

4  copies of documents and evidence, and then argue in

5  opposition to the objection to exemption that our own

6  evidence, which we got from her, proves that she acquired an

7  interest in February of 2021, when that's not what the

8  notary and the notary book have been telling us.

9        THE COURT:  Are you telling me that you have some

10  legal authority that supports the definition of "false oath"

11  under 727(a)(4)(A) that is not involved in a 341(a) meeting,

12  a deposition, or a trial?

13        MR. HAYS:  Yes, your Honor.

14        THE COURT:  Okay.

15        MR. HAYS:  "Any false oath made in connection with

16  the case," which is the plain language of --

17        THE COURT:  And where would the oath be?

18        MR. HAYS:  The oath is, she was arguing in her --

19        THE COURT:  No, no.  Where is the oath?

20        MR. HAYS:  Well, she's producing documents to us.

21        THE COURT:  Where is the oath?

22        MR. HAYS:  We can find it under --

23        THE COURT:  She may have handed it to you in the

24  hallway.  I don't know.  I don't have the evidence.  I need

25  to know where the oath is --

271

1          MR. HAYS:  We will find it.

2          THE COURT:  -- that said, "This is true and

3  correct, this document that I'm handing you."  I need that.

4  Apparently -- didn't she prepare a declaration of some sort

5  that describes these documents?  Maybe not, but I need to

6  know.  I don't -- handing something over -- that's why, when

7  you do a request for production of documents, you do get a

8  note, but I'm not sure you have that.

9          MR. BARNHARDT:  Your Honor, one of -- I can give

10 now is back to Exhibit 40, page --

11         THE COURT:  Okay.  40.  Good.  I am at 40.  What

12 page?

13         MR. BARNHARDT:  Page 1132.

14         THE COURT:  One second.  Eleven thirty-two?

15         MR. BARNHARDT:  Correct.

16         THE COURT:  Okay.  I am now at 1132.  Okay.

17         MR. BARNHARDT:  Your Honor, this is the Debtor's

18 opposition to the homestead exemption objection, and it says

19 on this page, "I declare under penalty of perjury" --

20         THE COURT:  Hold it.  Hold it.  What page?

21         MR. BARNHARDT:  Sorry.  Eleven thirty-two.

22         THE COURT:  Okay.  So "I declare under penalty of

23 perjury of law (sic) that the state of California" -- "that

24 the foregoing is true and correct."  So let's go to the

25 foregoing.

272

1          MR. BARNHARDT:  So the foregoing includes page

2   1103.

3          THE COURT:  Eleven, oh, three.  That's part of a

4   declaration?

5          MR. BARNHARDT:  Your Honor, she --

6          THE COURT:  Eleven, oh, three.  I'm going to turn

7   to page 1103.  I am now at 1103.  I don't think so.

8          MR. BARNHARDT:  Yes.  There's line 21 through 22,

9   "Moving party's own documents establish" --

10          THE COURT:  Excuse me.  You're mumbling.

11          MR. BARNHARDT:  Sorry.

12          THE COURT:  Tell me what page I should be looking

13   for, for her oath.

14          MR. BARNHARDT:  Your Honor, there's page 1103.

15          THE COURT:  I am at 1103.  Hang on one second.

16   1103 is the Debtor's reply opposition.  It is not a

17   declaration.  So tell me now where we have a declaration.

18          MR. HAYS:  Your Honor, if I may answer that

19   question, to try to speed things up?  The Debtor attached

20   page 1132, which is "I declare under penalty of perjury that

21   the foregoing is true and correct," to the back of the

22   pleading, thereby --

23          THE COURT:  Yes, I believe you.

24          MR. HAYS:  -- thereby representing that everything

25   that came before it in this pleading was true and correct.

273

1            THE COURT:  Is that right, Mr. Barnhardt?

2            MR. BARNHARDT:  Yes, your Honor.  That was what I

3   was -- that was the point I was trying to get across.

4            THE COURT:  So you're suggesting that a reply

5   opposition that starts on page 11 -- pardon me, 1099 --

6   which is Exhibit 40, which was Ms. Gallian's reply

7   opposition and a memorandum of points and authorities,

8   indicates that everything in here is true and correct, under

9   oath?  Is that your opinion?

10            MR. BARNHARDT:  That's my opinion, your Honor,

11  yes.

12            THE COURT:  Thank you.

13            Ms. Gallian.

14            MS. GALLIAN:  Yes, sir.

15            THE COURT:  Do you happen to have page 1132?

16            MS. GALLIAN:  Yes, sir.

17            THE COURT:  Okay.

18            MS. GALLIAN:  Yes, sir.

19            THE COURT:  Do you remember signing this on June

20  1, 2022?

21            MS. GALLIAN:  Yes, I did, sir.

22            THE COURT:  Good.  It says:

23            "I declare under penalty of perjury of

24            the laws of the state of California the

25            foregoing to be true and correct to the

274

1          best of my ability and belief."

2          MS. GALLIAN:  Yes, sir.

3          THE COURT:  Okay.  To what?  This is attached as

4  page 34 of Docket Number 105, which runs from page one to

5  35.  Thirty-five is the proof of service, which you

6  apparently served -- Robert McLelland served this.  Who is

7  Robert McLelland?

8          MS. GALLIAN:  My roommate, sir.

9          THE COURT:  Your roommate.  Okay.  Is he a lawyer?

10          MS. GALLIAN:  No, he is not, sir.

11          THE COURT:  Did he ever represent you?

12          MS. GALLIAN:  No.  He is not a lawyer.

13          THE COURT:  Okay.  So, now, what I have here is a

14  whole series of pages, one through 35, and on the last page,

15  you say that you declared under penalty of perjury that "The

16  foregoing was true and correct to the best of my ability and

17  belief," on the 31st day of May 2021.  Did you mean to say

18  that everything that was in this pleading was true and

19  correct to the best of your ability and belief?

20          MS. GALLIAN:  Yes, sir.

21          THE COURT:  Okay.  Now, where is the recitation

22  about the exhibit in this?

23          MR. BARNHARDT:  Your Honor, I believe it appears

24  in two places.

25          THE COURT:  Please tell me.

275

1          MR. BARNHARDT:  The first is page 1103.

2          THE COURT:  Okay.  I'm at 1103.  Where does it say

3    it?

4          MR. BARNHARDT:  It's lines 21 to 22.

5          THE COURT:  Okay:

6          "Moving party's own documents establish

7          that ownership of Unit 376 was released

8          by J-Sandcastle, signed and notarized by

9          its member, Jamie Lynn Gallian, on

10         February 24, 2021."

11         And where is that document on this, in this

12   pleading?  It says, "Movant's own document."

13         MR. BARNHARDT:  Correct.

14         THE COURT:  "Movant's own document."

15         MR. BARNHARDT:  So, your Honor, our position is

16   that she was referring back to the document attached to our

17   motion, which we just discussed a moment ago.

18         THE COURT:  Okay.  Ms. Gallian?

19         MS. GALLIAN:  Yes, sir.

20         THE COURT:  Is that correct, that you were

21   referring to the document that the acknowledgment is

22   attached to?

23         MS. GALLIAN:  Yes, sir.

24         THE COURT:  Okay.  And what is the second?

25         MR. BARNHARDT:  Your Honor, page 1127.

276

1          THE COURT:  I am there.

2          MR. BARNHARDT:  Your Honor, it's the sentence that

3  begins on line nine.

4          THE COURT:  Eight and a half?

5          MR. BARNHARDT:  Eight and a half, yes.

6          THE COURT:  Eight and a half to 12 and a half?

7          MR. BARNHARDT:  Correct.

8          THE COURT:  Okay.  Where it says that the

9  registered title owner of the manufactured home was Jamie

10  Lynn Gallian, notarized the same date?

11          MR. BARNHARDT:  Correct.

12          THE COURT:  I have a question.  Do you know

13  whether these even have to be notarized?

14          MR. BARNHARDT:  No, your Honor.

15          THE COURT:  Do you know if they have to be

16  notarized?

17          MS. GALLIAN:  They do not.

18          THE COURT:  They don't?

19          MS. GALLIAN:  No.

20          THE COURT:  So the notary was gratuitous?

21          MS. GALLIAN:  It was.

22          THE COURT:  Okay.  As you can see -- and I'll make

23  a record for this -- what I'm doing is, I'm making

24  determinations, and the standard is preponderance of the

25  evidence, and creating my own decisions are based upon an

277

1  assortment of information that I've been inquiring about,

2  including the dotting -- pardon me -- connecting the dots,

3  and asking whether notarization was even necessary, and, of

4  course, trying to understand whether or not this gentleman

5  who testified earlier as the notary remembered anything, and

6  whether or not it was the standard of practice to put any

7  further notarizations in his book, which I've pretty well

8  determined that he doesn't notarize anything unless he puts

9  it in his book, or vice versa -- everything he does notarize

10  is fully described in this book -- and that he said that he

11  only notarized two documents on the date in question, but I

12  also consider Ms. Gallian's testimony, which I'll inquire

13  in -- well, you should elaborate on what happened.

14          Thank you very much.

15          MR. BARNHARDT:  Thank you, your Honor.

16          THE COURT:  I now fully understand your argument.

17          MR. BARNHARDT:  Thank you.

18          THE COURT:  Okay.  Who else, Mr. Hays?

19          MR. HAYS:  Your Honor, we'll call Mr. Houser for

20  probably five minutes, and I see we're at eight minutes

21  until 5:00, so I think we can get him started.

22          THE COURT:  Well, we're not going to quit now.

23          MR. HAYS:  I'm sorry.  Yes.

24          THE COURT:  My deadline of 5:00 was not a hard

25  deadline, now that I know that we're going to hear testimony

278

1  from Ms. Gallian, and I want you to -- you're not under any

2  deadline.  I want you to be full and -- when you testify, I

3  want you to be complete.  Okay?

4           MS. GALLIAN:  Yes, sir.

5           THE COURT:  You're not under any deadline.  We're

6  not going to fast-pace anything.

7           MS. GALLIAN:  Yes, sir.

8           THE CLERK:  Please raise your right hand.

9           CHRISTOPHER CRAIG HOUSER - WITNESS - SWORN

10          THE CLERK:  Please state and spell your full name.

11          THE WITNESS:  Christopher Craig Houser,

12  H-O-U-S-E-R.

13          THE COURT:  By the way, well done, Mr. Barnhardt.

14          MR. BARNHARDT:  Thank you, your Honor.

15                    DIRECT EXAMINATION

16  BY MR. HAYS:

17  Q    Good afternoon, Mr. Houser.  Are you a representative

18  of Houser Brothers?

19  A    Yes, I am.

20          THE COURT:  In what capacity?

21          THE WITNESS:  I am a partner.

22          THE COURT:  Thank you.

23  BY MR. HAYS:

24  Q    Has Houser Brothers ever approved J-Sandcastle, J-Pad,

25  or Jamie Gallian to the residence in the Rancho del Rey

279

1 Park?

2 A     No, we have not.

3           THE COURT:  Where is Rancho del Rey Park?

4           THE WITNESS:  It's in Huntington Beach, on Bolsa

5 Chica and Edinger, or Saybrook and Edinger.

6           THE COURT:  Let me get this down.  Say it again.

7           THE WITNESS:  You want the address?

8           THE COURT:  Yes, start with that.

9           THE WITNESS:  16222 Monterey Lane, Huntington

10 Beach, 92649.

11          THE COURT:  Now, if you're driving down PCH --

12          THE WITNESS:  Yes.

13          THE COURT:  -- heading north, okay, where do you

14 make a right?

15          THE WITNESS:  PCH north from --

16          MR. HAYS:  Here.

17          THE COURT:  From here.

18          THE WITNESS:  From here.  If you're north, you're

19 going to make a right on Warner.

20          THE COURT:  Then what do you do?

21          THE WITNESS:  From Warner, you're going to make a

22 left on -- I think it's Algonquin.

23          THE COURT:  On Algonquin.

24          THE WITNESS:  Yes.  I'm trying to get through the

25 neighborhood.  I kind of forget that route.

280

1          THE COURT:  And when what do you do?

2          THE WITNESS:  And then you make a left on Heil.

3          THE COURT:  Spell "Heil."

4          THE WITNESS:  H-E-I-L.

5          THE COURT:  Okay.

6          THE WITNESS:  And then make a right on Saybrook.

7          THE COURT:  Say it again?

8          THE WITNESS:  Make a right on Saybrook,

9   S-A-Y-B-R-O-O-K.

10          THE COURT:  Okay.

11          THE WITNESS:  And then you're going to want to

12   make a right onto Edinger to get to the front gate, because

13   they're not --

14          THE COURT:  Edinger?

15          THE WITNESS:  Edinger.

16          THE COURT:  Spell it.

17          THE WITNESS:  E-D-I-N-G-E-R.

18          THE COURT:  And then that takes you to the gate?

19          THE WITNESS:  That will take you to the

20   nonresident gate, yes.

21          THE COURT:  The nonresident gate?

22          THE WITNESS:  Yes.

23          THE COURT:  There's a resident gate?

24          THE WITNESS:  Yes.  Well, there's one that you

25   have to have card access for.

*Briggs Reporting Company, Inc.*

281

1          THE COURT:  Yes, but there's a resident gate?

2          THE WITNESS:  Yes.

3          THE COURT:  And the Monterey Lane is --

4          THE WITNESS:  That's a private street that cuts

5    the mobile home park in half.

6          THE COURT:  When you walk -- when you drive into

7    the nonresident --

8          THE WITNESS:  You'll be on Monterey Lane.  The

9    whole thing is considered Monterey Lane.

10         THE COURT:  And how far from PCH is Monterey Lane?

11         THE WITNESS:  From PCH?  I don't know.

12         THE COURT:  Is it a mile, two miles, 10 minutes,

13   three minutes?

14         THE WITNESS:  Maybe a mile and a half.

15         THE COURT:  So it's five minutes, maybe, with

16   traffic?

17         THE WITNESS:  Yes.  It's right across from

18   Huntington Harbor.

19         THE COURT:  Okay.  And describe the -- what is it?

20   Is it a trailer park?

21         THE WITNESS:  Yes.  It's a mobile home park, yes.

22         THE COURT:  Mobile home park?

23         THE WITNESS:  Yes.

24         THE COURT:  How many mobile homes?

25         THE WITNESS:  Three hundred and seventy-nine

282

1  spaces.

2           THE COURT:  And how long has it been there?

3           THE WITNESS:  It was opened in 1965.  My

4  grandfather formed it in, I think, '49, '48, '49.

5           THE COURT:  It's been in the family since 1949?

6           THE WITNESS:  Yes, yes.

7           THE COURT:  Okay.  And of the units that are on

8  the mobile home park, how many does your company own?

9           THE WITNESS:  We own two, and that's just for

10 employees.  We don't own the homes.  We own the land.

11          THE COURT:  You own the land.  You don't own --

12          THE WITNESS:  Yes, we --

13          THE COURT:  Yes, I know, but do you own any of the

14 mobile homes?

15          THE WITNESS:  We own two.  We own two homes.

16          THE COURT:  Two homes?

17          THE WITNESS:  Yes.

18          THE COURT:  That's all?

19          THE WITNESS:  That's all.

20          THE COURT:  Of the 379?

21          THE WITNESS:  Yes.

22          THE COURT:  Okay.  And the rest are owned by other

23 people?

24          THE WITNESS:  They're owned by the residents, yes.

25          THE COURT:  And you lease those to the --

283

1              THE WITNESS:  The land.

2              THE COURT:  You lease the land --

3              THE WITNESS:  Yes.

4              THE COURT:  -- from the residents?

5              THE WITNESS:  To the residents.

6              THE COURT:  To the residents.  Are they long-term

7    leases?

8              THE WITNESS:  No.  They're usually 12-month

9    leases --

10             THE COURT:  Twelve-month leases.

11             THE WITNESS:  -- at max.  We've never done

12   anything over 12 months.

13             THE COURT:  Okay.  So they come in and they say,

14   "We want to move" -- or they want to buy one of the mobile

15   homes from a person that lives there now?

16             THE WITNESS:  Yes.

17             THE COURT:  Most of these are fixed to the land?

18             THE WITNESS:  No.  They're sitting on non-pillars.

19             THE COURT:  So are they hooked up to water?

20             THE WITNESS:  Yes.

21             THE COURT:  And are they hooked up to sewage?

22             THE WITNESS:  And gas.  Yes, they are.

23             THE COURT:  Is it permanent hookup or temporary

24   hookup?

25             THE WITNESS:  It can be removed, yes.

284

 1          THE COURT:  And in 20 minutes or an hour or a day?

 2          THE WITNESS:  Twenty minutes.

 3          THE COURT:  Okay.  So do all of the units have

 4  wheels?

 5          THE WITNESS:  Usually they're removed when the

 6  home is parked.

 7          THE COURT:  Okay.  So they're up on pilings?

 8          THE WITNESS:  Yes.

 9          THE COURT:  Okay.  Thank you.  I needed, in my

10  head, to understand what we're talking about here.

11          THE WITNESS:  Not a problem.  My pleasure.

12          THE COURT:  No, I appreciate it.

13          MR. HAYS:  And, your Honor, just briefly, with

14  respect to the location, just to get a visual, if you drive

15  north through PCH, you pass Bolsa Chica, where there's water

16  on the right-hand side as you're going north, and then

17  the --

18          THE COURT:  Well, that's the wetlands.

19          MR. HAYS:  The wetlands.  When you get past the

20  wetlands, the first street that comes in is Warner.

21          THE COURT:  Where is the hotel, the Hearst Hotel?

22          MR. HAYS:  The hotel is behind you at this point,

23  at, like, where the pier is.  So you would pass the pier.

24          THE COURT:  So this is past -- this is through

25  Huntington Beach?

285

1          MR. HAYS:  Yes.  You would pass through Huntington

2    Beach, pass the pier, go through the wetlands, where there's

3    water on the inland and the sand and everything, and then,

4    when you get back to where there's buildings and businesses

5    on both sides of the street, that's Warner, and that's

6    roughly the beginning of Sunset Beach.

7          THE COURT:  And the Seal Beach after that.

8          MR. HAYS:  And then Seal Beach afterwards, but,

9    before you get to Seal Beach, when you're still in the

10   Sunset Beach area, there's Huntington Harbor, where there's

11   water on the inland side of PCH, and then just on the inland

12   side of that water is roughly where the park is.

13         THE COURT:  Now I understand.  Thank you so much.

14         MR. HAYS:  Since I cycle up and down that street,

15   not this neighborhood, but --

16         THE COURT:  I needed to get a visual --

17         MR. HAYS:  Yes.

18         THE COURT:  -- of this.

19   BY MR. HAYS:

20   Q    Mr. Houser, to the best of your knowledge, have you or

21   anybody at Houser Brothers ever retained any monies tendered

22   by Ms. Gallian or either of her LLCs with respect to

23   proposed rent?

24   A    No.  Everything we're returned.

25   Q    Okay.  And as far as you're concerned, Ms. Gallian has

286

1 no legal ability to be on the premises, correct?

2 A    That is correct.

3 Q    And you have state court litigation filed to that

4 effect, correct?

5 A    That is correct.

6 Q    And this Court has granted relief from stay, and that

7 state court proceeding is now going forward, correct?

8 A    It's moving forward, correct.

9 Q    Okay.  And as of today, you do not yet have a money

10 judgment against Ms. Gallian, correct?

11 A    We do not, no.

12 Q    But you believe that you are owed by Ms. Gallian should

13 you prevail in the state court case?

14 A    Yes, that is correct.

15 Q    And have you filed a proof of claim in this bankruptcy,

16 or have you authorized us --

17 A    Yes.

18 Q    -- to file the proof of claim on your behalf in this

19 bankruptcy case?

20 A    Yes, I have.

21 Q    And do you recall the approximate amount of that proof

22 of claim?

23 A    I think it's around 280,000 --

24 Q    And that's a good recollection.

25 A    -- plus a little bit.

287

1  Q    It's just in excess of 280, but below 281.

2         THE COURT:  What's the number of the proof of

3  claim?

4         MR. HAYS:  That is Claim 3-1.

5         THE COURT:  Thank you.

6         MR. HAYS:  And, Mr. Houser, I have no further

7  questions of you.

8         Ms. Gallian.

9         THE COURT:  He tenders the witness.

10        MS. GALLIAN:  Well, your Honor, it is 5:00

11  o'clock, and I'm just a little overwhelmed today.

12        THE COURT:  You're fine.  Ask him questions.

13                    CROSS EXAMINATION

14  BY MS. GALLIAN:

15  Q    Okay.  Mr. Houser, you had stated earlier that you're a

16  partner in Houser?

17  A    That is correct.

18  Q    How many entities are there with the name Houser that

19  you --

20  A    What are you referring to?

21  Q    -- that you own?

22  A    I own Houser Brothers and Houser Company.

23        MR. HAYS:  Objection, beyond the scope of direct.

24        THE COURT:  Excuse me.  Hold on.

25        You're objecting?

288

1          MR. HAYS:  As being beyond the scope of direct.

2          THE COURT:  Well, I realize that.  Is there any --

3   is it a relevancy issue, also?

4          MR. HAYS:  Yes, relevancy.

5          THE COURT:  What is the relevancy of how many

6   units there --

7          MS. GALLIAN:  Well, I didn't know --

8          THE COURT:  -- or how many Houser entities?

9          MS. GALLIAN:  -- because Mr. Houser here filed

10  with the Secretary of State a disassociation from Houser

11  Brothers as a general partner.

12          THE COURT:  Yes.  So what?

13          MS. GALLIAN:  So I understand that there are two

14  entities, because I have a document here that was just

15  signed by Mr. Craig Houser.

16  BY MS. GALLIAN:

17  Q    Is that your father?

18  A    That's my father.

19          MS. GALLIAN:  Okay.  Mr. Craig Houser as the

20  general -- as a general partner, and I just was --

21          THE COURT:  Yes.  So what?

22          MS. GALLIAN:  I was just wondering why he isn't

23  here, if he is disassociated.

24          THE COURT:  Okay.  That's sustained.  Your next

25  question.

289

BY MS. GALLIAN:

Q    Okay.  So you're in the business of renting pads
underneath the home, underneath a --

A    Renting out mobile home spaces, correct.

Q    Yes, manufactured home.  And when a person brings --
maybe tears out -- maybe they're inherited an older mobile
home.  Is it in your best interests to maybe encourage or
facilitate the older, maybe a 1970, being removed, and a
brand-new mobile home, manufactured home, brought in?

A    We do not require --

        MR. HAYS:  Objection.  I would argue --

        THE COURT:  No, no.  She's asking these things for
bias.

        Go ahead.  Answer the question.

        THE WITNESS:  No, we don't require removal of
homes.  I think there might have been --

BY MS. GALLIAN:

Q    No, I didn't ask if you required it.  Is it beneficial
to the park?

A    Having newer homes?  Yes.  It makes the park look nicer
for people.  Sure.

Q    Sure.

A    But we don't facilitate that.

        THE COURT:  Just answer the question.

        MS. GALLIAN:  Sure.

290

BY MS. GALLIAN:

Q    And, in fact, that's the case in the home that I purchased, is that it was a newer home, a 2014, and Ms. Ryan had removed a 1970 home and put this 2014 on the land.  Is that correct?

A    Could you repeat the question?

Q    Okay.  So Ms. Ryan, the person that I purchased the home from in the park -- I purchased a 2014 manufactured home, and Ms. Ryan had removed a 1970 -- I forgot what type of model it was, but removed the home that she had inherited, because her parents died, and she went to the expense of purchasing a brand-new 2014 home through Five Star, and the home was installed on the pad, where her -- the old home that she inherited.  Is that a correct statement?  Is that pretty clear?  I mean, I don't know how else to explain it.

A    I'm sorry.

        THE COURT:  Either you know the answer or you don't know the answer.  Do you know the answer?

        THE WITNESS:  There's a problem.

        THE COURT:  She's asked you a question.  You don't understand the question?

        THE WITNESS:  If the home is installed on -- in the park.

        THE COURT:  I don't know.  I don't think that's

291

1 the question.  Do you understand the question?

2          THE WITNESS:  I don't understand the question.

3 I'm sorry.

4          THE COURT:  Okay.  Rephrase so that he understands

5 the question.

6 BY MS. GALLIAN:

7 Q    Okay.  Are you familiar with the previous owner before

8 me --

9 A    Yes, I am.

10 Q    -- Ms. Lisa Ryan?

11 A    Yes.

12 Q    Ms. Lisa Ryan's parents had a lease agreement with --

13          THE COURT:  Well, now you're testifying.

14          MS. GALLIAN:  I'm so sorry.  Okay.  I was trying

15 to simplify it.  Okay.

16          THE COURT:  You need to ask him specific

17 questions.

18 BY MS. GALLIAN:

19 Q    Okay.  So the Ryan home that Lisa Ryan inherited was

20 removed --

21 A    Correct.

22 Q    -- in 2013, and it takes what, about 12 to 18 months,

23 sometimes, to build a brand-new manufactured home?

24 A    No, that's incorrect.

25 Q    Okay.  I don't know.  I've never built one before.

292

1 Anyway, a brand-new home ended up showing up, and was placed

2 on Lot 376 --

3 A    That's correct.

4 Q    -- or Space 376?  Do you remember when that was

5 installed?

6 A    I don't remember when that was installed.

7 Q    Okay.  It was installed in September 2014.  So my

8 question is, when Ms. Ryan purchased this brand-new home,

9 was that a good thing for the park?

10 A    Yes, it was a good thing for the park.

11 Q    It was a great thing for the park.  Sure.  Okay.  And I

12 lost my train of thought.  So, when Ms. Ryan then was no

13 longer -- no longer had the old home, did you enter a new --

14 enter into a lease agreement for the 2014 home that she

15 purchased?

16 A    No.

17 Q    Why wouldn't you?

18 A    Can I --

19         THE COURT:  No, no.  You just -- you have to

20 answer her questions --

21         MS. GALLIAN:  Okay.

22         THE WITNESS:  Yes, sir, your Honor.

23         THE COURT:  -- and she asked you, did you enter

24 into a contract for purchase of that?

25         MS. GALLIAN:  Well, Ms. Ryan purchased the home.

293

1          THE COURT:  Is that what your question was?

2          MS. GALLIAN:  Yes, yes.

3          THE COURT:  And he said no?

4          MS. GALLIAN:  And he said no.

5          THE COURT:  Next question.

6          MS. GALLIAN:  Yes, sir.

7  BY MS. GALLIAN:

8  Q    So I'm trying to think of something else.  So were you

9  there in 2018 at the park?

10  A    I was, yes.

11  Q    Okay.  And so you're familiar with the qualifications

12  in 2018?

13  A    Yes, very much so.

14          THE COURT:  Qualifications for what?

15          MS. GALLIAN:  For tenancy.

16          THE WITNESS:  Yes, I am.

17  BY MS. GALLIAN:

18  Q    Okay.  So, when somebody purchases a home that's

19  existing, that's already in the park, does the homeowner

20  have to take it out, or, I mean, do you buy -- is the

21  homeowner just selling a box, or is the homeowner selling

22  the home that's installed on the dirt?

23  A    Which question are you asking on that one?

24  Q    I'm asking --

25  A    Which way?

294

1  Q    I'm asking if --

2  A    They're --

3         THE COURT:  No, no, no.  If you don't understand

4  the question, say it.

5         THE WITNESS:  Okay.

6         THE COURT:  So say it, "I don't understand the

7  question."

8  BY MS. GALLIAN:

9  Q    When Ms. Ryan purchased and designed and had delivered

10  a brand-new 2014 home in, I believe it was, September 2014,

11  were you aware when it was brought into the park?

12  A    I would have been, yes.

13  Q    Okay.

14  A    I do not recall exactly when that was.

15  Q    Okay.  And what gave Ms. Ryan the right to live in that

16  home, if it had just come in?

17  A    She had a preexisting lease.

18  Q    She had an existing lease, or her parents had the

19  existing lease?

20  A    She had the existing lease.

21  Q    Okay.  And when was that lease entered into?

22  A    I don't recall.

23  Q    Okay.  I happen to have that.

24         THE COURT:  But it doesn't matter.

25         MS. GALLIAN:  It doesn't matter.  Okay.

295

1  BY MS. GALLIAN:

2  Q    So Lisa Ryan's parents died, and back in 2006, was

3  there a 55-and-older requirement?

4  A    Yes, there was.

5  Q    Okay.  Do you know how old Lisa Ryan was in 2006?

6  A    I do not recall.  I would not have -- I was not doing

7  that back then.

8  Q    What does that mean?

9  A    In 2006?

10  Q    Yes.

11  A    It would have been the old managers, not me.

12  Q    Okay.  Did you work back then in there?

13  A    I did, yes.

14  Q    Were you there?  Okay.  So you were there.  Okay.  All

15  right.  So the exhibits here have a document that Lisa

16  Ryan's mother, Laura Ryan, on 1/1, 2006, signed with Lisa

17  Ryan and Patricia Ryan.

18          THE COURT:  What is the relevancy of this

19  question?

20          MS. GALLIAN:  Because Laura Ryan was dead.

21          THE COURT:  What is the relevancy of this question

22  to this action?

23          MS. GALLIAN:  Because he said -- pardon me, sir.

24  Pardon me.

25          THE COURT:  What is the relevancy of your

1  question --

2          MS. GALLIAN:  Yes.

3          THE COURT:  -- to this matter?

4          MS. GALLIAN:  I'm just wondering why the park --

5          THE COURT:  Well, just wondering isn't helpful to

6  the relevancy question that I'm asking.  What is the

7  relevancy of your question to this action?

8          MS. GALLIAN:  I would like to know why the park

9  would not enter into a lease agreement with somebody who

10 just spent $400,000 on a home.

11         THE COURT:  It's irrelevant.  Move on.

12         MS. GALLIAN:  Okay.

13         THE COURT:  Next question.

14 BY MS. GALLIAN:

15 Q   Okay.  Well, what gave Lisa Ryan authority to sell it,

16 then?

17         THE COURT:  What relevance is that to this action?

18         MS. GALLIAN:  Because --

19         THE COURT:  This action is against you for a false

20 oath, for various other things.  It has nothing to do with

21 those leases.

22         MS. GALLIAN:  Okay.  Yes, sir.

23         THE COURT:  So now tell me, what relevancy does it

24 have, one more time?

25         MS. GALLIAN:  Okay.  I will move on, sir.

297

1          THE COURT:  Thank you.

2          MS. GALLIAN:  Okay.  Very good, sir.

3    BY MS. GALLIAN:

4    Q    Who is Catherine Houser Curtis?

5    A    She's my cousin.

6    Q    She's your cousin.  Okay.  And has she ever worked as

7    the park manager?

8    A    No.

9          THE COURT:  What relevancy does that have to this

10   action?

11         MS. GALLIAN:  I gave her money, sir.

12         THE COURT:  What relevancy does it have to this

13   action?

14         MS. GALLIAN:  Okay.  I'm not sure what you're

15   asking.

16         THE COURT:  I'm asking you, what relevancy does

17   that question have to this particular action?  You must be

18   asking the question for a reason.  Tell me, what is the

19   reason?  What do you hope to prove?

20         MS. GALLIAN:  That Catherine Houser Curtis told me

21   that I could live there.

22         THE COURT:  It's irrelevant to this question -- to

23   this matter.  Move on.  Next question.

24   BY MS. GALLIAN:

25   Q    Okay.  So how many application for residency have you

298

1  received from myself?

2          THE COURT:  Okay.  Again, it's irrelevant to this

3  issue of the lawsuit before us today.

4          MS. GALLIAN:  Okay.

5          THE COURT:  Tell me why it matters how many times

6  you've applied for residency or a lease at this facility as

7  it pertains to the lawsuit in front of us today.

8          MS. GALLIAN:  Okay.  So let's see, here.

9          THE COURT:  I'm just going to rule.  It has no

10 relevancy.  Ask another question.

11         MS. GALLIAN:  Okay, sir.

12 BY MS. GALLIAN:

13 Q    So I remembered you stated a few minutes ago that you

14 filed a claim in my bankruptcy for $280,000.

15 A    That is correct.

16 Q    Is that correct?  And why do you believe that you're

17 entitled to that money?

18         THE COURT:  That is irrelevant.

19         MS. GALLIAN:  Okay.  I'm trying to --

20         THE COURT:  Moving right along.

21         MS. GALLIAN:  I'm trying to understand why --

22         THE COURT:  It's irrelevant to this matter.

23         MS. GALLIAN:  Okay.

24         THE COURT:  You have one more question, and it has

25 to be relevant, or this witness' time is going to be ending

*Briggs Reporting Company, Inc.*

299

1  here, unless there is some more questions from Mr. Hays that

2  involves anything that you've asked.

3         MS. GALLIAN:  Okay.

4         THE COURT:  You have one more chance.

5  BY MS. GALLIAN:

6  Q    How long have I lived on the property there in

7  Huntington Beach?

8  A    Since November, sometime in November 2018.

9  Q    Did I live there before?

10 A    In the mobile home park?  No.

11 Q    Have I lived within the same gates and --

12 A    I have been told so.  I do not know for sure.

13 Q    Okay.

14 A    I do not.  No.

15 Q    Okay.  And your family or your -- Houser Brothers owns

16 the Gables, where I lived previously and sold my home?

17 A    That is correct.  We own the land.

18 Q    Okay.  So you own the land?

19 A    Yes.

20 Q    Okay.  And so the homeowners there pay you money -- or

21 pay somebody who eventually pays your lease agreement?

22 A    We lease out the land, yes --

23 Q    Right.  You lease out --

24 A    -- to a single --

25 Q    Right.  But money is paid to you every month?

300

1  A      From the person we lease the land to, yes.

2  Q      Correct.  Okay.  And that money is corrected (sic) by

3  each one of the homeowners.  Okay.  Correct?

4  A      It's whatever portion they owe us, yes.

5  Q      Okay.  And so, when somebody doesn't pay the ground

6  lease, do they get evicted?

7              THE COURT:  That's irrelevant, and you're done.

8              MS. GALLIAN:  Okay.

9              THE COURT:  You're excused, sir.

10             THE WITNESS:  Thank you.

11             THE COURT:  You now get to -- we're going to take

12  a five-minute break, and then you get to testify on your

13  behalf, because -- are you closing your case?

14             MR. HAYS:  Yes, your Honor.

15             THE COURT:  All right.  Their case is closed.

16  It's your turn.

17             THE WITNESS:  Am I done?

18             THE COURT:  You're done.  Thank you for coming.

19             In five minutes, you're going to -- so organize

20  your discussion.  You're now going to testify on your

21  behalf, or call any witnesses you'd like.  We'll be back in

22  five minutes.

23        (The witness was excused.)

24             MR. HAYS:  Thank you, your Honor.

25        (Proceedings recessed briefly.)

301

1        THE CLERK:  Please remain seated.  Court is again

2   in session.

3        THE COURT:  Well, we'll go off the record until we

4   have our defendant back.

5      (Proceedings recessed briefly.)

6        THE COURT:  The Court is back in session.

7        Here's the status of the case so far.  The

8   plaintiff has called all of its witnesses with respect to

9   their main case, and the plaintiff has had an opportunity to

10  cross-examine two of their witnesses.

11       Of course, the first witness, which was Ms.

12  Gallian, she didn't have to cross-examine herself at the

13  time, but now she gets the opportunity, in her main case, to

14  present her main case, which means that she may call any

15  witness she'd like, and testify herself.

16       If you want to testify yourself, you can do one of

17  two things.  You can be sworn in and testify from where you

18  sit, so you'll have all your papers, or you could come up

19  here, but it's not necessary.  It's your choice.

20       Then what we call it is -- you can do it two ways.

21  You can ask yourself a question, and then answer it, or you

22  can provide a narrative.  You can just talk.  It's up to

23  you.  You had, I suspect, an opportunity to have an attorney

24  come in and ask you questions, but you chose not to do

25  that.

302

1          So let me ask you this.  How would you like to

2  proceed?  Would you like to, first of all, testify from your

3  seat there or testify from the witness box?

4          MS. GALLIAN:  Respectfully, your Honor, it's been

5  eight hours, and I think I am not capable to ask myself

6  questions and explain my case for the next eight hours.

7          THE COURT:  You don't need to.

8          MS. GALLIAN:  I have a lot of information.

9          THE COURT:  Well, I'm sorry --

10          MS. GALLIAN:  It's been three years.

11          THE COURT:  -- but you're going to have to do it.

12          MS. GALLIAN:  I'm sorry?

13          THE COURT:  You're going to have to continue.

14  We're not leaving until 7:00 o'clock.

15          MS. GALLIAN:  Until 7:00?

16          THE COURT:  Yes.

17          MS. GALLIAN:  So I have an hour and a half to put

18  on my case?

19          THE COURT:  Yes.

20          MS. GALLIAN:  And they had eight hours?

21          THE COURT:  Yes.  No, how much time do you need?

22  Let's ask it that way.  How much time do you need?

23          MS. GALLIAN:  Your Honor, there's 17 --

24          THE COURT:  How much time do you need?

25          MS. GALLIAN:  I would say a good six hours.

1          THE COURT:  All right.  Let's start right now.

2   Please begin.

3          MS. GALLIAN:  So this case is about credibility.

4          THE COURT:  Well, first we're going to swear you

5   in.

6          MS. GALLIAN:  I thought I did that already.  I

7   apologize.

8          THE COURT:  You didn't do it for your own self.

9   You may stand there and be sworn in.

10          THE CLERK:  Please raise your right hand.

11       JAMIE LYNN GALLIAN - WITNESS - PREVIOUSLY SWORN

12          THE CLERK:  Please state and spell your full name.

13          THE COURT:  Did you say yes?

14          THE WITNESS:  Yes, I did, sir.

15          THE COURT:  Okay.  Please proceed.

16                    DIRECT TESTIMONY

17          MS. GALLIAN:  Okay.  So I'm going to go in

18   chronological order, if that's okay.  Okay.  2009, I was

19   called by the owner of the Gables, the unit, and my father

20   had been gone for 10 years, and said, "I need to buy you a

21   house."  I said, "I don't need you to buy me a house."  "No,

22   have you buy you a house."  And there was conditions that it

23   be on leased land.  So I agreed.  I was a flight attendant

24   and had three small children, and agreed to move into this

25   Gables place.

304

1          Because I was a flight attendant and the three

2   small children, I asked my stepmother to leave the home in

3   her name.  In 2017 -- so I lived there from '09 to '17,

4   never had a problem, never received any warnings, paid my

5   ground lease, paid the HOA, paid the taxes -- my stepmother

6   did -- and I would give my mother, my stepmother, 25

7   percent.  I never had any privilege of the contracts because

8   I didn't purchase the home there.

9          So, in 2017, she got breast cancer, and she didn't

10  want anything more to do with the Gables.  So she gifted me

11  the property and said, "This is your inheritance," on March

12  23rd, 2017, and prior to that, a letter had come to the

13  house in her name, dated March 2nd, 2017, and asked Ms.

14  Bradley to go to ADR.  Ms. Bradley didn't respond, but

15  instead gifted me the property.

16         Eighteen days later, the Huntington Beach Gables

17  sued me for alleged violations that happened in 2014, '15,

18  and '16.  I wasn't the homeowner.  I was the tenant of Ms.

19  Bradley's.  Ms. Bradley is very wealthy, and gave a $10,000

20  check to the Gables, and the Gables dismissed Ms. Bradley

21  and left me as the sole defendant.

22         The reason why that's significant is because, when

23  the letter came to the Alderport address, it was addressed

24  to "Sandra L. Bradley, Trustee of the Sandra L. Bradley

25  Trust Dated 10/17/01."  Well, my father died in 2000, so the

305

1 trust couldn't have been dated in '01, and I was the

2 executor of the trust, but what happened was, is the

3 probate -- and that's why the probate is one of these -- one

4 of my cases in this case.

5        Well, what I learned was that my stepmother

6 destroyed all the trust documents and put my father's will

7 in the paper shredder, and then, instead of helping me, this

8 became a burden on me, and the HOA -- because now I'm the

9 one that's getting the County Tax Assessor's bill.  I'm the

10 one that's getting the ground lease of $9,000.  I'm the one

11 that's getting the $4,000 HOA fee, and I'm like -- all of

12 those things added up to more than I could afford.  So I

13 started asking questions, and the more questions I asked,

14 the bigger the attacks came at me.

15        Because I'm a flight attendant, they filed a

16 workplace violence restraining order.  I wasn't even in the

17 state.  I was in another country.  And that was very

18 devastating to me, because I can't have that on my record.

19 So I decided to move.  I listed my home.

20        On March 2nd, exactly one year later, March 2nd,

21 2018, I went to a mandatory settlement conference with an

22 attorney that I hired named David Flyer and Raquel Flyer,

23 and they submitted a mandatory settlement brief, and

24 basically argued that "She's not the responsible party.  She

25 wasn't the homeowner.  You sued the wrong person."  And I

306

1  learned what the term is, "buy my peace," never heard that

2  before.

3          So, at the mandatory settlement conference, I was

4  in chambers and asked, "How much will you pay?"  And I said,

5  "I'm not responsible.  I was not the legal owner."  And Ms.

6  Bradley had paid the HOA $10,000, and I said, "Okay.  Well,

7  I'll pay the same amount."  "No, no, no, no.  You need to

8  come up a little bit more."  It went up to 12, "Well, come

9  up a little bit more."

10          So I settled with the HOA on March 2nd, 2018, to

11  pay them $15,000.  I would sell my house.  What was the --

12  okay -- pay the $15,000, and they agreed to dismiss the

13  workplace violence.  It hadn't even gone to OSC yet.  It was

14  not set for OSC until August 15th, 2018.

15          So they didn't dismiss the workplace violence that

16  day as part of the record, and they put up cameras on

17  several of the buildings.  There's 20 buildings in the

18  Gables, and they put up cameras, and the person who was

19  controlling the cameras was a person named Janine Jasso.

20  You know, she's a plaintiff in another adversary in this

21  case.

22          Janine Jasso is an attorney, and she instigated

23  the workplace violence.  She wrote all the declarations, and

24  every time I would go outside and walk the dogs, she would

25  call and report that there was a violation, not that I did

1   anything.  She had an entire wall of cameras in one of her

2   rooms in her house, and she just stalked me, and she would

3   call the police department and say, you know, "She was

4   watering her lawn" or "She was walking her dogs, and she

5   walked past my car," and the police department -- I have

6   probably five volumes of police reports that she made,

7   nobody else, just Janine Jasso.

8           So Janine Jasso wasn't happy with the 10-year

9   stay-away, which is 30 feet.  Janine Jasso then, on April

10  18th -- well, let me -- because I might have missed

11  something.  So, on March 2nd, 2018, in front of Judge

12  Crandall, myself, Janine Jasso, the Flyer attorney, and

13  Pejman Kharrazian, the HOA attorney, and the president of

14  the association agreed in open court, on the record, "The

15  case is settled.  You're to dismiss the WV.  She's going to

16  sell her house.  She's going to move.  And everybody just

17  get along."

18          Well, on April 17th, Janine Jasso filed her own

19  CHO, and it was with the Honorable Stafford, Timothy

20  Stafford, I believe his name is.  He's now retired.  Well,

21  Timothy Stafford, the Honorable Timothy Stafford, was also

22  the same judge in the WV, and he denied Janine Jasso, and

23  she listed her 22-year-old son.  She listed her

24  eight-year-old daughter.  She listed her husband.  None of

25  these people filed declarations.  This was all just Janine

308

1  Jasso.  Well, he denied any stay-away order.

2          So Janine Jasso convinced the police department.

3  She never told them, when she would call, that the current

4  order didn't have a stay-away order.  She just kept

5  referring back to the one that was supposed to be dismissed

6  on March 2nd, 2018.  So, by this time, the HOA had filed a

7  motion under 664 to enforce the settlement agreement.  At

8  the March 2nd, 2018, hearing, Judge Crandall had set an OSC

9  regarding dismissal to make sure that everybody had done

10 what they were supposed to do.

11         I returned to court on June 4th, 2018, without an

12 attorney.  I had paid the Flyers in my bankruptcy monies.

13 They said they weren't attorneys.  I said, "You are an

14 attorney, because I retained you, and you are the one that

15 negotiated at this mandatory settlement conference."  Well,

16 I was there by myself.

17         So Judge Crandall said to me, "Ms. Gallian, why

18 hasn't this case settled?"  And I said, "Your Honor, I will

19 tell you exactly all of the things that I've done to move

20 this along."  So I gave him all of my things that I had one.

21 I listed my house, I show my house, all these things.

22         Well, I said -- at the end, he goes, "Okay.

23 That's all great, but, again, Ms. Gallian, why hasn't this

24 case settled?"  And I said, "Your Honor, I tried to dismiss

25 the case, but I'm not the plaintiff.  I filed all the

*Briggs Reporting Company, Inc.*

309

1  stipulations that we agreed to dismiss the WV.  I did all

2  this."

3          So, at the very last second, I said, "Your

4  Honor" -- I said, "I remember one thing that you said on the

5  record."  I said, "You said, 'Why don't we just sign the

6  transcript?'"  He goes, "Yes, I did."  He goes, "If you

7  can't get along" -- because they reduced the -- what they

8  understood the terms of the settlement to be.  They reduced

9  it to a writing, and I wouldn't agree to it, because they

10  hadn't dismissed the WV yet.

11          Yes, sir.

12          THE COURT:  Take a break for a minute while I ask

13  my clerk a question.

14          THE WITNESS:  Yes, sir.

15          THE COURT:  What time did she start her testimony?

16          THE CLERK:  5:48.

17          THE COURT:  Said it again.

18          THE CLERK:  5:48.

19          THE COURT:  Please continue.

20          THE WITNESS:  Okay.  So, on the day that was for

21  the OSC, he said, "I'm going to put you in the jury room.

22  You all work this out, and you're not getting past me until

23  this is worked out."  A few minutes later, half-hour, 45

24  minutes, your Honor (sic), Crandall, came in, and he said,

25  "Ms. Gallian" -- he goes, "I thought you had an excellent

310

1  suggestion."  He goes, "If you're willing to sign the

2  transcript, then it makes me question, what's plaintiff's

3  motives?"

4          So he goes, "Let's sign this.  Let's be done with

5  this."  So I had a certified copy of the March 2nd, and I

6  signed it and dated it June 4th, and I guess it was the

7  wrong side or something, so I signed the other side.  He

8  goes, "Okay," and then he left.  It was never put on the

9  record.  So I'm not an attorney, so I'm just trying to tell

10 you exactly what happened as I remember it.

11         So, on July 20th, 2018, the motion to enforce the

12 settlement was heard by Judge Crandall, and Judge Crandall

13 wrote a seven-page minute order, and it is in here, and I

14 don't want to waste the Court's time, but it is in here, and

15 he basically said, you know, "Ms. Gallian has a point."  He

16 said that it was very clear.  Plaintiff pushed the envelope,

17 and they included terms of the settlement that were not

18 agreed to on the record, and they left out things that were.

19 So he denied their settlement agreement.  That was on, I

20 believe, July 20th, 2018.  By that time --

21         THE COURT:  At this point, we have now let you

22 speak for 15 minutes --

23         THE WITNESS:  Yes, sir.

24         THE COURT:  -- and I'm going to ask you to take

25 some good notes, because I'm going to tell you what we're

311

1  going to do.  Would you please get a pen and take some

2  notes.

3          THE WITNESS:  Yes, sir.

4          THE COURT:  None of the matters that you've

5  discussed, absolutely none of the matters that you have

6  discussed, are involving this trial, and I'm going to give

7  you again what this trial is about, so that the record is

8  very clear --

9          THE WITNESS:  Yes, sir.

10         THE COURT:  -- about what you're supposed to be

11  talking about.

12         THE WITNESS:  Yes, sir.

13         THE COURT:  The first cause of action in this

14  bifurcated case, which we're taking up as in the Section 727

15  series, instead of 523, is 727(a)(2)(A).

16         THE WITNESS:  Yes, sir.

17         THE COURT:  727(a)(2)(A) says:

18         "A discharge shall be granted unless the

19         Debtor, with the intent to hinder,

20         delay, or defraud a creditor or an

21         officer of the estate charged with the

22         custody of property under this title" --

23         meaning Title 11 -- "has transferred,

24         removed, destroyed, mutilated, or

25         concealed, or has permitted to be

312

1              transferred, removed, destroyed,

2              mutilated, or concealed, A, property of

3              the Debtor within one year before the

4              date of the filing of the petition."

5         The elements of 727(a)(2)(A) which the plaintiff

6    is required to prove -- required to prove -- are, one, the

7    transfer of property, that the Debtor -- that's you --

8    "transferred, removed, destroyed, mutilated, or concealed,

9    or permitted such to be done, to property of the Debtor."

10   That's the first element.

11        The second element is it had to be done within one

12   year before the date of the filing of the petition, and,

13   two -- and three, I should say, intent.  They need to

14   demonstrate by a preponderance of the evidence that:

15             "The Debtor intended to hinder, delay,

16             and defraud a creditor or officer of the

17             estate."

18        That is the entirety of 727(a)(2)(A).  I will tell

19   you right now that, as of this moment, they have

20   demonstrated to me all of the elements.  This is your chance

21   to say where they're wrong.

22             THE WITNESS:  And I was getting to that, your

23   Honor.

24             THE COURT:  The next cause of action is

25   727(a)(4)(A).  727(a)(4)(A) states that the discharge shall

313

1  be granted unless, quote:

2          "The Debtor knowingly and fraudulently,

3          in or in connection with a case, made

4          false oath or account."

5          To do that, they must show the Debtor made a false

6  oath in the course of the bankruptcy proceeding, that the

7  oath was related to a material fact, and that the Debtor

8  knowingly made the false oath, and, finally, the Debtor

9  acted fraudulently in making the false oath.

10         The third cause of action that the plaintiff is

11  relying on in this particular case is 727(a)(5).  That

12  provision states the discharge shall be granted unless,

13  quote:

14         "The Debtor has failed to explain

15         satisfactorily, before determination of

16         denial of discharge under this

17         paragraph, any loss of assets or

18         deficiency of assets to meet the

19         Debtor's liability."

20         The elements of that matter are, one, "The Debtor,

21  at one time not too remote from the bankruptcy petition

22  date, owned identifiable assets," and, two, "On the date

23  that the bankruptcy petition was filed or order of relief

24  was granted" -- an order for relief granting is involuntary

25  bankruptcy -- "the Debtor no longer owned that asset," and,

*Briggs Reporting Company, Inc.*

314

three, "The bankruptcy pleadings or statement of the affairs

do not reflect an adequate explanation for the disposition

of assets."

What I'm telling you is this.  Those three actions

are what we're talking about today, nothing that occurred in

2018 with respect to what you have already described.  This

is your chance to tell me why the plaintiff is wrong about

everything that I've now described to you, and you don't

need to say anything else, because most of it is completely

irrelevant to this series of causes of action.

Sooner or later, counsels for the plaintiff are

going to start objecting to your testimony as being

irrelevant.  I have given you at least 15 minutes to say one

relevant thing, and you haven't done it yet.  So now you may

proceed, but, at this point, I am expecting objections if

your testimony has nothing to do with this case, and then

I'll rule on those objections after hearing both their

argument and your argument.  Please proceed.

THE WITNESS:  So, at this point, I'm in July 2018.

THE COURT:  Now, we're not going to --

THE WITNESS:  No, no, no.

THE COURT:  -- continue with this history.

THE WITNESS:  I'm not going to tell the story.

THE COURT:  You're going to address these causes

of action.

315

1          THE WITNESS:  Correct.

2          THE COURT:  You're not going to continue wasting

3    this Court's time.

4          THE WITNESS:  Okay.  The case was settled for

5    $15,000.

6          THE COURT:  Stop.  Transfer of property -- do you

7    understand what they have alleged with respect to the

8    transfer of property, or "The Debtor has transferred,

9    removed, destroyed, mutilated, or concealed, or has

10   permitted such to be done of property of the estate"?  Do

11   you understand their argument?

12         THE WITNESS:  Well, it seems like they're putting

13   the Alderport and the Monterey together, and what I was

14   trying to say is that I did exactly what I was asked.  I

15   sold the property and got out, and I have a transcript

16   there, and I've provided the documents to Mr. Hays.  I have

17   a transcript here that's dated -- well, actually, it's even

18   in his documents, but I'm not going to go and look for them.

19   I do have them all here.  I'm sorry.  I have minute orders

20   from -- beginning on 11/8, through Judge Crandall, all the

21   way to just -- to 12/6.

22         What I found interesting was that on 11/9, it was

23   an order, a temporary -- it was an "Ex Parte Application to

24   Enjoin Disbursements from Proceeds of Sale of Real Property,

25   or, Alternative, for an Order Requiring Gallian to Deposit

1 at Least $52,000 with the Court."  That motion was denied

2 because, again, the Court said, "You embellished the

3 settlement agreement, and she moved.  You did exactly what

4 she wanted."

5        THE COURT:  I don't understand what this has to do

6 with this lawsuit.  Would you explain to me what that has to

7 do --

8        THE WITNESS:  Well, because I sold the home for

9 300 --

10       THE COURT:  Don't interrupt me.

11       THE WITNESS:  I apologize, sir.

12       THE COURT:  I want you to explain to me what any

13 of that has to do with this lawsuit.

14       THE WITNESS:  Because, when I sold the house and

15 bought the other house, I didn't owe anything except $3,070.

16       THE COURT:  What does that have to do with this

17 lawsuit?

18       THE WITNESS:  Because it's trying to say that I

19 concealed something.  I didn't conceal anything.  I did

20 exactly what I was asked to do.  I didn't conceal the sale

21 of the house.  I published what it was.  I sold it in 2018.

22 I moved.  I moved with -- the purpose of buying the

23 Alderport address was it was something I -- not Alderport,

24 the Monterey -- it was something I could afford until I

25 could get out from underneath that three-year lease.  The

317

1  intent was to rent the property.

2         I was out of work, I had been injured, and I have

3  a document here, what I referred to on November 16th, the

4  day that I created that security agreement, and it says

5  right here, "Ex Parte Application by Plaintiff the

6  Huntington Beach Gables Homeowners for an Order Shortening

7  Motion to Be Deemed the Prevailing Party and Motion to

8  Compel for" --

9         THE COURT:  You're just reading something that

10  doesn't help.

11         THE WITNESS:  Okay.

12         THE COURT:  I need to understand what your defense

13  is in this particular case, and you started on it.  You said

14  they're saying you concealed something --

15         THE WITNESS:  Right.

16         THE COURT:  And you're saying you didn't.

17         THE WITNESS:  And I'm saying no, I have --

18         THE COURT:  Okay.  Do you know what they're saying

19  you concealed?

20         THE WITNESS:  They're saying that I hid assets,

21  and I'm like, "No, I did not."

22         THE COURT:  Okay.  So you're saying you didn't?

23         THE WITNESS:  I did not hide assets.

24         THE COURT:  Fine, fine.

25         THE WITNESS:  I --

318

1         THE COURT:  Do you have any evidence that you did
2  not hide any assets?
3         THE WITNESS:  Do I have -- I've given all of my
4  bank records.  I've given -- I publicly published UCCs.  I
5  gave everybody a copy of the security agreement that was
6  entered on November 16th.  Your Honor, the only reason I --
7  because I was taught as a young girl that you force yourself
8  to pay yourself back.
9         When I was given $375,000 from a house that I
10 supposedly inherited from my father, it wasn't a gift.  It's
11 been a nightmare, a burden.  And so I learned from my
12 father, "Pay yourself back."  So, when Judge Crandall said,
13 "No, I'm not going to freeze her money.  It's her money.
14 She can do whatever she wants with it" --
15        THE COURT:  So you're just justifying the
16 transfers?
17        THE WITNESS:  Well, I sold the property.  I got
18 out.
19        THE COURT:  Are you justifying the transfers by
20 your argument?  I'm trying to understand your argument.
21        THE WITNESS:  "Transfers" meaning --
22        THE COURT:  Mr. Hays.
23        MR. HAYS:  Yes.
24        THE COURT:  Are you alleging that the Debtor
25 transferred property?

319

1          MR. HAYS:  Yes, your Honor.

2          THE COURT:  Now, do you -- and what property are

3   you alleging that the Debtor transferred?

4          MR. HAYS:  Your Honor, there's multiple transfers

5   that --

6          THE COURT:  Well, just start.

7          MR. HAYS:  Yes.

8          THE COURT:  Help yourself.  If you help yourself,

9   you won't be here all night.

10          MR. HAYS:  I understand, your Honor.  The first

11   transfer is by purchasing property with her personal funds,

12   but titling it in the name of a separate entity.  We are

13   alleging that is a transfer.

14          THE COURT:  And what is, exactly, the transfer?

15          MR. HAYS:  The transfer is the placement of title

16   in the name of J-Sandcastle.

17          THE COURT:  Okay.  Do you understand that they're

18   saying that you placed -- used your money -- is that right,

19   her money?

20          MR. HAYS:  Yes, your Honor.  Yes.

21          THE COURT:  To buy property, and put it into the

22   name of J-Sandcastle?  That's what they're saying.  Did you

23   or did you not do that?

24          THE WITNESS:  Did I sell one home --

25          THE COURT:  No.  Did you buy property with your

320

1  money and put it into the name of Sandcastle, J-Sandcastle?

2          THE WITNESS:  J-Sandcastle.

3          THE COURT:  I know the answer.  You've testified

4  to it.  You did.

5          THE WITNESS:  No, sir.  I believe what I said was,

6  on November 7th, 2018, I deposited $175,000 into

7  J-Sandcastle's account, and on November 16th, after the

8  hearing with Judge Crandall, decided to create a promissory

9  note and security agreement, and the question has always

10 been asked to me, "Well, what did they give you?"  Well, I

11 was getting 5.5 interest, but that was if a tenant moved in

12 there, because I had that three-year lease on Pinon Drive

13 (phonetic), sir.

14         THE COURT:  So you're saying you did not transfer

15 property to another entity?  Is that what you're saying?

16         THE WITNESS:  I purchased the home.

17         THE COURT:  Is that what you're saying, that you

18 did not transfer property?

19         THE WITNESS:  Transfer?

20         THE COURT:  Transfer.

21         THE WITNESS:  You mean put it -- register it?

22         THE COURT:  Yes.

23         THE WITNESS:  It's a personal property.

24         THE COURT:  Did you do it?

25         THE WITNESS:  Did I put the name in LLC?  Yes,

321

1  your Honor --

2          THE COURT:  Thank you.

3          Mr. Hays.

4          THE WITNESS:  -- in the name of J-Sandcastle.

5          THE COURT:  I understand that.

6          THE WITNESS:  Yes.

7          THE COURT:  See how simple it is?

8          THE WITNESS:  Yes.

9          THE COURT:  Mr. Hays, what other property are you

10  alleging the Debtor transferred within one year?

11          MR. HAYS:  Your Honor, the transfer of the cash is

12  one transfer.  Placement of the title in the name of the LLC

13  is another transfer, and/or it's a concealment, which is

14  covered by the statute.

15          We are also saying that the Debtor made a transfer

16  of property by putting the promissory note payable to J-Pad,

17  when she was the party that advanced the money that was

18  purportedly loaned, and that the Debtor then made subsequent

19  transfers of her interest in J-Pad by adding different

20  people as secured creditors, including her children and

21  granddaughter and her former husband as secured creditors,

22  and she also --

23          THE COURT:  Well, that's enough.

24          Do you understand right now what he's just

25  alleged?

322

1           THE WITNESS:  I didn't owe anybody anything.

2           THE COURT:  I didn't ask you that.  Do you

3  understand what Mr. Hays just said?

4           THE WITNESS:  Yes.  He's alleged --

5           THE COURT:  Okay.  And you don't think he's

6  correct, correct?

7           THE WITNESS:  No.

8           THE COURT:  Tell me why he's not correct.

9           THE WITNESS:  Because it's my money.  I didn't owe

10  anybody.

11           THE COURT:  Okay.  It's your money.  Okay.  So

12  that's why he's not correct?

13           THE WITNESS:  I didn't owe anybody.

14           THE COURT:  Do you have any other argument, other

15  than it's your money?

16           THE WITNESS:  Well, I sold a home unencumbered,

17  with no liens.  I had a homestead exemption on it.

18           THE COURT:  You understand that you were being

19  sued?

20           THE WITNESS:  By who?

21           THE COURT:  In 2018.

22           THE WITNESS:  By who?

23           THE COURT:  Who was she being sued by?

24           MR. HAYS:  Multiple lawsuits that started in 2017.

25           THE COURT:  You testified to this.

323

1          THE WITNESS:  In 2017, your Honor.

2          THE COURT:  Yes, and 2018, and you have lost some

3 of those cases.

4          THE WITNESS:  It's one case, your Honor.

5          THE COURT:  Okay.  One case.  You understand that

6 you were being sued?

7          THE WITNESS:  Yes.

8          THE COURT:  Do you not understand that?

9          THE WITNESS:  Yes.

10          THE COURT:  Do you understand that there is a

11 theory that you were taking property away from yourself and

12 putting it into another name so you wouldn't have to pay

13 against that lawsuit?  Do you understand that that's the

14 allegation?

15          THE WITNESS:  Yes.

16          THE COURT:  Okay.  That's fine.  Explain why it's

17 not true.  That's what I'm asking you to do.  Why isn't that

18 true?  Why isn't it true that you were -- they're saying you

19 were hiding this asset to defraud creditors so, if they won

20 their lawsuit -- or they did win the lawsuit -- they

21 couldn't collect from you, because you wouldn't have a home

22 in your name.

23          They're also saying that you encumbered property

24 in other people's names so that, even if they could trace

25 the property, it wouldn't be worth anything to them, because

*Briggs Reporting Company, Inc.*

324

1  there were liens in other people's names that would come,

2  allegedly, first.  That's what they're saying.  Tell me why

3  they're wrong.  That's what I'm trying to get from you, an

4  explanation of why it's not true.

5          THE WITNESS:  I didn't believe that putting a home

6  in an LLC that I owned solely was doing anything wrong.

7          THE COURT:  Okay.  That's an explanation.  I

8  appreciate you giving me that explanation.  Do you have any

9  other explanation, other than you didn't think it was wrong?

10          THE WITNESS:  At the time when the home was

11  transferred, or registered, to so speak, in the LLC's name,

12  my potential exposure was, I think we established, 46,138

13  and $3,070.

14          THE COURT:  Okay.  Then connect the dot.

15          THE WITNESS:  Okay.

16          THE COURT:  Are you saying you wouldn't do it just

17  for that chump change?

18          THE WITNESS:  Well, no.

19          THE COURT:  What are you saying?

20          THE WITNESS:  I'm saying -- well, it appears to me

21  when -- on November 9th, when Judge Crandall said, "No, I'm

22  not going to freeze her money.  It's her money.  She can do

23  what she wants" --

24          THE COURT:  See, I realize that this is unusual,

25  but I hope that the reader of this transcript understands

325

1  that I am truly trying to get the defendant to explain why

2  the allegations are not correct, and I'm having to spend --

3        THE WITNESS:  I'm sorry, your Honor.

4        THE COURT:  -- I'm trying to spend as much time as

5  I can, and provide all of the courtesies I can to this

6  defendant, and trying to make sure she understands.

7        So now, Mr. -- and for this reason, I'm asking Mr.

8  Hays, are there any other concealments that you have alleged

9  that she can address?

10        MR. HAYS:  I don't recall specifically, but we

11  believe that by putting the lien in the name of another

12  party, she was concealing her true equity in the property,

13  and we are also alleging that she concealed that the money

14  was, in fact, owed to her, because she never disclosed it in

15  any of her 10 sets of schedules and amended schedules as

16  being an asset that she had.  We're also alleging that she

17  committed --

18        THE COURT:  Well, that's 727(a)(2)(A)?

19        MR. HAYS:  Concealment, yes.

20        THE COURT:  Okay.  You're saying that concealment

21  is concealment in her schedules that she was owed $275,000?

22        MR. HAYS:  Yes.

23        THE COURT:  Okay.

24        MR. HAYS:  And it's also a false oath.

25        THE COURT:  Do you understand what he's saying,

326

1 Ms. Gallian, that he is alleging that you concealed the fact

2 that you were owed $275,000?

3          THE WITNESS:  I believe that I disclosed the fact

4 that the loan --

5          THE COURT:  Well, you do, but it's not in your

6 schedule.

7          THE WITNESS:  I believe that it was on the July

8 9th one that disclosed that there was a UCC filing with the

9 number --

10          THE COURT:  That's not enough.

11          THE WITNESS:  That's not good enough?  Okay.

12          THE COURT:  No.  I want an explanation of why you

13 didn't conceal that.

14          THE WITNESS:  Why I didn't or I did?

15          THE COURT:  Why did you not conceal it?  Why

16 didn't -- you didn't -- are you telling me you didn't

17 conceal anything?

18          THE WITNESS:  The question -- I guess I'm

19 confused, or maybe I misunderstood your Honor.

20          THE COURT:  Maybe I misspoke.  Let me try it

21 again.

22          THE WITNESS:  Okay.  Yes, sir.

23          THE COURT:  He is saying you concealed the fact

24 that you were owed $275,000 under the documents that you've

25 given to the Bankruptcy Court and to the creditors and to

1  the Trustee.  He's saying that you concealed it.  Do you

2  have a response to that?  And, again, I apologize to the

3  reader of this transcript in having to deal with this

4  problem this way --

5  THE WITNESS:  I'm sorry.

6  THE COURT:  -- but I'm not going to get anywhere

7  for the next 24 hours by you just talking about history that

8  has nothing to do with this case.  So now, having again put

9  that onto the record, tell me -- he's telling you -- telling

10  me that you concealed assets, including 275,000.  Tell me

11  why you didn't.

12  THE WITNESS:  Okay.  I think the amount was

13  225,000, your Honor.

14  THE COURT:  Whatever it is.

15  THE WITNESS:  It's not 275.  Okay.

16  THE COURT:  Okay.  I'll give you the 225.

17  THE WITNESS:  I don't believe that I concealed

18  anything.  In fact --

19  THE COURT:  Okay.  All right.  Tell me why you

20  didn't conceal anything.

21  THE WITNESS:  I will.  In fact, it's probably why

22  I don't have an attorney, because, every time I interviewed

23  bankruptcy attorneys, they would go, "You're saying too

24  much.  You're saying too much.  Take all that stuff out of

25  there," and I'm like, "No.  I have nothing to hide."

328

1          THE COURT:  Well, fine.  Tell me why you didn't

2    conceal this.

3          THE WITNESS:  Because I filed a UCC.  That's

4    public, Secretary of State.

5          THE COURT:  Yes, and those documents indicate that

6    there are bogus people entitled to security interests.

7          THE WITNESS:  That was after the bankruptcy, your

8    Honor.

9          THE COURT:  Even worse.

10         THE WITNESS:  Well, I'm sorry.  I think that I

11   was --

12         THE COURT:  That's even worse.  Okay.  Now, I'm

13   going to have to do this.

14         One year prior.  What is your theory, Mr. Hays, on

15   the concealment or the transfers within one year?  I need to

16   understand that.

17         MR. HAYS:  Yes, your Honor.  The Ninth Circuit has

18   a case in which it said the circuit adopts what's called the

19   "continuing concealment doctrine."

20         THE COURT:  Yes, I know that.  It's In Re:

21   Lawson --

22         MR. HAYS:  Yes.

23         THE COURT:  -- at 122 Fed.3d 1237, at 1240, Ninth

24   Circuit, 1997.

25         MR. HAYS:  Yes.

329

1          THE COURT:  I understand that.

2          MR. HAYS:  I know you do.  I'm trying to speak

3   enough for the Debtor to be able to understand and then

4   respond.  By placing title in the name of an entity that

5   wasn't her, and that didn't pay for the property because she

6   gave it the money, that was concealing that she was the true

7   owner of the property.

8          Separately, she was concealing that the lien was

9   really payable to her, and why put a lien on the property to

10  begin with?  Because it's just trying to camouflage the fact

11  that the property is, in essence, owned free and clear.  She

12  paid cash for it.

13         THE COURT:  Stop right there.

14         Do you understand what the allegation is?

15         THE WITNESS:  Yes, I understand what the

16  allegation --

17         THE COURT:  Would you explain to me why it's --

18         THE WITNESS:  -- and I don't believe that's true.

19         THE COURT:  Tell me why not.

20         THE WITNESS:  Thank you.

21         THE COURT:  This is your chance.

22         THE WITNESS:  Okay.  I don't believe -- and I'm

23  not an attorney, but, in all of the stuff that I've read

24  is -- I don't believe that me putting a home in the name of

25  an LLC, and preparing a security agreement and a promissory

330

1  note, and depositing the money in their account, and filing

2  a public UCC filing back in 2019, when the -- I didn't have

3  any judgments, and the $3,070 one that was entered by Judge

4  Crandall was well under the amount of money that was paid to

5  me by -- I didn't feel like -- I didn't try to conceal

6  anything from anybody.

7         I have lived in the property since 2018.  I have

8  made payments every single month.  I've taken money out of

9  my 401(k).  I didn't have a job.  The point was originally,

10 when this promissory note, security agreement was done, was

11 to -- if I did get a renter and I was able to rent it,

12 because I wouldn't be able to get out of the Pinon Drive

13 three-year lease -- that it would force me to kind of --

14 that it was a mortgage, and that I was working very hard to

15 put the money back.  That's what I was trying to do, is save

16 money --

17        THE COURT:  Thank you.

18        THE WITNESS:  -- is just be responsible, and the

19 benefit of me doing that, of taking $175,000 and making a

20 note for 5.5-percent interest, is that that was my

21 retirement back.  I just spent all this money on this case,

22 and it never even was decided on the merits.

23        THE COURT:  Well, I have to apologize again to the

24 reader of this transcript, but I have to undertake the case

25 as I see it today with respect to the technique I'm going to

*Briggs Reporting Company, Inc.*

331

1  use.  They have to show that you intended to hinder, delay,

2  or defraud a creditor or officer of the estate.  Now, can

3  you rebut their allegation that you did intend to hinder,

4  delay, or defraud a creditor or officer of the estate?

5          THE WITNESS:  There is a case --

6          THE COURT:  I'm talking about facts.

7          THE WITNESS:  Right, right.  There was a case --

8  so you speak of the year mark, and I'm just so tired, your

9  Honor, but that's okay.

10          THE COURT:  You're doing fine.

11          THE WITNESS:  On 2/25, 2021, the house was put in

12 my name, because that's what Houser asked me to do.  We went

13 to a mandatory settlement conference, and they told the

14 judge, "We don't offer Lisa's, and it has to be the

15 homeowner that's living in there."

16          So I did the documents that you saw, and put the

17 home back in my name, and at 10:00 o'clock that night -- and

18 I've even sent Mr. Hays and the Trustee -- I applied for the

19 CARES Act -- or not CARES Act.  What is it when you're

20 low-income and you apply, when the utilities are now going

21 to be in your name?  Okay.  Well, whatever -- you get a

22 20-percent discount.  And I know that that's the date that I

23 signed that document because, at 10:00 o'clock that night, I

24 did the application, and I sent them a copy of it.  I also

25 have --

332

1          THE COURT:  Well, I'm asking you to rebut their

2 allegation that the transfers and concealments that you made

3 were intended to hinder, delay, or defraud a creditor or

4 officer of the estate.  I'm asking you to address

5 specifically their allegation, please.

6          THE WITNESS:  I didn't have a crystal ball.  I

7 wouldn't even have known they were coming.

8          THE COURT:  Okay.  I understand your response.

9 Anything else on that?

10          THE WITNESS:  (No response.)

11          THE COURT:  I'll take that as a no.

12          THE WITNESS:  That I just --

13          THE COURT:  The next item is 727(a)(4)(A), and

14 that is where a discharge shall be granted unless the Debtor

15 knowingly and fraudulently, or in connection with the case,

16 made a false oath or account, and they have to show that you

17 made a false oath in the course of a bankruptcy proceeding.

18          Now, I will tell you that in the case of <u>In Re:</u>

19 <u>Candelaria</u> (phonetic), which you'll find at 222 Bankruptcy

20 Lexis 41, at asterisk 21 -- and that's from the Bankruptcy

21 Court of the District of New Mexico, on January 7, 2022, and

22 they were citing, by the way, <u>In Re: Hayne</u>, H-A-Y-N-E, 2018,

23 Bankruptcy Lexis 1987, or you can also find it at Mr.

24 Blank's Westlaw at 2018 WL 3218104.  I'll say that one more

25 time, 18 Westlaw 3218108, at asterisk nine, at Bankruptcy

333

1   District, New Mexico -- that:

2           "A Debtor's petitions, schedules,

3           statement of financial affairs,

4           statements made at a 341(a) hearing,

5           testimony given at a Federal Rule of

6           Bankruptcy Procedure 2004 examination,

7           and answers to interrogatories all

8           constitute statements under oath for

9           purpose of 727(a)(4)(A).  The same holds

10          true for deposition testimony and

11          testimony at other hearings during the

12          course of the bankruptcy case.  The

13          false oath also need not be an

14          affirmative misstatement.  Knowing and

15          fraudulent admissions will also

16          suffice."

17          So, having said that, they're saying that you

18  knowingly and fraudulently, or in connection with this

19  bankruptcy case, made a false oath or account, and what

20  they're saying is that you started with your petition, and,

21  specifically, what your ownership was on J-Pad.  Is it

22  J-Pac?

23          MR. HAYS:  J-Pad.

24          THE COURT:  J-Pad.  And then it continued on for

25  numerous -- on numerous amounts, and they're saying that,

334

1  and they're saying that's a false oath.  And now I'm giving

2  you the opportunity to testimony why that isn't a false oath

3  that is made knowingly and fraudulently.

4          THE WITNESS:  I've given Mr. Hays a copy.  This is

5  the very first 341 meeting of creditors.

6          THE COURT:  Yes.

7          THE WITNESS:  It's a reporter's transcript.  May I

8  give --

9          THE COURT:  If you'd like.

10          THE WITNESS:  -- your copy --

11          THE COURT:  Well, does he have a copy?

12          THE WITNESS:  Yes, he does.

13          THE COURT:  I'd like a copy.

14          THE WITNESS:  And then have one for the clerk?

15          THE COURT:  You can give it to James.  And do you

16  still have a copy yourself?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  Good.  Thank you.  All right.  What

19  can I do with this?

20          THE WITNESS:  Grab it, here.  So this was the

21  first 341 meeting, and that question was asked to me.  Do

22  you want me to tell you the page?

23          THE COURT:  You have to tell me the page number.

24          THE WITNESS:  Okay.  Sure.

25          MR. HAYS:  And, your Honor, if you don't mind my

335

1 interruption, I don't know what it is she is referring to,

2 and whether she claims to have given it to me or not.  I

3 don't even know what document we're talking about.

4          THE COURT:  Did you give them a copy of the

5 transcript of the 341(a) meeting of creditors?

6          THE WITNESS:  I thought I gave you -- I'm sorry.

7 Didn't I hand you a bunch of documents?  I'm sorry.

8          MR. HAYS:  You're talking about these items?

9          THE WITNESS:  Yes, sir.

10          MR. HAYS:  And then if you could just say what it

11 is, so that I know which document to look at it.

12          THE WITNESS:  Yes.  It's the transcript of remote

13 audio-recorded 341 meeting of creditors, dated August 18th.

14          MR. HAYS:  Okay.

15          THE WITNESS:  Okay.

16          MR. HAYS:  Thank you, your Honor.  I now have that

17 document in front of me.

18          THE COURT:  What page number should I look at?

19          THE WITNESS:  So, when I filled out my

20 bankruptcy --

21          THE COURT:  What page number should I look at?

22          THE WITNESS:  Okay.  Page five, sir.

23          THE COURT:  All right.  I am looking at page five.

24          THE WITNESS:  Yes, sir.

25          THE COURT:  What line should I look at, starting?

*Briggs Reporting Company, Inc.*

1  On what line should I start?

2          THE WITNESS:  Okay.  Line 12, sir.

3          THE COURT:  Okay.

4          THE WITNESS:  And the Trustee is asking me if I

5  reviewed everything before I signed the petition, and I

6  said, "Yes, I did," and he asked me if I listed all of the

7  assets and "all of your liabilities."  I said:

8          "Yes, I did, and for the exception of

9          the new certificate of title that I

10          received a few days ago."

11          Question:

12          "Q   Are going to amend accordingly for

13          that?

14          A     Yes, sir."

15          I thought that he had asked me --

16          THE COURT:  Well, what do you want me to look at?

17          THE WITNESS:  Well, I thought the question was --

18          THE COURT:  Well, it wasn't.

19          THE WITNESS: Here it is.  Here it is.

20          THE COURT:  Okay.  What page number?

21          THE WITNESS:  Number six.

22          THE COURT:  Okay.

23          THE WITNESS:  He asked me, "Is" -- he said, "Other

24  than what you've said, you've listed all your assets and" --

25          THE COURT:  What line number?

337

1          THE WITNESS:  I'm sorry.  That was at the bottom

2  of page five, 24 and 25, and then he goes on, on page six,

3  and I said, "Yes, I did."  He says, "Everything is otherwise

4  true and correct?"  And I said, "Yes, sir," and he says, "No

5  other errors or omission?"  And I said:

6               "No, I don't believe so.  I've been

7               trying to study it and make sure it's

8               correct, and other than make amendments,

9               if I have to choose, in order to make

10              the right exemption code."

11         I thought he -- I guess he didn't ask the

12  question, because, in all the documents that I've been

13  reading from other people as -- I thought they've all said

14  that he asked me the question, "Did you sign all these under

15  penalty of perjury, and all they all correct?"  But he never

16  asked me, and I said that --

17         THE COURT:  Well, I'll say what you did say.  I'll

18  observe what you did say.

19         THE WITNESS:  Yes, sir.

20         THE COURT:  First of all, Mr. Hays, do you object

21  to having this transcript admitted into evidence?

22         MR. HAYS:  I do not, your Honor.

23         THE COURT:  Would you like to have this transcript

24  admitted into evidence?

25         THE WITNESS:  Yes, sir.

*Briggs Reporting Company, Inc.*

338

1          THE COURT:  Okay.  What is our next number?

2          THE CLERK:  49.

3          THE COURT:  This is Exhibit 49, and it is admitted

4  into evidence.

5          You were under oath when you made this.  Is that

6  correct?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  And so the first question he asked

9  was -- strike that.

10         The first interesting question that is relevant to

11 today is the question of "Did you review everything before

12 you signed the petition?"  That is page five, line 12.  And

13 your response is "Yes, I did."

14         THE WITNESS:  Wait.  Page five, sir?

15         THE COURT:  Page five.

16         THE WITNESS:  Line 12.

17         THE COURT:  Line 12 through 14.

18         THE WITNESS:  "And did you" -- "Yes, I did."

19         THE COURT:  "And did you review everything before

20 you signed the petition?"  Answer:  "Yes, I did."

21         THE WITNESS:  Yes.

22         THE COURT:  Then he asked, "And did you list all

23 of your assets and all of your liabilities?"  And you

24 answered, "Yes, I did, for the exception of the new

25 certificate of title that I received a few days ago."

339

1          Now, let's find out from Mr. Hays, what do you

2    think she left off her schedule at the beginning of this

3    case?

4          MR. HAYS:  A number of things, your Honor.

5          THE COURT:  Well, give me a list.

6          MR. HAYS:  And I think the most important one is

7    that she testified here today that she was the beneficiary

8    of the $225,000 promissory note, and that is not scheduled

9    as an asset in any of her original schedules and statements

10   or any of the 10 amendments to her schedules and statements.

11         THE COURT:  Do you have a reply to that, under

12   oath?

13         THE WITNESS:  Yes, and I hope that it answers the

14   question.  On July 9th, 2021, when I signed this document, I

15   had nothing except for a copy of the backside of the

16   certificate of title that said, "2/25, 2021," and I was so

17   concerned that if I signed this stating that I was the

18   registered owner, that it would be a lie, because I didn't

19   have anything in my possession.

20         THE COURT:  Can someone point me to the promissory

21   note that exists in the Debtor's favor for 225,000?  What

22   exhibit number is that?

23         THE WITNESS:  It's 1201, sir.

24         THE COURT:  Page 1201?

25         THE WITNESS:  Yes, Exhibit 40.

340

1          THE COURT:  All right.  One second.  Twelve, oh,

2   one is a security agreement.  I'm looking for the promissory

3   note.

4          THE WITNESS:  Pardon me, sir.  It's the next page

5   here, then.

6          MR. HAYS:  Twelve, twelve, your Honor.

7          THE COURT:  Say it again.

8          THE WITNESS:  Twelve, oh, five.

9          MR. HAYS:  Twelve, twelve.

10          THE WITNESS:  Twelve, twelve.  Okay.

11          THE COURT:  Twelve, twelve is a promissory note,

12   and it says:

13          "On or before 12/31, 2048, for value

14          received, the undersigned, J-Sandcastle

15          Company LLC, promises to pay to the

16          order of Jamie Lynn Gallian, the holder,

17          in the manner and place provided below,

18          the principal sum of $225,000."

19          THE WITNESS:  Correct, sir.

20          THE COURT:  And that was dated on November 16,

21   2018?

22          THE WITNESS:  That's correct.

23          THE COURT:  And did you put this obligation of

24   J-Sandcastle Company LLC to you into your original

25   bankruptcy schedule?

1          THE WITNESS:  No, I did not.

2          THE COURT:  When did you finally amend your

3  schedule to state that J-Sandcastle Company LLC placed -- or

4  owed you personally $225,000?

5          THE WITNESS:  I don't believe that it's ever in

6  there.

7          THE COURT:  Okay.

8          THE WITNESS:  I believe that it was --

9          THE COURT:  I understand.

10          THE WITNESS:  Okay.  May I just say one thing, is

11  that I guess I kept thinking that it was page 1220, and

12  you're right.  It does appear that there's two promissory

13  notes, but that was not my intent, sir, and that was not

14  what I --

15          THE COURT:  Well, you testified on this issue in

16  multiple ways, but let's move on, back to this 341(a)

17  hearing.

18          THE WITNESS:  Yes, sir.

19          THE COURT:  You said that you reviewed your

20  petition, and that you listed all of your assets and all of

21  your liabilities.  That's line 17 of page five of Exhibit

22  49.  Let me mark that down.  Forty-nine, right?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  And that wasn't true, correct?

25          THE WITNESS:  That is correct, sir, that it

342

1  wasn't --

2          THE COURT:  Thank you.

3          THE WITNESS:  I missed --

4          THE COURT:  And he again asked the question:

5          "And other than what you've said, you

6          listed all of your assets and

7          liabilities, correct?"

8          And you went on page six, line one, "Yes, I did."

9  And then he asked again, "Everything is otherwise true and

10  correct?"  And line three, "Yes, sir."  Four, "No other

11  errors or omissions?"  Five:

12          "No, I don't believe so.  I've been

13          trying to study it and make sure that

14          it's correct, other than to make

15          amendments if I have to choose the right

16          exemption code."

17          That's page six, lines five through seven.  Do you

18  have an explanation for your answer today?

19          THE WITNESS:  For not listing the security

20  agreement or the security promissory note, besides

21  ignorance?  No.

22          THE COURT:  Okay.  Now, we're still on

23  727(a)(4)(A), and we were asking Mr. Hays, are there any

24  other false oaths that you've alleged that perhaps we can

25  hear from the witness on an explanation?

343

1          MR. HAYS:  Yes, your Honor.  The Debtor did not

2    schedule the promissory note to herself, and if she were

3    believing that the promissory note was owed to J-Pad at the

4    time that she was filling out these schedules and

5    statements, she listed the value of J-Pad as zero, even

6    though J-Pad had a lien on unencumbered real property, and

7    she's testified here today that she believed herself to be

8    the 100-percent owner, notwithstanding all the other

9    documents filed with various different places, including

10   this Court.

11          THE COURT:  With respect to this alleged false

12   oath, do you have any response or explanation?

13          THE WITNESS:  The case that came to my head was

14   the Adeeb case.

15          THE COURT:  No.  I'm asking you for a factual

16   explanation.

17          THE WITNESS:  Right, and I just transferred the

18   home back to myself.  I was trying to be transparent, and

19   I'm not a lawyer.  I tried.

20          THE COURT:  Okay.  Do you have any other

21   explanation?

22          THE WITNESS:  That anybody I tried to hire just

23   kept saying I was disclosing too much.

24          THE COURT:  All right.  So you don't have any

25   further explanation?

344

1          THE WITNESS:  Just that I just -- this is a very

2   difficult law, and I tried to do my best.

3          THE COURT:  Okay.

4          THE WITNESS:  I tried to do my best.

5          THE COURT:  I hear you.  I hear you.

6          Mr. Hays, do you have any other examples?

7          THE WITNESS:  It was not intentional.

8          MR. HAYS:  Yes, your Honor.  In August of --

9          THE COURT:  And we're talking about examples of

10  false oath.

11         MR. HAYS:  And this is twofold.  It's both (a)(2)

12  and (a)(4).  But in August of 2020, the Debtor testified and

13  admitted here today that she added her sons as secured

14  parties.  She granted them a lien against the home in August

15  of 2020, August 28th of 2020, to be specific.  That is

16  within the one-year period prior to the bankruptcy case, and

17  that's a 727(a)(2) transfer, when she's further encumbering

18  property while there are these multiple judgments against

19  her, including what's now a $319,000 judgment entered in May

20  of 2019.

21         So she's transferring away property.  It's

22  basically all of her assets and property, is this house, and

23  that, moreover, that transfer was required to be disclosed

24  in the bankruptcy schedules and statements.  Specifically,

25  statement of financial affairs question eight requires that

345

1  a Debtor disclose any transfer of property on account of a

2  death, the benefit of an insider.

3         Our statement of financial affairs 18 requires the

4  disclosure of any transfer of property to anybody outside

5  the ordinary course of business within two years, and,

6  again, this transfer was not disclosed at all, and it was

7  never disclosed in her original schedules and statements or

8  any of the 10 sets of amended schedules and statements.  So

9  it's a transfer and a false oath.

10         THE COURT:  The Ninth Circuit case of <u>In Re: Retz</u>,

11  R-E-T-Z, at 606 Fed.3d 1189, at 1198.  That's Ninth Circuit,

12  2010, talks about:

13            "An omission or misstatement that

14            detrimentally affects administration of

15            the estate is material."

16         Mr. Hays, why would that be material, that you've

17  just described?

18         MR. HAYS:  Twofold, your Honor, because the

19  Trustee has to --

20         THE WITNESS:  Could you just slow down just a

21  little bit?  Excuse me, sir.  Could you just slow down just

22  a little bit?

23         MR. HAYS:  Sure.

24         THE WITNESS:  Thank you.

25         MR. HAYS:  The Trustee is armed with what are

346

1  called "strong-arm powers" under the Bankruptcy Code, and

2  one of the strong-arm powers is to avoid and recover certain

3  transfers of property by a Debtor.

4      There is an avoidance power called a "preference

5  action," where you avoid and recover a payment or transfer

6  made to an insider within one year.  These transfers were to

7  the Debtor's children, and she previously said that they

8  were -- that the security interest that first arose was in

9  January of 2019, but it wasn't perfected with HCD until

10  August 28 of 2020.  This arguably could be a preferential

11  transfer that the Trustee could try to pursue, and by

12  pursuing it, the Trustee would sue to avoid, recover,

13  preserve, which allows the Trustee to step into the shoes of

14  the insider and receive the money or property otherwise

15  payable to that transferee or, in this case, her two sons.

16      Separately, the Trustee has a different strong-arm

17  power to avoid and recover what are called "fraudulent

18  transfers."  There are two types of fraudulent transfers.

19  There is actual fraud, where the Debtor makes a transfer

20  with actual intent to hinder, delay, and defraud.  There is

21  also constructive fraudulent transfer, where the Debtor

22  makes a transfer for less than reasonable equivalent value

23  at a time while insolvent.

24      In this case, it would have been very beneficial

25  and material to the Trustee to know that there was this

347

1  transfer of lien on August 28 of 2020 that might have been

2  pursued as a preferential transfer or a fraudulent transfer,

3  but, by the Debtor not disclosing the existence of the

4  transfer at all, and by otherwise encumbering and concealing

5  the amount of money and equity in the property, the Trustee

6  has been prevented from being able to pursue claims, and

7  even if the Debtor's claim of exemption, which the

8  Bankruptcy Court has allowed -- even if that is ultimately

9  affirmed on appeal, if the Trustee can avoid, recover, and

10 preserve and step into the shoes of lien claimants on liens

11 that were voluntary transfers, those -- the Trustee inherits

12 those lien rights, and the Debtors can't claim an exemption

13 in those recovered funds.

14         So, even if the Debtor gets to keep the exemption

15 after the appeal, if the Trustee is able to avoid and

16 recover these liens and transfers, those funds get paid

17 before the homestead exemption gets paid, and that may be

18 the only dollars in this bankruptcy case that any creditor

19 ever sees, but the Debtor, through 11 sets of sworn

20 schedules and statements, omits reference to the transfers,

21 and completely omits reference to the promissory note, and

22 then, if you want to think the promissory note is in favor

23 of J-Pad, by valuing J-Pad as zero, the Trustee has no idea

24 what the facts and circumstances are with regard to this

25 Debtor's financial affairs and transactions.

348

1          THE COURT:  Well, what about ownership interest in

2    J-Pad?

3          MR. HAYS:  She disclosed that she was an owner of

4    J-Pad in the varying different amounts.  At first it was

5    one-third, then one-seventh, then 70 percent, and then,

6    eventually, 100 percent.  So she did schedule that she was

7    an owner of J-Pad.  She also, though, made transfers of her

8    interest in J-Pad through these various UCC filings and by

9    her testimony admitting she was intending to give gifts to

10   her children, which, in the depositions, she said was

11   $15,000 a year for three years to her two children.  She was

12   gifting her ownership in J-Pad.  She was also creating the

13   liens, and adding people as the lien holders, when she says

14   this was really hers all the time.

15          She's disposing of assets and concealing what are

16   really assets, and the Trustee also has other avoidance

17   powers that he can investigate and decide to pursue, or, if

18   the Trustee doesn't pursue it, a creditor can seek an order

19   granting derivative standing, and they can pursue it for the

20   benefit of creditors, but, at the end of the day, there is a

21   two-year statute of limitations to bring any of these

22   avoidance actions, and here we are in April of 2023, and

23   we're less than three months from that avoidance action

24   deadline, and the Debtor has still not corrected her

25   schedules and statements to fully and accurately list all of

349

 1  her transfers and all of her interests, so that the Trustee

 2  or a creditor can decide if they want to pursue an avoidance

 3  action.

 4           THE COURT:  In all of the -- and this is what I

 5  wanted to ask you, Ms. Gallian.  In all of your original

 6  schedules and the various at least 10 amendments to your

 7  schedules where you've made changes, would you reply to the

 8  question that I have, and explain why those changes are not

 9  material with respect to the oaths that you made that each

10  one of those changes were true, but have now been

11  demonstrated that they are not?

12           THE WITNESS:  A couple of different reasons.  I

13  was getting -- I think it was the Los Angeles County -- was

14  a lady -- said that you can amend, and the Trustee, also --

15  I think I have an e-mail -- has said you can amend the --

16  you can amend your schedules as many times to get it right.

17           THE COURT:  That's true.

18           THE WITNESS:  And I was trying to get it right,

19  and, you know, I thought it was --

20           THE COURT:  But you didn't even come close to

21  getting it right on the percentage of ownership of J-Pad

22  until the very last one.  You didn't even come close, and

23  here's my question to you.  What made you think you only

24  owned 33 and a third percent at one point, or 70 percent at

25  one time?

1          THE WITNESS:  Okay.

2          THE COURT:  What was the reasoning for that?

3          THE WITNESS:  When I first filed for bankruptcy --

4     I'm sorry, your Honor.  I haven't eaten since yesterday.

5     I've have one bottle of water.  And it's like, every time

6     you ask me a question, I can't remember what it is.  I'm

7     sorry.

8          THE COURT:  Well, we're in a trial right now --

9          THE WITNESS:  I'm sorry.

10         THE COURT:  -- and I want you to do your best.

11         THE WITNESS:  I know what I was going to say.

12    Okay.  So there was this gentleman -- and I'll bring you the

13    receipt tomorrow -- had said, "Please read the Adeeb case,"

14    and he said, "You transferred the property back," and he

15    goes, "You have no idea what you're doing," he said, "but

16    you've disclosed a ton of information," and that the -- as

17    Mr. Hays says, the certificate of title to perfect -- the

18    children were never -- it has never perfected anything.

19    They didn't want any involvement in it.

20         In fact, one of these documents in here has

21    whiteout all over it, and I think I did a statement of facts

22    that said, "Please disregard it.  I'm sorry there's whiteout

23    all over it, and please do not put it" -- I think it was a

24    document after we looked at some documents this morning,

25    where it said, "Steven Gallian and Brian Gallian with right

351

1  of survivorship."  That was never perfected.  They didn't

2  want anything to do with it, when this just kept going on

3  and on and on.

4          THE COURT:  Thank you.  During your deposition --

5          THE WITNESS:  Yes, sir.

6          THE COURT:  -- you falsely testified that you were

7  paying rent.

8          THE WITNESS:  I think I was misled on that,

9  because I was trying to ask -- or I was trying to explain

10 the whole purpose of when I bought the house, when I still

11 had that three-year lease hanging over to me, and for the

12 first month, I paid both.  I still had to pay the rent of

13 $3,400 a month, and I still made the payment of 2,787.55 to

14 Houser, and they did keep it for a while.

15         THE COURT:  Well, you've already admitted that you

16 falsely stated that you were paying rent in your testimony.

17         THE WITNESS:  I think I was making the comparison

18 of a person who lives in the house, and I think I was

19 comparing rent to the mortgage, that note that I had done

20 for the 5.5 percent.  Nothing has ever been paid.

21         THE COURT:  Okay.  Do you know what time it is

22 right now?

23         THE WITNESS:  It's 6:36, sir.

24         THE COURT:  Thank you.  So that's your explanation

25 for falsely testifying that you were paying rent in your

352

1  deposition.

2        Let me ask this question, Mr. Hays.  Was that

3  deposition taken in conjunction with the 727/523 action?

4        MR. HAYS:  Yes, your Honor, it was.

5        THE COURT:  Do you have any explanation, any

6  further explanation, other than you were misled or your

7  meant something else?

8        THE WITNESS:  No, no.  I think what I was trying

9  to explain to Mr. Hays was that I felt responsible to make

10 sure that all of these checks that were out there had money

11 in them, and so yes, it appeared to me -- I don't think it

12 was rent.  I'm the owner of the company.

13       THE COURT:  Yes, but you testified it was rent.

14       THE WITNESS:  I don't --

15       THE COURT:  So that's enough on that.

16       Mr. Hays, do you have any other examples of false

17 oath that you're alleging?

18       MR. HAYS:  Yes, your Honor.

19       THE COURT:  Please proceed.

20       MR. HAYS:  She testified in the deposition that

21 she was giving gifts to her children, but none of those

22 gifts were disclosed in the statement of financial affairs,

23 as required by paragraph 13, that requires disclosure of

24 gifts totaling more than $600 per person.

25       THE COURT:  So the question I have is, are you

1  alleging that she failed to -- she omitted these gifts on

2  her schedules, or that she prevaricated on her testimony

3  regarding whether these were gifts or not?

4            MR. HAYS:  She testified in the deposition that

5  they were gifts, and she was very specific about $15,000 a

6  year for three years with respect to her sons Steven and

7  Brian.

8            THE COURT:  I read that part of the deposition,

9  Mr. Hays.

10           MR. HAYS:  Yes, yes.

11           THE COURT:  That's true.

12           MR. HAYS:  And so that is an affirmative

13  statement.  She then equivocates a little bit today about

14  whether it was really a gift or not, but she did acknowledge

15  that the gifts were reflected in the minutes of the LLC, and

16  then she did acknowledge that documents were filed with the

17  Secretary of State that reflected the existence of them now

18  being owner of J-Pad or the lien held by J-Pad, and then

19  today she's in essence saying, "Well, there maybe never was

20  a gift."

21           So, somewhere along the line, there is a false

22  oath, but the fact that she, up until today, never denied

23  that this was a gift, it should have been listed in the

24  schedules and statements of financial affairs, as required

25  by paragraph 13, and she did not do so.  So, false oath.

354

1          THE COURT:  Let me ask you this Ms. Gallian.  If
2  you had the right today to amend your schedule, and you do,
3  would you list those as gifts?
4          THE WITNESS:  I didn't pay them anything.
5          THE COURT:  I didn't ask you that.
6          THE WITNESS:  I didn't --
7          THE COURT:  I did not ask you that, Ms. Gallian.
8          THE WITNESS:  Yes.
9          THE COURT:  I asked you this.
10          THE WITNESS:  Yes, sir.
11          THE COURT:  You have a right to amend your
12  schedules at any time before the filing of the -- the
13  closing of the bankruptcy case.  If you were to do that
14  today, would you disclose that you made gifts to the
15  children --
16          THE WITNESS:  Absolutely.
17          THE COURT:  -- and, specifically, what you
18  testified to in your deposition?
19          THE WITNESS:  Absolutely.  I would be honored to
20  do that.
21          THE COURT:  Well, it's not an honor.
22          THE WITNESS:  Well, it is to me.
23          THE COURT:  It just demonstrates which was the
24  prevarication.  Thank you.
25          THE WITNESS:  It does what?

355

1          THE COURT:  Do you know what a prevarication is?

2          THE WITNESS:  No.

3          THE COURT:  It's a polite word for "lie."

4          THE WITNESS:  Would you repeat what you're trying

5    to say?

6          THE COURT:  No.  I've done it, and I've gotten the

7    answer.

8          What other false oaths do you allege?

9          THE WITNESS:  I thought you were asking me if I

10   would amend my schedules.

11         THE COURT:  Yes.  I asked you, would you do it

12   today, so that you -- I'm not telling you to do it.  I'm

13   asking you, if you had the choice, would you say they're

14   gifts or not?

15         THE WITNESS:  I would have after 3/22, your Honor.

16         THE COURT:  But you never did.

17         THE WITNESS:  Because I didn't give them anything.

18         THE COURT:  Okay.  So now you're saying you didn't

19   give them gifts?

20         THE WITNESS:  I never said I did.

21         THE COURT:  Okay.  So you didn't give them any

22   gifts?

23         THE WITNESS:  Because I didn't put it on my tax

24   return, sir.

25         THE COURT:  Did you or did you not give your

356

1 children any gifts?

2          THE WITNESS:  They are grown men.

3          THE COURT:  I'm asking you again --

4          THE WITNESS:  They have million-dollar homes.

5          THE COURT:  I'm asking you again --

6          THE WITNESS:  They don't need anything from me.

7          THE COURT:  Calm down.  I'm asking you again, did

8 you or did you not give them any gifts?

9          THE WITNESS:  I did not give them anything.  They

10 didn't want anything.

11          THE COURT:  Let's use your words.  Did you give

12 them any gifts?

13          THE WITNESS:  No, sir.

14          THE COURT:  Thank you.

15          Now that you have an affirmative answer from her,

16 where is the false oath?

17          MR. HAYS:  It's in the deposition transcript,

18 where she testified the gifts did exist, and as further

19 evidenced by the minutes of the LLC in the Secretary of

20 State filings.

21          THE COURT:  Thank you.  Do you have any other

22 examples of false oath?

23          MR. HAYS:  I have several more, your Honor --

24          THE COURT:  Please continue.

25          MR. HAYS:  -- but the next major one is in her --

1  and this one we didn't cover with specificity, but, in her

2  schedules, she scheduled that she -- Schedule G for

3  unexpired leases -- she is affirmatively representing to the

4  Court and the Trustee that she has an unexpired ground lease

5  for Space 376.

6           She testified today and admitted today that no

7  ground lease was ever issued to her, and Mr. Houser took the

8  stand and said no ground lease was ever issued to her, and

9  the same answer applies to the LLCs.  They were not, also,

10 approved on a ground lease.  So she's falsely representing

11 that she has something that she does not have.

12          THE COURT:  And when did she falsely represent

13 that?

14          MR. HAYS:  In all of her petitions, schedules, and

15 statements, including the original.

16          THE COURT:  And how is that material?

17          MR. HAYS:  It's material because she's

18 representing to the Trustee that there's something there,

19 that she has some asset that the Trustee should be looking

20 at to decide, "Should I assume this?  Should I assign this?

21 Should I try to sell this?"  And she's wasting everybody's

22 time, including the Trustee's, by representing that she has

23 something that she does not have, under penalty of perjury.

24          THE COURT:  Do you have a response to that?

25          THE WITNESS:  Yes, I do.

1          THE COURT:  Please.

2          THE WITNESS:  That one, I absolutely do.

3          THE COURT:  I want to hear it.

4          THE WITNESS:  So the Huntington Beach Gables, in

5  their adversary, represent that the Gables is an airspace

6  condominium.  There is no way in this earth that that can be

7  an airspace condominium if the County Tax Assessor is

8  collecting taxes for the land and the building, and the

9  sublessor, the sublandlord, is collecting $9,000 a year on a

10 ground lease.

11          THE COURT:  Actually --

12          THE WITNESS:  It doesn't make sense.

13          THE COURT:  Actually, I've heard this argument

14 from you before, and I want to indicate that you're very

15 articulate at giving me that response.  I think that you

16 understand completely the situation.

17          THE WITNESS:  Can I just continue?

18          THE COURT:  I want you to, but I wanted to make a

19 record --

20          THE WITNESS:  Thank you.

21          THE COURT:  -- to make sure I understand that

22 you're doing well, and that you understand that you're doing

23 well.

24          THE WITNESS:  That one -- because I was floored.

25 So, when I looked up the final subdivision report, it refers

359

1  to the ground lease that's recorded on the land that I live

2  now, and the 771, where the Gables is -- and now it's my

3  exhibit title.  I'm starting to get a second wind, here.

4         THE COURT:  You're doing great.

5         THE WITNESS:  Okay.  So this would be -- it's a

6  colored picture of the entire property.  I just had it here.

7  Did I give you a picture, the big one of actual real time,

8  of the entire complex?  I've got it right here.  It's this

9  one right here (indicating), sir, Mr. Hays.  It's attached

10 to the notice of sale or transfer, the back page.

11        Your Honor, may I approach?

12        THE COURT:  All right.  I have the exhibit in

13 front of me.

14        THE WITNESS:  Yes, sir.  So it's the -- that will

15 give you a good idea of -- you were asking kind of what it

16 looks like.  There's kind of a good idea now of --

17        THE COURT:  I appreciate it.  Thank you.

18        THE WITNESS:  And there are 459 homes in that

19 community.

20        THE COURT:  Thank you.  Let's move on to your

21 point.

22        THE WITNESS:  Okay.  The question about the ground

23 lease.  Okay.

24        THE COURT:  Let's recap.  Mr. Hays claims that

25 you've committed false oath --

360

1          THE WITNESS:  Yes.

2          THE COURT:  -- saying that there was a ground

3  lease in your name.

4          THE WITNESS:  No, I did not say it was in my name.

5          THE COURT:  Hold on.  I'm saying what Mr. Hays

6  said.

7          THE WITNESS:  Yes.

8          THE COURT:  Is that true, Mr. Hays, that you said

9  that?

10          MR. HAYS:  Yes, your Honor.

11          THE COURT:  That is the false oath that he claims,

12  that you said that you had a ground lease in your name.

13  Now, tell me where he's wrong.

14          THE WITNESS:  Okay.

15          THE COURT:  I want to hear it.

16          THE WITNESS:  So the Lisa Ryan rental agreement,

17  or the listing agreement, said that I was buying the house

18  under Health and Safety Code 18551.  When I read 18551,

19  it's -- and I'm probably not using the right terms, but it

20  said that if there is an unexpired lease of more than 35

21  years, and that's what I believed was attached, and that was

22  where I was going when I asked Mr. Houser.  It's like, well,

23  the house is attached to the ground.  It clearly is -- you

24  know, mentioned it, even, the utilities.  It is real

25  property.  The lease, the unrecorded lease on that land, is

1   over 35 years.

2           THE COURT:  I appreciate that, but I need to

3   understand --

4           THE WITNESS:  Right.

5           THE COURT:  -- why Mr. Hays is wrong, that you

6   committed false oath by saying you had a ground lease.  Did

7   you or did you not say you had a ground lease?

8           THE WITNESS:  I said there was an unrecorded

9   ground lease --

10          THE COURT:  Didn't ask that.  Didn't ask that.

11          THE WITNESS:  -- and that I asked for the

12  unrecorded part, sir.

13          THE COURT:  I'm trying --

14          THE WITNESS:  Pardon me.

15          THE COURT:  Let's try it with Mr. Hays.  Mr. Hays,

16  did she ever claim to have a ground lease?

17          MR. HAYS:  Yes, your Honor.

18          THE COURT:  Where?

19          MR. HAYS:  Schedule G, which is Exhibit 28.

20          THE COURT:  I'm sorry?  Say that again.

21          MR. HAYS:  Schedule G, which is Exhibit 28.

22          THE COURT:  Page number?

23          MR. HAYS:  Five, three, four.

24          THE COURT:  Five, three, four?

25          MR. HAYS:  Yes.

362

1          THE COURT:  Volume --

2          MR. HAYS:  Two.

3          THE COURT:  Thank you.  Exhibit --

4          MR. HAYS:  28, the last exhibit in the binder,

5  page 534.

6          THE COURT:  Okay.  And what page?

7          MR. HAYS:  Five thirty-four.

8          THE COURT:  Five thirty-four.

9          So this is what he's alleging.

10         THE WITNESS:  Yes, sir.

11         THE COURT:  In your Docket Number One schedules,

12  executory contracts and expired leases, on page 534 of his

13  Exhibit 28, he says that you have an unexpired ground lease

14  pulled from Houser Brothers Company, dba Rancho del Rey

15  Mobile Home Estates.

16         Is that what you're saying?

17         MR. HAYS:  Yes.

18         THE COURT:  And you're saying you did have one.

19         THE WITNESS:  I'm saying that --

20         THE COURT:  Is that correct?  You're saying you

21  do --

22         THE WITNESS:  I paid it, your Honor.

23         THE COURT:  I'm sorry.  Do you --

24         THE WITNESS:  I paid the ground lease.

25         THE COURT:  I didn't ask you that.  Is there a

363

1  ground lease in your name with the Houser Brothers?

2       THE WITNESS:  I didn't have one even when it --

3       THE COURT:  It's a yes-or-no question.

4       THE WITNESS:  The answer is no.

5       THE COURT:  Okay.

6       THE WITNESS:  I have never had a ground lease.

7       THE COURT:  So you said you did have an unexpired

8  ground lease.

9       THE WITNESS:  I said there is an unexpired ground

10 lease.

11      THE COURT:  No, you said you have one.

12      THE WITNESS:  Well, okay.

13      THE COURT:  "List separately each person or

14 company with whom you have a lease."  I read paragraph two

15 of Official Form 106G, Schedule G, "Executory Contracts and

16 Unexpired Leases," and I'll read it one more time:

17           "List separately each person or company

18           with whom you have the contract or

19           lease."

20      THE WITNESS:  Okay.

21      THE COURT:  And it says that the Houser Brothers

22 have provided you with an unexpired ground lease.

23      THE WITNESS:  What page is that, sir?

24      THE COURT:  Page 534 of Exhibit 28.  It's your

25 very schedule, which I believe has not changed.

364

1          THE WITNESS:  You're looking --

2          THE COURT:  Has that ever changed?

3          MR. HAYS:  It appears in all of the subsequent

4    schedules.

5          THE COURT:  That's right.  It's never been

6    amended.

7          THE WITNESS:  Exhibit 28?

8          THE COURT:  Exhibit 28 of -- you're looking in

9    the -- those are your exhibits, I believe.

10         THE WITNESS:  Yes.

11         THE COURT:  You need to go to volume two.

12         THE WITNESS:  And this is July 9th.  Okay.

13         THE COURT:  Volume two, page --

14         THE WITNESS:  Yes, sir.

15         THE COURT:  Exhibit 28, page 534.

16         THE WITNESS:  Okay.

17         THE COURT:  That is your Docket Number One, filed

18   on 7/9/21, of the main case, and it is Schedule G,

19   "Executory Contracts and Unexpired Leases," and item number

20   2.4 says that you have an unexpired ground leasehold.

21         THE WITNESS:  Okay.  I'm looking at Exhibit 28,

22   page 534.

23         THE COURT:  Right.

24         THE WITNESS:  Okay.  And number one, "Do you have

25   any executory contracts or unexpired leases?"  And the box

365

1  is checked "No."

2          THE COURT:  And then go down to two.

3          THE WITNESS:  And then two:

4          "List separately each person or company

5          with whom you have the contract or

6          lease.  Then state what it's for."

7          THE COURT:  And then why -- if you had no leases

8  when you filled out "No," why did you put down Houser

9  Brothers Company's dba in 2.4?

10          THE WITNESS:  Because I believe that the unexpired

11  ground lease is relevant to parcel one and two --

12          THE COURT:  So either you --

13          THE WITNESS:  -- and I think it should be

14  disclosed.

15          THE COURT:  Either you made a false oath in

16  checking the box "No," and you should have checked "Yes," or

17  you checked "No," and then contradicted yourself by putting

18  in 2.4, and I'm trying to find out which one it is.

19          THE WITNESS:  I think I was just basically, sir,

20  honestly and forthright, disclosing that when I was given

21  the Lisa Ryan 1/1, 2006, assignment, and I signed it on

22  November 16th, that it references the master lease, this

23  lease, the unrecorded ground leasehold, and that's what I --

24          THE COURT:  Then why did you check "No"?

25          THE WITNESS:  Because I don't have one, but there

366

1  is a recorded ground lease still in place until 2059, and

2  that's what I believe.

3          THE COURT:  Okay.

4          THE WITNESS:  I mean, that's exactly what --

5          THE COURT:  I understand your argument completely.

6          THE WITNESS:  10542 Exeus (phonetic).

7          THE COURT:  Mr. Hays, do you have any other

8  examples of false oath?

9          MR. HAYS:  I'll just note, your Honor, that in the

10 subsequent amendments, in the 10 sets of subsequent

11 amendments, the box is checked "Yes" on all of the

12 subsequent ones.

13         THE COURT:  Give me a few examples of that.  For

14 instance, the most recent amendments that were made, I

15 believe, are this year.

16         MR. HAYS:  I don't think it was this year.  I

17 think it was March --

18         THE COURT:  Then 2022.

19         MR. HAYS:  Yes.  There was no amendment to

20 Schedule in March of 2020.  On that one, it was a separate

21 amendment in March 14 of 2022.

22         THE COURT:  Okay.

23         MR. HAYS:  So this is --

24         THE COURT:  Show me those.

25         MR. HAYS:  Yes.  This is the most recent amendment

367

1  to Schedule G.

2          THE COURT:  Help me.

3          MR. HAYS:  Yes.

4          THE COURT:  What exhibit?

5          MR. HAYS:  It is Exhibit 37.

6          THE WITNESS:  Can you tell me the book, please,

7  sir?

8          THE COURT:  37.

9          THE WITNESS:  The book, please, sir?

10         THE COURT:  In which trial book?

11         MR. HAYS:  The same book that we've been in, your

12 Honor, which is --

13         THE COURT:  Twenty-seven.

14         MR. HAYS:  -- three of six.

15         THE COURT:  Okay.  In 27 -- did you say Tab 27?

16         MR. HAYS:  37, your Honor.

17         THE COURT:  37.

18         THE WITNESS:  In what volume, sir?

19         THE COURT:  What binder?

20         MR. HAYS:  Three of six.

21         THE COURT:  So you want me to turn to 37?

22         MR. HAYS:  Yes.

23         THE COURT:  And that is Docket Number 72 in the

24 main document -- in the main case.

25         MR. HAYS:  Yes.

368

1        THE COURT:  And that is -- these are the amended

2   schedules, and where do you turn to that?

3        MR. HAYS:  Page 776.

4        THE COURT:  And if you turn to page 776, we now

5   see, Ms. Gallian, that you have now checked "Yes," and you

6   still list the Houser Brothers Company, dba Rancho del Rey

7   Mobile Home Estates, lease, property manager, Rancho del Rey

8   Mobile Home, Tract Number 10542, Units One, Two, Three, and

9   Four.

10       Is that the ground lease, Mr. Hays, that you're

11  referring to?

12       MR. HAYS:  Yes, your Honor.

13       THE COURT:  Okay.  Now, can you explain that -- if

14  you were correct in one, and you checked "No," why did you

15  amend your schedules to check "Yes"?

16       THE WITNESS:  Because I found the document that

17  was recorded on, I believe, 8/7, 1979, that references -- I

18  live in -- and this was why I printed this.  I live in

19  Section Four, and that subdivision, it was called

20  "Compliance with Subdivision Parcels One and Two, Tract

21  10542 of Unit One, Two, Three, and Four."  This is one, two,

22  three, four.

23       THE COURT:  Okay.

24       THE WITNESS:  Okay.  And so that's why I was very

25  specific, and I was really trying -- that's what I did with

369

1 these books last night.  I tried to memorize, and that's why

2 I put my own little tabs, and I wish I could show you the

3 document, and I believe that I filed it, but, interestingly

4 enough, it's the next page --

5          THE COURT:  So why is material --

6          THE WITNESS:  -- 777.

7          THE COURT:  Mr. Hays, why is it material that --

8 your allegation of false oath with respect to this executory

9 contract or unexpired lease?

10          MR. HAYS:  Because there is no executory contract

11 or unexpired lease in the Debtor's name with Houser

12 Brothers.

13          THE COURT:  Yes, but why is it material?

14          MR. HAYS:  It's material because it wastes the

15 creditors' and the Trustee's time to decide whether to

16 administer that asset, and there's a very short period of

17 time in the beginning of a bankruptcy case -- it's a 60-day

18 period -- within which the Trustee has to determine whether

19 to assume or assign an unexpired lease, and if it's not

20 assumed, or if the time is not extended, it's deemed

21 rejected.  And so it's a material fact with regard to an

22 asset that the Debtor is representing she has, and she

23 doesn't have it.

24          THE COURT:  And that is why it's material.

25          THE WITNESS:  May I draw your attention, sir, to

*Briggs Reporting Company, Inc.*

370

1  page 777?

2          THE COURT:  Yes.

3          THE WITNESS:  That is the legal description of the

4  property that I live on.

5          THE COURT:  Okay.

6          THE WITNESS:  Okay?  And what I don't believe is

7  being disclosed to the purchasers of the manufactured homes

8  is -- for the simple reason is the city of Huntington Beach

9  has a city ordinance where it's illegal.

10          THE COURT:  Why should I care?

11          THE WITNESS:  Because I care.  I was the

12  purchaser --

13          THE COURT:  Why should I care?

14          THE WITNESS:  -- and it was not disclosed to me.

15          THE COURT:  Excuse me.  With this case, why should

16  I care?  It's an honest answer -- or question.  I really

17  want to understand why I care.

18          THE WITNESS:  Because there is --

19          THE COURT:  Explain to me why it's important.

20          THE WITNESS:  -- one, two, three, four, four

21  people here, and in the next document --

22          THE COURT:  I don't understand.

23          THE WITNESS:  Okay.  The next document, sir, is

24  right here, is "Assignment of Assumption of a Ground Lease

25  and Condominium Subleases and Grant Deed."

371

1          THE COURT:  Yes, I understand that, and you've now

2  put it into your amended schedules, on March 11, 2022.  You

3  didn't disclose this earlier.  You said no in your original

4  petition, that you didn't have any ground lease.

5          THE WITNESS:  I don't have one personally.

6          THE COURT:  Yes, I understand.

7          THE WITNESS:  They won't give me one --

8          THE COURT:  But now --

9          THE WITNESS:  -- but the home is attached to the

10  ground.

11          THE COURT:  But now --

12          THE WITNESS:  How can you not issue one?

13          THE COURT:  But now you say you do.

14          THE WITNESS:  Because it makes sense.  When I

15  read -- I kept reading the documents.  How can you not give

16  somebody a lease for a home that's attached to the ground?

17          THE COURT:  Thank you very much.

18          Do you have any other allegations of false oath,

19  Mr. Hays?

20          MR. HAYS:  I don't think anything that we haven't

21  already covered, such as the various --

22          THE COURT:  Yes, but I'm trying to get her to

23  testify --

24          MR. HAYS:  I know.

25          THE COURT:  -- so that you don't get yourself

1 overturned and have to do this again.

2        MR. HAYS:  I understand, your Honor.  There's the

3 Mr. Buysman issue about the notarization, but I think we've

4 covered and I think she's testified to that already.

5        THE COURT:  Yes.

6        MR. HAYS:  Okay.  And there's the issue of how do

7 you have 11 sets of schedules and statements with all sorts

8 of varying information in it, when it evidences, at a

9 minimum, a reckless disregard for the truth?

10        THE COURT:  Explain that, please, to me, of why

11 you had so many amendments, please, and take your time on

12 this.

13        THE WITNESS:  Respectfully, I would have loved to

14 have called attorney Bert Briones, and I thought that the

15 Trustee was just over the moon when I finally got a

16 certified Bankruptcy Court -- or somebody to help me --

17        THE COURT:  Yes.

18        THE WITNESS:  -- until he had a 7:00 a.m. phone

19 call with Mr. Hays, and then calls me to come get my money.

20        THE COURT:  I'm trying to understand why you had

21 to amend your schedules over 10 times.

22        THE WITNESS:  Because I'm not an attorney, your

23 Honor.  I was trying to just give you everything, and not be

24 accused, "Well, you left that.  Well, you left this out.

25 Well, you left that out."

373

1          THE COURT:  That's how important --

2          THE WITNESS:  Maybe --

3          THE COURT:  That's how important it is.

4          THE WITNESS:  Maybe it isn't in the right place,

5    but the information is here.

6          THE COURT:  Okay.  Do you have any other excuse or

7    rationale?

8          THE WITNESS:  It's not an excuse.  It's the truth.

9          THE COURT:  Okay.  Do you have any other truth?

10         THE WITNESS:  May I ask just one question, just as

11   a hypothetical?  If I hadn't bought the manufactured home

12   park -- or manufactured home -- next door, on the same

13   property, on the same parcel of land, and I would have

14   stayed in my condo -- I had a recorded homestead

15   exemption -- or homeowners, you get your $70.  Okay?  Why

16   wasn't there any liens recorded?  Why wasn't there a lis

17   pendens recorded?  Why wasn't there any of that recorded?

18   Why?

19         THE COURT:  I have no idea.

20         THE WITNESS:  Exactly.

21         THE COURT:  No, I haven't thought about it.

22         THE WITNESS:  But I thought about it, and so did

23   Judge Crandall, and it's like, well --

24         THE COURT:  Well, how is that relevant to my

25   question?

374

1        THE WITNESS:  Because my exposure, I believe, to

2   any of this litigation -- and it's in the record, and I have

3   all the transcripts, and they're in this book -- was

4   $53,000.  I sold the home for 379,000.  Okay.  Why didn't

5   Judge Crandall just say to me, "You know what, Ms. Gallian?

6   Until this is all worked out, why don't you deposit

7   $53,000?"

8        But he didn't say that.  He said, "No."  He said,

9   "I hope plaintiff understands how distasteful the Court

10  finds the way you prosecuted this case," and it's almost

11  like, when the house was gifted to me, they saw an easy

12  mark, "Well, this is a good way.  We can make a clear

13  $379,000.  Let's sue her over something that happened back

14  in 2014, '15, '16, that she had nothing to do with."

15       THE COURT:  Thank you.

16       Mr. Hays, let's move to assist her testimony with

17  respect to 727(a)(5).

18       MR. HAYS:  May I respond to one thing she just

19  said --

20       THE COURT:  Yes.

21       MR. HAYS:  -- in terms of the relevance?

22       THE COURT:  Please do.

23       MR. HAYS:  She said why did she -- why did no

24  creditor do anything when she owned Alderport?  She sold

25  Alderport at the end of October of 2018.  The first adverse

375

1  judgment she suffered was several weeks later.  So there

2  would be no creditor that could try to record abstracts or

3  go after Alderport because, while the lawsuits were pending

4  since 2017, the judgments didn't start coming in until 2018,

5  and then the big judgment of 319,000 came in in May of 2019,

6  which was less than six months later.

7          Also, the Debtor testified on the original notice

8  of transfer signed by Lisa Ryan that her name was the

9  original name there on November the 1st, and then this is

10  really important, because the hearings on the motions for

11  attorney's fees were November 1st and November 8th in the

12  Superior Court, which she lost, and it led to the judgment

13  which was ultimately entered a couple weeks later, on

14  December 4th, but, important on that notice of transfer

15  form, her name was whited out at her request.

16          You know, Lisa Ryan did it at her request, and the

17  Court took pains this morning to get her to say, well, why

18  would she do that?  How would she know to put it in the name

19  of J-Sandcastle?  And then she had Lisa Ryan sign the

20  document again, and it was November 15 or November 16, by

21  which time she had already known she lost those hearings,

22  "And I'd better not put it in my name.  I'd better put it in

23  the name of this LLC, because I now have a $50,000 judgment

24  against me," and several months later, it was a $319,000

25  judgment.

376

1          So the timing here, I think, is very critical, and

2    the amendments to the release form are very critical, and to

3    respond to her, "Why didn't do anything before?," they

4    didn't have judgments, and she started making the transfers

5    at the time the judgments came in.

6          THE COURT:  In our process, which is admittedly

7    unusual, but seems to be the only way I can elicit

8    information under oath from the Debtor in a way that is

9    manageable, please respond to what Mr. Hays said, under

10   oath, so that I can appreciate your views on this and take

11   that evidence.

12         THE WITNESS:  Sure.  If you could -- I think your

13   Honor has this document here, "Notice of Sale or Transfer."

14   Okay.  And then on the second page is the homeowner's

15   property tax exemption, "When did you acquire this

16   property?"  "11/1, 2018."  "Date you occupied this property

17   as your principal residence?"  "11/1, 2018."  Do you own

18   another property that is or was your principal place of

19   residence?"  "Yes."  And I listed the property, the

20   Alderport property.

21         The point of me filling out this document was

22   because of this ground lease.  If it's a leasehold, I wanted

23   to transfer my tax based, because it was lower, and that's

24   what this whole thing was about, and I met with Claude

25   Parrish, the Orange County Tax Assessor, a very nice

377

1  gentleman.

2          He says, "Ms. Gallian, bring me the documents.  I

3  don't want it electronically.  I want it in paper form.  I

4  will look at this," he goes, "because you make a good

5  point."  He goes, "This is not APN77103.  These documents

6  were recorded on 178011."

7          What I started to tell your Honor was, the city of

8  Huntington Beach -- and I have the reporter's transcript

9  from 1979 -- it was illegal to record an airspace

10  condominium on leased land.  So that's why I believe it

11  never was -- it wasn't recorded over there, and that's why I

12  believe that the Huntington Beach Gables amended the CC and

13  Rs nine weeks, only nine weeks, after the first set was

14  recorded.  However, it was after the final subdivision

15  report.  That is illegal.  You cannot make a material change

16  to a public offering without going back to CalBRE.

17          THE COURT:  Thank you.

18          THE WITNESS:  And that's what this whole case is

19  about.

20          THE COURT:  Thank you.

21          Mr. Hays, anything else?

22          MR. HAYS:  Two more, your Honor, and I think I'll

23  be done pointing our very specific items.

24          THE COURT:  Again, this is a process that's

25  unusual --

378

1          MR. HAYS:  Yes.

2          THE COURT:  -- but I think that we're getting

3    answers from you, Ms. Gallian.  You're explaining yourself,

4    and it's in a way that we can listen to the allegation and

5    then have you specifically respond, so that we actually can

6    nail down what he's actually saying.  So it works.

7          THE WITNESS:  Okay.

8          THE COURT:  Okay.

9          THE WITNESS:  And then I just wanted to -- the

10   last comment I wanted to make, if I could, please?

11         THE COURT:  Sure.

12         THE WITNESS:  I'm trying to find it here in --

13   this is the very first 341 meeting, when Mr. Hays was

14   questioning me --

15         THE COURT:  Yes.

16         THE WITNESS:  -- and he was questioning me about

17   why I thought I had a ground lease or should have been given

18   a ground lease to the Ryan property, and I said that --

19         THE COURT:  Well, you've got to give me page

20   numbers.

21         THE WITNESS:  Yes.  I'm trying to find it, here.

22   It's when -- it doesn't say -- it says, "Mr. Hays."

23         THE COURT:  Well, what page number?

24         THE WITNESS:  Okay.  So I'm starting on page

25   seven.  I wanted to see if he's the first one that

379

1  questioned me.  Yes.  He starts questioning on page seven.

2  What he asked me was about that ground lease.

3              THE COURT:  Are you talking about the page of the

4  transcript or the page of the document that you've given me?

5              THE WITNESS:  Well, I'm looking at here where it

6  says, "Ten, eleven, twelve, thirteen," because they've got

7  four pages on one.

8              THE COURT:  Yes.  So which page number?

9              THE WITNESS:  Okay.  God.  Where is it?

10             THE COURT:  It's up on the right-hand corner of

11 the each of the quadrants.

12             THE WITNESS:  Right.  Here it is.  So I'm

13 starting --

14             THE COURT:  What page number?

15             THE WITNESS:  -- page number 11.

16             THE COURT:  Thank you.

17             THE WITNESS:  Okay.  He says, "Do you" -- he says

18 on line 19 on page 11, "And do you have any contracts or

19 ground lease that permits you to live in Space 376?"  And I

20 said, "It's under litigation.  So I believe that I do.  I've

21 lived on the property since 2009."  "So which contracts or

22 leases do you have that believe you (sic) support your right

23 to be in Space 376?"  And I said:

24             "Well, I have the original ground lease

25             that was recorded back in 1980, and on

380

1           the left-hand corner of that ground

2           lease, it had the APN17801101, and is

3           written on the contract from 40 years

4           ago, and that is exactly where my home

5           sits.  I believe that it was the same

6           property."

7           Then Mr. Hays:

8           "But how is it that you have rights

9           under this 1980 contract when you

10          weren't living there in 1980?  Can you

11          explain that?"

12          I said:

13          "Well, the home in Gables, right across

14          the street, is a ground leasehold.  I

15          read the contract and believed that when

16          I purchased the home, after I sold the

17          home to Mr. Nickel, when I went across

18          the street after I turned 55."

19          I believed that it was the same contract because

20  it had the same APN number as the contract that they were

21  trying to make me believe that went to the Gables.

22          THE COURT:  Thank you.

23          THE WITNESS:  And that's not --

24          THE COURT:  I appreciate that, looking at --

25          THE WITNESS:  That's not the APN --

381

```
 1          THE COURT:  Would you --
 2          THE WITNESS:  -- and he's telling me I'm a liar,
 3  and he's got the document.
 4          THE COURT:  Excuse me.  Would you look on page
 5  11 --
 6          THE WITNESS:  Yes, sir.
 7          THE COURT:  -- just above where you started?  And
 8  I think it was Mr. -- it is Mr. Golden.
 9          THE WITNESS:  Page 11, sir?
10          THE COURT:  Page 11, line seven:
11          "Q    Okay.  Why did you put title in
12          the name of J-Sandcastle?
13          A     I don't recall.  That was three
14          years ago.  I don't recall."
15          THE WITNESS:  Wait.  I'm sorry.  Can you point to
16  the page number, sir?
17          THE COURT:  Page 11 --
18          THE WITNESS:  Yes.
19          THE COURT:  -- line six and line seven.
20          THE WITNESS:  Line seven.
21          THE COURT:  Why don't you read it.  Why don't you
22  read it, line seven, "Q."
23          THE WITNESS:  Okay.
24          THE COURT:  Read it out loud.
25          THE WITNESS:  Okay.  Wait one second.  There's
```

382

1  not -- okay.  Wait a second, because I think I do remember

2  this.

3          THE COURT:  Well, I just want you to read it out

4  loud.

5          THE WITNESS:  (No response.)

6          THE COURT:  Would you read it out loud for me,

7  please?

8          THE WITNESS:  Yes, sir.  Okay.  "Once you send

9  paperwork to" --

10          THE COURT:  No, no.

11          THE WITNESS:  Page 11?

12          THE COURT:  Page 11, line seven, "Q," "Okay."

13          THE WITNESS:  I'm not sure what you're asking me

14  to do.

15          THE COURT:  I want you to read --

16          THE WITNESS:  Line seven?

17          THE COURT:  -- line seven.

18          THE WITNESS:  Okay:

19          "Q   Why did you put title in the name

20          of J-Sandcastle?

21          A    I don't recall.  That was three

22          years ago.  I don't recall."

23          THE COURT:  Thank you.  Is that what your response

24  was to his question of "Why did you put title in the name of

25  J-Sandcastle?," "I don't recall"?

**Briggs Reporting Company, Inc.**

383

1          THE WITNESS:  (No response.)

2          THE COURT:  Thank you.

3          Mr. Hays, please proceed.

4          MR. HAYS:  Yes, your Honor.  We believe that the

5   Debtor, in scheduling the value of the property at 235,000

6   in the various schedules and statements -- and that number

7   has been consistent -- and in the motions to avoid lien in

8   January of 2023, is a false oath, and that the Debtor knows

9   that the property is worth substantially more, and, for

10  example, if the Trustee were to avoid and recover the

11  $225,000 lien, and step into the shoes of J-Pad as lien

12  holder, and turn around and sell the property for 225,000 to

13  realize the benefit of that lien position, I can guarantee

14  that the Debtor would be opposing that sale as being

15  insufficient, because any excess proceeds could be paid to

16  her on account of the homestead if she wins the appeal.  So

17  we believe that to be a false oath.

18          THE COURT:  Thank you.  Anything else?

19          MR. HAYS:  Lastly --

20          THE COURT:  Well, hold on.

21          Would you like to respond --

22          MR. HAYS:  I'm sorry.

23          THE COURT:  -- to what he just said?

24          THE WITNESS:  I can't even -- he just was

25  speaking, it seemed to me, a little bit fast, and I was

384

1  trying to keep up.

2          THE COURT:  You were reading another document,

3  actually.

4          Would you please repeat it?

5          MR. HAYS:  Yes.  And, your Honor, if it's easier,

6  I can just ask her a simple question.

7          THE COURT:  Ask the question.

8                        CROSS EXAMINATION

9  BY MR. HAYS:

10 Q    If the Trustee were to sell the house for $225,000,

11 would you believe that to be market value, or would you

12 oppose it because any amount in excess of that could be paid

13 to you on account of your homestead?

14 A    Well, the question is, again, like you asked me

15 earlier, what is the value of the box?

16         THE COURT:  I never asked you that question.

17         THE WITNESS:  When I was sitting right here, you

18 asked me, "What do you think the value is today?"

19         THE COURT:  I'm sorry.  You keep talking about a

20 box.

21         THE WITNESS:  Well, it's because that's the way --

22         THE COURT:  It's a mobile home.

23         THE WITNESS:  Yes.  Well, but that's the way they

24 refer to it.

25         THE COURT:  So is that what you're talking about,

1  a mobile home?

2           THE WITNESS:  Yes.

3           THE COURT:  Okay.

4           THE WITNESS:  Because they're --

5           THE COURT:  What's the point, though?

6           MR. HAYS:  The point, your Honor --

7           THE COURT:  First of all, no, I don't think I'll

8  let you ask her questions.

9           MR. HAYS:  Okay.

10          THE WITNESS:  Well --

11          THE COURT:  We're not going to do that.  You're

12 going to respond to --

13          THE WITNESS:  Yes.

14          THE COURT:  And so repeat your question.

15          THE WITNESS:  Thank you.  I know what the question

16 is, and I have the -- I got the listing of all of the homes

17 that it sold in that park, and that was the average of all

18 of the homes for 24 months.  That was the average.

19          THE COURT:  Thank you.

20          MR. HAYS:  Your Honor, I'd like to ask if the

21 Court would inquire of her, if the Trustee were to sell for

22 225,000, would she oppose that?

23          THE COURT:  I'm not going to ask that question.

24          MR. HAYS:  Okay.  And this is the last issue I'll

25 raise, and I don't recall raising it before, but it's back

386

1  to (a)(2), transfer, and I know we touched on it briefly.

2          THE COURT:  Mr. Hays, all I'm trying to do is

3  assist her --

4          MR. HAYS:  I understand.

5          THE COURT:  -- in testifying on her own behalf,

6  and if we can ask her questions or make comments that assist

7  her in giving us explanations, so I can then decide this

8  case, I welcome it, but this is not discovery time.

9          MR. HAYS:  I understand, your Honor.

10          THE COURT:  So tell me and I'll ask.  Any further

11  allegations with regard to false oath?

12          MR. HAYS:  Not to false oath, but one more on

13  (a)(2), because I don't think I covered it earlier.

14          THE COURT:  Well, then, cover it now, quickly.

15          MR. HAYS:  Post-petition, in September of 2021,

16  the Debtor made multiple transfers by granting her other

17  son, Justin, and her granddaughter, Emma, and Mr. Pierpont

18  and Mr. McLelland, liens against the home, and so, two

19  months post-petition, the Debtor was --

20          THE COURT:  Post-petition?

21          MR. HAYS:  Post-petition, two months --

22          THE COURT:  Okay.  Now, how does that affect under

23  727(a)(2)(A)?

24          MR. HAYS:  The time period relevant under

25  727(a)(2)(A) is a transfer of property within one year prior

*Briggs Reporting Company, Inc.*

387

1    to bankruptcy or after the bankruptcy, during the

2    bankruptcy, and here, two months post-petition, the Debtor

3    is making transfers of property.

4            THE COURT:  It doesn't say that.  727(a)(2)(A)

5    says, "Within one year before the date of the filing of the

6    petition."

7            MR. HAYS:  Let me bring it up, your Honor.

8    727(a)(4)(B).

9            THE COURT:  (a)(2)(B)?

10           MR. HAYS:  Yes.

11           THE COURT:  Well, are you suing her under

12   (a)(2)(B)?

13           MR. HAYS:  I believe that the evidence in front of

14   the Court --

15           THE COURT:  I didn't ask you that.

16           MR. HAYS:  I don't have the complaint in front of

17   me.

18           THE COURT:  Well, I do.

19           MR. HAYS:  I can pull it up quickly.

20           THE COURT:  Okay.  Pull it up quickly, and look at

21   the pre-trial.  That's the thing you should look at, the

22   pre-trial, because that's where you canceled the complaint

23   and moved into the issue of what we're really going to do

24   here at this trial.  Here it is, the pre-trial stipulation.

25   In the pre-trial stipulation, "First claim for relief" --

388

1  I'm sorry.  That's 523.  Pardon me.  Yes, third claim for

2  relief, 727(a)(2)(A).  You don't have a 727(a)(2)(B) cause

3  of action.

4           MR. HAYS:  Your Honor, I believe that, under the

5  federal rules --

6           THE COURT:  Yes.  You can amend if you have good

7  reason.  You can file a motion.

8           MR. HAYS:  To conform to the evidence that was

9  presented and admitted.

10          THE COURT:  I know what the federal rule says.

11          MR. HAYS:  Okay.  And so the evidence was

12 presented and admitted, and came out that these transfers

13 were post-petition.

14          THE COURT:  Yes.  You knew it at all -- I knew it

15 at all times, that you were alleging post-petition

16 transfers.  Remember I said to her, "That's even worse"?

17          MR. HAYS:  Yes.

18          THE COURT:  Yes.

19          MR. HAYS:  So my point is, I think the evidence is

20 in the record of a post-petition transfer.

21          THE COURT:  Well, explain what you think the

22 post-petition transfer is, and she's going to get to explain

23 it --

24          MR. HAYS:  I understand.

25          THE COURT:  -- because I know she has an

389

1  explanation, because I've heard it.

2          MR. HAYS:  The post-petition transfer was adding

3  her son, Justin, her granddaughter, Emma, Mr. McLelland, and

4  her ex-spouse, Mr. Pierpont, as lien holders on the

5  property, and she did that by exercising her powers to

6  control J-Pad, and those powers were powers of the

7  bankruptcy estate, and she was doing it -- she did not have

8  those powers, and could not exercise them solely for someone

9  other than her.  So, under Section 541(b)(1), that meant

10 those powers belonged to the estate, and she was exercising

11 those powers, and making transfers of estate property

12 post-petition.

13         THE COURT:  And under 727(a)(2)(B), what authority

14 do I have to deny a discharge?

15         MR. HAYS:  If a transfer was made of property

16 after the bankruptcy with intent to hinder, delay, and

17 defraud.

18         THE COURT:  Okay.  He is saying that the evidence

19 that is before the Court justifies adding a 727(a)(4)(B)

20 cause of action to deny a discharge because of post-petition

21 activities, and specifically that you added your children to

22 the security interest, I believe.

23         Is that right?

24         MR. HAYS:  Yes.

25         THE WITNESS:  And I believe that your Honor had

*Briggs Reporting Company, Inc.*

390

1  asked me -- not today, when I first met you -- about a

2  manager-managed, that they don't have any voting or powers,

3  because I'm the manager-managed, something like that.

4            THE COURT:  I don't recall any of that, but tell

5  me.

6            THE WITNESS:  Yes.  But, anyway, the only lien

7  that's perfected on the property, on the certificate of

8  title, is the one that was recorded on 1/14, 2019.

9            THE COURT:  Right.

10           THE WITNESS:  I can't control, and, believe me, I

11 tried, those 9/12, 2021 -- clearly, it says on the name who

12 did those, and it seems like I need to take responsibility

13 for that.

14           THE COURT:  So your explanation is that none of it

15 was recorded?

16           THE WITNESS:  It's not perfected --

17           THE COURT:  Yes --

18           THE WITNESS:  -- on the certificate of --

19           THE COURT:  -- but you perfect by recording.  Am I

20 wrong about that?

21           THE WITNESS:  The certificate of title has to be

22 perfected in order for anything --

23           THE COURT:  You have to record it.  Am I wrong

24 about that?  How do you perfect a certificate of title?

25 Let's ask it that way.

391

1          THE WITNESS:  It has to be with the HCD.

2          THE COURT:  So, Mr. Hays?

3          MR. HAYS:  There was an attempted transfer, and

4  just because the transfer was ineffective, because it's

5  recorded and filed, the UCC3 amendment, doesn't mean that

6  the transfer didn't take place, as evidenced by the Debtor's

7  admission that it was in the minutes of the LLC, and so,

8  just because the parties did not accomplish the transfer,

9  technically, it would be an unperfected transfer, which a

10 Trustee could avoid if any of this had been disclosed or,

11 you know, communicated.

12         THE COURT:  Well, she did it after the filing of

13 the petition.

14         MR. HAYS:  But she still should have disclosed

15 that this had been done --

16         THE COURT:  I agree.

17         MR. HAYS:  -- and if it had been disclosed, the

18 Trustee could have pursued the avoidance of the unperfected

19 lien, or taken the position that it was a violation of the

20 automatic stay, although Debtor-initiated actions are

21 generally not treated as violations of the automatic stay.

22 But, again, this was a situation that just because somebody

23 attempted to but did not succeed in perfecting a

24 post-petition lien doesn't mean that the transfer did not

25 take place to begin with, in an ineffectual way.

392

1          THE COURT:  Okay.  File a motion on paper to amend

2  your pre-trial to add this, and I'll consider it.

3          MR. HAYS:  Thank you, your Honor.

4          THE COURT:  But I also will significantly consider

5  your explanation.

6          THE WITNESS:  I just think that if -- so another

7  hypothetical.  What if there was no legal owner on the HCD?

8  Then the Bankruptcy Court -- or the bankruptcy Trustee --

9  would have stepped into the shoes, under 544.  I think it's

10 544.  I'm not sure.  But it seems to me that he told me that

11 if there was no legal owner, then he steps in, and he is the

12 legal owner.  Is that correct, your Honor?

13         THE COURT:  I don't answer questions like that.

14         THE WITNESS:  I'm sorry.  Okay.

15         THE COURT:  I stopped giving --

16         THE WITNESS:  So we're talking about --

17         THE COURT:  I stopped giving legal advice --

18         THE WITNESS:  No, no, no.

19         THE COURT:  -- 14 years ago.

20         THE WITNESS:  I apologize.  I apologize.

21         THE COURT:  That's okay.

22         THE WITNESS:  Okay.  So I understand that on 1/14,

23 2019, a perfected lien appears on the HCD certificate of

24 title, from 2019.  That's when it was filed.  At the time

25 that I filed the UCC, I didn't know you had to perfect it on

393

1  the HCD.  I thought the Uniform Commercial Code was it.

2        Okay.  Then I started reading more, and that was

3  my mistake, to perfect -- or, let's see.  What did they call

4  it?  Yes, I guess it's "perfect a lien."  And my lien is

5  perfected.  It is a property security agreement.  It is a

6  proper promissory note.  I transferred the money to

7  J-Sandcastle's bank account.  Whether it's -- whether it --

8  and I have the document in my computer.  I didn't know that

9  the homestead exemption was going to change in 2021, back in

10 2018.  I had no idea.

11        THE COURT:  Thank you.  Let's move to 727(a)(5):

12        "Discharge shall be granted unless the

13        Debtor has failed to explain

14        satisfactorily, before determination or

15        denial of discharge under this

16        paragraph, any loss of assets or

17        deficiency of assets to meet the

18        Debtor's liabilities."

19        The plaintiff has suggested in the pre-trial order

20 and complaint that you failed to explain satisfactorily,

21 before determining -- explained satisfactorily the loss of

22 assets or deficiency of assets to meet your Debtor's

23 liabilities.

24        So the first question is, Mr. Hays, what is your

25 allegation, specifically, with respect to this?

394

1           MR. HAYS:  The Debtor received $379,000 from Mr.
2   Nickel for the sale of Alderport.  She testified that she
3   bought the property on Space 376 for 185,000, but that
4   20,000 of that, that cashier's check for 20,000, came back
5   to her.  So her next price was really 165.  That leaves
6   $214,000.  The Debtor is required under penalty of perjury
7   in her statement of financial affairs to disclose payments
8   to attorneys.  She disclosed 113,000 in her schedules.  She
9   testified today that there was maybe another 7,000 paid to a
10  separate attorney.  That's about $120,000.

11          That leaves $94,000 unaccounted for from the sale,
12  and the Court has asked the Debtor, and she has agreed, to
13  come back tomorrow and to provide the additional detail,
14  including the amounts paid to Mr. Blank, for other attorneys
15  that got the money, and she may find (sic), and it may
16  answer the question about where the rest of the money went,
17  but, at this point, she's failed to explain it, and under
18  penalty of perjury, the disclosures of 113,000 to the
19  lawyers she did list does not full account for the money.

20          THE COURT:  Is that it?

21          MR. HAYS:  Yes.

22          THE COURT:  Now, the code says:

23          "The discharge shall be granted unless

24          the Debtor has failed to explain

25          satisfactorily before determination of

1                denial of discharge under this

2                paragraph."

3            Okay?  And that's why I said tomorrow you're going

4    to bring me the full explanation, because I haven't

5    determined anything yet with respect to denial of discharge,

6    and this is one of those saving clauses that gives a Debtor

7    the right to fully explain what's happening, and I recall

8    you had some medical treatment done.

9                THE WITNESS:  Yes, your Honor.

10               THE COURT:  I want you -- do you need two days to

11   put all this together, instead of tomorrow?

12               THE WITNESS:  Today is --

13               THE COURT:  Today is Wednesday.  Do you need until

14   Friday at 5:00 o'clock?  You should have brought it today,

15   but you didn't, and I'm going to give you another two days.

16               THE WITNESS:  Okay.  Well, I know where the money

17   went to --

18               THE COURT:  Well, I don't, you see --

19               THE WITNESS:  -- I mean, but I will accept your

20   offer.

21               THE COURT:  -- and you could have hidden it, for

22   all I know.  I don't know.  You could have hidden it.  I

23   don't know.  You could have done -- but you haven't

24   explained it.  You see, you have a duty to explain --

25               THE WITNESS:  Yes.

1          THE COURT:  -- where it went, and I'm just

2    saying --

3          THE WITNESS:  Yes.

4          THE COURT:  -- would you please, by Friday at 5:00

5    p.m., do two things?  File a complete accounting with the

6    Court, and serve it on Mr. Hays, and I will look at it,

7    because now I know exactly what Mr. Hays has alleged under

8    727(a)(5).

9          THE WITNESS:  May I ask a question, sir?

10          THE COURT:  Wait, now.

11          THE WITNESS:  I'm sorry.

12          THE COURT:  I need to understand whether you are

13    going to do what I've asked you to do, and if not, we'll

14    forget it.  So are you going to do it or not?

15          THE WITNESS:  Well --

16          THE COURT:  It's a yes-or-no question.  Are you

17    going to do this?

18          THE WITNESS:  Yes.

19          THE COURT:  Okay.  Good.  Now, you're going to do

20    it by Friday, this Friday at 5:00 p.m., before 5:00 p.m.

21    You're going to file a sworn declaration of what you did

22    with that total money that Mr. Hays has already described,

23    and you're going to make sure he gets a copy of it.  I'll

24    read it.  He'll read it.  If I have any questions, then

25    that's good, and I'll ask you.  If I don't have any

397

1  questions about it, then I'll make the determination under

2  727(a)(5) of whether you can or can't explain satisfactorily

3  where that money went.  Okay?

4          THE WITNESS:  I don't want to waste the Court's

5  time, your Honor, if number four is already decided.

6          THE COURT:  No, don't do it that way.  Don't do it

7  that way.  Don't give up.  Keep fighting.  Please don't do

8  that.  You keep fighting on everything.  Don't give up.

9          THE WITNESS:  I agree.

10          THE COURT:  Everybody gets their day in court.

11          THE WITNESS:  It's just --

12          THE COURT:  You're getting yours, for sure.

13          THE WITNESS:  It's just, you know what?  I am not

14  a trained person that makes up the story and puts all the

15  papers in order.  That's why it's --

16          THE COURT:  I will tell you that you've done a

17  good job.

18          THE WITNESS:  Seven hundred fifty-six pages is not

19  the 46 documents that you got.

20          THE COURT:  I'm telling you that you've done a

21  good job.

22          THE WITNESS:  No, I haven't.

23          THE COURT:  Yes, you have.  And, in fact, I have

24  gone through all of these documents that he's provided us,

25  and I've gone page by page, I've gone through this.  That's

398

1 how much I invest in making sure everybody gets a fair shake

2 in my court.  And so the fact is that I really do want you

3 to, by Friday at 5:00 o'clock, give me an accounting of that

4 money --

5          THE WITNESS:  May I ask --

6          THE COURT:  -- before the determination of the

7 discharge --

8          THE WITNESS:  Correct.

9          THE COURT:  -- because I'm not going to determine

10 anything right now.

11          THE WITNESS:  May I ask a question?

12          THE COURT:  Yes, ma'am.

13          THE WITNESS:  It would be just -- if you decide --

14 and this is not whether any way (sic).  Do I have to go

15 through this two more times?

16          THE COURT:  What do you mean, "two more times"?

17          THE WITNESS:  Well, I was told, of course by an

18 attorney, that if this case is decided in my favor, that

19 Jasso, Ms. Jasso, and the Huntington Beach Gables gets to do

20 it all over again.

21          THE COURT:  Yes, that's true.  Everybody has a 523

22 action.  Let me explain this to you.

23          THE WITNESS:  But may I ask a last second part?

24          THE COURT:  Okay.  No, no, no, no.

25          THE WITNESS:  Okay.

399

1          THE COURT:  You're not going to -- you don't learn
2   anything by talking.

3          THE WITNESS:  Right.

4          THE COURT:  Okay.  You don't learn anything by
5   talking.  Let me explain the difference.  If anybody is
6   successful under any of the actions under 727, then nobody
7   cares about anything else, because all of your discharge is
8   gone.  Okay?

9          THE WITNESS:  Can you say that again, sir?

10         THE COURT:  Yes.  If anyone prevails on an action
11  under 727, which is what we've done today --

12         THE WITNESS:  "Prevails."  You mean opposing me,
13  if they prevail?

14         THE COURT:  -- then nobody cares.  Nobody cares at
15  all about anything else --

16         THE WITNESS:  Right.

17         THE COURT:  -- and the reason is because you've
18  lost your discharge completely.

19         THE WITNESS:  Right.

20         THE COURT:  Okay.  Who cares?  If you prevail
21  here, we go to another set of trials, and that is the 523
22  actions that are still pending --

23         THE WITNESS:  Right.

24         THE COURT:  -- and we do another set of trial with
25  respect to 523.  But I'm telling you right now, nothing has

400

1  been decided, and I'm the only person that decides, until

2  somebody wants to appeal me, but the appealing is

3  interesting because there's a thing called a "standard of

4  review" --

5          THE WITNESS:  Yes.

6          THE COURT:  -- and I have to make a very good

7  attempt at listening to all of the facts, and listening to

8  everybody's point of view, and then to weigh the evidence,

9  and all I've done right now is listen to all the evidence.

10 I have not weighed the evidence yet.  That's why I'm telling

11 you, don't give up.

12         THE WITNESS:  May I ask one --

13         THE COURT:  I have not weighed the evidence.  I

14 have listened, and I have worked hard to get your side of

15 the story in without having 10 days --

16         THE WITNESS:  You know, you've been extremely

17 accommodating.

18         THE COURT:  Don't interrupt me.  Don't interrupt

19 me.

20         THE WITNESS:  Pardon me.

21         THE COURT:  I'm helping you here.

22         THE WITNESS:  Yes, sir.

23         THE COURT:  I listen to all the evidence, and I'm

24 still continuing to listen to all the evidence, but you

25 asked me a question --

401

1          THE WITNESS:  Yes, I did.

2          THE COURT:  -- and I think I know your question.

3   Do you have to do this again?  If you prevail on these three

4   causes of action, they will still be back for their action

5   under 523.  Now, there are other parties who have, I

6   believe, sued you under 523.

7          Am I right about that?

8          MR. HAYS:  And 727.

9          THE COURT:  And 727.  So we'll be back, unless you

10  don't prevail, and if you don't prevail on this, then nobody

11  will care, because you've lost your discharge.  You can't

12  lose it twice, and they won't spend any more of their money,

13  and you won't spend any of your time and money, and it will

14  be resolved.

15         There's another option, and I noticed this in the

16  2003 stipulated judgment in your mother's estate.

17         THE WITNESS:  Yes, sir.

18         THE COURT:  I noticed something in that pleading.

19         THE WITNESS:  I didn't even know about it.

20         THE COURT:  Well, it was there.

21         THE WITNESS:  I was so young.

22         THE COURT:  Some lawyers put it together.  Mr.

23  Bank put it together on your behalf, and what he said in

24  that pleading was that you don't admit anything.  You deny

25  it all, and don't admit anything.  You said that.

402

1          THE WITNESS:  Excuse me?

2          THE COURT:  You said that in your --

3          THE WITNESS:  He wrote that, that I said that?

4          THE COURT:  Well, you signed it.  You said, "I

5  don't admit anything.  I'm just not going to put up with

6  this anymore, this litigation," and you gave that -- you

7  gave the determination of discharge, of nondischargeability,

8  to the estate.

9          MR. HAYS:  American Indemnity.

10          THE COURT:  American Indemnity.  And you said,

11  "I'm not going to admit anything," and that's okay.  "I

12  don't admit anything.  I'm just going to give up, because

13  this is not worth it, getting all of this nonsense, and my

14  discharge is not worth it."  You have a right --

15          THE WITNESS:  Did I get a discharge?

16          THE COURT:  What?

17          THE WITNESS:  Did I get a discharge?  I didn't get

18  a discharge?

19          THE COURT:  You didn't get a -- you got a

20  discharge against everybody but American Indemnity.

21          THE WITNESS:  Okay.

22          THE COURT:  Yes.  You got rid of all your debts in

23  2003, except for the one -- and they I don't think cared

24  about you.  They never tried to collect against you, did

25  they?

403

1          THE WITNESS:  I paid the whole thing, your

2   Honor --

3          THE COURT:  You paid the whole thing out of the

4   estate?

5          THE WITNESS:  -- and it wasn't even my debt.  It

6   was my sister's --

7          THE COURT:  Out of the --

8          THE WITNESS:  -- because I was the only one in

9   California.

10          THE COURT:  That's right.  And so that's why they

11   sued you in Bankruptcy Court.  Okay.  So what you did

12   was -- and Mr. Blank -- said, "Okay.  I'm going to pay it,

13   but I don't admit to anything."

14          THE WITNESS:  Because I didn't take the money.  My

15   sister did.

16          THE COURT:  Okay.  Well, that's why you said --

17          THE WITNESS:  It's those little postcards.

18          THE COURT:  -- "I don't admit to it."

19          THE WITNESS:  Yes.  It was those little postcards

20   you get after somebody dies and people want to loan you

21   money.

22          THE COURT:  Do you know that you can do that here

23   today?

24          THE WITNESS:  That I can do what?

25          THE COURT:  Say, "I don't admit to anything" --

*Briggs Reporting Company, Inc.*

404

```
1           THE WITNESS:  No.
2           THE COURT:  -- and get rid of -- you didn't know
3  that you could do that, and just say --
4           THE WITNESS:  No, I did not.
5           THE COURT:  -- "I don't care about the discharge"?
6           Explain the waiver of discharge.
7           MR. HAYS:  Your Honor, under Bankruptcy Code
8  Section 727(a)(10):
9           "The Debtor shall receive a discharge
10          unless the Court approves a written
11          waiver of discharge executed by the
12          Debtor after the order for relief."
13          Which, in English, means after the bankruptcy case
14 was filed.
15          THE COURT:  Right.
16          THE WITNESS:  What does that mean?
17          THE COURT:  Explain what it means.
18          MR. HAYS:  It means that if the Debtor doesn't
19 care about trying to get the discharge anymore, she can sign
20 a piece of paper that says, "Okay.  Fine.  I agree, no
21 discharge," and the Court can approve that, as long as the
22 agreement was entered into and signed after the bankruptcy
23 was filed.
24          THE COURT:  And if that gets entered, what happens
25 to all the other litigation?
```

405

1          MR. HAYS:  All of the other litigation becomes
2  moot, including my client's 523 action, which was bifurcated
3  and would be tried separately, and the other adversary
4  proceedings, including the 727 and 523 claims raised by the
5  Gables and by Janine Jasso.  So all of the litigation goes
6  away.
7          THE COURT:  Just wanted to let you know.  I don't
8  think any lawyer ever told you that, did they?
9          THE WITNESS:  (No response.)
10         THE COURT:  You have gone through all of this
11 hell, and you could have been doing what else you want to
12 do.
13         THE WITNESS:  I guess I don't understand.
14         THE COURT:  Well, it's hard.  Bankruptcy law --
15         THE WITNESS:  I will go home and read it.
16         THE COURT:  Listen.  Bankruptcy law is very hard,
17 and we have young lawyers who don't appreciate it.  I see
18 lawyers who just don't even read the Bankruptcy Code.  They
19 haven't read it in their first five to ten years of their
20 practice, and they fake it until they make it, they think,
21 but it's just stunning to me that I've seen bankruptcy
22 lawyers not read the Federal Rules of Evidence, the Federal
23 Rules of Civil Procedure, the Bankruptcy Code.  It's
24 stunning to me that they don't take the time to be good
25 lawyers.

1          So I completely understand your situation, where
2   it's hard.  It's hard enough for those who are trying, and
3   when the attorneys don't try, it's even worse for them, and
4   apparently no sense of embarrassment ever bothers them.
5   I've just never understood that.  But then, when a pro se
6   litigant comes in, like yourself, that's one of the hardest
7   things for bankruptcy judges to do, because we have to be
8   sensitive to your lack of information, but we still have to
9   engage in the process.

10          So, to answer your question, yes, you can say --
11  there are two questions.  One is, if you lose in the 727
12  case, all the other litigation is gone, because you've lost
13  your discharge.  If you give up --

14          THE WITNESS:  But what does that mean to me, if I
15  lose my discharge?

16          THE COURT:  Well, it means that anyone you owe
17  money to can still try to collect it.

18          THE WITNESS:  But aren't I in the same --

19          THE COURT:  The word is "try."

20          THE WITNESS:  Aren't I in the same position I
21  started three years ago?

22          THE COURT:  Yes.  That's exactly right.  It is,
23  except that it's all -- all of the judgments -- anything
24  else?  Is all the state litigation over?

25          MR. HAYS:  With respect to the Gables and the HOA,

407

 1  I believe is the case, but my client still has its case

 2  ongoing.

 3          THE COURT:  This case?

 4          MR. HAYS:  My client's underlying money judgment,

 5  its efforts to get a money judgment and the Debtor evicted

 6  for trespassing on the property.

 7          THE COURT:  Right.  Well, that's going to be

 8  determined by a state court, right?

 9          MR. HAYS:  Yes.  You were just saying, is all the

10  state court litigation over?

11          THE COURT:  Okay.  So there's more litigation.  So

12  the answer is, to answer your question directly, if you do

13  not prevail in this case, you will continue -- you will not

14  continue in anything but their state court matter, but

15  everything is over.  But, if you prevail in this, you'll

16  still continue on with another 727 action and a series of

17  523 actions, and we'll be seeing each other for a long time.

18          THE WITNESS:  And how long will I be in -- never

19  mind.  I can't ask you the question --

20          THE COURT:  No, that's okay.

21          THE WITNESS:  -- but how long before I can file

22  another bankruptcy?

23          THE COURT:  Well, when did you file your -- well,

24  first of all, any claims that are determined to be

25  nondischargeable now will forever be nondischargeable.  It

408

1  doesn't matter.  You can't re-file in eight years.  The

2  answer is eight years from the first day you filed your

3  bankruptcy, but it doesn't matter, because, once a

4  determination is made that it's nondischargeable, it's

5  nondischargeable forever.

6            THE WITNESS:  Okay.

7            THE COURT:  Okay.

8            THE WITNESS:  And in their unsecured money

9  judgments --

10           THE COURT:  And that will last for the first -- I

11 think it's 20 years in California.

12           MR. HAYS:  Ten years under state law, but could be

13 renewed for 10 more.

14           THE COURT:  Ten years, and then it gets renewed,

15 so at least 20 years or more.

16           THE WITNESS:  And I see so many people's files

17 that have these huge judgments, and, like, people don't

18 care.  Well, I care.

19           THE COURT:  Well, no, you should care.  But,

20 anyway, I answered your question.

21           THE WITNESS:  Because I didn't feel like I

22 deserved it.  It wasn't my property.

23           THE COURT:  Okay.  So this all started by me

24 asking you, can you, by Friday at 5:00 o'clock, file an

25 explanation that's satisfactory, that explains what happened

*Briggs Reporting Company, Inc.*

409

1 to all the money that Mr. Hays has described?

2          THE WITNESS:  Yes, sir.

3          THE COURT:  Okay.  If you do that, I'll certainly

4 look at it, and I'll look at it before I make any

5 determination, and if you succeed in explaining to my

6 satisfaction, not Mr. Hays', mine, where this money went,

7 then you prevail on this section, 727(a)(5).

8          THE WITNESS:  But then the next person comes, the

9 next person in line.

10          THE COURT:  You still have 727(a)(4) and 727(a)(2)

11 to deal with, but that's the system that --

12          THE WITNESS:  I understand.

13          THE COURT:  -- you're involved in right now.

14          THE WITNESS:  So I have one last question for your

15 Honor --

16          THE COURT:  Yes.

17          THE WITNESS:  -- and I believe it was November

18 18th that there was an order issued -- entered by Judge

19 Smith between the Trustee and myself, and it was an

20 agreement.  I extended the time for him to be able to file,

21 if I'm saying this right, 727 claims.

22          THE COURT:  I'm not sure what it said.  It could

23 possibly do that.

24          THE WITNESS:  Yes.  He asked me if I would give

25 him more time.

410

1          THE COURT:  Yes.  And did you give him more time?

2          THE WITNESS:  Yes, I did --

3          THE COURT:  Until when?

4          THE WITNESS:  -- and it expired.

5          THE COURT:  Has it expired?

6          THE WITNESS:  Yes.

7          THE COURT:  Well, then, he can't sue you.

8          THE WITNESS:  Well, so I guess, why does everybody

9  keep bringing up "Well, the Trustee can do this, this, this,

10  and this and this," if the time is up?

11          THE COURT:  No, I think what they're saying is had

12  the Trustee been given adequate information.  That's what

13  they're saying.

14          THE WITNESS:  Well, wouldn't that be something the

15  Trustee would bring up?

16          THE COURT:  Well, he's bringing it up.

17          THE WITNESS:  I see.  Okay.

18          THE COURT:  You know, anybody can bring it up.

19          THE WITNESS:  So he can bring it up.  Okay.

20          THE COURT:  You know, and that goes to what we're

21  calling "material" and "adversely affecting the estate," the

22  administration of the estate.

23          THE WITNESS:  Right.

24          THE COURT:  And so that's what Mr. Hays has been

25  discussing.  All right.

411

1          THE WITNESS:  And if you've ever seen anybody

2   provide as much documents, and nobody has ever said, "Well,

3   she didn't provide this," it's just --

4          THE COURT:  I don't know what you're talking

5   about.

6          THE WITNESS:  Well, all of these documents came

7   from me.

8          THE COURT:  Yes.  So you had them.

9          THE WITNESS:  No.  I gave them.

10         THE COURT:  Yes.  You had them, and you gave them.

11         THE WITNESS:  Yes.

12         THE COURT:  Yes.

13         THE WITNESS:  But it appears to me that the

14  documents are -- everything is up for interpretation.

15         THE COURT:  Well, and that's what I do, but I

16  haven't made any interpretation yet.  You need to fully

17  understand again that I have not made any decisions on this.

18         THE WITNESS:  You were quite angry with me today.

19         THE COURT:  I beg your pardon?

20         THE WITNESS:  You were pretty angry with me today.

21         THE COURT:  Pretty what?

22         THE WITNESS:  Pretty angry.

23         THE COURT:  I'm not angry at anybody.

24         THE WITNESS:  I know you're not, but -- yes.

25         THE COURT:  You know, I'm frustrated sometimes --

412

1          THE WITNESS:  I mean, you're tired.

2          THE COURT:  -- that when I -- here's my

3    frustration.

4          THE WITNESS:  And it's a pro per.  I'd be

5    frustrated with me.

6          THE COURT:  No, no.  Here's my frustration.  My

7    job is to do the fact finding, and when I can't get all of

8    the facts and all of the explanations in, it makes my job

9    harder --

10         THE WITNESS:  Because I don't know how to answer

11   the question.

12         THE COURT:  -- because I want to be right.  I want

13   to be as close to right as I get in making determinations.

14         THE WITNESS:  I understand.

15         THE COURT:  And so what's frustrating is when

16   people -- not you, but when people, they go, "Maybe," and I

17   go, "Well, that doesn't help me," or they go, "Well, I'm not

18   sure," or "I don't recall," or "I changed my mind," and it

19   drives me nuts, because I hear this all the time, and all I

20   do is attempt to encourage people to tell me -- remember

21   when you swore --

22         THE WITNESS:  The truth.

23         THE COURT:  -- the truth, the whole truth, and

24   nothing but the truth?  Those are three different things.

25         THE WITNESS:  And --

413

1          THE COURT:  And so I have never been angry at you.

2          THE WITNESS:  It happens.

3          THE COURT:  I only admire you.  I think that

4    you've done a good job here.  You've gotten the exhibits.

5    You understand the case.  And so don't think I've made --

6          THE WITNESS:  I just don't understand what the

7    point is.  It's like -- pardon me for --

8          THE COURT:  You do interrupt a lot.

9          THE WITNESS:  You know what?  It's because I'm so

10   tired.

11         THE COURT:  Well, I'm tired, too.

12         THE WITNESS:  And I appreciate that, and I'm so

13   sorry, but I guess the part that is just really upsetting to

14   me is that all of this money spent, time, and I know that

15   you all went to school to do this as your profession, but it

16   just seems like we're upside down.

17         THE COURT:  Well, here's what I'm going to do.  Do

18   you have -- each of you gets 10 minutes for closing

19   statements, if you want to take it.  Do you want to take 10

20   more minutes just to discuss the entire case right now?

21         THE WITNESS:  (No response.)

22         THE COURT:  Well, let me ask you this.  Do you

23   close your case?

24         THE WITNESS:  No.

25         THE COURT:  Then continue talking.  We're going to

414

1  be here for as long as you want to talk.

2          THE WITNESS:  My gosh.  I thought we were coming

3  back Friday.

4          THE COURT:  No, we're not.  We're finished.  I've

5  done my best to try to solicit from you evidence that I can

6  utilize to determine whether or not Mr. Hays' client

7  succeeds or you succeed, and I've been trying and trying and

8  trying, and I wanted to give you all the time in the world,

9  but you never even, in the first 15 minutes, said one thing

10  that was relevant to our case today, and that's why I had to

11  change our modus operandi to move into a solicitation of

12  questions on the specific issues that are in front of the

13  Court today, and that's what I undertook.

14          Do you have anything else to explain from Mr.

15  Hays' client's allegations?  I'm going to give you about 30

16  seconds to tell me if you do or not.

17          THE WITNESS:  No, your Honor.

18          THE COURT:  All right.  I'm going to close your

19  case.

20          This is what we're going to do.  Write all of this

21  down, folks.  As I've said before, Friday at 5:00 o'clock,

22  the Debtor shall or shall not -- it's her choice -- deliver

23  to the Court, in a filed declaration, an explanation of the

24  funds that Mr. Hays has already described, and she is to

25  serve Mr. Hays with that on that date and time.

415

1        Both Mr. Hays and Ms. Gallian may submit written

2   closing briefs, and you have two weeks to do it, on the

3   specific issues under 727(a)(2)(A), (a)(2)(B) -- and you

4   must make that motion, Mr. Hays -- 727(a)(4), and 727(a)(5).

5        Let me give you an exact date by which you will

6   submit your closing statements in writing.  That will be May

7   10 at 5:00 p.m.

8        Mr. Hays, I suggest that you list everything that

9   we have discussed about your allegations, and why they fit

10  into the various sections of 527(a)(2) (sic) and (b), and

11  (a)(4), and (a)(5), that you make a laundry list.

12       You, Ms. Gallian, need to make a laundry list of

13  why the allegations that we have now discussed don't fit

14  into those particular code sections, and I will take

15  everything else under submission.

16       Is there anything else I can help you with today?

17       (The witness was excused.)

18       MR. HAYS:  Nothing further today.  Thank you, your

19  Honor.

20       THE COURT:  Ms. Gallian?

21       MS. GALLIAN:  No, your Honor.  I appreciate your

22  time today.

23       THE COURT:  No.  Thank you very much.

24       The case is now closed, except for briefing and

25  supplemental documentation on the 727(a)(5) matter.  Thank

416

1    you for coming.

2           MR. HAYS:  Thank you, your Honor.

3           THE COURT:  Court is adjourned.

4        (Proceedings concluded.)

5

6           I certify that the foregoing is a correct

7    transcript from the electronic sound recording of the

8    proceedings in the above-entitled matter.

9    /s/ Holly Steinhauer          5-3-23
     Transcriber                   Date
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*