1   D. EDWARD HAYS, #162507
    ehays@marshackhays.com
2   LAILA MASUD, #311731
    lmasud@marshackhays.com
3   BRADFORD N. BARNHARDT, #328705
    bbarnhardt@marshackhays.com
4   MARSHACK HAYS LLP
    870 Roosevelt
5   Irvine, CA 92620
    Telephone: (949) 333-7777
6   Facsimile: (949) 333-7778

7   Attorneys for Plaintiff,
    HOUSER BROS. CO. dba RANCHO DEL
8   REY MOBILE HOME ESTATES

9                UNITED STATES BANKRUPTCY COURT

10       CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

11  In re                                  Case No. 8:21-bk-11710-SC

12  JAMIE LYNN GALLIAN,                    Chapter 7

13       Debtor.                           Adv. No. 8:21-ap-01097-SC

14  _____       NOTICE OF COMPENDIUM OF
                                           UNPUBLISHED AUTHORITY RE:
15  HOUSER BROS. CO. dba RANCHO DEL REY
    MOBILE HOME ESTATES,                   PLAINTIFF'S POST-TRIAL CLOSING
16                                         BRIEF
         Plaintiff,
17                                         **Trial Held:**
    v.                                     Date:   April 26, 2023
18                                         Time:   9:30 a.m.
                                           Ctrm:   5C
19  JAMIE LYNN GALLIAN,                    Location: 411 W. Fourth Street, Santa Ana,
                                           CA 92701
20       Defendant.
    _____
21

22  TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE,

23  DEFENDANT JAMIE LYNN GALLIAN, AND ALL INTERESTED PARTIES:

24       Plaintiff, HOUSER BROS. CO., a California limited partnership dba RANCHO DEL REY

25  MOBILE HOME ESTATES ("Houser Bros." or "Plaintiff"), in accordance with Local Bankruptcy

26  Rule 9013-2(b)(4), attaches copies of the following unpublished decisions cited in *Plaintiff's Post-*

27  *Trial Closing Brief* ("Brief"). Plaintiff's Brief was filed on May 10, 2023.

28

                                           1

**Unpublished Cases**

1. *In re Adri*, 2022 Bankr.LEXIS 1727, at *18 (Bankr. C.D. Cal. June 9, 2022)

2. *In re Miller*, 2015 Bankr.LEXIS 1929, at *6.

3. *JP Morgan Chase Bank, N.A. v. Ellison (In re Ellison)*, 2016 Bankr.LEXIS 3475, at *24 (Bankr. C.D. Cal. Sept. 23, 2016)

4. *Ravasia v. U.S. Tr. (In re Ravasia)*, 2021 Bankr.LEXIS 1033, at *18 (B.A.P. 9th Cir. Apr. 16, 2021)

5. *Schoenmann v. Chen (In re Chen)*, 2009 Bankr.LEXIS 3636, at *14 (Bankr. N.D. Cal. Nov. 9, 2009)

6. *Miller v. Wylie (In re Wylie)*, 21-04012-tjt, ECF No. 124 at 8 (Bankr. E.D. Mich. Apr. 17, 2023

DATED: May 10, 2023          MARSHACK HAYS LLP

                                       /s/ D. Edward Hays
                             By:_____
                                    D. EDWARD HAYS
                                    LAILA MASUD
                                    BRADFORD N. BARNHARDT
                                    Attorneys for Plaintiff,
                                    HOUSER BROS. CO. dba RANCHO DEL
                                    REY MOBILE HOME ESTATES

NOTICE OF COMPENDIUM OF UNPUBLISHED AUTHORITY
4886-1591-1427,v.1

**EXHIBIT 1**



**User Name:** Layla Buchanan

**Date and Time:** Wednesday, May 10, 2023 2:59:00PM PDT

**Job Number:** 196842689

## Document (1)

1. *In re Adri, 2022 Bankr. LEXIS 1727*

   **Client/Matter:** 1673-001

   **Search Terms:** 2022 Bankr.LEXIS 1727

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |

LexisNexis | About LexisNexis | Privacy Policy | Terms & Conditions | Copyright © 2023 LexisNexis

EXHIBIT 1, PAGE 3

Ⓐ Neutral

As of: May 10, 2023 9:59 PM Z

# *In re Adri*

United States Bankruptcy Court for the Central District of California, San Fernando Valley Division

June 9, 2022, Decided

Case No.: 1:18-bk-10417-VK, Chapter 7, Adv. Proc. No.: 1:19-ap-01072-VK

**Reporter**
2022 Bankr. LEXIS 1727 *; 2022 WL 2161085

In re: DEBORAH LOIS ADRI, Debtor.MOSHE ADRI, Plaintiff, vs. DEBORAH LOIS ADRI, Defendant.

## Core Terms

transferred, funds, bank account, schedules, disclose, personal account, false oath, personal expenses, client trust account, checking account, distributions, fraudulently, knowingly, financial affairs, bank statement, appoint, status conference, prepetition, concealed, defraud, website, hinder

## Case Summary

### Overview

HOLDINGS: [1]-The debtor's receipt of a discharge was denied pursuant to *11 U.S.C.S. § 727(a)(2)(A)-(B)* because, in order to conceal from her creditors that funds remained her property and property of the estate, the debtor had $100,000 of the Trust Distribution transferred to the corporation's bank account, did not disclose the existence of her accounts at the bank in her Original Schedule and misrepresented and concealed her actual use of that significant portion of the Trust Distribution, with intent to hinder, delay or defraud her creditors; [2]-The debtor's receipt of a discharge was denied pursuant to *§ 727(a)(4)* because the debtor made a false oath when she omitted the corporation's bank account, and the personal accounts, from her Original Schedule A/B, and that oath was false, related to material facts and was made knowingly by the debtor.

### Outcome
Debtor's discharge denied.

## LexisNexis® Headnotes

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Denial of Discharge

Evidence > Burdens of Proof > Allocation

Evidence > Burdens of Proof > Preponderance of Evidence

### *HN1*[🔽]  Liquidations, Denial of Discharge

Claims for denial of discharge are liberally construed in favor of the debtor and against the objector to discharge. The objector to discharge bears the burden to prove by a preponderance of the evidence that the debtor's discharge should be denied.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

### *HN2*[🔽]  Denial of Discharge, Concealment & Fraudulent Transfers

*11 U.S.C.S. § 727(a)(2)(A)-(B)* provides that a court shall grant a debtor a discharge unless the debtor, with intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property has transferred, removed, destroyed, mutilated, or concealed (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

Evidence > Types of Evidence > Circumstantial

2022 Bankr. LEXIS 1727, *1727

Evidence

Evidence > Inferences & Presumptions > Inferences

*HN3*[⤓] **Denial of Discharge, Concealment & Fraudulent Transfers**

Two elements comprise an objection to discharge under *11 U.S.C.S. § 727(a)(2)(A)*: 1) a disposition of property, such as transfer or concealment, and 2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor The transfer must occur within one year prepetition. Lack of injury to creditors is irrelevant under *§ 727(a)(2)*. The standard for denial of discharge under *§ 727(a)(2)(B)* is the same as *§ 727(a)(2)(A)*, but the disposition must be of estate property occurring after the petition date. Intent may be inferred from the actions of the debtor. The necessary intent under *§ 727(a)(2)* may be established by circumstantial evidence, or by inferences drawn from a course of conduct.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN4*[⤓] **Denial of Discharge, Concealment & Fraudulent Transfers**

The standard for denial of discharge under *11 U.S.C.S. § 727(a)(2)(B)* is the same as *§ 727(a)(2)(A)*, but the disposition must be of estate property occurring after the petition date.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

Evidence > Types of Evidence > Circumstantial Evidence

Evidence > Inferences & Presumptions > Inferences

*HN5*[⤓] **Denial of Discharge, False Accounts & Oaths**

*11 U.S.C.S. § 727(a)(4)(A)* denies a discharge to a debtor who knowingly and fraudulently made a false oath or account in the course of the bankruptcy proceedings. To bring a successful *§ 727(a)(4)(A)* claim for false oath, the plaintiff must show: (1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made

knowingly; and (4) the oath was made fraudulently. A false oath may involve a false statement or omission in the debtor's schedules. A fact is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property. A debtor acts knowingly if he or she acts deliberately and consciously. Intent must usually be established by circumstantial evidence or inferences drawn from the debtor's course of conduct. The cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent under *§ 727(a)(4)*.

**Counsel:** **[*1]** For Moshe Adri, Plaintiff (1:19-ap-01072-VK): Andrew Edward Smyth, Smyth Law Office, Los Angeles, CA.

For Deborah Adri, Defendant (1:19-ap-01072-VK): Gary R Wallace, Law Office of Gary R. Wallace, Los Angeles, CA.

For Deborah Lois Adri, aka Deborah Albert, Debtor (1:18-bk-10417-VK): Gary R Wallace, Law Office of Gary R. Wallace, Los Angeles, CA.

For Elissa Miller (TR), Trustee (1:18-bk-10417-VK): Steve Burnell, SulmeyerKupetz, Los Angeles, CA; Larry W Gabriel, Jenkins Mulligan & Gabriel LLP, Los Angeles, CA; Cathy Ta, Los Angeles, CA; Claire K Wu, Pillsbury Winthrop Shaw Pittman LLP, Los Angeles, CA.

For United States Trustee (SV), U.S. Trustee (1:18-bk-10417-VK): Russell Clementson, Los Angeles, CA.

**Judges:** Victoria S. Kaufman, United States Bankruptcy Judge.

**Opinion by:** Victoria S. Kaufman

## Opinion

**MEMORANDUM OF DECISION AFTER TRIAL**

On February 22, 2022, the Court conducted a trial in the above-captioned adversary proceeding. Andrew E. Smyth appeared on behalf of plaintiff Moshe Adri. Gary R. Wallace appeared on behalf of defendant Deborah Lois Adri.

The Court has jurisdiction over the adversary proceeding commenced by the filing of Mr. Adri's

EXHIBIT 1, PAGE 5

2022 Bankr. LEXIS 1727, *1

*Complaint to Deny Debtor's Discharge* pursuant to 11 U.S.C. §§ 727(a)(2)(A)-(B), and (a)(4). The matter in controversy [*2] is a core proceeding. Venue is proper pursuant to 28 U.S.C. § 1409.

For the following reasons, the Court hereby denies Ms. Adri her discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A)-(B), and (a)(4). This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law.

# I. BACKGROUND

On February 16, 2018 (the "Petition Date"), Deborah Lois Adri filed a voluntary chapter 11 petition. When she filed the petition, Ms. Adri was approximately 66 years old.

Ms. Adri is a beneficiary of her parents' trust, the Albert Family Trust (the "Trust"). Following her mother's death, in 2016, 2017 and 2018, Ms. Adri received large distributions from the Trust. As disclosed in her amended Statement of Financial Affairs (which was filed nearly one year after the Petition Date), Ms. Adri received $210,000 from the Trust in 2016, $125,000 from the Trust in 2017 and $627,500 from the Trust in 2018.

Moshe Adri is a judgment creditor, and the ex-husband, of Ms. Adri. In November 2017, Mr. Adri obtained an arbitration award against Ms. Adri in the amount of $1.35 million, concerning a business dispute.

## A. Ms. Adri's Retention of Bankruptcy Counsel

After Mr. Adri's receipt of the arbitration award, Ms. Adri went to see bankruptcy attorney Robert [*3] Yaspan. At that time, Ms. Adri recently had received a large check from the Trust, which represented a distribution to her, as a beneficiary. Ms. Adri testified that she was concerned that, if she deposited the check into her personal bank account, Mr. Adri would levy upon and seize it through judgment enforcement. At that time, Ms. Adri also had a number of other creditors, including the Internal Revenue Service and the California Franchise Tax Board, for capital gains received in 2014, to which she owed $526,400 and $300,000, respectively.

Ms. Adri has represented that Mr. Yaspan told her that she could protect the Trust distribution from her creditors by depositing it into Mr. Yaspan's client trust account and that later she could transfer those funds,

less his retainer, into a new debtor in possession account. According to Ms. Adri, Mr. Yaspan and Ms. Adri also discussed that she could propose a plan of reorganization which would offer her creditors a portion of what they claimed to be owed.

Ms. Adri decided to retain Mr. Yaspan to file a chapter 11 case for her. Ms. Adri paid Mr. Yaspan $44,271 up front for his retainer (including filing fees) and an additional retainer of $25,000 [*4] to handle anticipated issues with Mr. Adri, such as the possible filing of an adversary proceeding.

Ms. Adri gave Mr. Yaspan the approximately $626,000 distribution check from the Trust (the "2018 Trust Distribution"), which Mr. Yaspan then deposited into a client trust account. After that, $100,000 of the 2018 Trust Distribution was transferred into a bank account of Ms. Adri's wholly-owned corporation, Gold Girls, Inc. ("Gold Girls"). According to Ms. Adri, Mr. Yaspan told Ms. Adri that she did not have to place these funds, distributed to Gold Girls, into a debtor in possession ("DIP") account.

To prepare her bankruptcy filings, Ms. Adri testified that she primarily worked with Mr. Yaspan's paralegal, Tanya Menachian, and that Mr. Yaspan did not sit with her to go over her bankruptcy papers in detail, i.e., the petition, schedules, Statement of Financial Affairs, etc. Ms. Adri stated that Mr. Yaspan and Ms. Menachian told Ms. Adri that, if there was any information omitted from her initial bankruptcy schedules and statements, Ms. Adri could amend her filing later.

Included in Ms. Adri's trial exhibits, as Exhibit B, is an email, dated January 29, 2018, from Tanya Menachian to Ms. Adri. [*5] This email states, among other things:

> All prefiling bank accounts must be closed and new Debtor in Possession (DIP) accounts must be opened. I will need evidence of the closing and evidence of the opening. 3 accounts will be needed, general, tax and payroll. This can be done at any large bank. If you need our help with these accounts, let me know.

Ms. Adri's Trial Exhibit B.

## B. Ms. Adri's Initial Schedules and Statement of Financial Affairs

On February 16, 2018, Ms. Adri filed her schedules of assets and liabilities and her Statement of Financial Affairs ("SOFA"). In her schedule A/B ("Original Schedule A/B"), Ms. Adri listed personal property

EXHIBIT 1, PAGE 6

2022 Bankr. LEXIS 1727, *5

totaling $1,058,600.00. This included Ms. Adri 50% interest in Ride on Autos, LLC ("ROA"), which she valued at $5,000, and her 100% interest in Gold Girls, which she valued at $100,000. Also included in Ms. Adri's identified personal property assets was $501,000 in cash, then in Mr. Yaspan's client trust account. This cash originated from the 2018 Trust Distribution.

In her Original Schedule A/B, Ms. Adri did not disclose: (1) any bank accounts; (2) any funds remaining in the Trust; and (3) a Toyota Sienna.

In her Original Schedule A/B, Ms. Adri represented [*6] that she was not "the beneficiary of a living trust . . . or . . . currently entitled to receive property because someone has died." Ms. Adri also represented that she had no financial assets that she did not already list.

In her original SOFA, Ms. Adri stated that her income in 2017 was $60,000 from undisclosed sources and $15,500 in Social Security. She stated that her income in 2018 was $10,000 from operating a business and $1,300 from Social Security. Ms. Adri did not disclose any other income or the large distributions which she had received, e.g., from 2016 through 2018, from the Trust.

In her original SOFA, Ms. Adri stated that she had transferred $100,000 to Gold Girls on February 15, 2018, "[f]or working capital to be used by LLC that is 100% owned." She described Gold Girls as being in the business of "retail clothing" and further stated "store closed."[1] Ms. Adri described ROA as a "used car lot."

In her original SOFA, Ms. Adri did not disclose any other businesses she had owned, or with which she had any connections, in the prior 4 years.

## C. Ms. Adri's Use of Bank Accounts

Prepetition and after the Petition Date, Ms. Adri owned and controlled bank accounts at Bank of America ("BofA"). [*7] One of these BofA accounts, no. 9263, was in the name of Gold Girls. Ms. Adri also had two personal checking accounts at BofA, with account nos. 8188 and 5973.

---

[1] At her first § 341(a) examination and meeting of creditors, Ms. Adri also stated that Gold Girls had operated a retail clothing store and that Gold Girls' store had closed on January 18, 2018.

Within one month before the Petition Date, from January 17, 2018 through February 6, 2018, Ms. Adri transferred $44,300 from Gold Girls' BofA account no. 9263 to her BofA personal checking account no. 8188 [doc. 230]. On the Petition Date, Ms. Adri took $993.68 from her BofA personal checking account no. 8188 (identified as a "petty cash" transfer) and used the balance left in that account to pay a personal expense [doc. 264]. On February 28, 2018, Ms. Adri closed account no. 8188.[2]

From January 16, 2018 through and including the Petition Date, Ms. Adri transferred $24,800 from Gold Girls' BofA account no. 9263 to her BofA personal checking account no. 5973. Id. On the Petition Date, Ms. Adri transferred $5,000 of these funds from Gold Girls' BofA account to her BofA personal checking account, no. 5973 [doc. 264].

From the Petition Date through February 23, 2018, Ms. Adri disbursed $4,347.11 from her account no. 5973, of which approximately $2,200 was transferred to a DIP checking account, no. 5939, on February 20, 2018. Id. As [*8] of the end of February 2018, Ms. Adri's personal checking account, no. 5973, had a balance of $772.27. From March 1, 2018 through March 21, 2018, Ms. Adri disbursed the entire remaining balance from that account, in four separate transactions [doc. 265].[3]

Despite her extensive use of these BofA accounts shortly before and on the Petition Date, Ms. Adri did not disclose any of these BofA bank accounts in her Original Schedule A/B or in her original Monthly Operating Reports.

## D. Ms. Adri's First Meeting of Creditors

On March 29, 2018, Ms. Adri testified at her first meeting of creditors and examination held pursuant to 11 U.S.C. § 341. At her § 341(a) meeting, Ms. Adri stated that she reviewed the schedules and her SOFA that were filed in her case and that all the information in those documents was accurate and correct to the best of her knowledge.[4]

---

[2] Ms. Adri did not close her BofA personal checking account no. 5973 at that time, or by more than one month later.

[3] Although prepetition bank accounts are to be closed when a chapter 11 petition is filed, and Ms. Adri had been informed of her obligation to close them, Ms. Adri continued to use her BofA personal account, no. 5973, after the Petition Date.

[4] Mr. Yaspan also attended this meeting of creditors. During

2022 Bankr. LEXIS 1727, *8

When asked, Ms. Adri identified various entities that she had operated with Mr. Adri, including M&D Resources. Ms. Adri testified that a retail shopping center owned by M&D Resources was sold in 2014 for $3.8 million and that most of the proceeds paid off secured debt. Ms. Adri acknowledged that, on the Petition Date, she still owned M&D Resources. After Ms. Adri discussed [*9] her existing interest in M&D Resources, Mr. Yaspan acknowledged that Ms. Adri's schedules needed to be amended to disclose any active entities owned by Ms. Adri, even if they had no assets.

During the first meeting of creditors, the attorney for the United States Trustee asked Ms. Adri: "over what period had you received income distributions from the trust?" In response, Mr. Yaspan stated "they're not income distributions. They're distributions from the trust, but it's not - - but they're not income taxable and they're not income. . . . And they're not referred to in the first question of the Statement of Financial Affairs for that reason." Later in the meeting, the attorney for the United States Trustee noted that Ms. Adri should have disclosed her interest in the Trust in the Original Schedule A/B. Mr. Yaspan then agreed to give an explanation and to get the Trust agreement.[5]

Ms. Adri also answered questions about Gold Girls. Among other things, Ms. Adri stated that Gold Girls had bank accounts at Bank of America, with approximately $70,000 in cash, and that the cash in those accounts originated from a transfer of funds from a trust. Ms. Adri testified that the $100,000 transferred [*10] to Gold Girls "was transferred to help fund [Gold Girls'] new website" and "to pay some liabilities."

### E. Mr. Adri's Motion to Appoint a Chapter 11 Trustee or to Dismiss the Case

On December 7, 2018, Mr. Adri filed a motion to appoint

_____

the § 341(a) meeting, as concerns the accuracy of Ms. Adri's bankruptcy filings, Mr. Yaspan noted only that Ms. Adri's schedules had to be amended to add unsecured creditors.

[5] On March 29, 2018, Ms. Adri sent an email to Irwin Abramson and Jeffery Zabner, who were involved with the administration of the Trust. In her email, Ms. Adri stated that she had filed a chapter 11 case and that her bankruptcy lawyer would be requesting documents regarding the Trust. Subsequent to the meeting of creditors, in April 2018, Mr. Yaspan wrote to the lawyer for the Trust, Jeffrey Zabner, asking for an accounting and a copy of the Trust document. See Ms. Adri's Trial Exhibit I.

a chapter 11 trustee or to dismiss the case [doc. 216]. On December 28, 2018, Mr. Adri filed a supplement to that motion (the "Trustee Motion Supplement") [doc. 230]. Mr. Adri based the Trustee Motion Supplement on bank account records which Ms. Adri produced in response to the Court's Order granting Mr. Adri's motion to take a Fed. R. Bankr. P. 2004 examination of Ms. Adri, and compelling Ms. Adri's related production of bank records [docs. 225, 226 and 230].

### F. Ms. Adri's Amended Schedules and SOFA

On January 16, 2019, Ms. Adri filed amended schedules and statements [doc. 243]. Ms. Adri's original schedules and amended schedules, filed almost a year into her chapter 11 case, significantly vary. Below is a chart illustrating the differences.

Go to table1

### G. Ms. Adri's Chapter 11 Status Conference Report

In her initial chapter 11 case status conference report and her supporting declaration, Ms. Adri described her chief business activity as buying motor vehicles, primarily from wholesale auction houses, and then placing them for resale through ROA, a used-car dealership [Ms. Adri's Trial Exhibit E]. Ms. Adri stated that her business model was to purchase approximately 4-6 automobiles at auction each month, repair the cars if necessary and resell them. Ms. Adri stated that she expected to generate at least $10,000 of profit per month. *Id.*

Ms. Adri described her other intended stream of income as a website to be owned by Gold Girls, which was to sell products for dogs and their owners. Ms. Adri stated that she planned [*13] to buy $5,000 of opening inventory and that the income from this business would begin within 3-6 months of the petition date. *Id*

### H. Ms. Adri's Monthly Operating Reports

For the preparation of her Monthly Operating Reports ("MORs"), Ms. Adri testified that Mr. Yaspan referred her to Bryan Avaylon. In May 2018, several months after the Petition Date, Ms. Adri hired Mr. Avaylon to help her prepare her MORs.[6]

_____

[6] Ms. Adri's Trial Exhibit P, an email from a lawyer at Mr.

Layla Buchanan

2022 Bankr. LEXIS 1727, *13

On December 6, 2018, the Court held a continued chapter 11 case status conference in Ms. Adri's case. As of that time, Ms. Adri had filed MORs for February 2018 through September 2018. At the chapter 11 case status conference, the Court pointed out that Ms. Adri was not properly completing the MORs and had not submitted the underlying bank statements. Consequently, on December 7, 2018, the Court entered an order requiring Ms. Adri to file amended MORs, with the related bank statements attached, by December 31, 2018 (the "Order to Amend") [doc. 212].

After the status conference hearing on December 6, 2018, during which the Court noted the deficiencies in Ms. Adri's MORs, Ms. Adri engaged Carylon Feinstein of TIXE Consulting, Inc. to redo the MORS from the beginning of the case.

## I. Ms. [*14] Adri's Submission of Amended MORs

Following the entry of the Order to Amend and Mr. Adri's filing of his motion to appoint a chapter 11 trustee and the Trustee Motion Supplement, in January 2019, Ms. Adri filed three amended MORs for February 2018 through April 2018 and bank statements for May 2018 through October 2018. In late January 2019 and in February 2019, Ms. Adri filed second amended MORs for February 2018 through May 31, 2018 [doc. 267].

Unlike her original MORs, Ms. Adri's second amended MORs included bank statements for Gold Girls' BofA account. Ms. Adri's second amended February 2018 and March 2018 MORs also included bank statements for her BofA personal bank accounts, account nos. 8188 and 5973 - which accounts Ms. Adri did not disclose in her bankruptcy schedules until January 16, 2019 (the "Omitted Personal Accounts").

The second amended February 2018 and March 2018 MORs showed that, on and after the Petition Date, Ms. Adri used the Omitted Personal Accounts to pay her personal living expenses.[7] The amended MORs also

showed that Ms. Adri used Gold Girls' BofA account, no. 9263, to pay her personal living expenses.

In February 2018, Ms. Adri had spent $14,526 from Gold [*15] Girls' BofA account on personal disbursements, including a $5,000 transfer, made to one of the Omitted Personal Accounts, on the Petition Date [doc. 264]. For example, in February, March and April 2018, including on the Petition Date, Ms. Adri used Gold Girls' BofA account to purchase personal goods from, among other providers, Art's Deli, Gelson's Markets, Ralph's, Bloomingdales, Nordstrom, Pet Smart, Netflix, SiriusXM, DirecTV, Rite Aid and CVS Pharmacy.[8]

In her original SOFA, Ms. Adri represented that $100,000 transferred to Gold Girls on February 15, 2018 was to provide working capital to Gold Girls. At her 341(a) meeting, Ms. Adri further testified that these monies transferred to Gold Girls were to invest in Gold Girls' website and to pay liabilities. However, as reflected in the BofA account statements, Ms. Adri often used the monies transferred to Gold Girls for her personal expenses and did not use the funds to invest in a website.

## J. Appointment of Chapter 11 Trustee and Subsequent Events

At a hearing held on February 7, 2019, the Court granted Mr. Adri's motion to appoint a chapter 11 trustee [docs. 277 and 278]. Subsequently, on the motion of the chapter 11 trustee, the Court [*16] converted the chapter 11 case to one under chapter 7.

In July 2019, the chapter 7 trustee filed a complaint to deny Ms. Adri a discharge under *11 U.S.C. §§*

---

Yaspan's office, Debra Brand, to Ms. Adri, dated May 4, 2018, discusses the suggested engagement of Mr. Avaylon. In that email, Ms. Brand recommends that Ms. Adri engage Mr. Avaylon to help her with the bookkeeping and MORS. Ms. Adri's Trial Exhibit KK also includes emails, dated January 28, 2019, between Mr. Yaspan and Ms. Adri, concerning Ms. Adri's engagement of Mr. Avaylon.

[7] In her second amended MORs, Ms. Adri filed redacted bank statements for the Omitted Accounts, which blocked out

entries showing her use of those accounts during the first half of February 2018, i.e., within a few weeks (and days) before the Petition Date. Carolyn Feinstein of TIXE Consulting prepared the second amended MORs for February, March and April 2018. *See* Ms. Adri's Trial Exhibit LL, which includes emails from Ms. Feinstein to Ms. Adri about these MORs.

[8] Similarly, the September 2018 statement for Gold Girls' BofA account, attached to Ms. Adri's second amended MOR for September 2018 (filed on February 6, 2019), shows purchases from that account for "iTunes.com," "Paolis Italian Kitchen," "Siriusxm.com," "Bloomy's," "Macy's," "Fabiane's Café and Pastr Brooklyn" "Gramercy Park Hotel New York," "Thriftwares" and "AARPFoundat" [doc. 274]. Ms. Adri also paid personal expenses from Gold Girls' BofA account in August 2018, November 2018 and December 2018 [MORs, docs. 242, 244 and 273].

727(a)(2)(A), 727(a)(2)(B), 727(a)(3) and 727(a)(4). In October 2020, the Court denied in part the chapter 7 trustee's motion for summary adjudication, holding that Ms. Adri had raised a genuine issue of material fact as to whether she had transferred property with the intent to hinder, delay or defraud creditors and had made false oaths knowingly and fraudulently.

In October 2019, the chapter 7 trustee filed a complaint against Mr. Yaspan for breach of fiduciary duty. Following participation in mediation by the chapter 7 trustee, Ms. Adri and Mr. Yaspan, a settlement was reached in which Mr. Yaspan, through his insurance carrier, agreed to pay $626,000 to the chapter 7 trustee, for the dismissal of the litigation against him, and Ms. Adri agreed to pay $75,000, to resolve litigation between the chapter 7 trustee and ROA. The chapter 7 trustee then dismissed her denial of discharge action against Ms. Adri, without impact on Mr. Adri's denial of discharge litigation.

## II. ANALYSIS

HN1[↑] Claims for denial of discharge are liberally construed in favor of the debtor and against the objector to discharge. [*17] In re Khalil, 379 B.R. 163, 172 (B.A.P. 9th Cir. 2007), aff'd, 578 F.3d 1167 (9th Cir. 2009). The objector to discharge bears the burden to prove by a preponderance of the evidence that the debtor's discharge should be denied. Id.

### A. 11 U.S.C. § 727(a)(2)(A)-(B)

HN2[↑] Section 727(a)(2)(A)-(B) provides that a court shall grant a debtor a discharge unless "the debtor, with intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property ... has transferred, removed, destroyed, mutilated, or concealed ... (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition."

HN3[↑] "Two elements comprise an objection to discharge under § 727(a)(2)(A): 1) a disposition of property, such as transfer or concealment, and 2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor..." In re Beauchamp, 236 B.R. 727, 732 (B.A.P. 9th Cir. 1999). The transfer must occur within one year prepetition. In re Lawson, 122 F.3d 1237, 1240 (9th Cir. 1997). Lack of injury to creditors is

irrelevant under § 727(a)(2). In re Bernard, 96 F.3d 1279, 1281-82 (9th Cir. 1996). "The standard for denial of discharge under § 727(a)(2)(B) is the same as § 727(a)(2)(A), but the disposition must be of estate property occurring after the petition date." In re Miller, 2015 WL 3750830, at *3 (Bankr. C.D. Cal. June 12, 2015).

Intent may be inferred from the actions of the debtor. In re Devers, 759 F.2d 751, 753-54 (9th Cir. 1985). The necessary intent under § 727(a)(2) "may be established by circumstantial evidence, or by inferences drawn from [*18] a course of conduct." In re Adeeb, 787 F.2d 1339, 1343 (9th Cir.1986).

HN4[↑] "The standard for denial of discharge under § 727(a)(2)(B) is the same as § 727(a)(2)(A), but the disposition must be of estate property occurring after the petition date." In re Miller, 2015 WL 3750830, at *3 (Bankr. C.D. Cal. June 12, 2015).

Taking into account Ms. Adri's use of the funds in Gold Girls' BofA account and the Omitted Personal Accounts, and her failure to disclose these bank accounts in her Original Schedule A/B, the Court concludes that Ms. Adri, with intent to hinder, delay or defraud her creditors, transferred and concealed her property, a portion of the 2018 Trust Distribution, within one year before the Petition Date, and property of the estate, after the Petition Date.

Shortly before the Petition Date, Ms. Adri arranged for Mr. Yaspan to transfer $100,000 of the 2018 Trust Distribution into Gold Girls' BofA account, from his client trust account. At that time, Ms. Adri was in poor financial condition and concerned about Mr. Adri's arbitration award and her tax debts; Gold Girls was no longer operating. After Gold Girls's BofA account received $100,000 of the 2018 Trust Distribution, and after the Petition Date, Ms. Adri used the funds in Gold Girls' BofA account to pay her personal expenses. After the Petition Date, Ms. Adri also used [*19] one of the Omitted Personal Accounts to pay her personal expenses, without having disclosed its existence in her schedules, at her 341(a) meeting or in her MORs.

Contrary to Ms. Adri's representations at her 341(a) meeting and in other filings with the Court, Ms. Adri did not use the funds transferred to Gold Girls to restart the business of Gold Girls, as a website. Moreover, although they were open on and following the Petition Date, she did not disclose Gold Girls' BofA account, or the Omitted Personal Accounts, in her Original Schedule A/B, and she did not report her use of those

accounts in her original MORs. As reflected in her amended schedule A/B, on the Petition Date, those accounts had outstanding balances; Gold Girls' BofA account balance exceeded $120,000.

When Ms. Adri did file an amendment of her Original Schedule A/B, and her first and second amended MORs, in which she identified the BofA accounts, Ms. Adri did so nearly a year or more after the Petition Date. By that time, the Court had ordered her to file the bank statements for her bank accounts, and Mr. Adri had filed his motion to appoint a chapter 11 trustee and the Trustee Motion Supplement.

In her original SOFA, **[*20]** Ms. Adri did disclose a $100,000 transfer to Gold Girls, made on February 15, 2018. In her original SOFA, Ms. Adri stated that this transfer was "for working capital to be used by LLC that is 100% owned." At her 341(a) meeting of creditors and examination, Ms. Adri also represented that the funds transferred from the Trust to Gold Girls were to be used to restart a business for Gold Girls. However, funds transferred to Gold Girls were not used in that way; for months following the Petition Date, Ms. Adri used these funds to pay her personal expenses. Ms. Adri also omitted Gold Girls' BofA account, and her personal BofA bank accounts, from her Original Schedule A/B and her original MORs.

Ms. Adri contends that it is the fault of her bankruptcy lawyer, his staff and other professionals that she did not make accurate disclosures in her Original Schedule A/B and file complete MORS. However, when Ms. Adri discussed the transfer of funds into Gold Girls, she did not disclose that she would be continuing to use those funds to pay her personal expenses. Why would Ms. Adri think that it was appropriate for her to use Gold Girls' BofA account, and the Omitted Personal Accounts, to pay her personal **[*21]** expenses - on and for months following the Petition Date - without her identifying those BofA accounts in her Original Schedule A/B and her use of those accounts in her MORs? As of the Petition Date, she had more than $500,000 in Mr. Yaspan's client trust account; on March 5, 2018, those funds were transferred to a DIP account. Ms. Adri could have used funds in her DIP accounts to pay her personal expenses. Moreover, she had been informed that she had to close her prepetition personal bank accounts.

Based on the preponderance of the evidence, the Court concludes that, in order to conceal from her creditors that those funds remained her property and property of

the estate, Ms. Adri had $100,000 of the 2018 Trust Distribution transferred to Gold Girls' BofA Account, did not disclose the existence of her accounts at BofA in her Original Schedule A/B and misrepresented and concealed her actual use of that significant portion of the 2018 Trust Distribution, with intent to hinder, delay or defraud her creditors. Consequently, the Court will deny Ms. Adri's receipt of a discharge pursuant to *§ 727(a)(2)(A)-(B)*.

### B. *11 U.S.C. § 727(a)(4)*

*HN5* [↑] *Section 727(a)(4)(A)* denies a discharge to a debtor who "knowingly and fraudulently" made a false oath or account in **[*22]** the course of the bankruptcy proceedings. To bring a successful *§ 727(a)(4)(A)* claim for false oath, the plaintiff must show: (1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently. *In re Wills, 243 B.R. 58, 62 (B.A.P. 9th Cir. 1999)*. "[A] false oath may involve a false statement or omission in the debtor's schedules." *In re Roberts, 331 B.R. 876, 882 (B.A.P. 9th Cir. 2005)*, aff'd and remanded on other grounds, *241 F. App'x 420 (9th Cir. 2007)*.

"A fact is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *In re Retz, 606 F.3d 1189, 1198 (9th Cir. 2010)*(internal quotations omitted). "A debtor acts knowingly if he or she acts deliberately and consciously." *Retz, 606 F.3d at 1198*.

Intent must usually be established by circumstantial evidence or inferences drawn from the debtor's course of conduct. *Khalil, 379 B.R. at 174* (circumstances might include multiple omissions or failure to clear up omissions). "[T]he cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent" under *§ 727(a)(4)*. *Stamat v. Neary, 635 F.3d 974, 982 (7th Cir. 2011)*.

Based on the preponderance of the evidence, the Court concludes that Ms. Adri made a **[*23]** false oath when she omitted Gold Girls' BofA account, and the Omitted Personal Accounts, from her Original Schedule A/B. That oath was false, related to material facts and was made knowingly by Ms. Adri.

In addition, in light of her extensive prepetition and

postpetition use of Gold Girls' BofA account and the Omitted Personal Accounts to pay her personal expenses, her failure to correct the omission of these bank accounts from her schedules for nearly a year following the Petition Date (after she had spent the money and Mr. Adri had filed evidence of her postpetition use of the accounts), and Ms. Adri's repeated misrepresentations regarding the use of the $100,000 transfer to Gold Girls, the Court finds that Ms. Adri's intent was fraudulent; in order to hide her actual use of these bank accounts, Ms. Adri omitted Gold Girls' BofA account and her BofA personal bank accounts from her Original Schedule A/B and did not provide proper reporting of her personal expenses in her original MORs. *See* In re Sholdra, 249 F.3d 380, 383 (5th Cir. 2001) (affirming denial of discharge based on false oaths in original schedules and refusing to accept the debtor's attempt to blame the false oaths on his bankruptcy counsel; the debtor's "purported [*24] inexperience with financial affairs does not negate the fact that he made false oaths by knowingly swearing to false information").[9]

Ms. Adri also made false oaths when she omitted other assets, including her interest in the Trust, from her Original Schedule A/B and when she did not disclose the prepetition distributions from the Trust and her ownership interests in various active entities in her original SOFA. However, given Ms. Adri's testimony about those assets, the Trust and her interest in those entities during her first § 341(a) meeting, and the statements made by her bankruptcy counsel during that meeting, the Court finds that Ms. Adri did not do so with fraudulent intent.

For knowingly and fraudulently making false oaths regarding the BofA accounts of Ms. Adri and Gold Girls, the Court will deny Ms. Adri's receipt of a discharge pursuant to § 727(a)(4).

---

[9] Included in Ms. Adri's trial exhibits, as Exhibit F, are emails from Ms. Adri to Mr. Yaspan, dated March 19, 2018 and March 20, 2018. The March 19 email from Ms. Adri states: "Waiting for the answer regarding the reimbursement of funds to Gold Girls." The March 20 email from Ms. Adri states: "Please advise regarding the MOR report. Am I able to reimburse the Gold Girls account for my personal expenditures? The report is done and waiting for your reply."

These emails do not negate the Court's conclusion that Ms. Adri knowingly and fraudulently omitted her BofA personal checking accounts and Gold Girls' BofA account from her Original Schedule A/B.

## III. CONCLUSION

The Court will deny Ms. Adri's receipt of a discharge pursuant to § 727(a)(2)(A)-(B) and § 727(a)(4).

Date: June 9, 2022

/s/ Victoria S. Kaufman

Victoria S. Kaufman

United States Bankruptcy Judge

JUDGMENT IN FAVOR OF PLAINTIFF DENYING DEFENDANT'S DISCHARGE

On February 22, 2022, the Court conducted a trial in the above-captioned adversary proceeding. Andrew E. Smyth [*25] appeared on behalf of Moshe Adri (the "Plaintiff"). Gary R. Wallace appeared on behalf of Deborah Lois Adri (the "Defendant"). For the reasons stated in this Court's separately entered *Memorandum of Decision After Trial*, judgment is hereby entered as follows:

1. On the claims for relief under 11 U.S.C. § 727(a)(2)(A)-(B), judgment is entered in favor of the Plaintiff.

2. On the claim for relief under 11 U.S.C. § 727(a)(4), judgment is entered in favor of the Plaintiff.

3. The Defendant's discharge is denied.

Date: June 9, 2022

/s/ Victoria S. Kaufman

Victoria S. Kaufman

United      States      Bankruptcy      Judge

2022 Bankr. LEXIS 1727, *25

Page 1

**Table1 (**_Return to related document text_**)**

| Category | Schedules and SOFA filed on February 16, 2018 [doc. 1] | Schedules and SOFA filed on January 24, 2019 [doc. 248] |
|---|---|---|
| Schedule A/B - cash | • Cash on Hand - $1,100.00<br>• Cash at Robert M Yaspan Client Trust Account on day of **[\*11]** filing - $501,000.00 | Cash on Hand - $1,100.00<br><br>• |
| Schedule A/B - deposits of money | None | Cash at Robert M Yaspan Client Trust Account on day of filing - $501,000.00<br>• Bank of America, Gold Girls - $125,614.62<br>• Bank of America, ROA ending in 5494 - $51.87<br>• Bank of America, Street Resources LLC ("Street Resources") - $17.93<br>• Bank of America, Debtor's personal account ending in 5973 - $772.27<br>• Bank of America, Debtor's personal account ending in 8188 - $993.68<br><br>2708- $8,396.20 |
| Schedule A/B - property owed from someone who has died | None | Funds on hand in Trust - $25,000.00 estate entitled to 42% distribution<br><br>when it comes due |
| Schedule A/B - inventory | None | Toyota Sienna - $2,335.00 |
| SOFA - income from 2016<br>SOFA - income from 2017 | None<br>• Operating a business - $60,000.00<br>• Social security - $15,600.00 | Distribution from Trust - $210,000.00<br>• Operating a business - $60,000.00<br>• Social Security - $15,600.00<br>• Distribution from Trust - $125,000.00 |

Layla Buchanan

EXHIBIT 1, PAGE 13

2022 Bankr. LEXIS 1727, *11

| Category | Schedules and SOFA filed on February 16, 2018 [doc. 1] | Schedules and SOFA filed on January 24, 2019 [doc. 248] |
|---|---|---|
| SOFA - income from 2018 | • Operating a business - $10,000.00<br>• Social security - $1,300.00 | • Operating a business - $10,000.00<br>• Social security - $1,500.00<br>• Distribution from Trust - $627,500.00 |
| SOFA - within four years of petition, **[\*12]** businesses Debtor owned | • Gold Girls - retail clothing; store closed<br>• ROA - used car lot; still open | • Gold Girls - retail clothing; store closed<br>• ROA - used car lot; still open<br>• M & D Resources, LLC - real estate; 2001 - 2016<br>• Reseda Chase Plaza, LLC - real estate; 2005 - 2014<br>• Street Resources - real estate (ownership in dispute with Creditor); 2001 - present<br>• Prime Property Management Corporation - real estate management; 2004 - 2016 |
| SOFA - property kept in storage | None | Property has been kept in storage for over five years |

**Table1 (**_Return to related document text_**)**

End of Document

Layla Buchanan

**EXHIBIT 2**

**LexisNexis**

**User Name:** Layla Buchanan

**Date and Time:** Wednesday, May 10, 2023 3:00:00PM PDT

**Job Number:** 196842772

## Document (1)

1. *Faith v. Miller (In re Miller), 2015 Bankr. LEXIS 1929*

   **Client/Matter:** 1673-001

   **Search Terms:** 2015 Bankr.LEXIS 1929

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |

**EXHIBIT 2, PAGE 15**

**A** Neutral
As of: May 10, 2023 10:00 PM Z

# *Faith v. Miller (In re Miller)*

United States Bankruptcy Court for the Central District of California, Northern Division

June 12, 2015, Decided; June 12, 2015, Filed & Entered

Case. No. 9:13-bk-10313-PC, Adversary No. 9:13-ap-01133-PC, Chapter 7

**Reporter**

2015 Bankr. LEXIS 1929 *

In re: LOREN MILLER AND SARAH MILLER, Debtors.JEREMY W. FAITH, CHAPTER 7 TRUSTEE, Plaintiff, v. LOREN MILLER AND SARAH MILLER, Defendants.

**Notice:** NOT FOR PUBLICATION

**Subsequent History:** Related proceeding at *In re Miller, 2016 U.S. Dist. LEXIS 53084 (C.D. Cal., Apr. 20, 2016)*

Decision reached on appeal by *Miller v. Faith (In re Miller), 2017 U.S. App. LEXIS 15889 (9th Cir., Aug. 21, 2017)*

Decision reached on appeal by *Miller v. Geller (In re Miller), 2017 U.S. App. LEXIS 15888 (9th Cir. Cal., Aug. 21, 2017)*

Decision reached on appeal by *Miller v. Faith (In re Miller), 2017 U.S. App. LEXIS 15883 (9th Cir. Cal., Aug. 21, 2017)*

## Core Terms

turnover order, genuine, concealed, summary judgment, hinder, summary judgment motion, material fact, defraud, badges, funds, transferred

## Case Summary

### Overview

HOLDINGS: [1]-Debtor's discharge was denied under *11 U.S.C.S. § 727(a)(2)(A)* and *(B)*, as he transferred or concealed property within one year prior to and one year after the petition date; he failed to disclose assets and transactions; he concealed corporate accounts and disposed of funds in those accounts for personal use; and he acted with the subjective intent to hinder or

delay, if not defraud, trustee and creditors; [2]-Discharge was denied under *§ 727(a)(4)(A)*, as debtor's false statements and omissions were so intertwined with his business and financial affairs and trustee's ongoing efforts to investigate and recover property of the estate that the court inferred that his failure to make full and accurate disclosure was intentional and for the purposes of deceiving creditors and the trustee; [3]-Discharge was denied under *§ 727(a)(6)(A)*, as debtor disobeyed a turnover order.

### Outcome

The court granted the Chapter 7 trustee's motion for summary judgment and denied debtor husband's discharge.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal Entitlement

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

*HN1*[⬇] **Entitlement as Matter of Law, Genuine Disputes**

*Fed. R. Civ. P. 56(a)* authorizes a party to move for summary judgment, identifying each claim or defense -- or the part of each claim or defense -- on which summary judgment is sought. Summary judgment must be granted if the movant shows that there is no genuine

2015 Bankr. LEXIS 1929, *1929

dispute as to any material fact and the movant is entitled to judgment as a matter of law.

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

**HN2[⬇]    Entitlement    as    Matter    of    Law, Appropriateness**

In determining whether a genuine factual issue exists, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability. The judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. However, the court's function on a motion for summary judgment is issue-finding, not issue-resolution.

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Need for Trial

**HN3[⬇]    Entitlement    as    Matter    of    Law, Appropriateness**

*Fed. R. Civ. P. 56* does not permit trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are fact finder functions.

> Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

> Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

**HN4[⬇]    Summary Judgment, Supporting Materials**

*Fed. R. Civ. P. 56(c)* identifies the procedures the court and parties must follow in conjunction with motions for summary judgment.

> Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

> Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

**HN5[⬇]    Summary Judgment, Supporting Materials**

See *Fed. R. Civ. P 56(c)*.

> Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

> Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

**HN6[⬇]    Summary Judgment, Opposing Materials**

A court may grant summary judgment if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by *Fed. R. Civ. P. 56(c)*, *Rule 56(e)(3)*.

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

**HN7[⬇]    Entitlement as Matter of Law, Genuine Disputes**

A court may, after notice and a reasonable opportunity to respond, grant summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute. *Fed. R. Civ. P. 56(f)(3)*

Layla Buchanan

2015 Bankr. LEXIS 1929, *1929

Bankruptcy Law > ... > Liquidations > Denial of
Discharge > General Overview

*HN8*[📄] **Liquidations, Denial of Discharge**

Objections to discharge are to be literally and strictly
construed against the objector and liberally construed in
favor of the debtor. Courts should deny discharge only
for very specific and serious infractions.

Bankruptcy Law > ... > Liquidations > Denial of
Discharge > Concealment & Fraudulent Transfers

Evidence > Burdens of Proof > Preponderance of
Evidence

*HN9*[📄] **Denial of Discharge, Concealment &
Fraudulent Transfers**

To deny discharge under *11 U.S.C.S. § 727(a)(2)(A)*, a
plaintiff must establish by a preponderance of the
evidence (1) a disposition of property (i.e., transfer or
concealment); (2) with subjective intent to hinder, delay
or defraud a creditor; and (3) it must occur within one
year prior to filing bankruptcy. Because the statute is
written in the disjunctive, an intent to hinder or delay is
sufficient to deny discharge under *§ 727(a)(2)*. Proof of
fraud is not necessary nor is injury to creditors relevant
for purposes of *§ 727(a)(2)*.

Bankruptcy Law > ... > Liquidations > Denial of
Discharge > Concealment & Fraudulent Transfers

*HN10*[📄] **Denial of Discharge, Concealment &
Fraudulent Transfers**

The standard for denial of discharge under *11 U.S.C.S.
§ 727(a)(2)(B)* is the same as *§ 727(a)(2)(A)*, but the
disposition must be of estate property occurring after the
petition date.

Bankruptcy Law > ... > Liquidations > Denial of
Discharge > Concealment & Fraudulent Transfers

Evidence > Types of Evidence > Circumstantial
Evidence

Evidence > Inferences & Presumptions > Inferences

*HN11*[📄] **Denial of Discharge, Concealment &
Fraudulent Transfers**

For purposes of a denial of discharge under *11 U.S.C.S.
§ 727(a)(2)*, intent may be established by circumstantial
evidence, or by inferences drawn from a course of
conduct.

Bankruptcy Law > ... > Liquidations > Denial of
Discharge > Concealment & Fraudulent Transfers

Evidence > Types of Evidence > Circumstantial
Evidence

Evidence > Inferences & Presumptions > Inferences

*HN12*[📄] **Denial of Discharge, Concealment &
Fraudulent Transfers**

Whether a debtor harbors intent to hinder, or delay, or
defraud a creditor for purposes of denial of discharge
under *11 U.S.C.S. § 727(a)(2)* is a question of fact
reviewed for clear error. Intent may be inferred from
surrounding        circumstances.        The        surrounding
circumstances include the various "badges of fraud" that
constitute circumstantial evidence of intent. Certain
badges of fraud strongly suggest that a transaction's
purpose is to defraud creditors unless some other
convincing explanation appears. These factors, not all of
which need be present, include (1) a close relationship
between the transferor and the transferee; (2) that the
transfer was in anticipation of a pending suit; (3) that the
transferor debtor was insolvent or in poor financial
condition at the time; (4) that all or substantially all of the
debtor's property was transferred; (5) that the transfer
so completely depleted the debtor's assets that the
creditor has been hindered or delayed in recovering any
part of the judgment; and (6) that the debtor received
inadequate consideration for the transfer.

Civil Procedure > Judgments > Enforcement &
Execution > Fraudulent Transfers

*HN13*[📄] **Enforcement & Execution, Fraudulent
Transfers**

A non-exclusive list of "badges of fraud" has been
codified by California's Uniform Fraudulent Transfer Act

Layla Buchanan

(UFTA). The UFTA factors are intended to provide guidance to a trial court, not compel a finding one way or another. They include: (1) whether the transfer or obligation was to an insider; (2) whether the debtor retained possession or control of the property transferred after the transfer; (3) whether the transfer or obligation was disclosed or concealed; (4) whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) whether the transfer was of substantially all the debtor's assets; (6) whether the debtor absconded; (7) whether the debtor removed or concealed assets; (8) whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) whether the transfer occurred shortly before or shortly after a substantial debt was incurred; (11) whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor. _Cal. Civ. Code § 3439.04(b)_.

Civil Procedure > Judgments > Enforcement & Execution > Fraudulent Transfers

_HN14_[⬇] **Enforcement & Execution, Fraudulent Transfers**

The California Uniform Fraudulent Transfer Act (UFTA) list of "badges of fraud" in _Cal. Civ. Code § 3439.04(b)_ provides neither a counting rule, nor a mathematical formula. No minimum number of factors tips the scales toward actual intent. A trier of fact is entitled to find actual intent based on the evidence in the case, even if no badges of fraud are present. Conversely, specific evidence may negate an inference of fraud notwithstanding the presence of a number of badges of fraud.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

Evidence > Types of Evidence > Circumstantial Evidence

Evidence > Inferences & Presumptions > Inferences

_HN15_[⬇] **Denial of Discharge, False Accounts &**

**Oaths**

Under _11 U.S.C.S. § 727(a)(4)(A)_, a debtor's discharge will be denied if it is proven that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. The debtor's knowledge and fraudulent intent may be shown by circumstantial evidence and inferred from the debtor's course of conduct.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > General Overview

_HN16_[⬇] **Liquidations, Denial of Discharge**

_11 U.S.C.S. § 727(a)(6)_ states that a court shall grant a debtor a discharge, unless the debtor has refused to obey and lawful order of the court, other than an order to respond to a material question or to testify. _§ 727(a)(6)(A)_.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > General Overview

_HN17_[⬇] **Liquidations, Denial of Discharge**

The term used in _11 U.S.C.S. § 727(a)(6)(A)_ is "refused," not "failed."

Bankruptcy Law > ... > Liquidations > Denial of Discharge > General Overview

_HN18_[⬇] **Liquidations, Denial of Discharge**

A party objecting to discharge under _11 U.S.C.S. § 727(a)(6)(A)_ satisfies its burden by demonstrating that a debtor received the order in question and failed to comply with its terms. Such a showing then imposes upon the debtor an obligation to explain his non-compliance.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > General Overview

_HN19_[⬇] **Liquidations, Denial of Discharge**

2015 Bankr. LEXIS 1929, *1929

It is totally within the discretion of a bankruptcy court to find a particular violation of the court's order so serious as to require denial of discharge under *11 U.S.C.S. § 727(a)(6)(A)*.

**Counsel:** **[\*1]** For OneWest Bank, FSB, Creditor (9:13bk10313): Mark D Estle, The Estle Law Firm, San Diego CA.

For Loren Miller, Debtor (9:13bk10313): Vaughn C Taus, San Luis Obispo CA; Meghann A Triplett, Margulies Faith LLP, Encino CA.

For Sarah Miller, Joint Debtor (9:13bk10313): Reed H Olmstead, Hurlbett & Olmstead, Santa Barbara CA; Vaughn C Taus, San Luis Obispo CA; Meghann A Triplett, Margulies Faith LLP, Encino CA.

For Courtesy NEF, Interested Party (9:13bk10313): Meghann A Triplett, Margulies Faith LLP, Encino CA; Gilbert B Weisman, ll, Becket & Lee LLP, Malvern PA.

For Andrew and Eileen Geller, Interested Party (9:13bk10313): Howard Camhi, Beverly Hills CA.

For Jeremy W. Faith (TR), Trustee (9:13bk10313): Craig G Margulies, Meghann A Triplett, Margulies Faith LLP, Encino CA.

For Jeremy W. Faith, Chapter 7 Trustee, Plaintiff (9:13-ap-01133-PC): Noreen A Madoyan, Encino, CA; Craig G Margulies, LEAD ATTORNEY, Meghann A Triplett, Margulies Faith LLP, Encino CA.

Loren Miller, Defendant (9:13-ap-01133-PC), Pro se, Seabrook, TX.

For Jeremy W. Faith (TR), Trustee (9:13-ap-01133-PC): Meghann A Triplett, Margulies Faith LLP, Encino CA.

**Judges:** Peter H. Caroll, United States Bankruptcy Judge.

**Opinion by:** Peter H. Caroll

# Opinion

**MEMORANDUM [\*2] REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT LOREN MILLER UNDER *11 U.S.C. § 727(a)(2)(A), (a)(2)(B), (a)(4)(A), AND (a)(6)(A)***

At the above captioned date and time, the court considered the Plaintiff's Motion for Summary Judgment Against Defendant Loren Miller Under *11 U.S.C. §*

*727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)*, and *(a)(6)(A)* ("Motion"). Appearances were stated on the record. Having considered Plaintiff's Motion, the response of Defendant, Loren Miller ("Miller") in opposition thereto, the summary judgment evidence and argument of counsel, the court will grant Plaintiff's Motion and deny Miller's discharge pursuant to *11 U.S.C. § 727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)*, and *(a)(6)(A)* based on the following findings pursuant to *F.R.Civ.P. 56*,[1] as incorporated into *FRBP 7056* and applied to contested matters by *FRBP 9014(c)*.

A. Standard for Summary Judgment.

1. **HN1[⬆]** *Rule 56(a)* authorizes **[\*3]** a party to "move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought." *F.R.Civ.P. 56(a)*. Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id.

2. **HN2[⬆]** In determining whether a genuine factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability . . . ." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial . . . . If the evidence is merely colorable, or is not significantly probative, . . . summary judgment may be granted. *Id. at 249-250*. However, the court's function on a motion for summary judgment is "issue-finding, not issue-resolution." *United States v. One Tintoretto Painting Entitled "The Holy Catholic Family With Saint Catherine and Honored Donor", 691 F.2d 603, 606 (2d Cir. 1982)*.

3. **HN3[⬆]** *Rule 56* does not permit "trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are [fact finder] functions . . . ." *Anderson, 477 U.S. at*

---

[1] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, *11 U.S.C. §§ 101-1330* after its amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, *Pub. L. 109-8, 119 Stat. 23 (2005)*. "Rule" references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable certain Federal Rules of Civil Procedure ("F.R.Civ.P."). "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR").

2015 Bankr. LEXIS 1929, *3

*255*.

4. *HN4*[↑] *Rule 56(c)*, which identifies the procedures the court and parties must follow [*4] in conjunction with motions for summary judgment, states:

*HN5*[↑] (1) **Supporting Factual Positions**. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) **Objection That a Fact Is Not Supported by Admissible Evidence**. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) **Materials Not Cited**. The court need consider only the cited materials, but it may consider other materials in the record.

(4) **Affidavits or Declarations**. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant [*5] is competent to testify on the matters stated.

*F.R.Civ.P. 56(c)*. *HN6*[↑] The court may grant summary judgment "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by *Rule 56(c)*." See *F.R.Civ.P. 56(e)(3)*.

5. *HN7*[↑] The court may, after notice and a reasonable opportunity to respond, grant summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute. *F.R.Civ.P. 56(f)(3)*.

B. Undisputed Facts.

The court adopts and incorporates herein by reference Uncontroverted Fact Nos. 1 through 95 set forth in

Plaintiff's Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment Against Defendant Loren Miller Denying Debtor's Discharge Under *11 U.S.C. § 727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)*, and *(a)(6)(A)* filed on March 11, 2015,[2] as though fully set forth herein.

C. Conclusions of Law:

1. This court has jurisdiction over this adversary proceeding pursuant to *28 U.S.C. §§ 157(b)* and *1334(b)*. This matter is a core proceeding under *28 U.S.C. § 157(b)(2)(A)*, *(J)* and *(O)*. Venue is appropriate in this court. *28 U.S.C. § 1409(a)*.

2. *HN8*[↑] Objections to discharge [*6] are to be literally and strictly construed against the objector and liberally construed in favor of the debtor. *Lansdowne v. Cox (In re Cox), 41 F.3d 1294, 1297 (9th Cir. 1986)*. "Courts should deny discharge only for very specific and serious infractions." *Martin Marietta Materials Southwest, Inc. v. Lee (In re Lee), 309 B.R. 468, 476 (Bankr. W.D. Tex. 2004)*.

3. *HN9*[↑] To deny discharge under *§ 727(a)(2)(A)*, the plaintiff must establish by a preponderance of the evidence (1) a disposition of property (i.e., transfer or concealment); (2) with subjective intent to hinder, delay or defraud a creditor; and (3) it must occur within one year prior to filing bankruptcy. See *Fogal Legware of Switzerland, Inc. v. Wills (In re Wills), 243 B.R. 58, 65 (9th Cir. BAP 1999)*. Because the statute is written in the disjunctive, an intent to hinder or delay is sufficient to deny discharge under *§ 727(a)(2)*. See *Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279, 1281 (9th Cir. 1996)*. Proof of fraud is not necessary nor is injury to creditors relevant for purposes of *§ 727(a)(2)*. See *Id. at 1281-82*.

Miller's Discharge Will Be Denied Pursuant to *11 U.S.C. §§ 727(a)(2)(A)* & *(B)*

4. *HN10*[↑] The standard for denial of discharge under *§ 727(a)(2)(B)* is the same as *§ 727(a)(2)(A)*, but the disposition must be of estate property occurring after the petition date. See *11 U.S.C. § 727(a)(2)(B)*.

---

[2] Notice of Lodgment of Order or Judgment in Adversary Proceeding Re: Motion for Summary Judgment Against Defendant Loren Miller Denying Debtor's Discharge Under *11 U.S.C. § 727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)*, and *(a)(6)(A)* [Dkt. # 48], Exhibit A.

2015 Bankr. LEXIS 1929, *6

5. **_HN11_**[⬆] Intent "may be established by circumstantial evidence, or by inferences drawn from a course of conduct." _First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir. 1986)_ (citation omitted).

6. "**_HN12_**[⬆] Whether a debtor harbors intent to hinder, or delay, or defraud a creditor is a question of fact reviewed for clear error. Intent may be inferred from surrounding **[*7]** circumstances. The surrounding circumstances include the various 'badges of fraud' that constitute circumstantial evidence of intent." _Wolkowitz v. Beverly (In re Beverly), 374 B.R. 221, 243 (9th Cir. BAP 2007)_ (citations omitted).

7. "Certain 'badges of fraud' strongly suggest that a transaction's purpose is to defraud creditors unless some other convincing explanation appears. These factors, not all of which need be present, include 1) a close relationship between the transferor and the transferee; 2) that the transfer was in anticipation of a pending suit; 3) that the transferor Debtor was insolvent or in poor financial condition at the time; 4) that all or substantially all of the Debtor's property was transferred; 5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and 6) that the Debtor received inadequate consideration for the transfer." _Emmett Valley Assocs v. Woodfield (In re Woodfield), 978 F.2d 516, 518 (9th Cir. 1992)_.

8. **_HN13_**[⬆] A non-exclusive list of "badges of fraud" has been codified by California's Uniform Fraudulent Transfer Act ("UFTA").[3] The UFTA factors are intended

_____

[3] (1) Whether the transfer or obligation was to an insider; (2) whether the debtor retained **[*8]** possession or control of the property transferred after the transfer; (3) whether the transfer or obligation was disclosed or concealed; (4) whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) whether the transfer was of substantially all the debtor's assets; (6) whether the debtor absconded; (7) whether the debtor removed or concealed assets; (8) whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) whether the transfer occurred shortly before or shortly after a substantial debt was incurred; (11) whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor. _Cal. Civ. Code § 3439.04(b)_.

"to provide guidance to the trial court, not compel a finding one way or another." _Filip v. Bucurenciu, 129 Cal.App.4th 825, 834, 28 Cal. Rptr. 3d 884 (2005)_.

9. **_HN14_**[⬆] "The UFTA list of 'badges of fraud' provides neither a counting rule, nor a mathematical formula. No minimum number of factors tips the scales toward actual intent. A trier of fact is entitled to find actual intent based on the evidence in the **[*9]** case, even if no "badges of fraud" are present. Conversely, specific evidence may negate an inference of fraud notwithstanding the presence of a number of 'badges of fraud.'" _Beverly, 374 B.R. at 236_.

10. Miller transferred or concealed property within one year prior to the petition date, and transferred or concealed property of the estate within one year after the petition date.

11. Miller disposed of $27,173.38 through the Kitco Purchases of silver coins and gold bars in the months preceding the bankruptcy filing, and Defendant's Schedule B and SOFA failed to disclose these assets/transactions.

12. Miller also concealed his interest in the 2012 State Refund and 2012 Federal Refund.

13. Miller's Accounting admits to spending $68,000.00 of the Cash in the month prior to bankruptcy and during the three months following the petition date. Evidence recovered by Plaintiff shows that Miller was holding approximately $76,000.00 in additional undisclosed cash as of the petition date.

14. Miller concealed the Corporate Accounts and disposed of funds in the undisclosed Corporate Accounts for personal use both before and after the petition date.

15. Miller also concealed the post-petition rents generated by the Nevada Property **[*10]** and $100,000.00 worth of miscellaneous furniture.

16. Miller's transfer or concealment of property prior to the petition date was made with the subjective intent to hinder or delay, if not defraud, a creditor.

17. Miller's transfer or concealment of property of the estate after the petition date was made with the subjective intent to hinder or delay, if not defraud, the trustee and creditors of the estate.

18. Miller admits in his Accounting to spending $68,000 of the Cash on personal expenses in the three months

Layla Buchanan

2015 Bankr. LEXIS 1929, *10

following the petition date, with full knowledge of Trustee's efforts to recover said funds.

19. Miller disposed of funds in the Corporate Accounts for personal use, knowing that Trustee was examining said accounts after questioning Miller about them at a *§ 341(a)* meeting.

20. Miller's failure to disclose transfers and assets, as well as the dissipation of estate funds with knowledge of Trustee's efforts to recover said funds, are "badges of fraud" indicative of an intent to hinder or delay, if not defraud, creditors.

21. Miller's subjective intent to hinder or delay, if not defraud, the Trustee and creditors of the estate is further evidenced by Miller's overall course of conduct, which **[*11]** includes multiple instances of concealment of assets, frustrating Trustee's recovery efforts and ignoring the court's turnover orders.

22. There being no genuine issue of material fact with respect to Plaintiff's claims against Miller under *11 U.S.C. § 727(a)(2)(A)* or *(B)*, the court will enter an order granting Plaintiff's Motion against Miller on such claims.

Miller's Discharge Will Be Denied Pursuant to *11 U.S.C. §§ 727(a)(4)(A)*

23. **HN15**[⬆] "Under *section 727(a)(4)(A)*, the defendant's discharge will be denied if it is proven that: (1) the defendant made a statement under oath; (2) the statement was false; (3) the defendant knew the statement was false; (4) the defendant made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Stanley v. Hoblitzell (In re Hoblitzell), 223 B.R. 211, 215 (Bankr. E.D. Cal. 1998).*

24. "The debtor's knowledge and fraudulent intent may be shown by circumstantial evidence and inferred from the debtor's course of conduct." Id.

25. Miller made false statements under oath by failing to disclose in the schedules and statements property owned on the petition date, including (a) the Kitco Purchases; (b) the Cash; (c) the 2012 State Refund; (d) the 2012 Federal Refund; and (e) the Corporate Accounts.

26. Defendant also made false statements under oath at the July 15, 2013 *§ 341(a)* meeting **[*12]** when he confirmed that: (a) he had scheduled all of his interests

in entities and/or assets; (b) he had not sold, transferred or given away anything of value in the last four years; and (c) the Nevada Property was not generating any rental income.

27. In each instance, Miller's false statement under oath related to a material fact because it bore a relationship to Miller's business transactions or the estate, or concerned the discovery of assets, business dealings, or the existence or disposition of property of the debtor or the estate.

28. Miller's false statements and omissions were so intertwined with his business and financial affairs and the Trustee's ongoing efforts to investigate and recover property of the estate that the court infers his failure to make full and accurate disclosure in his statements under oath was intentional and for the purpose of deceiving creditors and the Trustee.

29. There being no genuine issue of material fact with respect to Plaintiff's claim against Miller under *11 U.S.C. § 727(a)(4)(A)*, the court will enter an order granting Plaintiff's Motion against Miller on such claim.

Miller's Discharge Will Be Denied Pursuant to *11 U.S.C. §§ 727(a)(6)(A)*.

30. **HN16**[⬆] *Section 727(a)(6)* states that the court shall grant the debtor a discharge, **[*13]** unless the debtor has refused to obey and lawful order of the court, other than an order to respond to a material question or to testify. *11 U.S.C. § 727(a)(6)(A).*

31. **HN17**[⬆] "The term used in *§ 727(a)(6)(A)* is 'refused,' not 'failed.'" *Smith v. Jordan (In re Jordan), 521 F.3d 430, 433 (4th Cir. 2008).*

32. **HN18**[⬆] "The party objecting to discharge [under *§ 727(a)(6)(A)*] satisfies [its] burden by demonstrating that the debtor received the order in question and failed to comply with its terms. Such a showing then imposes upon the debtor an obligation to explain his non-compliance." Id. (citations omitted). See *Hicks v. Decker (In re Hicks), 2006 Bankr. LEXIS 4897, 2006 WL 6810987, *8 (9th Cir. BAP 2006)* ("Once Trustee has produced sufficient evidence to support the claim, the burden of going forward then shifts to the Debtor to satisfactorily explain his behavior.").

33. **HN19**[⬆] "[I]t is totally within the discretion of the bankruptcy court to find a particular violation of the

EXHIBIT 2, PAGE 23

2015 Bankr. LEXIS 1929, *13

court's order so serious as to require denial of discharge under *§ 727(a)(6)(A)*." *Devers v. Bank of Sheridan (In re Devers), 759 F.2d 751, 755 (9th Cir. 1985)*.

34. On June 18, 2013, the court entered an Order Granting Chapter 7 Trustee's Motion for Turnover of Property of the Estate and Order Directing Debtors to Appear at Continued *11 U.S.C. § 341(a)* Meetings of Creditors [Dkt. # 54] ("First Turnover Order") which provided, in pertinent part: "[Loren Miller and Sarah Miller] are directed to immediately, but no later than five (5) days after entry of this **[*14]** Order, turn over to the Trustee, by and through his counsel Margulies Faith LLP ("MF"), $182,000, the amount listed in the Debtor's Schedule B filed on February 21, 2013 (Dkt. No. 11) by way of a Cashier's Check made payable to 'Jeremy W. Faith, Chapter 7 Trustee.'"

35. The First Turnover Order was served on Miller and his spouse, Sarah Miller, by United States mail, first class mail, postage prepaid, at 702 Whitecap Drive, Seabrook, TX 77586, on June 13, 2013.

36. The First Turnover Order was served electronically on Debtors' attorney of record, Vaughn C. Taus on June 13, 2013.

37. Miller had knowledge of the First Turnover Order either directly or through counsel.

38. Miller did turnover to the Trustee the sum of $182,000 by June 23, 2013, as required by the First Turnover Order.

39. On July 12, 2013, Miller ultimately turned over to the Trustee the sum of $101,731 and a one-page accounting prepared by Miller describing how $68,000 of the funds were spent prior to and approximately 3 months after the petition date.

40. Miller has neither turned over nor accounted for the balance of the funds -- $12,269, despite the First Turnover Order and repeated demands by the Trustee.

41. Miller attended **[*15]** a creditors' meeting on July 15, 2013, but did not appear for any continued creditors' meetings after July 15, 2015, despite the First Turnover Order and repeated demands by the Trustee.

42. On March 19, 2014, the court entered an Order Granting Chapter 7 Trustee's Motion for Turnover of Property of Estate [Dkt. # 124] ("Second Turnover Order") which provided, in pertinent part: [Loren Miller] is directed to immediately, but no later than ten (10) days after entry of this order, turn over to the Trustee,

by and through his counsel Margulies Faith LLP, (i) $6,716 received post-petition from the 2012 State Refund; and (ii) the Kitco Purchases (as detailed in Exhibit A to the Motion), or their cash value of $27,173.38"

43. The Second Turnover Order was served on the Miller by United States mail, first class mail, postage prepaid, at 600 E. Medical Center Blvd., # 1509, Webster, TX 77598, on March 21, 2014.

44. The First Turnover Order was served electronically on Debtors' attorney of record, Vaughn C. Taus on March 21, 2014.

45. Miller had knowledge of the Second Turnover Order either directly or through counsel.

46. Despite the Second Turnover Order and repeated demands by the Trustee, Miller **[*16]** has not turned over to the Trustee either the 2012 State Refund or the Kitco Purchases.

47. Miller has not responded to explain his behavior nor produce significantly probative evidence to establish a genuine issue of material fact regarding his ability or inability to comply with either the First Turnover Order or the Second Turnover Order.

48. There being no genuine issue of material fact with respect to Plaintiff's claim against Miller under *11 U.S.C. § 727(a)(6)(A)*, the court will enter an order granting Plaintiff's Motion against Miller on such claim.

## CONCLUSION

For the reasons stated, the court will enter an order granting Plaintiff's Motion against Miller on Plaintiff's claims against Miller under *11 U.S.C. § 727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)* and *(a)(6)(A)*.

A separate order will be entered consistent with this memorandum.

Date: June 12, 2015

/s/ Peter H. Caroll

Peter H. Caroll

United States Bankruptcy Judge

**ORDER GRANTING PLAINTIFF'S MOTION FOR**

Layla Buchanan

EXHIBIT 2, PAGE 24

2015 Bankr. LEXIS 1929, *16

**SUMMARY JUDGMENT AGAINST DEFENDANT
LOREN MILLER UNDER *11 U.S.C. § 727(a)(2)(A)*,
*(a)(2)(B)*, *(a)(4)(A)*, AND *(a)(6)(A)*

Based on the memorandum of even date herewith, it is

ORDERED that Plaintiff's Motion for Summary
Judgment Against Defendant Loren Miller Under *11
U.S.C. § 727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)*, and *(a)(6)(A)*
is granted.

Date: June 12, 2015

/s/ Peter H. Carroll

Peter H. Carroll

United States Bankruptcy Judge

---

**End of Document**

**EXHIBIT 3**

**User Name:** Layla Buchanan

**Date and Time:** Wednesday, May 10, 2023 3:03:00PM PDT

**Job Number:** 196842977

## Document (1)

1. *JP Morgan Chase Bank, N.A. v. Ellison (In re Ellison), 2016 Bankr. LEXIS 3475*

   **Client/Matter:** 1673-001

   **Search Terms:** 2016 Bankr.LEXIS 3475

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | Cases | -None- |

Positive
As of: May 10, 2023 10:03 PM Z

# *JP Morgan Chase Bank, N.A. v. Ellison (In re Ellison)*

United States Bankruptcy Court for the Central District of California, Los Angeles Division

September 23, 2016, Decided; September 23, 2016, FILED & ENTERED

Case No. 2:14-bk-24463-RK, Chapter 7, Adv. No. 2:15-ap-01001-RK

**Reporter**
2016 Bankr. LEXIS 3475 *

In re: JOSEPH ELLISON, Debtor.JP MORGAN CHASE BANK, N.A., JP MORGAN SECURITIES, LLC, Plaintiffs, vs. JOSEPH ELLISON, Defendant.

**Subsequent History:** Affirmed by *Ellison v. JPMorgan Chase Bank, N.A. (In re Ellison), 2017 Bankr. LEXIS 2561 (B.A.P. 9th Cir., Sept. 8, 2017)*

**Prior History:** *JPMorgan Chase Bank, N.A. v. Ellison (In re Ellison), 2015 Bankr. LEXIS 2571 (Bankr. C.D. Cal., Aug. 3, 2015)*

## Core Terms

transfers, funds, intent to hinder, exempt, hinder, non-exempt, prepetition, defraud a creditor, defraud, judgment creditor, actual intent, bankruptcy court, bankruptcy case, purposes, home loan, non-preferred, determines, fraudulent, prepayments, trial testimony, mere fact, preferential, refinancing, prepay, circumstances, fraudulent transfer, transactions, planning, insider, lenders

## Case Summary

### Overview

HOLDINGS: [1]-Pursuant to *11 U.S.C.S. § 727(a)(2)(A)*, debtor was not entitled to a discharge because, under the totality of the circumstances, debtor's prepetition transfers, including transfers to his wife and pre-payment of mortgage payments, resulted in dilution of at least $247,350 in non-exempt assets and thereby "crossed the line" of permissible behavior, evidencing that debtor had acted with an intent to hinder, delay or defraud creditors; [2]-Debtor's express admissions supported a finding that debtor undertook the prepetition transfers in an effort to become judgment proof as to his non-preferred creditors, and thwart their collection efforts against him.

### Outcome

Debtor's discharge denied.

## LexisNexis® Headnotes

Family Law > ... > Property Distribution > Characterization > Community Property

Family Law > ... > Property Distribution > Characterization > Separate Property

### *HN1*[ ] **Characterization, Community Property**

The mere commingling of separate property and community property funds does not alter the status of the respective property interests, provided that the components of the commingled mass can be adequately traced to their separate property and community property sources. But if the separate property and community property interests have been commingled in such a manner that the respective contributions cannot be traced and identified, the entire commingled fund will be deemed community property pursuant to the general community property presumption of *Cal. Fam. Code § 760*.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

### *HN2*[ ] **Denial of Discharge, Concealment & Fraudulent Transfers**

Under *11 U.S.C.S. § 727*, the court shall grant the debtor a discharge, unless the debtor, with intent to

2016 Bankr. LEXIS 3475, *3475

hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed, (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition. *11 U.S.C.S. § 727(a)(2)*.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN3*[ ] Denial of Discharge, Concealment & Fraudulent Transfers

A party seeking denial of discharge under *11 U.S.C.S. § 727(a)(2)* must prove two things: (1) a disposition of property, such as transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act of disposing of the property. Under *11 U.S.C.S. § 101(54)*, the term "transfer" means each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property. Those objecting to discharge bear the burden of proving by a preponderance of the evidence that the debtor's discharge should be denied.

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Denial of Discharge

*HN4*[ ] Liquidations, Denial of Discharge

In keeping with the "fresh start" purposes behind the Bankruptcy Code, courts should construe *11 U.S.C.S. § 727* liberally in favor of debtors and strictly against parties objecting to discharge. While this does not alter the burden on the objector, it rather means that actual, rather than constructive intent is required on the part of debtor.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN5*[ ] Denial of Discharge, Concealment & Fraudulent Transfers

For purposes of *11 U.S.C.S. § 727(a)(2)*, "transferred"

means transferred and remained transferred. i.e., a debtor who fraudulently transfers property out of the bankruptcy estate during the one-year pre-petition period but then returns the property to the estate before filing the petition may still receive a discharge.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN6*[ ] Denial of Discharge, Concealment & Fraudulent Transfers

For purposes of *11 U.S.C.S. § 727(a)(2)*, regarding the second Lawson element, the intent element, a debtor's intent does not need to be fraudulent to meet the requirements of *11 U.S.C.S. § 727(a)(2)*. Because the language of the statute is in the disjunctive, it is sufficient if the debtor's intent is to hinder or delay a creditor.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN7*[ ] Denial of Discharge, Concealment & Fraudulent Transfers

The intent to hinder or delay for purposes of *11 U.S.C.S. § 727(a)(2)(A)* is a question of fact that requires the trier of fact to delve into the mind of the debtor and may be inferred from surrounding circumstances. Furthermore, intent for purposes of *11 U.S.C.S. § 727(a)(2)* may be inferred from the surrounding circumstances, including certain "badges of fraud" that constitute circumstantial evidence of intent: These factors, not all of which need be present, include 1) a close relationship between the transferor and the transferee; 2) that the transfer was in anticipation of a pending suit; 3) that the transferor Debtor was insolvent or in poor financial condition at the time; 4) that all or substantially all of the Debtor's property was transferred; 5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and 6) that the Debtor received inadequate consideration for the transfer. A course of conduct may also be probative of the question of intent.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Intent

Layla Buchanan

2016 Bankr. LEXIS 3475, *3475

*HN8*[🔻] **Fraudulent Transfers, Intent**

The statutory text of *11 U.S.C.S. § 548(a)(1)(A)* focuses on the debtor's intent. The debtor must possess an intent to hinder, an intent to delay or an intent to defraud. The requirement is disjunctive; any one of the three intents is sufficient for liability.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN9*[🔻] **Denial of Discharge, Concealment & Fraudulent Transfers**

The words "hinder," "delay" and "defraud" used to describe the intent required under *11 U.S.C.S. § 727(a)(2)* are not defined terms under the Bankruptcy Code. The meaning of these terms comes from the common law and is codified in the Uniform Fraudulent Conveyance Act, now the Uniform Voidable Transactions Act. The terms of hinder, delay and defraud connote intentional actions by a debtor to frustrate or thwart collection by creditors and describe a continuum of intents that may differ temporally or in substance and effect, but each of which is impermissible for purposes of *11 U.S.C.S. § 727(a)(2)*.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN10*[🔻] **Denial of Discharge, Concealment & Fraudulent Transfers**

The intent to prefer creditors is not equivalent to the intent to hinder, delay or defraud creditors. A transfer preferring one creditor over another does not amount to an act to "hinder, delay, or defraud" an unpreferred creditor. Nonetheless, even if the intent to prefer creditors is not equivalent to the intent to hinder, delay or defraud creditors, the intent to prefer creditors may still coincide with the intent to hinder, delay or defraud creditors if there is other evidence of intent.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN11*[🔻] **Denial of Discharge, Concealment & Fraudulent Transfers**

The Ninth Circuit's statement in Hultman that the mere fact of a preferential transfer does not justify discharge denial means that such a transfer by itself is not grounds to deny a discharge, but it says nothing about a preferential transfer being considered as evidence of intent in the context of other facts that may evidence intent.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN12*[🔻] **Denial of Discharge, Concealment & Fraudulent Transfers**

The court may consider preferential payments to creditors for purposes of determining an intent to hinder, delay or defraud under *11 U.S.C.S. § 727(a)(2)(A)*.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN13*[🔻] **Denial of Discharge, Concealment & Fraudulent Transfers**

When a debtor admits that he acted with the intent penalized by *11 U.S.C.S. § 727(a)(2)(A)*, there is no need for the court to rely on circumstantial evidence or inferences in determining whether the debtor had the requisite intent. Additionally, entry of a discharge order should be denied if a debtor had the intent penalized by the statute notwithstanding any other motivation he may have had for the transfer.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

Civil Procedure > Judgments > Enforcement & Execution > Fraudulent Transfers

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Constructively Fraudulent Transfers

*HN14*[🔻] **Denial of Discharge, Concealment & Fraudulent Transfers**

Under the Uniform Fraudulent Transfer Act (now the Uniform Voidable Transactions Act), a transfer is constructively fraudulent if the debtor made the transfer without receiving a reasonably equivalent value for the

Layla Buchanan

transfer in exchange for the transfer and the debtor was insolvent at the time of the transfer or became insolvent as result of the transfer. *Cal. Civ. Code § 3439.05(a)*. Although the finding of lack of reasonably equivalent value is not directly relevant for a claim under *11 U.S.C.S. § 727(a)(2)*, such a finding would itself be a badge of fraud indicating actual intent to hinder, delay or defraud current creditors under the Uniform Fraudulent Transfer Act (now Uniform Voidable Transactions Act) and under the Ninth Circuit's listing of badges of fraud.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN15*[↓]  **Denial of Discharge, Concealment & Fraudulent Transfers**

"Insider" as defined in *11 U.S.C.S. § 101(31)* specifically includes the spouse of the debtor.

**Counsel:**  [*1] For Joseph Ellison, Debtor (2:14-bk-24463-RK): David S Hagen, Encino, CA.

For Trustee (2:14-bk-24463-RK): Brad D Krasnoff (TR), Los Angeles, CA.

For JPMORGAN CHASE BANK, N.A., J.P. Morgan Securities LLC, Plaintiffs (2:15-ap-01001-RK): Bryant S Delgadillo, Jeffrey N Williams, Wargo French LLP, Los Angeles, CA.

For Joseph Ellison, Defendant (2:15-ap-01001-RK): David S Hagen, Encino, CA.

For Trustee (2:15-ap-01001-RK): Brad D Krasnoff (TR), Los Angeles, CA.

**Judges:** Robert Kwan, United States Bankruptcy Judge.

**Opinion by:** Robert Kwan

# Opinion

MEMORANDUM DECISION ON PLAINTIFFS' ADVERSARY COMPLAINT OBJECTING TO ENTRY OF DISCHARGE PURSUANT TO *11 U.S.C. §§ 727(a)(2)(A)* AND *(a)(2)(B)*

The above-captioned adversary proceeding on the complaint of plaintiffs JP Morgan Chase Bank, N.A. and JP Morgan Securities, LLC ("Plaintiffs" or collectively, "JPMorgan"), asserting claims objecting to discharge of defendant Joseph Ellison ("Defendant"), Debtor, under *11 U.S.C. §§ 727(a)(2)(A)* and *(a)(2)(B)* came on for trial before the undersigned United States Bankruptcy Judge on November 19, 2015. Bryant S. Delgadillo, of the law firm of Wargo & French LLP, appeared for Plaintiffs. David S. Hagen, of the Law Offices of David S. Hagen, appeared for Defendant.

After trial, on January 15, 2016, Plaintiffs lodged their **[*2]** Proposed Findings of Fact and Conclusions of Law, and on February 1, 2016, Defendant lodged his Proposed Findings of Fact and Conclusions of Law. ECF 26 and 27. On February 4, 2016, Defendant filed objections to Plaintiffs' Proposed Findings of Fact and Conclusions of Law. ECF 28. Afterwards, the court then took the matter under submission.

Having considered the witness testimony and exhibits received at trial, and the other matters in evidence, the court hereby makes the following findings of fact and conclusions of law pursuant to *Rule 7052 of the Federal Rules of Bankruptcy Procedure* and *Rule 52 of the Federal Rules of Civil Procedure*.[1]

## FINDINGS OF FACT

Findings of Fact 1 through 39 are undisputed facts that were established through the Pre-Trial Stipulation for Claims for Relief, ECF 22, which the parties jointly filed and was approved by the court in its Order Approving Joint Pretrial Stipulation and Setting Trial Date, ECF 24.

1. Defendant was employed by JPMorgan as a financial advisor until approximately April 2012.

2. During the course of his employment, Defendant **[*3]** developed an animus towards JPMorgan.

3. In or about June 2012, Defendant initiated an arbitration action against JPMorgan before a Financial Regulatory Authority panel, FINRA case number 12-02244 ("FINRA Action"), by asserting various claims related to his employment.

4. JPMorgan filed a counterclaim in the FINRA Action for breach of contract related to a loan, in the approximate amount of $750,000, that Defendant obtained from JPMorgan as part of his employment, but

---

[1] Any findings of fact that should be properly characterized as conclusions of law will be considered as such, and any conclusions of law that should be properly characterized as findings of fact will be considered as such.

2016 Bankr. LEXIS 3475, *3

failed to repay.

5. During the FINRA Action, Defendant was represented by counsel. His original counsel, Shustak & Partners LLP ("Shustak"), was replaced during the proceeding as the result of a fee dispute.

6. Defendant's replacement counsel, Jeffrey Sigler, represented Defendant on a contingency basis.

7. The FINRA panel conducted an evidentiary hearing from April 28, 2014 to May 6, 2014.

8. On or about June 3, 2014, the FINRA panel found against Defendant on his claims and in favor of JPMorgan on its counterclaim, entering an award in favor of JPMorgan in the amount of $789,624.06 ("FINRA Award").

9. On July 17, 2014, JPMorgan initiated a proceeding with the United States District Court for the Central District of California, [*4] case number CV14-05567, for judicial confirmation of the FINRA Award ("FINRA Award Confirmation Action").

10. Less than two weeks later, on July 29, 2014, Defendant filed a voluntary petition for relief under chapter 7 of Title 11 of the United States Code ("Petition Date"), thereby initiating bankruptcy case number 2:14-bk-24463-RK, in the U.S. Bankruptcy Court for the Central District of California, Los Angeles Division ("Bankruptcy Case").

11. The FINRA Award Confirmation Action was stayed as a result of Defendant filing the Bankruptcy Case. See 11 U.S.C. § 362(a).

12. In the Schedule F filed concurrently with the petition in the Bankruptcy Case, Defendant reported unsecured debts totaling $926,506.00, including: (1) $789,000 owed to JPMorgan on account of the FINRA Award (not listed as disputed, contingent, or unliquidated); and (2) $45,000 owed to Shustak related to the attorney fee dispute (listed as disputed).

13. JPMorgan and Shustak are Defendant's two largest unsecured creditors and the debts owed to them account for approximately 90 percent of all of the Defendant's unsecured debt.

14. Eleven Sixteen LLLP is a limited liability company was [sic] created in January 2014. [LLLP refers to limited [*5] liability limited partnership. See Plaintiff's Exhibit 9, Proof of Claim No. 2, filed by Wood, Erickson & Whittaker on April 27, 2015, referring to billing

statement for "Drafting and formation of limited liability limited partnership: Eleven Sixteen LLLP [Flat fee] Amount - $7,500.00".]

15. Defendant admits that he retained a firm to form a trust and limited liability partnership, but denies that he formed or created Eleven Sixteen LLLP.

16. Defendant and his wife, Ellen Ellison, are the owners of the residential real property located at 555 S. Norton Avenue, Los Angeles, California 90020 ("Property").

17. In addition to the Property, Defendant holds interests in various bank accounts including: (1) Joseph Ellison ITF Ellen Ellison, City National Bank, account ending 1756 ("Defendant's CNB Account"); and (2) Joseph Ellison and Ellen Ellison Joint WROS, Mutual Securities, Inc., account ending 9350 ("Joint Account").

18. While the FINRA Action was pending, on or about February 14, 2014, Defendant and his wife obtained a loan, in the principal amount of $1,496,500 from Greenbox Loans, Inc. ("First DOT"). Dovenmuehle Mortgage, Inc. is the current servicer of the First DOT. [The court understands [*6] that "DOT" refers to a Deed of Trust securing a loan on Defendant's residence. See Plaintiff's Exhibit 8, Voluntary Petition for Relief and Schedules filed on July 29, 2014, referring to Schedule D listing "1st trust deed on residence" held by Dovenmuehle Mortgage Inc.; Defendant's Exhibit A, Closing Statement, referring to loan by Greenbox Loans, Inc., to Joseph Ellison and Ellen Ellison.].

19. The funds from the First DOT were disbursed as follows: (1) payoff of a deed of trust in favor of Ocwen Loan Servicing in the approximate amount of $605,728.11; (2) payoff of deed of trust in favor of Morgan Stanley Home Loans in the approximate amount of $742,802.77; and (3) disbursement in the approximate amount of $69,441.17 to Defendant's CNB Account.

20. Additionally, while the FINRA Action was pending, on or about February 28, 2014, Defendant and his wife obtained a loan, in the principal amount of $200,000 from Brian Dror and Rafael Ryzman ("Second DOT"). Logan Investments is the current servicer of the Second DOT.

21. The funds from the Second DOT, in the approximate amount of $178,509.68, were disbursed to Defendant's CNB Account.

Layla Buchanan

2016 Bankr. LEXIS 3475, *6

22. The First DOT and Second DOT fully encumbered the Property **[\*7]** (reflecting value of the property of $1,500,000 and encumbered with debts totaling $1,716,551.00).

23. On or about March 1, 2014, the funds disbursed to Defendant from the First DOT and the Second DOT, totaling $247,950.85, were in Defendant's CNB account.

24. Later that same month, Defendant transferred a total of $38,000 to two of his friends, Ed Jeffers and Charles Springer. Defendant testified that he was repaying one personal and one business project loan to these individuals, although the purported business loan was to pay for Defendant's living expenses.

25. While the FINRA Action was pending and shortly after the evidentiary hearing in the matter concluded, on or about May 12, 2014, Defendant transferred $18,000 from Defendant's CNB Account to an account held by the Law Offices of Ellen Ellison, at City National Bank, account ending 5499 ("Wife's CNB Account").

26. Approximately one week after the issuance of the FINRA Award, on or about June 10 and June 11, 2014, Defendant transferred, through two transactions, a total of $51,000 from Defendant's CNB Account to his Wife's CNB account.

27. Less than two weeks after the entry of the FINRA Award, on or about June 16, 2014, Defendant **[\*8]** transferred $121,000 from Defendant's CNB Account to the corporate account of Clownputsch, Inc., a corporation wholly owned by Defendant, at City National Bank, account ending in 7881 ("Clownputsch Account").

28. Defendant testified during the 2004 examination that he transferred the funds, in part, because he was afraid people were going to take all his money away and leave his family destitute.

29. Defendant retained bankruptcy counsel on or about June 15, 2014.

30. On or about June 21, 2014, Defendant transferred $119,000 from Clownputsch Account to Defendant's CNB Account.

31. On or about July 9, 2014, six days after receiving notice of the FINRA Award against him and three weeks before filing his petition, Defendant transferred $41,415.30 from Defendant's CNB Account to Dovenmuehle Mortgage, thereby prepaying the First

DOT for six months[2].

32. Also on or about July 9, 2014, Defendant transferred $11,062 from Defendant's CNB Account to Logan Investments, thereby prepaying the Second DOT for six months.[3]

33. Defendant testified at his 2004 Examination as follows:

A. Well, at the time that the payments were made — let's see. . . . July was the prepayment[,] by then the case had been decided, and I didn't know what I was going to do. Really, we were trying to make up our mind what we were going to do, and then I just wanted to make sure that those -- that whatever happened -- I mean, I got a threatening letter. I got threatening letters from the beginnings of what might have been attempts to collect money or whatever, and I just wanted to make sure that we wouldn't be thrown out in the street.

Q. And who did those letters come from?

A. Well, I got -- well, the award in and of itself was pretty breathtaking. When I got the notice of the award, that was F.I.N.R.A., and the F.I.N.R.A. fees. I didn't know if I would lose my license. I didn't. J.P. Morgan, obviously, they had sent me by July -- yeah. They had sent me a letter by then saying they wanted their money. **[\*10]** And who else was there? I was having a fee disputes. That's another thing. I was having a fee dispute. I found out that I was grossly overcharged by the attorneys I used first, and I got several attorneys' opinions, and so I was possibly fighting with them. Whatever else was going to go on, I wanted to make sure my family was at least ensconced in our home until the end of the year.

[. . . ]

Its a priority of survival. I wanted to make sure we had a home to live in and a place to live in while all this was going on.

Q. So if you had kept the funds in your city national

---

[2] Although the parties stipulated that Defendant prepaid both the First and Second DOT by six months, as clarified by Defendant's testimony at trial, it appears that the six month figure included the then currently due monthly payment, and thus, the court finds that Defendant prepaid the First and Second DOT by five months, not six months. *Trial Testimony* **[\*9]** *of Joseph Ellison*, November 19, 2015 at 9:22-9:23 a.m.

[3] *Supra* note 2.

Layla Buchanan

2016 Bankr. LEXIS 3475, *9

bank account, why wouldn't they have been there for you to be able to pay your mortgage?
A. Well, I didn't know if, for example, Shustak had gotten a judgment, which he didn't. They threw him out of court, but he kept trying to do things. I didn't know where -- I felt under siege. I guess you can understand that. So I had to prioritize where this money went, and other than food and other -- certain other things that had to be accounted -- you know, taken care of. This was a pretty important piece of that puzzle.
Q. Okay. So were [you] concerned that Shustak might get the judgment and then take the money?

A. That was a possibility. **[*11]** I thought I had -- I mean, I had a few disputes. I reported . . . .
Q. Were you concerned that the money would have gone to J.P. Morgan?
A. I don't remember my thinking about that. But I remember thinking, "if I don't keep a roof over our heads right now, we're going to be in a lot of trouble."

34. Defendant further testified that he "had to prioritize where this money went" and that repayment of the First DOT and Second DOT "was a pretty important piece of that puzzle."

35. The funds transferred to Dovenmuehle Mortgage and Logan Investments, totaling $52,477.30 are not available for distribution to Defendant's unsecured creditors.

36. Defendant transferred, through four separate transactions, a total of $31,600 from the non-exempt Joint Account to various destinations. This included a transfer of $17,000.00 to his wife on the Petition Date.

37. The four transactions posted to the Joint Account after the Petition Date.

38. As a result of the four transfers, the balance of the Joint Account decreased from $33,494.92 to $1,895.02.

39. Defendant disclosed a balance for the Joint Account of $1,895.02 in the Schedule B.

40. The parties in their Pre-Trial Stipulation for Claims for Relief, ECF 22, **[*12]** designated the following as Disputed Fact 1 for determination at trial:

[Disputed Fact] "1. Defendant's bankruptcy schedules and statement of financial affairs did not disclose any interest in a limited liability limited partnership, or a bank account in the name of a company owned by the

Defendant, Clownputsch, Inc."

The court finds that this disputed fact is not supported by a preponderance of the evidence because Defendant's Schedule B-Personal Property, Petition, Exhibit 8 at 16, disclosed the existence of Clownputsch, Inc.

41. The parties in their Pre-Trial Stipulation for Claims for Relief, ECF 22, designated the following as Disputed Fact 2 for determination at trial:

[Disputed Fact] "2. Defendant held no interest in his Wife's CNB Account."

The court finds that this disputed fact is not supported by a preponderance of the evidence. Based on *California Family Code § 760* and *In re Marriage of Braud, 45 Cal.App.4th 797, 822-823, 53 Cal. Rptr. 2d 179 (1996)*, the court finds that the evidence shows that Defendant had a community property interest in the funds in his Wife's CNB Account. At trial, Defendant testified that he was not involved in opening his Wife's CNB Account, which belonged to his wife's law practice, that he was not a signatory on that account, that he had no control over the **[*13]** account, that he had nothing to do with the account and that he was not a member of his wife's law practice. *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:17-9:18 a.m. Although Defendant's testimony on these points is credible and although Defendant listed the account as his wife's personal checking account on his bankruptcy schedules, the court gives more weight to other admitted evidence. First, the court observes that Defendant listed his Wife's CNB Account as community property on Defendant's Schedule B, Exhibit 8 at 14, and claimed a $24,925.00 exemption in that account, whose value on the Petition Date was scheduled at $25,793.00 pursuant to Defendant's Schedule C, Exhibit 8 at 20. Further, even if Defendant's Wife's CNB Account was his wife's separate property, because community property was commingled with separate property in Wife's CNB Account, and because no evidence was presented tracing the source of any separate funds, the court determines that based upon the admitted evidence, Defendant has a community property interest in the funds in his Wife's CNB Account. That is, given that less than three months before the Petition Date, shortly after Defendant refinanced **[*14]** the Property, Defendant transferred at least $69,000.00 to his Wife's CNB Account from the refinancing of the Property, which Defendant listed as community property on Defendant's Schedule A, Exhibit 8 at 13, and given

2016 Bankr. LEXIS 3475, *14

that no evidence was presented tracing the funds in his Wife's CNB Account to a separate property source and no other evidence was admitted regarding the characterization of the Property, the court determines that Defendant had a community interest in his Wife's CNB Account. *In re Marriage of Braud, 45 Cal.App.4th at 822-823* (citations omitted) (*HN1*[⬆]) "[T]he mere commingling of separate property and community property funds does not alter the status of the respective property interests, provided that the components of the commingled mass can be adequately traced to their separate property and community property sources. But if the separate property and community property interests have been commingled in such a manner that the respective contributions cannot be traced and identified, the entire commingled fund will be deemed community property pursuant to the general community property presumption of *section 760*.").

42. The parties in their Pre-Trial Stipulation for Claims for Relief, ECF 22, designated the following as Disputed Fact 3 for **[*15]** determination at trial:

> [Disputed Fact] 3. Defendant prepaid the First DOT and Second DOT because he had received a collection letter related to the FINRA Award and had a fee dispute pending with Shustak, and wanted to ensure that his family could remain in the Property and that the funds used for the prepayment would not go to pay any judgment obtained by Shustak.

As discussed in detail below, the court finds this disputed fact to be supported by a preponderance of the evidence.

43. There are no liens on Defendant's CNB Account or the Joint Account.

Finding of Fact 43 was established through the Order on Plaintiffs JPMorgan Chase, N.A. and J.P. Morgan Securities, LLC's Motion for Summary Judgment, ECF 19, which treated certain facts as established pursuant to *Federal Rule of Civil Procedure 56(g)*, but was left out of the parties Pre-Trial Stipulation for Claims for Relief, ECF 22. *See* ECF 11, Exhibit 10, Proposed Uncontroverted Fact No. 18.

In addition to the findings of fact set forth above, the court makes the following findings of fact based on the testimony at trial.

44. As indicated by Defendant's testimony that less than one month after the FINRA award, he thought of prepaying the loans secured by DOTs on his

residence **[*16]** by five months because "I had the money at that time and I wanted to make sure my family was protected and that I had paid my primary obligation to them for that period of time," *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:22-9:23 a.m., and that a primary motivation behind his home loan prepayments was that he was concerned about his prior lawyer, who he was having a fee dispute with, and who has a disputed claim in Defendant's bankruptcy case, "from coming in and attaching his assets," *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:24-9:25 a.m., such loan prepayments by Defendant indicate an intent on his part to hinder or delay payment of his non-preferred creditors, including Shustak, his prior lawyer, and JPMorgan, the FINRA awardee, in taking his nonexempt home equity to prepay the preferred home loan lenders holding DOTs on the home where he and his family resided.

45. As indicated by Defendant's testimony that he prepaid Dovenmuehle Mortgage, the servicer for the First DOT on the Property, roughly $40,000.00 (i.e., $41,415.30), and Logan Investments, the servicer for the Second DOT on the Property, roughly $11,000.00 (i.e., $11,062.00), "to assure that **[*17]** my wife and my daughter and myself had a home to live in through the end of the year . . . I did prepay [the home loans in the past] but not to that degree, not six months, or four months, five months, whatever it was in advance, normally." *Trial Testimony of Joseph Ellison*, November 19, 2015 at 10:43 a.m., the number of advance mortgage payments were admittedly out of the ordinary and further indicate an intent to hinder or delay payment of his non-preferred creditors.

46. As indicated by Defendant's testimony that prior to filing his bankruptcy petition, he met with an asset protection firm, and one of his goals in doing so, was to potentially protect his assets from potential creditors, *Trial Testimony of Joseph Ellison*, November 19, 2015 at 10:58-10:59 a.m., and while he changed his mind about using the asset protection firm, the evidence of his consideration, meeting and paying the asset protection firm supports a finding that Defendant intended to hinder or delay his non-preferred creditors.

47. From his refinancing of the Property, Defendant took out cash of almost $250,000.00 (i.e., $247,950.85) from the equity in the Property. *Trial Testimony of Joseph Ellison*, November 19, **[*18]** 2015 at 9:15 a.m.; *see also*, Finding of Fact No. 23, *supra*.

48. As stated on his bankruptcy schedules, as of the

2016 Bankr. LEXIS 3475, *18

Petition Date, Defendant had $600.00 in his CNB Account, for which he did not claim an exemption. Exhibit 8 at 14 and 20. Furthermore, as stated on his bankruptcy schedules, as of the Petition Date, Defendant had $1,894.00 in the Joint Account, for which he did not claim an exemption. *Id.*

**CONCLUSIONS OF LAW**

HN2[🔼] Under *11 U.S.C. § 727*,

> [t]he court shall grant the debtor a discharge, unless . . . the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed[,] (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition.

*11 U.S.C. § 727(a)(2)*.

HN3[🔼] A party seeking denial of discharge under *§ 727(a)(2)* must prove two things: "(1) a disposition of property, such as transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act [of] disposing of the property." [*19] *Hughes v. Lawson (In re Lawson), 122 F.3d 1237, 1240 (9th Cir. 1997)*; *accord, In re Retz, 606 F.3d 1189, 1200 (9th Cir. 2010)*; *Cooke v. Renshaw (In re Cooke), 2016 Bankr. LEXIS 2703, *12, 2016 WL 4039699, at *5 (9th Cir. BAP 2016)*, *appeal pending*, No. 16-60068 (9th Cir., notice of appeal filed on August 5, 2016). Under *11 U.S.C. § 101(54)*, "The term 'transfer' means . . . (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with— (i) property; or (ii) an interest in property." "Those objecting to discharge 'bear [ ] the burden of proving by a preponderance of the evidence that [the debtor's] discharge should be denied." *In re Retz, 606 F.3d at 1196*, quoting, *Khalil v. Developers Surety & Indemnity Co. (In re Khalil), 379 B.R. 163, 172 (9th Cir. BAP 2007)*, *affirmed*, *578 F.3d 1167, 1168 (9th Cir. 2009)*; *see also, Beverly v. Beverly (In re Beverly), 374 B.R. 221, 243 (9th Cir. BAP 2007)* ("The burden of proof on an objection to discharge under *§ 727(a)(2)* is preponderance of the evidence."), *affirmed in part and appeal dismissed in part*, *551 F.3d 1092 (9th Cir. 2008)*, *citing inter alia, Grogan v. Garner, 498 U.S. 279, 289, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991)*.

HN4[🔼] "In keeping with the 'fresh start' purposes behind the Bankruptcy Code, courts should construe *§ 727* liberally in favor of debtors and strictly against parties objecting to discharge." *In re Retz, 606 F.3d at 1196*, quoting, *Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279, 1281 (9th Cir. 1996)*. While "[t]his does not alter the burden on the objector, [it] rather means that 'actual, rather than constructive intent is required' on the part of debtor." *In re Retz, 606 F.3d at 1196*, quoting, *In re Khalil, 379 B.R. at 172*.

**I. Prepetition Transfers Under *11 U.S.C. § 727(a)(2)(A)***

The court first addresses the relevant prepetition transfers at issue in this case under *11 U.S.C. § 727(a)(2)(A)*. As explained in more detail below, based on evidence of Defendant's prepetition [*20] transfers and of his intent to hinder, delay or defraud creditors JPMorgan and Shustak, his prior lawyer, the court determines that Defendant's discharge should be denied pursuant to *11 U.S.C. § 727(a)(2)(A)*.

Within one year prior to filing his bankruptcy petition, Defendant refinanced the Property by taking out a loan in the principal amount of $1,496,500.00 secured by the First DOT in favor of Greenbox Loans, Inc., used the $1,496,500.00 to pay off the previous first deed of trust to Ocwen Loan Servicing and the previous second deed of trust to Morgan Stanley Home Loans in the amounts of $605,728.11 and $742,802.77 respectively, deposited the remaining $69,441.17 in Defendant's CNB account, took out another loan in the amount of $200,000.00 secured by the Second DOT in favor of Brian Dror and Rafael Ryzman, and then deposited $178,509.68 of the $200,000.00 in Defendant's CNB account. Subsequently, from the refinancing proceeds deposited into Defendant's CNB account, Defendant transferred $38,000.00 to two friends, Ed Jeffers and Charles Springer, allegedly in satisfaction of two debts owed to them, separately transferred $18,000.00 and $51,000.00 from Defendant's CNB Account to his Wife's CNB Account, and [*21] transferred $41,415.30 to Dovenmuehle Mortgage and $11,062.00 to Logan Investments, thereby prepaying the loans secured by the First and Second DOTs on the Property by five months. At or just before the petition date, Defendant also transferred $31,600.00 from Defendant's non-exempt Joint Account to various destinations, including a $17,000.00 transfer to his wife on the Petition Date. Because all of the above-described acts involved the disposition of or parting with of property within the

statutory time period, the court determines that each of the above-described acts constitute transfers under the first *Lawson* element.

Additionally, Defendant transferred $121,000.00 from Defendant's CNB Account into the Clownsputsch Account, then transferred $119,000.00 from the Clownsputsch Account back to Defendant's CNB Account. The court determines that the net of $2,000.00 that remained in the Clownsputsch Account constitutes a transfer under *Lawson* because the $2,000.00 was disposed of or parted with, but the $119,000.00 that was transferred back to Defendant's CNB Account does not constitute a transfer under *Lawson* because that money did not remain in the Clownsputsch Account. 4 March, Ahart **[*22]** and Shapiro, *California Practice Guide: Bankruptcy*, ¶ 22:856 at 22-118 (2015) (*HN5*[↑]) "For purposes of *§ 727(a)(2)*, 'transferred' means 'transferred and *remained transferred*." I.e., a debtor who fraudulently transfers property out of the bankruptcy estate during the one-year prepetition period but then *returns the property to the estate* before filing the petition may still receive a discharge.") (emphasis in original), *citing, In re Adeeb, 787 F.2d at 1339, 1344-1345 (9th Cir. 1986)*.

## A. Both Intent to Hinder and Intent to Delay are Individually Sufficient to Deny a Debtor's Discharge Under *11 U.S.C. § 727(a)(2)*

*HN6*[↑]] Regarding the second *Lawson* element, the intent element, "[a] debtor's intent does not need to be fraudulent to meet the requirements of *11 U.S.C. § 727(a)(2)*. *In re Retz, 606 F.3d at 1200*. "Because the language of the statute is in the disjunctive, it is sufficient if the debtor's intent is to hinder or delay a creditor." *Id., citing, In re Bernard, 96 F.3d at 1281; accord, In re Cooke, 2016 Bankr. LEXIS 2703 at *14, 2016 WL 4039699, at *5*; *see also,* 6 Resnick and Sommer, *Collier on Bankruptcy*, ¶ 727.02[3][a] at 727-17 (16th ed. 2016) ("The language of *section 727(a)(2)*, drawn from the Uniform Fraudulent Conveyance Act, implies that the debtor must have intent to defraud a creditor or officer of the estate. However, some courts have found that, under a literal reading of the language, an intent to hinder or delay creditors, even **[*23]** if not fraudulent, may be sufficient to warrant denial of discharge.") (footnotes and citations omitted), *citing inter alia, In re Retz, supra, First Beverly Bank v. Adeeb, 787 F.2d 1339, 1343 (9th Cir. 1986)* (concluding that trial court's finding that the debtor "acted with actual intent to hinder or delay a creditor" was not clearly erroneous

based on the debtor's admission that "he transferred the property intending to put it out of the reach of one of his creditors"); *but see, In re Cooke, 2016 Bankr. LEXIS 2703 at *27, 2016 WL 4039699, at *9* (Taylor, J., dissenting) (noting the bankruptcy court and the majority opinion affirming the bankruptcy court "fail to cite a single reported Ninth Circuit or Panel decision where a court denied discharge based on efforts to hinder or delay that did not involve deceit or other objectively or subjectively improper conduct"); *cf., Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 804-812 (9th Cir. 1994)* (reviewing for clear error and affirming trial court's holding and sustaining reorganized debtor's fraudulent transfer claims under *11 U.S.C. §§ 544(b)* and *548(a)(1)* against debtor's insider as transferee of corporate funds based on factual findings that the insider caused debtor to transfer the funds with intent to hinder or delay debtor's creditors); *Pioneer Liquidating Corp. v. San Diego Trust & Savings Bank, 211 B.R. 704, 717 (S.D. Cal. 1997)* (stating that "the purpose of fraudulent transfer recovery is to prevent a debtor from putting assets otherwise available to its creditors **[*24]** out of their reach"), *citing and quoting,* Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law, 8 Bankr. Dev. J. 55, 128 (1991)* ("In our quest to understand fraudulent transfer liability, we often overlook first principles. At its core, fraudulent transfer law is a debt-collection device and not a revenue generating tool; its mission is to prevent the unjust diminution of the debtor's estate.").

*HN7*[↑]] "The intent to hinder or delay [for purposes of *11 U.S.C. § 727(a)(2)(A)*] 'is a question of fact that requires the trier of fact to delve into the mind of the debtor and may be inferred from surrounding circumstances.'" *In re Cooke, 2016 Bankr. LEXIS 2703 at *15-16, 2016 WL 4039699, at *6, citing, Searles v. Riley (In re Searles), 317 B.R. 368, 379 (9th Cir. BAP 2004), affirmed in an unpublished decision, 212 Fed. Appx. 589 (9th Cir. 2006), citing, Emmett Valley Associates v. Woodfield (In re Woodfield), 978 F.2d 516, 518 (9th Cir. 1992)*. Furthermore, intent for purposes of *11 U.S.C. § 727(a)(2)* may be inferred from the surrounding circumstances, including certain "badges of fraud" that constitute circumstantial evidence of intent:

These factors, not all of which need be present, include 1) a close relationship between the transferor and the transferee; 2) that the transfer was in anticipation of a pending suit; 3) that the transferor Debtor was insolvent or in poor financial condition at the time; 4) that all or substantially all of

2016 Bankr. LEXIS 3475, *24

the Debtor's property was transferred; 5) that the transfer so completely **[*25]** depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and 6) that the Debtor received inadequate consideration for the transfer.

*In re Woodfield, 978 F.2d at 518*, *citing inter alia*, *Evans v. Trude, 193 Or. 648, 240 P.2d 940, 944 (1952)* (citing state court cases listing "badges of "fraud" to infer actual intent to prove fraudulent transfer) and *Matter of Ayala, 107 B.R. 271, 274-275 (Bankr. E.D. Cal. 1989)* (citing federal court cases listing similar but not identical indicia of fraud to prove intent under *11 U.S.C. § 727(a)(2)*). "A course of conduct may also be probative of the question of intent." *In re Beverly, 374 B.R. at 243*, *citing, In re Adeeb, 787 F.2d at 1343*.

As previously noted, *Collier on Bankruptcy* commented that the language of *11 U.S.C. § 727(a)(2)* was drawn from the Uniform Fraudulent Conveyance Act and "implies that the debtor must have intent to defraud a creditor or officer of the estate", but that citing the Ninth Circuit in *In re Retz*, "some courts have found that, under a literal reading of the language, an intent to hinder or delay creditors, even if not fraudulent, may be sufficient to warrant denial of discharge." 6 Resnick and Sommer, *Collier on Bankruptcy*, ¶ 727.02[3][a] at 727-17 (footnotes and citations omitted). In this court's view, *Collier*'s comment is somewhat overstated because the Uniform Fraudulent Conveyance Act, later the Uniform **[*26]** Fraudulent Transfer Act, and now the Uniform Voidable Transactions Act, does not draw any distinction in proving actual intent to prove a "fraudulent", now voidable, transfer, whether to hinder, to delay, or to defraud, because to prove any of these forms of intent stated in the disjunctive may be proven by a common set of factors, or indicia, as indicated by the current California version of the Uniform Fraudulent Conveyance Act, now the Uniform Voidable Transactions Act, *California Civil Code § 3439.04(a)*, which provides as follows:

(a) A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:

(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

(B) Intended to incur, or believed or reasonably should **[*27]** have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(b) In determining actual intent under *paragraph (1) of subdivision (a)*, consideration may be given, among other factors, to any or all of the following:

(1) Whether the transfer or obligation was to an insider.

(2) Whether the debtor retained possession or control of the property transferred after the transfer.

(3) Whether the transfer or obligation was disclosed or concealed.

(4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(5) Whether the transfer was of substantially all the debtor's assets.

(6) Whether the debtor absconded.

(7) Whether the debtor removed or concealed assets.

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11) Whether the debtor transferred the essential assets of the business to a lienor **[*28]** that transferred the assets to an insider of the debtor.

(c) A creditor making a claim for relief under *subdivision (a)* has the burden of proving the elements of the claim for relief by a preponderance of the evidence.

*See also*, 8 Witkin, *California Procedure*, Enforcement of Judgment, § 495 at 534-536 (2008 and 2016 Supp.); *cf.*, 5 Resnick and Sommer, *Collier on Bankruptcy*, ¶ 548.04[1][a] at 548-56 and n. 5 (*HN8*[⬆]) "The statutory text [of *11 U.S.C. § 548(a)(1)(A)*] focuses on the debtor's intent. The debtor must possess an intent to hinder, an intent to delay or an intent to defraud. The

requirement is disjunctive; any one of the three intents is sufficient for liability." *citing inter alia, Lippe v. Bairnco Corp., 249 F. Supp. 2d 357, 374 (S.D.N.Y. 2003)* ("As the use of the disjunctive 'or' makes clear, '[o]nly an actual intent to hinder and delay need be established, not an actual intent to defraud.'") (citation omitted).

*HN9*[↑] The words "hinder," "delay" and "defraud" used to describe the intent required under *11 U.S.C. § 727(a)(2)* are not defined terms under the Bankruptcy Code. *See 11 U.S.C. § 101.* The meaning of these terms comes from the common law and is codified in the Uniform Fraudulent Conveyance Act, now the Uniform Voidable Transactions Act. *See In re Woodfield, 978 F.2d at 518, citing inter alia, Evans v. Trude, supra,* and *Matter of Ayala, supra.* The terms of hinder, delay and defraud connote intentional actions *[*29]* by a debtor to frustrate or thwart collection by creditors and describe a continuum of intents that may differ temporally or in substance and effect, but each of which is impermissible for purposes of *11 U.S.C. § 727(a)(2)*. The dictionary definitions of these words reinforce these observations. The word "hinder" has been defined as a transitive verb: "1. To be or get in the way of. 2. To obstruct or delay the progress of." *The American Heritage Dictionary of the English Language* at 830 (4th ed. 2006). The word "delay" has been defined as a transitive verb: "1. To postpone until a later time; defer. 2. To cause to be later or slower than expected or desired." *Id.* at 480. The word "defraud" has been defined as a transitive verb: "To take something by fraud; swindle." *Id.* at 477. The word "fraud", in turn, has been defined as a noun: "1. A deception deliberately practiced in order to secure unfair or unlawful gain. 2. A piece of trickery; a trick . . . ." *Id.* at 699.

**B. An Examination of *In re Cooke* and *Hultman v. Tevis*: the Court May Consider Prepetition Preferential Payments to Creditors for Purposes of Determining Whether There is Intent to Hinder, Delay or Defraud Under *11 U.S.C. § 727(a)(2)(A)***

Before the court addresses whether, under *Lawson*, Defendant's *[*30]* pre-bankruptcy acts of using non-exempt assets to pay, and thus prefer, some creditors, including the home loan lenders holding the First and Second DOTs on the Property, and his friends as well as an insider, his wife, involved the requisite actual intent to hinder, delay or defraud a creditor, the court must also carefully consider the overlay between the intent to prefer creditors and the intent to hinder, delay or defraud creditors. *HN10*[↑] "The intent to prefer

creditors is not equivalent to the intent to hinder, delay or defraud creditors." 6 Resnick and Sommer, *Collier on Bankruptcy*, ¶ 727.02[3][c] at 727-19, *citing inter alia, Equitable Bank v. Miller (In re Miller), 39 F.3d 301 (11th Cir. 1994)* and *In re Richter, 57 F.2d 159 (2d Cir. 1932)*; *see also, In re Chu, 511 B.R. 681, 685 (Bankr. D. Hawaii 2014)* ("An intent to prefer one creditor over others is not necessarily the same as an intent to hinder, delay, or defraud creditors."). A transfer preferring one creditor over another does not amount to an act to "hinder, delay, or defraud" an unpreferred creditor. 8 Witkin, *California Procedure*, Enforcement of Judgment, § 495 at 534, *citing inter alia, California Civil Code § 3432* and *Wyzard v. Goller, 23 Cal.App.4th 1183, 28 Cal. Rptr. 2d 608 (1994)*; *see also, Hultman v. Tevis, 82 F.2d 940, 941 (9th Cir. 1936)* (mere fact of a preferential transfer does not establish an act to "hinder, delay or defraud" creditor to deny discharge). Nonetheless, in this court's view, as discussed below, even *[*31]* if the intent to prefer creditors is not equivalent to the intent to hinder, delay or defraud creditors, the intent to prefer creditors may still coincide with the intent to hinder, delay or defraud creditors if there is other evidence of intent as was recently held by a divided Bankruptcy Appellate Panel of the Ninth Circuit ("BAP") in an unpublished memorandum decision in *In re Cooke, 2016 Bankr. LEXIS 2703, 2016 WL 4039699, at *1-8* (majority opinion) and at *2016 Bankr. LEXIS 2703, [WL] *8-17* (Taylor, J., dissenting), affirming a decision of another judge of this court (the Honorable Peter H. Carroll); *cf.,* 5 Resnick and Sommer, *Collier on Bankruptcy*, ¶ 548.04[1][a] at 548-57 and n. 6 ("The requisite actual intent [to hinder, delay or defraud to prove fraudulent transfer under *11 U.S.C. § 548(a)(1)(A)*], however, must be something more than just an intent to prefer one creditor over another." *citing inter alia, Stone v. Abraham (In re Prestige Spring Corp.), 628 F.2d 840, 842-843 (4th Cir. 1980)*. For purposes of determining whether the court may consider prepetition preferential payments to creditors when determining whether there is intent to hinder, delay or defraud under *11 U.S.C. § 727(a)(2)(A)*, the court now examines the BAP's decision in *Cooke* and the Ninth Circuit's decision in *Hultman*.

In *Cooke*, the debtor and the judgment creditor were involved in a multi-vehicle accident in which the creditor, *[*32]* a former fireman, was seriously and permanently injured. *2016 Bankr. LEXIS 2703 at *1, [WL] at *1.* The judgment creditor sued the debtor in state court for negligence and the debtor who was insured was defended by the counsel retained by the insurance company. *Id.* The state court entered a

2016 Bankr. LEXIS 3475, *32

judgment in favor of the judgment creditor against the debtor of $1.6 million, and in October 2012, the insurance company paid the judgment creditor directly the amount of the policy limits of $250,000. *Id.* The debtor's insurance policy also provided for certain supplemental payments to be made on behalf of the debtor as the insured, including postjudgment interest, which was $45,147.62 as of the date the insurance company paid the judgment creditor on the judgment. *Id.* On November 13, 2012, the insurer mailed a check for the postjudgment interest to the debtor, who deposited the check in his checking account on November 19, 2012. *2016 Bankr. LEXIS 2703 at *3-4, [WL] at *1-2*. On November 30, 2012, the debtor filed a Chapter 7 bankruptcy case in this court; however, shortly before filing his Chapter 7 bankruptcy case, he spent approximately $30,000 from the insurance payment not to the judgment creditor on the judgment, but for other purposes, including: (1) $1,040 in cash paid for **[*33]** miscellaneous items, $1,040; (2) $5,600 for on-campus housing at the university he was attending for the upcoming quarter; (3) $4,670 for tuition and fees to the university for the upcoming quarter; (4) $11,000 for taxes on the insurance payment he received, which was paid to the IRS; (5) $4,306 for bankruptcy attorney and filing fees; (6) $2,800 for taxes on the insurance payment he received, which was paid to the state taxing authority; and (7) $2,500 for the purchase of a personal computer for his use. *2016 Bankr. LEXIS 2703, [WL] at *2*. The debtor claimed the remaining amount of $14,250 as exempt on his bankruptcy schedules. *Id.* The judgment creditor filed an adversary proceeding under *11 U.S.C. § 727(a)(2)* against the debtor to deny his discharge. *2016 Bankr. LEXIS 2703, [WL] at *3*. During his meeting of creditors under *11 U.S.C. § 341(a)*, during an examination under *Federal Rule of Bankruptcy Procedure 2004* by the judgment creditor and during the trial in the adversary proceeding, the debtor gave inconsistent testimony about whether he received and read the letter from the insurance company transmitting the supplemental payment check which told him what the check was for before depositing the check into his account, and he admitted in his testimony that he knew the insurance payment he received represented the interest accrued **[*34]** from the judgment creditor's judgment, that based on his attorney's advice (never disclosed due to the continued assertion of the attorney-client privilege), the debtor concluded that the money from the insurance payment belonged to him and not the judgment creditor, that the judgment creditor might try to collect the money and that he could have given the money to the judgment creditor, but elected to use the money for other purposes, and that he contemplated filing for bankruptcy before depositing the check. *2016 Bankr. LEXIS 2703, [WL] and n. 5*.

Among other things, the bankruptcy court in *Cooke* found that the debtor intended to hinder or delay the judgment creditor in his ability to collect on the judgment by transferring the funds. *Id.* Based on the totality of the circumstances, the bankruptcy court believed that the debtor's transfers went beyond legitimate prebankruptcy planning and were done with the intent to keep the funds from the judgment creditor, his most significant creditor, and to maximize the benefit of the funds for himself. *2016 Bankr. LEXIS 2703, [WL] at *8*. The bankruptcy court entered judgment in favor of the judgment creditor, denying the debtor his discharge under *11 U.S.C. § 727(a)(2)*, and the Bankruptcy Appellate Panel in a divided vote **[*35]** affirmed.

In affirming the bankruptcy court's judgment denying the discharge, the majority in *Cooke* held that the bankruptcy court applied the correct law articulating the elements for a claim under *11 U.S.C. § 727(a)(2)* and made the necessary findings of fact to determine the debtor's actual intent to hinder or delay the creditor, including inferences and course of conduct that may be considered as circumstantial evidence of intent. *2016 Bankr. LEXIS 2703, [WL] at *8*. "The party objecting to discharge under *§ 727(a)(2)(A)* must prove two things: (1) the disposition of property, whether by transfer, removal, destruction, mutilation or concealment (within the statutory time period); and (2) the debtor's subjective intent to hinder, delay or defraud a creditor through the act of disposition of the property." *2016 Bankr. LEXIS 2703, [WL] at *5*, *citing, In re Retz, 606 F.3d at 1200*, *citing, In re Lawson, 122 F.3d at 1240*. As to the second *Lawson* element, the majority held that the bankruptcy court's factual findings of intent were not clearly erroneous because the court could properly have found actual intent to hinder or delay based on the facts and debtor's course of conduct that he made the transfers with the knowledge that he was liable to the judgment creditor in excess of the policy limits, that the supplemental insurance payment was for accrued **[*36]** interest on the judgment owed to the judgment creditor, that the judgment creditor might try to collect the payment from him, that he did not want the judgment creditor to get the payment, and that the debt owed to the judgment creditor was the reason he filed for bankruptcy as he had no other material debt as of the petition date. *2016 Bankr. LEXIS 2703, [WL] at *6*. The majority finally observed that "[a]lthough two views of the evidence may exist, the court's choice between

2016 Bankr. LEXIS 3475, *36

them in determining that [the debtor] actually intended to hinder or delay, cannot be clearly erroneous." *2016 Bankr. LEXIS 2703, [WL] at *8*.

The dissent in *Cooke* observed that the critical inquiry in the case came down to the question of "what did [the debtor] do with the Funds that would justify the loss of discharge?", and the dissent's answer was that "he did nothing that was an appropriate basis for discharge denial under *§ 727(a)(2)(A)*." *2016 Bankr. LEXIS 2703, [WL] at *9*. Among the eleven reasons that the dissent gave for reversal and possible remand of the bankruptcy court's judgment denying discharge was that reversal is warranted as a matter of law because the bankruptcy court's factual finding of intent was based on transfers which it could not consider for purposes of *§ 727(a)(2)(A)*. *2016 Bankr. LEXIS 2703, [WL] at *9-17*.

The debtor in *Cooke* has appealed the judgment of the **[*37]** Bankruptcy Appellate Panel affirming the bankruptcy court to the Ninth Circuit, which will decide the appeal in due course. This court specifically addresses some of the concerns raised in *Cooke* which are germane to the discussion of the issues in this case, particularly whether reversal is warranted as a matter of law because the bankruptcy court's factual finding of intent was based on transfers which it could not consider for purposes of *11 U.S.C. § 727(a)(2)(A)*, and in support of that ground for reversal, the dissent in *Cooke* cited the Ninth Circuit's decision in *Hultman v. Tevis, supra*, which was decided under the Bankruptcy Act of 1898 rather than the modern Bankruptcy Code.

The facts in *Hultman v. Tevis* were as follows. *82 F.2d at 940-941*. The debtor filed a petition for relief under the Bankruptcy Act and was adjudged a voluntary bankrupt. *Id. at 940*. The trustee in bankruptcy opposed the petition and sought denial of the debtor's discharge on two grounds, including the transfer of large sums of money within one year of the petition date to his son with the intent to hinder, delay or defraud his creditors. *Id. at 940-941*, *citing*, Bankruptcy Act of 1898, § 14b, as amended by § 6 of the Act of May 27, 1926, c. 406, 44 Stat. 663, former 11 U.S.C § 32(b). The debtor owed a debt to his son, which had not **[*38]** been fully paid. *Id. at 941*. Debtor began receiving money from a spendthrift trust set up by his sister, and he transferred some of that money to his son within one year of the petition date. *Id.* The debtor had been advised by his attorney, to whom all the facts were fully disclosed, that the money received from the spendthrift trust could not be subjected to the claims of his creditors, even after it reached his hands. *Id.* The debtor in good faith believed

and relied upon the attorney's advice and acted on it in making the transfer to his son. *Id.* The amount of money that the debtor transferred to his son was less than the amount owed. *Id.* The special master in bankruptcy made the above findings of fact, which were not excepted to at trial, and further found that the money which the debtor transferred to his son was not transferred with the intent to hinder, delay or defraud his creditors and that the debtor was entitled to a discharge of his debts. *Id.* The trustee in bankruptcy interposed exceptions to the special master's findings of fact and conclusions of law, but the district court accepted the special master's findings and conclusions granting the debtor a discharge. *Id.* The Ninth Circuit **[*39]** in *Hultman* affirmed the district court's judgment upholding the debtor's discharge. In so holding, the Ninth Circuit made two specific observations germane here. *Id.* First, the Ninth Circuit stated: "Whether [the lawyer's] advice was correct or not is a question which the District Court did not, nor do we, deem it necessary to decide." *Id.* Second, the Ninth Circuit stated: "The mere fact that a bankrupt has made a preferential payment or transfer to one of his creditors is no ground for denying a discharge." *Id.* (citations omitted).

The dissent in *Cooke* concluded that "[t]he bankruptcy court here did not acknowledge the rule in *Hultman* and erroneously relied on [the debtor]'s use of the Funds to pay other creditors." *In re Cooke, 2016 Bankr. LEXIS 2703 at *34, 2016 WL 4039699, at *11* (Taylor, J., dissenting). The dissent in *Cooke* asserted that the majority opinion only addressed one of the two relevant rulings of the Ninth Circuit in *Hultman* for not denying the debtor's discharge based on reliance of counsel and simply disregarded the other relevant ruling relating to preferential payments. *Id.* Relying on the Ninth Circuit's statement in *Hultman* that "[t]hat the mere fact that a bankruptcy has made a preferential payment or transfer to one of his creditors is **[*40]** no grounds for denying a discharge," the dissent in *Cooke* stated: "*Hultman* clearly states that payment of legitimate creditor claims, even to insiders, is not a basis for discharge denial. Both the bankruptcy court and the majority ignore this authority; I cannot and do not do so." *Id.* In other words, as the dissent stated, "as the Ninth Circuit made clear in *Hultman*, some transfers do not support discharge denial as a matter of law." *2016 Bankr. LEXIS 2703, [WL] at *12 n. 4*.

In asserting that reversal in *Cooke* was warranted as a matter of law because the bankruptcy court's factual finding was based on transfers which it could not consider for purposes of *11 U.S.C. § 727(a)(2)(A)*, the

dissent in *Cooke* also criticized the majority's analysis based on another Ninth Circuit decision in *In re Adeeb, supra*. *2016 Bankr. LEXIS 2703, [WL] at *14*. The dissent stated:

> In summary, I would reverse because the bankruptcy court erred as a matter of law when it based its decision almost entirely on [the debtor]'s payment of other debt. *Hultman*, as recognized by this Panel, does not permit this reliance. I also conclude that the laptop computer acquisition in isolation did not justify *§ 727(a)(2)(A)* denial of discharge.

> I emphasize that my analysis is independent of the bankruptcy court's finding of intent. As **[*41]** already noted, all commencements of bankruptcy cases involve, to some extent, an express intent to hinder and delay a creditor. Further, almost all bankruptcy cases involve some measure of transfer in anticipation of the creditor-hindering-or-creditor-delaying bankruptcy; bankruptcy lawyers are paid, creditors are preferred, and in some reasonable regards non-exempt assets become exempt or goods or services essential to day-to-day existence are obtained. These types of transfers do not justify a denial of discharge, so one never need consider a debtor's intent when causing them. And *Hultman* provides a firm foundation for a determination that not all transfers are appropriately considered in a *§ 727(a)(2)(A)* context. *Adeeb* is another such case.

> In *Adeeb*, the debtor admitted to making pre-petition transfers with improper intent. *787 F.2d at 1341-42*. But, he repented and attempted to retrieve the assets. *Id.* The Ninth Circuit, thus, reversed the district court and remanded to the bankruptcy court for a determination as to whether recovery had been complete. *Id. at 1346*. The Ninth Circuit read transferred in *§ 727(a)(2)(A)* as meaning 'transferred and remained transferred.' *Id. at 1345*. And it noted that Congress intended to deny discharge where debtors took **[*42]** actions **to keep assets from their creditors** by hiding assets or destroying them. *Id.* The facts here evidence no such improper conduct. Instead, in *Hultman*, the transfers did not support *§727(a)(2)(A)* discharge denial.

*2016 Bankr. LEXIS 2703, [WL] at *14* (emphasis in original).

With respect to the debtor's use of the insurance payment funds to purchase a laptop computer, the dissent in *Cooke* commented:

> Moreover, the Ninth Circuit allows debtors to engage in some forms of pre-bankruptcy planning and to protect assets by converting them from non-exempt to exempt. *See, e.g., Gill v. Stern (In re Stern), 345 F.3d 1036, 1043 (9th Cir. 2003)* ("[T]he purposeful conversion of nonexempt assets to exempt assets on the eve of bankruptcy is not fraudulent per se." (quoting *Wudrick v. Clements, 451 F.2d 988, 989 (9th Cir. 1971))*. The bankruptcy court acknowledged this fact, stating that this was a close case, but finding that combined expenditures from the Funds tipped the balance towards a denial of discharge. In a close case, the bankruptcy court could not find that the purchase of a much-needed tool of [the debtor]'s trade as a student, one that involved use of less than ten percent of the Funds, justified discharge denial.

*Id.* (footnote omitted).

In response to the dissent's analysis, the majority in *Cooke* stated that "[i]n the requisite analysis for this appeal, we need **[*43]** to determine if the bankruptcy court's finding of actual intent was clear error." *2016 Bankr. LEXIS 2703, [WL] at *7 n. 7*. In addressing the dissent's analysis, citing *Hultman*, the majority stated:

> The dissent's analysis doesn't consider intent, but rather questions whether any transfers contemplated by *§ 727(a)(2)* occurred if the transfers constitute preferment of other creditors. *See Hultman v. Tevis, 82 F.2d 940, 941 (9th Cir. 1936)*. As noted in *First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir. 1986)*, the real issue in *Hultman* involved whether the debtor acted with the requisite intent when he "in good faith, believed and relied upon his attorney's advice and acted on it in making the transfer to his son." *Id.* The Hultman court concludes no other indicia of intent existed, warranting a discharge. The facts in this present appeal distinguish this appeal from *Hultman*. Although [the debtor] vaguely raised an advice of counsel defense, he inconsistently testified as to whether he talked to his counsel. Further he declined to waive his attorney-client privilege so [the attorney] could testify or submit a declaration as to his advice to [the debtor]. However, in raising such a defense, [the debtor] could not invoke an attorney-client privilege. *Chevron Corp. v. Pennzoil Co., 974 F.2d 1156,*

2016 Bankr. LEXIS 3475, *43

*1163 (9th Cir. 1992)*.

*2016 Bankr. LEXIS 2703, [WL] at *5 n. 5*.

With respect to the bankruptcy court's factual findings on intent, the majority in *Cooke* noted **[*44]** that "[b]eyond the credibility determination, the bankruptcy court also identified several elements as support for the inference that [the debtor] acted with the requisite intent under *§ 727(a)(2)(A)*," citing what the bankruptcy court considered as reflected in the trial transcript:

The bankruptcy court considered: "(1) the timing of the transfer; (2) the amount of the transfer in relation to the remaining property of the debtor; (3) whether the transfer occurred after the entry of a large judgment against the debtor; (4) whether the transfer rendered the debtor insolvent; (5) the debtor's motivation to make the transfers; and (6) the credibility of the debtor's explanation regarding the transfers."

*2016 Bankr. LEXIS 2703, [WL] at *7 and n. 6*, *citing*, Trial Tr. (Jan.12, 2015) 10:23-11:5.

This court has quoted the dissent and majority opinions in *Cooke* at length because the issues raised are germane to this case, that is, whether, as the dissent in *Cooke* concluded, based on the Ninth Circuit's decision in *Hultman* that some transfers by a bankruptcy debtor, including preferential payments to other creditors, do not support discharge denial as a matter of law. In considering the merits of the analyses of the majority and dissent in *Cooke*, this **[*45]** court concludes that while the dissent makes cogent points, the majority has the better side of the argument. The majority in *Cooke* is correct in emphasizing that "[i]n the requisite analysis for this appeal, we need to determine if the bankruptcy court's finding of actual intent was clear error." The bankruptcy court's analysis based on its findings considering "(1) the timing of the transfer; (2) the amount of the transfer in relation to the remaining property of the debtor; (3) whether the transfer occurred after the entry of a large judgment against the debtor; (4) whether the transfer rendered the debtor insolvent; (5) the debtor's motivation to make the transfers; and (6) the credibility of the debtor's explanation regarding the transfers" was not clear error, though a reasonable finder of fact could decide differently. *Id.*

In this court's view, *Hultman* does not dictate a different result in *Cooke* or in this case. The Ninth Circuit's statement in *Hultman* that "[t]hat the mere fact that a bankruptcy has made a preferential payment or transfer to one of his creditors is no grounds for denying a discharge" does not support the broad reliance of the dissent in *Cooke* for its proposition that **[*46]** preferential transfers do not support discharge denial as a matter of law and cannot be considered for determining intent for purposes of *11 U.S.C. § 727(a)(2)(A)*. That is not what the Ninth Circuit said in *Hultman*. As worded, **HN11[⬆]** the Ninth Circuit's statement in *Hultman* that the mere fact of a preferential transfer does not justify discharge denial means that such a transfer by itself is not grounds to deny a discharge, but says nothing about a preferential transfer being considered as evidence of intent in the context of other facts that may evidence intent. The analysis in *Hultman* indicated that the appropriate inquiry was to determine the existence of an intent on behalf of the debtor to hinder, delay or defraud creditors, which is a fact-based inquiry, and the findings of fact and conclusions of law proposed by the special master adopted by the district court that the debtor lacked such intent was reviewed for clear error, which was affirmed by the Ninth Circuit. The *Cooke* majority's analysis of *Hultman* was correct that the district court's finding of lack of intent based on the debtor's reliance on counsel's advice without other evidence of intent was not clearly erroneous and was appropriately affirmed. **[*47]** *See also, In re Perrine, 2008 Bankr. LEXIS 4719, 2008 WL 8448835, at *5-6 (9th Cir. BAP 2008)* (unpublished BAP memorandum decision discussing *Hultman* and acknowledging the Ninth Circuit's determination in that case that the fact that a preferential payment did not necessitate a finding that it was made with an intent to hinder or delay creditors, upholding the district court's finding of lack of intent without additional evidence of intent, but distinguishing *Hultman* on its facts to uphold discharge denial involving a preferential or fraudulent transfer with additional evidence of intent).

The court acknowledges what the Ninth Circuit stated in *Hultman* about the *mere* fact that a preferential transfer is not a ground to deny a discharge under *11 U.S.C. § 727(a)(2)(A)*, but the circumstantial evidence in this case supports a finding that Defendant made transfers to prefer creditors, including the home loan lenders holding the First and Second DOTs on the Property and his wife, with the intent to hinder, delay or defraud creditors beyond the mere fact that he made certain preferential transfers to other creditors and, as discussed in more detail below, beyond the mere fact that he converted nonexempt assets into exempt assets.

Layla Buchanan

2016 Bankr. LEXIS 3475, *47

## C. Based on *In re Beverly*, Defendant "Crossed the Line"

Beyond the **[*48]** previous determination that HN12[↑] the court may consider preferential payments to creditors for purposes of determining an intent to hinder, delay or defraud under *11 U.S.C. § 727(a)(2)(A)*, the court is persuaded by the decision and analysis of the Bankruptcy Appellate Panel for the Ninth Circuit ("BAP") in *In re Beverly*, which dealt with another issue that is relevant to this case: whether the pre-bankruptcy conversion of non-exempt assets into exempt assets, which is nonfraudulent by itself as a matter of law under the Ninth Circuit's decision in *Gill v. Stern (In re Stern), 345 F.3d 1036, 1044 (9th Cir. 2003)*, warrants denial of a bankruptcy debtor's discharge if there was also a subjective intent to hinder, delay or defraud a creditor. *In re Beverly, 374 B.R. at 242-246*. The court believes the BAP's framework in that case is instructive here because in addition to Defendant's use of non-exempt assets to prefer certain creditors prepetition, this case also involves the transfer of non-exempt assets to Defendant's Wife's CNB Account which Defendant claimed an exemption in. As discussed in more detail below, the totality of circumstantial evidence in this case shows an intent to hinder, delay or defraud creditors to warrant denial of discharge as shown by Defendant's prepayments of the First and Second DOTs **[*49]** with five advance monthly payments, and transfers to his Wife's CNB Account which Defendant claimed an exemption in, all of which, like in *Beverly*, are forms of improper pre-bankruptcy planning that furthered Defendant's intent to keep certain assets for his personal benefit and out of reach of his creditors who might have received the value of these assets through a bankruptcy distribution.

In *Beverly*, the BAP reversed the bankruptcy court's holding that the debtor's pre-bankruptcy conversion of non-exempt assets to exempt assets during the debtor's divorce was non-fraudulent as a matter of law for purposes of denying the debtor's discharge under *11 U.S.C. § 727(a)(2)*. *Id. at 246*. In *Beverly*, the facts were as follows. The debtor, anticipating a large judgment on a community debt, executed a marital settlement agreement with his wife prepetition whereby he transferred a $1 million interest of non-exempt property to his non-filing wife in exchange for his wife's interest in his $1.1 million exempt retirement fund. *Id. at 226-227*. By doing so, the debtor would shoulder the impending judgment debt, but having first stripped himself of the non-exempt liquid assets with which to pay that debt. *Id. at 227*. After the debtor filed for bankruptcy, **[*50]** the trustee and the judgment creditor objected to the debtor's discharge under various *11 U.S.C. § 727(a)* theories. *Id. at 229*. The bankruptcy court ruled for the debtor, reasoning that the toleration of bankruptcy exemption planning meant that the discharge cannot be denied because there could not have been an intent to hinder, delay or defraud creditors. *Id. at 244*.

On the creditor's appeal of its *11 U.S.C. § 727(a)(2)(A)* claim, the BAP in *Beverly* specifically addressed the relationship between the conversion of non-exempt assets to exempt assets, which is not by itself fraudulent, and an intent to defraud creditors, stating:

> [I]t is difficult to draw the line between legitimate bankruptcy planning and intent to defraud creditors. Only two things are certain about the line.
>
> First, as already explained, denial of discharge involving exemption planning requires that there be evidence other than the mere timing of the transformation of property from nonexempt to exempt status.
>
> Second, there is a principle of "too much." In classical terms, it is the Sword of Damocles. In the agrarian terms used by the Fifth Circuit affirming the denial of a discharge, "when a pig becomes a hog it is slaughtered."
>
> The reality is that cases finding discharge-disqualifying **[*51]** intent to hinder, delay, or defraud creditors typically involve some combination of large claims of exemption and overtones of overreaching.

*Id. at 245* (citations omitted). Based upon the fact of the debtor's conversion of at least $424,450 in non-exempt assets to exempt assets and a record replete with evidence that the debtor was fixated on moving assets away from the reach of the judgment creditor, the BAP in *Beverly* held that the bankruptcy court's factual finding that the debtor did not have the requisite intent to hinder or delay the judgment creditor was clearly erroneous. *Id. at 245*. In so holding, the court stated,

> [t]here is a remarkably large volume of evidence of [the debtor]'s intent to hinder or delay that is extrinsic from the fact that he transferred nonexempt property for exempt property in the MSA. As a result, it is beyond cavil that [the debtor]'s intent was to become judgment proof and not just to protect his assets.

*Id. at 246*.

2016 Bankr. LEXIS 3475, *51

Based on the BAP's analytical framework in *Beverly* regarding the relationship between a debtor's intent and the conversion of assets from nonexempt to exempt status, and based on additional evidence of intent beyond the mere conversion of assets from nonexempt to exempt, the court **[*52]** considers, as discussed below, whether Defendant "crossed the line" based on additional evidence of intent beyond the mere fact that some of the transfers appear to be preferential only when Defendant used his non-exempt assets to make prepetition transfers to preferred payees when he made five months of prepayments to his home lenders totaling $51,000.00 and transferred $38,000.00 to two of his friends on debts allegedly owed to each of them, as well as when Defendant converted nonexempt non-exempt assets to exempt assets by transferring $86,000.00 to his Wife's CNB Account which Defendant claimed an exemption in.

### i. Defendant's Prepayments of First and Second DOTs on the Property

Regarding the additional evidence of intent beyond the mere preferential payments and conversion of nonexempt assets to exempt assets, and specifically, Defendant's act of prepaying the First and Second DOTs on his home, the court first notes that aside from the timing of Defendant's prepetition transfers of nonexempt assets and the amounts of those transfers, he made multiple admissions in his trial testimony that evidence his intent to hinder or delay his non-preferred creditors. **HN13**[⬆]] "When a debtor admits that he acted **[*53]** with the intent penalized by *section 727(a)(2)(A)*, there is no need for the court to rely on circumstantial evidence or inferences in determining whether the debtor had the requisite intent." *In re Adeeb, 787 F.2d at 1343* ("Adeeb admitted that he transferred the property intending to put it out of the reach of one of his creditors."). Additionally, entry of a discharge order should be denied if a debtor "had the intent penalized by the statute notwithstanding any other motivation he may have had for the transfer." *Id. at 1343*; accord, *In re Beverly, 374 B.R. at 246*; cf. *Matter of Trinity Baptist Church, 25 B.R. 529, 532-533 (Bankr. M.D. Fla. 1982)* (analyzing fraudulent transfer claim under Florida law) ("Intent to defraud within the meaning of the statute is the debtor's intention to prevent his creditors from satisfying their debts . . . An evil motive is not required in order to set aside a transfer.") (citations omitted).

Specifically, at his *Rule 2004* examination, Defendant

testified to the following:

> Well, at the time that the payments were made — let's see. . . . July was the prepayment[,] then the case had been decided, and I didn't know what I was going to do. Really, we were trying to make up our mind what we were going to do, and then I just wanted to make sure that those -- that whatever happened -- I mean, I got a threatening letter. I got threatening **[*54]** letters from the beginnings of what might have been attempts to collect money or whatever, and I just wanted to make sure that we wouldn't be thrown out in the street.
>
> Well, I got -- well, the award in and of itself was pretty breathtaking. When I got the notice of the award, that was F.I.N.R.A., and the F.I.N.R.A. fees. I didn't know if I would lose my license. I didn't. J.P. Morgan, obviously, they had sent me by July -- yeah. They had sent me a letter by then saying they wanted their money. And who else was there? I was having a fee disputes. That's another thing. I was having a fee dispute. I found out that I was grossly overcharged by the attorneys I used first, and I got several attorneys' opinions, and so I was possibly fighting with them. Whatever else was going to go on, I wanted to make sure my family was at least ensconced in our home until the end of the year.
>
> [. . .]
>
> Its a priority of survival. I wanted to make sure we had a home to live in and a place to live in while all this was going on.
>
> Well, I didn't know if, for example, Shustak had gotten a judgment, which he didn't. They threw him out of court, but he kept trying to do things. I didn't know where -- I felt under **[*55]** siege. I guess you can understand that. So I had to prioritize where this money went, and other than food and other -- certain other things that had to be accounted -- you know, taken care of. This was a pretty important piece of that puzzle.

Furthermore, at trial, Defendant testified that he thought of prepaying his home loans by five months because "I had the money at that time and I wanted to make sure my family was protected and that I had paid my primary obligation to them for that period of time", *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:22 a.m., and that a primary motivation behind his prepayments was that he was concerned about his prior lawyer, Shustak, who he was having a fee dispute with, and who has a disputed claim in Defendant's bankruptcy

2016 Bankr. LEXIS 3475, *55

case, "from coming in and attaching his assets", *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:24-9:25 a.m. *In re Adeeb, 787 F.2d at 1343* ("Adeeb admitted that he transferred the property intending to put it out of the reach of one of his creditors."). Although Defendant had a benign motive of protecting his family, the evidence otherwise indicates that he still had the intent to hinder or delay his creditors. *Matter of Trinity Baptist Church, 25 B.R. at 532-533* (mixed motive of a debtor **[*56]** does not defeat a finding of intent, stating: "Clearly, the Debtor intended to hold those dissatisfied creditors at bay, and prevent levy and sale of the property, in hopes of rehabilitation and the satisfaction of all creditors. While admirable, the end result of this scheme was nonetheless hindrance and delay of creditors.").

Moreover, Defendant testified that he prepaid the home loans secured by the First and Second DOTs "to assure that my wife and my daughter and myself had a home to live in through the end of the year . . . I did prepay [the mortgage in the past] but not to that degree, not six months, or four months, five months, whatever it was in advance, normally." *Trial Testimony of Joseph Ellison*, November 19, 2015 at 10:43 a.m. This out of the ordinary course transaction and Defendant's admissions are additional evidence of his intent to hinder or delay his creditors by putting these funds out of their reach for his personal benefit. *Silagy v. Morris (In re Morris), 2013 Bankr. LEXIS 4369, 2013 WL 5705630, at *17 (Bankr. N.D. Ohio 2013)* (transfers of debtor's property in exchange for waiver of future child support was a badge of fraud due to detriment of debtor's current creditors indicating intent to hinder, delay or defraud creditors as fraudulent transfer under *11 U.S.C. § 548(a)(1)(A)*), *objections* **[*57]** *to bankruptcy court's proposed findings of fact and conclusions of law overruled in pertinent part and sustained in part on other grounds, 2015 U.S. Dist. LEXIS 23565, 2015 WL 853499 (N.D. Ohio 2015)*. In holding that the debtor's transfers of her equity in the marital residence to her spouse in a martial dissolution for a waiver of her future child support obligations was a badge of fraud with respect to her current creditors, the bankruptcy court stated in *In re Morris*:

> Debtor's actions amount to accelerating an unmatured, future obligation and allowed her to prepay it. Assets that were immediately available, equity in the real estate, were traded for a future obligation that has not yet come due. This is little different than allowing a debtor to prepay ten years of rent or any other future expense saving tactic at the expense of current creditors holding liquidated, matured debts. While this action has not been

previously listed as a badge of fraud, under the particular facts of this case, the court finds that the transaction increases the overall likelihood of actual fraudulent intent.

*2013 Bankr. LEXIS 4369, 2013 WL 5705630, at *17*. The court in *In re Morris* also held that the transfer was also constructively fraudulent because prepayment of a future obligation was not reasonably equivalent **[*58]** value and the transfer harmed creditors:

> . . . Debtor should not be able to reduce the amount she will pay to her current creditors by either obtaining a waiver of a future obligation or withholding money to satisfy a future debt. For example, a debtor should not be allowed to set aside money for her next five years of rent under the guise that the money will be used to pay her future creditor (the landlord) at the expense of her current creditors. In *In re Strasser*, a debtor moved $62,000 out of reach of her current creditors by transferring the money to her father, who then gave the money back to the debtor for the payment of her living expenses. *303 B.R. 841, 847-48 (Bankr. D. Ariz. 2004)*. The court held that the debtor should not be able to harm her current creditors by withholding money under the guise that the property would be used to pay her future expenses, and therefore her future creditors. *Id.* Such an action is putting money out of the reach of current creditors, and then claiming 'no harm no foul, I used it on my future creditors.' *Id.* (internal quotation marks omitted). While the facts are different in the current case, the theory is the same: Debtor is not allowed to give significant value to her future creditors **[*59]** in order to harm her current creditors. For the above reason, the court will not consider the waiver of the child support in calculating reasonable equivalence.

*2013 Bankr. LEXIS 4369, 2013 WL 5705630, at *11*.

*HN14*[⬆] Under the Uniform Fraudulent Transfer Act (now the Uniform Voidable Transactions Act), a transfer is constructively fraudulent if the debtor made the transfer without receiving a reasonably equivalent value for the transfer in exchange for the transfer and the debtor was insolvent at the time of the transfer or became insolvent as result of the transfer. *California Civil Code § 3439.05(a)*. Although the finding of lack of reasonably equivalent value was made in support of the holding of constructive fraudulent transfer in *In re Morris*, though not directly relevant for a claim under *11*

2016 Bankr. LEXIS 3475, *59

U.S.C. § 727(a)(2), such a finding would itself be a badge of fraud indicating actual intent to hinder, delay or defraud current creditors under the Uniform Fraudulent Transfer Act (now Uniform Voidable Transactions Act) and under the Ninth Circuit's listing of badges of fraud in *In re Woodfield, supra.* *California Civil Code § 3439.04(b)(8)* ("(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred."); *In re Woodfield, 978 F.2d at 518* ("6) that the Debtor received inadequate consideration **[*60]** for the transfer.") (citations omitted).

Although Defendant might have argued that the prepayments of the home loans are not indicative of an intent to hinder, delay or defraud creditors because these payments to the home lenders were to fully secured creditors, the court would not be persuaded by such. See *Pioneer Liquidating Corp. v. San Diego Trust & Savings Bank, 211 B.R. at 717 (S.D. Cal. 1997)* (holding that payment to a fully secured creditor does not hinder, delay or defraud creditors because it does not put assets otherwise available in a bankruptcy distribution out of the reach of other creditors), *cited in, Henry v. Lehman Commercial Paper, Inc. (In re First Alliance Mortgage Co.), 471 F.3d 977, 1008 (9th Cir. 2006).* This argument fails under the circumstances of this case because Defendant had refinanced his existing home loans by taking out new home loans to repay the old ones and to extract and monetize the existing equity in his home that was otherwise available to pay his current creditors. Defendant took out the surplus refinancing proceeds, which were converted home equity, and transferred such proceeds for his personal purposes rather than to pay debt to current creditors. Defendant made transfers to his wife, and he made prepayments on his new home loans five months in advance as he admitted so he and his family had a place to live. Although the new home lenders **[*61]** are secured creditors, the liens they hold are based on trust deeds on the home as real property, and not on the surplus refinancing proceeds. Findings of Fact Nos. 18-22. Defendant's transfers in his home loan prepayments from the refinancing proceeds were thus not payments of the home lenders as fully secured creditors from their collateral, the home itself, which is different from the circumstances in *Pioneer Liquidating Corp. v. San Diego Trust & Savings Bank, supra,* where the fully secured lender was paid from its collateral on which it had a security interest, which was held not to be a transfer involving an intent to hinder, delay or defraud creditors since there was no diminution of the

bankruptcy estate as the transferred assets were fully encumbered by the secured creditor's lien. This is not the situation here because the funds used to make Defendant's home loan prepayments were from the surplus refinancing proceeds from his converted home equity, which were prepetition assets not encumbered by the home lenders' security interests, and thus, these funds had been prepetition assets otherwise available to his current creditors which he put out of their reach resulting in a diminution of the bankruptcy estate. Why this is overreaching and **[*62]** improper is that Defendant converted the prepetition asset of nonexempt home equity available to pay prepetition debts for which he was legally obligated to pay at the time into a postpetition asset by prepaying his future obligations which were not yet legally due, thus, diminishing the pool of prepetition assets available to pay current creditors otherwise barred from further collection due to the bankruptcy discharge and relieving him of having to use his postpetition assets to pay debts for which he had to pay in the future, but he did not yet have to pay at the time, and conferring a financial benefit to him at the expense of his current creditors. Accordingly, the court finds on this record that Defendant's transfers of $41,415.30 and $11,062.00 to prepay his home loans for five months are badges of fraud indicating an intent to hinder, delay or defraud his current creditors, including JP Morgan Chase, by putting these otherwise available assets out of the reach of these creditors and by not receiving reasonably equivalent value in doing so.

Additionally, Defendant testified that prior to filing his bankruptcy petition, he met with an asset protection firm, and one of his goals **[*63]** in doing so was to potentially protect his assets from potential creditors. *Trial Testimony of Joseph Ellison,* November 19, 2015 at 10:58-10:59 a.m. These admitted facts of Defendant's knowledge and planning are additional evidence of his intent to hinder or delay his creditors. Accordingly, based on the Ninth Circuit's decisions in *Adeeb* and *Retz,* the court determines that Defendant's admissions that he prepaid the home loans secured by the First and Second DOTs to prevent other creditors from gaining access to equity in the Property and collecting on those assets, constitutes additional and sufficient evidence of an actual intent to hinder, delay or defraud creditors beyond the mere fact of making preferential transfers, and thus, establishes a claim to deny Defendant's discharge under *11 U.S.C. § 727(a)(2)(A).* Furthermore, based on the analytical framework set forth in *Beverly,* the court also determines that such admissions constitute evidence of defendant's actual intent to

Layla Buchanan

2016 Bankr. LEXIS 3475, *63

hinder, delay or defraud his creditors beyond the mere fact of the timing of using non-exempt funds to prepay the home loans secured by the First and Second DOTs immediately before he filed for bankruptcy.

Defendant's admissions notwithstanding, **[*64]** the sequence of events preceding the filing of his bankruptcy petition provides circumstantial evidence of his actual intent to hinder or defraud his creditors. *See In re Beverly, 374 B.R. at 243* (for the purposes of *11 U.S.C. § 727(a)(2)(A)*, intent to hinder, delay, or defraud may be established by circumstantial evidence or by inferences drawn from a course of conduct); *In re Adeeb, 787 F.2d at 1343, citing, In re Devers, 759 F.2d 751, 755 (9th Cir. 1985).* The Ninth Circuit in *Woodfield* identified certain "badges of fraud" indicative of circumstantial evidence of an intent to hinder or defraud, which can be found here, including factors (1) a close relationship between the transferor (Debtor) and the transferee (his wife and friends); (2) that the transfers were in anticipation of a pending suit (Plaintiffs' counterclaims in the FINRA Action and suit to confirm their award); (3) that the transferor Debtor was insolvent or in poor financial condition at the time (Defendant's filing of his bankruptcy case with his schedules showing insufficient nonexempt assets to pay his outstanding debts); (4) that all or substantially all of the Debtor's property was transferred (prepetition payment of preferred parties, his wife, his friends and his home lenders, and Debtor's conversion of nonexempt assets into exempt assets); **[*65]** (5) that the transfers so completely depleted the Debtor's assets that the creditors have been hindered or delayed in recovering any part of the judgment (reduction of most, if not all, value in nonexempt assets as of the petition date). *In re Woodfield, 978 F.2d at 518*.

Defendant took out the equity from the Property and used the proceeds to pay his wife, friends, and the First DOT and the Second DOT on the Property so that his family could continue to retain the benefits of the funds and live in the Property. As a result of Defendant depleting the equity in the Property through the refinancing and prepetition transfers, there is little or no equity in the Property available to pay nonpreferred creditors through Defendant's bankruptcy case. Though the refinancing transactions, Defendant pulled out net equity of almost $250,000 from his residence, solving his practical problem of shielding the nonexempt equity from his creditors based on the limited $100,000 homestead exemption for Defendant and his spouse as a "family unit" under *California Code of Civil Procedure § 704.730(a)(2)*. Likewise, as a result of the transfers,

the disbursed funds, which would have otherwise remained in Defendant's [unencumbered] CNB Account, are also **[*66]** unavailable for distribution to Defendant's unsecured creditors. Defendant's nonpreferred unsecured creditors, JPMorgan and Shustak, representing 90 percent of the value of Defendant's general unsecured claims, are thus likely to recover little or nothing from Defendant's bankruptcy estate in light of Defendant's prepetition transfers, while he continues to benefit from these transfers diverting his assets which would have otherwise been intended and available for distribution to these creditors in this bankruptcy case.

According to Defendant's bankruptcy schedules, his real property asset, the home, is fully encumbered, and of his personal property assets with a total value of $303,587.00, most of the value of these assets is claimed as exempt in the amount of $254,673.00, leaving a net of $48,914.00 as non-exempt property. Schedule A-Real Property, Schedule B-Personal Property, Schedule C-Property Claimed as Exempt, Petition, Exhibit 8 at 13-21. Most of the value of Defendant's nonexempt assets comes from an account receivable valued at $35,914.00, which he says is owed from his former employer, Morgan Stanley, in company stock from a performance award, and is thus not traceable to **[*67]** the subject transfers from Defendant's converted home equity. Schedule B-Personal Property, Petition, Exhibit 8 at 17. In comparison, on March 1, 2014, Defendant received the funds of $247,950.85 disbursed to him from the refinancing of his home not claimed as exempt on his bankruptcy schedules representing the home equity that he took out and converted for his use, and not available to pay claims of current creditors, including the transfers discussed herein. These circumstances indicate perfect prebankruptcy planning from Defendant's perspective because through the transfers, he was able to extract the net equity of almost $250,000 from his home and provide for himself and his family and his preferred creditors, leaving almost nothing for his nonpreferred creditors, despite the limited $100,000 homestead exemption, and are the result of Defendant's design and actual intent to hinder or delay his creditors.

Furthermore, the court also observes that the timing, quantity, and circumstances surrounding Defendant's transfers—which occurred while the FINRA Action was pending, while an evidentiary hearing was ongoing, while the issuance of an adverse FINRA award was imminent, and shortly **[*68]** after the issuance of the FINRA award, highlight that Defendant made the transfers intending to hinder creditors' ability to recover

Layla Buchanan

2016 Bankr. LEXIS 3475, *68

from his assets. Moreover, within the five months preceding the Petition Date and while the FINRA Action was pending, Defendant sought the assistance of an asset protection law firm to create an asset protection trust and establish a Limited Liability Limited Partnership (LLLP) to shield his assets from creditors, and while Defendant said that he changed his mind about forming the asset protection trust and tried to instruct the asset protection law firm not to go ahead with the trust formation, such consultation reflects Defendant's state of mind with an awareness and intent not to pay his nonpreferred creditors. During this same time period, Defendant then refinanced the loans on the Property and, in the process, took out cash of nearly $250,000.00 from the equity in the Property, and then transferred much of this cash to pay preferred parties, his wife and his home lenders, notably, so he would be able to stay in his residence through advance loan payments.

### ii. Defendant's Prepetition Transfers to His Friends

Nonetheless, regarding Defendant's $38,000 **[\*69]** of prepetition payments to his friends, the court does not find that such payments by themselves indicate an intent to hinder, delay or defraud his other creditors because the evidence indicates that Defendant was repaying loan obligations to them, which makes these transfers only preferential payments to these creditors, which transfers by themselves do not indicate an intent to hinder, delay or defraud under applicable law. *California Civil Code § 3432*; *Hultman v. Tevis, supra.* According to Defendant, Mr. Springer had advanced Defendant $30,000 in advance capital for a joint business venture that they were going to have, and that he did not have a contractual or written obligation to repay him, and Mr. Jeffers had loaned him $8,000.00 to help him pay personal expenses, and that he did not have a written agreement to repay the loan. *Trial Testimony of Joseph Ellison*, November 19, 2015 at 10:46-10:48 a.m. The court determines that Defendant's payment of $30,000.00 to Mr. Springer was to repay money held by Defendant for their joint business venture, but the money belonged to Mr. Jeffers, and not Defendant, as the evidence does not indicate that a gift to Defendant was intended. The court further determines that Defendant's payment of **[\*70]** $8,000.00 to Mr. Jeffers was to repay a loan made by Mr. Jeffers to Defendant. These transfers, while preferential, do not indicate an intent to hinder, delay or defraud other creditors.

### iii. Defendant's Prepetition Transfers to His Wife's CNB Account

Regarding Defendant's prepetition transfers to his Wife's CNB Account, by transferring a total of $86,000.00 to his wife prepetition, Defendant hindered, delayed and defrauded his creditors' ability to collect on their claims by putting these funds out of his name and into his wife's name and control, which transactions do not exemplify the actions of an "honest but unfortunate debtor." *See Grogan v. Garner, 498 U.S. at 286-287.* Specifically, six days after the conclusion of a week-long evidentiary hearing in the FINRA Action, Defendant transferred $18,000.00 to his wife's CNB Account. One week after the FINRA Award issued, Defendant, through two transactions, transferred an additional $51,000.00 to his wife's CNB Account because he was worried about what would happen, he wanted to retain the funds to benefit him and his family, and he did not want anyone to gain access to these funds. Defendant's wife is an insider for purposes of the Bankruptcy Code pursuant to *11 U.S.C. § 101(31)(A)(i)* as a relative **[\*71]** of an individual debtor. *See Hahn v. Leong (In re Llamas), 2011 Bankr. LEXIS 4779, 2011 WL 7637254, at \*7 (Bankr. C.D. Cal. 2011)* (dicta in unpublished opinion holding former spouse is not an insider) (*HN15*⬆] "'Insider,' as defined in *§ 101(31)*, specifically includes the spouse of the debtor . . . ."), *citing, Miller v. Schuman, 81 B.R. 583, 585 (9th Cir. BAP 1987)* ("A spouse of the debtor is a relative . . . because the definition includes individuals 'related by affinity.'") (dicta as holding related to former spouse). Defendant's pattern of asset diversions to his wife continued all the way to the Petition Date, when Defendant transferred an additional $17,000.00 to his wife. Given that within three months of the Petition Date, Defendant transferred at least $86,000.00 from the CNB account in his name to his Wife's CNB Account in which, as previously stated, Defendant had a community property interest, and given that the account belonged to his wife's law practice and that Defendant was not a signatory on the account, the court determines that through such transfers, Defendant intended to hinder, delay and defraud creditors by making it difficult for them to collect on their claims because they would have had to establish that his interest in property no longer in his name was still his, having transferred funds in his name to another. **[\*72]** *See In re Woodfield, 978 F.2d at 518* (intent may be inferred from certain "badges of fraud" that constitute circumstantial evidence of intent, including a close relationship between the transferor and the transferee); *California Civil Code § 3439.04(b)(1)* and *(2)* ("(1) Whether the transfer or obligation was to an insider" and

2016 Bankr. LEXIS 3475, *72

"(2) Whether the debtor retained possession or control of the property transferred after the transfer"); 6 Resnick and Sommer, *Collier on Bankruptcy*, ¶ 727.02[3][b] at 727-18 and n. 37 ("The fact that a transfer is to a relative or close associate can also be indicative of fraud, as can the debtor's retaining possession, benefits or use of the property that was transferred."), *citing, Pavy v. Chastant (In re Chastant), 873 F.2d 89 (5th Cir. 1989)*.

Defendant argues that the transfers to his wife of $86,000 in the three months before his bankruptcy case was filed were to "pay customary bills," but there is no evidence to corroborate Defendant's testimony that this was the purpose of the transfers and for the court to determine that such "customary" bills were reasonable living expenses. *See Defendant's Post-Trial Proposed Findings of Fact and Conclusions of Law*, ECF 27 at 6-7, *citing inter alia, Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:16 a.m. and 9:51-9:52 a.m. The court cannot **[*73]** accept at face value Defendant's assertion that his wife used the funds transferred by him to her bank account to pay "customary bills," implicitly suggesting that her use of the transferred funds was reasonable or justifiable, since he admitted in his testimony that her bank account was her own account, that he had nothing to do with it, that he was not a signatory on her bank account, and had no control over the account, thus indicating that he may not have personal knowledge of what she did with the funds transferred to her bank account . *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:16 a.m. and 9:16-9:18 a.m.; *Federal Rule of Evidence 602* (A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. . . ."). The only person with personal knowledge of what Defendant's wife did with the funds transferred to her bank account over which she had sole control was the wife, and she did not testify at trial. It appears that he would only have known what she did with the transferred funds based on what she told him. Thus, the court determines that Defendant's testimony as to what his wife did with the transferred **[*74]** funds is not credible because he has not provided a foundation for the court to make a finding that he has personal knowledge of that matter, and that the court otherwise has no reliable evidence as to what Defendant's wife did with the funds that Defendant transferred to her account, that is, there is no way of ascertaining from this record whether she used the funds to make preferential transfers to existing creditors, which may indicate a lack of intent to hinder, delay or defraud, or she went on a shopping spree before

Defendant filed his bankruptcy case, which may indicate such intent. Given the timing of the transfers by Defendant to his wife's bank account and the amounts transferred within three months of his filing this bankruptcy case totaling $86,000, of which only $25,793 was listed in her bank account on his bankruptcy schedules, the court infers that the unaccounted for amount of about $61,000 was dissipated for the benefit of Defendant and his wife to avoid paying his nonpreferred creditors, which is similar to the situation in *In re Cooke, supra*, i.e., expenditures for the personal benefit of the debtor rather than payment of current creditors.

According to Defendant, the $18,000 transferred **[*75]** to his wife right before the petition date is accounted for on his bankruptcy schedules as his community property interest in his wife's bank account which is a listed asset on Schedule B-Personal Property (i.e., part of the $25,793 listed on Schedule B for her account). *Id.* at 7. This interest is claimed as exempt on Schedule C-Property Claimed as Exempt and is apparently intended to pay for "customary bills" in the future (i.e., postpetition). Exhibit 8 at 21; *see In re Beverly, 374 B.R. at 245* ("Even if the exemption is not defeated, the existence of intent to hinder, delay, or defraud creditors nevertheless may warrant denial of discharge under *§ 727(a)(2)*."), *citing inter alia, Norwest Bank Neb., N.A. v. Tveten, 848 F.2d 871, 874-876 (8th Cir. 1988)* ("debtor did not want a mere *fresh* start, he wanted a *head* start") (emphasis in original; internal quotation marks omitted). Thus, the circumstances of Defendant's transfers to his wife go beyond the mere fact that Defendant converted his nonexempt home equity to exempt property to be outside the holding of *Gill v. Stern, supra. See also, In re Beverly, 374 B.R. at 240-241* (discussing *Gill v. Stern, supra*, in that it involved a transfer from one form of exempt asset to another form of exempt asset, and was "not a simple instance of eve-of-bankruptcy exemption planning").

### iv. Defendant's Other Prepetition Transfers Right Before **[*76]** Filing for Bankruptcy

At or just before the petition date, Defendant also transferred $31,600.00 from Defendant's non-exempt Joint Account to various destinations. Aside from the $17,000.00 transfer to his wife on the Petition Date, which was discussed above regarding his transfers to his wife, Defendant made two transfers to benefit himself and his wife by making a contribution of $6,500.00 to a Roth Individual Retirement Account (IRA)

2016 Bankr. LEXIS 3475, *76

in his name and a contribution of $6,500.00 to a Roth IRA in his wife's name. Apparently, these were new accounts because Defendant's bankruptcy schedules only show the amounts of these contributions in the accounts. *See Defendant's Post-Trial Proposed Findings of Fact and Conclusions of Law*, ECF 27 at 6-7. Both of these assets are claimed by Defendant as exempt. *Id.; see also, In re Beverly, 374 B.R. at 245* ("Even if the exemption is not defeated, the existence of intent to hinder, delay, or defraud creditors may warrant denial of discharge under *§ 727(a)(2)*.") (citations omitted). These transfers are additional evidence of Defendant's actual intent to hinder or delay his creditors in light of the other circumstances of his transfers in this case as discussed herein.

### v. The Totality of Circumstances [*77] Showing Defendant's Actual Intent to Hinder, Delay or Defraud Creditors

The court considers Defendant's admitted animus towards JPMorgan and his fear of former counsel, Shustak, obtaining a judgment and levying Defendant's CNB Account, as further evidence of his actual intent to hinder, delay or defraud creditors through his prepetition asset transfers. Defendant has been open about his hostility towards both creditors, who and which are the largest unsecured creditors in his bankruptcy case, and the transfer of Defendant's property prevented the distribution of the value of such property to these creditors. Indeed, if Defendant had not transferred the funds, the funds would be in Defendant's CNB Account and available for distribution as part of the bankruptcy estate. For instance, had Defendant not made the transfers to Dovenmuehle Mortgage and Logan Investments, $52,477.30 would have been in Defendant's CNB Account on the Petition Date, would have become part of the bankruptcy estate by operation of law, and thus, would have been available for distribution to Defendant's unsecured creditors. The same is true for all of Defendant's prepetition transfers. Indeed, Defendant recognized **[*78]** that, absent the transfers, the funds would be available to benefit his creditors, including JPMorgan and Shustak. In order to avoid that outcome however, Defendant admitted at trial that he "had to prioritize where this money went" and the court determines that he made the various transfers at issue to his wife and preferred creditors in the weeks preceding the Petition Date to ensure the funds were distributed, as he, and not the Bankruptcy Code, deemed appropriate.

The court concludes that under these circumstances, as in *Beverly*, Defendant's prepetition transfers were "too much" because they involved a large dilution of non-exempt assets. *In re Beverly, 374 B.R. at 245*. On or about March 1, 2014, before Defendant prepaid the loans secured by the First and Second DOTs on the Property, Defendant had at least $247,950.85 in his CNB Account, and considering that Defendant did not claim an exemption in his CNB account, Defendant would have had non-exempt assets of at least $247,950.85 that could have been used to pay Defendant's unsecured creditors. After the various transfers described above, Defendant had only $600.00 in his CNB Account on the Petition Date, and almost no assets with which to pay his non-preferred **[*79]** creditors like Plaintiffs and Shustak. Furthermore, as detailed above, the record is replete with evidence that Defendant focused on preventing his non-preferred creditors from reaching the value in his assets, including the nonexempt equity in the Property. Accordingly, based on the dilution of at least $247,350.85 in non-exempt assets, leaving little to pay the claims of nonpreferred creditors shortly before filing for bankruptcy, who would be otherwise barred from collecting due to the bankruptcy discharge, and the dilution of the pool of prepetition assets included Defendant's transfers of $52,000.00 in non-ordinary course prepayment of his home loans (i.e., paying future creditors as opposed to current nonpreferred creditors), and his insider transfers of $86,000.00 to his wife, and based on evidence of Defendant's prior animus towards, and intent not to pay, his nonpreferred creditors, such as JPMorgan, including express admissions, the court determines that Defendant undertook the prepetition transfers involving large claims of exemption and overtones of overreaching, like the debtor in *Beverly*, in an effort to become judgment proof as to his non-preferred creditors, including **[*80]** JPMorgan and Shustak, and thwart their collection efforts against him, and the evidence surrounding the circumstances of these transfers demonstrate his intent to hinder, delay, or defraud his creditors to warrant denial of his bankruptcy discharge under *11 U.S.C. § 727(a)(2)(A)*.

In making such a determination in this case, the court does not intend to "draw a line" that demarcates the line between permissible and impermissible prebankruptcy planning, but rather, the court determines that based on the additional and sufficient evidence of intent presented in this case beyond the mere fact that Defendant made some preferential transfers to other creditors immediately preceding his bankruptcy filing, and beyond the mere fact that Defendant converted nonexempt

2016 Bankr. LEXIS 3475, *80

assets to exempt assets, Defendant "crossed over the line" of what is permissible behavior. *See In re Beverly, 374 B.R. at 244-246* (discussing the difficulty in drawing the line between legitimate bankruptcy planning and intent to hinder, delay or defraud creditors). Accordingly, the court determines that under the totality of the circumstances here, the preponderance of the evidence shows that Defendant transferred property prepetition with the intent to hinder, delay or defraud creditors, **[*81]** and therefore, the court should deny the entry of a discharge order in Defendant's bankruptcy case under *11 U.S.C. § 727(a)(2)(A)*.

## II. Postpetition Transfers Under *11 U.S.C. § 727(a)(2)(B)*

Through their complaint, Plaintiffs argue that Defendant's discharge should be denied pursuant to *11 U.S.C. § 727(a)(2)(B)*. Nonetheless, the court observes that Plaintiffs abandoned this claim by failing to introduce evidence supporting the existence of any postpetition transfers and by failing to argue such at trial. Accordingly, the court denies Plaintiffs' claim under *11 U.S.C. § 727(a)(2)(B)* for lack of proof.

## III. Conclusion

For the foregoing reasons, the court determines that there is adequate and sufficient evidence to establish by a preponderance that Defendant made prepetition transfers to preferred parties with actual intent to hinder or delay non-preferred creditors, including JPMorgan and Shustak, and therefore, Defendant's discharge should be denied pursuant to *11 U.S.C. § 727(a)(2)(A)*.

This memorandum decision constitutes the court's findings of fact and conclusions of law pursuant to *Rule 7052 of the Federal Rules of Bankruptcy Procedure* and *Rule 52 of the Federal Rules of Civil Procedure*. A separate judgment is being entered concurrently.

IT IS SO ORDERED.

Date: September 23, 2016

/s/ Robert Kwan

Robert Kwan

United States Bankruptcy Judge

JUDGMENT

The court having issued its memorandum decision in this adversary **[*82]** proceeding on the complaint objecting to entry of discharge pursuant to *11 U.S.C. § 727(a)(2)(A)* and *(a)(2)(B)*, which decision sets forth its findings of fact and conclusions of law after trial, pursuant to *Rule 7052 of the Federal Rules of Bankruptcy Procedure* and *Rule 52 of the Federal Rules of Civil Procedure*,

Judgment is hereby entered in favor of Plaintiffs JP Morgan Chase Bank, N.A., and JP Morgan Securities, LLC, and against Defendant Joseph Ellison that the discharge of Defendant Joseph Ellison, the debtor in this bankruptcy case, is denied pursuant to *11 U.S.C. § 727(a)(2)(A)*.

IT IS SO ORDERED.

Date: September 23, 2016

/s/ Robert Kwan

Robert Kwan

United States Bankruptcy Judge

---

*End of Document*

Layla Buchanan

**EXHIBIT 4**

**User Name:** Layla Buchanan

**Date and Time:** Wednesday, May 10, 2023 3:04:00PM PDT

**Job Number:** 196843016

## Document (1)

1. *Ravasia v. United States Tr. (In re Ravasia), 2021 Bankr. LEXIS 1033*

   **Client/Matter:** 1673-001

   **Search Terms:** 2021 Bankr.LEXIS 1033

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |

About LexisNexis | Privacy Policy | Terms & Conditions | Copyright © 2023 LexisNexis

✦ Positive
As of: May 10, 2023 10:04 PM Z

# *Ravasia v. United States Tr. (In re Ravasia)*

United States Bankruptcy Appellate Panel for the Ninth Circuit

April 16, 2021, Filed

BAP No. EW-20-1212-BTL

**Reporter**
2021 Bankr. LEXIS 1033 *; 2021 WL 1511940

In re: SAJID A. RAVASIA and DEBRA J. RAVASIA, Debtors.SAJID A. RAVASIA; DEBRA J. RAVASIA, Appellants, v. UNITED STATES TRUSTEE, Appellee.

**Notice:** THIS DISPOSITION IS NOT APPROPRIATE FOR PUBLICATION. ALTHOUGH IT MAY BE CITED FOR WHATEVER PERSUASIVE VALUE IT MAY HAVE, SEE *FED. R. APP. P. 32.1*, IT HAS NO PRECEDENTIAL VALUE, SEE 9TH CIR. BAP RULE 8024-1.

**Subsequent History:** Affirmed by *In re Ravasia, 2022 U.S. App. LEXIS 4808 (9th Cir., Feb. 23, 2022)*

**Prior History: [*1]** Appeal from the United States Bankruptcy Court for the Eastern District of Washington. Bk. No. 2:17-bk-00106-FPC, Adv. No. 2:17-ap-80021-FPC. Frederick P. Corbit, Bankruptcy Judge, Presiding.

*Garvin v. Ravasia (In re Ravasia), 2020 Bankr. LEXIS 2176, 2020 WL 4726416 (Bankr. E.D. Wash., Aug. 13, 2020)*

## Core Terms

false oath, schedules, bankruptcy court, expenses, amend, original complaint, amended complaint, fraudulently, knowingly, income and expenses, monthly, discovery, leave to amend, omission, financial affairs, business debt, tax refund, underreported, estimated, false statement, time of filing, postpetition, disclose, refund, cases, monthly income, relates back, credit card, misrepresentations, revocation

## Case Summary

### Overview

HOLDINGS: [1]-Order denying debtors' discharge under

*11 U.S.C.S. § 727(a)(4)(A)* for false oaths was affirmed because the debtors' continued false oath as to the husband's income in the Amended Schedule I established an intent to deceive and the advice-of-counsel defense was not available because it should have been, and admittedly was, evident to the debtors by no later than July 2017 that their schedules were inaccurate.

**Outcome**
Order affirmed.

## LexisNexis® Headnotes

Bankruptcy Law > ... > Judicial Review > Standards of Review > Abuse of Discretion

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Relation Back

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Commencement of Adversary Proceedings

### *HN1*[⤓] Standards of Review, Abuse of Discretion

An appellate court reviews de novo whether an amended complaint relates back to the original pleading. An appellate court reviews for abuse of discretion the bankruptcy court's decision to allow or deny amendment of pleadings under *Fed. R. Civ. P. 15(c)* and *Fed. R. Bankr. P. 7015*. Whether cause exists

2021 Bankr. LEXIS 1033, *1

to extend the filing deadline to object to a debtor's discharge is reviewed for abuse of discretion.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law

*HN2*[↧] **Standards of Review, Abuse of Discretion**

A trial court abuses its discretion if it applies the wrong legal standard or if its factual findings were clearly erroneous.

Bankruptcy Law > ... > Judicial Review > Standards of Review > Clear Error Review

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Denial of Discharge

*HN3*[↧] **Standards of Review, Clear Error Review**

In an action for denial of discharge under *11 U.S.C.S. § 727*, an appellate court reviews: (1) the bankruptcy court's legal conclusions de novo, (2) factual findings for clear error, and (3) mixed questions of law and fact de novo. Under *§ 727(a)(4)(A)*, whether a debtor made a false oath, whether the false statements were material, and whether the debtor had the requisite fraudulent intent are all questions of fact reviewed under the clearly erroneous standard. Factual findings are clearly erroneous if they are illogical, implausible, or without support in the record.

Civil Procedure > Appeals > Record on Appeal

*HN4*[↧] **Appeals, Record on Appeal**

An appellate court may affirm on any ground supported by the record, regardless of whether the bankruptcy court relied upon, rejected or even considered that ground.

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Commencement of Adversary Proceedings

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Relation Back

*HN5*[↧] **Adversary Proceedings, Commencement of Adversary Proceedings**

A court should freely give leave to amend when justice so requires. *Fed. R. Civ. P. 15(c)* and *Fed. R. Bankr. P. 7015*. The Ninth Circuit applies this rule with extreme liberality. In discharge cases, the opportunity to amend is especially important because of the short time frame under which such a complaint must be filed. *Fed. R. Bankr. P. 4004(a)*.

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Causes of Action

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Relation Back

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Commencement of Adversary Proceedings

*HN6*[↧] **Adversary Proceedings, Causes of Action**

Under *Fed. R. Civ. P. 15(c)(1)*, made applicable to adversary proceedings by *Fed. R. Bankr. P. 7015*, an amendment to a pleading relates back to the date of the original pleading when it asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading. *Rule 15(c)(1)(B)*; *Rule 7015*. This link will be found when the claim to be added is likely to be proven by the same kind of evidence that would be used to support the original pleading. The focus of the inquiry is on the factual allegations made in the two complaints so as to give the opposing party fair notice of the claims against him.

Layla Buchanan

2021 Bankr. LEXIS 1033, *1

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Relation Back

**HN7[↧] Amendment of Pleadings, Relation Back**

In applying the relation back doctrine in the context of objections to discharge and the dischargeability of certain debts, the basic test is whether the evidence with respect to the second set of allegations could have been introduced under the original complaint, liberally construed; or as a corollary, that in terms of notice, one may fairly perceive some identification or relationship between what was pleaded in the original and amended complaints.

Bankruptcy Law > ... > Bankruptcy > Claims > Objections to Claims

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Revocation of Discharge

**HN8[↧] Claims, Objections to Claims**

*Fed. R. Bankr. P. 4004(b)(2)* provides for the addition of objection to discharge claims after the time for objection has expired but before discharge is granted when: (A) the objection is based on facts that, if learned after the discharge, would provide a basis for revocation under *11 U.S.C.S. § 727(d)*; and (B) the movant did not have knowledge of those facts in time to permit an objection.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Revocation of Discharge

**HN9[↧] Exceptions to Discharge, Embezzlement & False Representations**

*11 U.S.C.S. § 727(d)(1)* provides for revocation of discharge when it is shown that the debtor obtained a discharge through fraud and the plaintiff was not aware of the fraud until after the discharge was entered.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

Evidence > Burdens of Proof > Preponderance of Evidence

**HN10[↧] Denial of Discharge, False Accounts & Oaths**

The bankruptcy court may deny a chapter 7 debtor's discharge if the debtor knowingly and fraudulently, in or in connection with the case-(A) made a false oath or account. *11 U.S.C.S. § 727(a)(4)(A)*. The fundamental purpose of *§ 727(a)(4)(A)* is to insure that the trustee and creditors have accurate information without having to conduct costly investigations. To prevail on a claim under this section, a plaintiff must show, by a preponderance of the evidence, that: (1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently. A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath. It is crucial to the proper operation of the bankruptcy system that chapter 7 debtors ensure to the greatest extent possible that the information turned over to the bankruptcy court is accurate.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

**HN11[↧] Denial of Discharge, False Accounts & Oaths**

The second element necessary for a *11 U.S.C.S. § 727(a)(4)(A)* claim is that the false oath relate to a material fact. A fact is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property. An omission or misstatement that detrimentally affects administration of the estate is material.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

**HN12[↧] Denial of Discharge, False Accounts & Oaths**

Layla Buchanan

2021 Bankr. LEXIS 1033, *1

The third element necessary for a *11 U.S.C.S. § 727(a)(4)(A)* claim is that the debtor makes the false oath knowingly. A debtor acts knowingly if he or she acts deliberately and consciously.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

Evidence > Types of Evidence > Circumstantial Evidence

Evidence > Inferences & Presumptions > Inferences

**HN13[⤓]** **Denial of Discharge, False Accounts & Oaths**

To prevail on a claim under *11 U.S.C.S. § 727(a)(4)(A)*, the objecting party must establish that the debtor's false oath was made fraudulently. Intent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct. Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent. But the existence of more than one falsehood, together with a debtor's failure to take advantage of the opportunity to clear up all inconsistencies and omissions, such as when filing amended schedules, can be found to constitute reckless indifference to the truth satisfying the requisite finding of intent to deceive.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

**HN14[⤓]** **Denial of Discharge, False Accounts & Oaths**

In the context of *11 U.S.C.S. § 727(a)(4)(A)*, nondisclosure of creditors (and debts) can be just as important as nondisclosure of assets. Information regarding business and personal dealings can lead to discovery of assets, potentially avoidable transfers, or other relevant information such as grounds to deny a debtor's discharge. A false statement or omission may be material even if it does not cause direct financial prejudice to creditors. A discharge may be denied if the omission adversely affects the trustee's or creditors' ability to discover other assets or to fully investigate the debtor's pre-bankruptcy dealing and financial condition.

Bankruptcy Law > ... > Bankruptcy > Debtor Benefits & Duties > Debtor Duties

**HN15[⤓]** **Debtor Benefits & Duties, Debtor Duties**

Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge of his debts. However, the debtor's reliance must be in good faith. The advice of counsel is not a defense when the erroneous information should have been evident to the debtor. The advice of counsel is also not a defense when it is transparently plain that the property should be scheduled.

**Counsel:** For SAJID A. RAVASIA, Appellant: Daniel P. O'Rourke, Esquire, Attorney, SOUTHWELL & O'ROURKE, PS, Spokane, WA.

For DEBRA J. RAVASIA, Appellant: Darren M. Digiacinto, Esquire, AT, Winston & Cashatt, Spokane, WA.

For UST- UNITED STATES, TRUSTEE, SPOKANE, Appellee: James David Perkins, Trial Attorney, Office of the United States Trustee, United States Courthouse, Spokane, WA.

**Judges:** Before: BRAND, TAYLOR, and LAFFERTY, Bankruptcy Judges.

## Opinion

**MEMORANDUM**

**INTRODUCTION**

Chapter 7[2] debtors Dr. Sajid Ravasia and Dr. Debra Ravasia[3] appeal an order denying their discharge under *§ 727(a)(4)(A)* for false oaths. The Ravasias also appeal a prior order granting the U.S. Trustee ("UST") leave to file an amended complaint. We AFFIRM.

---

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, **11 U.S.C. §§ 101-1532**, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

[3] Because the Ravasias are both physicians, we refer to them individually as Mr. Ravasia and Mrs. Ravasia to avoid any confusion. No disrespect is intended.

Layla Buchanan

2021 Bankr. LEXIS 1033, *1

## FACTS

### A. The bankruptcy filing and the *§ 727* complaint

The Ravasias are both physicians. Mr. Ravasia is a psychiatrist and at all times relevant was employed by a private health care provider. Mrs. Ravasia is an obstetrician/gynecologist.

The Ravasias filed a joint chapter 7 bankruptcy case on January 19, 2017, after closing **[*2]** a medical clinic they owned and operated. Their debts were primarily business debts. In their schedules and statement of financial affairs signed under penalty of perjury, the Ravasias represented: (1) Mr. Ravasia's estimated monthly gross wages were $26,818.05, and his estimated monthly overtime pay was $0; (2) Mrs. Ravasia was unemployed with estimated monthly gross wages of $0, but an increase in income was expected because she was looking for work; (3) their estimated monthly expenses were $26,805.06, with no indication if any increase or decrease was expected; and (4) there was a "possible tax refund" for 2016 in an "unknown amount" and its value was $0.

At the *§ 341(a)* meeting of creditors, the Ravasias confirmed under oath that they reviewed their bankruptcy petition, schedules, and statement of financial affairs before signing them and that the information contained therein was "truthful and accurate." Mrs. Ravasia testified that, following the closure of their clinic, she was "not terribly employable" as an OB-GYN. To become gainfully employed in that area of practice, she was leaving for seven weeks to do volunteer work in Afghanistan to get recent experience delivering babies. Mrs. **[*3]** Ravasia testified that she was also inquiring about locum tenens (temporary) work in Canada, but there was "nothing really on the horizon" for paid employment, and if she did obtain such work, it would be sporadic and part-time and she could not estimate what the compensation would be.

After two extensions, the chapter 7 trustee filed a timely complaint to deny the Ravasias' discharge. He alleged that the Ravasias knowingly and fraudulently made materially false statements or accounts in their bankruptcy case under *§ 727(a)(4)(A)*, including failing to disclose payments made to creditors within 90 days prior to filing bankruptcy and failing to disclose certain prepetition cash withdrawals. Ultimately, the chapter 7 trustee reached a settlement with the Ravasias, but the

UST objected to the portion of the proposed settlement to dismiss the *§ 727* complaint. The bankruptcy court agreed with the UST and entered an order that preserved the monetary settlement but allowed the *§ 727* action to proceed with the UST substituted as plaintiff.

Upon completing her volunteer work in Afghanistan in May 2017, Mrs. Ravasia found steady locum work in Canada and the United States for the remainder of the year. For her various **[*4]** locum positions, Mrs. Ravasia grossed $260,462 in 2017. Mr. Ravasia grossed $668,000 in 2017, or about $55,000 per month.[4]

Nearly two years after the *§ 727* complaint had been filed, the Ravasias filed Amended Schedules I and J. On the Amended Schedule I, the Ravasias represented that Mr. Ravasia's gross monthly wages were $20,630.40, about $6,000 less than originally reported, and that Mrs. Ravasia's income was $0. To explain the $6,000 decrease in Mr. Ravasia's income, the Ravasias represented that, with Mrs. Ravasia leaving the country for an indefinite period of time for employment, Mr. Ravasia would become a solo parent and unable to do his usual extra shift work, if that was still an option given his employer's plan to hire additional psychiatrists. Therefore, Mr. Ravasia expected to earn only his base salary of $250,000 per year.

On the Amended Schedule J, the Ravasias represented that their estimated monthly expenses were $90,955.76, about $64,000 more than originally reported. This figure included more unreported business expenses and student loan payments for their children.

### B. Bankruptcy court grants the UST leave to amend **[*5]** the *§ 727* complaint

Two years after the *§ 727* complaint was filed, the UST sought leave to amend. The amended complaint asserted the same claim for relief under *§ 727(a)(4)(A)*, but alleged that the Ravasias made additional false oaths by understating their expected income and

---

[4] Mr. Ravasia's W-2's and tax statements for 2013 through 2016 revealed his gross annual wages as follows:

2013: $575,641

2014: $569,946

2015: $530,503.99

2016: $481,268

2021 Bankr. LEXIS 1033, *5

expenses for 2017. For example, Schedule I listed Mr. Ravasia's expected gross income at $27,000 per month, but his gross monthly income for 2016 was $40,000, and his gross monthly income for 2017 was $55,000. Further, Schedule J understated the Ravasias' expected living expenses on non-essentials such as foreign travel, private school and college tuition for their children, frequent spa visits, and extensive dining out.

The UST alleged that the Ravasias knowingly and fraudulently made these (and other) misrepresentations about their financial situation at the time of their filing to mislead the court and creditors about their ability to repay their debts. The UST alleged that had it known the truth about the Ravasias' financial condition, a conversion to chapter 11 would likely have been pursued and granted.

Over the Ravasias' objection, the bankruptcy court granted the UST's motion for leave to amend the *§ 727* complaint. The Ravasias' appeal **[\*6]** of that interlocutory order to the district court was denied.

## C. The *§ 727* trial and the bankruptcy court's decision

After a three-day trial, the bankruptcy court entered its order denying the Ravasias' discharge under *§ 727(a)(4)(A)*, finding that they made multiple false oaths on their schedules with respect to their income and expenses.

Schedule I and Amended Schedule I both indicated Mr. Ravasia's income was substantially less than what he earned in each of the several years before and after he filed for bankruptcy. The Ravasias also failed to indicate that his income could increase, and in fact had increased substantially, within the year of filing. The court found that Mr. Ravasia's reduced income in January 2017 - the month the Ravasias filed for bankruptcy — was not a representative month for his income, and the use of that month, especially without consideration of his substantial annual July bonus and their failure to amend the schedules to reflect that known bonus, was fraudulent. The court found that the Ravasias' repeated misrepresentations and omissions about Mr. Ravasia's income were materially false. It further found that it was evident to the Ravasias that Mr. Ravasia's income on Schedule **[\*7]** I was substantially underreported, and thus their false oaths related to his income were made knowingly, deliberately, and consciously. Finally, the court found that the Ravasias

acted with intent to deceive interested parties about Mr. Ravasia's income given their failure to update their schedules with accurate income information for him and the Amended Schedule I continuing to dramatically underreport it.

While the court did not find the initial reported income for Mrs. Ravasia as $0 materially false, it did find her testimony that she was not employable and that her income was uncertain "not credible." The court found that the Ravasias' failure to amend the schedules with accurate income information for Mrs. Ravasia, and failure to disclose her substantial income in the Amended Schedule I, established that their false oaths about her income were made knowingly and fraudulently and that they had acted with intent to deceive interested parties about her income.

The court also found that the Ravasias made false oaths about their expenses. The evidence established that the Ravasias' combined net income for 2017 was approximately $550,000, and that they spent substantially all of this **[\*8]** income, or an average of $45,000 per month, as compared to the $26,000 they reported on Schedule J. The Ravasias acknowledged the underestimated expenses in Schedule J as inaccurate. The court found that the Ravasias' misrepresentation of their expected ongoing expenses was a material fact, made knowingly, deliberately, and consciously. The court found that the Ravasias knowingly and fraudulently provided false information about their expenses and failed to amend their schedules with accurate information.

In summary, the court found that, in what might have been an attempt to prevent conversion of the case to chapter 11, the Ravasias adopted a zealous position regarding their financial reporting. However, their zealous actions amounted to fraud. The Ravasias timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction under *28 U.S.C. §§ 1334* and *157(b)(2)(J)*. We have jurisdiction under *28 U.S.C. § 158*.[5]

---

[5] The order granting leave to amend the *§ 727* complaint was an interlocutory order that merged into the final order denying discharge. Therefore, we have jurisdiction to review that earlier, non-final order. *See Harvey v. Waldron, 210 F.3d 1008, 1012 (9th Cir. 2000)*, overruled in part on other grounds

Layla Buchanan

2021 Bankr. LEXIS 1033, *8

## ISSUES

1. Did the bankruptcy court err in granting the UST leave to amend the *§ 727* complaint?

2. Did the bankruptcy court err in denying the Ravasias' discharge under *§ 727(a)(4)(A)*?

## STANDARDS OF REVIEW

*HN1*[⬆] We review de novo whether an amended complaint relates back to the original pleading. *Alfaro v. Johnson, 862 F.3d 1176, 1179 (9th Cir. 2017)*; *Magno v. Rigsby (In re Magno), 216 B.R. 34, 37-38 (9th Cir. BAP 1997)*. We review for **[*9]** abuse of discretion the bankruptcy court's decision to allow or deny amendment of pleadings under Civil *Rule 15(c)* and *Rule 7015*. *In re Magno, 216 B.R. at 38*; *First Fed. Sav. Bank v. Gunn (In re Gunn), 111 B.R. 291, 292 (9th Cir. BAP 1990)*. Whether cause exists to extend the filing deadline to object to a debtor's discharge is reviewed for abuse of discretion. *McDermott v. St. George (In re St. George), Nos. 16-8017/8018, 2017 Bankr. LEXIS 1065, 2017 WL 1379321, at *1 (6th Cir. BAP Apr. 17, 2017)*; *Rupp v. Auld (In re Auld), 561 B.R. 512, 515-16 (10th Cir. BAP 2017)*. *HN2*[⬆] A trial court abuses its discretion if it applies the wrong legal standard or if its factual findings were clearly erroneous. *United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009)* (en banc).

*HN3*[⬆] In an action for denial of discharge under *§ 727*, we review: (1) the bankruptcy court's legal conclusions de novo, (2) factual findings for clear error, and (3) mixed questions of law and fact de novo. *Searles v. Riley (In re Searles), 317 B.R. 368, 373 (9th Cir. BAP 2004)*, *aff'd, 212 F. App'x 589 (9th Cir. 2006)* (citing *Murray v. Bammer (In re Bammer), 131 F.3d 788, 791-92 (9th Cir. 1997)* (en banc)). Under *§ 727(a)(4)(A)*, whether a debtor made a false oath, whether the false statements were material, and whether the debtor had the requisite fraudulent intent are all questions of fact reviewed under the clearly erroneous standard. *Retz v. Samson (In re Retz), 606 F.3d 1189, 1197 (9th Cir. 2010)*. Factual findings are clearly erroneous if they are illogical, implausible, or without support in the record. *Id. at 1196*.

*HN4*[⬆] We may affirm on any ground supported by the

record, regardless of whether the bankruptcy court relied upon, rejected or even considered that ground. *Fresno Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2014)*.

## DISCUSSION

### A. The bankruptcy court did not err in **[*10]** granting the UST leave to amend the *§ 727* complaint.

*HN5*[⬆] ] "The court should freely give leave [to amend] when justice so requires." *Civil Rule 15(a)*; *see also Rule 7015*. The Ninth Circuit applies this rule with "extreme liberality." *Brown v. Stored Value Cards, Inc., 953 F.3d 567, 574 (9th Cir. 2020)* (citations omitted). In discharge cases, the opportunity to amend is especially important because of the short time frame under which such a complaint must be filed. *In re Gunn, 111 B.R. at 293*; *Mission Viejo Nat'l Bank v. Englander (In re Englander), 92 B.R. 425, 428 (9th Cir. BAP 1988)*; *Rule 4004(a)*.

*HN6*[⬆] ] Under *Civil Rule 15(c)(1)*, made applicable here by *Rule 7015*, an amendment to a pleading relates back to the date of the original pleading when it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading[.]" *Civil Rule 15(c)(1)(B)*; *see also Rule 7015*. This link will be found when the claim to be added is likely to be proven by the same kind of evidence that would be used to support the original pleading. *In re Magno, 216 B.R. at 39*; *see also Dominguez v. Miller (In re Dominguez), 51 F.3d 1502, 1510 (9th Cir. 1995)*. "The focus of the inquiry is on the factual allegations made in the two complaints so as to give the opposing party fair notice of the claims against him." *In re Magno, 216 B.R. at 39-40* (holding that amended complaint alleging *§ 523(a)(6)* claim did not relate back to original complaint for denial of debtor's discharge under *§ 727(a)(2)(A)* and *(a)(4)(A)*, because mere mention of a $120,040 claim in the original complaint **[*11]** was not enough to put debtor on notice of a *§ 523(a)(6)* claim and original complaint did not allege any facts which would have proven the required elements of a *§ 523(a)(6)* claim).

*HN7*[⬆] In applying the relation back doctrine in the context of objections to discharge and the dischargeability of certain debts, we have held:

    The basic test is whether the evidence with respect to the second set of allegations could have been

---

by *Wallace v. Kato, 549 U.S. 384, 393-94, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007)*.

2021 Bankr. LEXIS 1033, *11

introduced under the original complaint, liberally construed; or as a corollary, that in terms of notice, one may fairly perceive some identification or relationship between what was pleaded in the original and amended complaints.

*Gelling v. Dean (In re Dean), 11 B.R. 542, 545 (9th Cir. BAP 1981)*, aff'd, 687 F.2d 307 (9th Cir. 1982) (internal citations omitted); *see also In re Gunn, 111 B.R. at 292-94* (allowing amendment of original complaint under *§ 523(a)(2)(A) and (B)* and *§ 727(a)(5)* that added claims under *§ 727(a)(3)* and *(4)*, because "[t]he objection to discharge and dischargeability claims of the original complaint would certainly have put the debtor on notice of the two related theories of the amended complaint.").

It is undisputed that the UST's motion for leave to amend the *§ 727* complaint was filed after the deadline expired for filing such a complaint by two years. *See Rule 4004(a)*.[6] The Ravasias argue that the bankruptcy court erred by granting leave to amend because **[*12]** the allegations of false oaths as to income and expenses were new, did not relate back to the original complaint, and were therefore time barred. The Ravasias have not cited a case where a court denied leave to amend a complaint alleging a claim for false oath under *§ 727(a)(4)(A)*, when that same claim was alleged in the original complaint but the amended complaint asserted additional false oaths learned in discovery.

We conclude that the amended complaint related back to the original complaint. Both complaints challenged the veracity of the representations the Ravasias made in connection with their bankruptcy case, particularly those made in their schedules and statement of financial affairs. For example, the original complaint alleged that the Ravasias failed to disclose certain credit card debts owed and that those debts were paid shortly before their chapter 7 filing. The amended complaint alleged that the Ravasias made false oaths with respect to their income and expenses including, among other things, these same, undisclosed credit card expenditures. Hence, the Ravasias were on notice that they might have to defend false oath claims, and the evidence of their income and expenses could have **[*13]** been introduced under the original complaint, liberally construed. *In re Dean, 11*

*B.R. at 545*. Further, the original complaint alleged facts which would have proven the required elements for a claim under *§ 727(a)(4)(A)*. *In re Magno, 216 B.R. at 39-40*.

This case is strikingly similar to *Kennicott Brothers Co. v. Fidanovski (In re Fidanovski), 347 B.R. 343 (Bank. N.D. Ill. 2006)*. There, the creditor sought leave to amend after filing an original complaint under *§ 727(a)(4)(A)* that listed a single example of a false oath committed by the debtors in their statement of financial affairs. The amended complaint, filed after discovery, set forth "an immense list [some 31 paragraphs, in all] of instances in which [the debtors] committed false oaths either in their schedules and statement of financial affairs or at the *[§] 341* meeting." *Id. at 346*. The court concluded that, while the creditor's new claim under *§ 727(a)(3)* did not relate back to the original complaint, the *§ 727(a)(4)(A)* claim did. *Id. at 347-48*. Specifically, the court found that the amendment consisting of additional facts supporting the existing *§ 727(a)(4)(A)* claim related back since the new allegations concerned the same "core of facts" alleged in the original complaint. Thus, the amendment to add these facts was timely. *Id.* [7]

*HN8*[↑] We also conclude that the amendments to the *§ 727* complaint were permissible under *Rule 4004(b)(2)*,[8] which provides for the addition of objection to **[*14]** discharge claims after the time for objection has expired but before discharge is granted when: (A) the objection is based on facts that, if learned after the discharge, would provide a basis for revocation under *§*

_____

[7] The court in *Fidanovski* ultimately denied leave to amend on the grounds of futility, because it determined that the amendment was unnecessary pursuant to *Civil Rule 8*, *347 B.R. at 348*. The court found that the original complaint "gave perfectly adequate notice of its *[§] 727(a)(4)(A)* claim," *id. at 348*, and that "[a]dding 31 more paragraphs of 'false oaths' to the complaint . . . serve[d] no purpose." *Id. at 349*.

[8] *Rule 4004(b)(2)* provides:

A motion to extend the time to object to discharge may be filed after the time for objection has expired and before discharge is granted if (A) the objection is based on facts that, if learned after the discharge, would provide a basis for revocation under *§ 727(d)* of the Code, and (B) the movant did not have knowledge of those facts in time to permit an objection. The motion shall be filed promptly after the movant discovers the facts on which the objection is based.

_____

[6] *Rule 4004(a)* provides, in relevant part, that "[i]n a chapter 7 case, a complaint . . . objecting to the debtor's discharge shall be filed no later than 60 days after the first date set for the meeting of creditors under *§ 341(a)*."

Layla Buchanan

2021 Bankr. LEXIS 1033, *14

727(d); and (B) the movant did not have knowledge of those facts in time to permit an objection. *See Heartwood 4, LLC v. Tabor (In re Tabor), Adv. No. 15-01616-EPK, 2016 Bankr. LEXIS 2382, 2016 WL 3598643 (Bankr. S.D. Fla. June 24, 2016); Link v. Mauz (In re Mauz), 513 B.R. 273 (Bankr. M.D. Pa. 2014)* (considering propriety of motion for leave to amend objection to discharge complaint under both *Civil Rule 15(c)(1)(B)* and *Rule 4004(b)(2)*). **HN9**[↑] *Section 727(d)(1)* provides for revocation of discharge when it is shown that the debtor obtained a discharge through fraud and the plaintiff was not aware of the fraud until after the discharge was entered.

Thus, under *Rule 4004(b)(2)* as relevant to the motion to amend, the UST had to show **[*15]** the amended complaint alleged that the Ravasias committed an act of fraud that would provide a basis for revocation of discharge under *§ 727(d)(1)*, that the UST did not know of the act in time to permit an objection to discharge prior to the expiration of the *Rule 4004(a)* deadline, and that the UST filed the motion to amend promptly upon discovering the facts on which the objection was based. *In re Tabor, 2016 Bankr. LEXIS 2382, 2016 WL 3598643, at \*8*.

All three elements were met here. In the amended *§ 727* complaint, the UST alleged that the Ravasias made multiple false oaths about their income and expenses in their schedules and at the *§ 341(a)* meeting in violation of *§ 727(a)(4)(A)*. Those facts, if learned after entry of the discharge, would constitute fraud that would support revocation of discharge under *§ 727(d)(1)*. *Jones v. U.S. Tr., 736 F.3d 897, 900 (9th Cir. 2013)* (material false oath which would have resulted in denial of discharge had it been known at the time can justify subsequent revocation of discharge under *§ 727(d)(1)*) (citing cases). In the motion to amend, the UST asserted that the extent of the Ravasias' false oaths about their income and expenses was not learned until the parties had engaged in formal discovery, which was not until early-mid 2019 - long after the deadline had run under *Rule 4004(a)* - and the delay in discovery was due, in some part, to **[*16]** the Ravasias. The Ravasias filed their Amended Schedules I and J on May 28, 2019, wherein they made further misrepresentations about their income and expenses. The UST promptly filed its motion to amend the *§ 727* complaint on June 4, 2019, to include these additional facts learned in discovery.

Accordingly, because the amended *§ 727* complaint related back to the original *§ 727* complaint, and because the amendments were permissible under *Rule*

*4004(b)(2)*, the bankruptcy court did not abuse its discretion in granting the UST leave to amend.

**B. The bankruptcy court did not err in denying the Ravasias' discharge under *§ 727(a)(4)(A)*.**

**1. Law governing *§ 727(a)(4)(A)***

**HN10**[↑] The bankruptcy court may deny a chapter 7 debtor's discharge if "the debtor knowingly and fraudulently, in or in connection with the case - (A) made a false oath or account[.]" *§ 727(a)(4)(A)*. "The fundamental purpose of *§ 727(a)(4)(A)* is to insure that the trustee and creditors receive accurate information without having to conduct costly investigations." *Fogal Legware of Switz., Inc. v. Wills (In re Wills), 243 B.R. 58, 63 (9th Cir. BAP 1999)* (citation omitted).

To prevail on a claim under this section, a plaintiff must show, by a preponderance of the evidence, that: "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and **[*17]** (4) the oath was made fraudulently." *In re Retz, 606 F.3d at 1197* (citations omitted).

"A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath." *Khalil v. Devs. Sur. & Indem. Co. (In re Khalil), 379 B.R. 163, 172 (9th Cir. BAP 2007)*, *aff'd, 578 F.3d 1167 (9th Cir. 2009)*; *see also In re Searles, 317 B.R. at 378*. It is crucial to the proper operation of the bankruptcy system that chapter 7 debtors "ensure to the greatest extent possible that the information turned over to the bankruptcy court is accurate." *In re Retz, 606 F.3d at 1199*; *see also In re Searles, 317 B.R. at 378* ("The continuing nature of the duty to assure accurate schedules of assets is fundamental because the viability of the system of voluntary bankruptcy depends upon full, candid, and complete disclosure by debtors of their financial affairs.").

**HN11**[↑] The second element necessary for a *§ 727(a)(4)(A)* claim is that the false oath relate to a material fact. "A fact is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property. An omission or misstatement that detrimentally affects administration of the estate is material." *In re Retz, 606*

Layla Buchanan

2021 Bankr. LEXIS 1033, *17

*F.3d at 1198* (citations and quotation marks omitted).

**HN12**[↑] The third element necessary for a *§ 727(a)(4)(A)* claim is that the debtor makes the false oath knowingly. **[*18]** "A debtor acts knowingly if he or she deliberately and consciously." *Id.* (citations and quotation marks omitted) (debtor's signing of schedules when he knew the information was incomplete was sufficient to support a finding that the debtor acted knowingly).

**HN13**[↑] Finally, to prevail on a claim under *§ 727(a)(4)(A)*, the objecting party must establish that the debtor's false oath was made fraudulently. "Intent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct." *Id. at 1199* (citing *Devers v. Bank of Sheridan (In re Devers), 759 F.2d 751, 753-54 (9th Cir. 1985)*; *Roberts v. Erhard (In re Roberts), 331 B.R. 876, 884 (9th Cir. BAP 2005)*, *aff'd and remanded*, *241 F. App'x 420 (9th Cir. 2007))*. "Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent." *Id.* (citing *In re Khalil, 379 B.R. at 172*) But "the existence of more than one falsehood, together with a debtor's failure to take advantage of the opportunity to clear up all inconsistencies and omissions, such as when filing amended schedules, can be found to constitute reckless indifference to the truth satisfying the requisite finding of intent to deceive." *In re Khalil, 379 B.R. at 175* (citation omitted).

**2. Analysis**

The Ravasias raise several challenges to the bankruptcy court's decision to deny discharge. First, they challenge the court's finding of knowing and fraudulent **[*19]** false oaths about their expenses, arguing that chapter 7 debtors do not have a duty to report expenses that did not exist at the time of the filing. The court found that the Ravasias made a false oath by intentionally underreporting their expenses by nearly $20,000 per month.

The evidence showed that the Ravasias failed to disclose several credit cards on which they were making payments, in addition to other luxury expenses, and that these expenses existed at the time of filing. The chapter 7 trustee testified that the Ravasias continued to use and pay for credit cards and other expenses that were not listed on Schedule J. He testified that he requested their credit card information to see what the

expenditures were, because there was no change in lifestyle yet the bills were getting paid. In addition, the evidence showed that the Ravasias were spending on average $45,000 per month, as compared to the $26,000 they reported on Schedule J. Clearly, the Ravasias did not comply with their duty to provide an accurate account of their monthly expenditures.

The Ravasias argue that, while perhaps Schedule J was inaccurate, their monthly expenditures were difficult to project at the time of filing **[*20]** given Mrs. Ravasia's extensive travel to obtain employment and the expenses of the failed medical clinic that were being paid off by credit cards. While that may be true, the point is that significant debts were being paid off by credit cards and other means. But it takes income to do that, and the income the Ravasias reported was insufficient to do so given their other debts.

The Ravasias argue that underestimating expenses could not impact the bankruptcy estate or prejudice creditors and should have not resulted in a denial of discharge. In other words, they argue that their underreporting of expenses was not material. We disagree. **HN14**[↑] "Nondisclosure of creditors (and debts) can be just as important as nondisclosure of assets. Information regarding business and personal dealings can lead to discovery of assets, potentially avoidable transfers, or other relevant information such as grounds to deny a debtor's discharge." *In re Khalil, 379 B.R. at 177*. "'A false statement or omission may be material even if it does not cause direct financial prejudice to creditors.'" *Id.* (quoting *In re Wills, 243 B.R. at 63*). "[A] discharge may be denied if the omission adversely affects the trustee's or creditors' ability to discover other assets or to fully **[*21]** investigate the debtor's pre-bankruptcy dealing and financial condition." *In re Wills, 243 B.R. at 63* (citation omitted).

The Ravasias' monthly expenses bore a relationship to their business and personal transactions and concerned the discovery of the existence and disposition of their assets. Their underreporting of expenses also adversely affected the trustee's ability to fully investigate their financial condition, detrimentally affected the administration of the estate, and prejudiced creditors. Both the chapter 7 trustee and the UST testified that, had the Ravasias provided accurate income and expenses information, they would have handled the case differently. Specifically, they likely would have sought to convert the case to chapter 11, and the chapter 7 trustee (who also has extensive chapter 11 experience) testified that there would have been a

Layla Buchanan

substantial distribution to creditors through a plan.

Next, the Ravasias argue that in business debt cases, unlike consumer debt cases, there is no legal requirement to provide future averages of net income or gross wages for the months or year following the bankruptcy filing. They argue that the bankruptcy court erred by using postpetition income in hindsight to **[*22]** find that they made false statements, when Schedule I does not require them to forecast future income or average past fluctuating income. They argue that their statements with respect to income were not false as a matter of law, because they had no obligation to provide anything more than a "snapshot" of their income at the time the petition was filed.

The only case the Ravasias cite in support of their argument is *Westland Architecture & Development Corp. v. Matthews (In re Matthews), Adv. No. 2:12-01499-RK, 2016 Bankr. LEXIS 3609, 2016 WL 5746251 (Bankr. C.D. Cal. Oct. 3, 2016)*, an unreported case from a California bankruptcy court. *Matthews* was not a business debt case. Further, it does not help the Ravasias. While the court stated that a debtor's income as calculated on Schedule I is a "snapshot" of the debtor's income at the time the petition is filed, it also noted that a debtor's income as calculated on Schedule I is an "**estimate of average projected income**." *2016 Bankr. LEXIS 3609, [WL] at \*26* (emphasis in original). In other words, it considers future income.

The bankruptcy court was aware that this was a business debt case. Contrary to the Ravasias' argument, the court did not impose an improper legal requirement with respect to the reporting of income. The court was allowed to consider **[*23]** Mr. Ravasia's historical income from 2013 to 2016 and what he actually made in 2017, as well as what Mrs. Ravasia made in 2017, to determine the truthfulness of what they reported on their Schedule I and Amended Schedule I.

Further, Schedule I contemplates not simply a "snapshot" of monthly income but the forecasting of such income for the year with question 13, which asks if the debtor expects an increase or decrease "within the year" after the bankruptcy filing. And the publicly available instructions for filling out bankruptcy forms instruct debtors to "give details about the monthly income you currently expect to receive," i.e., in the future, and to "show all totals as monthly payments, even if income is not received in monthly payments," and if the "income is received in another time period, such as daily, weekly, quarterly, annually, or irregularly,"

i.e., irregular overtime/ bonus income, "calculate how much income would be by month." *See* Instructions: Bankruptcy Forms for Individuals at 28, available at https:// www.uscourts.gov/sites/default/files/instructions_individuals.pdf (last visited Apr. 16, 2021). Finally, Attachment 1 to the Amended Schedule I — where the Ravasias stated their expectation that postpetition income would **[*24]** be less than it was prepetition — demonstrates that they understood the instruction in Part 2 of Schedule I to "[e]stimate monthly income as of the date you file this form" to mean expected income going forward, not a snapshot on the day of filing.

The Ravasias also argue that, in a chapter 7 case, there is no duty to amend to update postpetition changes in income or to retroactively add income that was not earned and did not exist at the time of the filing. They argue that the bankruptcy court could not have found a false oath with respect to their income or that one was made knowingly and fraudulently for failure to perform a non-existent duty.

The Ravasias' argument misses the point. Regardless of any duty to update postpetition changes in income, they did have a duty to assure accurate schedules. The evidence showed that Mr. Ravasia made substantially more money in 2017 than what the Ravasias reported, and that they knew such income existed at the time of filing. At minimum, the Ravasias were required to amend and report a more accurate figure for Mr. Ravasia's income once the inaccuracy became apparent. *See In re Searles, 317 B.R. at 378* ("Postpetition discovery of rights that actually existed at the time of **[*25]** filing must be addressed in the schedules. This implies a duty to amend."). They did not do so, at least not until over two years later and only after the UST started asking questions. *See id. at 377* (failure to amend schedules promptly upon noting the discrepancy supports an inference of intent). When the Ravasias did amend, they falsely reported that Mr. Ravasia made even less money in 2017 than what they reported before. Their continued false oath as to Mr. Ravasia's income in the Amended Schedule I further established an intent to deceive.

The Ravasias next argue that their reliance on their counsel's advice for filling out their schedules was reasonable, and that the bankruptcy court erred in finding that their reliance was not in good faith because the "erroneous" information "should have been evident." *HN15*[⬆] "Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to

2021 Bankr. LEXIS 1033, *25

deny him a discharge of his debts. However, the debtor's reliance must be in good faith. The advice of counsel is not a defense when the erroneous information should have been evident to the debtor." *In re Retz, 606 F.3d at 1199* (internal citations omitted). The advice of counsel is also not a defense "'when it is transparently **[*26]** plain that the property should be scheduled.'" *Shoemaker v. U.S. Tr. (In re Shoemaker), BAP No. CC-18-1020-KuFL, 2019 Bankr. LEXIS 1966, 2019 WL 2774265, at *15 (9th Cir. BAP July 1, 2019)* (quoting *In re Mascolo, 505 F.2d 274, 277 n.4 (1st Cir. 1974))*.

The bankruptcy court found that the advice-of-counsel defense was not available because it should have been, and admittedly was, evident to the Ravasias by no later than July 2017 that their schedules were inaccurate. We see no error in that finding. Further, the Ravasias did not present any evidence at trial that their attorney advised them to make the specific false oaths they made. *See id.* (affirming denial of discharge under *§ 727(a)(2)(A)* and *(a)(4)(A)* where there was no evidence that counsel had advised debtor not to disclose assets). Accordingly, the bankruptcy court did not err in rejecting the reliance on counsel defense in this case.

Lastly, the Ravasias argue that the bankruptcy court improperly relied on standards relating to an overall "means" analysis in determining whether they made false oaths. The Ravasias argue that by analyzing pre- or postpetition income and expenses, as well as bank deposits and withdrawals, the court was applying the "means test" or "totality of the circumstances test" used to dismiss or convert a chapter 7 case to chapter 11 or 13. They argue that such **[*27]** tests apply only in consumer debt cases.

While these tests do apply in consumer debt cases under *§ 707(b)*, the Ravasias do not cite any authority that it was error for the court to consider some of this same type of evidence in a business debt case to determine a false oath and deny discharge under *§ 727(a)(4)(A)*. In the usual corporate-type business debt case under chapter 7, a discharge of debts is not at issue. But in this case it was. The fact that this was a business debt case did not insulate the Ravasias from making false statements in their schedules or at the *§ 341(a)* meeting or from abusing the bankruptcy system. Therefore, we do not believe that the bankruptcy court erred in considering the income and expense evidence to find a false oath and deny discharge. The Ravasias' underreported expenses, especially when combined with their underreported income, supported the

bankruptcy court's ultimate finding that their misrepresentations and omissions about their income and expenses were an intentional and material false oath.

The bankruptcy court declined to address the additional allegation that the Ravasias made a false oath related to their 2016 income tax refund. We conclude that they did, and that this **[*28]** is an additional basis to affirm.

The UST presented evidence that the Ravasias knew when they filed their chapter 7 case that they were getting a refund of at least $28,000 (and maybe as much as $100,000), yet they represented in their schedules that any potential refund was "unknown" and valued it at $0. Emails between the Ravasias and their accountant in December 2016 revealed that such a refund was likely, that the chapter 7 trustee would inquire about the amount of the refund anticipated, and that Mrs. Ravasia was searching for ways to prevent the bankruptcy estate from getting it.

Mrs. Ravasia testified that she did not disclose at the *§ 341(a)* meeting that she had spoken to her accountant about the tax refund and that it could range from $28,000 to $100,000, because she was trying to answer "yes" or "no" to the questions being asked. The chapter 7 trustee testified that, based on the schedules and the Ravasias' testimony at the *§ 341(a)* meeting, he was led to believe that a refund, if any, would be de minimis. However, he testified, had he known that a minimum of $28,000 was coming to the cash-poor estate, he might have litigated against (as opposed to settling with) Mr. Ravasia's employer over **[*29]** whether Mr. Ravasia's deferred employee compensation plan — which was a significant asset — was an estate asset, and the outcome may have been more favorable to the estate and creditors. In any case, he said he certainly would have done more follow up had the extent of the tax refund been disclosed. Ultimately, the Ravasias received a tax refund of $177,000. The chapter 7 trustee only learned about the refund after reviewing a copy of the UST's deposition of Mrs. Ravasia. It does not appear that the Ravasias ever filed an amended Schedule A/B to correct the false information about the tax refund.

Accordingly, the evidence established that the Ravasias' false statements and omissions about their 2016 income tax refund constituted a false oath, that it was material, and that it was made knowingly and fraudulently.

**CONCLUSION**

Layla Buchanan

2021 Bankr. LEXIS 1033, *29

For the reasons stated above, we AFFIRM.

---

**End of Document**

Layla Buchanan

EXHIBIT 4, PAGE 65

**EXHIBIT 5**



**User Name:** Layla Buchanan

**Date and Time:** Wednesday, May 10, 2023 3:05:00PM PDT

**Job Number:** 196843070

## Document (1)

1. *Schoenmann v. Chen (In re Chen), 2009 Bankr. LEXIS 3636*

   **Client/Matter:** 1673-001

   **Search Terms:** 2009 Bankr.LEXIS 3636

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |

---

LexisNexis | About LexisNexis | Privacy Policy | Terms & Conditions | Copyright © 2023 LexisNexis

EXHIBIT 5, PAGE 66

**A** Neutral
As of: May 10, 2023 10:05 PM Z

# *Schoenmann v. Chen (In re Chen)*

United States Bankruptcy Court for the Northern District of California

November 9, 2009, Decided; November 9, 2009, Filed; November 10, 2009, Entered on Docket

Bankruptcy Case No. 03-32157DM, Chapter 7, Adversary Proceeding No. 07-3108DM

**Reporter**
2009 Bankr. LEXIS 3636 *; 2009 WL 3788898

In re GEORGE QUINN CHEN, Debtor. E. LYNN SCHOENMANN, as Trustee of the Chapter 7 Estate of George Quinn Chen, Debtor, Plaintiff, v. GEORGE QUINN CHEN, an individual, CYNTHIA WONG, an individual, SHANGHAI 1930 LLC, a California limited liability company, and SHANGHAI 1930 RESTAURANT PARTNERS, L.P., a California limited partnership, Defendants.

**Prior History:** *Schoenmann v. Chen, 2009 Bankr. LEXIS 2534 (Bankr. N.D. Cal., Aug. 4, 2009)*

## Core Terms

Restaurant, Distributions, property of the estate, claim for relief, post-petition, bookkeeper, Partnership, Partner, posted, tips, reimbursements, sales, estate's interest, advances

## Case Summary

### Procedural Posture

Plaintiff Chapter 7 trustee filed a complaint against defendants, a debtor, his wife, a limited liability corporation (LLC), and a limited partnership (LP). The LLC and LP were eliminated as defendants by an unopposed motion for summary judgment. The only issues remaining for consideration were the avoidance and recovery of postpetition transfers and revocation of the debtor's discharge under *11 U.S.C.S. 727(d)*.

### Overview

The trustee sought to avoid and recover numerous postpetition transfers made by the LP, under the control and direction of the debtor and his wife, during the period between the petition date and the date of sale of the estate's ownership interest in a restaurant to the debtor's wife. With the approval of the court, the trustee had sold all of the estate's interest in the LLC and the LP to the debtor's wife. As of the petition date, there was an outstanding amount owed by the LP to the debtor. The trustee was unaware of the existence of the loan because the debtor did not list it on his schedules. The trustee was entitled to judgment on its claim to recover postpetition transfers in amounts representing repayments of the loan to the debtor and certain partnership distributions. The debtor's discharge was revoked under *§ 727(d)* because he failed to disclose the substantial loan owed to him and he did not disclose the partnership distributions that he received. The debtor possessed the necessary intent because he procured his discharge by fraud or knowingly and fraudulently failed to schedule debt, report the payments, or deliver the monies to the trustee.

### Outcome

The trustee was awarded judgment on her claims to avoid and recover postpetition transfers. The trustee was also awarded a judgment revoking the debtor's discharge.

## LexisNexis® Headnotes

Contracts Law > ... > Discharge & Payment > Payments > General Overview

*HN1*[⬇] **Discharge & Payment, Payments**

When payment is made on an obligation, unless there is some indication to the contrary, the practical and ordinary interpretation must undoubtedly be that payment is to be applied to the part first coming due to be paid.

2009 Bankr. LEXIS 3636, *3636

Bankruptcy Law > ... > Bankruptcy > Estate Property > Contents of Estate

**HN2[**↓**]** **Estate Property, Contents of Estate**

Property of a bankruptcy estate includes money that a debtor has a right to receive.

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Revocation of Discharge

**HN3[**↓**]** **Liquidations, Revocation of Discharge**

The benefit of discharge is reserved for the honest but unfortunate debtor. If _11 U.S.C.S. § 727(d)_ is satisfied, a debtor has been less than honest and deserves no discharge.

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Revocation of Discharge

**HN4[**↓**]** **Liquidations, Revocation of Discharge**

To warrant revocation under _11 U.S.C.S. § 727(d)_, a trustee must show that (1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge; (2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee. _§ 727(d)(1)-(2)._

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Revocation of Discharge

Evidence > Types of Evidence > Circumstantial Evidence

**HN5[**↓**]** **Liquidations, Revocation of Discharge**

_11 U.S.C.S. § 727(d)_ does not require direct evidence of intent.

**Counsel:** **[*1]** For George Quinn Chen, Debtor: Cynthia L. Cox, Law Offices of Cynthia Cox, Oakland, CA; Trevor Caudle, Rubinstein Law Group PC, San Francisco, CA.

For E. Lynn Schoenmann, Trustee: Daniel M. Linchey, Goldberg, Stinnett, Davis and Linchey, San Francisco, CA; Kathy Quon Bryant, Merle C. Meyers, Meyers Law Group, PC, San Francisco, CA.

U.S. Trustee: William T Neary, San Francisco, CA.

**Judges:** DENNIS MONTALI, U.S. Bankruptcy Judge.

**Opinion by:** DENNIS MONTALI

# Opinion

_MEMORANDUM DECISION ON COMPLAINT TO REVOKE DISCHARGE AND TO RECOVER MONEY_

_I. INTRODUCTION._

E. Lynn Schoenmann, the Chapter 7 [1] trustee ("Trustee"), initiated this adversary proceeding by filing a complaint (the "Complaint") against George Q. Chen ("Debtor"), his wife, Cynthia Wong ("Wong"), Shanghai 1930 LLC ("Shanghai LLC"), and Shanghai 1930 Restaurant Partners, L.P. ("Shanghai LP") on September 24, 2007. The Complaint sought declaratory relief regarding Debtor's ownership interest in Shanghai LLC, the avoidance of postpetition transfers and revocation of the Debtor's discharge.

More specifically, the Complaint sought a determination that as of July 23, 2003, the date of commencement of this bankruptcy case (the "Petition Date"), the Debtor was the sole member of Shanghai LLC. The Debtor contended that as of the Petition Date, Wong owned a 51% membership interest in Shanghai LLC, by way of transfer from the Debtor. On this claim for relief the parties brought cross motions for summary judgment and the Court granted summary judgment in favor of the

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, **11 U.S.C. §§ 101-1532**, and to the _Federal Rules of Bankruptcy Procedure, Rules 1001-9037_ **[*2]** in effect prior to October 17, 2005, the effective date of most of the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, April 20, 2005, 119 Stat. 23, as Debtor's case was filed prior to its effective date.

EXHIBIT 5, PAGE 68

2009 Bankr. LEXIS 3636, *2

Trustee on November 14, 2008, determining that all membership interests in Shanghai LLC were owned by the Debtor as of the Petition Date.

On October 21, 2008, Shanghai LLC and Shanghai LP were eliminated as defendants by way of their summary judgment motion that was not opposed by the Trustee.

On April 20, 2009, the Debtor and Wong, the only remaining defendants, filed a motion seeking reconsideration of the court's ruling in favor of the Trustee on the first claim [*3] for relief. On August 4, 2009, the court issued its Memorandum Decision on Motion to Reconsider, stating its reasons for denying the motion. That denial will be incorporated into the Final Judgment to be issued.

By the second claim for relief, the Trustee seeks to avoid and recover numerous postpetition transfers made by Shanghai LP (under the Debtor's and Wong's control and direction) to the Debtor and Wong during the period between the Petition Date and the date of sale of the estate's ownership interest in the Restaurant (as hereafter defined) to Wong.

In the third claim for relief, the Trustee seeks revocation of Debtor's discharge.

The matter was tried to the court on June 1 & 2, 2009; appearances were noted in the record. Having considered the testimony of the witnesses, the documentary evidence, and the arguments of counsel, the court now issues it decision, subject to further consideration of the evidence as discussed below.

For the reasons to be explained, on the second claim for relief the court will award Trustee damages in the sum of $ 38,806.84 against Debtor based upon his receipt of that amount by way of two equity distributions that were property of the estate and in the [*4] sum of $ 729,044.19 based upon proof that he received at least that amount on account of a prepetition loan owed to him that also was property of the estate. The court will award Trustee damages in the sum of no less than $ 11,000 against Wong based upon her receipt of a portion of the debt owed to Debtor. It will not award damages against Wong based upon her receipt of two equity distributions.

On the third claim for relief, Debtor's discharge will be revoked.

II. FACTS. [2]

The Debtor filed for chapter 13 relief on July 25, 2003 (the "Petition Date"). The Debtor's case was converted to chapter 11 on August 13, 2003, and Trustee was appointed. Then on July 15, 2005, the Debtor's case was converted to chapter 7; the Trustee continues to serve as trustee. The court entered an order discharging the Debtor on October 26, 2005.

Debtor founded a restaurant known as "Shanghai 1930" in 1997 in San Francisco, California (the "Restaurant"). It has operated [*5] ever since, and is owned and operated by Shanghai LP, the general partner of which is Shanghai LLC. Debtor was the 100% separate property owner of Shanghai LLC. Debtor and Wong are also limited partners in Shanghai LP.

On April 25, 2007, Debtor filed a motion seeking the estate's abandonment of his interest in Shanghai LP. His expert appraisal witness concluded that that interest had a nominal or no value as of February 28, 2007.

In opposition the Trustee located a third-party buyer willing to buy the estate's interest for $ 25,000. Wong objected to the sale and ultimately purchased the estate's interest for $ 50,000.

With the approval of the court, Trustee sold all of the estate's interests in Shanghai LP and Shanghai LLC to Wong on November 14, 2007 (the "Sale Date"). The sale did not include any claims held by the estate against the Debtor or Wong with respect to payments made by either Shanghai LP or Shanghai LLC prior to the Sale Date. At issue before the court are activities that occurred between the Petition Date and the Sale Date (the "Subject Period").

As of the Petition Date there was an outstanding amount owed by Shanghai LP to the Debtor of no less than $ 935,709.98 (the "Chen [*6] Loan"). The Chen Loan is reflected in Shanghai's general ledger as a liability account (Loan from George Chen - Account 2300, or "Chen Loan Account"). Most, if not all, of the Chen Loan represents cash advances Debtor made prior to the Petition Date to help the Restaurant deal with cash flow needs, including covering employees' tips, cash purchases, etc. The Trustee was unaware of

---

[2] The following discussion constitutes the court's findings of fact and conclusions of law. *Fed. R. Bankr. P. 7052(a)*. Some of the findings are based upon the parties' Stipulation Of The Parties To Undisputed Facts filed May 29, 2009 (docket # 76).

the existence of or the outstanding balance on the Chen Loan until conducting discovery involving the sale of the estate's interest in Shanghai LP because the Debtor did not list it on his schedules. The Trustee has received no payments from Shanghai or anyone else on account of the Chen Loan.

A. *Equity Distributions.*

During the Subject Period, and disregarding management fees and salary payments, $ 20,880 was paid to the Debtor in December, 2005 and $ 17,926.84 more in April 2007. The same amounts were paid to Wong on the same dates, and all four payments were distributions on equity interests in Shanghai LP (the "Partner Distributions"). The Partner Distributions to Debtor were property of the estate, as the estate owns the entirety of Shanghai LLC and Debtor's limited partnership interest in Shanghai LP. **[*7]** Trustee did not prove that Wong's Partner Distributions were on account of her own interest as a limited partner in Shanghai LP.

Debtor attempts to justify his Partnership Distributions on the basis of his apparent belief that Trustee told him after entry of his discharge that he could build the Restaurant. The Trustee did not authorize him to withdraw and keep any Partner Distributions as Debtor never asked Trustee about them.

B. *Payments on the Chen Loan.*

Trustee contends that during the Subject Period the Debtor and Wong caused Shanghai LP to repay the entire balance of the Chen Loan to the Debtor and Wong, in the amount of $ 935,709.98. She maintains that Shanghai had sufficient cash to make those payments from its cash sales to customers. Debtor contends that these payments to him were on account of post-petition loans or alternatively that the Restaurant lacked sufficient cash to make any payments on the Chen Loan. He contends that the Restaurant's outside bookkeeper simply used the Chen Loan Account to post transactions that were not otherwise documented, primarily cash the Restaurant needed to pay weekly to its servers as tips that were given by customers via credit card charges. **[*8]** The bookkeeper, only a few weeks prior to trial, came to realize that cash used to pay those tips to the servers should have been posted as such, rather than shown as advances by Debtor, increasing the Chen Loan. These were described at trial as "unsubstantiated entries." Similarly, she maintains that reductions in the Chen Loan account were not that at all, but were simply incorrect postings.

The Trustee's accounting expert prepared a report that demonstrated that Debtor received transfers during the Subject Period by checks to various payees, including the Debtor, Wong, "cash," and "Shanghai 1930." Some of those payments were debited to sales and sales tax accounts, resulting in a reduction of reported sales.

If the journal entries that resulted in an increase to the Chen Loan account actually reflected reimbursements to the Debtor, such reimbursements would be posted as costs in the "costs of sale" or "operating expenses" accounts.

Although the Chen Loan account balance increased during the Subject Period, the increases were largely based on the unsubstantiated entries made by the bookkeeper on the books. Basically, because she was not aware of the Restaurant's recording of tips, she **[*9]** increased the Chen Loan balance for any otherwise undocumented receipts. Actual restaurant sales were reported to her on a reliable point-of-sale system; credit card receipts, representing 95% of all Restaurant revenues, were greater than reported sales because customers included sales taxes and tips; sales taxes were easily calculated and paid by the bookkeeper, but since she did not know about the tips, she assumed the additional cash came from Debtor and posted it accordingly. In fact, five percent of the Restaurant's sales revenues came from cash-paying customers.

When she had more money on hand than was reported in sales of the Restaurant, the bookkeeper automatically attributed that excess to monies that came from Debtor by posting increases in Account 2300, using it as a balancing account because of the lack of credible documentation. However, the Debtor, Wong nor the bookkeeper provided documents to substantiate such a practice.

Debtor's claims that he advanced monies to the Restaurant post-petition, but he has offered no documentary evidence or entries in the Restaurant's books and records to support that contention. The evidence establishes that what the bookkeeper posted as **[*10]** postpetition payments on the Chen Loan should have been booked as expenses. Further, Trustee's expert examined the records and concluded, convincingly, that Debtor did not make any significant advances to increase the Chen Loan. They cannot be verified through corresponding bank deposits.

The court is faced with the task of determining whether there were in fact payments to Debtor and/or Wong on

2009 Bankr. LEXIS 3636, *10

the Chen Loan during the Subject Period. On the Trustee's side there is an expert report (Exhibit 14), modified by and adjusted after accepting the bookkeeper's concessions of erroneous postings of unsubstantiated transactions and cash payments (Exhibit 19); on the Debtor's side there is no expert witness, inconclusive and somewhat confusing financial accounting, and capable counsel's creative arguments and speculation about large amounts of unproven tip receipts that do not amount to evidence. On balance, the preponderance of the evidence supports the court's acceptance of the Trustee's accountant's opinion that *at least* $ 729,044.19 of the Chen Loan was paid to Chen or Wong during the Subject Period. The court rejects the Trustee's suggestion that under a last-in, first out theory, Chen should **[*11]** be liable for the entire amount of the prepetition Chen Loan, $ 935,709.98.

At the minimum, Chen is liable to the estate in this amount of repayments of the Chen Loan. As to Wong, the specific evidence alluded to by Trustee's counsel during argument is found in Exhibit 1, p. 1147. There the court notes a total of $ 11,000 paid to Wong and booked as payments on the Chen Loan. As such, Wong had no right to that money, has not proven that she was otherwise entitled to it, and must reimburse the estate for it.

Whether Wong received more than $ 11,000 on the Chen Loan may have been established in the documentary evidence, but the court will not wade through that detailed evidence to find other similar entries to make out the case against Wong. But to the extent the admitted evidence does show similar disbursements, the court will permit the Trustee to point out such disbursements and add them to the amount of Wong's liability, as discussed in the Conclusion to this Memorandum Decision.

Postpetition, the Debtor claims that he has had an ongoing relationship with the Restaurant whereby he purchases wine, restaurant supplies and other merchandise and is reimbursed for it. These "reimbursements" **[*12]** are reflected on the Restaurant's books and records as payments on the Chen Loan. There is no indication to which debt the payment is applied. Accordingly, *HN1*[⬆] when payment is made on an obligation, unless there is some indication to the contrary, the practical and ordinary interpretation must "undoubtedly be that payment is to be applied to the part first coming due to be paid." *Smith v. Renz, 122 Cal. App. 2d 535, 538, 265 P.2d 160 (Cal. App. 1st Dist. 1954)*.

The Petition Date balance of the Chen Loan of $ 935,709.98 is an earlier obligation than any postpetition advances, and therefore any pay-down of the Chen Loan must be credited to the prepetition debt. No logical reason has been offered as to why, in the ordinary course of events, it should be approached in inverse order. Therefore, it must be assumed that if the parties intended to "depart from the ordinary" they would have specifically so provided. *Id.*

Because general credits on open accounts stand as payments on the oldest items of such accounts, the Debtor's contention that the payments made were post-petition reimbursements for post-petition advances is incorrect. *Jessup Farms v. Baldwin, 33 Cal. 3d 639, 190 Cal. Rptr. 355, 660 P.2d 813 (Cal. 1983)*.

The Trustee's counsel **[*13]** asked that all of the amounts repaid Chen Loan during the Subject Period be declared as a joint and several liability of Chen and Wong. Absent facts and law to support such a result, the court will not do that. Wong's liability is limited to distributions to her on the Chen Loan.

### C. *Revocation of Discharge*.

The Debtor was aware of the Chen Loan when he filed his bankruptcy petition, related schedules and statement of financial affairs, but he failed to disclose this substantial debt owed to him. His Schedule B declared no debt owing. It showed $ 228,141.17 in personal property, $ 200,000 of which was stock in an unrelated company that has since been sold. Debtor also knew that payments on the Chen Loan and the Partnership Distributions made during the Subject Period belonged to the estate, but he knowingly failed to report them or turn them over to the Trustee.

Debtor also misled the Trustee when he argued that the estate's interest in Shanghai LLP had a nominal value at best and the Restaurant was operating at a loss when in the same year he and received a Partnership Distribution of $ 17,926.,84, having earlier received a Partnership Distribution of $ 20,880.

*HN2*[⬆] ] Property of the estate includes **[*14]** money that a debtor has a right to receive. *In re Crysen/Montenay Energy Co., 902 F.2d 1098, 1101 (2d Cir. 1990)* (debtor's right to collect accounts receivable is "property of the estate"). An outstanding loan that a debtor expects to be repaid is property of the debtor's bankruptcy estate. *In re Martin, 141 B.R. 986, 993 (Bankr. N. D. Ill. 1992)*. The Chen Loan and the right to collect it became property of the Estate as of the

2009 Bankr. LEXIS 3636, *14

Petition Date. All payments made on account of that loan prior to the Sale Date, therefore, belonged to the estate. Debtor and Wong had no right to retain the payments on the Chen Loan that they received.

Similarly, the two Partner Distributions to Chen made prior to the Sale Date constituted property of the estate as well and Debtor has no right to retain them.

*HN3*[↑] The benefit of discharge is reserved for "the honest but unfortunate debtor." *In re Holstein, 299 B.R. 211, 233 (Bankr. N.D. Ill. 2003)*. If *section 727(d)* is satisfied, the debtor has been less than honest and deserves no discharge. *In re Barr, 207 B.R. 160, 165 (Bankr. N.D. Ill. 1997)*.

*HN4*[↑] To warrant revocation under *section 727(d)*, the Trustee must show that (1) such discharge was obtained through the fraud **[*15]** of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge; (2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee. *11 U.S.C. § 727(d)(1)-(2)*.

Debtor failed to report the Chen Loan on his schedules when his petition was filed and at no point did he amend his schedules to reflect the debt. The evidence shows that the Trustee did not learn of the Chen Loan until it was revealed in through discovery in 2007. This was after the court discharged the Debtor. By then, a substantial portion of the Chen Loan outstanding as of Petition Date had already been paid to the Debtor. Debtor also made no attempt to disclose the 2005 and 2007 Partnership Distributions he received. These facts establish all the necessary elements under both *Sections 727(d)(1)* and *(2)*.

The Debtor possessed the necessary intent because he procured his discharge by "fraud" or that he "knowingly and fraudulently" failed to schedule the **[*16]** debt, report the payments or deliver the monies to the Trustee. *HN5*[↑] *Section 727(d)* does not require direct evidence of intent.

The Debtor's fraudulent intent is clear from the fact that he was aware of the omitted assets and knew his failure to list the assets could seriously mislead the Trustee; in the alternative, Debtor acted so recklessly in not reporting the asset that fraud is implied.

Based on the behavior of the Debtor, his discharge should be revoked pursuant to *Section 727(d)*.

*IV. CONCLUSION.*

Trustee is entitled to a judgment on the second claim for relief against Debtor in the amount of $ 729,044.19 (for repayments of the Chen Loan) and $ 38,806.84 (for the Partnership Distributions), plus costs. She is entitled to judgment against Wong in the amount of at least $ 11,000, plus costs.

At the time her counsel submits a form of judgment he may also submit (without argument) a list of citations to the appropriate exhibit number, page and entries where additional payments on the Chen Loan to Wong have been documented. The list should include a total dollar amount Trustee contends the judgment against Wong should be. Counsel for Wong will then have ten days to file a designation (also **[*17]** without argument) of any of the Trustee's citations to the record he believes do not show a payment to Wong on the Chen Loan. The court will determine whether Trustee is entitled to a judgment against Wong in excess of $ 11,000.

On the third claim for relief, Trustee is entitled to a judgment revoking Chen's discharge.

Counsel for the Trustee should submit and serve in accordance with *B.L. R. 9021-1* a form of final judgment consistent with the foregoing and for the reasons stated in this Memorandum Decision (with the amount to be awarded against Wong left blank so the court may insert an amount) and consistent with the court's denial of the motion to reconsider the grant of summary judgment in her favor on the first claim for relief.

**Signed and Filed: November 09, 2009**

/s/ Dennis Montali

**DENNIS MONTALI**

**U.S. Bankruptcy Judge**

_____

*End of Document*

Layla Buchanan

**EXHIBIT 6**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                                Case No. 20-49216

JASON ROBERT WYLIE, and                               Chapter 7
LEAH S. WYLIE,
                                                      Judge Thomas J. Tucker
              Debtors.
_____/

TIMOTHY J. MILLER, TRUSTEE,

        Plaintiff,

v.                                                    Adv. Pro. No. 21-4012

JASON ROBERT WYLIE,

and

LEAH S. WYLIE,

        Defendants.
_____/

**POST-TRIAL OPINION**

## I. Introduction

        This adversary proceeding concerns objections to discharge.  The Defendants, Jason

Wylie and Leah Wylie, are husband and wife.  They filed a joint Chapter 7 bankruptcy case on

August 27, 2020.  The Plaintiff Timothy J. Miller, Chapter 7 Trustee, seeks a judgment denying

each of the Defendants a discharge, based on 11 U.S.C. §§ 727(a)(2)(A), 727(a)(2)(B), and

727(a)(4)(A) (Counts I, II, and III of Plaintiff's First Amended Complaint).[1]

_____

        [1]  Plaintiff's First Amended Complaint (Docket # 10) contained ten counts.  On the first day of
trial, the Court entered orders dismissing Counts IV through X, and part of Count III.  *See* "Order
Dismissing Certain Claims in Plaintiff's First Amended Complaint, with Prejudice, as Untimely" (Docket
# 100); "Order Dismissing Certain Claims in Plaintiff's First Amended Complaint, Without Prejudice, as
Moot" (Docket # 101).  This leaves only Counts I, II, and part of Count III pending.

EXHIBIT 6, PAGE 73

The Court held a bench trial over a four day period.[2]  The Court has considered all of the evidence and arguments presented by the parties.  This includes the testimony of all the witnesses — namely, Steven Eshelman; Defendant Jason Wylie; Defendant Leah Wylie; attorney Jeffrey Bigelman; and attorney Thomas Morris.  And this includes all of the exhibits, or parts of exhibits, that were admitted into evidence.[3]  This Opinion states the Court's findings of fact and conclusions of law.

For the reasons stated below, the Court finds for the Defendant Debtors on Counts I and III of the First Amended Complaint, and will dismiss those counts with prejudice.  The Court finds for the Plaintiff Trustee on Count II of the First Amended Complaint, and will deny each of the Defendant Debtors a discharge under 11 U.S.C. § 727(b)(2)(B).  The Court will enter a judgment accordingly.

## II.  Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and E.D. Mich. L.R. 83.50(a).  Each of the Plaintiff's three remaining claims in this adversary proceeding is a core proceeding under 28 U.S.C.

---

[2]  Due to the COVID pandemic, the trial was conducted remotely, rather than in person in the courtroom.  This was done by a combination of Webex video conference and telephone.

[3]  In this Opinion, the Court will cite the trial exhibits using this format: "PX-__" for the Plaintiff's exhibits; and "DX-__" for the Defendants' exhibits.  The Plaintiff's exhibits admitted into evidence are PX-2, 3, 5, 6, 7, 8, 16, and 17-27.  All of these Plaintiff's exhibits are filed at Docket # 97.  The Court notes that PX-9 was never admitted into evidence, but there was a good deal of testimony by Steven Eshelman about that exhibit and its subject matter that was admitted into evidence.

The Defendants' exhibits admitted into evidence are DX-A (conditionally admitted, as discussed below); B, C, D, E, F, G, and H.  These Defendants' exhibits are filed at Docket ## 98, 102, and 104.  DX-A was conditionally admitted into evidence, subject to the Court's later determination as to whether it is relevant.  The Court now rules that this exhibit is relevant, and so it is now unconditionally admitted into evidence.

2

EXHIBIT 6, PAGE 74

§ 157(b)(2)(J).

## III. Discussion

### A. Background and basic facts

The Trustee's objections to discharge relate to the Debtors' 2018 and 2019 federal and state income tax returns, and the Debtors' rights to tax refunds as shown by those tax returns. The following basic facts are undisputed.

#### a. The Debtors' 2018 income tax returns

The Debtors filed their joint 2018 federal income tax return and their joint 2018 Michigan income tax return on March 31, 2020[4] — *i.e.*, almost five months before the Debtors filed their bankruptcy petition on August 27, 2020. As shown on the 2018 federal return, the Debtors made federal income tax payments for 2018 that exceeded their tax liability (an "overpayment") in the amount of $21,317.00.[5] As shown on the 2018 Michigan return, the Debtors made a state income tax overpayment for 2018 in the amount of $17,956.00.[6] Thus, the Debtors had a right to receive income tax refunds for 2018 in the total amount of $39,273.00.

Instead of opting to receive these tax refunds, however, the Debtors elected to have their tax overpayments applied to their 2019 income tax liabilities. On their 2018 federal income tax return, the Debtors listed the entire $21,317.00 tax overpayment on line 21, as the amount "you

---

[4]  The parties stipulated to this March 31, 2020 tax return filing date.  *See* Final Pretrial Order (Docket # 94) at pdf p. 18 ¶ 4.a.i (stipulation).

[5]  *See* PX-5 (excerpt of 2018 Form 1040) at pdf p. 2, line 19.  A copy of the Debtors' full 2018 federal income tax return is in DX-D, at pdf pp. 5-52.

[6]  *See* PX-5 (excerpt of 2018 Michigan Form MI-1040) at pdf p. 4, line 34.  A copy of the Debtors' full 2018 Michigan income tax return is in DX-D, at pdf pp. 53-65.

3

EXHIBIT 6, PAGE 75

want **applied to your 2019 estimated tax**."[7]  On their 2018 Michigan income tax return, the

Debtors listed the entire $17,956.00 tax overpayment amount on line 35, as "**Credit Forward.**

Amount of [tax overpayment] to be credited to your 2019 estimated tax for your 2019 tax

return."[8]

The Trustee alleges that in making these elections within one year before filing their

bankruptcy petition, to apply their 2018 tax overpayments to their 2019 income tax liabilities,

the Debtors "transferred" and "concealed" their property, and that they did so "with intent to

hinder, delay, or defraud a creditor," all within the meaning of 11 U.S.C. § 727(a)(2)(A).  For

this reason, Count I of the Trustee's First Amended Complaint seeks the denial of the Debtors'

discharge.[9]

### b. The Debtors' 2019 income tax returns

The Debtors filed their joint 2019 federal income tax return and their joint 2019 Michigan

income tax return on September 15, 2020[10] — *i.e.*, just under three weeks after the Debtors filed

their bankruptcy petition.  As shown on the 2019 federal return, the Debtors were credited with

federal income tax payments for 2019 that exceeded their tax liability by the amount of

$20,798.00.  In calculating this 2019 tax overpayment amount, the Debtors' 2019 tax payments

---

[7]  PX-5 at pdf p. 2 line 21 (emphasis in original).

[8]  PX-5 at pdf p 4 line 35 (emphasis in original).

[9]  First Am. Compl. (Docket # 10) at ¶¶ 31-33.

[10]  The parties stipulated to this September 15, 2020 tax return filing date.  *See* Final Pretrial
Order (Docket # 94) at pdf p. 18 ¶ 4.a.ii (stipulation).

4

included the Debtors' $21,317.00 overpayment from 2018.[11]

As shown on the Debtors' 2019 Michigan return, the Debtors made state income tax overpayments for 2019 in the amount of $20,736.00. In calculating this 2019 tax overpayment amount, the Debtors' 2019 tax payments included the Debtors' $17,956.00 overpayment from 2018.[12]

Thus, the Debtors had a right to receive income tax refunds for 2019 in the total amount of $41,534.00. Instead of opting to receive these tax refunds, however, the Debtors elected to have the entire amount of their federal and state income tax overpayments applied to their 2020 income tax liabilities. They made this election in their 2019 tax returns, in the same way they had done in their 2018 tax returns.[13]

The Trustee alleges that in making these elections after filing their bankruptcy petition, to apply their 2019 tax overpayments to their 2020 income tax liabilities, the Debtors "transferred" and "concealed" property of the bankruptcy estate, and that they did so "with intent to hinder, delay, or defraud" the Trustee, who is "an officer of the estate charged with custody of property under the Bankruptcy Code," all within the meaning of 11 U.S.C. § 727(a)(2)(B). For this reason, Count II of the Trustee's First Amended Complaint seeks the denial of the Debtors' discharge.[14]

---

[11] *See* PX-7 (excerpt of 2019 Form 1040) at pdf p. 2 lines 18d, 18e, 19, 20; DX-E at pdf p. 14 (2019 Schedule 3). A copy of the Debtors' full 2019 federal income tax return is in DX-E, at pdf pp. 10-102.

[12] *See* PX-7 (excerpt of 2019 Michigan Form MI-1040) at pdf p. 4 lines 30, 34. A copy of the Debtors' full 2019 Michigan income tax return is in DX-E, at pdf pp. 106-121.

[13] *See* PX-7 at pdf p. 2 line 22, pdf p. 4 line 35.

[14] First Am. Compl. (Docket # 10) at ¶¶ 35-37.

5

EXHIBIT 6, PAGE 77

Ultimately, in June 2021, the Trustee obtained the tax refunds at issue.  The details of that recovery are stated in Part III.C.3.b of this Opinion, below.

### c. The alleged false oaths made by the Debtors

Item number 28 in Schedule A/B, filed by the Debtors with their petition on August 27, 2020,[15] required the Debtors to disclose information about tax refunds owed to them.  The Debtors checked the box "Yes," that tax refunds were owed to them.  The Schedule A/B form therefore required the Debtors to disclose the value of the tax refunds, and to disclose the following information: "Give specific information about them, including whether you already filed the returns and the tax years . . . ."  The Debtors stated that the value of tax refunds owed to them was "Unknown."[16]  The only other information the Debtors stated about tax refunds was this:

> Payment of $13,000 total, $10,000 to IRS and $3,000 to state of Michigan on October 2, 2019, towards estimated income tax liability.  2019 returns have not been filed.  Payment amount was estimated to equal the tax liability. [17]

The Debtors each signed and filed with their Schedules a declaration under penalty of perjury, stating that "I have read the summary and schedules filed with this declaration and that they are true and correct."[18]

The Trustee alleges that this disclosure by the Debtors about tax refunds was false, in failing to disclose the tax overpayments for 2018 and 2019, in stating that the value of tax

---

[15]  Docket # 1 in Case No. 20-49216 at pdf pp. 12, 18; PX-27 at pdf pp. 12, 18.

[16]  *Id.* at pdf p. 18.

[17]  *Id.*

[18]  *Id.* at pdf p. 54.

6

EXHIBIT 6, PAGE 78

refunds owed to the Debtors was "Unknown," and in stating that the "Payment amount was estimated to equal the tax liability." The Trustee also alleges that the Debtors repeated these false statements on October 21, 2020, when they testified under oath at the § 341 first meeting of creditors that their Schedules were "truthful, accurate, and complete."[19]

In these ways, the Trustee alleges that the Debtors each "made a false oath or account," and they did so "knowingly and fraudulently," all within the meaning of 11 U.S.C. § 727(a)(4)(A). For this reason, Count III of the Trustee's First Amended Complaint seeks the denial of the Debtors' discharge.[20]

## B.  Applicable law

Much of the law applicable to this adversary proceeding was discussed in the Court's opinion in a prior case, *Wise v. Wise* (*In re Wise*), 590 B.R. 401 (Bankr. E.D. Mich. 2018). The Court will quote at length from the *Wise* opinion, and the Court reiterates and adopts in this case what it stated in the quoted material.

Initially, the Court notes the following general principles:

---

[19] *See* Tr. of First Meeting of Creditors (PX-1) at 5-6 (testimony of each of the Debtors). The exhibit just cited, PX-1 was not admitted into evidence at trial. But the Court will cite and quote from that exhibit in this Opinion, because during trial both parties cited it, relied on, and asked questions about it. This occurred during the second day of trial, during the Debtors' attorney's questioning of the Trustee's attorney, Jeffrey Bigelman, as part of the Debtors' case in chief. It also occurred during the fourth day of trial, during the closing argument of the Debtors' attorney, and during the rebuttal closing argument of the Trustee's attorney.

[20] First Am. Compl. (Docket # 10) at ¶¶ 40-41, 45. Count III of the Trustee's First Amended Complaint alleged other false oaths, in addition to the false oaths described above, but to that extent Count III was dismissed by the Court's Order filed on January 11, 2022. *See* "Order Dismissing Certain Claims in Plaintiff's First Amended Complaint, with Prejudice, as Untimely" (Docket # 100); *see also* "Order Granting in Part, and Denying in Part, Defendants' Amended Motion in Limine, and Regarding Dismissal at Trial of Certain Claims in Plaintiff's First Amended Complaint as Untimely" (Docket # 90) at ¶¶ 1(b), 1(c), 3.

EXHIBIT 6, PAGE 79

Section 727(a) of the Bankruptcy Code contains twelve enumerated grounds for denying the debtor a discharge.  *See* 11 U.S.C. §§ 727(a)(1)-727(a)(12).  For the Court to deny the debtor a discharge under any one of these grounds, the party objecting to the discharge must prove all of the elements of such ground by a preponderance of the evidence.  *Keeney v. Smith* (*In re Keeney*), 227 F.3d 679, 683 (6th Cir. 2000).  "'Exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's fresh start policy.'  However, 'the very purpose of certain sections of the law, like [§ 727(a) ], is to make certain that those who seek the shelter of the [B]ankruptcy [C]ode do not play fast and loose with their assets or with the reality of their affairs.'" *Robin Singh Educ. Servs., Inc. v. McCarthy* (*In re McCarthy*), 488 B.R. 814, 825 (B.A.P. 1st Cir. 2013) (citing *Palmacci v. Umpierrez (In re Umpierrez*), 121 F.3d 781, 786 (1st Cir.1997) (internal quotation marks and citations omitted)).

*Wise*, 590 B.R. at 429.

**1.  Bankruptcy Code §§ 727(a)(2)(A) and 727(a)(2)(B)**

Section 727(a)(2) of the Bankruptcy Code states:

(a) The court shall grant the debtor a discharge, unless–
. . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed–

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2).

In *Wise*, the Court noted the following about § 727(a)(2)(A), much of which also applies

to § 727(a)(2)(B):

8

EXHIBIT 6, PAGE 80

"This section encompasses two elements: 1) a disposition of
property, such as concealment, [transfer, removal, destruction, or
mutilation,] and 2) 'a subjective intent on the debtor's part to
hinder, delay or defraud a creditor through the act disposing of the
property.'" *Keeney*, 227 F.3d at 683 (quoting *Hughes v. Lawson*
(*In re Lawson*), 122 F.3d 1237, 1240 (9th Cir. 1997)). . . .

> [P]roof of harm is not a required element of a cause
> of action under Section 727. . . . [A] fair reading of
> the statute makes it clear that so long as there is an
> *intent* to hinder, delay, or defraud, in combination
> with an act such as a transfer, then a debtor should
> be denied the privilege of discharge. The statute
> does not provide that the creditors must have, in
> fact, been hindered, delayed or defrauded.

*Smiley v. First Nat'l Bank of Belleville* (*In re Smiley*), 864 F.2d
562, 569 (7th Cir. 1989) (citations omitted) (italics in original).

*Wise*, 590 B.R. at 429-30.

The Plaintiff must prove that the Debtor "transferred, removed, destroyed, mutilated, or

concealed" property of the Debtor within one year of the bankruptcy, § 727(a)(2)(A), or property

of the bankruptcy estate after the date of the bankruptcy petition, § 727(a)(2)(B), or that the

Debtor has "permitted [such property] to be transferred, removed, destroyed, mutilated, or

concealed." *See* 11 U.S.C. § 727(a)(2).  In *Wise*, this Court discussed the concepts of

"concealment" and "transfer" under this statute:

> **a. "Concealment"**
>
> . . .
>
> > Concealment includes overt acts of disguise and
> > "other conduct, such as placing assets beyond the
> > reach of the creditors or withholding knowledge of
> > the assets by failure to divulge owed information." 6
> > Collier on Bankruptcy ¶ 727.02[6][b] (Alan N.
> > Resnick & Henry J. Sommer eds., 16th ed. 2017)
> > (citing *Village of San Jose v. McWilliams*, 284 F.3d
> > 785 (7th Cir. 2002) (placing title to property in

9

EXHIBIT 6, PAGE 81

others' names and retaining beneficial interest)); *see also Keeney*, 227 F.3d at 682–83.

> *Carter-Jones Lumber Co. v. Beatty* (*In re Beatty*), 583 B.R. 128, 136–37 (Bankr. N.D. Ohio 2018); *see also Cooper v. Crocker* (*In re Cooper*), No. 3:17-cv-00569,  2018 WL 1907448, at *2 (M.D. Tenn. Apr. 23, 2018) (quoting *Buckeye Retirement Co., LLC, LTD. v. Swegan* (*In re Swegan*), 383 B.R. 646, 655 (B.A.P. 6th Cir. 2008)) ("'Concealment' is defined as, 'the withholding of knowledge of an asset by the failure or refusal to divulge information required by law to be made known.'").  "Concealment may also occur when a debtor transfers 'legal title to property to a third party with the retention of a secret interest.'" *McDermott v. Recupero* (*In re Recupero*), No. 13-60322, 2014 WL 1884331, at *7 (Bankr. N.D. Ohio May 12, 2014) (citing *Ohio Citizens Trust Co. v. Smith* (*In re Smith*), 11 B.R. 20, 22 (Bankr. N. D. Ohio 1981) and  *Kaler v. Craig* (*In re Craig*), 195 B.R. 443, 449 (Bankr. D.N.D. 1996)).
>
> **b.  "Transfer"**
>
> Section 101(54) of the Bankruptcy Code defines "transfer."  It provides, in relevant part: "The term 'transfer' means . . . each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with– (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D).  "'Under the broad definition of transfer in 11 U.S.C. § 101(54), even disposition of possession, custody or control could qualify as a transfer.'" *Beatty*, 583 B.R. at 136 (quoting *RES–GA Diamond Meadows, LLC. v. Robertson* (*In re Robertson* ), 576 B.R. 684, 700 (Bankr. N.D. Ga. 2017)).

*Wise*, 590 B.R. at 430.

In addition, the Plaintiff must prove the intent element — that the Debtor intended to "hinder, delay, or defraud a creditor or an officer of the estate charged with custody of" estate property.  11 U.S.C. § 727(a)(2).  As held by this Court in *Wise*,

> **c.  The intent element: intent to "hinder" or "delay" is sufficient; intent to "defraud" is also sufficient, but not required.**

10

EXHIBIT 6, PAGE 82

"[A]ctual, rather than constructive, intent is required on the part of the debtor." *Retz v. Samson* (*In re Retz*), 606 F.3d 1189, 1196 (9th Cir. 2010) (internal quotation marks and citation omitted). "[B]ecause of the inherent difficulties in proving intent, circumstantial evidence, including evidence of the debtor's conduct, may be used to establish his intent." *Ayers v. Babb* (*In re Babb*), 358 B.R. 343, 350 (Bankr. E.D. Tenn. 2006) (citing *Buckeye Retirement Co., L.L.C. v. Heil* (*In re Heil*), 289 B.R. 897, 907 (Bankr. E.D. Tenn. 2003)).

Because the phrase "intent to hinder, delay, or defraud" in § 727(a)(2)(A) is in the disjunctive,

> [a] party objecting to the debtor's discharge under § 727(a)(2)[(A)] need not prove that a debtor intended to hinder, delay, *and* defraud his creditors; proof of any one is sufficient. Thus, for example, if plaintiffs are able to establish a debtor's intent to delay, it is not necessary to prove an intent to defraud.

*McDermott v. Kerr* (*In re Kerr*), No. 15-30531, 2017 WL 3880875, at *14 (Bankr. N.D. Ohio Aug. 30, 2017) (citing *Cuervo v. Snell* (*In re Snell*), 240 B.R. 728, 730 (Bankr. S.D. Ohio 1999) and *Los Alamos Nat'l Bank v. Wreyford* (*In re Wreyford*), 505 B.R. 47, 55 n.6 (Bankr. D.N.M. 2014)). This Court agrees with the many cases that have held that an intent *to defraud* is not necessary under § 727(a)(2)(A); rather, mere intent to hinder or delay is sufficient.

*Wise*, 590 B.R. at 430-31 (citations omitted). The Court's opinion in *Wise* includes a lengthy discussion and cites many cases in support of the foregoing conclusions about the intent element, all of which the Court adopts and reiterates now, and incorporates by reference. *See id.* at 430-35. In summary, § 727(a)(2) "provides three different types of intent [— intent to hinder, intent to delay, intent to defraud —], any one of which will satisfy the intent element of this section." *See id.* at 434.

In *Wise*, the Court described each of the three types of intent under this statute:

11

EXHIBIT 6, PAGE 83

### d.  **The meaning of "intent to hinder" and "intent to delay"**

With respect to two of the types of intent — intent to "hinder" and intent to "delay":

> The Bankruptcy Code [also] does not define an intent to "hinder" or an intent to "delay."  According to the Oxford English Dictionary, the term "hinder" means to "keep back, delay; impede; obstruct; prevent."  It defines "delay" as "put off to a later time; postpone, defer." In keeping with this plain meaning, courts have held that a debtor acts with an intent to "hinder" if he or she acts with ". . . an intent to impede or obstruct" creditors and an intent to "delay" if he or she acts with ". . . an intent to slow or postpone creditors."  Others have stated more generally . . . that to act with "intent to hinder or delay" is to "act improperly to make it more difficult for a creditor to collect a debt."

*Wiggains*, 2015 WL 1954438, at *17  (footnotes omitted).

### e.  **"Intent to defraud"**

As noted earlier in this opinion, "intent to defraud" may be shown by circumstantial evidence.  *See Hobbs v. Rao* (*In re Rao*), 526 B.R. 623, 627 (Bankr. E.D. La. 2015).  Such evidence may include the so-called "badges of fraud."

> In order to determine actual intent, based upon circumstantial evidence, many courts consider the following "badges of fraud":

> > (I) the lack of adequate consideration for the transfer; (ii) the family, friendship, or close relationship between the parties; (iii) the retention of possession, benefit, or use of the property in question by the debtor; (iv) the financial condition of the party sought to be charged prior to and after the transaction in question; (v) the conveyance of all of the

12

> debtor's property; (vi) the secrecy of
> the conveyance; (vii) the existence or
> cumulative effect of a pattern or
> series of transactions or course of
> conduct after incurring of debt, onset
> of financial difficulties, or pendency
> or threat of suit by creditors; and
> (viii) the general chronology of
> events and transactions under inquiry.

[*E. Diversified Distrib., Inc. v. Matus* (*In re*] *Matus*[)], 303 B.R. [660,] 672-73 [(Bankr. N.D. Ga. 2004)]; *see also Stevenson v. Cutler* (*In re Cutler*), 291 B.R. 718, 723 (Bankr. E.D. Mich. 2003); *Nashville City Bank & Trust Co. v. Peery* (*In re Peery*), 40 B.R. 811, 815 (Bankr. M.D. Tenn. 1984). Additional factors indicating a debtor's actual intent include

> whether the transaction is conducted
> at arm's length; whether the debtor is
> aware of the existence of a significant
> judgment or over-due debt; whether a
> creditor is in hot pursuit of its
> judgment or claim and whether the
> debtor knows this; and the timing of
> the transfer relative to the filing of
> the petition.

*Adamson v. Bernier* (*In re Bernier*), 282 B.R. 773, 781 (Bankr. D. Del. 2002). If the plaintiff establishes the existence of badges of fraud, the burden shifts to the debtor to rebut the presumption. *Village of San Jose v. McWilliams*, 284 F.3d 785, 791 (7th Cir.2002); *see also Peery*, 40 B.R. at 815 n. 6. Moreover, "[j]ust one wrongful act may be sufficient to show actual intent . . . [although] a continuing pattern of wrongful behavior is a stronger indication [thereof]." [*Hunter v. Sowers* (*In re*] *Sowers*[)], 229 B.R. [151,] 157 [(Bankr. N.D. Ohio 1998)].

*Gordon v. Courtney* (*In re Courtney*), 351 B.R. 491, 500 (Bankr. E.D. Tenn. 2006).

13

*Wise*, 590 B.R. at 435-36.

###   2.  Bankruptcy Code § 727(a)(4)(A)

Section 727(a)(4)(A) of the Bankruptcy Code states:

> (a) The court shall grant the debtor a discharge, unless–
>
>    (4)  the debtor knowingly and fraudulently, in or in connection with the case--
>
>        (A) made a false oath or account[.]

11 U.S.C. § 727(a)(4)(A).  In *Wise*, the Court discussed in detail the elements of a "false oath"

claim under this section:

> The United States Court of Appeals for the Sixth Circuit has specified the elements that the Plaintiff must prove, by a preponderance of the evidence under § 727(a)(4)(A).  In *Keeney*, the court stated:
>
> > In order to deny a debtor discharge under this section, a plaintiff must prove by a preponderance of the evidence that: 1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case.
>
> 227 F.3d at 685 (citations omitted).
>
> With respect to the first element noted above, that the statement was made under oath, statements made under penalty of perjury, such as [the debtor's] statements in her bankruptcy schedules and SOFA, are considered to be under oath for purposes of § 727(a)(4)(A).  *See Lim v. Storozhenko* (*In re Storozhenko*), 487 B.R. 457, 466 (Bankr. E.D. Mich. 2012) (citing *Keeney*, 227 F.3d at 686 and 28 U.S.C. § 1746).
>
> As for the fifth of these elements, materiality:
>
> > The subject of a false oath is material if it "'bears a

14

EXHIBIT 6, PAGE 86

> relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'"

*Keeney*, 227 F.3d at 686 (citations omitted).

As for the fourth of the *Keeney* elements, *i.e.*, the fraudulent intent element:

> "'Complete financial disclosure'" is a prerequisite to the privilege of discharge. . . . [I]ntent to defraud "involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression." A reckless disregard as to whether a representation is true will also satisfy the intent requirement. "'[C]ourts may deduce fraudulent intent from all the facts and circumstances of a case." However, a debtor is entitled to discharge if false information is the result of mistake or inadvertence.

*Id.* at 685-86 (citations omitted).

This Court reiterates what it said about the fraudulent intent element, in the case of *Becker v. McInerney* (*In re McInerney*), 509 B.R. 109, 114-16 (Bankr. E.D. Mich. 2014):

> [N]ot caring whether some representation is true or false—the state of mind known as "reckless disregard"—is, at least for purposes of the provisions of the Bankruptcy Code governing discharge, the equivalent of knowing that the representation is false and material.
>
> *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998)(citations omitted)
> . . .
>
> In a recent bench opinion in *McDermott v. Schwenck*

15

*(In re Schwenck)*, this Court interpreted *Keeney* as requiring the Court to employ a "totality of circumstances" test to determine whether the "fraudulent intent" element of § 727(a)(4)(A) has been satisfied.  (*See* Docket # 30 in Adv. Pro. No. 13-4701 (Tr. of Opinion on Trustee's Mot. for Summ. J.) at 14-17.)  Under that test, a finding that a debtor had a "reckless disregard as to whether a representation is true," does not, standing alone, *require* the court to find that the "fraudulent intent requirement" of § 727(a)(4)(A) has been established.  Rather, whether a debtor had a "reckless disregard as to whether a representation is true," is one factor among others that a court may consider in determining whether to draw an inference of fraudulent intent on the part of a debtor.  *Id.*  In other words, the Court *may*, but

> is not required to make a finding of fraudulent intent solely because the plaintiff has shown a reckless disregard by the debtor as to truth, ultimately it's all the facts and circumstance that the Court must consider to determine whether the debtor is guilty of actual fraudulent intent and fraudulent intent under *Keeney* . . . mean[s] actual intent to defraud, such as an actual intent by the debtor to conceal, for example, an asset that the debtor wants to keep . . . for his or herself and not lose to the administration of the bankruptcy case by disclosing it.

(*Id.* at 17.)

This Court interprets *Keeney* and similar cases as permitting, but not requiring, a finding of fraudulent intent if the debtor is guilty of reckless disregard for the truth.  "[Fraudulent intent] can be found based on 'the cumulative effect of a series of innocent mistakes which evidence a pattern of reckless and

16

EXHIBIT 6, PAGE 88

cavalier disregard for the truth.'" [citations omitted].

*Wise*, 590 B.R. at 436-38.  *Wise* then discussed the concept of "reckless disregard" for the truth:

> In an analogous context, in *Bullock v. Bankchampaign, N.A.*, 133 S.
> Ct. 1754, 1759 (2013), the United States Supreme Court recently
> held that "defalcation" under 11 U.S.C. § 523(a)(4) must be treated
> similarly to the way "fraud" is treated in that section; that fraud
> requires a showing of "positive fraud, or fraud in fact, involving
> moral turpitude or intentional wrong;" but that an intentional wrong
> includes "not only conduct that the fiduciary knows is improper,
> but also reckless conduct of the kind that the criminal law often
> treats as the equivalent [of an intentional wrong];" and that reckless
> conduct for purposes of § 523(a)(4) is when a "fiduciary
> 'consciously disregards' (or is willfully blind to) 'a substantial and
> unjustifiable risk' that his conduct will turn out to violate a
> fiduciary duty").  *See also Shapiro v. Plante & Moran, LLP* (*In re
> Connolly North America, LLC*), 376 B.R. 161, 184 (Bankr. E.D.
> Mich. 2007) (citations omitted) (discussing levels of culpability in
> the context of a failure to comply with discovery obligations)
> ("'Reckless disregard' . . . is '[c]haracterized by the creation of a
> substantial and unjustifiable risk of harm to others, and by a
> conscious (and sometimes deliberate) disregard for or indifference
> to that risk.'")

*Wise*, 590 B.R. at 438.

## C.  Application of law to the facts of this adversary proceeding

### 1.  Denial of discharge based on § 727(a)(2)(A) — the 2018 tax returns

### a.  Transfer and concealment of the Debtors' property

The Trustee argues that the Debtors made pre-petition "transfers" of their property, and

"concealed" their property, when they filed their federal and state income tax returns for 2018,

containing the Debtors' election to apply their 2018 tax overpayments to their 2019 tax

liabilities.  The Court agrees.  The Debtors' tax elections easily fit within the broad definitions of

"transfer" and "conceal" adopted by Bankruptcy Code § 101(54) and the case law, discussed in

17

EXHIBIT 6, PAGE 89

Part III.B of this Opinion, above.

The Debtors' rights to receive federal and state tax refunds for 2018 clearly were "property" of the Debtors under § 727(a)(2)(A), and the Debtors do not argue otherwise. *See* cases cited in Part III.C.3.a of this Opinion, below. The Debtors made a "transfer" of their rights to receive the federal and state tax refunds, because they disposed of those rights. They did so because in effect they traded those rights in exchange for a credit against the next year's taxes. Put another way, the Debtors used their rights to 2018 tax refunds to make a payment to the two taxing authorities for 2019 taxes. *See, e.g.,* 26 U.S.C. § 6513(d);[21] Mich. Comp. Laws Ann.

---

[21] Section 6513(d) states:

> **(d) Overpayment of income tax credited to estimated tax.**--If any overpayment of income tax is, in accordance with section 6402(b), claimed as a credit against estimated tax for the succeeding taxable year, ***such amount shall be considered as a payment of the income tax for the succeeding taxable year*** (whether or not claimed as a credit in the return of estimated tax for such succeeding taxable year), and no claim for credit or refund of such overpayment shall be allowed for the taxable year in which the overpayment arises.

26 U.S.C. § 6513(d) (bold in original) (italicized bold added).

18

EXHIBIT 6, PAGE 90

§ 205.30;[22] Mich. Comp. Laws Ann. § 206.301.[23]

    Case law on this subject, cited by the Trustee,[24] supports the Court's conclusion that the

Debtors made a "transfer," and the Debtors have cited no case law to the contrary. *See United*

---

    [22]    Mich. Comp. Laws Ann. § 205.30 states, in relevant part:

    (1) The [Michigan Department of Treasury] shall credit or refund an
overpayment of taxes; . . .

    (2) . . . **If a tax return reflects an overpayment or credits in excess of
the tax, the declaration of that fact on the return constitutes a claim
for refund**. If the department agrees the claim is valid, **the amount of
overpayment**, penalties, and interest **shall be first applied to any
known liability** as provided in section 30a, **and the excess, if any**, **shall
be refunded to the taxpayer or credited at the taxpayer's request,
against any current or subsequent tax liability**. . . .

*Id.* (emphasis added) (footnote omitted).

    [23]  Mich. Comp. Laws Ann. § 206.301 requires certain taxpayers to make estimated income tax
payments.  Such payments must be made on a quarterly basis, or, in the alternative, in one annual lump
sum.  The annual lump sum must be paid when the taxpayer files their annual tax return for the prior
year.  This section states, in relevant part:

    Sec. 301. (1) Every person on a calendar year basis, if the person's
annual tax can reasonably be expected to exceed the amount withheld
under section 351 and the credits allowed under this part by more than
$500.00, **shall pay to the department installments of estimated tax**
under this part on or before April 15, June 15, and September 15 of the
person's tax year and January 15 in the following year. Subject to
subsection (3), each installment shall be equal to ¼ the taxpayer's
estimated tax under this part after first deducting the amount estimated
to be withheld under section 351.
    . . . .

    (5) **Instead of quarterly payments, a person subject to this section
may pay an estimated annual tax for the succeeding tax year. The
payment shall be made at the same time the person files the annual
return for the previous full tax year**.

*Id.* (emphasis added) (footnote omitted).

    [24]  The Trustee cited these cases in his trial brief (Docket # 99) at pdf pp. 6-8.

*States v. Sims* (*In re Feiler*), 218 F.3d 948, 955, 956 (9th Cir. 2000) (bankruptcy debtors' pre-petition tax election to carry forward net operating loss ("NOL") to offset future income, and to waive NOL carryback and resulting tax refund, was a "transfer" of a property interest to the IRS); *Gibson v. United States* (*In re Russell*), 927 F.2d 413, 418 (8th Cir. 1991) (same, regarding bankruptcy debtor's post-petition NOL election); *Kapila v. United States* (*In re Taylor*), 386 B.R. 361, 369 (Bankr. S.D. Fla. 2008) (same, regarding bankruptcy debtor's pre-petition NOL election).

The Debtors also "concealed" their rights to the 2018 tax refunds, because the Debtors placed their 2018 tax refunds beyond the reach of their creditors, other than the tax creditors. As noted above, concealment "includes . . . 'conduct, such as placing assets beyond the reach of creditors . . . .'" *Wise*, 590 B.R. at 430 (citations omitted); *see, e.g.*, *McDermott v. Recupero* (*In re Recupero*), No. 13-6089, 2014 WL 1884331, at *7 (Bankr. N.D. Ohio May 12, 2014) (bankruptcy debtors' pre-petition deposit of personal earnings into a corporate bank account was both a "transfer" and a "concealment" of the debtors' property under § 727(a)(2)(A)).

### b.  The intent element

The Trustee's objection to discharge under § 727(a)(2)(A) fails, however, because the Trustee did not meet his burden of proving that the Debtors' 2018 tax refund transfers were made "with intent to hinder, delay, or defraud" a creditor or the Trustee. To the contrary, the Court finds that the Debtors did *not* make the transfers with such intent.

There was no such intent with respect to the Trustee, nor does the Trustee contend that there was. There was no Chapter 7 Trustee in place as of March 31, 2020. The Debtors' bankruptcy case was not yet pending, and would not be pending until almost five months later.

There is no evidence that in March 2020 the Debtors intended to hinder, delay, or defraud a future Chapter 7 trustee, in a future bankruptcy case.

And there was no such intent with respect to any creditor.  The evidence persuades the Court that the Debtors' 2018 tax refund transfers were made with the sole intent of trying to insure that there would be enough money for the Debtors to pay their *2019* federal and state income taxes, to the Internal Revenue Service and the State of Michigan.  Such intent *does* amount to an intent to give preferential treatment to those two taxing authorities, which were creditors of the Debtors, compared to the treatment of other creditors.  But as a matter of law, a debtor's mere intent to prefer one creditor over other creditors cannot be deemed an intent "to hinder, delay, or defraud" a creditor or creditors, within the meaning of § 727(a)(2)(A).  *See ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 390, 391 (S.D. Texas 2008) (citations omitted) ("[A]n intent to prefer one creditor over others is not, standing alone, enough to prove that the debtor had the intent to hinder, delay, or defraud any creditors."); *Adamson v. Bernier* (*In re Bernier*), 282 B.R. 773, 781 (Bankr. D. Del. 2002) (citing *Equitable Bank v. Miller* (*In re Miller*), 39 F.3d 301, 307 (11th Cir. 1994) and 6 Collier on Bankruptcy ¶ 727.02[3][c] (15th ed. rev. 2000) ("The debtor's intent to prefer one bona fide creditor over another is not equivalent to intent to hinder, delay, or defraud creditors" under § 727(a)(2)(A).); *Kane v. Chu* (*In re Chu*), 511 B.R. 681, 685 (Bankr. D. Haw. 2014) (denying a trustee's summary judgment motion against the debtor under § 727(a)(2)(A), based on debtor's testimony that she made transfers with intent of making sure that "some favored creditors got paid.").

Construing the § 727(a)(2)(A) intent element in this way is consistent with the requirement that the § 727(a) grounds for denying discharge be "narrowly construed in

21

EXHIBIT 6, PAGE 93

furtherance of the Bankruptcy Code's fresh start policy.'" *Wise*, 590 B.R. at 429 (citations

omitted) (quoted in Part III.B of this Opinion). If in making a pre-petition transfer, a debtor's

mere intent to prefer one creditor over others were sufficient to deny discharge, that could

subject most or all debtors who merely made a pre-petition preferential transfer under 11 U.S.C.

§ 547 to a denial of their discharge. Section 727(a)(2)(A) cannot be construed so broadly.

The evidence supports the Court's finding that in making their 2018 tax refund transfers,

the Debtors merely intended to prefer their tax authority creditors over their other creditors.

It is undisputed that the Debtors began having serious financial problems at least as early

as August 2018, some two years before they filed bankruptcy. This was due to the Debtor Jason

Wylie suffering multiple and severe health problems, which began in 2014, when Jason had a

seizure and underwent surgery to remove a brain tumor.[25] Jason had more surgery in 2017, once

again to remove a brain tumor, and in 2018 had intestinal surgery. For his brain cancer he had a

year of chemotherapy and 42 rounds of radiation therapy. By August 2018, Jason could no

longer work due to his continuing health problems.[26] And he had to have colon surgery in

2019.[27]

Jason Wylie's health problems caused a significant decline in the income the Debtors

depended on to support themselves and their two teenage children. Before his health problems

began, Jason Wylie worked full time as an engineer for General Motors, and earned additional

---

[25] Tr. (Docket # 122) at 78 (Jason Wylie testimony). The Court will cite Jason Wylie's trial testimony (transcript at Docket # 122) as "Jason Wylie testimony at __."

[26] *See* Jason Wylie testimony at 77-79; Tr. (Docket # 123) at 25-26 (Leah Wylie testimony). The Court will cite Leah Wylie's trial testimony (transcript at Docket # 123) as "Leah Wylie testimony at __."

[27] *See* Jason Wylie testimony at 109.

22

income from farming.  He also owned and ran two small businesses — Wylie's Rental and

Excavating and Bliz Properties.  Wylie's Rental and Excavating rented out construction

equipment and did excavating work, and eventually evolved into a farming operation.[28]  Bliz

Properties acquired farmland from Jason's relatives, with family financing, and rental homes.[29]

Jason also acquired farmland from his relatives personally, again with family financing.[30]  The

Debtor Leah Wylie worked for a landscaping company.

     In his farming work and businesses, Jason had a significant amount of farm machinery

and equipment and vehicles, which had been financed with secured lenders.  And Wylie's Rental

and Excavating had 52 pieces of equipment listed on a depreciation schedule, most of which had

been financed.[31]

     On August 10, 2018, Jason had to stop working for General Motors.[32]  By the fall of

2018, Jason also had to stop operating his farming business, Wylie's Rental and Excavating,

Inc.[33]  And he was unable to harvest his own crops (corns and beans) in 2018; he had to pay two

other farmers to do so, in what turned out to be his last harvest.  This caused the Debtors a big

financial loss.[34]  These events left the Debtors with "very little, if any, cash coming in" and bills

---

[28]  *Id.* at 71-72, 79-80.

[29]  *See id.* at 73-75.

[30]  *See id.* at 74.

[31]  *See id*. at 77.

[32]  *See id.* at 5.

[33]  *See id.* at 5-6, 71-72.

[34]  *Id.* at 6, 83.

EXHIBIT 6, PAGE 95

to pay.[35] Beginning in 2018 and carrying over into 2019, several vehicles and all of the machinery and equipment had to be surrendered to, and were repossessed by, the Debtors' secured creditors.[36] And in 2019, Jason surrendered to his relatives several parcels of real estate that he had acquired from them.[37]

The Debtors stopped making payments on their several credit cards after September and October 2018.[38] The Debtors were able to pay to settle with only one of their credit card creditors.[39]

In addition to cooperating with the surrender/repossession of the vehicles, machinery, and equipment, the Debtors voluntarily used $70,000.00 of the proceeds from their 2018 crop harvest to partially pay an unsecured creditor, Napoleon Feed Mill.[40]

The Debtors were sued by several of their creditors.[41] According to their Statement of Financial Affairs, during the one year preceding their bankruptcy filing, the Debtors were parties to at least four collection lawsuits filed by creditors, as well as repossessions and numerous

---

[35] *Id.*

[36] *See id.* at 22-23 (2018 Chevrolet Silverado surrendered and sold by creditor; Skidoo repossessed by creditor and sold; 2017 Chevrolet Silverado surrendered and sold by creditor); Leah Wylie testimony at 27-29 (surrender and repossession of all the farm equipment; snowmobiles; two pickup trucks).

[37] *See* Jason Wylie testimony at 76; Leah Wylie testimony at 33-34.

[38] *See* Leah Wylie testimony at 10.

[39] *See id.* at 35.

[40] *See id.*

[41] *See* Jason Wylie testimony at 106.
garnishments by creditors.[42]

Against this backdrop of financial distress, the Debtors had to worry about their federal and state income taxes for 2018 and 2019. For many years, the Debtors had employed a tax accountant for tax preparation and advice, Steven Eshelman, who is a tax accountant with Greenstone Farm Credit Services. Mr. Eshelman had prepared the Debtors' income tax returns for the last 20-25 years.[43] As of September 2019, the Debtors had not yet prepared or filed their 2018 income tax returns, and had not yet determined what the amount of their 2018 tax liabilities were. Mr. Eshelman did not even start working on preparing the Debtors' 2018 tax returns until November 2019.[44] The 2018 tax returns were not timely filed because of Jason's health problems, and because Leah Wylie "was having difficulty getting everything around and ready for the tax preparation, dealing with everything else so everything was just delayed."[45]

In September 2019, the Debtors were concerned that they might have a significant tax liability for 2018, due, in part at least, to the fact that depreciated machinery and equipment had been surrendered to creditors and sold.[46] Mr. Eshelman advised the Debtors of this at the time.[47] At Mr. Eshelman's suggestion, in September 2019, the Debtors made estimated income tax

---

[42] *See* PX-27 at pdf pp. 57-59 (Statement of Financial Affairs at item nos. 9, 10).

[43] Tr. (Docket # 117) at 4-5 (Steve Eshelman testimony). The Court will cite Mr. Eshelman's trial testimony (transcript at Docket # 117) as "Eshelman at ___."

[44] *See* Eshelman at 57.

[45] *Id.*

[46] *See id.* at 58; *see also id.* at 78 (repossessions give rise to tax liabilities, potentially); Jason Wylie testimony at 84-85; Leah Wylie testimony at 39.

[47] *See* Eshelman at 70-72.

25

EXHIBIT 6, PAGE 97

payments for 2018, of $10,000.00 to the Internal Revenue Service and of $3,000.00 to the State of Michigan.[48]  According to Mr. Eshelman, these amounts were "mainly a shot in the dark," because he "had no figures to go by at that point as far as what [the 2018 tax liability] would be."[49]

By December 18, 2018, with their financial problems continuing, the Debtors retained their current bankruptcy attorney for advice and possibly for filing bankruptcy.[50]

By late March 2020, Mr. Eshelman had completed preparation of the Debtors' 2018 state and federal income tax returns.  The tax returns were complicated[51] and lengthy,[52] for a number of reasons, including the nature and number of income sources the Debtors had in 2018 and the repossessions and sales of depreciated assets that had occurred in 2018.  As noted earlier, the returns showed that the Debtors had overpaid their 2018 federal income tax by $21,317.00, and had overpaid their 2018 Michigan income tax by $17,956.00.

Despite these overpayments for 2018, the Debtors and Mr. Eshelman were concerned that the Debtors might have significant income tax liabilities for 2019, in part because there had been more sales that year than in 2018 of depreciated machinery and equipment.  As of March 2020 Mr. Eshelman did not know how large the Debtors' 2019 income tax liability might turn out to be.  It would be several months later before Mr. Eshelman was able to complete the preparation

---

[48]  *See* Eshelman at 15, 16; Leah Wylie testimony at 39.

[49]  Eshelman at 72.

[50]  *See* Jason Wylie testimony at 8-9; DX-B at pdf p. 9 ¶ 25.

[51]  Eshelman at 64.

[52]  The Debtors' 2018 federal income tax return was 48 pages long, and their 2018 Michigan income tax return was 13 pages long. (*See* DX-D at pdf pp. 5-52; DX-D at pdf pp. 53-65).

26

of the Debtors' 2019 tax returns.[53]

Mr. Eshelman explained why determining the tax liability on the Debtors' 2019 tax

returns was even more complicated than with the 2018 returns:

> Q.  [W]as the 2019 return more complicated than the 2018?
>
> A.  Yes.
>
> Q.  Why is that?
>
> A.  In the 2019 return, there were quite a few assets, either sales or
> repossessions with equipment.  It had depreciation taken on it, so I
> had to have gain or loss figured on each one of those assets either
> sold or repossessed.  And on real estate, there was land sold or
> repossessed that, I believe, previously had sold the development
> rights on, so the basis might've been adjusted because of that.[54]

Faced with this uncertainty, and owing a significant amount of debt to numerous

creditors, and knowing that they could not pay all of their creditors in full, and having been sued

by some of their creditors, the Debtors wanted to try to make sure they could pay their 2019

income taxes.  In order to try to insure that, the Debtors elected to apply their 2018 income tax

overpayments to their 2019 tax liabilities, rather than receiving tax refunds for those

---

[53]  The 2019 tax returns were prepared during the summer of 2020, in July and August 2020, and went through several drafts.  The returns were finalized on August 26, 2020, when Jason Wylie approved them and when the Debtors both signed off on them.  (*See* Eshelman at 73, 75, 37-38, PX-8 at pdf. pp. 1, 4-6).

[54]  Eshelman at 69.  Ultimately, the Debtors' 2019 federal income tax return was 93 pages long, while their 2019 Michigan income tax return was 16 pages long. (*See* DX-E at pdf pp. 10-102; DX-E at pdf pp. 106-121).

Jason Wylie testified that the task of helping prepare the 2019 tax returns "was overwhelming." (Jason Wylie testimony at 108).  Leah Wylie testified that the 2019 tax returns were "a lot more complicated" than the 2018 returns, "because a lot of the equipment and items were repossessed.  There were 50 things at different time frames with depreciation and gains and it was extremely complicated." (Leah Wylie testimony at 38).

27

overpayments.  And this is what the Debtors' long-time tax accountant, Mr. Eshelman, advised the Debtors to do.[55]

At the time, if the Debtors had received their $39,273.00 in 2018 tax overpayments as tax refunds, there was a risk that the Debtors would spend the money on living expenses, and possibly on paying other creditors.  There also was an obvious risk, well known to the Debtors' retained bankruptcy attorney advising the Debtors at the time, that creditors other than the tax creditors would try to collect their debts from the tax refund money, including by means of bank garnishments.

To try to prove the intent element of his objection to discharge, the Trustee relies heavily on an email exchange between Mr. Eshelman and Jason Wylie that occurred on the morning of March 31, 2020, just before Mr. Eshelman filed the Debtors' 2018 income tax returns.  The exchange began with an email from Mr. Eshelman to Jason Wylie, stating:

> Jason,
>
> I am done with your 2018 returns. With our offices shut down what I can do is e-mail you a client copy to review.  Each return will have a Form 8879 e-file authorization that is the 2nd or 3rd page printing. **The refunds on each return I credited toward [2019][56] as previously you and Leah mentioned you didn't want it refunded because creditors might go after it.**
>
> I just wanted to give you a heads up that I will e-mail those returns through our mimecast secure software today.  If you and Leah can print the Form 8879 for each return, sign it and scan it in and e-mail it to me or take a picture of it and e-mail it to me I will e-file the returns.

---

[55]  *See* Leah Wylie testimony at 57, 95-97.

[56]  Here the email says "2020," but Mr. Eshelman testified, and the parties agree, that this was a typographical error, and Mr. Eshelman meant to say "2019" here.  *See* Eshelman at 31.

28

EXHIBIT 6, PAGE 100

Thanks,

Steve[57]

Jason Wylie responded to this email later that morning, as follows:

Great.

Thanks.  I will look for the email[.]

Jason[58]

At first blush, the bolded part of Mr. Eshelman's email may seem like a "smoking gun,"

showing the Debtors' intent to hinder, delay, or defraud creditors.  The Trustee views it as such,

especially when combined with Jason Wylie's email response.  But in the Court's view, it

merely shows the Debtors' intent to give preferential payment treatment to their taxing authority

creditors.

The testimony of Mr. Eshelman and the Debtors' testimony fully support this conclusion.

Mr. Eshelman admitted that he wrote the March 31, 2020 email to Jason Wylie,[59] and Jason

Wylie admits that he "must have" received this email, and that he made the response quoted

above.[60]  But Mr. Eshelman explained the email this way:

> [The 2018 tax overpayments] were credited to 2019 because [the
> Debtors] were worried about having a lot of tax to pay, that's when
> all the equipment and land was sold or repossessed.  And they were
> worried if it was refunded that it might go somewhere else, and it
> wouldn't be able to be used for taxes.
> . . .

---

[57] PX-6 (emphasis added).

[58] *Id.*

[59] *See* Eshelman at 30-33.

[60] Jason Wylie testimony at 27.

29

EXHIBIT 6, PAGE 101

> [The Debtors] were worried about 2019 taxes because of the sale of
> the equipment and the property, and they were worried, and they
> wanted to make sure the taxes were paid.[61]

In March 2020, when the Debtors elected in their tax returns to have their 2018 tax overpayments applied to the Debtors's 2019 tax liabilities, it was certainly plausible that the Debtors believed that they needed to do this in order to make sure that their as-yet undetermined amount of 2019 income taxes would be fully paid. And the Court finds that this is in fact what the Debtors believed.

At the time, Mr. Eshelman discussed with the Debtors the option of them getting their tax refunds, and putting the money in a bank account to be used to pay 2019 taxes later:

> Q. And so, if they were concerned about 2019 taxes, they could have
> gotten a refund and then put the money in a bank account or put it
> anywhere they chose, and then later on paid the 2019 tax liability
> or the tax bill when it came due, isn't that true?
>
> A. Correct.
>
> Q. Do you recall any discussion with them about that option, about
> getting a refund and then holding on to it?
> . . .
>
> A. Yeah, . . . when the return was done, they wanted it credited
> towards the . . . 2019 return mainly to make sure that their taxes
> were paid. They were afraid if it was refunded, the money
> wouldn't be there to be able . . . to pay taxes for the next year.[62]

When questioned about why the Debtors elected to apply their 2018 tax overpayments to their 2019 taxes, Jason Wylie testified as follows:

> Q. What was the purpose in doing that?

---

[61] Eshelman at 33, 63-64.

[62] *Id.* at 77-78.

A.  Just like I stated before, because we had all those repossessions coming up, and if you look at my tax return there's, you know, almost $1 million of equipment all being repossessed, there's gains to be paid, and we didn't know what they would be.  So being safe, [the IRS is][63] like a creditor to me, so you don't want to double-cross IRS, so we were playing it safe by applying it to the '19 tax return.

Q.  Why didn't you just keep the money -- take the refund and keep the money in your bank account and if you had tax liability in 2019 or thereafter pay it with the money in your bank account?

A.  Because sometimes I spend it.

Q.  Is it also possible that creditors could have seized that money if it was in your bank account?

A.  I don't know.

Q.  You owed creditors a lot of money at the time you filed your 2018 tax return, correct?

A.  Yeah.

Q.  I believe that was March 31, 2020, you owed creditors money for at least a year and a half, correct?

A.  Yeah.

Q.  Were you worried that if you got a tax refund and put it in the bank they would seize your money?

A.  I was more worried about paying IRS than I was having my money tax taken out of my account.[64]

---

[63]  At this point in the transcript, the transcriber inserted "(unintelligible)."  *See* Jason Wylie testimony at 26 line 8.  But the Court has listened to the audio recording of the testimony, and there is nothing that is unintelligible at this point.  The Court has inserted the phrase in brackets at this point in the quotation, because that is what the witness said.  That is clearly audible from the audio recording, which is filed at Docket # 103, at the 3:51:53 mark.

[64]  Jason Wylie testimony at 26-27.

31

Similarly, Leah Wylie testified as follows:

> Q. . . . In regards to your 2018 tax return where you and your husband made an election to apply your tax overpayment to tax year 2019, why did you do that?
>
> A. Because we weren't sure whether we were going to owe taxes. I wanted to make sure our taxes were paid.
>
> Q. When you leave the money with the IRS or state of Michigan, do they pay you any interest?
>
> A. I have no idea.
>
> Q. If you would have received the tax refund you could have kept it in your bank account, correct?
>
> A. Yes. But my husband has brain cancer and over the last few years does not deal with money well in a bank account.
>
> Q. . . . You could have [taken] the tax refund and bought a certificate of deposit and received interest on your money, correct?
>
> A. I don't know what that even is, so I'm not sure.
>
> Q. The truth is, you were worried about creditors seizing your money if you received a tax refund. Isn't that correct?
>
> A. No.
> . . .
>
> A. I was worried that we were not going to have enough to pay our taxes. To me, taxes are part of bills, and if you don't pay your taxes I know the interest rates are extremely high and I wanted to make sure that we paid them. I know that if you get behind on your taxes, it's very hard to catch up. I wanted to make sure that didn't happen.[65]

Elaborating on Jason Wylie's testimony, Leah Wylie explained about her concern that if

they received the 2018 tax refunds, rather than applying them to their 2019 taxes, the refund

---

[65] Leah Wylie testimony at 13-14, 40.

EXHIBIT 6, PAGE 104

money would be spent and would not be available to pay the 2019 taxes:

> Q. You heard Mr. Wylie testify the other day that he said a concern he would have with the money being in his bank account is that he might spend it?
>
> A.  Exactly.  Which was why I had guardianship and conservatorship, and that was granted August 13th, a year ago, so of 2020.
>
> Q.  And prior to that time, were there ever occasions when Jason spent money and you didn't agree with the decision?
>
> A. Yes.  Part of his tumor location, he does not make very good decisions sometimes, and that is a definite scare to have any money in the account, which is why I have guardianship and conservatorship. . . .
> Q.  Is it possible that you discussed this concern, your concern over Jason's spending, with Steve Eshelman?
>
> A. Yes.  Absolutely.  I remember a conversation.
>
> Q.  You did speak to him about that concern?
>
> A.  Yes.
>
> Q.  And was your discussion with him related to any discussion of the possibility of getting a refund on the 2018 taxes and holding on to it and later using it to pay 2019 taxes?
>
> A. . . . I know that I didn't want the money sitting in our account in fear for Jason spending it.
>
> Q.  Are you saying you had a conversation with Steve Eshelman about this?
>
> A.  Yes.
>
> Q.  You were concerned that if you got a refund on the 2018 taxes and deposited in your bank account Jason might spend it?
>
> A.  Yes.

<div align="center">33</div>

> Q. Is it possible that when Mr. Eshelman sent the email to Jason
> saying there was a concern about getting a refund that what he was
> remembering is your discussion with him that your concern was
> that Jason might spend the money?

> A. I believe so, yes. [66]

Based on the evidence described above, including the testimony of each of the Debtors
and of their tax accountant Mr. Eshelman, all of which the Court finds credible, the Court finds
that the Debtors' only intent in making their 2018 tax refund elections was to try to make sure
that their taxing authority creditors would be paid in full for the 2019 taxes. The Debtors' intent
in taking this action was not to hinder, delay, or defraud creditors, but rather merely to prefer the
two tax creditors over their other creditors.[67]

For this reason, the Trustee has failed to prove a necessary element of his objection to the
Debtors' discharge under § 727(a)(2)(A). That objection fails.

**2. Denial of discharge based on § 727(a)(4)(A) — the alleged false oaths**

As described in Part III.A.1.c of this Opinion, the Trustee alleges that the Debtors made
false oaths, in the information they gave and failed to give about tax refunds owed to them, at
item no. 28 of the Schedule A/B they filed with their bankruptcy petition. And, the Trustee
alleges, the Debtors made a further false oath when they verified the accuracy and completeness

---

[66] *Id.* at 43-45.

[67] In support of the intent element of each of the Trustee's § 727(a) claims, the Trustee argues
that several "badges of fraud," and other circumstances, show that the Debtors had fraudulent intent. The
circumstances include alleged false statements in the Debtors' Schedule J and Statement of Financial
Affairs, and several allegedly fraudulent transfers of real estate made by the Debtor Jason Wylie to his
relatives, some of which transfers are the subject of other pending adversary proceedings. In this
adversary proceeding, the Court finds it unnecessary to resolve the disputes between the parties about
these things. The Court does not find these allegations by the Trustee persuasive or very relevant in this
particular case, which concerns only tax refunds.

34

EXHIBIT 6, PAGE 106

of their Schedule A/B, in their testimony at the first meeting of creditors.

The Court finds that in these instances, the Debtors did make false statements under oath about their tax refunds.  But the Trustee has failed to prove an essential element of his false oath claim under § 727(a)(4)(A), namely, the intent element.  The Trustee failed to prove by a preponderance of the evidence that the Debtors made these false statements "fraudulently," — that is, that the Debtors made the false statements "with fraudulent intent."  *See Wise*, 590 B.R. at 436, quoted in Part III.B.2 of this Opinion (quoting *Keeney v. Smith* (*In re Keeney*), 227 F.3d 679, 685 (6th Cir. 2000)).  To the contrary, the Court finds that the Debtors did *not* make these false statements with any fraudulent intent.

**a.  The Debtors made false statements under oath.**

The Debtors filed their Schedule A/B, along with their other schedules, on the same date as their bankruptcy petition, August 27, 2020.  The basic facts about the Debtors' Schedule A/B are described in Part III.A.1.c of this Opinion.  At item 28, the Debtors checked the box "Yes," that tax refunds were owed to them.  The Debtors stated that the value of tax refunds owed to them was "Unknown."[68]  The only other information the Debtors stated about tax refunds was this:

> Payment of $13,000 total, $10,000 to IRS and $3,000 to state of
> Michigan on October 2, 2019, towards estimated income tax
> liability.  2019 returns have not been filed.  Payment amount was
> estimated to equal the tax liability.[69]

The Debtors each signed and filed with their Schedules a declaration under penalty of perjury,

---

[68]  PX-27 at pdf p. 18.

[69]  *Id.*

35

EXHIBIT 6, PAGE 107

stating that "I have read the summary and schedules filed with this declaration and that they are true and correct."[70]

The Court finds that the following statements in Schedule A/B were false when made: (1) that the value of the tax refunds was "Unknown;" and (2) that the $13,000 in estimated tax payments made on October 2, 2019 (the "Payment amount") "was estimated to equal the tax liability."

It is true that the Debtors did not file their 2019 federal and state income tax returns until September 15, 2020, almost three weeks after filing their petition and Schedule A/B. But the Debtors' 2019 tax returns had been completed by their tax accountant, Steven Eshelman, and the Debtors had received copies of the returns *and* signed off on them, *before* they filed their petition and Schedule A/B. By 1:06 p.m. on August 26, 2020, Jason Wylie had reviewed the 2019 tax returns, and in an email to Mr. Eshelman at that date and time, Jason Wylie approved the returns.[71] This was the day before the Debtors filed their bankruptcy petition and Schedule A/B. Also, on August 28, 2020, Mr. Eshelman received from Jason Wylie the IRS form 8879 for 2019, which both of the Debtors had signed with a printed signature date of August 26, 2020.[72] That form 8879 is entitled "IRS *e-file* Signature Authorization," and that form authorized Mr. Eshelman's firm to electronically sign the Debtors' names to their 2019 federal income tax return, and electronically file that return.[73]

---

[70]  *Id.* at pdf p. 54.

[71]  *See* PX-8 at pdf pp. 1, 6; Eshelman at 37-38.

[72]  *See* PX-8 at pdf pp. 4-6; Eshelman at 39-42.

[73]  *See* PX-8 at pdf p. 4.

EXHIBIT 6, PAGE 108

The 2019 income tax returns that Jason Wylie reviewed and approved, and that the

Debtors signed off on, all on August 26, 2020, showed the exact amount of the Debtors' federal

and state income tax overpayments — namely, $20,798.00 federal and $20,736.00 state, for a

total of $41,534.00.  So the Debtors *did* know, when they filed their Schedule A/B on August 27,

2020, that they had a right to 2019 tax refunds, in these amounts.  And the Debtors both signed

their Declaration under penalty of perjury, verifying the truth of their Schedule A/B, on August

27, 2020.[74]  On that date, it was false for the Debtors to say that their right to tax refunds was

"Unknown."

It was also false for the Debtors to say in their Schedule A/B that the $13,000 in

estimated tax payments they made on October 2, 2019 (the "Payment amount") "was estimated

to equal the tax liability."  As described in Part III.C.1.b of this Opinion, it was at the suggestion

of the Debtors' tax accountant, Steven Eshelman, that the Debtors made these estimated income

tax payments for 2018, of $10,000.00 to the Internal Revenue Service and of $3,000.00 to the

State of Michigan.[75]  According to Mr. Eshelman, these amounts were "mainly a shot in the

dark," because he "had no figures to go by at that point as far as what [the 2018 tax liability]

would be."[76]  So it was false for the Debtors to say, in their Schedule A/B, that these estimated

tax payments were "estimated to equal the tax liability."

In their trial testimony, neither of the Debtors could explain why their statement at item

28 of their Schedule A/B, about tax refunds, was worded the way it was, but they both admitted

---

[74]  *See* PX-27 at pdf p. 54.

[75]  *See* Eshelman at 15-16; Leah Wylie testimony at 39.

[76]  Eshelman at 72.

37

EXHIBIT 6, PAGE 109

that it was inaccurate as of the date they filed Schedule A/B.[77]

The Debtors repeated these false statements about tax refunds under oath, on October 21, 2020, when they each testified at the § 341 first meeting of creditors that their Schedules were "truthful, accurate, and complete."[78]

### b. The Debtors' false oaths were not made with fraudulent intent.

The Court finds that the Debtors' false statements about their tax refunds, described above, were not made with any fraudulent intent. When the Debtors made those statements, they knew, and their attorney certainly knew, that the Debtors' 2018 and 2019 tax returns were going to be provided to the Trustee, promptly. And it was obvious, and the Debtors and their attorney knew, that those tax returns would reveal to the Trustee all of the exact and material details about the Debtors' rights to tax refunds. That persuades the Court that the Debtors could not possibly have intended to deceive or mislead the Trustee about their tax refunds when they made their false statements about them.

Shortly before or shortly after the bankruptcy petition and Schedule A/B were filed, the Debtors provided their bankruptcy attorney with their 2018 tax returns, knowing and intending that their attorney would provide those returns to the Trustee.[79] And the Debtors' attorney did provide those returns to the Trustee, on August 28, 2020, the day after filing Schedule A/B.[80]

---

[77] *See* Jason Wylie testimony at 33; Leah Wylie testimony at 19; *but see* Leah Wylie testimony at 52-54.

[78] *See* Tr. of First Meeting of Creditors (PX-1) at 5-6 (testimony of each of the Debtors); Jason Wylie testimony at 69.

[79] *See* Leah Wylie testimony at 54-55.

[80] This was the testimony of Thomas R. Morris, given on the third day of trial. There is no transcript of this testimony on file, but the Court's audio recording of this day of trial, including attorney

38

EXHIBIT 6, PAGE 110

Similarly, soon after the Debtors filed their 2019 income tax returns on September 15, 2020,

they gave the returns to their attorney, and sometime before September 30, 2020, their attorney

provided those returns to the Trustee.[81]  We know these things, not only from the testimony of

Leah Wylie and of her attorney, Thomas Morris, but also from the fact that during the first

meeting of creditors on October 21, 2020, the Trustee acknowledged that he had both the 2018

and 2019 federal income tax returns, and he asked the Debtors questions about them.[82]

Moreover, the December 11, 2020 demand letter from the Trustee's attorney to the Debtors'

attorney clearly shows that well before that date, the Trustee's attorney had the 2018 and 2019

tax returns.[83]

       In addition, the Debtors' attorney certainly knew, before he filed the Debtors' bankruptcy

petition and Schedule A/B, that the Debtors would be required to provide the Trustee with their

2018 and 2019 federal and state income tax returns.  It is routine and very common for Chapter 7

trustees in this district to investigate whether debtors are owed any tax refunds.  Trustees

_____

Morris's testimony, is filed at Docket # 109.  The Trustee presented no evidence contradicting this.  In his trial testimony on the third day of trial, the Trustee's attorney, Jeffrey Bigelman, testified that he had no personal knowledge of whether or when the Trustee received the Debtors' 2018 tax returns.  (Audio recording at Docket #109).

[81] *See* Leah Wylie testimony at 55, and citation in footnote 82, and testimony of Thomas Morris, third day of trial (audio recording at Docket # 109).  Thomas Morris testified that the 2019 tax returns were provided to the Trustee prior to September 30, 2020.  The Trustee presented no evidence contradicting this.  Instead, the Trustee's attorney, Jeffrey Bigelman, testified that he did not know when the Trustee received the Debtors' 2019 tax returns.  (Audio recording at Docket #109).  The Trustee himself did not testify at trial.

[82] *See* PX-1 at 7-9.

[83] *See* DX-A.  The Trustee's attorney, Jeffrey Bigelman, testified during the Trustee's rebuttal case on the third day of trial that it was not until January 5, 2021 that he learned that the Debtors' 2019 tax returns had been filed post-petition, on September 15, 2020.  (Audio recording at Docket # 109).

39

EXHIBIT 6, PAGE 111

routinely demand copies of debtors' tax returns. And in this case, 11 U.S.C. § 521(e)(2)(A)(i) required the Debtors to provide the Trustee, and any requesting creditor, with a copy of their 2018 federal income tax return, no later than 7 days before the first meeting of creditors.[84] That return showed the large federal tax refund that the Debtors had credited against their 2019 federal taxes. That return alone would certainly cause the Trustee to investigate the Debtors' tax refunds further, and to demand copies of all of the Debtors' 2018 and 2019 federal and state income tax returns. And if the Debtors did not voluntarily give the Trustee copies of all the tax returns, the Trustee easily could have obtained an order compelling the Debtors to do so, under Fed. R. Bankr. P. 2004.

All of this was very obvious to the Debtors' attorney, who is an experienced and knowledgeable bankruptcy attorney, before the bankruptcy case was filed.

For all of these reasons, the Court finds that the Debtors could not possibly have intended, and did not intend, to defraud or deceive the Trustee or anyone else, in making their

---

[84] This section states:

> The debtor shall provide—
>
> (i) not later than 7 days before the date first set for the first meeting of creditors, to the trustee a copy of the Federal income tax return required under applicable law (or at the election of the debtor, a transcript of such return) for the most recent tax year ending immediately before the commencement of the case and for which a Federal income tax return was filed; and
>
> (ii) at the same time the debtor complies with clause (i), a copy of such return (or if elected under clause (i), such transcript) to any creditor that timely requests such copy.

11 U.S.C. § 521(e)(2)(A). If the debtor fails to comply with these requirements, the Court "shall dismiss the case unless the debtor demonstrates that the failure to so comply is due to circumstances beyond the control of the debtor." 11 U.S.C. § 521(e)(2)(B).

40

false statements about tax refunds.  The Trustee has failed to meet his burden of proving the

fraudulent intent element of the Trustee's false oaths claim under § 727(a)(4)(A), so that

objection to discharge fails.

### 3.  Denial of discharge based on § 727(a)(2)(B) — the 2019 tax returns

### a.  Transfers of property of the bankruptcy estate

The Trustee argues that the Debtors made post-petition "transfers" of property of the

bankruptcy estate, when they filed their federal and state income tax returns for 2019, containing

the Debtors' election to apply their 2019 tax overpayments to their 2020 tax liabilities.  The

Court agrees.  The Debtors' tax elections were transfers they made on September 15, 2020,

almost three weeks after filing their bankruptcy petition, so the transfers were transfers of

property of the bankruptcy estate.  These tax refund elections, like the Debtors' pre-petition 2018

tax refund transfers, easily fit within the broad definitions of "transfer" adopted by Bankruptcy

Code § 101(54) and the case law, discussed in Parts III.B and III.C.1.a of this Opinion, above.

The Debtors' rights to receive federal and state tax refunds for 2019 clearly was

"property" of the Debtors under § 727(a)(2)(A), and therefore became property of the bankruptcy

estate the moment the Debtors filed their Chapter 7 bankruptcy petition on August 27, 2020.

The Debtors do not argue otherwise.

"It is well settled that tax refunds that the debtor is entitled to at the time of filing a

bankruptcy petition are the property of the estate."  *Dubois v. Guerrero* (*In re Guerrero*), 30 B.R.

463, 465 (N.D. Ind. 1983) (citations omitted); *see also Turshen v. Chapman* (*In re Turshen*), 823

F.2d 836, 838 (4th Cir. 1987) (citations omitted) (debtor's right to income tax refunds

"constituted property of the bankruptcy estate, title to which vested in the estate upon the filing

EXHIBIT 6, PAGE 113

of [the debtor's] Chapter 7 petition." ); *In re Lange*, 110 B.R. 907, 908-09 (Bankr. D. Minn.

1990) (Chapter 7 debtor had no right to file income tax returns post-petition that elected to apply

tax refunds to future tax year liabilities, because the tax refund rights were entirely property of

the bankruptcy estate); *Gibson v. United States*, 927 F.2d at 417-18 (bankruptcy debtor's post-

petition tax election, to carry forward net operating loss ("NOL") to offset future income and to

waive NOL carryback and resulting tax refund, was a post-petition transfer of property of the

bankruptcy estate); *United States v. Sims*, 218 F.3d at 955 ("the right to receive a tax refund is an

interest in property"); *In re Culp*, 641 B.R. 252, 253 (Bankr. E.D. Mich. 2021) (quoting *Aruj v.

Kohut* (*In re Araj*), 371 B.R. 240, 243 (Bankr. E.D. Mich. 2007)) (right to tax refunds are

property of the bankruptcy estate).

### b.  The intent element

The Trustee contends that in making the post-petition tax refund transfers (the "2019 Tax

Refund Transfers"), the Debtors made transfers of property of the estate "with intent to hinder,

delay, or defraud" the Trustee and/or creditors, so that the Debtors must be denied a discharge

under 11 U.S.C. § 727(a)(2)(B).  The Court finds that the Trustee met his burden of proving the

necessary intent element under this section, by a preponderance of the evidence.  The Court finds

that the Debtors made the 2019 Tax Refund Transfers with an intent to hinder the Trustee.

Initially, the Court notes that while the issue is the Debtors' intent, rather than the actual

effect of the Debtors' action, the 2019 Tax Refund Transfers *potentially* could have had *the

effect* of hindering and delaying the Trustee in his efforts to obtain the tax refund proceeds for

the bankruptcy estate.  Had the Debtors simply elected on their federal and state 2019 tax returns

to receive their overpayments as tax refunds, rather than electing to apply the overpayments to

42

EXHIBIT 6, PAGE 114

2020 taxes, the taxing authorities would have promptly paid the tax refunds.  Instead, they did

not pay the refunds until much later, as described below.  This had the potential of forcing the

Trustee to file adversary proceedings against the taxing authorities, to avoid the 2019 Tax

Refund Transfers under 11 U.S.C. § 549(a), as unauthorized post-petition transfers.  *See, e.g.*,

*Gibson v. United States*, 927 F.2d at 417-18 (discussing such a § 549 action by a Chapter 11

trustee).  The Trustee would have prevailed in such adversary proceedings, but the need to

prosecute such adversary proceedings would have delayed the Trustee in obtaining the tax

refunds, and cost the bankruptcy estate additional attorney fees in doing so.

But as it turned out, the Debtors' 2019 Tax Refund Transfers did not *actually* hinder or

delay the Trustee in obtaining the tax refunds, for the following reasons.

In this case, it turned out that § 549(a) adversary proceedings were not necessary.  This is

because the Debtors filed their *2020* income tax returns, sometime between March 26, 2021 and

April 5, 2021,[85] and their 2019 tax refunds were still intact, and their refunds for 2020 were

actually even  higher.[86]  And with their 2020 income tax returns, the Debtors elected to receive

the tax refunds, rather than try to apply them to 2021 taxes.  So the taxing authorities paid the tax

refunds, and the Trustee did not have to file § 549(a) avoidance actions.

In this case, another reason contributed to the result that the Trustee was not *actually*

hindered or delayed in getting the tax refunds belonging to the bankruptcy estate.  The Debtors

amended their Schedule C claims of exemption on January 21, 2021, to claim that the tax

---

[85]  *See* Eshelman at 54-55; citations in footnote 86 below.

[86]  *See* DX-F (2020 income tax returns) at pdf p. 7 (2020 federal income tax refund of
$24,863.00); pdf p. 76 (2020 Michigan income tax refund of $26,155.00).

EXHIBIT 6, PAGE 115

refunds were entirely exempt.[87]  The Trustee objected.  The Debtors' exemption claims were not

frivolous, but they were unsuccessful.  The Court sustained the Trustee's objection to the tax

refund exemptions on May 28, 2021, a decision later affirmed by the district court.  *See In re*

*Wylie*, 630 B.R. 68 (Bankr. E.D. Mich. 2021), *aff'd.*, No. 21-cv-11354, 2022 WL 2872240 (E.D.

Mich. July 21, 2022).

During the time the Debtors and the Trustee were litigating the claimed exemptions in

this Court the Trustee could not obtain the tax refunds, because of the pending exemption

claims.

Ultimately, after filing their 2020 tax returns, the Debtors received the tax refunds, in

June 2021, and then promptly paid them over to the Trustee on June 22, 2021.[88]

For this fortuitous combination of reasons, although the Trustee *potentially might have*

*been* hindered and delayed by the Debtors' 2019 Tax Refund Transfers, in reality the Trustee

was not *actually* hindered or delayed.

But it is the Debtors' *intent* in making their 2019 Tax Refund Transfers that matters.  As

noted in Part III.B of this Opinion, under § 727(a)(2) there is no requirement of "proof of harm,"

or that creditors or the Trustee "must have, in fact, been hindered, delayed or defrauded."  *Wise*,

590 B.R. at 429-30 (quoting *Smiley v. First Nat'l Bank of Belleville* (*In re Smiley*), 864 F.2d 562,

569 (7th Cir. 1989)).

---

[87]  Docket # 40 in Case No. 20-49216.

[88]  *See* Leah Wylie testimony at 55-56, 83, 85.  In the Trustee's Interim Report filed in the main
bankruptcy case on April 12, 2022 (Docket # 141 in Case No. 20-49216), the Trustee reported that he
received tax refunds totaling $45,174.98 from Leah Wylie, on June 22, 2021.  (*See id.* at pdf pp. 3, 6).
Some of this amount is for the 2020 tax year.  (*See id.* at pdf p. 3 column 1, line 36).

EXHIBIT 6, PAGE 116

The Court finds that the Debtors *did intend* to hinder the Trustee in making their 2019

Tax Refund Transfers.  This is shown by the testimony of the Debtors themselves.

Jason Wylie and Leah Wylie both admitted in their trial testimony that the purpose of

making their 2019 Tax Refund Transfers was the same kind of purpose they had when they made

their 2018 tax refund elections — to try to make sure that their *2020* taxes would be paid.[89]  As

the Court has discussed in Part III.C.1.b of this Opinion, this purpose is essentially a purpose to

prefer the Debtors' two taxing authority creditors (the Internal Revenue Service and the State of

Michigan) over their other creditors.  That is, the Debtors wanted to insure that their taxing

authority creditors were paid in full, for 2020 taxes, in preference to their other creditors, many

or most of which could not be paid in full.

In the post-petition context, the Debtors making a transfer of estate property with this

purpose is wholly inconsistent with the duties of the Chapter 7 Trustee.  This means that in

substance, the Debtors had, at a minimum, an intent to *hinder* the Trustee.  In the Debtors'

Chapter 7 bankruptcy case, the Chapter 7 Trustee would not and could not give the Debtors'

intended preferential treatment to these taxing authority creditors for 2020 taxes.  This is so for

several reasons.

First, because the Debtors filed their bankruptcy case mid-year, on August 27, 2020, only

some of their 2020 income tax liabilities even arguably accrued pre-petition, and the rest accrued

post-petition.  The entire 2020 income tax liability could not be paid by the Trustee in the

---

[89] *See* Jason Wylie testimony at 108; Leah Wylie testimony at 41 lines 12-20, 93-94.  Leah Wylie
tried somewhat to walk back her testimony about her intent, in testifying that she did not know that there
was a box checked on her 2019 tax returns to cause the 2019 overpayments to be applied to 2020 taxes.
*See id.* at 92.  But the Court finds more persuasive and credible Leah's initial, clear testimony about her
intent.  *Id.* at 41 lines 12-20.

45

EXHIBIT 6, PAGE 117

Chapter 7 case; at a minimum, the post-petition portion of the 2020 taxes could not be deemed an allowed claim in the bankruptcy case, and for that reason could not be paid. At most, only the arguably "pre-petition" part of the 2020 income taxes could be paid by the Trustee in the bankruptcy estate, and even that could be the subject of a legal dispute.

Second, even if all of the Debtors' 2020 income taxes could be considered as a pre-petition allowed claim in the bankruptcy case, no portion of the 2020 income tax liability would be a priority claim under 11 U.S.C. § 507(a). Section 507(a)(8) gives an eighth priority for certain income taxes, for example, but only for such income taxes "for a taxable year ending on or before the date of filing the petition." 11 U.S.C. § 507(a)(8)(A). That means the Debtors' taxable year of 2019, not 2020. So at most, such taxes could only be paid as non-priority unsecured claims, pro rata with all other such creditors.

Third, in any event, any claim by the taxing authorities for the Debtors' 2020 income taxes would be subordinate to the payment, in full, of all allowed administrative expenses of the Chapter 7 case, under 11 U.S.C. §§ 507(a)(2) and 726(a)(1).

Thus, the Debtors' intent that their 2020 income taxes be paid in full was at war with the priority and distribution scheme of the Bankruptcy Code, and with the Trustee's duty under 11 U.S.C. § 704 to follow that scheme in administering the assets of the bankruptcy estate, including the Debtors' rights to 2019 income tax refunds, which were property of the bankruptcy estate.

The Court assumes that the Debtors were not intimately familiar with the foregoing legal principles about bankruptcy distributions and priorities, although their attorney no doubt was. But the Debtors' actual subjective intent in transferring property of the bankruptcy estate, when

46

EXHIBIT 6, PAGE 118

they made their 2019 Tax Refund Transfers, still was, in substance, an intent to "hinder" the

Trustee.  *See* discussion of "intent to hinder" in Part III.B.1 of this Opinion ("hinder" means

"keep back, delay; impede; obstruct; prevent").

For these reasons, the Court finds that in making the 2019 Tax Refund Transfers, the

Debtors transferred property of the bankruptcy estate with intent to hinder the Trustee.  Based on

§ 727(b)(2)(B), therefore, the Court must deny each of the Debtors a discharge.  The Court will

enter judgment for the Trustee on this objection to discharge.[90]

## IV.  Conclusion

For the reasons stated in this Opinion, the Court will enter a judgment: (1) dismissing,

with prejudice, Counts I and III of the Trustee's First Amended Complaint; (2) granting

judgment for the Trustee on Count II of the First Amended Complaint; and (3) denying each of

the Debtors a discharge under 11 U.S.C. § 727(b)(2)(B).

---

[90]  In doing so, the Court rejects an argument made by the Debtors that the Trustee is guilty of unclean hands — "extortion" — for having made a demand in December 2020 that the Debtors pay the Trustee the tax refunds at issue by a deadline of December 18, 2020.  In the Trustee's demand letter dated December 11, 2020 (DX-A), the Trustee demanded payment, or a convincing explanation of the Debtors position regarding the tax refunds, and stated that if neither was received, "we will take action on December 18, 2020."  The letter did not specify what action would be taken (DX-A at pdf p. 2).  But the Trustee's attorney, Jeffrey Bigelman, testified that at the time of this letter, the Trustee contemplated possibly filing a turnover motion, or an adversary proceeding to avoid the 2019 Tax Refund Transfer as a fraudulent transfer.  According to Bigelman, after later learning on January 5, 2021 that the Debtors filed their 2019 tax returns post-petition rather than pre-petition, the Trustee decided to file this § 727 action, which the Trustee filed on January 14, 2021.  But the Debtors' attorney Thomas Morris testified that in a phone call preceding the letter of December 11, 2020, the Trustee's attorney threatened to file objections to discharge under § 727(a) if the tax refunds were not paid to the Trustee.

The Court finds it unnecessary to decide any possible factual disputes about the Debtors' unclean hands/extortion argument, because even under the Debtors' view of events, the alleged threat of a § 727 action was not "extortion," nor was it conduct that would make the Trustee guilty of having "unclean hands."  And the Debtors have cited no authority that such an unclean hands type defense can ever be a valid defense to an objection to discharge under Bankruptcy Code § 727.

47

**Signed on April 17, 2023**



/s/ Thomas J. Tucker

**Thomas J. Tucker**
**United States Bankruptcy Judge**

48

EXHIBIT 6, PAGE 120

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
870 Roosevelt, Irvine, CA 92620.

A true and correct copy of the foregoing document entitled: **NOTICE OF COMPENDIUM OF UNPUBLISHED AUTHORITY RE: PLAINTIFF'S POST-TRIAL CLOSING BRIEF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **May 10, 2023**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Bradford Barnhardt**    bbarnhardt@marshackhays.com, bbarnhardt@ecf.courtdrive.com,kfrederick@ecf.courtdrive.com
- **Jeffrey I Golden (TR)**    lwerner@go2.law, jig@trustesolutions.net;kadele@go2.law;C205@ecfcbis.com
- **D Edward Hays**    ehays@marshackhays.com, ehays@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendoza@ecf.courtdrive.com
- **Laila Masud**    lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**: On **May 10, 2023**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**DEBTOR AND DEFENDANT (VIA U.S. MAIL AND EMAIL TRANSMISSION)**
JAMIE LYNN GALLIAN
16222 MONTEREY LANE, SP #376
HUNTINGTON BEACH, CA 92649

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **May 10, 2023**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Honorable Scott C. Clarkson
United States Bankruptcy Court
Central District of California
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5130
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 10, 2023 | Layla Buchanan | /s/ Layla Buchanan |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**